1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE NO:   3:21-CR-22-MMH-MCR

UNITED STATES OF AMERICA,        Jacksonville, Florida

   -vs-                          March 15, 2021

KRISTOPHER JUSTINBOYER ERVIN,    2:02 - 3:06 p.m.;
                                 3:19 - 3:23 p.m.
        Defendant.
                                 Courtroom 5B
_____

**DIGITALLY RECORDED ARRAIGNMENT
AND DETENTION HEARING PROCEEDINGS**

BEFORE THE HONORABLE PATRICIA D. BARKSDALE
UNITED STATES MAGISTRATE JUDGE

<u>APPEARANCES:</u>

GOVERNMENT COUNSEL:

  **LAURA TAYLOR, ESQUIRE**
  United States Attorney's Office
  300 North Hogan Street, Suite 700
  Jacksonville, FL 32202

DEFENSE COUNSEL:

  **LISA CALL, ESQUIRE**
  Federal Public Defender's Office
  200 West Forsyth Street, Suite 1240
  Jacksonville, FL 32202

OFFICIAL COURT REPORTER:

  Katharine M. Healey, RMR, FPR-C
  PO Box 56814
  Jacksonville, FL 32241
  Telephone: (904) 301-6843

        (Proceedings recorded by electronic sound recording;
                    transcript produced by computer.)

|   |   |
|---|---|
| 1 | <u>P R O C E E D I N G S</u> |
| 2 | March 15, 2021                                              2:02 p.m.<br>- - - |

3      THE COURT:  Good afternoon.  We're on the record in

4  the United States vs. Kristopher Justinboyer Ervin.  It's Case

5  3:21-cr-22.

6      We have Assistant United States Attorney Laura Taylor

7  here for the United States.  Ms. Taylor, would you like to

8  introduce your agent for the record.

9      MS. TAYLOR:  Yes.  Should I stand or remain seated?

10      THE COURT:  You can stand.  I don't think there's

11  anyone on the telephone for this proceeding.

12      MS. TAYLOR:  Okay.  Yes, Your Honor.  With me is

13  Special Agent John Powley of the Bureau of Alcohol, Tobacco,

14  Firearms, and Explosives.

15      THE COURT:  Good afternoon.  We have Assistant

16  Federal Defender Lisa Call representing Mr. Ervin.  Good

17  afternoon, Ms. Call.

18      MS. CALL:  Good afternoon, Your Honor.

19      THE COURT:  And Mr. Ervin is present.

20      Ms. Taylor, is the United States prepared to go

21  forward with both the arraignment and the detention hearing?

22      MS. TAYLOR:  Yes, Your Honor.

23      THE COURT:  Ms. Call, is the defense?

24      MS. CALL:  Yes, Your Honor.

25      THE COURT:  Let's start with the arraignment, then.

1                Mr. Ervin, I'm going to ask you similar questions to
2      what I asked when we first met.  These are designed to assess
3      competency.  If you'll state your full name, please.
4                THE DEFENDANT:  My name is Kristopher Justinboyer
5      Ervin.
6                THE COURT:  How old are you?
7                THE DEFENDANT:  I'm 41.
8                THE COURT:  And remind me how far you went in school.
9                THE DEFENDANT:  I've been all the way through high
10     school with some college and --
11               THE COURT:  You can read, write, and understand --
12               THE DEFENDANT:  I like to read.
13               THE COURT:  -- English?
14               THE DEFENDANT:  Yes, ma'am.
15               THE COURT:  Okay.  In the past 24 hours have you had
16     any drugs, alcohol, medication, or any type of intoxicant?
17               THE DEFENDANT:  No, ma'am.
18               THE COURT:  Have you ever been treated for or
19     suffered from any mental illness, emotional disability,
20     anything like that?
21               THE DEFENDANT:  No, ma'am.
22               THE COURT:  Do you take prescription medication?
23               THE DEFENDANT:  No, ma'am.
24               THE COURT:  Do you clearly understand where you are,
25     what you're doing, and the importance of the proceedings?

1          THE DEFENDANT:  Yes, ma'am.

2          THE COURT:  Let's talk about the rights that you have

3    in this case.  You have a Constitutional right to remain

4    silent.  You don't have to make a statement.  You don't have to

5    give a statement at any time to any law enforcement agent.

6          If you do make a statement, what you say can be used

7    against you, including during later proceedings in this case.

8          If you made a statement in the past, you need not

9    make a statement in the future.

10         Do you understand this right?

11         THE DEFENDANT:  Yes, ma'am.

12         THE COURT:  You have the right to plead guilty, and

13   by doing so, admit the truth of the charges against you.  If

14   you did that, there would be no trial on your plea and the

15   court would find you guilty, convict you, skip the trial, and

16   ultimately proceed to sentencing.

17         You also have the right to plead not guilty and to

18   maintain a not-guilty plea.  If you plead not guilty you have

19   these rights under the United States Constitution and the other

20   laws of the United States:  You have the right to a trial by a

21   jury of 12 people.  If tried by a jury, all 12 of the jurors

22   would have to unanimously agree on your guilt before you could

23   be convicted.

24         You're presumed innocent.  The burden's on the United

25   States to overcome that presumption by competent and sufficient

1   evidence beyond a reasonable doubt.  You don't have a burden of

2   proving innocence.

3          At a trial, the witnesses for the United States would

4   have to come into court and testify in front of you.  You have

5   the right to confront them; see, hear, question, cross examine

6   them.

7          Of course, you have the right to present evidence and

8   witnesses in your defense.  If any defense witnesses refused to

9   come into court voluntarily, the court would issue orders to

10  make them come into court.

11         At a trial you'd have the right to choose whether to

12  testify.  The choice would belong entirely up to you.  No one

13  could force you to testify.  Conversely, no one could force you

14  to not testify.

15         We have something called the Speedy Trial Act in

16  federal court.  It requires that you be brought to trial within

17  a specified period of time.  It's typically 70 days.  There are

18  certain days that don't count toward those 70 days.  If you

19  have questions about those, you could talk to Ms. Call.  She

20  could answer any questions that you have about that.

21         Know that if you are convicted you have the right to

22  have a Court of Appeals, three judges in Atlanta, review the

23  rulings in this court to determine if your conviction,

24  sentence, or both, should be reversed as improperly obtained.

25         I went through those fairly quickly.  Do you have

1   questions about those rights?

2          THE DEFENDANT:  No, ma'am.  I understand.

3          THE COURT:  Since we last met in the courtroom, a

4   Grand Jury returned an indictment against you.  Did you get a

5   copy of that?

6          THE DEFENDANT:  Yes, ma'am, I have it right here.

7          THE COURT:  Okay.  Have you had time to talk to

8   Ms. Call about it?

9          THE DEFENDANT:  Yes, ma'am.

10         THE COURT:  Ms. Call, would you like the prosecutor

11  to formally read the indictment?

12         MS. CALL:  No, Your Honor.  We would waive the

13  indictment -- reading of the indictment and accept a summary.

14         THE COURT:  Thank you, Ms. Call.

15         Ms. Taylor, if you'll please review the charge with

16  Mr. Ervin and penalties that he faces if convicted.

17         MS. TAYLOR:  Yes, Your Honor.

18         Kristopher Justinboyer Ervin, you're charged in a

19  one-count Grand Jury indictment that on or about January 15th,

20  2021, you knowingly possessed a firearm, that is, a machine-gun

21  conversion device that is a machine gun as defined under

22  federal laws, and that it was not registered to you in the

23  National Firearms Registration and Transfer Record.

24         If you were to be convicted of this offense, you

25  would be facing a maximum term of imprisonment of up to ten

1    years, a fine of up to $250,000, or the court could impose

2    prison and a fine.  A term of supervised release of up to three

3    years could be imposed following prison.  And if you were to

4    violate the terms and conditions of the supervised release, you

5    could be sent back to prison for up to two years, and then a

6    new term of supervised release would be imposed.  And there is

7    a $100 mandatory special assessment.

8            Additionally, the indictment calls for the forfeiture

9    of any firearms involved in the violation; any aircraft,

10   vehicle, or vessel used to facility the transportation,

11   concealment, receipt, possession, purchase, sale, exchange, or

12   giveaway of any of those firearms.

13           THE COURT:  Thank you, Ms. Taylor.

14           Mr. Ervin, do you understand the general nature of

15   the charge against you?

16           THE DEFENDANT:  Yes, ma'am.

17           THE COURT:  And Ms. Taylor talked about various

18   penalties that you face if convicted.  Did you understand those

19   as well?

20           THE DEFENDANT:  Yes, ma'am.

21           THE COURT:  Ms. Call, is there any reason why

22   Mr. Ervin should not enter a plea at this time?

23           MS. CALL:  No reason, Your Honor.  And we would

24   tender a plea of not guilty to the indictment.

25           THE COURT:  Okay.  Mr. Ervin, the court will enter a

1   not-guilty plea on your behalf to the charge in the indictment

2   and talk about scheduling for a few minutes.

3        This case is assigned to two different judges.  We

4   have the Honorable Marcia Morales Howard is the district judge.

5   My neighbor, the Honorable Monte Richardson, is the magistrate

6   judge.

7        Ms. Call, is Mr. Ervin willing to accept discovery

8   under Judge Howard's standing discovery order?

9        MS. CALL:  Yes, Your Honor.  I've served the

10  government and tendered to the clerk a Notice of Acceptance of

11  General Discovery.

12       THE COURT:  Okay.  And I see it right here on the

13  bench.  Thank you.

14       Ms. Taylor, has the United States provided discovery

15  yet?

16       MS. TAYLOR:  Your Honor, I have not yet provided

17  discovery, and I would ask the court for a deadline of next

18  Wednesday for my discovery.

19       THE COURT:  Next Wednesday, which is March 24th?

20       MS. TAYLOR:  Yes, Your Honor.

21       THE COURT:  All right.  Judge Howard will conduct the

22  trial during the trial term beginning on May 3rd, 2021, at

23  9 o'clock a.m. in her courtroom, 10B.  She'll conduct a status

24  conference on April 19th of this year at 3 o'clock p.m. in her

25  courtroom, 10B.  Mr. Ervin, that's usually just attended by the

1  lawyers to decide scheduling, but Ms. Call will let you know if

2  your presence is required.

3          Discovery motions, dispositive motions, motions to

4  suppress, other non-discovery motions have to be filed by

5  April 12th of this year.  Because that deadline is quickly

6  approaching, if either side needs more time, simply file a

7  motion with Judge Howard for that.

8          Ms. Taylor, is the United States willing to provide a

9  reciprocal exchange of witness list and Jencks Act materials?

10  And if so, how many days before trial?

11          MS. TAYLOR:  Yes, Your Honor.  The United States

12  would stipulate to do so three business days prior to the start

13  of trial.

14          THE COURT:  Three business days.

15          Ms. Call, is that acceptable to the defense?

16          MS. CALL:  Yes, Your Honor.  We are willing to be

17  bound by the same stipulation.

18          THE COURT:  All right.  Thank you, Ms. Call.

19          I believe I read this at the initial proceeding, but

20  I'll read it again.  As required by Rule 5(f), the United

21  States is ordered to produce all exculpatory evidence to

22  Mr. Ervin pursuant to *Brady vs. Maryland* and its progeny.

23  Failing to do that in a timely manner may result in sanctions,

24  including the exclusion of evidence, adverse jury instructions,

25  dismissal of charges, and contempt proceedings.

1          Anything else on scheduling before we move to the

2    detention hearing, Ms. Taylor?

3          MS. TAYLOR:  No, Your Honor.

4          THE COURT:  Ms. Call?

5          MS. CALL:  No, Your Honor.

6          THE COURT:  Let's move, then, to the detention

7    hearing.

8          Ms. Taylor, is it still the United States's position

9    that Mr. Ervin should be detained?

10         MS. TAYLOR:  It is, Your Honor.

11         THE COURT:  All right.  You can proceed.

12         MS. TAYLOR:  May I stand at the podium, Your Honor?

13         THE COURT:  Yes.

14         MS. TAYLOR:  Your Honor, this is a case where the

15   United States seeks detention under Section 3142(f)(1) because

16   it is a case that involves the possession of firearms, and so

17   the United States is moving for detention based both on risk of

18   flight and danger to the community.

19         With regard to the nature and circumstances of the

20   offense, this case is particularly -- poses a particular danger

21   to the community because of the nature and circumstances of it,

22   which is that it involves the manufacturing and possession and

23   distribution by Mr. Ervin of a substantial number of

24   machine-gun conversion devices.

25         So these are items that Mr. Ervin was -- apparently

1    obtained a machine shop to engrave into metal -- thick metal

2    cards, which he then advertised on his website as bottle

3    openers or pen holders, depending on which version one was

4    purchasing.  Each card would have between one to three etchings

5    for what's called an auto sear or a lightning link on the card.

6              And an auto sear or a lightning link, those are two

7    terms for the same thing.  I'll just call them auto sears from

8    here on out.

9              The auto sears could be cut out of cards, placed into

10   an AR-15 style rifle, and then cause the rifle to perform as an

11   automatic -- fully automatic machine gun.  And so under federal

12   law, that is in itself a machine gun because the definition for

13   a machine gun under Title 26 includes any part designed and

14   intended solely and exclusively, or a combination of parts

15   designed and intended, for use in converting a weapon into a

16   machine gun, which is exactly what these are.

17             Some of the auto sears that Mr. Ervin was producing

18   contained cutouts from the middle of the device and some of

19   them did not.  So there's two different designs.  He charged

20   more for the ones that had the cutout out of the middle, which

21   would obviously be more difficult for an individual to, you

22   know, cut out themselves at home.

23             Special Agent Hooker and Postal Inspector Hannon both

24   conducted undercover purchases from Mr. Ervin via an online --

25   or, excuse me, via a mail-in ordering form.  The mail-in

1  ordering form suggested that payments, either money orders or

2  checks, could be made out to J. Ervin, which is, of course,

3  Mr. Ervin's middle initial.  And based on my investigation, he

4  does go by the name "Justin."  So "J. Ervin" would be

5  Mr. Ervin.

6           They used money orders to pay for these online orders

7  that were made out to J. Ervin.  And surveillance camera video

8  at the bank where Mr. Ervin does his banking showed that he

9  deposited those money orders into his account.  So he is the

10 one that was receiving payment and receiving the money that was

11 obtained as a result of this business.

12          Additionally, Mr. Ervin was surveilled on

13 February 22nd as he left his home.  He traveled to the post

14 office and he deposited a box containing 22 individual

15 envelopes were which indistinguishable from the envelopes that

16 the agents had received their purchases in.  And search

17 warrants were executed on each of those 22 packages, and each

18 one of them was found to contain one of these etched cards.

19          The device that Special Agent Hooker first purchased

20 on January 15th from Mr. Ervin was sent to an ATF expert, who

21 was able to cut the device out of the card in less than

22 45 minutes, place it into an AR-15, and the AR-15 did function

23 as a machine gun; that is, it expelled multiple bullets with a

24 single function of the trigger once the auto sear that

25 Mr. Ervin sold to Special Agent Hooker was placed inside of the

1  AR-15.

2          That design that Special Agent Hooker had purchased

3  was the design that did have the internal cutouts made.  So in

4  other words, if you think of it as, you know, a piece of metal

5  that's kind of rectangularish in design, it had a piece from

6  the middle that was cut out as well as part of the design of

7  the auto sear.

8          Mr. Ervin was using an online postage meter in order

9  to send these packages.  In the time frame that Mr. Ervin was

10  operating his business, that is, approximately from around

11  Thanksgiving of 2020, so end of November, through when he was

12  arrested a couple of weeks ago, he sent out approximately 1,300

13  packages, which the only devices -- the only items that he had

14  listed on his website were the cards, the auto key cards, which

15  are the metal cards with the auto sears etched onto them.  He

16  also had listings for a beanie hat and a T-shirt.

17          I asked Postal Inspector Hannon whether any of the

18  packages Mr. Ervin had sent out were consistent with being the

19  clothing items, and he stated that they were not.  A clothing

20  item would weigh more than the metal card.  And so each of the

21  packages that was sent out was consistent with having had the

22  metal card, not the clothing items, inside of it.

23          Each of them was sent out with a return address

24  associated with Mr. Ervin's website.  He had two websites.  One

25  was autokeycard.com.  I believe that that was the original

1  website that he set up.

2          ATF identified postings online, comments that appear

3  to be from Mr. Ervin where he stated that his initial website

4  may have been taken down.  He said it was a victim of cancel

5  culture and that that was what caused him to get the second

6  website, which was autokeycards.com, with an "s."

7          Ultimately, more recently, if one went to the

8  autokeycard.com without an "s" website and clicked there, it

9  would forward to the autokeycards.com with an "s."

10          Your Honor, ATF did obtain a search warrant for

11  Mr. Ervin's home as well as his automobile.  Those search

12  warrants were executed the same day that Mr. Ervin was arrested

13  on the criminal complaint in this case.

14          Inside of Mr. Ervin's home was a whiteboard that

15  contained quite a few different URLs that Mr. Ervin apparently

16  had purchased, in other words, domain names, and many of these

17  indicating Mr. Ervin's intention that these things be used as

18  machine-gun conversion devices.

19          And they're not direct, but for example,

20  nofullautoAR15.com is one of the URLs that's listed.

21          THE COURT:  Say that again, no . . .

22          MS. TAYLOR:  NofullautoAR15.  He also had

23  recycledgun.com.  Notagunpart.com.  I actually visited that

24  website, the notagunpart.com website, and it -- unfortunately

25  my PDF got a little jumbled because it doesn't quite display

1   the same, I guess we'll call it (unintelligible), but

2   essentially what was -- what is present on notagunpart.com is

3   multiple images that are firearms with a -- you know, a red

4   "not" symbol imposed on top of them.  And there's a sign that

5   says, "Notice:  No firearms allowed on premises.  No guns,

6   tasers, clubs, knives."  And then when you click on the -- if

7   you scroll down and you click, there's an "enter" button below

8   that.  And when you click the "enter" button it forwarded to

9   the autokeycards.com website.  So, I mean, he's plainly -- he's

10  putting this information out there in this kind of cute manner

11  of like:  Oh, this is not a gun part.  Go to my website where

12  you can buy a pen holder for, you know, $100.  But there's just

13  really no reason that anyone would be motivated to buy a piece

14  of metal with a hole cut in it and an auto sear etched on it to

15  hold a pen.  So it's an attempt to try and conceal what he's

16  really doing.

17          But our information also shows that a person named --

18  with the user name Justin Ervin was commenting on different

19  social media forums.  For example, the website Reddit hosts a

20  number of different discussion boards, one of which was

21  firearms, and an account that was -- with the name A Key Card

22  commented.  There was a posting made by another user

23  essentially saying the autokeycards.com website's been taken

24  down, and then this account, A Key Card, posted, you know,

25  "We're back up and running.  Here's a discount code."  So --

1   and that's in the firearms forum.  So -- you know, the whole

2   purpose of that forum is to discuss firearms.

3          Additionally, there are several YouTubers, including

4   one with the name CRS Firearms, that were promoting these

5   devices.  The individual who runs CRS Firearms is believed to

6   be a person who is a federal firearms licensee here in the

7   United States who owns a shop that sells various kind of home

8   goods resale items and also firearms.  He indicated in a video

9   that he posted that he had spoken to Mr. Ervin and was -- his

10  entire channel on YouTube is devoted to discussing firearms,

11  promoting firearms.  He runs a gun store.  The name of his

12  YouTube channel is CRS Firearms.  And he has multiple videos

13  where he's promoting these cards that are made by Mr. Ervin and

14  giving them away and indicates that he had discussed that

15  with -- discussed with Mr. Ervin doing those promotions.  So it

16  wasn't something that he was, you know, buying from Mr. Ervin

17  and then promoting them as firearms on his own, but, rather,

18  somebody who we understand Mr. Ervin had approached to promote

19  these things to firearms enthusiasts.

20         THE COURT:  "Promoting" is what?

21         MS. TAYLOR:  "Promoting" would include discussing

22  what they are, discussing how they can be used, telling

23  individuals who watch the video where one can purchase them.

24         THE COURT:  And how they can be used, the promotion

25  was you can use these to convert . . .

1          MS. TAYLOR:  Yes.

2          THE COURT:  Okay.  To a machine gun?

3          MS. TAYLOR:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MS. TAYLOR:  And Your Honor, frankly, there's just no

6    conceivable reason why anyone would pay the amount of money

7    that Mr. Ervin was charging for these items, which, again, are

8    simply a piece of sheet metal that's been cut out and has these

9    items etched on it, other than that they intended to use them

10   as machine guns.  Legitimate machine guns would start at

11   possibly $5,000 on the low end.  They are fairly rare.  It is

12   possible to have a legitimately registered machine gun;

13   however, all legitimately registered machine guns would have to

14   have been made before 1986, and so they're hard to come by.  So

15   people who want to have a machine gun and don't have the money

16   to get a legitimate one, their next option would be to do a

17   home conversion.  And certainly these items that Mr. Ervin was

18   making would facilitate that process for them.

19          I'm just trying to look here for what the pricing

20   range was, Your Honor, for the item.  For example, the items

21   that Special Agent Hooker purchased from Mr. Ervin on

22   January 15th was labeled AutoKeyCard 3-in-1 Pen Holder Edition.

23   So the Pen Holder Edition, again, would be the one that has the

24   machining through the middle of it.  And that was sold for $139

25   each.

1     Special Agent Hooker was able in his investigation to

2  identify the machine shop that was actually performing the

3  cutouts for Mr. Ervin.  He went and interviewed two of the

4  employees of the machine shop as well as the owner.  And

5  Special Agent Hooker learned through those interviews that

6  Mr. Ervin was paying perhaps around $5 per item to have these

7  made, so his profit margin, you know, for a $5 machined piece

8  of sheet metal versus what he was selling it for, you know, up

9  to $139 per item, is substantial.  So if somebody wanted to

10  just get a piece of -- you know, a credit-card-sized piece of

11  metal, they would pay much less than $139 for it.  The only

12  reason to pay that much would be because you wanted the auto

13  sear to be able to cut out for your firearm.

14     But -- but even at that price of $139 for a piece of

15  sheet metal with some etchings and cutouts on it, Mr. Ervin, in

16  the short period of time that he was operating the website,

17  that is, from approximately Thanksgiving until the beginning of

18  March, ran approximately $130,000 through his bank account, all

19  of which appears to be income that was generated by the sale of

20  these items.

21     Again, the postal inspector was able to see that

22  Mr. Ervin had created shipping labels for approximately 1,300

23  packages, so it appears that those items are -- you know, those

24  numbers are consistent, that he sold 1,300 orders' worth of

25  these items for a total of about $130,000.

1       Mr. Ervin then -- he was using a website called

2  Stripe to process the online orders.  And the agents were able

3  to see through a bank subpoena that, again, about $125,000 had

4  been deposited into his account.

5       IRS has interviewed some of the bank employees who

6  interacted with Mr. Ervin at the bank.  One of the bank

7  employees indicated that at one point on a date in December

8  that Mr. Ervin had approximately $60,000 in his account; that

9  he came to the bank requesting to withdraw all of the money in

10  cash, but he was told that he could not do that because the

11  bank did not have that amount of cash on hand, but the bank

12  could either give him a check or they could order the cash and

13  it would be ready for him at the end of the week.

14       Mr. Ervin was told, "You can have $10,000."  That was

15  the maximum that he could withdraw that day.  Mr. Ervin then

16  said that he wanted to obtain the $10,000, and then apparently

17  thought better of it and said "No, I want $9,000" instead.  And

18  then less than an hour later Mr. Ervin was at another branch of

19  the bank and withdrew an additional $5,000 in cash.  And

20  thereafter Mr. Ervin proceeded to conduct a series of

21  withdrawals on -- very close in time, you know, one day apart,

22  maybe two days apart, where he repeatedly withdrew

23  approximately $9,000 from the bank account in order to draw

24  that balance down.

25       And so it appears that Mr. Ervin, in addition to

1   engaging in this illegal business activity, was also engaging

2   in financial crimes in that he was structuring his withdrawals

3   from the account.

4          And frankly, Your Honor, there's $130,000 that went

5   into that bank account.  It was essentially drawn down to I

6   think less than $5,000 when Mr. Ervin was arrested.  When

7   Mr. Ervin was arrested, he had I believe it was $3,700 in cash

8   on his person, or in his vehicle that was in a bank envelope.

9   We were able to identify that he had purchased a piece of land

10  for approximately $35,000 in February; that he purchased a bus

11  for approximately $10,000 in February.  However, the remainder

12  of that cash, it's unknown where it is at this time.

13         I heard Mr. Ervin at one of the previous hearings in

14  front of Your Honor state that if he were to get out on bond,

15  he could get resources.  And he has not disclosed what these

16  resources are to the pretrial services officer.  So the

17  pretrial services officer -- first off, he stated he's only an

18  investor in the business, and that's just not borne out by

19  what's in the criminal complaint.  He was surveilled taking

20  these packages to the post office and dropping them off.

21  Search warrants were done on the packages.  The contents of the

22  packages were auto sear devices sold on his website.

23  Additionally, he was depositing the money orders that were used

24  for the mail-in order form at his bank in his name.

25         At this time we do have information that Mr. Ervin

1   may have been been employing other people in order to help him

2   with some of the final machining on the devices.  According to

3   the owner of the machine shop that had done the cutouts and the

4   etchings for Mr. Ervin, they did not know at the time they did

5   those what the devices were for.  They stated Mr. Ervin was

6   very cagey, didn't want to really say what they were for,

7   called them his artwork, and that in February Mr. Ervin had

8   come to the machine shop to complain about the quality of some

9   of the items.

10          And at that point the machine shop employees and

11  owner became suspicious of what he was doing; recalled that he

12  had worn a T-shirt that said "Auto Key Card" on it before;

13  Googled them; very clearly and immediately realized what the

14  devices were for based on what the internet search results

15  were; and that they then destroyed all of the items that they

16  still had that they had been manufacturing for Mr. Ervin.

17          Additionally, the owner of the shop stated that he

18  made arrangements with Mr. Ervin to meet him at another

19  location, and that he gave back Mr. Ervin $5,000 in cash that

20  Mr. Ervin had recently given him for more devices that the

21  machine shop was making for Mr. Ervin.

22          Special Agent Hooker has shown me three boxes,

23  probably 15 by 15, approximately, just piled high with these

24  devices cut up.  So the machine shop -- it was clear enough to

25  the machine shop owner once he Googled and saw the results,

1  which were all firearms related, and, you know, looked at the

2  items and figured out what they were, that they said, "I'm not

3  going to do business with you anymore."

4  　　　　But the machine shop owner also did confirm that

5  Mr. Ervin at one point had asked the machine shop if they could

6  perform some sanding of the devices after they were

7  manufactured.  Apparently the manufacturing etching process and

8  machining process creates a layer of carbon on top -- on the

9  surface of the devices.  And Mr. Ervin actually brought in

10  several -- or at least one belt sander that he had that he was

11  asking the machine shop to use to sand off that layer of

12  carbon.  The machine shop stated that they would not do that

13  because it was not financially profitable for them.

14  　　　　When the search warrant was executed at Mr. Ervin's

15  house, he had a number of these belt sanders that had different

16  grades or different grits of sandpaper loaded up on them so

17  that he could sand them down and get that layer of black off of

18  them.  So he was contracting with the machine shop to do -- you

19  know, cutting these things out of a piece of sheet metal,

20  performing the etchings, performing the internal cutouts, and

21  then he himself was finishing a portion of the manufacturing

22  process by sanding them.  And the evidence of that was inside

23  of his residence.

24  　　　　And we have received proper information that he was

25  engaging other people, including possibly his sister and a

1   friend of his, to assist him with some of that machining.  At

2   this time I do not know whether they were aware of exactly what

3   the devices were, but certainly to the extent that Mr. Ervin

4   involved other people in his offense, he was really the

5   ringleader here.  He was the one who had the website.  He was

6   the one who was mailing the items.  He was the one who was

7   taking the cash out of his bank account.

8          And again, at this point he has not been fully

9   forthcoming with the pretrial services officer about -- about

10  the business that he was generating.  He stated that he -- to

11  the pretrial services officer that he earned 20,000 to $30,000

12  last month and that he then returned all of the proceeds back

13  to the business, which is certainly not true because for one

14  thing we do know that he purchased a piece of land, he

15  purchased the bus.  But there's no evidence that he reinvested,

16  you know, over $100,000 into this business.  And there would

17  be, frankly, no need to because the cost to manufacture these

18  things is, you know, well under $10, and he was making a profit

19  of, you know, a thousand percent on every one of them that he

20  sold.

21         Mr. Ervin, when he was transported after his arrest

22  to the courthouse, he had invoked his right to counsel.  He was

23  not questioned by Special Agent Hooker.  However, Special Agent

24  Hooker did turn on a recording device in the event that

25  Mr. Ervin made any spontaneous statements, which he did.

1          Mr. Ervin stated while he was being transported that

2   he had over 37 websites.  So -- and he -- I believe he talked

3   about the notagunpart.com website specifically and essentially

4   expressed that this was his First-Amendment-protected speech

5   and that he didn't understand how it could be illegal.

6          So there's unexplained -- or unaccounted-for assets

7   that only at this point Mr. Ervin knows where they are, that he

8   seems to think that he can access not from within the jail but

9   he could access if he's out of the jail, which suggests that he

10  has hidden away assets in some location probably not in a bank.

11  He has not been straightforward with the pretrial services

12  officer about what he does, about where the money went.

13          Given that he does have these assets, he is a flight

14  risk.  He has the means to flee.  And given the nature and

15  circumstances of the offense -- and understanding that

16  Mr. Ervin's criminal history is very minimal, and that's in his

17  favor, but given the nature and circumstances of this offense,

18  I mean, Mr. Ervin knew exactly what he was doing.  He knew what

19  he was manufacturing.  He went, you know, full on in this

20  business of selling these illegal parts, marketing them through

21  YouTube channels that promote firearms, promoting them with

22  comments, providing discount codes for his website on videos,

23  you know, talking about the devices on firearms channels, going

24  on the Reddit website and posting, you know, discount codes in

25  there, in the firearms Reddit, and was making a substantial

1   amount of money engaging in this criminal activity, far more

2   than he has ever made legitimately.

3          Mr. Ervin stated that his last legitimate employment

4   was in 2011 to 2012, when he worked as a maintenance man for an

5   apartment complex.  So there's really -- given that he has not

6   been legitimately employed in nearly a decade, there's no other

7   explanation for his accumulating this mass of wealth in a short

8   period of time other than that it was through selling these

9   auto sear devices online.

10          Machine guns are regulated more heavily than other

11   kinds of firearms.  They are required to be registered because

12   they do pose a special risk to the community.  And Mr. Ervin

13   has just completely flouted the law on that and mailed these

14   devices out across the country.  ATF does have at least a

15   partial customer list I believe from the online mail meter that

16   Mr. Ervin used to ship the devices and identified I believe it

17   was eight multiple-purchase customers of Mr. Ervin's just here

18   in ATF's area of responsibility in Jacksonville.  So it's a

19   substantial number of devices that he's put out on the street.

20          Obviously the business was highly lucrative for him,

21   and he would have a strong incentive to try and find some way

22   to continue in engaging in it because he has no other

23   legitimate source of income for the past ten years and this was

24   massively profitable for him.

25          And so, Your Honor, I would submit to the court that

1    he is both a flight risk and a danger to the community.

2           I failed to note as well, Your Honor, that when the

3    search warrant for his residence was performed, it did appear

4    that he had invested some of the money from the business, from

5    the illegal business, into multiple rifles which were hung

6    along a wall in his house.

7           But this is what Mr. Ervin was doing for a living.

8    It's his only source of legitimate income.  He knows now,

9    perhaps, that he can't be quite as overt about it, but I'm sure

10   he also is aware of other channels that are more covert where

11   he could continue to promote these items if he so chooses to do

12   so.

13          Your Honor, I would also note just in terms of

14   Mr. Ervin's awareness and consciousness of guilt that he had

15   recently started promoting a revised version of the devices on

16   his website that he referred to as Gen 2.  And in the Gen 2

17   devices, the etchings for the auto sears were incomplete.  So

18   in other words, there was a straight line for part of the

19   rectangular shape that the middle of the straight line wouldn't

20   be etched at all.

21          And additionally, he marketed them as being made out

22   of a stiffer metal.  If one were purchasing these items simply

23   to stick it in your wallet, I don't know why a thinner versus a

24   thicker metal business card, as he called it, would be

25   advantageous.  But in terms of the revised design, the

1   disconnected line, to me, that suggests that Mr. Ervin is aware

2   that there's a line that he was crossing with the previous

3   model.  It's evidence of his consciousness of guilt that he

4   felt he needed to scale back his design and make it more

5   abstract in order to try and maintain its legality.  And that's

6   really the only plausible explanation for why he would start

7   disconnecting the lines and changing the design in that manner.

8   But at the same time, he was marketing it as being on a

9   thicker, more durable piece of metal, which suggests that he

10  was, perhaps, you know, trying to make a more durable auto sear

11  for his customers.

12          So, Your Honor, for all of those reasons, I would

13  submit that given the nature and circumstances of the offense,

14  Mr. Ervin's history of having no legitimate employment until

15  engaging in this illegal business, given the fact that he has

16  distributed what appears to be likely well in excess of a

17  thousand of these devices across the country in a short period

18  of time, and appears to be hiding assets that he could use to

19  flee, that he should be detained both on risk of flight and

20  danger to the community.

21          THE COURT:  Thank you.

22          Ms. Call.

23          MS. CALL:  Your Honor, may I stay seated for the

24  first part?

25          THE COURT:  Yes.

1          MS. CALL:  I just have a couple of questions.  May I

2     inquire of the government, Your Honor, first, under 3142(f)(1),

3     Ms. Taylor indicated that she was moving for detention on that

4     ground.  In subparagraph (E) it does say any felony that

5     involves the possession or use of a firearm or destructive

6     device as those terms are defined in Section 921.

7          Is that the provision on which the government rests?

8          MS. TAYLOR:  Yes, it is.

9          And I would note that in Section 921 -- it might take

10    me a second to pull this up -- Section 921(a)23 defines the

11    term -- and this is for -- that section, 921, defines what a

12    firearm is.  And in that section there's a definition for

13    "machine gun."  It says, "The term 'machinegun' has the meaning

14    given such term in Section 5844(b) of the National Firearms

15    Act."

16         So definitionally, these devices are a firearm under

17    Section 921.

18         THE COURT:  Do you have another question of

19    Ms. Taylor, Ms. Call?

20         MS. CALL:  Yes, Your Honor.  First, if I can follow

21    up on that point, 9 -- the Bail Reform Act -- 3142 says

22    "firearm or destructive device."  "Firearm" is defined in

23    paragraph (a)(3); "destructive device" in (a)(4); "machinegun"

24    then is (a)(23).

25         The Bail Reform Act, though, doesn't reference

1  "machinegun."  It's saying "firearm or destructive device."

2  MS. TAYLOR:  And a machine gun is a firearm under --

3  of design under Section 921.

4  MS. CALL:  Well, the term "firearm" means any weapon,

5  including a starter gun, which will or is designed to expel a

6  projectile; any frame or receiver for the weapon; the firearm

7  muffler or silencer; and a destructive device.

8  THE COURT:  Well, it sounds like, Ms. Taylor --

9  Ms. Call, you're attempting to make a legal argument that that

10  provision does not apply --

11  MS. CALL:  Yes, Your Honor.

12  THE COURT:  -- is that -- okay.  And I'll consider

13  that argument.

14  Ms. Taylor, you can -- while Ms. Call is presenting

15  her case, you can have some time to respond to that legal

16  argument.

17  MS. TAYLOR:  Yes, Your Honor.

18  THE COURT:  And Ms. Call, do you have other questions

19  outside of that for Ms. Taylor?

20  MS. CALL:  Yes, Your Honor.

21  You had indicated that the items that were purchased

22  and seized by Agents Hooker and Hannon were described on the

23  website as bottle openers and pen holders?

24  MS. TAYLOR:  That's correct.

25  MS. CALL:  And that the one that Agent Hooker sent to

1   the ATF for firearm testing, when Agent Hooker received it in

2   the envelope, were there any instructions or other paperwork

3   apart from the card itself?

4         MS. TAYLOR:  There was a card, I believe it was green

5   in color, that was contained with it, but it essentially was an

6   advertisement for the business.  It just said "auto" --

7   "autokeycard.com."  I do not believe it said anything about

8   firearms, and there were no instructions for how to cut it out.

9         However, I would state that instructions are really

10  not necessary to be included with it.  They can be readily

11  found online.  And the design is fairly simple.  It's just two

12  little pieces of metal.  All one has to do is follow the

13  etching and cut along the lines to cut it out.

14        MS. CALL:  And you proffered, I believe, Ms. Taylor,

15  that it took 45 minutes with a machine in order for the

16  firearms tester to take out part of the business card?

17        MS. TAYLOR:  That's correct.  It was less than

18  45 minutes.

19        MS. CALL:  I believe that the criminal complaint says

20  43 minutes, was that --

21        MS. TAYLOR:  I thought it said 38 minutes, but I may

22  be mis-remembering.

23        MS. CALL:  Was it -- in order to remove the card, the

24  firearms tester used the machine because it's not able to

25  simply push it out by hand; is that correct?

1       MS. TAYLOR:  That's correct, it has to be cut out.

2   And I believe the firearms officer who did the examination and

3   cut the device out of the card used a Dremel, which is a

4   commonly-available and inexpensive tool to cut the item out of

5   the card.

6       MS. CALL:  And if I'm understanding correctly, first

7   you said there were no other items for sale, and then you said

8   that there were clothing items for sale on the websites?

9       MS. TAYLOR:  On the website there also was advertised

10  a T-shirt and a beanie-style hat.  However, Postal Inspector

11  Hannon looked through the posting -- posted weights that were

12  on the electronic mail meter, and it was his opinion that none

13  of the packages that Mr. Ervin had sent out could have

14  contained a clothing item due to the weights that were listed

15  on the packages.

16      MS. CALL:  And are those autokeycard and autocard --

17  autokeycards.com shut down or removed at this point?

18      MS. TAYLOR:  They are.

19      MS. CALL:  You indicated that during the search

20  warrant there was a whiteboard of the names that are described

21  in the criminal complaint, and then it said "and others,"

22  correct?

23      MS. TAYLOR:  Here's a (unintelligible).

24      THE COURT:  What was that for the record, Ms. Taylor?

25  You said "here's a" what?

1      MS. TAYLOR:  Your Honor, I provided Ms. Call --

2  there's a photograph that shows part of what's written on the

3  whiteboard which I was relying on when making my presentation,

4  so I just provided her with a copy of the photograph of the

5  whiteboard.

6      THE COURT:  Thank you.

7      MS. CALL:  So in the top left corner it says "parody

8  video, question mark, question mark" and then goes down to it

9  looks like the word "copyright."  And all of this was already

10  written when the officers executed the search warrant?

11      MS. TAYLOR:  I'm not sure where you see "copyright,"

12  but yes, this is what the board -- as the board appeared when

13  they executed the search warrant.

14      MS. CALL:  That's the page that it was where you had

15  said there was a website called notagunpart.com?

16      MS. TAYLOR:  Correct.

17      MS. CALL:  It goes down, madebypatriots.com,

18  onlyforpatriots.com, fullmetaltrumppart.com,

19  ultimatetrumppart.com, autotrumppart.com?

20      MS. TAYLOR:  Correct.  And then there were

21  additional -- it's partially cut off in this particular

22  photograph, but sort of at the top middle there's another URL,

23  it says "Get Lit Lightning."  There are a few variations on

24  that particular URL.  And, of course, these items are known as

25  lightning links.  And so the fact that Mr. Ervin was also

1   obtaining website URLs containing the word "lightning,"

2   alternatively containing the word "gun," containing the word

3   "AR-15," containing the word "auto," would suggest that he knew

4   that these were for guns.

5           MS. CALL:  You had said that Mr. Ervin made a

6   spontaneous statement about First Amendment because you know

7   that he's held this out to be his artwork, correct?

8           MS. TAYLOR:  That is what he has held it out to be.

9   However, based on my research, the etching that was on the

10  devices is a -- it's not something that Mr. Ervin invented.  In

11  my Google searching I was able to find a manual describing and

12  dimensioning a lightning link of a very substantially similar

13  design to what Mr. Ervin was putting on these cards, which

14  would suggest it's not his original artwork.

15          MS. CALL:  In the Pretrial Services Report it

16  indicates that his closest family members here in town are his

17  father, brother, and sister.  Did each of them receive

18  subpoenas to testify at the Grand Jury?

19          MS. TAYLOR:  I'm not sure that it frankly would be

20  proper for me to disclose who's been subpoenaed to the Grand

21  Jury.  This is an ongoing investigation.

22          THE COURT:  Ms. Call, is there a reason for that

23  question?

24          MS. CALL:  Because what I have learned, Your Honor,

25  is that each of them have retained counsel and asked not to be

1    interviewed by me nor appear at the bond hearing.

2              THE COURT:  Okay.

3              MS. CALL:  And so I want to be able to convey that to

4    the court, that it's not they're walking away from Mr. Ervin --

5              THE COURT:  They're a little bit worried about --

6    okay.  I'll accept that without Ms. Taylor having to respond.

7              Any other questions for Ms. Taylor?

8              MS. CALL:  No, Your Honor.

9              THE COURT:  All right.  Thank you, Ms. Taylor.

10             Ms. Call.  And I think I understand the legal

11   argument you are trying to make, that Ms. Taylor is moving

12   under 3142 (f)(1), which talks about "firearm" as defined in

13   921, and then you look at the definition of "firearm" and it

14   has a discrete definition and then "machinegun" has a separate

15   definition.

16             MS. CALL:  Yes.

17             THE COURT:  Is that where you were going with that?

18             MS. CALL:  Yes, Your Honor, so that it would not

19   trigger the rebuttable presumption under (f)(1), but instead,

20   because it would be a burden on the government to show serious

21   risk that the person would flee or a serious risk that they

22   would obstruct justice, threaten or intimidate a witness, et

23   cetera, I --

24             THE COURT:  But doesn't that -- sorry to interrupt.

25   Doesn't that provision also talk about any other dangerous

1  weapon?  So even if you were correct on the definition of

2  "firearm," that machinegun is not included in that, wouldn't

3  that be included in "any other dangerous weapon" as defined in

4  921, or even not defined in 921?

5         MS. CALL:  Correct, because the 921 stops with

6  "firearm or destructive device."  And then "any other dangerous

7  weapon," because that doesn't have a definitional provision, I

8  would argue, Your Honor, that the charge here, not being

9  possession of a machine gun, like the thing itself, but as it's

10 described in the indictment, a machine-gun conversion device,

11 that that does not fall under even that broader definition of

12 "any other dangerous weapon."

13        THE COURT:  And regardless, there's no presumption,

14 right?  This is just what the government can go under?

15 Ms. Taylor wants to go under danger and failure to appear.  You

16 say she can only go under failure to appear?

17        MS. CALL:  Yes, Your Honor.

18        THE COURT:  But regardless, there's no presumption,

19 correct?

20        MS. CALL:  Well, I was thinking under (f)(1) that

21 this would be talking about the presumption.

22        MS. TAYLOR:  Your Honor, I don't think there's a

23 presumption.

24        THE COURT:  I didn't think there was a presumption,

25 but --

1          MS. TAYLOR:  I don't think there is, Your Honor.  I

2    was just arguing under (f)(1) for the offense that it -- that

3    it provides the ability to move based on danger and risk of

4    flight.

5          THE COURT:  Okay.  Well, Ms. Call, if you want to go

6    ahead and do your presentation and then I'll give Ms. Taylor a

7    chance to respond to your legal argument.

8          MS. CALL:  Yes, Your Honor.

9          THE COURT:  And Ms. Taylor can also look again at the

10   presumption, but that's -- I'm sort of on the same page as

11   Ms. Taylor, though, that there is no presumption.

12         MS. CALL:  Very well, Your Honor.

13         Your Honor, in this case I do not believe that the

14   government should prevail on its motion to detain Mr. Ervin and

15   that he should be released on bond conditions.

16         As noted in the Pretrial Services Report, he is a

17   lifelong resident of Northeast Florida, and that information

18   was verified by his family members when they were interviewed

19   by Pretrial Services.  His father is still employed.  He works

20   at a hospital company.  His brother is a JSO officer.  And his

21   sister also resides here in the Jacksonville area.

22         And the father owns the residence where Mr. Ervin

23   resides, and he indicated to Pretrial Services that that

24   address would be available to my client, Mr. Ervin, to continue

25   to reside at that residence and that it would be suitable for

1    location monitoring if needed by the court.  And public records

2    like DMV also verified that information.

3         THE COURT:  Now, he was -- there was some indication

4    in the Pretrial Services Report that his father was going to

5    serve as a third-party custodian, but I couldn't tell if he was

6    saying at the residence where Mr. Ervin was living or at

7    another residence.

8         MS. CALL:  Your Honor, so Mr. Ervin, Senior is a

9    widower, and so I think that he has at least a residence that

10   he's living at with a girlfriend, but -- and that's, quite

11   frankly, why I couldn't get into any other details with the

12   senior Mr. Ervin, is when I spoke him, he verified that he did

13   have counsel and had spoken to that person about the ongoing

14   nature of the investigation.  So I was not able to ask any

15   follow-up questions on where he would be residing if Mr. Ervin

16   were released by the court.

17        THE COURT:  And did he change his position after

18   getting counsel that he would be interested in serving as

19   third-party custodian?

20        MS. CALL:  The statement that he made was that all of

21   the family had been advised not to be at court.

22        THE COURT:  Okay.

23        MS. CALL:  Your Honor, where Ms. -- I was just going

24   to go through the Pretrial Services Report for a couple of

25   other comments.  Where Ms. Ervin had indicated -- I mean

1   Ms. Taylor had indicated that Mr. Ervin's quote was he is only

2   an investor, I would suspect that that may have -- he may have

3   said where he was the only investor.  And that's just a quick

4   typing-a-note problem.  And the reason I say that is because

5   the Pretrial Services Officer also had left one of the words

6   out of his trust and then was saying that they were unable to

7   locate or verify the ownership of the property.  I looked it up

8   under the full name of the trust and located the property.  And

9   I believe that Pretrial, as the court noted, has now an

10  addendum to that.  It does indicate that recently Mr. Ervin had

11  purchased a five-acre lot in Columbia County.  And so just the

12  fact that there was a word left out of the trust was -- made it

13  unavailable.  But, in fact, that is verified.

14          Further verification that Pretrial was able to do on

15  the public records was the fact that Mr. Ervin's LLC is

16  registered appropriately under the Florida Department of State.

17  It comes up as a public record on SunBiz.

18          Ms. Taylor had indicated that Mr. Ervin had last

19  maintained full-time employment about ten years ago or so.  He

20  proffered to me that he at that point had undergone a break-up

21  in a relationship, lost his employment, moved back home, and he

22  was the caregiver to her -- his mother until she passed a

23  couple of years ago.  And so he stayed in the family home,

24  helped take care of Dad and helped assist his father so that he

25  could have full-time employment and that he took care of his

1    mother.

2          And then in 2018 and '19 Mr. Ervin had two health

3    issues come up.  He had abdominal surgery on a hernia and -- I

4    forgot the other name of it.  He had another serious sort of

5    abdominal surgery and an upper abdominal hernia.  Those were

6    operated in 2018-'19.  And he said the recovery on those was

7    quite extensive.  So that all explains why he was not employed

8    during that time period.

9          Your Honor, as the Pretrial Services Report notes,

10   though, and now he verified the employment, the property

11   records, he purchased the Chevy tour bus for about $10,000, the

12   land for about $30,000, and indicated that he had purchased

13   several items to convert the bus into an RV.  So wiring,

14   air-conditioning, things that would go inside it to convert it

15   from being more of a bus into being more of an RV-type

16   property, and that he had spent money on the land installing a

17   well, doing land-clearing and that, in fact, when the search

18   warrant was executed, there was another person there with him

19   because they had rented a small backhoe to further do work on

20   the property.  So that's other money that would have gone into

21   both the bus and the land.  So there isn't money that would be

22   largely unaccounted for, especially considering the other

23   business expenses.

24         Although Ms. Taylor says the cost of machining the

25   parts may have been about $5, there was purchase of the

1  physical cards themselves, office supplies, like the envelopes

2  and postage, postage meter, in addition to the machining

3  expenses.  So it's not simply that it was $5 to $129 or $139.

4          Mr. Ervin has no passport, so he doesn't have the

5  ability to travel internationally.  And as Ms. Taylor had

6  indicated, there is -- he has no felony convictions.  It looks

7  like there was a worthless check charge that was dropped about

8  17 years ago.  And then the only other was a case where he had

9  an adjudication withheld on a house party 20 years ago.  But to

10 that extent, he obeyed the court proceedings and there's no

11 information that he failed to appear or otherwise missed court.

12         Your Honor, although Ms. Taylor disparages the idea

13 that this is artwork or that this would be anything other than

14 being able to remove these, if the court has ever had

15 experience of going to firearm shops or gun shows, there's

16 often a great deal of collateral stuff that goes along with

17 that.  Many of the gun shops sell purses, jewelry, other

18 knickknacks that go along with firearms and could be, you know,

19 artistic if you look at them in that way.

20         And then the last comment I had on the proffer was

21 there's a great deal of information that Ms. Taylor proffers

22 about what other people said, but Mr. Ervin doesn't have any

23 ability to control what people put on the internet about him,

24 and therefore that should not be something that gets held

25 against him.

1          And so, Your Honor, if you look at Mr. Ervin's lack

2    of record and his stable residence, because even taking the

3    fact that he hasn't worked for several years, he has been at

4    the same address for many years, that is a family property

5    that's available to him, and the ability for the court to

6    monitor his whereabouts, I don't believe that he is, in fact, a

7    risk of flight, and that the other conditions that the court

8    could set with requiring pretrial supervision would address any

9    issues of ongoing danger.

10          THE COURT:  All right.  Thank you.

11          Ms. Taylor, would you like to respond to anything

12   Ms. Call said as well as her legal argument?

13          MS. TAYLOR:  Yes, Your Honor.  Your Honor, I'm not

14   sure what LLC Ms. Call is referring to.  I'm aware on SunBiz

15   there is an LLC called Enterprise 27 which was registered

16   several years ago to Mr. Ervin and to his father.  And that one

17   is not the LLC -- or was not related to this particular

18   business.  So I'm not sure if she's thinking of some other LLC

19   that I'm not aware of or if that's the one that she's referring

20   to.

21          THE COURT:  Is that it, Ms. Call?

22          MS. CALL:  Your Honor, I have too many pieces of

23   paper going here.  Your Honor, this is a printout.  I only have

24   this copy, but I can provide that to Ms. Taylor.  There are

25   four that are attributed to Kristopher J. Ervin, and one of

1    those is Enterprise 27 but the others are not.

2            THE COURT:  When you were -- Ms. Call, when you were

3    talking about it, you were referring to one LLC.  Was there one

4    in particular on that list, or you might have been referring to

5    multiple ones?

6            MS. CALL:  The Free Speech -- Free Speech Industries,

7    LLC --

8            THE COURT:  Okay.

9            MS. CALL:  -- because if the court recalls from the

10   criminal complaint, that was described as one of the third

11   web- -- or the third website that was located by law

12   enforcement.

13           THE COURT:  Okay.  Thank you.

14           MS. TAYLOR:  Your Honor, I'll also -- Ms. Call also

15   noted several business expenses that she thought might have

16   accounted for the other I think it's $85,000 of cash that

17   Mr. Ervin has amassed as a result of this offense.  The actual

18   physical metal -- sheet metal material that the cards were made

19   out of were supplied by the machine shop, so there's no

20   additional cost for him to acquire the metal that was then

21   machined into the cards.  The costs that I was discussing, it

22   includes all of the machining that was done on the cards.  The

23   only additional cost that Mr. Ervin would have would be his

24   labor costs to sand them at his home as he finished the

25   manufacturing process on them.

1        Your Honor, in terms of the legal argument on whether

2   these things are firearms as defined under Section 921, Your

3   Honor, again, I am moving based both on danger and risk of

4   flight, but I would also state that this is an "other dangerous

5   weapon" not confined by the definition in Section 921.

6        Certainly these devices are dangerous weapons.

7   Congress has so defined them to be machine guns.  The ATF

8   Firearms Technology Branch has analyzed them and determined

9   that they can readily be converted and inserted to an AR-15 and

10  cause it to function as a machine gun.  And there are special

11  regulations that are applied to these types of devices, to

12  lightning links and auto sears, because of this special danger

13  that they pose to the community.  And so I would argue that it

14  does fall under that "other dangerous weapon" catchall, but I

15  would also argue that it is clearly intended -- that Section

16  921 definition of a firearm would include machine guns because

17  it's -- Section 921 defines a firearm to include any weapon

18  which will or is designed to or readily may be converted to

19  expel a projectile by action of explosive; the frame or

20  receiver of any such weapon; any firearm muffler or firearm

21  silencer; or any destructive device.  And the only exclusion is

22  it does not include an antique firearm.

23       And then it specifically includes an additional

24  definition of "machinegun," which references the definition

25  under Title 26.

```
 1              THE COURT:  That's separate from "firearm."

 2              MS. TAYLOR:  However, a machine gun is a firearm as

 3    defined under this section because the machine gun is a weapon

 4    which will or is designed to be converted to expel a

 5    projectile.

 6              THE COURT:  And I think Ms. Call's point was that's

 7    true for a machine gun itself but not for a conversion device.

 8    You just disagree with that argument, I take it?

 9              MS. TAYLOR:  I do, Your Honor.

10              THE COURT:  Okay.

11              MS. TAYLOR:  I unfortunately don't have a case that

12    would, you know, elaborate on that particular point --

13              THE COURT:  Okay.

14              MS. TAYLOR:  -- but that's my view, Your Honor.

15              THE COURT:  Okay.  Do you know how courts have

16    defined "or any other dangerous weapon"?

17              MS. TAYLOR:  I do not, Your Honor.

18              THE COURT:  Okay.

19              MS. TAYLOR:  And additionally, Your Honor, there

20    is -- for whatever the reasons may be, there's no third-party

21    custodian that's been presented to the court today that might

22    help overcome some of the concerns that the court may have

23    about releasing Mr. Ervin.

24              Mr. Ervin's father is not living at that residence

25    that -- I think it's 2409 Kirkwall Court, the residence where
```

1  Mr. Ervin was living.  My information is that Mr. Ervin's

2  father was living in a separate residence with his girlfriend,

3  and essentially Mr. Ervin was the only one living in that home.

4       Mr. Ervin's father has apparently decided based upon

5  advice of counsel that he should not become involved as a

6  third-party custodian in this case.  And so absent a

7  third-party custodian, I would submit that there's no

8  conditions -- I don't know that a third-party -- that there is

9  a third-party custodian that would render acceptable conditions

10 for the court, but here there is none to even consider.  And

11 so, Your Honor, I would argue that Mr. Ervin must be detained

12 on these -- based on these circumstances.

13      THE COURT:  Thank you.  I'm going to take a brief

14 recess, between five and ten minutes.  So I'll be back on the

15 record at that time.  Thank you.

16      COURT SECURITY OFFICER:  All rise.

17   (A recess was taken from 3:07 p.m. to 3:19 p.m.)

18      COURT SECURITY OFFICER:  All rise.

19      THE COURT:  All right.  We're back on the record in

20 Mr. Ervin's case.  It looks like Mr. Ervin's still here,

21 counsel is present.  So I have some findings to make.

22      Ms. Call, let me first address your legal argument,

23 which I think is really interesting.  It's never been brought

24 up before.  Of course, this crime is not charged very often,

25 but I found it very interesting.  I think the "other dangerous

1   weapon" part encompasses this, and so that will be my finding,

2   that the government can go under danger and flight.  If after

3   this hearing you find contrary authority, if you can present a

4   motion for reconsideration on that point.  But I did quick

5   research, it was so fast, I'm sure I missed something, but in

6   the short time that I have looking at the "other dangerous

7   weapon," this appears to satisfy that broad category.  That

8   being the case, I did find the government satisfied its burden

9   at least as to danger to the community.

10          The risk of flight, I found the government did not

11  satisfy its burden because Mr. Ervin has close family ties.

12  His brother and sister did appear at the initial proceeding to

13  support him.  That does show a strong family support.  And his

14  father, at least until counsel got involved, was going to

15  support him.  In addition to that, he's a lifelong resident to

16  Jacksonville.  In addition to that, the maximum penalty in this

17  case is ten years, and he's still a young man.  It would be

18  unusual for someone under these circumstances to flee,

19  especially if the court ordered electronic monitoring.

20          As far as danger, the government did satisfy its

21  burden.  Among other things that I'll just talk about, but I'll

22  put this in a more articulate written order after I leave the

23  bench, no current job or source of income; no real history of

24  working.  There was an explanation for that failure, but be it

25  as it may, there's no history of working, at least recent

1  history.  No one mentioned drug abuse, but that is out there as

2  well.  Mr. Ervin is a user of illegal drugs.  The nature and

3  seriousness of this offense is high for all the reasons

4  Ms. Taylor said.  1,300 packages that the government contends

5  will be used to convert a legal firearm into an illegal one,

6  especially a machine gun, makes this a very serious offense

7  that's alleged against Mr. Ervin.

8          The evidence in the United States's case is fairly

9  overwhelming, I would say, and shows, at least according to the

10 government's proffer, some real risk-taking by Mr. Ervin.

11         There's no third-party custodian, again, leaving

12 Mr. Ervin to his own devices and having no one watch over him,

13 that's a factor in the decision as well.  And certainly there's

14 at least some sort of network out there with whom Mr. Ervin has

15 a relationship with.

16         So that's my decision.  Ms. Taylor, is there anything

17 else we can do today?

18         MS. TAYLOR:  No, Your Honor.

19         THE COURT:  Ms. Call, anything else we can do?

20         MS. CALL:  No, Your Honor.

21         THE COURT:  All right.  Thank you.  Court's in

22 recess.

23         COURT SECURITY OFFICER:  All rise.

24     (The proceedings concluded at 3:23 p.m.)

25                         -    -    -

```
1              CERTIFICATE OF OFFICIAL COURT REPORTER
2    UNITED STATES DISTRICT COURT)
3    MIDDLE DISTRICT OF FLORIDA )
4
5         I, court approved transcriber, certify that the
6    foregoing is a correct transcript from the official electronic
7    sound recording of the proceedings in the above-entitled
8    matter.
9
10        DATED this 25th day of March 2022.
11
12                      /s/ Katharine M. Healey
                        Katharine M. Healey, RMR, FPR-C
13                      Official Court Reporter
14
15
16
17
18
19
20
21
22
23
24
25
```