<pre>
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
 2                  JACKSONVILLE DIVISION

 3  UNITED STATES OF AMERICA,      Case No. 3:21-cr-22(S4)-MMH-MCR

 4        Plaintiff,               April 11, 2023

 5  v.                             9:05 a.m. - 5:27 p.m.

 6  KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
    and MATTHEW RAYMOND HOOVER,
 7
          Defendants.
 8  _____

 9
                            JURY TRIAL
10                        (VOLUME 2 of 9)

11
           BEFORE THE HONORABLE MARCIA MORALES HOWARD
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20        Katharine M. Healey, RMR, CRR, FPR-C
          PO Box 56814
21        Jacksonville, FL 32241
          Telephone: (904) 301-6843
22        KatharineHealey@bellsouth.net

23

24                        (Proceedings reported by stenography;
                          transcript produced by computer.)
25
</pre>

1                        A P P E A R A N C E S

2

3    COUNSEL FOR THE GOVERNMENT:

4    **LAURA C. TAYLOR, ESQUIRE**
     **DAVID MESROBIAN, ESQUIRE**
5      United States Attorney's Office
       300 North Hogan Street, Suite 700
6      Jacksonville, FL 32202

7

8    COUNSEL FOR DEFENDANT ERVIN:

9    **ALEX KING, ESQUIRE**
       Monroe & King, P.A.
10     1805 Copeland Street
       Jacksonville, FL 32204
11

12
     COUNSEL FOR DEFENDANT HOOVER:
13
     **ZACHARY Z. ZERMAY, ESQUIRE**
14     Zermay Law
       1762 Windward Way
15     Sanibel, FL 33957

16   - A N D -

17   **MATTHEW LAROSIERE, ESQUIRE**
       6964 Houlton Circle
18     Lake Worth, FL 33467

19

20

21

22

23

24

25

1            I N D E X

2                                              PAGE

3  GOVERNMENT'S WITNESSES:

4  **SPECIAL AGENT JESSE HOOKER**

5   DIRECT EXAMINATION (CONTINUED) BY MS. TAYLOR........... 7

6   CROSS-EXAMINATION BY MR. ZERMAY........................ 222

7   CROSS-EXAMINATION BY MR. KING.......................... 240

8

9

10

11

12

13            E X H I B I T S

14  ADMITTED IN EVIDENCE                          PAGE

15   GOVERNMENT'S EXHIBIT 17.2A............................ 208

16   GOVERNMENT'S EXHIBIT 48.............................. 16

17   GOVERNMENT'S EXHIBITS 50A-50F........................ 31

18   GOVERNMENT'S EXHIBITS 50G-50I........................ 32

19   GOVERNMENT'S EXHIBITS 50J and 50K.................... 32

20   GOVERNMENT'S EXHIBITS 50L-50P........................ 37

21   GOVERNMENT'S EXHIBITS 51 and 52...................... 100

22   GOVERNMENT'S EXHIBITS 53 and 54...................... 65

23   GOVERNMENT'S EXHIBITS 58A-58D........................ 53

24   GOVERNMENT'S EXHIBITS 67 and 67A-67CCC............... 105

25   GOVERNMENT'S EXHIBITS 74-88.......................... 212

1                         E X H I B I T S

2  RECEIVED IN EVIDENCE                                    PAGE

3    GOVERNMENT'S EXHIBITS 89 and 89A-89I................... 161

4    GOVERNMENT'S EXHIBITS 90 and 90C-G..................... 170

5    GOVERNMENT'S EXHIBIT 90A............................... 171

6    GOVERNMENT'S EXHIBIT 90B............................... 170

7   GOVERNMENT'S EXHIBIT 90H............................... 170

8   GOVERNMENT'S EXHIBITS 91 and 91A-91N.................. 176

9   GOVERNMENT'S EXHIBITS 92 and 92A-92K.................. 188

10  GOVERNMENT'S EXHIBIT 96............................... 75

11   GOVERNMENT'S EXHIBIT 102.............................. 43

12   GOVERNMENT'S EXHIBITS 103 and 103A.................... 38

13   GOVERNMENT'S EXHIBIT 104.............................. 43

14   GOVERNMENT'S EXHIBIT 110.............................. 165

15   GOVERNMENT'S EXHIBIT 112.............................. 148

16   GOVERNMENT'S EXHIBIT 118 and 119...................... 212

17

18

19

20

21

22

23

24

25

1                      P R O C E E D I N G S

2     April 11, 2023                              9:05 a.m.

3                          -   -   -

4          (All parties present.  Jury not present.)

5          COURT SECURITY OFFICER:  All rise.  The United States

6     District Court in and for the Middle District of Florida is now

7     in session.  The Honorable Marcia Morales Howard presiding.

8          Please be seated, everyone.

9          THE COURT:  All right.  We're back on record in

10    Case No. 3:21-cr-22(S4)-MMH-MCR, United States of America vs.

11    Kristopher Justinboyer Ervin and Matthew Raymond Hoover.

12          Ms. Taylor and Mr. Mesrobian are here on behalf of

13    the United States, along with Agent Slosson.

14          Mr. King is here with Mr. Ervin.

15          Mr. Zermay and Mr. Larosiere are here with

16    Mr. Hoover.

17          Are we ready to go, Ms. Taylor?

18          MS. TAYLOR:  Yes, Your Honor.  Special Agent Hooker

19    is in the courtroom ready to take the stand.

20          I did have one sort of housekeeping matter to ask the

21    Court about.  This is related to Thursday afternoon.  Our

22    office has the Law Enforcement Awards ceremony that I'm giving

23    out two awards for, so if there is any chance that we could --

24    that I can get 15 minutes during the normal break time to run

25    downstairs and give out the two awards that I'm giving out, I

1  would appreciate being able to do that.  Or I might possibly be

2  able to do it while Mr. Mesrobian is presenting a witness.  But

3  I just wanted to put that on the Court's radar.  If it's not

4  going to be possible, I can ask somebody else in my office to

5  be prepared to make the presentations.

6          THE COURT:  I usually try to break around 12:30.  I

7  break for -- depending on the -- whether we're going fast or

8  slow, I break for an hour, an hour and 15 minutes.  If you can

9  do it in that time, if it's not a problem, or if the witness is

10 Mr. Mesrobian's and you want to be absent, unlike the

11 defendant, we can proceed in your absence for a few minutes.

12 But I don't think I can ask the jury to wait --

13         MS. TAYLOR:  Yes, Your Honor.

14         THE COURT:  -- for that.

15         MS. TAYLOR:  I will -- I will let them know that I --

16 that I will try -- that I will likely need to go first so that

17 we can try and fit it into the lunch break.

18         THE COURT:  Okay.

19         MS. TAYLOR:  Thank you, Your Honor.

20         THE COURT:  All right.  Agent Hooker, would you

21 return to the witness stand.

22         And let's get the jury in.

23         I'm assuming you have nothing to bring up?

24         MR. KING:  Nothing, Your Honor.  Thank you.

25         THE COURT:  And did you have an opportunity to review

1    the evidence?

2              THE WITNESS:  We did, Your Honor.

3              MR. KING:  Yes, Your Honor.

4              MR. ZERMAY:  Yes, Your Honor.

5              MS. TAYLOR:  Your Honor, should I stay here or go to

6    the podium?

7              THE COURT:  You can go ahead, get yourself together

8    at the podium.

9              COURT SECURITY OFFICER:  All rise for the jurors.

10        (Jury enters, 9:10 a.m.)

11             COURT SECURITY OFFICER:  Please be seated.

12             THE COURT:  Good morning, ladies and gentlemen.  We

13   are continuing this morning with the evidence in

14   Case No. 3:21-cr-22(S4)-MMH-MCR.

15             Ms. Taylor, you may proceed.

16             MS. TAYLOR:  Yes, Your Honor.

17             Special Agent Hooker, you are still under oath.

18             THE COURT:  Pardon me.

19             You understand that you're still under oath, sir?

20             THE WITNESS:  Yes, ma'am.

21             THE COURT:  Go ahead.

22             MS. TAYLOR:  Thank you, Your Honor.

23         **SPECIAL AGENT JESSE HOOKER, GOVERNMENT WITNESS,**

24                     **PREVIOUSLY SWORN,**

25             DIRECT EXAMINATION (CONTINUED)

1    BY MS. TAYLOR:

2    Q.    Yesterday we were talking about the second undercover

3    purchase that you had made in this case related to auto key

4    cards, correct?

5    A.    Yes.

6    Q.    And you also had mentioned that you were working with a

7    postal inspector.  And what was his name?

8    A.    Keith Hannon.

9    Q.    And do you know whether he made an undercover purchase?

10   A.    Yes, he did.

11   Q.    And do you know how he paid for that undercover purchase?

12   A.    With a Postal Money Order.

13          MS. TAYLOR:  Ms. Ganoe, if we could please have

14   Exhibit 95A, page 75.

15   BY MS. TAYLOR:

16   Q.    Do you know whether Inspector Hannon was using an alias or

17   an undercover name to make his purchase?

18   A.    Yes, he was.

19   Q.    And do you know what that name was?

20   A.    Richard Carter.

21          MS. TAYLOR:  Ms. Ganoe, could we zoom in on the top

22   part, top two.  Yes.

23   BY MS. TAYLOR:

24   Q.    And do you see anything on this page, which was

25   Exhibit 95A, page 75, related to Inspector Hannon's purchase?

1  A.   I see a Postal Money Order in the amount of $230.  And

2  it's a little blurry, but I think it says from R. Carter.

3  Q.   And does it have an address -- a shipping address in

4  Savannah, Georgia?

5  A.   It does.  It's a P.O. Box.

6  Q.   And is that R. Carter -- that's the name Inspector Hannon

7  was using?

8  A.   Yes.

9  Q.   And does it indicate that this Postal Money Order was

10  deposited at any particular place?

11  A.   Community First Credit Union of Florida.

12  Q.   And does it indicate the date that it was deposited?

13  A.   February 3rd, 2021.

14  Q.   And time?

15  A.   4:09 p.m.

16  Q.   You previously, yesterday, testified about Exhibit 94,

17  that that was a surveillance video that you had obtained from

18  Community First Bank.  Correct?

19  A.   Yes.

20       MS. TAYLOR:  And Ms. Ganoe, could we have Exhibit 94.

21       (Video played.)

22  BY MS. TAYLOR:

23  Q.   And we started with -- the video is playing from the

24  beginning.  Do you recognize any particular vehicle or person

25  that's in this first part of the video?

1  A.   A silver Honda SUV.  Mr. Ervin is exiting the vehicle,

2  walking towards the front door of the credit union.

3  Q.   And how do you recognize that as being Mr. Ervin?

4  A.   Based on my prior surveillances and interactions with him.

5  Q.   Did he have any particular item of attire that you

6  observed him wearing repeatedly during your investigation?

7  A.   He wore a pair of sunglasses, white in color.

8  Q.   Is he wearing them in this video?

9  A.   Yes.

10 Q.   Was he also wearing them in Exhibit 93, which was the

11 surveillance video from the deposit of your undercover money

12 order?

13 A.   I believe so, yes.

14      MS. TAYLOR:  And Ms. Ganoe, could you advance the

15 video to 1 minute, 53 seconds.

16      (Video played.)

17 MS. TAYLOR:

18 Q.   What's happening at this point in the video?

19 A.   Mr. Ervin is approaching a teller, removing items from his

20 pocket.

21 Q.   And then what does he do?

22 A.   Signs what appears to be two items.

23 Q.   Are they -- do they appear to be paper?

24 A.   Yes.

25 Q.   And then what does he do with the two items?

1    A.    He's going to slide them to the teller.

2              MS. TAYLOR:   And if we could advance the video to

3    3 minutes and 30 seconds.

4         (Video played.)

5    BY MS. TAYLOR:

6    Q.    What's happening at this part of the video?

7    A.    He's awaiting, I believe, U.S. currency being provided to

8    him by the teller.

9              MS. TAYLOR:   And if we can advance it to about

10   4 minutes.

11        (Video played.)

12   BY MS. TAYLOR:

13   Q.    What's happening at this point in the video?

14   A.    He's walking out of the lobby.

15   Q.    And what's the time stamp on the video now?

16   A.    4:40 and 54 seconds p.m.

17   Q.    And just before that time stamp, Mr. Ervin walked close to

18   a surveillance camera, correct?

19   A.    Yes.

20   Q.    And you were able to recognize him?

21   A.    Yes.

22   Q.    Do you recognize Mr. Ervin in the courtroom today?

23   A.    Yes.

24   Q.    Could you please describe him.

25   A.    He is wearing I think a blue suit jacket and blue tie.

1    Q.    And is he sitting at a particular table in the courtroom?

2    A.    He's sitting at the first table with his attorneys.

3          MS. TAYLOR:  Your Honor, I would ask that the record

4    reflect that Special Agent Hooker has identified Mr. Ervin.

5          MR. KING:  We would so stipulate, Your Honor.

6          THE COURT:  The record will so reflect.

7    BY MS. TAYLOR:

8    Q.    At some point in your investigation did you participate in

9    any surveillance of Mr. Ervin?

10   A.    Yes, I did.

11   Q.    And what day was that?

12   A.    February 22nd, 2021.

13   Q.    And what did you observe on your surveillance?

14   A.    I observed Mr. Ervin's silver Honda SUV parked in the

15   driveway of the 2409 Kirkwall Court residence.

16          Later in the surveillance I observed Mr. Ervin

17   driving to the U.S. Post Office in Orange Park, Florida.  I

18   observed him exit his vehicle with a cardboard box that

19   contained numerous white padded mailing mailers and walk into

20   the post office.

21   Q.    Were you able to tell whether those mailers appeared

22   consistent with the two that you had received as a result of

23   your undercover purchases?

24   A.    Yes, they appeared to the same type of envelope.

25   Q.    Why were you conducting surveillance of Mr. Ervin?

1   A.   We were trying to ascertain if he was manufacturing the

2   devices at his residence and if he was the person mailing the

3   devices.

4   Q.   And did there -- during the time that you were surveilling

5   him, you said that he took some items into the post office?

6   A.   Correct.

7   Q.   And did he -- did you observe him leave the post office?

8   A.   He did.

9   Q.   And did he go anywhere else that was pertinent to your

10   investigation?

11   A.   Yes.  Later in the day he drove to an area in Orange Park,

12   an industrial area.  The road was call Industrial Loop.  We

13   unfortunately lost surveillance of him in that area on that

14   day.

15   Q.   And during the time that you surveilled Mr. Ervin on

16   February 22nd, did it appear that anyone was assisting him?

17   A.   No.

18   Q.   Was there anyone who appeared to be with him?

19   A.   No.

20   Q.   You've mentioned that he -- he had departed from the 2409

21   Kirkwall Court address.  Did you obtain a warrant -- a federal

22   warrant to search that residence?

23   A.   Yes.

24   Q.   Did you also obtain a federal warrant to search

25   Mr. Ervin's vehicle?

1    A.    Yes.

2    Q.    Was that the same silver Honda SUV?

3    A.    Yes.

4    Q.    When were those warrants executed?

5    A.    On March 2nd, 2021.

6    Q.    And did you personally participate in any of those

7    searches?

8    A.    Yes.  I was present at the residential search warrant.

9    Q.    Now, you have -- when you are going to execute a search

10   warrant, you have an operational plan, correct?

11   A.    Yes, we do.

12   Q.    And did everything go according to what you expected in

13   your operational plan that day?

14   A.    No.

15   Q.    And what was different than what you expected?

16   A.    We had intended to execute the warrant in the morning.

17   And we had preoperational surveillance drive by Mr. Ervin's

18   residence, and we noticed that his Honda was not present at the

19   residence.  So it was our belief that he was not home.

20   Q.    And did -- what steps did you take next before executing

21   the warrant?

22   A.    We ultimately received intelligence indicating that

23   Mr. Ervin was on a rural piece of property in Lake City,

24   Florida, doing work on it.  So we coordinated with the Columbia

25   County Sheriff's Office and sent agents to that area.

1   Q.   And you did not personally go to that area in Columbia
2   County?
3   A.   I did not.
4   Q.   After Mr. Warrant -- sorry.
5        After Mr. Ervin was located in Columbia County, at
6   some point after that did you execute the warrant at his
7   residence?
8   A.   Yes.
9   Q.   And was anyone present at the residence at that time?
10  A.   No.
11  Q.   Did you find anything that was of evidentiary interest to
12  your investigation during that search of the residence?
13  A.   Yes, we did.
14  Q.   I'm going to --
15           MS. TAYLOR:  Your Honor, may I approach the witness?
16           THE COURT:  What numbers?
17           MS. TAYLOR:  Exhibit 48, Your Honor.
18           THE COURT:  Yes.
19  BY MS. TAYLOR:
20  Q.   Agent Hooker, could you please identify in general what is
21  in Exhibit 48.
22  A.   These are photographs that were taken during the execution
23  of the search warrant at Mr. Ervin's residence.
24           MS. TAYLOR:  I'd move for admission of Exhibit 48.
25           MR. KING:  Without objection, Your Honor.

1           MR. ZERMAY:  Without objection.

2           THE COURT:  48 is admitted.  You may publish.

3       (Government's Exhibit 48 admitted in evidence.)

4           MS. TAYLOR:  Ms. Ganoe, if you could --

5   BY MS. TAYLOR:

6   Q.   Okay.  We have the first page of Exhibit 48 on the screen

7   now, correct?

8   A.   Yes.

9   Q.   Could you tell the jury what's in this page.

10  A.   That is the front exterior of Mr. Ervin's residence.

11  Q.   What was the weather like at the time the warrant was

12  executed?

13  A.   It was rainy.

14  Q.   Is that why there are white flecks all over the photo?

15  A.   Yes.

16          MS. TAYLOR:  Ms. Ganoe, page 2, please.

17  BY MS. TAYLOR:

18  Q.   This one's a little bit blurry, correct?

19  A.   Yes.

20  Q.   But what's depicted in this photo?

21  A.   There's the white bus that we had noticed on his -- at his

22  property.

23  Q.   At the residence?

24  A.   At the residence, yes.

25          MS. TAYLOR:  Ms. Ganoe, page 3, please.

1  BY MS. TAYLOR:

2  Q.   What's depicted in this photo?

3  A.   This is a detached garage that is located in the back yard

4  of Mr. Ervin's property.

5        MS. TAYLOR:  Ms. Ganoe, page 4, please.

6  BY MS. TAYLOR:

7  Q.   What is this photo?

8  A.   The interior contents of the detached garage.

9        MS. TAYLOR:  And Ms. Ganoe, page 20, please.

10  BY MS. TAYLOR:

11  Q.   What's depicted in this photo?

12  A.   This is a work bench within the -- within the detached

13  garage.  It has different power tools on it as well as auto key

14  cards that are in stacks.

15        MS. TAYLOR:  Ms. Ganoe, page 21, please.

16  BY MS. TAYLOR:

17  Q.   Is this a close-up of some items on that work bench?

18  A.   Yes.  There's numerous auto key cards that are located on

19  the bench.

20  Q.   And Ms. Ganoe is zooming in on the middle part of that

21  photo.  Is that where you see the auto key cards?

22  A.   Yes.

23  Q.   And you mentioned that they are in stacks?

24  A.   Yes.

25        MS. TAYLOR:  Ms. Ganoe, if we could go to page 22,

1    please.

2    BY MS. TAYLOR:

3    Q.    What are these items that are on page 22?

4    A.    Belt sanders.

5    Q.    How were these pertinent to your investigation?

6    A.    We believed that these belt sanders were being utilized to

7    finish the auto key cards to put a high-gloss shine on them.

8    Q.    Prior to executing the search warrant, had you observed

9    any photos that you believed were depicting a part of the

10   manufacturing process for auto key cards?

11   A.    I have.

12   Q.    And what -- where did you observe those and what, in

13   particular, did you observe?

14   A.    I observed those on the Instagram account, the Auto Key

15   Card Instagram account.

16   Q.    Okay.  And what was depicted in the photos?

17   A.    There were numerous auto key cards that were laying or

18   sitting on what looked like a bath towel and they were wet.

19        MS. TAYLOR:  Ms. Ganoe, could we have page 5, please.

20   BY MS. TAYLOR:

21   Q.    What's depicted in this photo?

22   A.    This is the living room of the residence, and I think they

23   are specifically focusing on the computer that's on the table.

24   Q.    And so you're referring to there appear to be two monitors

25   with some green and black displayed on them?

1    A.    Yes.

2    Q.    And there's a tower the left of those monitors?

3    A.    Correct.

4    Q.    Was there anything else that was in this room that we're

5    going to talk about but that can't be seen in this particular

6    photo?

7    A.    Yes.  There were auto key cards located on the computer

8    desk and adjacent to it on a table.

9    Q.    Does there appear to be a mirror in the rear right corner?

10   A.    Yes.

11   Q.    Okay.  Is that where the -- generally where that table was

12   located?

13   A.    Correct.

14          MS. TAYLOR:  Okay.  Ms. Ganoe, if we could have page

15   6, please.

16   BY MS. TAYLOR:

17   Q.    Is this the whiteboard next to that computer?

18   A.    Yes.

19   Q.    Was there anything on the whiteboard that was of

20   particular interest to you?

21   A.    Yes.  There were numerous website addresses as well as

22   what appeared to be inventory of auto key cards that had been

23   written on the board.

24   Q.    Those -- we've zoomed in on part of this picture of a

25   whiteboard, correct?

1    A.    Yes.

2    Q.    There's one -- there's one URL that's got kind of a

3    squiggly blue line around it, correct?

4    A.    Yes.

5    Q.    And what's that URL?

6    A.    Not -- excuse me, notagunpart.com.

7    Q.    And is that a URL that came up anywhere else in your

8    investigation?

9    A.    Yes.

10   Q.    Where did that come up?

11   A.    It was provided to the owner of the company that

12   manufactured the auto key cards.

13   Q.    By Mr. Ervin?

14   A.    Correct.

15   Q.    Below that does it have some more URLs?

16   A.    Yes.

17   Q.    Could you read the first two?

18   A.    Could you zoom in, ma'am?

19          The first one appears to be notfullauto.com.

20   Q.    And then after that?

21   A.    NofullautoAR-15.com.

22   Q.    And there's another area just above where the

23   notagunpart.com URL was, correct?

24   A.    Yes.

25   Q.    And Ms. Ganoe has zoomed in on this now.  So the first one

1  is getlitlightningunlimited.com, correct?

2  A.   Correct.

3  Q.   Getlitlightningnow.com?

4  A.   Correct.

5  Q.   Getlitlightningandmore.com?

6  A.   Yes.

7  Q.   And then I can't quite make out the next one in full, but

8  it says getlitlightning, and then something that looks like

9  "services," possibly, dot.com?

10  A.   Yes, possibly.

11  Q.   And then getlitlightningtoday.com?

12  A.   Yes.

13  Q.   Okay.  Ms. Ganoe has zoomed in on what looks like a table

14  with some figures on it, correct?

15  A.   Yes.

16  Q.   How is this pertinent to your investigation?

17  A.   I recognize the 1 in 1, 2 in 1, 3 in 1 as models of the

18  auto key card.  There appears to be numbers associated with it.

19  We were under the assumption this may be some type of inventory

20  of his current supplies.

21        MS. TAYLOR:  If I could have just a minute, Your

22  Honor.

23  BY MS. TAYLOR:

24  Q.   Were there -- in this -- on this whiteboard, were there

25  additional URLs that referenced "auto," "AR-15," "firearms" and

1    terms like that?

2    A.    I believe so.

3            MS. TAYLOR:  Ms. Ganoe, could we please have page 7.

4    BY MS. TAYLOR:

5    Q.    Is this a close-up of a computer desk?

6    A.    Yes.

7    Q.    And at this time it looks like maybe the computer's been

8    woken up because the two monitors are displaying a blue

9    graphic, correct?

10   A.    Yes.

11   Q.    And on this computer desk, did you locate anything that

12   was of interest?

13   A.    Yes, we did.

14   Q.    And what did that include?

15   A.    There were numerous auto key cards on the desk.  There

16   were -- I think there was a card that had -- in the monitor

17   that had the name Matt -- I think "Hoover" might have been

18   misspelled, but it had Matt Hoover and an email address on it.

19   Q.    Ms. Ganoe has zoomed in on the area that's just to the

20   right of the computer tower, correct?

21   A.    Yes.

22   Q.    And is there anything in this photo that you recognize as

23   being pertinent?

24   A.    There appear to be numerous stacks of auto key cards next

25   to the tower.

1      MS. TAYLOR:  And if we could have, please, page 8.

2  BY MS. TAYLOR:

3  Q.   What's shown in this picture?

4  A.   Two documents; two or three documents.

5  Q.   And were these -- were these documents that were on that

6  desk?

7  A.   Yes.

8  Q.   And does it have a document that says, "What is an auto

9  key card?"

10  A.   Yes.  I think the line above it said that.

11  Q.   Okay.  Can you read what this part of the document says?

12  A.   "What is my first product?  The auto key card.  What is my

13  intent in designing, marketing, and selling the product?

14        "From our terms of service, section 5, products or

15  services.

16        "Products are a political sculpture, for

17  conversation, a novelty, or as artwork only.  Products are not

18  designed or intended to increase any rate, just to increase the

19  rate at which people have conversations.  A form of creative,

20  artistic, peaceful protest along with other common-use

21  features, such as a bottle opener or a desktop pen holder.

22  They are not sold or intended to be altered in any way.  Our

23  products are a form of satire and 100 percent First Amendment

24  activity.

25        "Nothing like this has existed before, because we

1  drew the art, designed the piece, and made it to keep the
2  conversation going."
3  Q.   So on this page it states -- and you've seen these auto
4  key cards advertised as being Pen Holder Editions, correct?
5  A.   Yes.
6  Q.   And that was the version that has those internal cutouts
7  made?
8  A.   Correct.
9  Q.   And you recovered a lot of auto key cards from this home,
10 correct?
11 A.   Yes.
12 Q.   Approximately how many?
13 A.   We -- we recovered approximately 1,550 machine gun
14 conversion devices from the residence.
15 Q.   So when you say that, you mean that's the number of
16 etchings for lightning links that were on the cards that were
17 recovered?
18 A.   Correct.
19        THE COURT:  I'm sorry, sir, can you repeat the
20 number.
21        THE WITNESS:  1,550, approximately.
22 BY MS. TAYLOR:
23 Q.   Were any of those auto key cards being used to hold pens?
24 A.   No.
25 Q.   Not a single one?

1   A.   No.

2   Q.   Were some of them Pen Holder Editions?

3   A.   Yes.

4          MS. TAYLOR:   Could we please have page 9.

5   BY MS. TAYLOR:

6   Q.   What's shown here?

7   A.   It's the corner of the desk, and on the top is a stack of

8   auto key cards.

9   Q.   Is it basically right in the middle of that photo?

10  A.   Yes.

11         MS. TAYLOR:   Could we have page 10, please.

12  BY MS. TAYLOR:

13  Q.   What is this?

14  A.   That is the stack of auto key cards that has been picked

15  up and displayed for a photograph.

16         MS. TAYLOR:   Could we have page 11, please.

17  BY MS. TAYLOR:

18  Q.   Is this the same stack of auto key cards that we zoomed in

19  on during a previous image?

20  A.   Yes.

21         MS. TAYLOR:   Ms. Ganoe, could you zoom in, please.

22  BY MS. TAYLOR:

23  Q.   So we've zoomed in on that stack of auto key cards,

24  correct?

25  A.   Yes.

1    Q.    And there's some pens on top of the auto key cards,

2    correct?

3    A.    Correct.

4    Q.    But none of them are, in the auto key card, being used to

5    hold a pen?

6    A.    No.

7            MS. TAYLOR:  Could we have page 12, please.

8    BY MS. TAYLOR:

9    Q.    Is this the -- that -- one of the monitors that was

10   sitting on the desk?

11   A.    Yes.

12           MS. TAYLOR:  Ms. Ganoe, could you zoom in on the

13   index card.

14   BY MS. TAYLOR:

15   Q.    And what does -- there's an index card that's tucked into

16   the frame of one of the monitors, correct?

17   A.    Yes.

18   Q.    Is that where it was when you executed the warrant?

19   A.    Yes.

20   Q.    And what is written on that index card?

21   A.    The name Matt, H-o-v-e-r is how the last name is spelled.

22   Q.    And is there an email address?

23   A.    Yes.

24   Q.    And what is it?

25   A.    Mh355sc@yahoo.com.

1    Q.    Is that an address that you know to belong to defendant

2    Matthew Hoover?

3    A.    Yes.

4             MS. TAYLOR:   Could we have page 13, please.

5    BY MS. TAYLOR:

6    Q.    And are there some receipts from Community First Credit

7    Union here?

8    A.    Yes.

9             MS. TAYLOR:   Could you zoom in, Ms. Ganoe.

10   Q.    Does it include --

11            MS. TAYLOR:   Let's zoom in on just one of them.

12   BY MS. TAYLOR:

13   Q.    Can you describe what this receipt is?

14   A.    It's a receipt for Kristopher Ervin dated February 25th,

15   2021, at 9:41 a.m.

16   Q.    And what does it show happened that day?

17   A.    It looks like a cash dispense clearing of $5,000.   Cash

18   withdrawal of $5,000.

19            MS. TAYLOR:   Could we have page 25, please.

20   BY MS. TAYLOR:

21   Q.    What is in this picture?

22   A.    It's a cardboard box with the padded envelope mailers.

23   Q.    And where was this box located?

24   A.    Somewhere in the living room.

25            MS. TAYLOR:   And could we have page 17, please.

1  BY MS. TAYLOR:

2  Q.   What's shown in this picture?

3  A.   This is the area -- the desk -- or the table to the right

4  of the computer desk.

5  Q.   Is that the one that's near the mirror?

6  A.   Yes.

7  Q.   And what's in this picture that is pertinent?

8  A.   There's a large cardboard box with plastic baggies,

9  business cards, and auto key cards.

10       MS. TAYLOR:  Could we have page 18, please.

11  BY MS. TAYLOR:

12  Q.   What's in this picture?

13  A.   This is paperwork that was on top of the box.  It has

14  diagrams of the auto key cards on it.

15  Q.   And underneath the paperwork are there more auto key

16  cards, looks like they were Pen Holder Editions?

17  A.   Yes.

18       MS. TAYLOR:  Page 19, please.

19  BY MS. TAYLOR:

20  Q.   And this is just showing the contents of that same box?

21  A.   Correct.

22  Q.   Those green business cards that are viewable in this

23  image, are they consistent with the cards that you received in

24  your undercover purchase?

25  A.   Yes.

1        MS. TAYLOR:  Could we have page 23, please.

2   BY MS. TAYLOR:

3   Q.   What is this?

4   A.   Cardboard box with the plastic baggies and the business

5   cards.

6        MS. TAYLOR:  Page 24, please.

7   BY MS. TAYLOR:

8   Q.   What is this?

9   A.   It's a zoom-up of -- or a zoomed photograph of the same

10  box.

11       MS. TAYLOR:  Page 14, please.

12  BY MS. TAYLOR:

13  Q.   What's depicted in this photo?

14  A.   This is the kitchen of the residence and focusing in on

15  auto key cards located in the cabinets there.

16  Q.   So there's a piece of blue tape with the number 7 written

17  on it, correct?

18  A.   Yes.

19  Q.   And there's some metal items below that?

20  A.   Correct.

21  Q.   Those are the auto key cards?

22  A.   Yes.

23  Q.   Were there more than just those stacks?

24  A.   Excuse me.  Yes.

25       MS. TAYLOR:  Page 15, please.

1    BY MS. TAYLOR:

2    Q.    And now we're just close up on that same stack of auto key

3    cards under the number 7?

4    A.    Correct.

5    Q.    Is the number 7, is that something that ATF put there?

6    A.    Yes.

7    Q.    Okay.

8          MS. TAYLOR:  And could we have page 16, please.

9    BY MS. TAYLOR:

10   Q.    And this is just depicting those same auto key cards?

11   A.    Yes.

12   Q.    Are there multiple different models of auto key cards in

13   this image?

14   A.    Yes.

15         MS. TAYLOR:  Okay.  And page 26, please.

16   BY MS. TAYLOR:

17   Q.    What is this?

18   A.    Another view of the kitchen cabinets in the kitchen.

19   Q.    And you mentioned that more of these cabinets had auto key

20   cards in them?

21   A.    Yes.  I believe there was more above the dishwasher area.

22   Q.    Did you see any auto key cards in the home that were

23   displayed as artwork?

24   A.    No.

25         MS. TAYLOR:  Your Honor, at this time I'm going to

1    ask for Mr. Mesrobian's assistance with providing Exhibits 50A

2    through 50P for Agent Hooker to review.

3              THE COURT:  I'm sorry, 50 . . .

4              MS. TAYLOR:  50A through 50P.

5         (Pause in proceedings.)

6    BY MS. TAYLOR:

7    Q.   Agent Hooker, have you looked through these exhibits?

8    A.   I've looked through 50A through F.

9    Q.   Could you look through G through P.

10             Well, I guess let's start with A through F.  Are

11   those auto key cards that were seized from Mr. Ervin's

12   residence?

13   A.   Yes.

14             MS. TAYLOR:  I'd move 50A through 50F into evidence.

15             THE COURT:  Any objection?

16             MR. KING:  No, Your Honor.

17             MR. ZERMAY:  No, Your Honor.

18             THE COURT:  50A through F are admitted.

19        (Government's Exhibits 50A-50F admitted in evidence.)

20   A.   I've looked through G, H, and I.

21   Q.   Are those auto key cards that were seized from Mr. Ervin's

22   residence?

23   A.   Yes.

24             MS. TAYLOR:  I'd move for admission of A through I.

25             MR. KING:  Without objection, Your Honor.

```
 1              MR. ZERMAY:  (Nods head.)

 2              THE COURT:  They're admitted without objection.

 3   That's 50 G, H, and I.

 4              MS. TAYLOR:  Yes, Your Honor.

 5         (Government's Exhibits 50G-50I admitted in evidence.)

 6   A.   I've looked at J and K.

 7   Q.   Are those auto key cards that were seized from Mr. Ervin's

 8   residence?

 9   A.   Yes.

10              MS. TAYLOR:  I'd move for admission of J and K.

11              MR. KING:  Without objection, Your Honor.

12              MR. ZERMAY:  Without objection.

13              THE COURT:  50J and K are admitted.

14         (Government's Exhibit 50J and 50K admitted in evidence.)

15              MR. KING:  And Your Honor, no objection to L through

16   P.

17              THE COURT:  Any objection to the remaining 50L

18   through 50P, Mr. Zermay?

19              MR. ZERMAY:  No, Your Honor.

20   BY MS. TAYLOR:

21   Q.   Okay.  Agent Hooker, so all of these -- all of these are

22   bagged into different bags, correct?

23   A.   Yes.

24   Q.   And how are they -- are they organized by basic design?

25   A.   Yes.
```

1   Q.   For example, let's look at -- do you have Exhibit 50E?

2   A.   Yes.

3   Q.   Is that one a single auto key card?

4   A.   It is.

5   Q.   Is that a 3 in 1 Pen Holder Edition?

6   A.   It is a 3 in 1 Pen Holder with Bottle Opener.

7           MS. TAYLOR:   Your Honor, may I publish this to the

8   jury?

9           THE COURT:   You may.

10          MS. TAYLOR:   Scissors?

11  BY MS. TAYLOR:

12  Q.   Agent Hooker, I'm going to ask you to cut open that

13  evidence bag because there's a -- that particular item is in

14  a -- one of those baggies with the business card, correct?

15  A.   Yes.

16  Q.   So I think let's take it out and -- so the jury can see it

17  more clearly.

18          MS. TAYLOR:   And I'll republish, Your Honor, if

19  that's okay?

20          THE COURT:   Go ahead.

21  BY MS. TAYLOR:

22  Q.   And I'm going to also put it on the projector.

23          So I've left the green business card in the plastic

24  baggie, correct?

25  A.   Yes.

1   Q.   And then -- and then this is the Pen Holder Edition,

2   correct?

3   A.   Yes.

4   Q.   Because it has these six cutouts made, correct?

5   A.   Yes.

6   Q.   And it's a -- it's a 3 in 1, right?

7   A.   Correct.

8   Q.   So it was called a 3 in 1 and not a 6 in 1?

9   A.   Correct.

10  Q.   Even though it has six different etchings on it?

11  A.   Correct.

12  Q.   And then the bottle opener is this larger piece at the

13  end?

14  A.   Yes.

15  Q.   I'm going to zoom in a little bit.  And it also says

16  "patent pending" on it, correct?

17  A.   Yes.

18  Q.   And it has a copyright symbol?

19  A.   Yes.

20  Q.   And then it also has etched onto the surface "made in the

21  U.S.A."?

22  A.   Correct.

23  Q.   Agent Hooker, I'm going to return this to you and ask you

24  to put it back into the evidence bag so that we don't lose

25  track of which one this is.

1    A.    Okay.

2    Q.    Agent Hooker, are you aware of whether Mr. Ervin altered

3    the design for the auto key card at some point and made what

4    was called a G2 edition?

5    A.    Yes.

6    Q.    And if you could please look at Exhibit 50C, as in cat.

7    A.    Okay.

8    Q.    And describe -- are these -- they -- I believe they are

9    3 in 1 Pen Holder Editions.  So that's with the cutouts,

10   correct?

11   A.    Yes.

12   Q.    And with the bottle opener, correct?

13   A.    Yes.

14   Q.    And are these the G2 edition?

15   A.    Yes.

16   Q.    What's the difference between the original design and the

17   G2 edition?

18   A.    There is a separation in the laser engraving.  The lines

19   are no longer continuous.  They skip a small space.

20          MS. TAYLOR:  Your Honor, may I publish this to the

21   jury?

22          THE COURT:  Yeah.  I think, Ms. Taylor, it would

23   probably be quicker to just publish it on the ELMO rather than

24   walking it back and forth.

25          MS. TAYLOR:  Yeah, I'll put this one on.

1          THE COURT:  Okay.

2    BY MS. TAYLOR:

3    Q.    Okay.  I put these exhibits on the ELMO, correct, on the

4    projector?

5    A.    Yes.

6    Q.    And this is the G2 edition?

7    A.    Yes.

8    Q.    So looking at this link, the big piece in the middle, the

9    line is broken, correct?

10   A.    Correct.  It's no longer continuous.

11   Q.    But -- but it's a straight point between the two ends of

12   the line, correct?

13   A.    Correct.

14   Q.    And there are -- it looks like there are three places

15   total where that line is broken?

16   A.    Yes, two on the --

17   Q.    Here?

18   A.    Yes.  Two on one line and one on the other.

19   Q.    And then for the smaller -- the smaller piece of the

20   lightning link -- I'm trying to get it to show clearly -- it

21   has two places where the line is broken; one on the top and one

22   on the bottom?

23   A.    Correct.

24   Q.    But it's a straight shot between those two ends of the

25   line, correct?

1    A.    Yes.

2    Q.    Were there other items that were seized from the residence

3    besides the auto key cards that were relevant to your

4    investigation?

5    A.    Yes.

6          MS. TAYLOR:  Your Honor, may I approach Agent Hooker

7    with Exhibits 102, 103, and 104?

8          THE COURT:  Yes.

9          Ms. Taylor, counsel has indicated that they did not

10   have objection to 50L through P, but you didn't move those into

11   evidence.

12         MS. TAYLOR:  I apologize, Your Honor.  I'd move them

13   into evidence now.

14         THE COURT:  50L through P are admitted.  Go ahead.

15      (Government's Exhibits 50L-50P admitted in evidence.)

16         MS. TAYLOR:  And then there's also -- 103A is a

17   document that should be in the binders, so -- but I'll bring

18   all three of -- sorry, all four of those, 102, 103, 103A, and

19   104, to show to counsel.

20         THE COURT:  All right.

21   BY MS. TAYLOR:

22   Q.    Agent Hooker, let's start with Exhibit 103 and 103A.  103

23   is a -- is a -- is in a paper envelope, correct?  Or --

24   A.    Yes.

25   Q.    Could you please open that paper envelope and verify

1    what's inside.

2    A.   Miscellaneous documentation.

3    Q.   And was this seized from Mr. Ervin's residence?

4    A.   Yes.

5    Q.   And 103A, what is that?

6    A.   It is a photocopy of the first three documents in 103.

7    Q.   Okay.  So it's a partial scan or photocopy of what's in

8    103?

9    A.   Yes.

10         MS. TAYLOR:  Your Honor, move for admission of 103

11   and 103A.

12         MR. KING:  Without objection, Your Honor.

13         MR. ZERMAY:  No objection.

14         THE COURT:  All right.  Without objection, 103 and

15   103A are admitted.  And you may publish.

16       (Government's Exhibit 103 and 103A admitted in evidence.)

17         MS. TAYLOR:  Ms. Ganoe, can we have 103A, please.

18   BY MS. TAYLOR:

19   Q.   What is this in 103A on the first page?

20   A.   It is a piece of paper with a -- with four drawings of

21   auto key cards on it.

22   Q.   And this --

23         MS. TAYLOR:  Ms. Ganoe, the next page, please.

24   BY MS. TAYLOR:

25   Q.   What is on this page of 103A?

1   A.   Looks like different companies or contacts with addresses
2   and phone numbers.
3   Q.   What kind of companies do they appear to be?
4   A.   It looks like companies -- I know one company for certain,
5   Bane Industries at the top right, is a metal fabrication
6   company.  There appears to be another company titled Metal
7   Supermarkets, as well as Specialty Engraving Florida, Stamping
8   Blanks.
9   Q.   In your investigation, did you determine that Bane
10  Industries was one of the companies that had created the auto
11  key cards for Mr. Ervin?
12  A.   Yes.
13        MS. TAYLOR:  And the next page, please, Ms. Ganoe.
14  BY MS. TAYLOR:
15  Q.   What's on this page?
16  A.   Different URLs or websites.
17  Q.   And we're going to zoom in on the top portion first.  This
18  top portion, it says PayPal.com and then ECvolcom80@aol.com,
19  correct?
20  A.   Yes.
21  Q.   And is ECvolcom80@aol.com an email address that you came
22  across in your investigation?
23  A.   Yes.
24  Q.   Who does it belong to?
25  A.   Mr. Ervin.

1   Q.   And then it says Stripe.com, JustinErvin80@aol.com,

2   correct?

3   A.   Yes.

4   Q.   And does the email address JustinErvin80@aol.com, is that

5   one that you came across in your investigation?

6   A.   Yes.

7   Q.   Who does it belong to?

8   A.   Mr. Ervin.

9   Q.   And then it says Bonanza.com, JustinErvin80@aol.com,

10  correct?

11  A.   Yes.

12  Q.   And then Gun.deals, and then JustinErvin80@aol.com,

13  correct?

14  A.   Yes.

15  Q.   And then underneath Gun deals -- Gun.deals, it has a

16  little arrow, correct?

17  A.   Yes.

18  Q.   And then does it say "drive sales"?

19  A.   Yes.

20  Q.   And then another arrow, "Ad on Reddit"?

21  A.   Yes.

22  Q.   And then another arrow, "Other ways"?

23  A.   Yes.

24       MS. TAYLOR:  Ms. Ganoe, could you focus in on the

25  middle part.

 1   BY MS. TAYLOR:

 2   Q.   And in this middle part of the document it says

 3   AutoKeyCard.com and has some little suns or stars drawn on

 4   either side, correct?

 5   A.   Yes.

 6   Q.   And then does it say -- what does it say underneath that?

 7   A.   I believe it says, "Memorable.  It's an auto key."

 8   Q.   And then does it say -- what are the URLs underneath that?

 9   A.   AutocardUSA.com, autokeylink.com, ARautokey.com,

10   AR15fullauto.com hyphen forums question mark,

11   autobusinesscard.com, and ARautokey.com.

12   Q.   In your -- in your training and experience, what do you

13   understand "full auto" to refer to?

14   A.   Fully automatic gunfire, or a machine gun.

15          MS. TAYLOR:  Ms. Ganoe, could we have this section to

16   the right of the document.

17   BY MS. TAYLOR:

18   Q.   There are different -- different figures here,

19   calculations it appears?

20   A.   Yes.

21   Q.   Is it clear what those relate to?

22   A.   Not to me.

23          MS. TAYLOR:  Can we have the lower left corner of the

24   document zoomed in.

25   BY MS. TAYLOR:

1    Q.    There's some more email addresses here, correct?

2    A.    Yes.

3    Q.    Autosaw15@gmail.com?

4    A.    Yes.

5    Q.    Is that an email address that you came across in your

6    investigation?

7    A.    Yes.

8    Q.    Who does it belong to?

9    A.    Mr. Ervin.

10   Q.    AutoKeyCard@gmail.com, is that an email address that you

11   came across in your investigation?

12   A.    Yes.

13   Q.    Who does it belong to?

14   A.    Mr. Ervin.

15   Q.    If you could please look now at Exhibit 102 and

16   describe -- I think you'll need to open that one and describe

17   what is inside.

18   A.    Numerous cards with writing on them.

19   Q.    Are these cards that were seized from Mr. Ervin's

20   residence during the search warrant?

21   A.    Yes.

22              MS. TAYLOR:  Move for admission of Exhibit 102.

23              MR. KING:  Without objection.

24              MR. ZERMAY:  No objection.

25              THE COURT:  102 is admitted.  You may publish.

1    (Government's Exhibit 102 admitted in evidence.)

2         MS. TAYLOR:  Thank you, Your Honor.  I think --

3    BY MS. TAYLOR:

4    Q.   Let's go ahead and verify what 104 is.  And I think you'll

5    need to open that as well.

6    A.   Okay.  It's miscellaneous documentation, bank money

7    envelope, numerous receipts, bank receipts, receipts from

8    Harbor Freight, and other miscellaneous documentation.

9    Q.   Was this documentation seized from Mr. Ervin's residence

10   during the search warrant?

11   A.   Yes.

12        MS. TAYLOR:  I move for admission of Exhibit 104.

13        MR. KING:  Without objection, Your Honor.

14        MR. ZERMAY:  No objection, Judge.

15        THE COURT:  104 is admitted.

16    (Government's Exhibit 104 admitted in evidence.)

17        MS. TAYLOR:  Your Honor, I'd like to retrieve these

18   and show them on the ELMO.

19        THE COURT:  Sure.

20   BY MS. TAYLOR:

21   Q.   Agent Hooker, you described that Number 102 was different

22   index cards, correct?

23   A.   Yes.

24   Q.   And I'm not going -- I'm not going to put every one of

25   them on the projector, but this is an index card that says,

1  "30 percent off A Key cards, Christmas end of the year sale,"

2  correct?

3  A.   Yes.

4  Q.   And it has different prices and then -- and then are they

5  discounted to 30 percent off?

6  A.   It does have different prices.  I assume the math is

7  correct.

8  Q.   You did not verify the math?

9  A.   I did not.

10  Q.   But it purports to be the prices at 30 percent off?

11  A.   Yes.

12  Q.   I've put another card on the screen.  What does this card

13  state?

14  A.   "Partnership agreement, Matt slash Justin."

15  Q.   This card says "Tim" in the top left corner, correct?

16  A.   Yes.

17  Q.   And then what else -- does it say "military arms channel"?

18  A.   Yes.

19  Q.   This card says "704 Tactical" at the top, correct?

20  A.   Yes.

21  Q.   What does "tactical" refer to in your experience?

22  A.   "Tactical?"  It's often used to describe tactics that law

23  enforcement or military use to -- for instance, maybe to

24  execute a search warrant or to arrest an individual.

25  Q.   And under "704 Tactical" it says, "Sent Instamessage for

1   AKC Insta"?

2   A.   Yes.

3   Q.   And then it says, in the bottom right corner, "215K subs"?

4   A.   Yes.

5   Q.   Do you have an understanding of what "215K subs" means?

6   A.   215,000 subscribers to that particular channel, or

7   website.

8   Q.   I've put another card on the projector.  It says "Mike" at

9   the top, correct?

10  A.   Yes.

11  Q.   And then it has "SOT" with a circle around it?

12  A.   Yes.

13  Q.   What, in your experience, is an SOT?

14  A.   A Special Occupation Tax.

15  Q.   And what's the relevance of that to NFA weapons?

16  A.   SOTs are issued to certain type of dealers that are

17  authorized to deal in NFA items, such as machine guns and

18  silencers.

19  Q.   When you say "dealers," do you mean gun dealers?

20  A.   Federally licensed firearms dealers, yes.

21  Q.   And so underneath "Mike" it says "Mr. Guns N Gear"?

22  A.   Yes.

23  Q.   And then it says in the bottom right corner "511K subs"?

24  A.   Yes.

25  Q.   And those were all part of Exhibit 102?

1    A.    I believe so, yes.

2    Q.    I'm pulling out documents from Exhibit 104.  There's some

3    Community First Credit Union receipts that are clipped together

4    here, correct?

5    A.    Yes.

6    Q.    All right.  I'm going to take the clip off.

7          Well, first, there's also a -- you mentioned a bank

8    envelope?

9    A.    Yes.

10   Q.    Is that what's on the screen now?

11   A.    Yes.

12   Q.    It says "move up"?

13   A.    Yes.

14   Q.    And then on the other side it says "5K"?

15   A.    Yes.

16   Q.    I've put one of the receipts on the screen, correct?

17   A.    Yes.

18   Q.    Is it from Community First Credit Union?

19   A.    Yes.

20   Q.    Dated -- is the name on the account Kristopher Ervin?

21   A.    Correct.

22   Q.    And the date of the receipt is December 30th, 2020?

23   A.    Yes.

24   Q.    And does it indicate that the previous balance was a

25   little over $44,000?

1    A.    Yes.

2    Q.    And that $9,000 in cash was withdrawn?

3    A.    Correct.

4    Q.    Here's another receipt from Community First Credit Union

5    dated December 28th of 2020, correct?

6    A.    Yes.

7    Q.    And does it indicate that the balance on that day was a

8    little over $60,000?

9    A.    Yes.

10   Q.    This one's from December 22nd, 2020, correct?

11   A.    Yes.

12   Q.    Indicating a balance of $54,000?

13   A.    Correct.

14   Q.    And so this one was only six days before the one we were

15   just looking at, correct?

16   A.    Correct.

17   Q.    And the balance went from about $54,000 to about $60,000?

18   A.    Yes.

19   Q.    In your investigation, did you identify any source of

20   income for Mr. Ervin other than Auto Key Cards?

21   A.    No, I did not.

22   Q.    This is another receipt from Community First Credit Union

23   for Mr. Ervin, correct?

24   A.    Yes.

25   Q.    Dated January 2nd, 2021?

1   A.   Correct.

2   Q.   And does it indicate the previous balance was $28,566.60?

3   A.   Yes.

4   Q.   And that $9,000 in cash was dispensed?

5   A.   Correct.

6   Q.   I'm not going to go through every receipt, but this one is

7   dated January 6th of 2021 for Mr. Ervin, correct?

8   A.   Yes.

9   Q.   This is also -- these are all Community First Credit Union

10  receipts, correct, all the bank receipts?

11  A.   Yes.

12  Q.   And this one indicates a previous balance of $19,810?

13  A.   Correct.

14  Q.   And that there was cash dispensed of $9,000 that day?

15  A.   Correct.

16  Q.   This one's dated January 19th, 2021, for Mr. Ervin,

17  correct?

18  A.   Yes.

19  Q.   And it indicates a cash withdrawal of $5,000?

20  A.   Yes.

21  Q.   This receipt from Community First from Mr. Ervin is dated

22  January 21st, 2021, correct?

23  A.   Yes.

24  Q.   And it indicates a cash withdrawal of $5,500?

25  A.   Yes.

1  Q.   This one's dated February 19th, 2021, correct?

2  A.   Yes.

3  Q.   Indicating a cash withdrawal of $5,000?

4  A.   Correct.

5  Q.   This one's four days later, on February -- or, sorry, six

6  days later, on February 25th, 2021, correct?

7  A.   Yes.

8  Q.   It reflects that Mr. Ervin withdrew $5,000?

9  A.   Yes.

10  Q.   This one's from February 6th of 2021, correct?

11  A.   It is.

12  Q.   And it indicates that Mr. Ervin withdrew $5,000?

13  A.   Yes.

14  Q.   And then there's two receipts from Harbor Freight.  I'm

15  going to put one of them on the screen.

16          Have I put the Harbor Freight receipt on the screen?

17  A.   Yes.

18  Q.   And it is dated November 30th, 2020, correct?

19  A.   Correct.

20  Q.   And it indicates that there were two 36-inch disk sanders

21  sold to Mr. Ervin?

22  A.   Yes.

23  Q.   And it says "Chris Ervin" at the top, correct?

24  A.   Yes.

25  Q.   "Chris" is not spelled the way Mr. Ervin spells his name

1  though, correct?

2  A.   Correct.

3  Q.   But it indicates that there are two sanders and then some

4  ammunition that were sold to Mr. Ervin that day?

5  A.   My belief is that second charge is not ammunition but an

6  ammunition can.

7  Q.   Okay.  And then this is a page from Exhibit 104, which is

8  the documents we've been reviewing.  It says, "Stop resisting

9  freedom, exclamation point"?

10  A.   Correct.

11  Q.   When you searched the house, you talked about the two

12  sanders that you found, correct?

13  A.   There may have been more, but we did find sanders.  There

14  may have been three.  I don't recall without seeing the

15  picture.

16  Q.   Okay.  Did you find evidence that Mr. Ervin had the

17  equipment at his residence to fully manufacture these auto key

18  cards?

19  A.   We did not.

20  Q.   Did you take steps to find out where the auto key cards

21  were being manufactured?

22  A.   Yes, I did.

23  Q.   And what did you do to try and figure that out?

24  A.   I traveled back to the Industrial Loop area of Orange Park

25  where we had previously lost sight of Mr. Ervin and basically

1    looked for a business that might do that type of work.

2    Q.    Did you find anything?

3    A.    I did.

4    Q.    And what was that?

5    A.    I found a business called Orange Park Machine.

6    Q.    And did you enter that business?

7    A.    I did.

8    Q.    And did you speak with anyone there?

9    A.    Yes.

10   Q.    Who did you speak with?

11   A.    A Mr. Breslend and a Mr. Ruiz.

12   Q.    Ruiz?

13   A.    Correct.

14   Q.    And did you ask them whether they had had any business

15   with Mr. Ervin?

16   A.    Yes.

17   Q.    And did they confirm that they had?

18   A.    Yes.

19   Q.    Did you ask them whether they had any materials at their

20   shop that were related to their business with Mr. Ervin?

21   A.    I did.

22   Q.    And did they indicate that they did have materials?

23   A.    I'm sorry, I didn't hear you.

24   Q.    Did they indicate that they had something in their shop

25   related to Mr. Ervin?

1   A.   Yes.

2   Q.   And what was it?

3   A.   They had three large cardboard boxes containing over a

4   thousand auto key cards that they had destroyed by cutting.

5        MS. TAYLOR:  Your Honor, may I approach Special Agent

6   Hooker with Exhibits 58A, 58B, and 58C?

7        THE COURT:  You may.

8        MS. TAYLOR:  Your Honor, Ms. Ganoe reminded me I need

9   to give him 58D as well.

10       THE COURT:  Go ahead.

11  BY MS. TAYLOR:

12  Q.   Agent Hooker, can you tell us what 58A, B, and C are?

13  A.   Those are the three boxes of auto key cards that employees

14  at Orange Park Machine destroyed by cutting.

15  Q.   And they gave them to you?

16  A.   They did.

17  Q.   And did you put them into ATF evidence?

18  A.   I did.

19  Q.   And 58D, what is that?

20  A.   A photograph of the interior contents of the boxes.

21  Q.   Did you take that photo?

22  A.   Yes.

23  Q.   And it shows all three of the boxes?

24  A.   Yes.

25  Q.   And they've been opened in the photo?

```
 1   A.   Correct.
 2              MS. TAYLOR:  Your Honor, move for admission of 58A,
 3   B, C, and D.
 4              MR. KING:  Without objection, Your Honor.
 5              MR. ZERMAY:  No objection.
 6              THE COURT:  58A, B, C, and D are admitted and you may
 7   publish.
 8        (Government's Exhibit 58A-58D admitted in evidence.)
 9   BY MS. TAYLOR:
10   Q.   58D is on the screen, correct, Special Agent Hooker?
11   A.   Yes.
12              MS. TAYLOR:  And Ms. Ganoe, could you zoom in to the
13   left-most box.
14   BY MS. TAYLOR:
15   Q.   And these are -- this is what Orange Park Machine gave
16   you?
17   A.   Yes.
18   Q.   And did they tell you that they had cut the auto key
19   cards?
20   A.   Yes.
21   Q.   And they didn't -- they didn't cut them to cut out the
22   lightning links, correct?
23   A.   No, they cut them to destroy them.
24   Q.   Okay.  Could you please open -- open 58A, B, and C, and
25   verify that that's what's inside?
```

1   A.    Sure.

2         Yes.   Excuse me.   Yes.

3   Q.    And so all three of these boxes contain cut-up auto key

4   cards?

5   A.    Yes.

6         MS. TAYLOR:  Your Honor, I'm going to be getting into

7   some of the social media investigation.  I'm not sure if the

8   Court wants to give a break or if I should continue.

9         THE COURT:  We can go ahead and take our morning

10  break now and that way -- can we move all of this evidence?

11        MS. TAYLOR:  Yes.

12        THE COURT:  All right.  We should do some

13  rearranging.

14        All right.  So ladies and gentlemen, it's 10:20.

15  We'll take a 15-minute recess.

16        I'll ask you to remember that you should not read,

17  watch, or listen to any media reports.

18        You must not discuss the case with one another, your

19  family, your friends, or anybody else.

20        Please don't let anybody speak about the case in your

21  presence.  If anybody attempts to speak to you about the case,

22  please stop them and notify the court security officer

23  immediately.

24        Remember that you must not do any independent

25  research about anything in any way related to the case and that

1   you must not form or express any opinions until you've heard

2   all the evidence, the arguments of the attorneys, and my

3   instructions on the law.

4           I'll ask you to be back a little after 10:35 and

5   we'll continue with the evidence at that time.

6           COURT SECURITY OFFICER:  All rise for the jury.

7       (Jury exits, 10:22 a.m.)

8           COURT SECURITY OFFICER:  Please be seated.

9           THE COURT:  Mr. Mesrobian, if you would assist

10  Ms. Wiles in getting the evidence to the evidence table.

11          MR. MESROBIAN:  Yes, Your Honor.

12          THE COURT:  We'll be in recess for about 15 minutes.

13          COURT SECURITY OFFICER:  All rise.

14      (Recess, 10:22 a.m. to 10:37 a.m.)

15      (All parties present.  Jury not present.)

16          COURT SECURITY OFFICER:  All rise.  This Honorable

17  Court is back in session.

18          Please be seated.

19          THE COURT:  All right.  Are there any exhibits that

20  you need to go ahead and take up to him, Ms. Taylor?

21          MS. TAYLOR:  Yes.

22          THE COURT:  Do you want to --

23          MR. KING:  Thank you.

24          MS. TAYLOR:  Those are all in the binders.

25      (Counsel confer.)

1          THE COURT:  Let's have the jury then, please.

2          MR. KING:  Your Honor --

3          THE COURT:  Hold on, I'm sorry.

4          MS. TAYLOR:  I think that there's some objections to

5     some of the upcoming exhibits that might be best to handle

6     before bringing the jury in.

7          THE COURT:  Okay.

8          MS. TAYLOR:  In particular, the United States is

9     intending to ask for 53 and 54 to be admitted, which are both

10    search warrant returns from Instagram.  53 is the search

11    warrant return for the account @AutoKeyCarddotcom, and 54 is

12    the search warrant return for @realJustinErvin -- or, sorry,

13    @therealJustinErvin.

14         THE COURT:  On your exhibit list it says

15    @realJustinErvin.

16         MS. TAYLOR:  That might be the display name.

17         THE COURT:  All right.  And there's objection to the

18    admission of these?

19         MR. KING:  Yes, Your Honor.  Particularly as to

20    Number 53.  So the -- there's a business record certification

21    for the -- essentially it's a myriad of Facebook and Instagram

22    messages and records.

23         The issue comes down to what is actually a business

24    record of Facebook and Instagram and what's not.  Our objection

25    is the metadata that's contained in there, the subscriber

 1    information, the dates and times of messages, are all things

 2    that are kept in the normal course of business by Face- -- I'll

 3    says Facebook.  I know it's Facebook, Instagram, but it gets a

 4    little confusing with the corporate ownership.

 5          The legal issue is the messages that are contained

 6    therein are not business records that are created by Facebook

 7    or Instagram.  Those are created by individual users and

 8    transmitted.

 9          The -- I've done some research.  I know the Eleventh

10    Circuit has not explicitly ruled on this, but my understanding

11    from I think it's three other circuits is that the content of

12    the messages -- because those aren't business records, those

13    aren't -- you know, that's not a business need for Facebook or

14    Instagram to create those messages -- and they actually don't

15    create them, they're created by third parties -- that those

16    aren't business records.

17          Some of them may otherwise be admissible as -- you

18    know, particularly if they're from Mr. Ervin they would be

19    admissions of a party opponent, or if he responds to it, or if

20    it's demonstrated that he interacted with them, it would be

21    for, you know, the effect on the listener.  So they're not

22    business records, the content of the messages.

23          And then if you look at the @autokeycarddotcom one in

24    particular, there was a second --

25          THE COURT:  Is that 53?

1      MR. KING:  I'm sorry, that's Exhibit 53.  And you

2  know, this will tie in to some emails that I imagine we'll have

3  the same issue on later.

4      Mr. Ervin is not the only person who had access to

5  this account.  There's another witness, Carolanne Wolfe, who

6  used and responded to these.  So in terms of whether he's even

7  viewed those, I think that would have to be established if it's

8  going to be for effect on listener.  Otherwise, they're hearsay

9  without an exception and we would object to the contents of

10  those messages.

11      THE COURT:  All right.

12      Ms. Taylor.

13      MS. TAYLOR:  Well, Your Honor, Ms. Wolfe is going to

14  be Mr. Mesrobian's witness, but my understanding is that she

15  did not use the @ -- either of the -- these Instagram accounts.

16  And so the argument that the messages may not be Mr. Ervin's

17  statements I don't think has any -- has a basis.

18      But we -- so there is a Certificate of Authenticity

19  for each of those two record returns.  We're not relying on

20  that certificate to admit it as a business record, but rather,

21  we are moving for the admission of the -- these documents under

22  Rule 9(11)(a) [verbatim] because we believe their authenticity

23  is sufficiently shown in terms of they are records that are

24  genuinely -- that they are genuine records that were maintained

25  by Facebook, which owns Instagram.

1          THE COURT:  Which means you are -- I understand the

2    902 authentication issue, but you do have to address the

3    business record issue.

4          MS. TAYLOR:  We're not seeking to admit them as

5    business records.  I think it's 9(11)(a), Your Honor.  Maybe

6    I'm wrong.  Let me get my book.  Oh, sorry, 901(a) is what I

7    meant to say.

8          THE COURT:  All right.  Just a moment.

9       (Pause in proceedings)

10          THE COURT:  Right.  And that's what I just said.  901

11   deals with authenticity.  And I don't think Mr. King's

12   objection is the authenticity objection.  What he's raised is a

13   hearsay objection.  901 doesn't get you over the hearsay issue.

14   The business record exception would get you over the hearsay

15   issue.  So do you want to address that argument?

16          MS. TAYLOR:  We are not seeking to admit them as

17   business records but would submit that they are not hearsay.

18          To the extent that the messages are those of

19   Mr. Ervin -- and both of these accounts we believe we will show

20   are attributed to him, all of the user information points to

21   him, they are clearly associated -- they have -- the personal

22   account has Mr. Ervin's photo on it.  They both are associated

23   with his known phone number and with his name.

24          And to the extent that these are his accounts and

25   they're -- and the messages that are in here are his messages,

1   then they're the statement of a party opponent and are

2   admissible for that -- not hearsay for that reason.

3          To the extent that there are messages where Mr. Ervin

4   interacts with another individual, the statements of the other

5   individual are provided -- are necessary for the context of

6   what Mr. Ervin is saying.

7          To the extent -- to the -- and frankly, none of this

8   is being offered for truth.  It's being offered to reflect

9   Mr. Ervin's state of mind.

10         And I don't know if Mr. King has, like, specific

11   messages that he thinks -- or specific items that he thinks

12   would fall outside of those hearsay exceptions that I've

13   raised.  If so, I can address those individually.  But we

14   believe that all of the pages in this document would be covered

15   by one or more of those hearsay exceptions.

16         THE COURT:  Mr. King, can you point me to the case

17   law that you say finds that messages kept by Facebook or Meta

18   are not business records?  Because my recollection of the

19   business records exception -- and I understand that the

20   government isn't relying on it, but it was brought up and I

21   want to address it.  My recollection is that if the record is

22   kept in the ordinary course of the company's business, it

23   doesn't matter who made it.  It doesn't have to have been made

24   by an employee of the company.  So I guess I'd like to see that

25   case law that you're relying on because it's inconsistent with

1   my recollection of the interpretation of the rule.

2          MR. KING:  Your Honor, if I could have just a moment

3   to pull up Westlaw because I did not anticipate this coming up.

4          THE COURT:  If you . . .

5      (Pause in proceedings.)

6          THE COURT:  Ms. Taylor, are you intending to offer

7   the evidence to tie those records up to the defendant through

8   this witness?

9          MS. TAYLOR:  Well, I believe that Agent Hooker has

10  already provided a lot of that evidence.  I think he -- his

11  testimony thus far has established that Mr. Ervin is clearly

12  the one that was operating the Auto Key Cards business that --

13  and that, as I mentioned, I believe he would be prepared to

14  testify that, for example, looking at Exhibit 53, on the second

15  page it says, "Name changes.  Old name, Justin Ervin.  New

16  name, AutoKeyCard.com."  That on page three of Exhibit 53 it

17  has a verified phone number, which is the (904) 405-9878 phone

18  number which Agent Hooker knows to belong to Mr. Ervin through

19  a number of different means, but including through his review

20  of Mr. Ervin's bank account information, which also specified

21  that phone number.

22         THE COURT:  Let me clarify one thing.  Are these

23  documents different than the ones that were addressed in the

24  motion in limine that I've already ruled on?

25         MR. KING:  I believe they are, Your Honor.  The

1  motion in limine dealt primarily, at least in my mind, with --

2  there was a lot of YouTube comments underneath the CRS.  So

3  everybody that went up on CRS, there was a lot of comments.

4  That was addressed towards those, was my recollection of the

5  motion.

6          MS. TAYLOR:  Your Honor, I believe that the motion in

7  limine was actually substantially broader than what -- or my

8  recollection is that it was substantially broader than what

9  Mr. King just represented; that there was an objection as to

10  hearsay to essentially all of the internet evidence that has

11  been gathered.  YouTube comments were one part of it, but it

12  also addressed emails and -- yeah, so what it -- what it

13  stated -- this is document 223 -- oh, sorry, this is the

14  Court's order specifying that the defendants asked the Court to

15  exclude evidence of hearsay statements made in electronic

16  communications and platforms, including YouTube comments and

17  electronic mail.

18          And so my view, Your Honor, is that this is already

19  addressed by the Court's order.

20          And as I said, I believe that the hearsay exceptions

21  that we already addressed in our response to the motion, and

22  that I believe the Court accepted in its ruling, would cover

23  the pages of this document, unless Mr. King has a specific page

24  that he believes would fall outside of all of those exceptions.

25          THE COURT:  All right.  Mr. King, it seems to me --

1    and as I was looking through this, it was what I thought --

2    that these fall within the motion in limine.  And if you didn't

3    intend to, I think the ruling would be the same unless the

4    government fails to adequately connect or establish that

5    Mr. Ervin was the user of this account.

6         To the extent there are messages by him, they're

7    admissions and they're admissible on that basis.  To the extent

8    there are comments back to him by others, they're offered for

9    context and not for the truth, as more fully explained in my

10   order.

11        If your objection is that they haven't tied it to

12   Mr. Ervin, then I'll let you address that on cross-examination.

13   But I think they've made a sufficient showing to allow that to

14   go to the jury.

15        If there are specific messages in here that you want

16   to address or object to, you can do that -- you can identify

17   them for me now and we'll address them.

18        MR. KING:  And Your Honor, I do have that cite for

19   the case.

20        THE COURT:  Okay.

21        MR. KING:  Your Honor, it's a Seventh Circuit case,

22   US v. Jackson.  It's 208 F.3d 633.  And it does collect some

23   additional cases.

24        THE COURT:  All right.  I'll take a look at it, but

25   I'm not ruling on that basis, so . . .

1          So were there specific messages that you wanted to

2   address in Exhibit 53, or -- well, we're only talking about 53.

3          MR. KING:  No, Your Honor.

4          THE COURT:  Is the argument the same as to 54?

5          MR. KING:  Yes, Your Honor.

6          THE COURT:  Any specific messages in 54?

7          MR. KING:  No, Your Honor.

8          THE COURT:  All right.  Then subject to the

9   government sufficiently establishing that the accounts belong

10   to Mr. Ervin, the objections are overruled.

11          MR. KING:  And Your Honor, if I could just -- for the

12   record, the issue with it is the accounts -- and I think

13   Ms. Wolfe, if she -- I think if Ms. Wolfe came and testified it

14   would potentially alleviate some of this.  But Ms. Wolfe used

15   these accounts and directly dealt with Auto Key Card customers.

16   And so to the extent that Ms. -- you know, Mr. Ervin created

17   the account, but then Ms. Wolfe was the one using it

18   frequently, if that makes sense.

19          So it was as if I set up an email address and then

20   had somebody else using it on my behalf that I was not

21   personally receiving or interacting with the messages, it would

22   not fall within that hearsay exception because a third person

23   is using it, even if I set up that account.

24          And I think Ms. Wolfe can say, "This is the account I

25   used, this is the account I didn't use."  But I don't think

1    Agent Hooker would be competent to testify to that.

2            THE COURT:  Mr. Mesrobian, apparently Mrs. Wolfe is

3    your witness?

4            MR. MESROBIAN:  Yes, Your Honor.  And it is my

5    understanding that she will come in and say -- or I anticipate

6    her testimony will be that she did not use the

7    AutoKeyCarddotcom Instagram at all, nor his personal Instagram,

8    Mr. Ervin's personal Instagram.

9            With respect to the emails, I think Mr. King may be

10   talking more about the AutoKeyCard.com email domain, which I

11   think is Exhibit 67 and all the various sub exhibits there.

12           Mrs. Wolfe I think will testify that she had an

13   account, AutoKeyCard.com, but admin@AutoKeyCard.com, I

14   believe -- I don't believe any of the emails here are

15   exclusively with that email address.  And she would testify

16   that Mr. Ervin was the one who controlled all of the other

17   AutoKeyCard.com email accounts and was very actively monitoring

18   them.

19           MR. KING:  Your Honor, in light of Mr. Mesrobian --

20   because of the way the discovery has been, in light of his

21   proffer, if that comes out, we would withdraw the objection on

22   that basis.

23           THE COURT:  All right.  Then I'll admit 53 and 54.

24      (Government's Exhibits 53 and 54 admitted in evidence.)

25           THE COURT:  And let's bring in the jury.

1         MS. TAYLOR:  Your Honor, if I may, one more thing.

2    Just for the record, we did do some research on this as well.

3    And the case that we would point the Court to is United States

4    v. Brown, which is 834 F.3d 403 at 412 to 415.  And that's a

5    Third Circuit Case from 2016 which talks about authenticating

6    Facebook records and messages and the standard for that.

7         THE COURT:  Okay.  I'll say to both of you-all, in

8    the future, if you're aware, as both of you clearly were, that

9    something like this is going to come up, if you bring it up in

10   the morning or in the afternoon, or even when I first let the

11   jury go out, instead of taking a break, I'll work through.  I

12   don't like to keep the jury waiting.

13        So I appreciate you-all being prepared on the issue,

14   and that's fine, but I'd like to use our time, not the jury's

15   time, in the future, so -- and I'll review this additional

16   case, but I understand the objection to be withdrawn, so let's

17   go ahead.

18        COURT SECURITY OFFICER:  All rise for the jury.

19      (Jury enters, 11:00 a.m.)

20        COURT SECURITY OFFICER:  Please be seated.

21        THE COURT:  All right.  Sorry to have kept you-all

22   waiting.

23        Ms. Taylor, you may continue.

24   BY MS. TAYLOR:

25   Q.   Special Agent Hooker, do you have in front of you an

1   exhibit that's marked Exhibit 53?

2   A.   Yes.

3   Q.   And could you describe for the jurors what this is.

4   A.   Records from Instagram.

5   Q.   And is it for a particular account?

6   A.   Yes.

7   Q.   And what account is that?

8   A.   AutoKeyCarddotcom.

9   Q.   And is the "dot" spelled out?

10  A.   It is.

11  Q.   And are these records that you obtained as a result of a

12  search warrant?

13  A.   Yes.

14  Q.   And Instagram is owned by Facebook; is that your

15  understanding?

16  A.   Yes.

17  Q.   And so these -- some of these records say that they're

18  from Facebook, correct?

19  A.   Correct.

20  Q.   But they are related to an Instagram account?

21  A.   Yes.

22  Q.   And these records were previously admitted into evidence,

23  correct?

24  A.   Yes.

25            MS. TAYLOR:  Your Honor, I believe that the Court

 1    admitted 53 and 54?

 2            THE COURT:  That's correct.

 3            MS. TAYLOR:  Okay.  If you could please, Ms. Ganoe,

 4    put the second page of Exhibit 53 on the screen.

 5    BY MS. TAYLOR:

 6    Q.   Looking at the middle part of this account --

 7            MS. TAYLOR:  Yeah, right there is good, thank you.

 8    BY MS. TAYLOR:

 9    Q.   -- it indicates a name associated -- first name associated

10    with the account, correct?

11    A.   Yes.

12    Q.   And what is that?

13    A.   Autokeycard.com.

14    Q.   And then right below that it says, "Name changes,"

15    correct?

16    A.   Yes.

17    Q.   And it says, "Old name."  What is that?

18    A.   Justin Ervin.

19    Q.   And new name is what?

20    A.   AutoKeyCard.com.

21    Q.   Looking at page 3 of this exhibit, and there's a phone

22    number right above that dark box, correct?

23    A.   Correct.

24    Q.   And it states that the phone number is verified?

25    A.   Yes.

1   Q.   And the phone number is +19044059878?

2   A.   Yes.

3   Q.   Are you familiar with that phone number?

4   A.   Yes.

5   Q.   How are you familiar with that phone number?

6   A.   Based upon my investigation, I know that that phone number

7   was associated with Mr. Ervin.  It was on his bank records as

8   the phone number belonging to him.  It's also been part of

9   numerous other email accounts that I served search warrants on

10  attributed to him.  And it's also been provided to me during

11  interviews of individuals who know his phone number.

12  Q.   Friends and family of Mr. Ervin?

13  A.   Correct.

14  Q.   Looking at page 43 --

15       MS. TAYLOR:  If you could zoom in on the middle part.

16  Q.   It says "About Me Definition," correct?

17  A.   Yes.

18  Q.   And what does the About Me paragraph say?

19  A.   "Just add an 's'" -- or "just add," in quotes, "'s,'

20  Autokeycards.com.  The first Autokeycard.com goes there too.

21  We own both.  Clear your cookies/cache in your browser to see

22  the original."

23  Q.   And when you were doing your undercover purchases, did you

24  correspond with email -- an email address that was

25  @autokeycard.com?

1   A.   Yes.

2   Q.   And did you also receive correspondence on one of your

3   undercover purchases from an email address @autokeycards.com?

4   A.   Yes.

5   Q.   And so one of them has an "s" after "card" and the other

6   doesn't?

7   A.   Correct.

8   Q.   Did you have some understanding from your investigation

9   why there were two different websites?

10  A.   Yes.

11  Q.   And what's that?

12  A.   My understanding was the first website was shut down.

13  Q.   Okay.  And looking at page 53 -- sorry, page 44, what's --

14  what's shown in the -- there's an image at the top of this

15  page, correct?

16  A.   Yes.

17  Q.   What's shown in this image?

18  A.   That's an auto key card 1 in 1 Pen Holder Edition.

19  Q.   And is it the G2 version?

20  A.   Yes.

21  Q.   With the broken lines?

22  A.   Yes.

23  Q.   And is there a pen -- a pen through the hole of the pen

24  holder?

25  A.   Yes.

1   Q.    And what was the date that this indicates it was taken?

2          MS. TAYLOR:  If you can zoom in, Ms. Ganoe.

3   A.    February 25th, 2021.

4   Q.    And then right above the dark box at the bottom there --

5          MS. TAYLOR:  Ms. Ganoe, if you can zoom in.

6   BY MS. TAYLOR:

7   Q.    -- is there a caption that was with it, where it says

8   "text"?

9   A.    Yes.

10  Q.    What does that read?

11  A.    "New G2 Pen Holder Edition available now.  All artwork on

12  sale.  Check it out."

13  Q.    On page 45 of the exhibit, is this another image of a G2

14  pen holder type auto key card?

15  A.    Yes.

16  Q.    Looking at page 48, this appears to be an aircraft that's

17  pictured?

18  A.    Yes.

19  Q.    Is this an image that you were able to see on the public

20  viewable part of this Instagram account?

21  A.    Yes.

22  Q.    And looking at the next page, where it says "text," is

23  there a caption posted with that image?

24  A.    Yes.

25  Q.    What's the date that's specified?

1    A.    November 27th, 2020.

2    Q.    And what does the text read?

3    A.    "Clear your cookies and web data.  Autokeycard.com is back

4    up and we have a secondary site up at Autokeycards.com with an

5    's' until we get both sites pointed to our new online freedom

6    store platform next week.  All orders will be fulfilled.

7    15 percent off sale Black Friday to Cyber Monday.  Code:

8    15 percent off.  Thank you for the support during this time.  I

9    am thankful for all of you."

10   Q.    Looking at page 54 of the exhibit, is there an image on

11   this page?

12   A.    Yes.

13   Q.    What does it appear to you to be based on your

14   investigation?

15   A.    A cardboard box with the padded white mailers similar to

16   the ones that I received during my undercover purchase.

17   Q.    And does it indicate at the bottom a date that this was

18   taken?

19   A.    November 9th, 2020.

20   Q.    And looking at the next page, page 55, is there an image

21   on this page?

22   A.    Yes.

23   Q.    What is it?

24   A.    Numerous auto key cards, Pen Holder Edition, Bottle Opener

25   Edition.  They appear to be wet or have some type of water

1    droplets on them.  And they are on a towel.

2    Q.   Is this one of the images you were describing earlier?

3    A.   Yes.

4    Q.   Page 56, please.  What is depicted on this page?

5    A.   An image.

6    Q.   Is it -- what type of image is it?

7    A.   It is an auto key card 3 in 1 Bottle Opener Edition with a

8    pen through it.

9    Q.   Is there anything else in the image?

10   A.   I'm not sure what you're trying to get me to focus on.

11   Q.   The image of the auto key card is imposed on another

12   image, correct?

13   A.   Correct.

14   Q.   And is there writing on that other image?

15   A.   Yes.

16   Q.   What does it say?

17   A.   "Autokeycard.com.  My man has one . . . Does yours?"

18   Q.   And there's a female's rear-end in the image?

19   A.   Correct.

20   Q.   Did it appear to you that this image was advertising the

21   auto key cards?

22   A.   Yes.

23        MS. TAYLOR:  Page 62, please.

24   BY MS. TAYLOR:

25   Q.   This is a non Pen Holder Edition auto key card on this

1    page, correct?

2    A.    Yes.

3    Q.    And there's a pen with it, though?

4    A.    Yes.

5    Q.    And the pen is just clipped on to the auto key card?

6    A.    Correct.

7    Q.    Turning to page 169, were there any messages in this

8    account that were pertinent to your investigation?

9    A.    Yes.

10   Q.    Looking at the -- zooming in to the bottom of the text

11   here, it says "Thread," and then there's a long number,

12   correct?

13   A.    Yes.

14   Q.    And it says "Participants."  Who are the participants?

15   A.    Prettynpink0421 and Autokeycarddotcom.

16   Q.    And are you familiar with the prettynpink0421 account?

17   A.    Yes.

18   Q.    How are you familiar with that?

19   A.    During my investigation I learned that it belonged to

20   Erica Ibe, who may be Erica Hoover presently.

21   Q.    And how is she related to your investigation?

22   A.    She had communication with Mr. Ervin.

23   Q.    From your investigation, do you know her to be related to

24   anyone that was part of your investigation?

25   A.    I believe she's Mr. Hoover's wife.

1          MS. TAYLOR:  Your Honor, if I could bring up

2   Exhibit 96 to the witness.

3          THE COURT:  You may.

4   BY MS. TAYLOR:

5   Q.   Would you please describe what's in Exhibit 96.

6   A.   It is a -- many different photographs of a female.

7   Q.   And is it from the prettynpink0421 Instagram page?

8   A.   I believe so.  It's so small I can't see it.  But I

9   believe it is, yes.

10  Q.   Did you review this document in electronic format

11  previously?

12  A.   Yes.

13  Q.   And when you reviewed it in electronic format, could you

14  see the name of the account?

15  A.   Yes.

16  Q.   And was it the prettynpink 0421 Instagram account?

17  A.   Yes.

18          MS. TAYLOR:  Your Honor, I'd move for admission of

19  Exhibit 96.

20          MR. KING:  Without objection.

21          MR. ZERMAY:  No objection.

22          THE COURT:  96 is admitted.

23     (Government's Exhibit 96 admitted in evidence.)

24  BY MS. TAYLOR:

25  Q.   And looking at that -- looking at that exhibit -- well,

1   let's pull up 96, please.

2           MS. TAYLOR:  If could you zoom in on the top part.

3   BY MS. TAYLOR:

4   Q.   There's a -- you can see here the name of the Instagram

5   account, correct?

6   A.   Yes.

7   Q.   And it says prettynpink0421?

8   A.   Yes.

9   Q.   And there's a profile picture in a circle or an oval to

10  the left of that, correct?

11  A.   Correct.

12  Q.   And is there anyone that you recognize depicted in that --

13  in that oval or circle?

14  A.   Mr. Hoover.

15  Q.   How do you recognize Mr. Hoover?

16  A.   I've seen many of his videos.  I've seen him in court.

17  I've seen his tattoos on his videos.

18  Q.   Can you see his distinctive tattoo in this picture?

19  A.   Yes.

20  Q.   And then there's a female pictured in the first three kind

21  of square-shaped photos in the account, correct?

22  A.   Yes.

23  Q.   And is this female pictured in the vast majority of the

24  pictures on this account?

25  A.   Yes.

1    Q.    And who is the female pictured here?

2    A.    Erica Hoover.

3    Q.    Okay.  And so that -- this is the account that was

4    corresponding with the @autokeycarddotcom account that we were

5    just looking at?

6    A.    Yes.

7          MS. TAYLOR:  Okay.  If we could go back to

8    Exhibit 53, page 169 -- actually, page 170.  And zoom in on the

9    top message.

10   BY MS. TAYLOR:

11   Q.    This says the author is who?

12   A.    Autokeycarddotcom.

13   Q.    And when was this message sent?

14   A.    December 8, 2020.

15   Q.    And what does the message read?

16   A.    I think it should have read, "This is Justin from

17   autokeycard.  I wanted to say hello and ask about what Matt

18   would like for Christmas.  He has been very good to us and I

19   wanted to send him a Christmas gift.  I can send cash but maybe

20   there's something better you could suggest.  Let me know."

21         MS. TAYLOR:  Could you scroll down, Ms. Ganoe, to the

22   next message.

23   BY MS. TAYLOR:

24   Q.    Did the prettynpink account respond to that message?

25   A.    Yes.

1    Q.    And what did they say?

2    A.    "Hello.  Nice to finally meet you.  I'm Erica.  I always

3    have suggestions for him.  He's always spitting out stuff he

4    wants or needs.  LOL.  What price range are you looking at?"

5    Q.    And did she send another message after that?

6    A.    Yes.

7    Q.    What did she say?

8    A.    "I'm a girl.  I was bred to shop.  Ha."

9    Q.    And did the autokeycard account send another message?

10   A.    Yes.

11   Q.    What did he say?

12   A.    "He has been a" --

13            MS. TAYLOR:  If you can focus on that.  Yep.

14   A.    "Nice to finally meet and talk to you.  Up to 500 is my

15   budget.  Think about it for a few days.  I know you're in the

16   shopping zone.  I need your expertise.  I am looking to send it

17   in about a week" -- or "send it about a week before Christmas.

18   I was going to send cash but there may be something better.

19   See what you can come up with."

20   Q.    And then did he send another message from the

21   autokeycarddotcom account?

22   A.    Yes.

23   Q.    What did he say?

24   A.    "He has been a great business buddy and a great friend

25   too.  I want the gift to be on that mark."

1   Q.    And did Ms. Hoover respond?

2   A.    Yes.

3   Q.    What did she say?

4   A.    "Sounds good.  I'll probably send you links.  There's a

5   few things I can think of.  Aw.  That's awesome.  He really is

6   such a good man.  I wouldn't be with him if he wasn't, ya know.

7   Okay.  Let me look around a bit."

8   Q.    And then did Mr. Ervin respond from the autokeycarddotcom

9   account?

10  A.    Yes.

11  Q.    What did he say?

12  A.    "Awesome.  Let me know.  I want to do my part as he has

13  helped us significantly."

14  Q.    And did Ms. Hoover respond?

15  A.    Yes.

16  Q.    What did she do?

17  A.    "Will do."

18  Q.    What did she say?

19  A.    "Congrats on your site, by the way."

20  Q.    Moving through these messages, did Mr. Ervin and

21  Ms. Hoover have some discussions about particular items that

22  might be appropriate to purchase?

23  A.    Yes.

24  Q.    And were they related to video production?

25  A.    Yes.

1   Q.   And looking at page 171 in the middle, on December 9th,

2   did Mr. Ervin say, "Let's get you guys a studio setup"?

3   A.   Yes.

4   Q.   And then did he say, "Perfect.  Can you give me the home

5   address to send it?  I have the shop address only"?

6   A.   Yes.

7   Q.   And then did he ask, "Can you wrap them for me if I send

8   them there?  It would be cool"?

9   A.   Yes.

10  Q.   And then did Ms. Hoover respond, "401 Chilewski Drive,

11  Coloma, Wisconsin, 54930"?

12  A.   Yes.

13  Q.   Is that an address that you're familiar with?

14  A.   Yes.

15  Q.   How are you familiar with that address?

16  A.   Based on my investigation, I determined it to be their

17  residential address.

18  Q.   The residential address for who?

19  A.   There was also -- for Mr. Hoover.

20  Q.   And Mrs. Hoover?

21  A.   Yes.

22  Q.   Sorry, please continue.

23  A.   ATF in Wisconsin also served a grand jury subpoena to

24  Ms. Hoover at that address and she was present.

25  Q.   And did they then have some more messages about -- about

1    what to send?

2    A.    Yes.

3    Q.    And then looking at page 172, at the bottom chunk --

4             MS. TAYLOR:  I'm sorry, the one right before that.

5    BY MS. TAYLOR:

6    Q.    Did Mr. Ervin ask on December 9th, "What name do you want

7    me to use for the shipping?"

8    A.    Yes.

9    Q.    And then did Ms. Hoover respond, "Erica Ibe"?

10   A.    Yes.

11   Q.    And is that the name that you knew Ms. Hoover to go by

12   prior to marrying Mr. Hoover?

13   A.    Yes.

14   Q.    And then at the bottom of the page does it indicate that

15   the autokeycarddotcom account sent a photo?

16   A.    Correct.

17   Q.    And that's on December 9th of 2020?

18   A.    Yes.

19   Q.    And on the next page, is that the photo that was sent

20   according to the records?

21   A.    Yes.

22   Q.    What's -- what's depicted in the photo?

23   A.    I -- it's I believe studio equipment consisting of a

24   microphone of some type.

25   Q.    Does it appear to be a photo of a computer monitor?

1   A.   Yes.

2   Q.   And so is the equipment listed on a website?

3   A.   Yes.

4   Q.   Are you able to recognize what website that is?

5   A.   Amazon.com.

6   Q.   And did Mr. Ervin and Ms. Hoover have some additional

7   conversations about the equipment?

8   A.   Yes.

9   Q.   Including exchanging additional photos?

10  A.   Yes.

11  Q.   And then looking at page 178, Ms. Ganoe is going to zoom

12  in on some of the messages.

13        Did Mr. Ervin, from the autokeycarddotcom account,

14  say, "It's okay, we will figure it out together"?

15  A.   Yes.

16  Q.   And then did Ms. Hoover state, "I don't want to empty your

17  bank account though"?

18  A.   Yes.

19  Q.   And then a few messages down, did Mr. Ervin say, "He is

20  worth it all, you know that.  He has been good to me.  I will

21  do the same"?

22  A.   Yes.

23  Q.   And then at the bottom of this page, did Mr. Ervin state

24  on December 9th, "He is an amazing individual.  I like doing my

25  part as he helped me a lot too"?

1  A.   Yes.

2  Q.   And looking at page 181, did Mr. Ervin send an additional

3  photo of his computer screen?

4  A.   Yes.

5  Q.   And did it show a subtotal, 11 items, for $797.85?

6  A.   Yes.

7  Q.   And does it -- right at the -- above where it says the

8  subtotal in that image, there's an American flag at the top

9  left corner of the part we're zoomed in, right?

10  A.   Correct.

11  Q.   And does it say "Hello, Justin" right next to that?

12  A.   It does.

13  Q.   And looking at page 182 --

14       MS. TAYLOR:  And zoom in on the top part, please.

15  BY MS. TAYLOR:

16  Q.   -- did Ms. Ibe say on the same date, December 9th of 2020,

17  "Well, thank you very much.  Awesome.  Me too.  I can't wait

18  for him to open them.  Way too exited.  Thank you again"?

19  A.   Yes.

20  Q.   And then did she say, "Bless your heart.  This means so

21  much.  Thank you again"?

22  A.   Yes.

23  Q.   And then did Mr. Ervin state, "Kim" -- and I think -- does

24  it appear that's supposed to be "Okay, I am," or something like

25  that?

1    A.    That's my assumption.

2    Q.    "Am ordering them now.  Can I get your phone number for

3    the shipment?  Amazon may call to help with delivery.  Plus I

4    think they will send a text when delivered"?

5    A.    Yes.

6    Q.    And did Ms. Hoover send a phone number?

7    A.    Yes.

8    Q.    What's the phone number that she sent?

9    A.    (608) 617-0055.

10   Q.    And did Mr. Ervin state he's ordering them now?

11   A.    Yes.

12   Q.    And then did he say, "Kim, typo, LOL"?

13   A.    Correct.

14   Q.    Looking on page 183, Mr. Ervin sent another image,

15   correct?

16   A.    Yes.

17   Q.    And does it indicate an Order Summary with a total being

18   $841.70?

19   A.    Yes.

20   Q.    And then looking on page 184, did he send another photo?

21   A.    Yes.

22   Q.    And does it indicate that an order had been placed with

23   items to be shipped?

24   A.    Correct.

25   Q.    And then did he send additional messages after that?

1    A.    Yes.

2    Q.    Did he state on December 9th, "Done.  All delivered by the

3    16th"?

4    A.    Yes.

5    Q.    And then on December 9th of 2020 at the bottom, did he

6    say, "It's me calling.  You have one minute"?

7    A.    Yes.

8    Q.    After that there were -- there was a period of time where

9    there were no messages between the two of them, correct?

10   A.    Correct.

11   Q.    Looking at the next page, 185, were there additional

12   messages that began on December 30th of 2020?

13   A.    Yes.

14   Q.    And did Ms. Hoover state, "Thank you for the keychain.

15   That was very special.  I love it," with a smily face?

16   A.    Yes.

17   Q.    And what did Mr. Ervin state?

18   A.    "Your man helped" -- excuse me.  "Your man helped to make

19   it all possible.  He is one hell of a salesman.  I was just

20   thinking bling, bling when I saw it.  I figured it was

21   something most people don't get, so I got it.  The new year is

22   going to be great for us all.  Matt and I have been brain

23   storming and making big plans for our futures.  Thank you so

24   much."

25   Q.    And then did Ms. Ibe -- or, sorry, Mrs. Hoover respond to

1  that message?

2  A.   Yes.

3  Q.   What does she say?

4  A.   "It definitely looks gorgeous with the purse.  I love

5  shiny bling, rhinestone stuff.  I really appreciate it and

6  thank you for everything you have done for our family.  Much,"

7  and there's a heart symbol, "to you and your family."

8  Q.   And then did she send another message on January 2nd?

9  A.   Yes.

10 Q.   Does she state that, "I just wanted to let you know that

11 your business cards that are in the ouch" -- which appears to

12 be a typo for "pouch," correct?

13 A.   That's my assumption, yes.

14 Q.   -- "with the item say autokeycard and not autokeycards.

15 I'm sure you know but just in case you haven't.  I know when

16 Matt did his last live stream people were getting confused with

17 what site they should use"?

18 A.   Correct.

19 Q.   And then did Mr. Ervin state, "They both go to the same

20 place.  The store is at autokeycards.com.  If you go to the

21 original with no 's' then click on enter it goes to the store

22 with an 's.'  Next month I am moving the site to our new

23 freedom platform.  Then it will be autokeycard.com for the

24 store.  Then the one with an 's' will go there too.  This all

25 comes from my original hosting service closing my store for no

1   reason and me getting back up quickly.  I'm just getting rid of

2   the last of my old logo business cards.  I'm going to make new

3   ones with the new logo and info next month"?

4   A.   Yes.

5   Q.   And then the last two messages on this page, did Mr. Ervin

6   send a message to Ms. Hoover on January 3rd of 2021?

7   A.   Yes.

8   Q.   What did he say?

9   A.   "Good job on the live stream.  That was real creative

10  using Instagram too.  There were 30 orders by the next morning

11  after I went to bed at 2 a.m."

12  Q.   And then did Ms. Hoover respond on the same day, "Oh,

13  okay.  That's awesome.  Matt didn't want to do and said it may

14  be more" -- "it may be stupid, but I pushed him to do it, and

15  then he said thank you to me, LOL.  I also answered emails that

16  wanted links to the site too"?

17  A.   Yes.

18  Q.   You also searched another Instagram account related to

19  Mr. Ervin, correct?

20  A.   Yes.

21  Q.   And did that appear to be a personal account for him?

22  A.   Yes.

23  Q.   If -- and you're looking at Exhibit 54, correct, which was

24  already admitted into evidence?

25  A.   I am.

1           MS. TAYLOR:  And if we could pull up page 2,

2  Ms. Ganoe.

3  BY MS. TAYLOR:

4  Q.   Looking at the top of this information, it indicates the

5  Account Identifier is what?

6  A.   TherealJustin_Ervin.

7  Q.   And in the middle of this page does it indicate a first

8  name?

9  A.   Kristopher.

10  Q.   It says Name, First, and then?

11  A.   Oh, I'm sorry.  It says "Kristopher Justin Ervin" all

12  under the first name.

13  Q.   And then looking at page 3 at the top, does it indicate a

14  vanity name?

15  A.   Yes.

16  Q.   And does it say -- does it indicate there was a change to

17  the vanity name?

18  A.   Yes.

19  Q.   What does it say the old vanity was?

20  A.   Kristopher_Justin_Ervin.

21  Q.   And what is the new vanity?

22  A.   TherealJustin_Ervin.

23  Q.   And does it have a phone number right above the dark box

24  on this page?

25  A.   It does.

1   Q.   And what is that phone number?

2   A.   +19044059878.

3   Q.   Is that the same phone number that was on the business

4   Instagram account?

5   A.   Yes.

6   Q.   And you already testified that you had attributed that

7   phone number to Mr. Ervin?

8   A.   I did.

9   Q.   Looking at page 7, is there an image posted to this page?

10  A.   Yes.

11  Q.   Is it a three-part image?

12  A.   Yes.

13  Q.   And does it appear that there are two -- two people

14  talking to each other in the first part of the image?

15  A.   Yes.

16  Q.   And that the person on the right is saying what?

17  A.   "We register cars, why shouldn't we register guns as

18  well?"

19  Q.   And then the middle image has the man on the left.  It's

20  more zoomed in on his face and he's smiling?

21  A.   Yes.

22  Q.   And then the bottom image is even more zoomed in on the

23  left, on the man on the left, and he is saying what?

24  A.   "I don't believe in registering cars either."

25  Q.   And then if you could -- sorry.  Is there a date indicated

1   on this posting?

2   A.   January 12th, 2021.

3   Q.   Is that right around the time that you began your

4   investigation of Mr. Ervin?

5   A.   Four days after.

6   Q.   If you could please look at page 9.  Is there an image

7   posted on this page as well?

8   A.   Yes.

9   Q.   What is -- what appears to be depicted in this image?

10  A.   It's an image.  There's people in Colonial garb -- what

11  appears to be Colonial garb firing weapons at -- my assumption,

12  it's British Redcoats.

13  Q.   And they're on either side of a bridge?

14  A.   Correct.

15  Q.   And there are words that have been typed on top of the

16  image, correct?

17  A.   Yes.

18  Q.   What do they say?

19  A.   "Americans lining up to register their guns."

20  Q.   And what -- when does the record indicate that this was

21  posted?

22  A.   January 8th, 2021.

23  Q.   Looking at page 10 of the document, is there a cartoon

24  that's posted?

25  A.   Yes.

1    Q.    Does it have four panels in the cartoon?

2    A.    Yes.

3    Q.    And what does the first panel read?

4    A.    "Don't like it?  Build your own Twitter."

5    Q.    And what does the second panel read?

6    A.    "Don't like it?  Build your own payment processor."

7    Q.    And the third panel?

8    A.    "Don't like it?  Build your own . . . uh . . .

9    government."

10   Q.    And what's in the fourth panel?

11   A.    There's no -- nothing written there.

12   Q.    It's just -- is it just the cartoon character?

13   A.    Correct.

14   Q.    Does he appear to have a bead of sweat dripping off of his

15   head?

16   A.    Yes.

17   Q.    When was this posted?

18   A.    January 8th, 2021.

19   Q.    If you could look at page 11, please.  There's an image

20   posted on this page, correct?

21   A.    Correct.

22   Q.    And what -- what's in the top part of the image?

23   A.    It's a photograph, or a picture.

24   Q.    What's in the picture?

25   A.    Again, I -- you know, individuals dressed in what I would

1    describe as Colonial garb, looks like they're crossing some

2    type of river on a barge.

3    Q.    And does it state underneath that, "Americans willing to

4    cross a frozen river to kill you in your sleep on Christmas.

5    Totally not kidding.  We've done it"?

6    A.    Yes.

7    Q.    And when was this posted?

8    A.    December 30th, 2020.

9    Q.    And then page 13.  Is there another image posted?

10   A.    Yes.

11   Q.    When was this one posted?

12   A.    November 21st, 2020.

13   Q.    And at the top it says, "I'm sorta thinking we are getting

14   close to this"?

15   A.    Yes.

16   Q.    And then are there -- there's an image below that,

17   correct?

18   A.    Yes.

19   Q.    Who appears to be on the left side of the image?

20   A.    British troops.

21   Q.    And on the right side of the image?

22   A.    American colonists.

23   Q.    And what do the British appear to be saying?

24   A.    "Get inside your house."

25   Q.    And what do the colonists say?

1   A.   "F star star K you."

2   Q.   If we could go to page 16.  Is there another image posted

3   on this page?

4   A.   Yes.

5   Q.   What -- what is in the actual -- like not talking about

6   the words.  What's in the image?

7   A.   There's an American flag and an individual, seems to be

8   squatting down.  He's wearing a coat and a hoodie over his

9   head.

10  Q.   And the flag is not the current American flag, correct?

11  A.   Correct.

12  Q.   Because it does not have 50 stars on it?

13  A.   Yes.

14  Q.   And then at the top does it state, "The silent patriot"?

15  A.   Yes.

16  Q.   And then what does it say below at the bottom?

17  A.   "The day is coming when good people will be forced to do

18  bad things to bad people."

19  Q.   And when was this posted?

20  A.   November 2nd, 2020.

21  Q.   Page 17, please.  Is there an image on this page?

22  A.   Yes.

23  Q.   What is in this image?

24  A.   An individual smoking a cigarette, has makeup on his face.

25  Q.   And what is -- are there words on this image?

1    A.    Yes.

2    Q.    What do they say?

3    A.    "Rule number one:  F-u-c-k what they think."

4    Q.    When was this posted?

5    A.    November 2nd, 2020.

6    Q.    Page 18, please.  Is there an image posted on this page?

7    A.    Yes.

8    Q.    And what is depicted in this image on the left side?

9    A.    A female's breasts.

10   Q.    Do they have -- do they each have a word typed over on top

11   of each breast?

12   A.    Yes.

13   Q.    What does the top one say?

14   A.    "Liberty."

15   Q.    What does the other one say?

16   A.    "Firearms."

17   Q.    And what's on the right side of the picture?

18   A.    A small dog, maybe a Chihuahua.

19   Q.    And what's the Chihuahua doing?

20   A.    Licking his lips.

21   Q.    And where is he looking?

22   A.    At the breasts.

23   Q.    And does it say "me" on the Chihuahua's head?

24   A.    Yes.

25   Q.    Looking at page -- or, I'm sorry, when was that posted?

1    A.    October 26th, 2020.

2    Q.    Looking at page 19, there's an image posted on this page?

3    A.    Yes.

4    Q.    Do you recognize the person in this image?

5    A.    Yes.

6    Q.    Who is it?

7    A.    Mr. Ervin.

8    Q.    Does it appear to have a filter over it?

9    A.    Yes.

10   Q.    How do you -- is there any article of clothing that you

11   recognize in this image that you also saw Mr. Ervin wearing at

12   points in your investigation?

13   A.    The white sunglasses.

14   Q.    When was this posted?

15   A.    October 19th, 2020.

16         MS. TAYLOR:  Could you please go to page 27.  And

17   zoom in on the top part of the page, please.

18   BY MS. TAYLOR:

19   Q.    This indicates that therealJustinErvin account had

20   messages exchanged with Texas_gun_vault?

21   A.    Yes.

22   Q.    And does the Justin Ervin account on November 14th send a

23   message?

24   A.    Yes.

25   Q.    What does he say?

1    A.    "Hey, it's me.  I got your message and sent you a reply.

2    Let's talk more."

3    Q.    And then did he send another message?

4    A.    Yes.

5    Q.    What did he say?

6    A.    "Oh, I" -- excuse me.

7          "Oh, I forgot one thing.  It is equal to a solvent

8    trap.  Just a piece of metal and notagunpart.com."

9    Q.    And do you have any experience with solvent traps?

10   A.    Yes.  I have conducted investigations involving solvent

11   traps.

12   Q.    What is a solvent trap?

13   A.    It is a device that is purported to attach to the end of

14   your barrel.  And it has baffles within it that are purported

15   to catch the solvents that are used to clean a gun.

16   Q.    And when you say "your barrel," so it's something that

17   screws on to a gun?

18   A.    Yes.

19   Q.    And you said it's purported to be used to catch cleaners

20   for the gun?

21   A.    Yes.

22   Q.    In your experience, does a solvent trap have a true use

23   that's different from that?

24   A.    We often find that people drill -- drill holes in it and

25   use it as a silencer.

1    Q.    When you say "baffles," what are baffles?

2    A.    Those are items within a silencer that are used to reduce

3    the sound that is produced by the firing of a projectile.

4    Q.    Okay.  So that's what causes the sound to be muffled?

5    A.    Correct.

6    Q.    Let's look at the other messages on this page, please.

7          Did Texas_gun_vault send a message back on

8    November 14th, 2020, saying, "Hey.  Thank you for sending me

9    those.  It took me a little bit to figure out what they were"?

10   A.    Yes.

11   Q.    And did Mr. Ervin respond?

12   A.    Yes.

13   Q.    What did he say?

14   A.    "Cool.  Thank you too.  I am a fan.  My whole business

15   model is to support great channels and help them grow while

16   educating and creating interesting conversations.  CRS did a

17   video and it's going viral with over 150,000 views since

18   Thursday.  Sales have been good too.  It's a win win.  Let me

19   know if I can help you in any way.  It's not only about sales,

20   it's about growing the public perception of our freedoms.  I

21   have several other not related products I am working on.  Many

22   possibilities in the future to help each other.  Reach out any

23   time.  I appreciate you."

24   Q.    Does CR- -- did you understand "CRS" to refer to something

25   in particular?

1    A.    Yes.

2    Q.    And based on your investigation, what did you believe

3    "CRS" to refer to?

4    A.    The CRS Firearms YouTube channel.

5    Q.    And who runs the CRS Firearms YouTube channel?

6    A.    Matthew Hoover.

7    Q.    Do you see Mr. Hoover in the courtroom?

8    A.    Yes.

9    Q.    And you're able to recognize him how?

10   A.    As I said before, I've had interactions with him in court,

11   I've watched his YouTube channels.

12   Q.    And could you please describe which individual in this

13   courtroom is Matthew Hoover.

14   A.    He's sitting at the end of the second defense table.  He's

15   wearing a bright blue suit.  He's raising his hand presently.

16          MS. TAYLOR:  And Your Honor, I would ask for the

17   record to reflect that Special Agent Hooker has identified

18   Mr. Hoover.

19          THE COURT:  The record will so reflect.

20   BY MS. TAYLOR:

21   Q.    Looking at page 28, there's a message thread with a user

22   bjjwolfe, correct?

23   A.    Correct.

24   Q.    Do you know who bjjwolfe is?

25   A.    Yes.

1  Q.    Who is that?

2  A.    Mrs. Wolfe.  I can't remember her first name at this time.

3  Q.    Okay.  But you understand her to -- what was her role in

4  your investigation, as far as your investigation revealed?

5  A.    She was assisting Mr. Ervin with the auto key cards

6  business.

7  Q.    Did you also serve search warrants to a company called

8  Namecheap?

9  A.    Yes.

10  Q.    How was Namecheap related to your investigation?

11  A.    We determined that they were the company that provided

12  email -- customer service support for the Auto Key Cards sales.

13  Q.    And I jumped ahead a little bit.  You have Exhibit -- do

14  you have Exhibit 51 in front of you and 52?

15  A.    I do.

16  Q.    Could you describe what 51 is?

17  A.    Records from Amazon.com.

18  Q.    Did you obtain these by subpoena?

19  A.    Yes.

20  Q.    And 52, what is that?

21  A.    Records from Louis Vuitton.

22  Q.    And did you obtain these by subpoena?

23  A.    Yes.

24         MS. TAYLOR:  I would move for the admittance of

25  Exhibits 51 and 52.

1          MR. KING:  Without objection, Your Honor.

2          MR. ZERMAY:  No objection, Your Honor.

3          THE COURT:  51 and 52 are admitted and you may

4    publish.

5      (Government's Exhibits 51 and 52 admitted in evidence.)

6          MS. TAYLOR:  Ms. Ganoe, could you please bring up 51,

7    page 2, and let's look at the Account Information.

8    BY MS. TAYLOR:

9    Q.   Who is specified to be the accountholder for this account?

10   A.   Justin Ervin.

11   Q.   And is there an email address associated with that?

12   A.   JustinErvin80@aol.com.

13   Q.   And under Payment Information there are a number of

14   different credit cards, correct?

15   A.   Yes.

16   Q.   Do some of them -- two of them say "Kristopher J. Ervin,"

17   correct?

18   A.   Yes.

19   Q.   And then one says "Justin Ervin"?

20   A.   Yes.

21   Q.   And then many of them say "Kris A. Ervin," correct?

22   A.   Yes.

23   Q.   Is that a different person from Justin Ervin?

24   A.   Yes.

25   Q.   Who is that?

1    A.    His father.

2    Q.    Based on your investigation, did Justin Ervin regularly

3    use the credit card belonging to his father?

4    A.    Yes.

5    Q.    And looking at the Address History, let's look at the very

6    first one.  It indicates that an address for Erica Ibe is

7    stored in this Amazon account, correct?

8    A.    Yes.

9    Q.    And it's been redacted, but it indicates that address is

10   in Coloma, Wisconsin?

11   A.    Correct.

12   Q.    And it indicates "created on December 9th of 2020"?

13   A.    Yes.

14   Q.    Does that correspond with the messages that were sent

15   between the prettypink Instagram account and the -- the

16   autokeycarddotcom Instagram account?

17   A.    I believe so.

18   Q.    Let's also look at -- so now let's look at page 52.  In

19   those Instagram messages there is reference to a purse and a

20   keychain, correct?

21   A.    Yes.

22   Q.    And did you receive information that led you to believe

23   that that purse had been purchased at a particular location?

24   A.    Yes.

25   Q.    And where was that?

1    A.    The Louis Vuitton store in Jacksonville, Florida.

2    Q.    Did you go with a subpoena to the Louis Vuitton store?

3    A.    I did.

4    Q.    And did that subpoena call for them to give you any

5    records related to purchase by Mr. Ervin?

6    A.    Yes.

7    Q.    And were you able to obtain a record?

8    A.    Yes.

9          MS. TAYLOR:  If we could look at page two, please.

10   BY MS. TAYLOR:

11   Q.    The top part of this indicates it's a record from Louis

12   Vuitton, and then at 4834 River City Drive in Jacksonville,

13   Florida, correct?

14   A.    Yes.

15   Q.    And there's customer information right there, correct?

16   A.    Yes.

17   Q.    Who is the client?

18   A.    Kristopher Ervin.

19   Q.    And what's the date?

20   A.    November 30th, 2020.

21   Q.    And what are the items that are reflected to have been

22   purchased on this record?

23   A.    I believe the first one is the keychain that was

24   mentioned, or -- I'm not very familiar with these items.  The

25   second one was the purse.

1    Q.    And the first one, the one that you believe is the
2    keychain, how much was that?
3    A.    $400.
4    Q.    And the one that is the purse says "Alma BB MNG," correct?
5    A.    Yes.
6    Q.    How much was that?
7    A.    $1,430.
8    Q.    And was there sales tax charged?
9    A.    There was.
10   Q.    And what was the total amount paid for these two items by
11   Mr. Ervin?
12   A.    $1,958.10.
13   Q.    And how did he pay for them?
14   A.    With cash.
15   Q.    Okay.  So getting back to Namecheap, how did Namecheap
16   come up in your investigation?
17   A.    We determined that they were the company -- the hosting
18   company for the emails -- the customer service emails related
19   to the autokeycard.com.
20   Q.    And you had said that you had personally corresponded with
21   at least two different email accounts in your undercover
22   purchases, correct?
23   A.    Correct.
24        MS. TAYLOR:  I want to approach the witness, Your
25   Honor, with Exhibits 67 and 67A through triple C.

1          THE COURT:  Go ahead.

2    BY MS. TAYLOR:

3    Q.   Agent Hooker, you have Exhibit 67 in front of you now?

4    A.   Yes.

5    Q.   And what is that?

6    A.   A Declaration of Authentication of Business Records.

7    Q.   And take a minute to thumb through A through triple C and

8    verify what those are and then please tell us.

9    A.   They are emails from the customerservice@autokeycard or

10   autokeycards.com account.

11   Q.   And if I could have you, in particular, look at 67CCC.  It

12   should be the last one.

13   A.   My last one is 67V, as in victor.

14   Q.   Okay.

15          MS. TAYLOR:  Your Honor, apparently that one is the

16   disk.  So if I may, I'm going to sub in my 67CCC.  It's a paper

17   version.

18          MR. KING:  I was going to say, we can stipulate to

19   that.  I have that.  No objection.

20          THE COURT:  All right.  Mr. King has no objection to

21   it.

22          So Mr. Zermay, any objection?

23          MR. ZERMAY:  No objection, Your Honor.

24          THE COURT:  All right.  Do you just want to move it

25   into evidence?

1          MS. TAYLOR:  Sure.  So -- is that to all of them?

2          THE COURT:  Is that the whole --

3          MR. KING:  The entire 67 series, if they want to move

4    it into evidence, we can get going.

5          THE COURT:  All right.

6          MS. TAYLOR:  Okay.

7          THE COURT:  So -- hold on.  67A through triple -- 67

8    and 67A through triple C are admitted.  Do you want to give

9    the -- well, I guess since it's admitted you can just display

10   it.

11       (Government's Exhibits 67 and 67A-67CCC admitted in

12   evidence.)

13          MS. TAYLOR:  Yes, Your Honor, if I may.

14          Your Honor, may I have a sidebar?

15          THE COURT:  Yes.

16       (Proceedings at sidebar:)

17          MS. TAYLOR:  These are going to take a little while

18   to walk through.  They're individuals emails.  I can get

19   started and you can just tell me when to stop, or I didn't know

20   if you want to stop now.

21          THE COURT:  If we stop now then the afternoon gets

22   too long.  I like to go to about 12:30.  That's kind of how I

23   keep it so I keep my promise to them of not sitting for more

24   than about an hour and a half.

25          MS. TAYLOR:  Okay.  Thank you.

```
 1              THE COURT:  Or an hour and 45 minutes.
 2         (Proceedings in open court:)
 3              MS. TAYLOR:  If we can have Exhibit 67CCC on the
 4    screen.
 5              THE COURT:  Can you get in front of a microphone,
 6    please.
 7              MS. TAYLOR:  I apologize.  That's 67CCC.
 8    BY MS. TAYLOR:
 9    Q.   And this has User Info from Namecheap, correct?
10    A.   Correct.
11    Q.   And on the left-most column, it indicates a username, user
12    ID.  What is the user name?
13    A.   JustinTime1980.
14    Q.   And what's the first name and last name for the account?
15    A.   Kristopher Justin Ervin.
16    Q.   And the email associated with the account?
17    A.   JustinErvin80@aol.com.
18    Q.   And what's the signup date?
19    A.   July 28th, 2020.
20    Q.   And if we could look at the remainder of that information.
21              Does it indicate an address for the account?
22    A.   Yes.
23    Q.   And what is that?
24    A.   2409 Kirkwall Court, Orange Park, Florida.
25    Q.   And is that the same residence that you searched?
```

1    A.   It is.

2    Q.   That's the residence of Mr. Ervin?

3    A.   Yes.

4    Q.   Looking at the second page.

5              MS. TAYLOR:  If we could look at the left-hand

6    column.

7    BY MS. TAYLOR:

8    Q.   It says at the top, "Whois details for autokeycard.com,"

9    correct?

10   A.   Yes.

11   Q.   And it has Registrant Contact, Administrative Contact,

12   Technical Contact, and Billing Contact, correct?

13   A.   Yes.

14   Q.   Are they all the same person?

15   A.   Yes.

16   Q.   Who is it?

17   A.   Kristopher Justin Ervin.

18   Q.   And is it at that same Kirkwall Court address?

19   A.   Yes.

20   Q.   And that's for AutoKeyCard without an "s," correct?

21   A.   Yes.

22   Q.   And the next page is page 3.  This is the "Whois details

23   for autokeycards.com" with an "s," correct?

24   A.   Yes.

25   Q.   And again:  Registrant Contact, Administrative Contact,

1    Technical Contact, and Billing Contact, all the same person?

2    A.   Yes.

3    Q.   And who is it?

4    A.   Kristopher Justin Ervin.

5    Q.   At that Kirkwall address?

6    A.   Yes.

7    Q.   With the JustinErvin80@aol.com email?

8    A.   Yes.

9    Q.   And I want to now turn your attention to 67A.

10        MS. TAYLOR:  If you could, Ms. Ganoe, go to page 2

11   and zoom in on --

12   BY MS. TAYLOR:

13   Q.   There's an email that it indicates it was sent by Austin

14   on November 16th, correct?

15   A.   Yes.

16   Q.   And in that email it says, "Hello.  Austin from the Risk

17   Operations Team at Shopify.  We are writing to you in regards

18   to your account AutoKeyCard.myshopify.com."

19        And then it states, "We are constantly monitoring

20   businesses we are supporting who are using the Shopify Payments

21   Gateway.  Your business has been identified as presenting an

22   elevated level of risk that we will be unable to support with

23   Shopify Payments."

24        And then he links to some information, correct?

25   A.   Yes.

1    Q.    And then the next paragraph states, "We will transfer your

2    existing payouts to the bank account on file after 120 days, on

3    March 16th, 2021, but will be unable to accept any additional

4    payments on your behalf transacted through the Shopify Payments

5    Gateway," correct?

6    A.    Yes.

7          MS. TAYLOR:  And if we could go to page 1, Ms. Ganoe.

8    And the bottom email.

9    BY MS. TAYLOR:

10   Q.    And it states on November 17th that Kristopher Justin

11   Ervin wrote a message back, correct?

12   A.    Yes.

13   Q.    And what does his message say?

14   A.    "My business does not pose an elevated risk.  Please

15   identify the specific risk that justifies holding funds that I

16   have already fulfilled orders for.  We have no charge backs,

17   only a few refunds, and I get emails daily from our customers

18   satisfied with my service.  All orders have been delivered

19   except one that the customer gave the wrong address and it was

20   returned.  That will be fixed tomorrow.

21         "I have worked immensely to build this business,

22   spent thousands on marketing and worked very hard to get orders

23   out the door quickly.  I have been staying up till 4 a.m. most

24   days to make sure orders are ready for the next day.  Long days

25   and nights.  I take care of my elderly father and now the

1  lights are going to get cut off.  I have timed this for Black

2  Friday and Christmas holiday" -- "and the Christmas holiday

3  coming up.  It is working great and now you have killed it.

4  With no warning.  Why couldn't you send me a message before

5  setting a bomb off in my lap?  Why can I not talk to someone on

6  the phone about this?  I could have just changed the payment

7  provider with no down time.  Did someone report me for" --

8  Q.    And then it continues on the next page, correct?

9  A.    Yes.

10         -- "something I am not doing?  This has to be a

11  misunderstanding.

12         "I work very hard to be one of those" --

13         THE COURT:  I'm sorry.

14  A.    "I work very hard not to be one of those horror stories

15  you hear about with two month shipping times.  We do not drop

16  ship from China.  Our products are made in the U.S.A. by me.

17  All our customer" -- "all our custom cat items are made by

18  Americans too.  These items are shipped from Detroit.  The

19  customers are very happy."

20  Q.    And then he -- he continues on and -- in a further

21  paragraph, correct, and ultimately he states, "My main concern

22  is getting the funds released so I can continue my life, not go

23  bankrupt, and keep my family from being destroyed"?

24  A.    Yes.

25  Q.    And then does he sign the message "Kristopher Justin

1  Ervin"?

2  A.    Yes.

3  Q.    Based on your investigation, was it accurate that

4  Mr. Ervin was taking care of his elderly father?

5  A.    No.

6  Q.    Was Mr. Ervin's father working?

7  A.    Yes.

8  Q.    And then on November 17th of 2020, did Austin from Shopify

9  respond?

10  A.    Yes.

11  Q.    And did he state, "Hi Kristopher.  The product you are

12  offering, and its intended use, are not supportable through

13  Shopify Payments, potentially not on Shopify either, although I

14  will defer to our legal to make that determination," and then

15  additional information about when they would release the funds?

16  A.    Yes.

17  Q.    You've reviewed a mountain of evidence in this case; is

18  that fair?

19  A.    That's fair.

20  Q.    Does that include transactional data?

21  A.    Yes.

22  Q.    And does it include data reflecting when mailings were

23  sent out by Mr. Ervin?

24  A.    Yes.

25  Q.    After Mr. Ervin received this email, did he stop selling

1  auto key cards?

2  A.   No.

3         MS. TAYLOR:  If we could move on to 67B.

4  BY MS. TAYLOR:

5  Q.   This is an email -- or, sorry, there's an email at the top

6  from autokeycard@autokeycard.com to admin@autokeycard.com,

7  correct?

8  A.   Yes.

9  Q.   And it says, "Perfect"?

10 A.   Yes.

11 Q.   And then it's responding to an e-mail below, which

12 included a graphic, correct?

13 A.   Yes.

14 Q.   And what is depicted in the graphic?

15 A.   An image of an individual with a cap on backwards holding

16 a rifle, tattoos on his left arm.

17 Q.   Is it cartoonized?

18 A.   Yes.

19 Q.   And do you recognize who that cartoon is intended to be

20 of?

21 A.   I believe it's intended to be Matt Hoover.

22 Q.   Is there anything else about that image that leads you to

23 believe that's intending to depict Matt Hoover?

24 A.   "CRS Firearms" is printed at the bottom.

25 Q.   And that's Mr. Hoover's YouTube channel?

1    A.    Yes.

2              MS. TAYLOR:  If we could move, please, to 67C.

3    BY MS. TAYLOR:

4    Q.    This one, if we look at the second page of this email, the

5    information indicates that it relates to an order and the

6    customer's name is purported to be Carl Consumer?

7    A.    Yes.

8    Q.    And it's stated that an auto key card 3 in 1 with bottle

9    opener have been purchased?

10   A.    Yes.

11   Q.    And on page 1 of that email, at the bottom there's an

12   email from February 10th of 2021, correct?

13   A.    Yes.

14   Q.    And that is sent using the admin@autokeycard.com address?

15   A.    Yes.

16   Q.    And that person wrote, "Hi, Justin.  When you get a

17   moment, can you mail this customer a replacement order.

18   Thanks, Carolanne"?

19   A.    Yes.

20   Q.    Do you know who Carolanne is?

21   A.    Carolanne Wolfe.

22   Q.    And so in this email she was using the

23   admin@autokeycard.com email address?

24   A.    Yes.

25   Q.    And then the address autokeycard@autokeycard.com sent a

1    reply saying, "Done.  Here's the info.  Thank you"?

2    A.    Yes.

3    Q.    Based on your investigation, other than Mr. Ervin and

4    Ms. Wolfe, was anyone else using any of these Namecheap email

5    accounts for the autokeycard.com or autokeycards.com email

6    accounts?

7    A.    Not that we discovered.

8    Q.    Looking at Number 67D, admin@autokeycard.com sent this

9    email to autokeycard@autokeycard.com, correct?

10   A.    Yes.

11   Q.    And stated, "What do you think?"

12   A.    Yes.

13   Q.    And is there an image in the email?

14   A.    Yes.

15   Q.    Do you recognize who's in that image?

16   A.    I believe it's the movie character Rambo, but I believe

17   that Mr. Hoover's face has been imposed on it.

18   Q.    So it's Rambo's body with Mr. Hoover's face?

19   A.    Yes.

20   Q.    Looking at 67E.

21        MS. TAYLOR:  And if we could start with the bottom

22   email, Ms. Ganoe.

23   BY MS. TAYLOR:

24   Q.    It indicates an individual sent an email on August 24th of

25   2020, correct?

1  A.   Yes.

2  Q.   And he stated, "Thank you for the shipment of my auto key

3  card.  Thought the package might include some instructions as

4  to the proper use of the card, as intended.  I have searched

5  YouTube and saw the videos, but none indicate the specific use

6  of the card.  I would appreciate any help in that direction, if

7  possible"?

8  A.   Correct.

9  Q.   And did customerservice@autokeycard.com respond to that?

10  A.   Yes.

11  Q.   And what did he say?

12  A.   "Jerry, Thank you for your purchase and support of liberty

13  for all.  All NFA rules apply.  Unfortunately, we cannot

14  provide instructions as per the NFA.  It is a gray market item

15  and that is the line we can't cross.

16       "I can point you in the right direction so you can

17  find information on your own at your own risk.  Do a Google

18  image search for different combinations of terms, quote,

19  lightning, unquote; quote, swift, unquote; quote, coat hanger

20  test, unquote; quote, link, unquote; and any terms you discover

21  along the way.  YouTube search the same terms and between both

22  you should" -- or, I'm sorry, "and between both you should find

23  the information you seek.  The image search will help you

24  greatly find general available schematic information.  It is

25  not difficult to find.

1          "The auto key card is a conversation piece as sold

2   and as with many legal products, illegal use can occur.  Think

3   of brass knuckles sold as paperweights.  Please be smart and

4   careful you don't get into trouble.  It is intended to stay in

5   the sold-as form.  Individuals may make the choice to use it in

6   a different way under certain dire circumstances in the future.

7   Please share our product with others and friends that may need

8   it some day.  Stay safe and protect the innocent.  They need

9   people like us in the difficult times ahead."

10  Q.    And is it signed, "Sincerely, The Auto Key Card Team"?

11  A.    Yes.

12  Q.    And nowhere in this email did Mr. Ervin say, "Don't cut it

13  out"?

14  A.    I don't believe so, no.

15  Q.    He did direct the individual to do some searches on the

16  web for different terms, correct?

17  A.    Yes.

18  Q.    One of those is "lightning," correct?

19  A.    Yes.

20  Q.    And we've talked about lightning links.

21          And the next one was "swift."  What's the

22  significance of "swift" in your experience and based upon your

23  investigation?

24  A.    "Swift link" is another term for machine gun conversion

25  device.

1   Q.    Is it a different machine gun conversion device than the
2   lightning link, or do you know?
3   A.    I am not certain.
4   Q.    And what about "coat hangar," how is that relevant to your
5   investigation?
6   A.    That is also another type of drop-in -- drop-in auto sear
7   that is a machine gun conversion device.
8   Q.    And if we could move forward to 67F.  And look at the
9   second page, please.  At the bottom it indicates, "AutoKeyCard.
10  Your order has been delivered," for Order Number 1046, correct?
11  A.    Yes.
12  Q.    And then above that, did the purchaser respond to the
13  automated delivery email?
14  A.    Yes.
15  Q.    And what did he -- did he say, "Was just wondering, does
16  this item come with instructions?  Excellent customer service
17  by the way.  Thanks"?
18  A.    Yes.
19  Q.    And on September 15th of 2020, did
20  customerservice@autokeycard respond?
21  A.    Yes.
22  Q.    Does this response appear to be largely the same as the
23  one that we just read in the previous email?
24  A.    It does.
25  Q.    And did Mr. Ervin tell the person to Google for -- do a

1  Google image search for "lightning," "swift," "coat hangar

2  test," and "link"?

3  A.   Yes.

4  Q.   And did he indicate also, "Individuals may make the choice

5  to use it in a different way"?

6          That's in the final paragraph.

7  A.   Yes.

8  Q.   And did he also state at the top, "All NFA rules apply"?

9  A.   Yes.

10 Q.   And that he couldn't provide instructions as per the NFA?

11 A.   Yes.

12 Q.   But then gave instructions for how to find the

13 instructions?

14 A.   Correct.

15 Q.   And then at the top of the email did the purchaser respond

16 again?

17 A.   Yes.

18 Q.   And did he say, "Yes, sir.  I understand the gray area,

19 been living there most of my life.  When I find a product I

20 like, I spread the word.  Those weren't really paperweights?  I

21 would so be in trouble, but Texas legislature made knuckles,

22 swords, and Bowie knives legal again here about a year ago.  We

23 don't have constitutional carry yet, and it's in the works,

24 although I have never looked a gift horse in the mouth.  I can

25 tell that the team working there are true patriots.  Hard to

1  find people like that now, and needed more now than ever.  I

2  will indeed share this product and all relevant information as

3  discreetly as possible.  Thank you for making it available.  I

4  like to say, be good or be good at it.  Yours truly, C."?

5  A.    Yes.

6  Q.    Looking at Exhibit 67G, it's another email.  At the bottom

7  is an email sent out from customerservice@autokeycard.com on

8  September 16th of 2020, correct?

9  A.    Yes.

10 Q.    And it appears to be an advertising email?

11 A.    It is.

12 Q.    Or promotional email?

13 A.    Yes.

14 Q.    And it's advertising the auto key card, correct?

15 A.    Yes.

16 Q.    Looking at the second page, which is part of that

17 promotional email --

18        MS. TAYLOR:  Can we zoom in on the top, everything

19 above "Shop Now."

20 BY MS. TAYLOR:

21 Q.    Does the email say, "304 stainless.  High strength

22 stainless steel.  Durable"?

23 A.    Yes.

24 Q.    Does it also say, "Full Auto laser engraved to scale

25 graphic design"?

1   A.   Yes.

2   Q.   What words are capitalized in that sentence?

3   A.   "Full Auto."

4   Q.   Does it then say, "Auto Key Card-15 in Full sized Auto

5   business card with graphic artwork"?

6   A.   Yes.

7   Q.   And are "Full" and "Auto," again, capitalized in this

8   part?

9   A.   Yes.

10  Q.   And "card" has "dash 15" after it?

11  A.   Yes.

12  Q.   And then it says "Do not cut" at the bottom?

13  A.   Yes.

14  Q.   And then it says, "Business card, great conversation

15  piece, or novelty," correct?

16  A.   Correct.

17  Q.   Looking at page -- back at page 1 of this exhibit, did

18  somebody respond to Mr. Ervin's email?

19  A.   Yes.

20  Q.   And what did he say?

21  A.   "The f-u-c-k does this do?"

22  Q.   Looking at 67H, on page -- the bottom of page 1 is

23  indicating another advertising email that was sent out on

24  September 30th of 2020 from customerservice@autokeycard.com?

25  A.   That's correct.

1    Q.    And looking at page 2, it's a similar advertising email to
2    the one we just reviewed, correct?
3    A.    Yes.
4    Q.    Does it, again, say, "304 stainless.  High strength
5    stainless steel.  Durable"?
6    A.    It does.
7    Q.    Does it say "Full Auto laser engraved to scale graphic
8    design"?
9    A.    It does.
10   Q.    With "Full Auto" capitalized?
11   A.    Yes.
12   Q.    And "Auto Key Card-15 in Full sized Auto business card
13   with graphic artwork"?
14   A.    Yes.
15   Q.    With "Full Auto" capitalized?
16   A.    Yes.
17   Q.    And then at the very bottom, "Do not cut"?
18   A.    Yes.
19   Q.    "Business card, great conversation piece, or novelty"?
20   A.    Correct.
21   Q.    And then did -- looking back at page 1, did a customer
22   send a short email to -- back to Mr. Ervin saying, "I'm still
23   trying to figure out what to do with it," and then in
24   parenthesis, "how it's used"?
25   A.    Yes.

1   Q.    And did Mr. Ervin respond?

2   A.    Yes.

3   Q.    What did he say?

4   A.    "Thank you for the" -- "Charles, Thank you for the

5   response.  We value our customers' input.  The auto key cards

6   are very popular, that's why we sent the email to spread the

7   word.  It is just a metal card with a artistic graphic on it.

8   You can keep it in your wallet and save it.  You don't have to

9   do anything with it.  Like a time capsule.  You either get it

10  or you have to do more research.  It's a gray market item.

11  Like a solvent trap, but not one of those.  Like any product it

12  can be used in wrong way and we don't recommend that.

13          "It is designed and sold as a metal business card, a

14  novelty, or conversation piece.  The design is also our

15  business logo.  I take mine out of my wallet at the range to

16  bring up interesting conversations with like-minded,

17  freedom-loving individuals.  I hope this helps.

18          "Check out our videos on YouTube or the one on our

19  website.

20          "Just search for 'Auto Key Card.'  They are not hard

21  to find and will help you greatly.

22          "We would love for you to become a customer.  Here is

23  a discount code for you as an appreciation."

24  Q.    And then he provides a discount code?

25  A.    Yes.

1    Q.    And then at the top did the customer respond, "Thanks for

2    the reply.  I understand everything.  Unfortunately, I just

3    can't find that pesky rabbit in his rabbit hole"?

4    A.    Yes.

5    Q.    Looking at page -- sorry, Exhibit 67I, at the bottom, the

6    large email there indicates this is sent from AutoKeyCard,

7    correct?

8    A.    Yes.

9    Q.    And it states, "Hello.  We are interested to join your

10   Vendor Postings.  One deal post every three days subscription.

11   Our product is gun community related, although not a gun part.

12   It is a novelty and conversation starter.  We are about to

13   launch a new thicker model that has a bottle opener on it too.

14   It has been very popular with firearms enthusiasts on Facebook.

15   We are looking to widen our footprint and customer base by

16   opening an account with you."

17             And then he stated -- I'm skipping a couple

18   sentences, but he says, "Our experience is about 80 percent

19   love it and want one if they see it."

20             And then skipping the next sentence, he stated, "Feel

21   free to call me at any time to discuss business with your site

22   or any questions you may have.  Kristopher Justin Ervin,

23   (904) 405-9878"?

24   A.    Yes.

25   Q.    And that's the same phone number that was in the Instagram

1   accounts as the verified phone number, correct?

2   A.   Yes.

3   Q.   And in Mr. Ervin's bank records?

4   A.   Correct.

5   Q.   And then a person that's listed as Adrian, parenthesis

6   Gun.deals, responded, "Sorry, our website is for guns and ammo

7   only.  Have a great weekend"?

8   A.   Yes.

9   Q.   67J, is this another -- it appears to be a test email

10  based on the subject line, correct?

11  A.   Yes.

12  Q.   Sent on October 29th, 2020?

13  A.   Correct.

14  Q.   And it states, "Introducing the new 30 percent thicker

15  cards.  As requested by our great customers"?

16  A.   Yes.

17  Q.   And then it advertises that there are three updated and

18  three new models available now?

19  A.   Yes.

20  Q.   And on page 2 of this email it indicates, "New Pen Holder

21  Edition Auto Key Card With Bottle Opener," correct?

22  A.   Yes.

23  Q.   "Full Auto laser engraved to scale graphic artwork logo

24  design"?

25  A.   Yes.

1   Q.   "Full Auto" capitalized?

2   A.   Correct.

3   Q.   And "Full Auto" is capitalized in the next sentence as

4   well?

5   A.   Yes.

6   Q.   And the next sentence it advertises that it's durable?

7   A.   Correct.

8   Q.   And then the next -- the next line is, "30 percent thicker

9   and more durable design"?

10   A.   Yes.

11   Q.   And then at the very bottom, "Do not cut or alter in any

12   way"?

13   A.   Yes.

14   Q.   And at the very bottom of this email it has an address for

15   AutoKeyCard, correct?

16   A.   Yes.

17   Q.   At 950 Blanding Boulevard, Suite 23, PMB 336, Orange Park,

18   Florida, 32065?

19   A.   Correct.

20   Q.   Is that where you sent your mail-in order form when you

21   ordered your undercover auto key card?

22   A.   It is.

23   Q.   Looking at 67K, this is an email from November 12th of

24   2020, correct?

25   A.   Yes.

1   Q.   And did this person ask, "Can the auto key card be used

2   with a Springfield Saint Victor"?

3   A.   Yes.

4   Q.   Are you familiar with what a Springfield Saint Victor is?

5   A.   Yes.

6   Q.   What is it?

7   A.   It's an AR-15 rifle.

8   Q.   And is Springfield the manufacturer?

9   A.   Correct.

10   Q.   Did Mr. -- did Mr. Ervin stop selling auto key cards after

11   this person asked them if it could be used with this particular

12   AR-15 rifle?

13   A.   No.

14   Q.   67L.  It's an email from November 13th of 2020 to

15   customerservice@autokeycard.com, correct?

16   A.   Yes.

17   Q.   And this person asked, "Hi there.  Is there a place I can

18   go to on how to use my auto key card" -- sorry, "my auto card?

19   Directions?"

20   A.   Correct.

21   Q.   Did Mr. Ervin stop making and selling auto key cards after

22   this person asked for instructions on how to use it?

23   A.   No.

24   Q.   67M.  At the bottom of page 1 is the top of an order

25   confirmation email, correct?

1   A.    Yes, Order Number 1208.

2   Q.    And did that person respond on November 13th of 2020

3   stating, "Hi.  After you fulfilled this order, may I ask you to

4   delete data regarding this order, including this email if

5   possible?  Thanks"?

6   A.    Yes.

7   Q.    And then did the person write a subsequent email and say,

8   "Please disregard the previous email.

9         "Actually, I would like to cancel this order" --

10  which is in bold and underlined, correct?

11  A.    Yes.

12  Q.    -- "since I don't really need a key card for this size.

13  It can't fit my pen as I measured"?

14  A.    Correct.

15  Q.    And then there's some more to -- oh, and then he states at

16  the bottom of his email, "Thanks a lot.  I'll tell my friend

17  who has the pen that this will work with"?

18  A.    Yes.

19  Q.    And then did autokeycard@autokeycard.com respond and tell

20  this person to read the terms, shipping and return policies?

21  A.    Yes.

22  Q.    And did the customer respond, "Okay.  Then just delete

23  this order information, please"?

24  A.    Yes.

25  Q.    67N is an email from November 14th of 2020, correct?

1   A.   Correct.

2   Q.   At the bottom this customer stated, "I ordered the double

3   and received a single.  What would you like to do?"

4   A.   Yes.

5   Q.   And then what did -- what did

6   customerservice@autokeycard.com respond with?

7   A.   "Bobby, I am so sorry about that.  We work hard to get it

8   right the first time.  Orders have increased dramatically since

9   the word has gotten out about our great products.  I was up

10  till 4 a.m. fulfilling orders last night.  I will send you

11  another order for no charge with the right one in it.  Keep the

12  single as an appreciation from us.  Thank you for your support.

13  It will ship Monday."

14  Q.   Agent Hooker, based on your investigation, there were

15  multiple videos that Mr. Hoover released related to auto key

16  cards, correct?

17  A.   Yes.

18  Q.   Do you recall the date that the first of those videos was

19  released?

20  A.   I don't off the top of my head.

21  Q.   Do you need to refer to your notes to refresh your

22  recollection?

23       Well, maybe I'll ask a different way.  Did Mr. Hoover

24  first publish videos about the auto key card in November of

25  2020?

1  A.    I believe so, yes.

2  Q.    And in this email, which was from November 14th of 2020,

3  Mr. Ervin said to the customer, "Orders have increased

4  dramatically since word has gotten out about our great

5  products," and that he was up till 4 a.m. fulfilling orders?

6  A.    Yes.

7  Q.    Looking at Exhibit 67O, this is an email confirmation

8  dated November 14th of 2020, correct?

9  A.    Yes.

10  Q.    And who was the purchaser on this particular order?

11  A.    Darek Stennes.

12  Q.    And is Mr. Stennes somebody that you've talked to in your

13  investigation?

14  A.    Yes.

15  Q.    And looking at 67P, is this also an order confirmation

16  from November 14th of 2020 for Mr. Stennes?

17  A.    It is.

18  Q.    Looking at 67Q, is this an email from someone to

19  customerservice@autokeycard.com on November 16th of 2020?

20  A.    Yes.

21  Q.    What does the person ask?

22  A.    "Is there anywhere I can go for instructions?"

23  Q.    Did Mr. Ervin stop selling auto key cards after this

24  person asked for instructions?

25  A.    No.

1    Q.    Looking at 67R at the bottom email, it's dated

2    November 17th of 2020, correct?

3    A.    Yes.

4    Q.    Actually, I guess the first one is November 16th, 2020,

5    correct?  Josh Gilbert?

6    A.    Josh Gilbert, correct.

7    Q.    And Josh Gilbert wrote, "My buddy got one of these cards,

8    accidentally dropped it and pieces went everywhere.  Before I

9    buy, how sturdy are they?"

10   A.    Yes.

11   Q.    And did customerservice@autokeycard.com respond?

12   A.    Yes.

13   Q.    What did he say?

14   A.    Excuse me.  "That was not our card.  Check the production

15   description."

16   Q.    The product description?

17   A.    I'm sorry, yes, "product description."

18   Q.    And then on November 19th of 2020 did Mr. Gilbert write

19   back and say, "Dude, what part of subtle questions that hide

20   what you are actually asking do you not understand?"

21   A.    Yes.

22   Q.    And then did that individual send another email stating,

23   "An appropriate response is that they are incredibly durable,

24   or be careful not to lean on it because it might break"?

25   A.    Yes.

1   Q.   And then did Mr. Ervin respond, "Thank you.  They are

2   incredibly durable or be careful to lean on it because it might

3   break"?

4   A.   "Or be careful not to lean on it or it might break," yes.

5   Q.   Okay.  And then did the potential customer respond,

6   "Thanks for the humor.  I'll pass the joke on to every single

7   gun guy I know.  And they'll pass it to every gun guy they

8   know"?

9   A.   Yes.

10   Q.   Exhibit 67S, is this correspondence between Darek Stennes

11   and Mr. Ervin -- or, sorry, and the

12   customerservice@autokeycard.com email?

13   A.   Yes.

14   Q.   And again, Mr. Stennes is a person who you have spoken

15   with in your investigation, correct?

16   A.   Correct.

17   Q.   And this is dated November 26th of 2020?

18   A.   Yes.

19   Q.   And these emails were found in the account that you got

20   from Namecheap, correct?

21   A.   Yes.

22   Q.   And on page 2 did Mr. Stennes attach a picture?

23   A.   Yes.

24   Q.   And did he -- had he placed a pen through the auto key

25   card?

1   A.    Yes.

2   Q.    And then on page 3, 4, and 5 of this document, are there

3   emails between Mr. Stennes and Auto Key Cards related to a

4   missing shipment?

5   A.    Yes.

6   Q.    If we can look at 67T, please.  This is an email dated

7   November 1st, 2020, correct?

8   A.    November 21st, 2020, yes.

9   Q.    To customerservice@autokeycard.com?

10  A.    Correct.

11  Q.    And what did this person ask?

12  A.    "Hi.  My name is Miguel and I have just received your

13  product in the mail.  My order number is 1462.  The product

14  came in very thick and in excellent condition.  And I know that

15  you direct people to not cut it or alter it in any way shape or

16  form, but if I was to do so, dot dot, in what way would you not

17  recommend but suggest I do it?  It is very thick and I thought

18  it would have been able to just poke it out with a nail or pen

19  and a hammer, but that doesn't seem to be the case."

20  Q.    After this person wrote to Mr. Ervin and stated that he

21  knew he wasn't supposed to cut it out and intended to do so

22  anyway and was asking for instructions on how Mr. Ervin

23  recommended to cut it out, or suggested to cut it out, did

24  Mr. Ervin stop selling auto key cards?

25  A.    No.

1   Q.   Exhibit 67U, please.  This is an email from Shopify,

2   specifically, legal@shopify.com, to

3   autokeycard@autokeycard.com, correct?

4   A.   Yes.

5   Q.   What's the date?

6   A.   November 24th, 2020.

7   Q.   And does the email state, "Dear Account Owner, We have

8   recently been made aware that certain products sold on your

9   Shopify store, autokeycard.myshopify.com, may violate the

10  Restricted Items section of Shopify's Acceptable Use Policy"?

11  A.   Yes.

12  Q.   And then they hyperlink to those web pages, it appears?

13  A.   Yes.

14  Q.   And did Shopify further state to Mr. Ervin, "We have

15  reviewed your account and determined that it is violative of

16  the Restricted Items section of Shopify's AUP.  As a result, we

17  are no longer able to host your store,

18  autokeycard.myshopify.com, on our platform"?

19       And then did it advise that the storefront had been

20  disabled?

21  A.   Yes.

22  Q.   And that the account would be permanently closed and

23  deleted after December 1st, 2020?

24  A.   Correct.

25  Q.   After Shopify closed down his account and advised him that

1  it violated their Restricted Items section of the Acceptable

2  Use Policy, did Mr. Ervin stop selling auto key cards?

3  A.   No.

4  Q.   Looking at 67V, this email is -- the subject is

5  "Announcement," correct?

6  A.   Yes.

7  Q.   And it's both to and from autokeycard@autokeycard.com?

8  A.   Yes.

9  Q.   And could you read what this email stated?

10  A.   "Clear your cookies and web data.  Autokeycard.com is back

11  up and we have a secondary site up at autokeycards.com with an

12  's' until we get both sites pointing to our new online freedom

13  store platform next week.  15 percent off sale Black Friday to

14  Cyber Monday.  Code 15:  Percent off.  Thank you for the

15  support during this time.  I am thankful for all of you."

16  Q.   Is this language, or language similar to it, similar to

17  language that you had seen Mr. Ervin post elsewhere on the

18  internet?

19  A.   Yes.

20  Q.   And did it appear to be related to Shopify shutting down

21  his store based upon the timing?

22  A.   Yes.

23  Q.   This email was from November 27th, correct?

24  A.   Correct.

25  Q.   And the previous email, which was 67U, that was dated

1    November 24th?

2    A.    Yes.

3    Q.    Do you have 67W in front of you?

4              THE COURT:  Ms. Taylor, would this be a good time to

5    take a break?

6              MS. TAYLOR:  Yes, Your Honor.

7              THE COURT:  Okay.  Ladies and gentlemen, it's 12:30.

8    We'll take a break until 1:40, so about an hour and ten

9    minutes.

10             I'll ask you to remember to follow my instructions

11   not to talk to anybody or let anybody talk to you about the

12   case; not to read, watch, or listen to any media reports; not

13   to conduct any independent investigation in any way about

14   anything remotely related to the case; and please do not form

15   or express any opinions as you've not yet heard all the

16   evidence, the arguments, or my instructions on the law.

17             Have a nice lunch and we'll see you in an hour and

18   ten minutes.

19             COURT SECURITY OFFICER:  All rise for the jury.

20        (Jury exits, 12:31 p.m.)

21             COURT SECURITY OFFICER:  Please be seated.

22             THE COURT:  You may step down.

23             MR. MESROBIAN:  Your Honor, just for the record,

24   because I think I may have been the only one who saw this, as

25   well as the court security officer and marshal, but when Juror

1    7, the gentleman in the front row on the right, returned from

2    the break, he had his cell phone with him.  I don't think he

3    was looking at it.  He just surrendered it to the marshals.

4         But just, number one, for the record; but number two,

5    in case the Court -- this is their first day being allowed to

6    bring their phones into the courthouse, so maybe remind them

7    not to bring them into the courtroom.

8         THE COURT:  Would it be sufficient if I just asked

9    the court security officer to remind them to leave their cell

10   phones?

11        Or actually, should the cell phones be downstairs in

12   the lockers, or can they have them in --

13        COURT SECURITY OFFICER:  As soon as he came in, he

14   immediately gave it to the U.S. Marshals.  He -- they know not

15   to bring it in, but he forgot.  But as soon as he came to the

16   courtroom, he noticed that he had it with him, and I

17   immediately brought it to the jury room.

18        THE COURT:  Okay.  I don't know that I want to

19   embarrass him, so --

20        MR. MESROBIAN:  No, and that's why I didn't bring it

21   up before they left.  I think that's fine, Your Honor, I

22   just -- again, I know it's their first day.

23        THE COURT:  Yeah.  No, and I didn't see it, so thank

24   you.  But to the extent we need to give any reminders, I think

25   I'll just rely on the court security officer to do that.  If

1    that's unacceptable, let me know now.

2        (No response.)

3            THE COURT:  No?  Okay.

4            Anything else we need to address before I let you-all

5    get some lunch, Ms. Taylor?

6            MS. TAYLOR:  I don't believe so, Your Honor.

7            THE COURT:  Mr. King?

8            MR. KING:  Nothing on behalf of Mr. Ervin, Your

9    Honor.

10           THE COURT:  Mr. Zermay?

11           MR. ZERMAY:  No, Judge.

12           THE COURT:  All right.  Then I'll see you back at

13   1:40.

14           COURT SECURITY OFFICER:  All rise.

15           THE COURT:  Oh, I tell you what, I need to ask my

16   courtroom deputy a question, so you-all go on about your

17   business.

18       (Lunch recess, 12:30 to 1:44 p.m.)

19       (All parties present.  Jury not present.)

20           COURT SECURITY OFFICER:  All rise.  This Honorable

21   Court is back in session.

22           Please be seated.

23           THE COURT:  Let's have the jury, please.

24           COURT SECURITY OFFICER:  All rise for the jury.

25       (Jury enters, 1:46 p.m.)

1              COURT SECURITY OFFICER:  Please be seated.

2              THE COURT:  You may continue, Ms. Taylor.

3              MS. TAYLOR:  Yes, Your Honor.

4    BY MS. TAYLOR:

5    Q.    Special Agent Hooker, we're going to turn now to

6    Exhibit 67W.

7    A.    Okay.

8    Q.    And we're still looking at the emails from the

9    customerservice@autokeycards.com account, correct?

10   A.    Yes.

11   Q.    This one is dated November 28th of 2020, correct?

12   A.    Yes.

13   Q.    And somebody wrote the subject "auto key card," correct?

14   A.    Yes.

15   Q.    And the email says, "Do these need to be heat treated and

16   hardened?"

17   A.    Correct.

18   Q.    And if you could please look at 67X.  This is an email,

19   correct?

20   A.    Yes.

21   Q.    Subject line is "Key card question"?

22   A.    Yes.

23   Q.    And sent to customerservice@autokeycards.com?

24   A.    Yes.

25   Q.    Could you please read this email.

1    A.    "Good afternoon.  I'm inquiring about the key card.  If I

2    were to bolt this to the wall, would I need a specific bolt, or

3    would any bolt do?  The internet has said I need a M16 thread

4    bolt for it to look the best on the wall.  Any other sources

5    said" -- "and other sources said any bolt will get it done.

6    Thanks."

7    Q.    Special Agent Hooker, what does "M16" refer to in your

8    training and experience?

9    A.    A fully automatic machine gun.

10   Q.    Is it related in some way to the AR-15 design-wise?

11   A.    People often consider the AR-15 as a civilian version of

12   the M16.

13   Q.    And is there a part of an AR-15 that's referred to as "the

14   bolt"?

15   A.    There's a bolt carrier group.

16   Q.    And are there different designs of bolt carriers?

17   A.    Yes.

18   Q.    Can we move to 67Y?

19   A.    Sure.

20   Q.    This is an email dated December 1st, 2020, with a subject,

21   "Sale by mail, question mark"?

22   A.    Yes.

23   Q.    And what does this email state?

24   A.    "CRS made me aware of you guys.  So my question is does

25   the sale apply to mail orders?  If so, how does this work?

1    Postmark date?"

2    Q.    Did you understand "CRS" to refer to anyone in particular?

3    A.    Yes, the CRS YouTube channel run by Matt Hoover.

4    Q.    67Z, please.  This is an email dated December 7th, 2020,

5    correct?

6    A.    Yes.

7    Q.    And what does this email say?

8    A.    "Do you know where I could find swift pen holder?  Do you

9    folks offer a swift pen holder?  My particular pen style won't

10   fit in your pen holder."

11   Q.    And Agent Hooker, I think earlier in exhibits -- in some

12   of the sub exhibits from 67 you had testified about a device

13   called a swift link, correct?

14   A.    Yes.

15   Q.    And what is a swift link?

16   A.    A machine gun conversion device.

17   Q.    67AA, please.  This is an email from December 9th, 2020.

18   Subject, "Key card," correct?

19   A.    Yes.

20   Q.    And what does this email read?

21   A.    "Just wanted to check that lowers and trigger

22   assemblies" -- I'm sorry.

23         "Just wanted to check what lowers and trigger

24   assemblies this worked with before I went ahead and bought it.

25   Any other mods needed for it to work?  Just started to look

1   into the auto world.  Thanks in advance."

2   Q.    Special Agent Hooker, based on your training and

3   experience as an ATF agent, what does "lower" refer to with

4   regard to firearms?

5   A.    The lower portion of the firearm.  An AR-rifle would have

6   an upper receiver and a lower receiver.

7   Q.    And then a "trigger assembly," that's what it is called?

8   A.    Yes.

9   Q.    Also part of a firearm?

10  A.    Yes.

11  Q.    After Mr. Ervin received these emails inquiring about, for

12  example, what type of lower receiver and trigger assembly the

13  key card would work with, did he stop selling auto key cards?

14  A.    No.

15  Q.    67BB, an email from December 14th, 2020.  Subject, "Not

16  too sure about this, dot dot dot."

17        What does this -- that's all accurate, correct?

18  A.    Yes.

19  Q.    What does this email read?

20  A.    "Honestly, I'm having a funny feeling about this after

21  watching all the YouTube videos on these and similar products.

22  Then saw no returns, no refunds when I went to cancel my

23  order."

24  Q.    Looking at 67CC, please, an email dated December 15th,

25  2020.  Subject, "Bottle opener question"?

1   A.   Correct.

2   Q.   What does this email read?

3   A.   "Good morning.  I recently became aware of your awesome

4   bottle opener.  I am writing to ask questions about it, as I am

5   having trouble finding the answer elsewhere on the interwebs.

6   I have a standard high shelf and a 16 carrier.  Would this

7   bottle opener work?"

8   Q.   What do you, based on your training and your experience

9   and your experience in this investigation, understand "16

10  carrier" to refer to?

11  A.   He's referring to the bolt carrier that he has in his AR

12  rifle.

13  Q.   After Mr. Ervin received this coded email inquiring

14  whether an M16 bolt carrier would work with the auto key card,

15  did he stop selling auto key cards?

16  A.   No.

17  Q.   67DD, please.  Subject, "SP1 styled motors," dated

18  December 15th, 2020, correct?

19  A.   Yes.

20  Q.   What does this email read?

21  A.   "These keys I bought are no good without an SP1 motor.  Do

22  you have access to SP1 motors or can you mod a standard AR

23  motor?"

24  Q.   Are you familiar with something referred to as an "SP1

25  motor"?

1    A.    No.

2    Q.    Are you referring to something else referred to by "SP1"?

3    A.    A bolt carrier group.

4    Q.    Is that a particular design of a bolt carrier?

5    A.    Yes.

6    Q.    67FF, please -- sorry, EE.  This is an email from

7    December 18th, 2020.  Subject, "Auto key card 300 blackout,"

8    correct?

9    A.    Yes.

10   Q.    And what does this email read?

11   A.    "Was just wondering if compatible with 300 aac.  Thanks."

12   Q.    Are you familiar with "300 blackout" or "300 aac" and what

13   they might refer to?

14   A.    It's a fairly common caliber in an AR-15 rifle.

15   Q.    Caliber of ammunition that would be used or --

16   A.    Yes, caliber of ammunition.

17   Q.    67FF, please.  This is an email.  Subject, "Re, Cards,"

18   date, December 27th, 2020, correct?

19   A.    Yes.

20   Q.    And there are two -- two emails in this document, correct?

21   A.    Yes.

22   Q.    Could you read what the first email said?

23   A.    Would that be the top one or the bottom?

24   Q.    Well, read -- read the one that's on the bottom of the

25   page at 9:47 a.m., please.

1    A.    Okay.

2            "Hello.  How durable are these cards?  Are they heat

3    treated for durability or anything?  How long should they last?

4    What are they made out of?  Thank you for your help."

5    Q.    And then there was an additional email on top, correct?

6    A.    Yes.

7    Q.    And that one is stamped 7:18 a.m.?

8    A.    Yes.

9    Q.    And what did that person add to that email?

10   A.    "Hello.  I'd also be interested in if they will work with

11   any parts or if certain parts are required."

12   Q.    67GG, please.  This is an email.  Subject, "Product info,"

13   date, January 2nd, 2021, correct?

14   A.    Yes.

15   Q.    What does this email read?

16   A.    "Hi.  I'm interested in your product.  Any information

17   other than on your page would be appreciated.  Does this come

18   with instructions?  Thanks, Russell."

19   Q.    After this person wrote to Mr. Ervin requesting

20   instructions, did he stop selling auto key cards?

21   A.    No.

22   Q.    67HH, please.

23            MS. TAYLOR:  If you could zoom in on the text at the

24   top, please.

25   BY MS. TAYLOR:

1   Q.    This is an email.  Subject, "Quick question on setting up

2   a display," dated January 1st, 2021, correct?

3   A.    Yes.

4   Q.    And what did this individual write?

5   A.    They said, "Hi.  I have a quick question.  I am setting up

6   a display in my house to show my S&W stock MP AR-15 and I would

7   like to use some of your cards to accent the display and do not

8   want to get the wrong one.  Can you please tell me what make or

9   model would be best from your current line?  Obviously I would

10  never put your card in my gun, as that would be illegal, but I

11  think with the right card it would really make the display very

12  nice.  Thank you and have a good new year."

13  Q.    And so this person states that they would never put the

14  card in their gun as that would be illegal, correct?

15  A.    Yes.

16  Q.    But also in the same email is asking which one works with

17  an S&W stock MP AR-15?

18  A.    Correct.

19  Q.    What do you understand, based on your training and

20  experience, "S&W" to refer to?

21  A.    Smith & Wesson.

22  Q.    And what does "stock MP AR-15" refer to?

23  A.    A "stock" typically refers to just something that's sold

24  from the company that hasn't been modified.  So a stock Smith &

25  Wesson that the -- M&P is the model:  military and police.

1  Q.    67II, please.  This is an email dated January 3rd, 2021.

2  Subject, "Cancel order," correct?

3  A.    Yes.

4  Q.    What does this email read?

5  A.    "Good afternoon.  I would like to cancel my Order Number

6  2483 placed on January 1st, 2021, at 8:34 p.m. Eastern" --

7  "EST, period, as further reading and information from Google

8  showed this to be a item that should not be in possession of.

9  Thank you and have a great day."

10  Q.    After receiving this email, did Mr. Ervin stop selling

11  auto key cards?

12  A.    No.

13  Q.    67JJ, please.  If we could please look at the bottom part

14  of this document dated January 15th, 2021, correct?

15  A.    Correct.

16  Q.    What did this individual write at that time?

17  A.    "First, educate me about your product.  What can I do with

18  this card?  Is it legal for me to purchase and/or possess?

19  Thanks.  Any information will be greatly appreciated."

20  Q.    And did the customer service email respond, "Dear David

21  Kouba, Thank you for your interest in our products.  The auto

22  key card is a great piece of artwork, conversation piece, or

23  other common use item, such as a bottle opener or desktop pen

24  holder.  It is also covered by the First Amendment and its

25  intent is to generate great conversations with liberty-minded

1  individuals.  We also offer T-shirts and beanies with the same

2  business logo design.  See the terms of service section 5 for

3  more info"?

4  A.    Yes.

5  Q.    And after this person was told by Mr. Ervin that this is

6  artwork and it's a bottle opener or a pen holder and intended

7  to create conversation, what did that person respond with?

8  A.    "Do instructions come with the key cards that would let me

9  to be able to all of my options?  Thanks."

10  Q.    So even after being told that it's not, I suppose, for any

11  purpose other than holding a pen or creating conversation, this

12  person wrote back and asked for instructions?

13  A.    Yes.

14  Q.    67KK, please.  This is an email from Steve Duty.  Subject,

15  "How do you cut out a card," dated January 16th, 2021, correct?

16  A.    Yes.

17  Q.    What did Mr. Duty write?

18  A.    "That's all I was needing, the above title?  What tool is

19  used or is there a video?  Thanks.  Steve."

20         MS. TAYLOR:  Give me just a moment.

21         Your Honor, may I approach Special Agent Hooker with

22  Exhibit 112?

23         THE COURT:  You may.

24  BY MS. TAYLOR:

25  Q.    Special Agent Hooker, could you please look at Exhibit 112

1    and tell the jury what it is.

2    A.    It is packaging from the auto key card addressed to Steve

3    Duty.  The packaging also contains a business card from Auto

4    Key Card.

5    Q.    No auto key card?

6    A.    No auto key card.

7    Q.    Are these items that you placed into ATF evidence?

8    A.    Yes.

9    Q.    Where did you obtain them?

10   A.    From Mr. Duty.

11   Q.    He provided them to you?

12   A.    I would have to refer -- recollect the -- or review the

13   report.  I believe he provided them to agents in the

14   location that -- or in the area he was located in, and then it

15   was transferred to me to be placed into evidence here in

16   Jacksonville.

17          MS. TAYLOR:  At this time I would move for admission

18   of Exhibit 112.

19          MR. KING:  Without objection, Your Honor.

20          MR. ZERMAY:  No objection, Your Honor.

21          THE COURT:  112 is admitted.  You may publish.

22      (Government's Exhibit 112 admitted in evidence.)

23          MS. TAYLOR:  Thank you, Your Honor.  I'm going to

24   publish that one later.

25   BY MS. TAYLOR:

1   Q.    And so Mr. Duty wrote, "That's all I was needing, the

2   above title?  What tool is used or is there a video?  Thanks"?

3   A.    Yes.

4   Q.    And so he was asking how to cut out the auto key card,

5   correct?

6   A.    Correct.

7   Q.    And did Mr. Ervin stop selling auto key cards after

8   Mr. Duty asked him how to cut it out?

9   A.    No.

10  Q.    67LL, please.  Looking at the bottom part of this email,

11  it's dated January 20th of 2021 and an individual wrote, "Hi.

12  I saw your website and wanted to know if it would be possible

13  to get a dispensation to export a single three piece card to

14  Denmark, preferably as a private citizen who shoots competitive

15  myself, or secondly, as a company that sells knives and gun

16  parts to hunters and competition shooters among other things to

17  import one.  Many regards, Michael Anderson"?

18  A.    Correct.

19  Q.    And then did Mr. Ervin respond to that email?

20  A.    Yes.

21  Q.    What did he say?

22  A.    "Thank you for the interest.  At this time we only ship to

23  the 50 states of the U.S.A.  Stay tuned, as we may add more

24  regions in the future."

25  Q.    And Mr. Ervin didn't say anything in his response about,

1  "Why would you need dispensation," correct?

2  A.   No.

3  Q.   Or anything about it not being a gun part?

4  A.   Not in his response, no.

5  Q.   Now, at the top of this document, the original author

6  responded back to Mr. Ervin and stated, "And there's no way to

7  get a dispensation?  Because I believe Scandinavia and

8  Greenland would be good new territory for you to get because

9  it's actually easier to get a permit for a full automatic than

10  a small 9 millimeter semiautomatic pistol because you don't use

11  pistols to hunt.  Our rules about guns are a bit different from

12  the U.S.  Another example is silencers.  They don't require any

13  permits and they are cheap, and you could legally sell key

14  cards in shops without having to mask" -- in quotes -- "their

15  intended use.  And on Greenland they have several semiautomatic

16  AR-15s they use to hunt, so your product would be an accessory,

17  just like a scope or a flashlight"?

18  A.   Correct.

19  Q.   Could we have 67MM, please.  This is an email dated

20  January 23rd, 2021.  Subject, "Key card bottle opener"?

21  A.   Correct.

22  Q.   And the email reads, "Hi.  I've ordered one of your bottle

23  openers.  I was just wondering, if someone wanted to remove the

24  excess material so the bottle opener would fit in your pocket

25  better, what would be the best method for doing so?  Keep in

1  mind I have minimal tools to work with.  Thank you for any
2  help"?
3  A.    Yes.
4  Q.    And 67MM, an email dated January 24th, 2021.  Subject,
5  "Business cards," and then in parenthesis, "question, comma,
6  not spam, exclamation point"?
7  A.    Correct.
8  Q.    What does this email read?
9  A.    "I recently placed an order, but I really like the bottle
10  opener with the small center that is cut out already so I can
11  open bottles.
12        "I know for a fact that I will never be able to keep
13  a straight pattern doing a small inside cut.
14        "When will these -- will these be back in stock
15  anytime soon?"
16  Q.    When he is talking about the bottle opener with the small
17  center that was cut out already, what portion of the auto key
18  card do you understand that to refer to?
19  A.    The portion that the pen is displayed through on the
20  website.
21  Q.    Is that -- and based upon your life experiences, are there
22  bottles in existence that would be opened with that small of an
23  opening -- or that small of a bottle opener?
24  A.    I have never seen one.
25  Q.    6700, please.  If we could look at the -- yeah, let's look

1  at the bottom email here.  Do you recognize this email?

2  A.  Yes.

3  Q.  How do you recognize it?

4  A.  I sent it.

5  Q.  This is the John Holbrook email that you sent with regard

6  to your second undercover purchase?

7  A.  Yes.

8  Q.  And we already reviewed it when we reviewed the documents

9  connected to that purchase that you got from your undercover

10  email account, correct?

11  A.  Yes.

12  Q.  And did this version come from your undercover email

13  account?

14  A.  It came from the records that we received after we served

15  a federal search warrant on AKC.

16  Q.  67PP, please.  The subject is, "Auto card Canada," date,

17  January 28th, 2021, correct?

18  A.  Yes.

19  Q.  What did this person write?

20  A.  "Hey.  I was wondering why you guys won't send me a card

21  to Canada because we are allowed to own them for conversation

22  pieces just like the M16 trigger group, if not installed," in

23  parenthesis.  "I would like to purchase two cards if possible.

24  If you won't do it can someone else help me out?  Thanks."

25  Q.  67QQ.  It's an email dated January 31st, 2021, correct?

1    A.    Yes.

2    Q.    And what does it read?

3    A.    "Will these work in high shelf lowers?  Thanks."

4    Q.    And you already testified about the AR having an upper and

5    a lower receiver?

6    A.    Yes.

7    Q.    67RR, please.  This is an email dated February 1st, 2021,

8    correct?

9    A.    Correct.

10   Q.    Subject, "Got mine"?

11   A.    Yes.

12   Q.    And what did this person write?

13   A.    "Just a question.  Order Number 2859.  Lance Knight, 187

14   Shady Lake Drive, Shady Spring, West Virginia, 25917.  Phone

15   number (304) 575-6372.  Does my order come with directions on

16   how to use this product?  I see that a guy can use it for pen

17   holders, dot dot dot, opening bottles, dot dot dot, and

18   probably a lot of wonderful things.  I want to use mine for a

19   certain purpose but I'm not knowledgeable enough on how to do

20   this.  Do directions come with the product?  Thank you."

21   Q.    After receiving this inquiry from somebody asking how to

22   use it and for directions, did Mr. Ervin stop selling auto key

23   cards?

24   A.    No.

25   Q.    67SS, please.  Do you recognize this email?

1  A.   Yes.

2  Q.   How do you recognize this email?

3  A.   I sent it.

4  Q.   And is this related to your first or second undercover

5  purchase?

6  A.   I think that would be my second.  It's dated February 1st,

7  and I believe I placed my second order on January 26th.

8  Q.   67TT, please.  On the lower part of this email there's an

9  email dated February 3rd, 2021, correct?

10  A.   Correct.

11  Q.   And this individual wrote, "Hi there.  I see your area

12  code is mine as well.  Is local pick up available?  Referred by

13  CRS" -- sorry, it says "CBS Firearms," correct?

14  A.   Correct.

15  Q.   And then the next email above that is a response from

16  Mr. Ervin, correct?

17  A.   Yes.

18  Q.   And what did he state?

19  A.   "Hi, Chuck.  Thank you for contacting us.  We'll be sure

20  to thank CRS Firearms for the referral.  As of right now, we

21  offer purchasing online or via the mail-in order form.  We

22  currently do not offer local pick up, unfortunately.

23  Sincerely, AutoKeyCard.com."

24  Q.   67UU, please.  This is an email dated February 6th, 2021.

25  Subject, "Info."  What did this person write?

1    A.    "Would I be able to have a conversation about this key

2    card and a high shelf AR, or would it only pertain to a low

3    shelf?"

4    Q.    67VV, please.  If we could go to the -- to page 4.  An

5    individual on February 10th, 2021, wrote, "When are you going

6    to have more auto key cards back in stock?  Please email me

7    back when you can.  Thank you and have a blessed day"?

8    A.    Yes.

9    Q.    And did Mr. Ervin respond?

10   A.    Yes.

11   Q.    What did he say?

12   A.    "Hi, Eric.  Thank you for contacting us.  We restocked the

13   1 in 1, 2 in 1, and 3 in 1 originals today.  We are expecting

14   to restock the rest of our products within the next day or so.

15   We appreciate your patience and support while we restock our

16   store.  Sincerely, AutoKeyCard.com."

17   Q.    And did the original author respond again?

18   A.    Yes.

19   Q.    And did he say, "I believe you need to update the website

20   so others know as well because the only products that show sold

21   out are the auto cards.  All the other clothing products are

22   still available according to the website.  So maybe you need to

23   go to the website and see what's going on because you sound

24   like an FBI agent trying to start drama with innocent people's

25   lives.  And if you're not the FBI, ATF" -- it says "pr local

1  law enforcement, I sincerely apologize.  But if you are, please

2  find something better to do.  I'd like to purchase one of those

3  cards, but if there's going to be strings attached, then I

4  don't want one.  I'm a law-abiding citizen with no priors or

5  felonies.  I've never been I'm [verbatim] prison as I have a

6  clean criminal record.  Anyways, have a blessed day"?

7  A.   Yes.

8  Q.   And did Mr. Ervin respond?

9  A.   Yes.

10 Q.   What did he say?

11 A.   "This is not a scan.  We are not the FBI, ATF, or any

12 other alphabet organization.  We are freedom loving Americans

13 who support other freedom loving Americans.  We believe in our

14 mission and our products.  We finally received a shipment

15 yesterday and have been working diligently to prepare and

16 package our products to be ready for our awesome customers.  We

17 appreciate your patience and support.  Hope you have a blessed

18 day as well."

19 Q.   And did the original author respond again on February 10th

20 of 2021 and state, "I see that your phone is linked up to wifi

21 and also I noticed that all those pics are screenshot from the

22 website.  If you're so real, send me one as a gift and once I

23 receive it I will tell my church friends and family about your

24 company and products and I'm sure they will purchase some and

25 also spread the word.  Tax return is just around the corner.

1   And if not, it's all cool because a coat hanger works just fine

2   too.  Have fun with out [verbatim] at the range and a couple of

3   my detective buddies from church"?

4   A.   Yes.

5   Q.   67WW, please.  An email from February 16th, 2021.

6   Subject, "Hello," correct?

7   A.   Yes.

8   Q.   What did this person write?

9   A.   "How do you cut it out?  Especially the part in the

10  middle?  And how to install?"

11  Q.   After this person asked for instructions on how to cut it

12  out, did Mr. Ervin stop selling auto key cards?

13  A.   No, he did not.

14  Q.   67XX, please.  Email dated February 18th, 2021.  Subject,

15  "Smith & Wesson M&P 15."  What did this person write?

16  A.   "Will your product fit the Smith & Wesson M&P 15?"

17  Q.   Next email, 67YY.  Subject, "Auto key card."  Date,

18  February 19th, 2021, correct?

19  A.   Yes.

20  Q.   What did this person write?

21  A.   "I just received my card.  Great quality.  Any suggestions

22  on how to cut it out?  Thanks."

23  Q.   After receiving these last couple of emails asking about

24  "will it work with my gun," how do I cut it out," did Mr. Ervin

25  stop selling auto key cards?

1  A.    No.

2  Q.    67ZZ.  This is an email dated February 19th, 2021.

3  Subject, "Availability," correct?

4  A.    Yes.

5  Q.    And what did this person write?

6  A.    "Hi.  I'm very interested in your Pen Holder Editions.

7  Any idea when they will be available for purchase?  Also, do

8  the cards represent both AR-15 and AR-10 or just AR-15?"

9  Q.    67AAA.  At the second page of this email it has a shipping

10  confirmation, correct?

11  A.    Yes.

12  Q.    And the third page of the email indicates a recipient,

13  correct?

14  A.    Yes.

15  Q.    Who is that recipient?

16  A.    Richard Roberts.

17  Q.    And he's -- and according to this document, he's located

18  in Clinton Township, Michigan?

19  A.    That's the billing address.  The shipping address is

20  Shelby Township, Michigan.

21  Q.    Okay.  If we can go back to page 1, please.  On

22  February 8th, 2021, did Rick Roberts write an email in which he

23  stated, "Hi.  Can you tell me when this was delivered?  Rick"?

24  A.    Yes.

25  Q.    And did Mr. Ervin respond?

1    A.    Yes, he did.

2    Q.    What did he say?

3    A.    "Hi, Rick.  Thank you for your purchase and for contacting

4    us.  We are sorry to hear you have not received your order yet.

5    I checked the tracking for your order, and USPS shows it is

6    still in transit.  It seems your order is lost.  We will send

7    you a replacement order asap.  Thank you for your patience

8    while we make this right."

9    Q.    And then did Mr. Roberts respond again?

10   A.    Yes.

11   Q.    On February 19th of 2021?

12   A.    Yes.

13   Q.    And did he state, "Hi.  I cut the part out of your, quote,

14   can opener, unquote, but it will not allow me to run automatic.

15   I own a tooling shop, so I cut it right to your line.  It will

16   allow me to shoot one shell and it will load the next but not

17   fire unless I release the trigger.  I'm using an S&W AR-15

18   Sport Two.  I tried it in two different AR-15s.  Am I doing

19   something wrong?  Rick"?

20   A.    Correct.

21   Q.    Did Mr. Ervin ever market these as a can opener?

22   A.    Not to my knowledge.

23   Q.    And Agent Hooker, did you also get a search warrant for

24   the account AKeyCard@gmail.com?

25   A.    Yes.

1          MS. TAYLOR:  Your Honor, if I may approach Agent

2    Hooker with a number of exhibits.  I have 89 and then 89A

3    through I.

4          THE COURT:  Go ahead.

5          MS. TAYLOR:  And then I also have 90 and 90A through

6    N, 91 and 91A through N, 92 and 92A through K.  And that's it

7    for right now.

8          THE COURT:  All right.  Go ahead.

9    BY MS. TAYLOR:

10   Q.   Agent Hooker, if you could please first look through

11   Exhibits 89 and 89A through I and let me know when you've had

12   the chance to look through those so you can identify them for

13   the jury.

14   A.   Okay.

15        I've reviewed them.

16   Q.   What are the exhibits in 89 and 89A through I?

17   A.   89 is a Certificate of Authenticity from Google regarding

18   the account AKeyCard@gmail.com.

19   Q.   And what about 89A through I?

20   A.   89A is Google Subscriber Information regarding that same

21   account.  And B through I are emails.

22        MS. TAYLOR:  Move for admission of 89 and 89A through

23   I.

24        MR. KING:  Without objection, Your Honor.

25        MR. ZERMAY:  No objection.

```
 1              THE COURT:  89A and 89A through -- pardon me, 89 and
 2    89A through I are admitted.
 3         (Government's Exhibits 89 and 89A-89I admitted in
 4    evidence.)
 5              MS. TAYLOR:  May we have 89A, Ms. Ganoe.
 6    BY MS. TAYLOR:
 7    Q.   You said that 89A was the Google Subscriber Information
 8    for AKeyCard@gmail.com, correct?
 9    A.   Yes.
10    Q.   And at the top of this document does it indicate who the
11    subscriber is for that account?
12    A.   Yes.
13    Q.   Who was it?
14    A.   Justin Ervin.
15    Q.   And does it indicate a birth date?
16              In that second little --
17    A.   Yes.  March 3rd, 1980.
18    Q.   Do you know whether that is Mr. Ervin's birthday?
19    A.   Yes, it is.
20    Q.   And looking down under Account Recovery, does it indicate
21    that there's a recovery phone number?
22    A.   Yes.
23    Q.   And for Recovery SMS?
24    A.   Yes.
25    Q.   And what's the phone number for that Recovery SMS?
```

1   A.    +19044059878.

2   Q.    And is that Mr. Ervin's phone number?

3   A.    Yes.

4   Q.    And it also specifies that phone number under User Phone

5   Number in the next section on this page, correct?

6   A.    Correct.

7   Q.    Now, looking at 89B, is this an order -- or a notification

8   that Mr. Ervin received an order for an Auto Key Card?

9   A.    Yes.

10  Q.    And who was the purchaser?

11  A.    Joel -- excuse me, Joel Moya.

12  Q.    And he was located at that time in Orange Park, Florida?

13  A.    Yes.

14  Q.    And it reflects that Mr. Moya purchased an auto key

15  card -- or four auto key card 3 in 1 Pen Holder Edition with

16  Bottle Openers?

17  A.    Yes.

18  Q.    And that he used a discount code?

19  A.    Correct.

20  Q.    And that his order total was $614.82 --

21  A.    Correct.

22  Q.    -- for those four bottle openers?

23  A.    Yes.

24  Q.    And then on 89C, is this a notification to Mr. Ervin that

25  he had received a new order on December 12th of 2020?

1   A.   Yes.

2   Q.   And is the purchaser a Ronald Davis?

3   A.   Yes.

4   Q.   Located in Yulee, Florida?

5   A.   Correct.

6   Q.   And does it indicate that Mr. Davis purchased an auto key

7   card 1 in 1?

8   A.   Correct.

9   Q.   And that his order total was $46.01?

10  A.   Yes.

11  Q.   And 89D, is this a notification to Mr. Ervin that he had

12  received a new order for an auto key card from Steve Duty?

13  A.   Yes.

14  Q.   And Steve Duty is someone who you just testified about a

15  moment ago with regard to one of the exhibits -- or one of the

16  sub exhibits from 67, correct?

17  A.   Yes.

18  Q.   And do you know whether this is the same Steve Duty that

19  made this order?

20  A.   Yes, it's the same, same Steve Duty.

21  Q.   And his order was on December 16th, 2020, for an auto key

22  card 2 in 1?

23  A.   Yes.

24  Q.   And did he also use a discount code?

25  A.   Yes, he did.

1    Q.    And paid a total of $51.20 for that auto key card?

2    A.    Correct.

3    Q.    And then is 89E another notification to Mr. Ervin of an

4    incoming order?

5    A.    Yes, from James Acs.

6    Q.    And that's spelled A-c-s, correct?

7    A.    Yes.

8    Q.    How do you know that it's pronounced "Aces"?

9    A.    I interviewed him.

10   Q.    And he's located, according to this document, in South

11   Rockwood, Michigan?

12   A.    Just outside of Detroit.

13          MS. TAYLOR:  Your Honor, may I approach with

14   Exhibit 110?

15          THE COURT:  You may.

16   BY MS. TAYLOR:

17   Q.    Could you identify what's in Exhibit 110?

18   A.    It is an auto key card Pen Holder Edition containing two

19   lightning links.  It was seized from the residence of James Acs

20   on June 1st, 2021.

21   Q.    And who put that into evidence?

22   A.    I did.

23   Q.    Did you travel to Michigan as part of your investigation?

24   A.    I did.

25   Q.    And did you speak with Mr. Acs when you were in Michigan?

1    A.    Yes.

2    Q.    And when you say it was seized from the residence, did he

3    give it to you voluntarily?

4    A.    Yes.

5          MS. TAYLOR:  Okay.  I would move for admission of

6    Exhibit 110.

7          MR. KING:  Without objection, Your Honor.

8          MR. ZERMAY:  No objection.

9          THE COURT:  110 is admitted.

10    (Government's Exhibit 110 admitted in evidence.)

11   BY MS. TAYLOR:

12   Q.    Turning to page 89F -- or, sorry, Exhibit 89F.  Is this

13   another notification to Mr. Ervin that he had received an order

14   for an auto key card on January 17th of 2021?

15   A.    Yes.

16   Q.    And the purchaser is who?

17   A.    Randy Willis.

18   Q.    And is he located in Michigan as well?

19   A.    He is.

20   Q.    And what did Mr. Willis purchase?

21   A.    An auto key card 2 in 1 Pen Holder Edition.

22   Q.    And what did he pay in total for that item?

23   A.    $109.

24   Q.    And looking at Exhibit 89G, is this another notification

25   to Mr. Ervin that he received a new order for an auto key card?

1    A.    Yes.

2    Q.    Is it dated February 1st of 2021?

3    A.    Yes.

4    Q.    And who was the ship -- who was it to be shipped to?

5    A.    First initial A period Osso.

6    Q.    And did you speak with that individual?

7    A.    Yes.

8    Q.    Do you know what his first name is?

9    A.    Aric.

10   Q.    And is it A-r-i-c?

11   A.    Yes.

12   Q.    And according to this document, Mr. Oe-so, or Osso,

13   purchased two auto key card 3 in 1 with bottle opener?

14   A.    Yes.

15   Q.    And it indicates the subtotal is $218, correct?

16   A.    Yes.

17   Q.    And then it says, "Discount, minus $218"?

18   A.    Yes.

19   Q.    And then on the second page of the document it indicates a

20   promo code, 100 percent discount?

21   A.    Yes.

22   Q.    And the discount was $218?

23   A.    Correct.

24   Q.    Looking at page -- Exhibit 89H, is this another

25   notification to Mr. Ervin of receiving an order for an auto key

1    card?

2    A.    Yes.

3    Q.    Dated February 4th of 2021?

4    A.    Correct.

5    Q.    And who was this to be shipped to?

6    A.    Richard Carter.

7    Q.    And where is Richard Carter?

8    A.    Savannah, Georgia.

9    Q.    Do you know who Richard Carter is?

10   A.    I do.

11   Q.    Who is Richard Carter?

12   A.    It's an undercover alias for Keith Hannon, United States

13   Postal Inspector.

14   Q.    And you testified previously that you had been working

15   with Postal Inspector Hannon in this investigation, correct?

16   A.    Yes.

17   Q.    And do you know how Mr. Hannon -- or Inspector Hannon paid

18   for this undercover order?

19   A.    With a Postal Money Order.

20   Q.    And on this particular order, under Order Summary it

21   indicates that there were three items purchased, correct?

22   A.    Yes.

23   Q.    Two auto key card 1 in 1 for $69 each with a subtotal of

24   $138?

25   A.    Yes.

1   Q.   And then one auto key card 3 in 1 with bottle opener for
2   $109?
3   A.   Correct.
4   Q.   And does the order total indicate $247?
5   A.   Yes.
6   Q.   And on the second page does it also state, "Promo code,
7   100 percent discount"?
8   A.   Yes.
9   Q.   Looking at page -- excuse me, Exhibit 89I, is this another
10  notification to Mr. Ervin that he received a new order for an
11  auto key card?
12  A.   Yes.
13  Q.   And is it dated February 5th, 2021?
14  A.   Yes.
15  Q.   And that the person who it was billed to and shipped to
16  was Phillip Wilson, or Phil Wilson?
17  A.   Correct.
18  Q.   And that Mr. Wilson had purchased an auto key card 3 in 1
19  Pen Holder Edition with Bottle Opener?
20  A.   Yes.
21  Q.   And his order total, including tax, was $159.43?
22  A.   Yes.
23  Q.   And Mr. Wilson is indicated to live in the St. Augustine
24  area?
25  A.   Correct.

```
 1    Q.    Could you please look at Exhibits 91 and 91A through N --

 2    or, excuse me, 90 and 90A through N.  And once you're ready,

 3    let the jurors know what those exhibits are.

 4              Apologies.  Apparently I have a typo.  It's 90 and

 5    90A through H.

 6    A.    Did you say I was looking through 90H?

 7    Q.    Yes.

 8    A.    All right.  I've reviewed them.

 9    Q.    What's in Exhibit 90?

10    A.    A Certificate of Authenticity from Google regarding the

11    account Justin.Ervin80@gmail.com.

12    Q.    And what's in 90A?

13    A.    I don't think I have A.  Mine starts with B.

14              MS. TAYLOR:  I apologize, Your Honor, it's on a disk.

15              THE COURT:  Okay.

16              MS. TAYLOR:  May I approach Agent Hooker?

17              THE COURT:  You may.

18              MS. TAYLOR:  Your Honor, with regard to 90B, I'm

19    moving for admission of that.  It's Subscriber Information, and

20    I am moving for admission of that under Federal Rule of

21    Evidence 803(6) and 902(11).

22              THE COURT:  And that's specifically 90B?

23              MS. TAYLOR:  Yes, Your Honor.

24              THE COURT:  All right.  Any objection to 90B?

25              MR. KING:  Without objection, Your Honor.
```

1        MR. ZERMAY:  No objection.

2        THE COURT:  All right.  90B is admitted.

3     (Government's Exhibit 90B admitted in evidence.)

4        MS. TAYLOR:  And then same with 90H.  That's

5  Subscriber Information.

6        MR. KING:  And again without objection, Your Honor.

7        MR. ZERMAY:  No objection.

8        THE COURT:  90H is admitted.

9     (Government's Exhibit 90H admitted in evidence.)

10  BY MS. TAYLOR:

11  Q.   With regard to 90C through G, what are those documents?

12  A.   Emails.

13  Q.   And are they from the Justin.Ervin80@gmail.com account?

14  A.   Yes.

15  Q.   And are they emails that were provided to you by Google in

16  response to a federal search warrant?

17  A.   Yes.

18        MS. TAYLOR:  I'd move for the admission of 90, which

19  is the certification, as well as 90C through G.

20        MR. KING:  Without objection, Your Honor.

21        MR. ZERMAY:  No objection.

22        THE COURT:  All right.  So 90 and 90C through G are

23  admitted.

24     (Government's Exhibits 90 and 90C-G admitted in evidence.)

25        MS. TAYLOR:  I believe that covers everything in 90,

```
 1    Your Honor.
 2              THE COURT:  I don't believe 90A --
 3              MS. TAYLOR:  Oh, I'm sorry.  90A -- oh, 90A is
 4    YouTube Activity History.  And that one I was moving for
 5    admission under Federal Rule of Evidence 803(6) and 902(11) as
 6    well.
 7              THE COURT:  Any objection?
 8              MR. KING:  No, Your Honor.
 9              MR. ZERMAY:  None.
10              THE COURT:  All right.  90A is admitted as well.
11         (Government's Exhibit 90A admitted in evidence.)
12              MS. TAYLOR:  If we could have 90H.
13    BY MS. TAYLOR:
14    Q.   This is, again -- for this email account it's Justin
15    Ervin -- sorry, Justin.Ervin80@gmail.com, correct?
16    A.   Yes.
17    Q.   And this provides what Google had in their system as
18    subscriber information; in other words, who owns the account?
19    A.   Yes.
20    Q.   And who is indicated to own this account?
21    A.   Justin Ervin.
22    Q.   And does it provide a birth date for Mr. Ervin?
23    A.   March 3rd, 1980.
24    Q.   And that's Mr. Ervin's birthday?
25    A.   Correct.
```

1    Q.    And does it provide a Signin Phone Number?

2    A.    Yes.

3    Q.    And a User Phone Number?

4    A.    Yes.

5    Q.    And a Reachable Phone Number?

6    A.    Yes.

7    Q.    Are those all the same phone number?

8    A.    They're all Mr. Ervin's phone number.

9    Q.    And that's the (904) 405-9878 phone number?

10   A.    Correct.

11   Q.    Looking at 90C, this is an email from noreply@youtube.com

12   to Mr. Ervin at his gmail account, correct?

13   A.    Yes.

14   Q.    And the content of that email has a YouTube logo, correct?

15   A.    Yes.

16   Q.    And then underneath that it says, "CRS firearms loves your

17   comment"?

18   A.    Yes.

19   Q.    And is there a screenshot and a title indicated for what

20   that comment was left on?

21   A.    Are you referring to the homemade machine gun picture?

22   Q.    Yes.

23   A.    Yes, there is.

24   Q.    And to the right of where it says "homemade machine gun"

25   and has a picture of some firearms, what does it indicate?

1    A.    "The Parts the ATF Wishes Never Existed."

2    Q.    Are you familiar with that video?

3    A.    Yes.

4    Q.    And who made that video based on your investigation?

5    A.    Matthew Hoover.

6    Q.    And in that video does Mr. Hoover discuss the auto key

7    card?

8    A.    Yes.

9    Q.    And is the comment left by Mr. Ervin also contained in

10   this email?

11   A.    It is.

12   Q.    And is that right below where it has the image with

13   "homemade machine gun" written over it?

14   A.    Correct.

15   Q.    And what does it indicate that Mr. Ervin had commented on

16   that CRS Firearms video?

17   A.    "Clear your cookies and web data.  Autokeycard.com is back

18   up with a temporary site at autokeycards.com with an 's' until

19   we get the new freedom platform online next week.  15 percent

20   off sale Black Friday to Cyber Monday.  Code: 15 percent off.

21   Thank you for the support during this time.  I am thankful for

22   all of you."

23   Q.    And this was from November 27th of 2020, correct?

24   A.    Yes.

25   Q.    And during that time, is that the time in which

1    Mr. Ervin -- his website had been shut down by Shopify?

2    A.    I believe so.

3    Q.    And then the next exhibit, 90D, also dated November 27th,

4    2020, from noreply@youtube.com, correct?

5    A.    Correct.

6    Q.    Does it indicate, "CRS Firearms pinned your comment on

7    'The Parts the ATF Wishes Never Existed'"?

8    A.    Yes.

9    Q.    And is it that same comment?

10   A.    Yes.

11         MS. TAYLOR:  Your Honor, I'm going to move on now to

12   Exhibit 91.

13   BY MS. TAYLOR:

14   Q.    Special Agent Hooker, if you could look through Exhibits

15   91 and 91A through N.

16         (Pause in proceedings.)

17         THE COURT:  Go ahead.

18         MS. TAYLOR:  I'm just waiting for Agent Hooker to

19   finish looking through them.

20   A.    Okay.

21   Q.    Could you tell us what Exhibit 91 is?

22   A.    It's a correspondence from the custodian of records of

23   Yahoo, Incorporated regarding the JustinErvin80@aol.com

24   account.

25   Q.    And 91N, what is that?

1   A.   N, as in Nancy?

2   Q.   Yes.

3   A.   Subscriber Details for JustinErvin80@ -- oh, I'm sorry.

4        Yeah, Subscriber Details for JustinErvin80@aol.com.

5   Q.   And the rest of the documents in this exhibit, are they

6   emails that were from that account?

7   A.   Yes, I believe so.

8   Q.   And they were provided to you in response to you serving a

9   federal search warrant?

10  A.   Correct.

11  Q.   The custodian of records certification indicates that

12  it's -- that they're a custodian of records for Yahoo.com,

13  correct?

14  A.   Correct.

15  Q.   But this is an AOL email account?

16  A.   Yes.

17  Q.   Does -- based upon your experience in this investigation,

18  at least at the time that you served the search warrant, did

19  Yahoo own AOL?

20  A.   Yes.

21       MS. TAYLOR:  I'd move at this point for admission of

22  91 and 91A through N.

23       MR. KING:  Without objection, Your Honor.

24       MR. ZERMAY:  No objection.

25       THE COURT:  91 and 91A through N, as in -- oh, pardon

1    me.

2         (Government's Exhibits 91 and 91A-91N admitted in

3    evidence.)

4    BY MS. TAYLOR:

5    Q.    Looking at 91N, you said these are the Subscriber Details

6    that were provided to you by Yahoo?

7    A.    Yes.

8    Q.    And they indicate that the account is

9    JustinErvin80@aol.com, correct?

10   A.    Yes.

11   Q.    And they also indicate at the bottom of the part that

12   Ms. Ganoe has zoomed in on there, Recovery Phone Number?

13   A.    Correct.

14   Q.    Is that the same 987 phone number for Mr. Ervin?

15   A.    Yes, it is.

16   Q.    Looking at Exhibit 91A, this is an email dated July 28th

17   of 2020, correct?

18   A.    Correct.

19   Q.    And the subject is "Order Number 1001 confirmed"?

20   A.    Yes.

21   Q.    And it indicates a number of -- in this Order Summary the

22   items are referred to as stainless business card, correct?

23   A.    Correct.

24   Q.    And looking at the second page of the email, who was the

25   purchaser for this order?

1  A.   Justin Ervin.

2  Q.   And is his address given as 2409 Kirkwall Court in Orange

3  Park, Florida?

4  A.   Yes.

5  Q.   And then looking at 91B, this is -- this is sequentially

6  the next order confirmation.  It's number 1002, correct?

7  A.   Yes.

8  Q.   And dated July 29th of 2020?

9  A.   Correct.

10  Q.   And indicating that this individual purchased a stainless

11  business card?

12  A.   Correct.

13  Q.   And who was that individual?

14  A.   Justin Ervin.

15  Q.   Looking at 91C, this is sequentially the next order,

16  Number 1003, correct?

17  A.   Yes.

18  Q.   Dated July 29th, 2020?

19  A.   Correct.

20  Q.   For a purchase of stainless business card?

21  A.   Yes.

22  Q.   Who was the purchaser?

23  A.   Justin Ervin.

24  Q.   And then 91D also dated July 29th of 2020?

25  A.   Correct.

1  Q.   It's the next sequential order number, 1004, correct?

2  A.   Correct.

3  Q.   And indicating that there were two items ordered, and it

4  appears a discount code applied?

5  A.   Yes.

6  Q.   Who was the purchaser for this one?

7  A.   Also Justin Ervin.

8  Q.   Did it appear to you -- did you come to have any theory

9  about what was going on here in the context of your

10  investigation?

11  A.   I theorized that he was testing his ordering platform to

12  ensure that it was working correctly.

13  Q.   Looking at 91E, Order Number 1005 on July 29th, 2020,

14  correct?

15  A.   Correct.

16  Q.   And is this purchaser also Justin Ervin?

17  A.   Yes.

18  Q.   91F, what is the date on this document, this email?

19  A.   July 30th, 2020.

20  Q.   And it says to Kristopher Justin Ervin?

21  A.   Correct.

22  Q.   And it's from PayPal?

23  A.   Yes.

24  Q.   And the subject is, "Receipt for your payment to Bane

25  Industries"?

1   A.   Yes.

2   Q.   Have you spoken with anyone at Bane Industries?

3   A.   Yes, I have.

4   Q.   And did you learn anything through your investigation

5   about what -- what the business is of Bane Industries?

6   A.   Yes.  It's a metal fabrication business here in

7   Jacksonville, Florida.

8   Q.   And this receipt indicates that Kristopher Justin Ervin

9   sent money to Bane Industries via PayPal, correct?

10  A.   Yes.

11  Q.   And what was the money for?

12  A.   Design work.

13  Q.   And what was the amount?

14  A.   $200.

15  Q.   And the shipping address is what?

16  A.   2409 Kirkwall Court, Orange Park, Florida, 32065.

17  Q.   Looking at Number -- Exhibit 91G, this is an email to --

18  from noreply@armslist.com to JustinErvin80@aol.com.  Subject,

19  "Arms List listing FS, colon, auto key card," correct?

20  A.   Yes.

21  Q.   Are you familiar based on your training and experience in

22  this investigation with what Arms List is?

23  A.   Yes.

24  Q.   What is Arms List?

25  A.   It's an online marketplace to buy and sell firearms.

1    Q.    And can we look at 91H.  This is an email.  Subject, "New

2    30 percent thicker auto key cards," and it's from AutoKeyCard

3    to JustinErvin80@aol.com on October 29th, 2020?

4    A.    Yes.

5    Q.    And does this appear -- this email appear similar to some

6    of the other emails you found in other email accounts with

7    Mr. Ervin?

8    A.    Correct.

9    Q.    And does it provide a 10 percent off discount code?

10   A.    Yes.

11   Q.    And does it also indicate on the second page, "New Pen

12   Holder Edition Auto Key Card"?

13   A.    It does.

14   Q.    "Full Auto laser engraved to scale graphic artwork logo

15   design"?

16   A.    Yes.

17   Q.    What words in that sentence are capitalized?

18   A.    "Full Auto."

19   Q.    And then, "Auto Key Card-15 in Full sized Auto metal

20   business card with graphic artwork"?

21   A.    Correct.

22   Q.    And what words are capitalized in that sentence?

23   A.    "Full Auto."

24   Q.    And also "Auto Key," and then the word "card" is fully

25   capitalized?

1   A.   Yes.

2   Q.   And is it advertised as "High strength stainless steel.

3   Durable"?

4   A.   Yes.

5   Q.   And "New 30 percent thicker and more durable design"?

6   A.   Yes.

7   Q.   And then does it warn at the bottom, "Do not cut or alter

8   in any way"?

9   A.   Yes.

10  Q.   Looking at page 91I, is this another email from

11  Mr. Ervin's AOL account?

12  A.   Correct.

13  Q.   And the subject is what?

14  A.   "CRS Firearms."

15  Q.   And who was it from?

16  A.   Matthew Hoover.

17  Q.   What's the date?

18  A.   November 23rd, 2020.

19  Q.   And what is the content of this email?

20  A.   It appears to have a hyperlink to a product at Louis

21  Vuitton, as well as an address for -- that I'm familiar with as

22  belonging to Coloma Resale.

23  Q.   And what is Coloma Resale?

24  A.   It is a -- a business that ATF has licensed as a federal

25  firearms licensee in Coloma, Wisconsin.

1   Q.   And is it associated with Mr. Hoover and his family?

2   A.   Yes.

3   Q.   Do you have an understanding from your investigation of

4   what "CRS" stands for?

5   A.   Coloma Resale.

6   Q.   And in the link in this email, it indicates at the end a

7   particular item, correct, it says, "Alma dash BB dash

8   Monogram"?

9   A.   Correct.

10  Q.   Looking back at Exhibit 52, page 2, is that the same item

11  that Mr. Ervin purchased, that Louis Vuitton, on November 30th

12  of 2020?

13  A.   Yes.

14  Q.   It says, "Alma BB MNG"?

15  A.   Correct.

16  Q.   91J, please.  This is an email.  Subject, "Your Louis

17  Vuitton order," correct?

18  A.   Yes.

19  Q.   From Louis Vuitton to JustinErvin80@aol.com?

20  A.   Yes.

21  Q.   Dated November 25th, 2020?

22  A.   Yes.

23  Q.   And at the top of this email it states, "Dear Kristopher

24  Justin, We are pleased to confirm that your order" -- and then

25  there's a number -- "has been received."  And then in bold,

1  "Please click here within one hour to proceed with payment and
2  finalize your order"?
3  A.   Correct.
4  Q.   And this indicates that there's still payment due on this
5  order, correct?
6  A.   Yes.
7  Q.   And if we could look at the shipping and billing
8  addresses, what are those?
9  A.   Shipping is Mr. Matt Hoover, 105 E. Main Street, Coloma,
10 Wisconsin, 54930.
11       Billing is Mr. Kristopher Justin Ervin, 2409 Kirkwall
12 Court, Orange Park, Florida, 32065.
13 Q.   Looking at 91K.  Previously you reviewed for the jurors
14 the conversation between the prettynpink0421 Instagram account
15 and the autokeycarddotcom Instagram account, correct?
16 A.   Correct.
17 Q.   And there's discussion of a purchase of video-making
18 equipment, correct?
19 A.   Yes.
20 Q.   On 91K, the subject is "Your Amazon.com order," correct?
21 A.   Correct.
22 Q.   And it indicates that the date is December 9th of 2020?
23 A.   Yes.
24 Q.   And does it indicate that Mr. Ervin placed some orders to
25 be mailed to someone else?

1    A.    Yes.

2    Q.    And who are those orders to be sent to according to this

3    email?

4    A.    Erica in Coloma, Wisconsin.

5    Q.    And Erica is the first name of Mr. Hoover's wife, correct?

6    A.    Yes.

7    Q.    Exhibit 91L, please.  This is an email dated January 29th

8    of 2021 from the Copyright Office, correct?

9    A.    Yes.

10   Q.    And does that appear to be a government email address?

11   A.    Yes.

12   Q.    It ends in "dot gov," right?

13   A.    Correct.

14   Q.    And it's sent to JustinErvin80@aol.com?

15   A.    Yes.

16   Q.    And it states, "This is an automated email.  Please do not

17   reply," correct?

18   A.    Correct.

19   Q.    And then what does it state under that?

20   A.    "Your application and payment for the work Auto Key Card

21   were received by the U.S. Copyright Office on 1/29/2021."

22   Q.    And does it indicate that -- that he can -- that it's

23   essentially a pending application?

24   A.    Correct.

25   Q.    And then Exhibit 91M, please.  Is this another email from

1    the Copyright Office?

2    A.    Yes.

3    Q.    "Regarding subject," and there's a long number there and

4    then it says "auto key card," correct?

5    A.    Correct.

6    Q.    And the date is February 11th, 2021?

7    A.    Yes.

8    Q.    And then does it say, "Dear Kristopher Ervin, We are

9    sending you this email and the attached letter because U.S.

10   Copyright Office staff are currently working remotely in an

11   effort to mitigate the spread of the COVID-19 respiratory

12   virus," and then explained to him that people are not working

13   in the office?

14   A.    Yes.

15   Q.    And then is there an attachment to this email?

16   A.    Yes.

17          MS. TAYLOR:   Could we look at the next page,

18   Ms. Ganoe.

19   BY MS. TAYLOR:

20   Q.    Is this the letter that was attached to that email?

21   A.    Yes.

22   Q.    At the top it has an insignia for the United States

23   Copyright Office, correct?

24   A.    Correct.

25   Q.    And it indicates that it's part of the Library of

1  Congress?

2  A.   Yes.

3  Q.   And it's addressed to Kristopher Ervin at 2409 Kirkwall

4  Court, Orange Park Florida, 32065?

5  A.   Correct.

6  Q.   And regarding what?

7  A.   Auto key card.

8  Q.   And what does the letter say?

9  A.   "Dear Kristopher Ervin, Registration for the above work

10 must be refused because it is a design for a useful article

11 that does not contain any copyrightable authorship needed to

12 sustain a claim to copyright."

13 Q.   And then does it go on to say, "The copyright law protects

14 pictorial, graphic, and sculptural works," and cite to a

15 statute, "Eligible works of art include works of artistic

16 craftsmanship insofar as their form, but not their mechanical

17 or utilitarian aspects"?

18 A.   Yes.

19 Q.   And then the next -- and there's some more information in

20 that paragraph, but the next paragraph down indicates, "We

21 examined your work and concluded that it is a useful article

22 and determined that it does not contain any non-useful design

23 element that could be copyrighted and registered.

24 Consequently, we cannot register your copyright claim"?

25 A.   That is correct.

1  Q.   After being informed that a copyright was being denied for

2  his purported artwork and that the Copyright Office believed it

3  to be a useful article, did Mr. Ervin stop making the auto key

4  card?

5  A.   No.

6           MS. TAYLOR:  Your Honor, that completes this set of

7  exhibits.  I didn't know if the Court wanted to take the

8  afternoon break or if I should continue.

9           THE COURT:  You should go ahead and continue.  It's a

10 little early for the afternoon break.  Thank you.

11 BY MS. TAYLOR:

12 Q.   Special Agent Hooker, you also have Exhibit 92 and 92A

13 through K in front of you?

14 A.   I'm not sure that I -- okay.  Yes.

15 Q.   Could you page through those, and when you're ready, tell

16 us what they are.

17 A.   Okay.

18 Q.   What -- yeah, please tell us.

19 A.   92 is a Business Records Declaration regarding

20 CRSfirearms@yahoo.com.

21 Q.   And what about 92A through G?

22 A.   Those are emails.

23 Q.   Are they from that email account?

24 A.   They're -- yes, they are from CRSfirearms@yahoo.com.

25 Q.   And then 92H, what is that?

1  A.    This is a User Contact Details regarding the targeted

2  account, CRSfirearms@yahoo.com.

3  Q.    And then 92I, J, and K, what are those?

4  A.    Subscriber Details for CRSfirearms@yahoo.com.

5        MS. TAYLOR:  Your Honor, move for admission of these

6  exhibits.

7        MR. KING:  Without objection.

8        MR. ZERMAY:  No objection, Judge.

9        THE COURT:  All right.  They're admitted and you may

10 publish.

11     (Government's Exhibits 92 and 92A-92K admitted in

12 evidence.)

13 BY MS. TAYLOR:

14 Q.    Looking at 92K, these were the Subscriber Details,

15 correct?

16 A.    Correct.

17 Q.    And it indicates full name is CRS Firearms Business?

18 A.    Yes.

19 Q.    And it indicates a Recovery Phone Number, correct?

20 A.    Correct.

21 Q.    And that's +16086170055?

22 A.    Yes.

23 Q.    Who -- based on your investigation, who does that phone

24 number belong to?

25 A.    Erica Hoover.

1  Q.   And let's look at 92A, please.  This is an email dated

2  November 5th of 2020, correct?

3  A.   Correct.

4  Q.   And addressed to CRSfirearms@yahoo.com?

5  A.   Correct.

6  Q.   And does this email -- did the person write to CRS

7  Firearms and state, "Just watched you [verbatim] video titled,

8  quote, Is This an ATF Trap or What, exclamation point, end

9  quote.  And I saw the lightning link or bottle opener, as you

10 called it.  Thumbs up.  And I would like to get the info as to

11 where you purchased it and the price.  Please send info on both

12 links that you were displaying.  And I would certainly

13 appreciate the info.  And I am like you as to the stupidity of

14 our country's laws about firearms.  I had an FFL for 12 years,

15 and now after the gun ban back in the '80s, as well as other

16 laws regarding the way they changed the 4473 forms, now having

17 to call the info in other than filling the form out as required

18 before, it just got to be way too much for me to try and do

19 because I was a part-time in the gun selling business, as well

20 as going to gun shows and having to put up with customers

21 pulling out their Shotgun News to compare my prices as to what

22 guns were selling for in the Shotgun News.  Anyway, I have been

23 there and done that and have plenty of T-shirts too"?

24         And then the individual provides an email address,

25 correct?

1    A.    Yes.

2    Q.    And then states, "Thank you in advance.  I really enjoy

3    you [verbatim] videos and just get a big laugh when you start

4    putting down ATF"?

5    A.    Correct.

6    Q.    Are you familiar with the 4473 form?

7    A.    Yes.

8    Q.    What is that?

9    A.    It's a form that you must fill out when you purchase a

10   firearm from a federally licensed firearms dealer.  It asks

11   numerous questions about criminal activity, past criminal

12   activity, citizenship, and other issues.  And then the form is

13   called in by the dealer to do a background check by either the

14   FBI or a state entity that will perform it.

15   Q.    And is the 4473 form in part meant to ensure that

16   prohibited persons are not sold firearms by federal firearms

17   licensees?

18   A.    Correct.

19   Q.    And what is a prohibited person?

20   A.    There's numerous categories.  Some -- some of it has to do

21   with prior criminal convictions, such as someone being

22   convicted of a felony, also other categories of people, such as

23   people that are unlawfully in the U.S. or drug users or persons

24   that have renounced their citizenship or have been

25   determined -- deemed to be incompetent by a judge.  And there's

1   several others.  Domestic violence and someone that's under a

2   domestic violence injunction.

3   Q.   So those are all different types of prohibited persons?

4   A.   Correct.

5   Q.   And the 4473 form has questions about whether you fit any

6   of those categories?

7   A.   Yes.

8   Q.   Exhibit 92B, please.  And this is an email to the

9   CRSfirearms@yahoo.com account.  Subject, "Lightning link can

10  opener," correct?

11  A.   Correct.

12  Q.   Dated November 9th, 2020?

13  A.   Correct.

14  Q.   And again, to your knowledge, did Mr. Ervin or Mr. Hoover

15  ever say it was a can opener?

16  A.   I only heard it described as a bottle opener.

17  Q.   And this email states, "I seen your video on the lightning

18  link can opener on YouTube and Gun Streamer.  I subscribe to

19  both and thanks again for all the help and useful videos.  I

20  was wondering if you could send me some links for them so I can

21  get some for the family for stocking stuffers.  That would be a

22  great conversation piece and I can get the one-up for school

23  stuff this year.  Thanks again for your help.  Keep the great

24  videos coming"?

25  A.   Correct.

1  Q.    92C, please.  And this is an email dated November 14th of

2  2020.   Subject is "lightning links."  And the -- it's sent to

3  CRSfirearms@yahoo.com?

4  A.    Yes.

5  Q.    And in this email did the person state, "In your video the

6  other day you had talked about lightning links and I think

7  that's the most bad a-s-s thing ever, exclamation point.

8  Looking online for some, I only found one really suspicious

9  website," and there's a link there, and it's

10  silencer-sales.com/product/lightning-link-fullauto-ar-15,

11  correct?

12  A.    Yes.

13  Q.    And then the person said, "I don't really trust them

14  considering they're selling the already-cut-out lightning link.

15  If you know where I could get one, like you showed in your

16  video, or if I'm simply going to have to machine it myself, I'd

17  appreciate it a lot"?

18  A.    Correct.

19  Q.    After receiving these emails where people are asking

20  Mr. Hoover where to go buy a lightning link, did he stop

21  promoting lightning links or auto key cards?

22  A.    No.

23  Q.    92D.  Subject is, "Product inquiry."  Date is

24  November 24th, 2020, correct?

25  A.    Correct.

1    Q.    And what did this person write to Mr. Hoover?

2    A.    "Hey, man.  Just want to start out by saying just found

3    your channel and am loving it.  Good solid content on subject

4    matters most people in the community are scared to talk about,

5    so I appreciate that.  Also, where the hell can I get a

6    lightning link to open bottles with and such?

7    Q.    92E, please.  This is an email dated December 13th, 2020.

8    An individual asked Mr. Hoover, "Hey, is auto key card

9    available and take prepaid card"?

10   A.    Yes.

11   Q.    92F is an email dated December 16th, 2020.  Subject, "Auto

12   link"?

13   A.    Yes.

14   Q.    And this person asked Mr. Hoover -- or stated to

15   Mr. Hoover, "I love your videos.  You have restored my faith in

16   your generation.  I have often thought guys your age were

17   clueless about the liberties my generation has willingly

18   surrendered," and then in parenthesis, "apologies for my

19   generation.  And you guys were like, 'F-u-c-k b-i-t-c-h-e-s,

20   get paid.'  Sorry for that generalization.  I don't know if

21   YouTube is removing them, but I cannot find the links you

22   mentioned in your videos, particularly the key card.  Keep up

23   the good work.  Defenders of the Faith, Michigan"?

24   A.    Yes.

25   Q.    92G is an email dated January 5th, 2021.  Subject,

1    "Novelty lightning link," correct?

2    A.   Correct.

3    Q.   And this person wrote to Mr. Hoover, "Hi.  I've watched an

4    awful lot of your videos, and to be honest, I'm very impressed

5    by your presentation and the content.  Quick question.  Any

6    idea how I can buy a couple novelty lightning link bottle

7    openers and get them shipped to the UK"?

8    A.   Yes.

9    Q.   And then in 92H, page 12, these are contact -- contacts

10   that were stored in Mr. Hoover's CRSfirearms@yahoo.com email

11   address, correct?

12   A.   Yes.

13   Q.   And on page 12 of the second one down --

14        MS. TAYLOR:  Ms. Ganoe.

15   Q.   -- is there a contact entered there?

16   A.   Yes.

17   Q.   And who -- what's the name of this contact?

18   A.   Under "Value," it's listed as Justin, Key Card Guy.

19   Q.   And then a phone number is listed as well, correct?

20   A.   Yes.

21   Q.   And what's that phone number?

22   A.   (904) 405-9878.

23   Q.   Is that Mr. Ervin's phone number?

24   A.   Yes.

25   Q.   Did you also obtain records from GoFundMe via subpoena

1  that were related to your investigation?

2  A.   Yes.

3           MS. TAYLOR:  Your Honor, may I approach with

4  Exhibit 73?

5           THE COURT:  You may.

6  BY MS. TAYLOR:

7  Q.   Would you please describe what Exhibit 73 is.

8  A.   The first page is a Declaration of Authentication of

9  Business Records from GoFundMe.  And there are numerous other

10 documents -- and the rest would be the documents provided by

11 GoFundMe to me after I served the federal grand jury subpoena.

12 Q.   Did you also review --

13           JUROR:  (Indicating.)

14           COURT SECURITY OFFICER:  She feels nauseous, Your

15 Honor.

16           THE COURT:  Okay.  Let's take -- let's take a break a

17 minute.

18           Ms. Wiles.

19           All right.  Ladies and gentlemen, we'll just take our

20 afternoon break early.  Why don't we take about 20 minutes to

21 make sure we give one of your number an opportunity to get

22 something to drink.

23           It's -- can you-all follow all of the instructions I

24 gave you previously?

25           JURY:  (Affirmative head nods.)

1        THE COURT:  Yes?  All right.  We're in recess until
2    3:30.
3        COURT SECURITY OFFICER:  All rise for the jury.
4        (Jury exits, 3:10 p.m.)
5        COURT SECURITY OFFICER:  Please be seated.
6        THE COURT:  You may step down.
7        We'll be in recess until 3:30.
8        COURT SECURITY OFFICER:  All rise.
9        MR. KING:  And Your Honor, I apologize.  I do believe
10   we might be having an objection on 73.  I wanted to bring it to
11   the Court's attention while the jury is out.
12       THE COURT:  Then why don't I ask you-all to come back
13   at 3:25.
14       Also, can I just remind Mr. King and Mr. Zermay and
15   Mr. Larosiere, when you-all talk to each other, you need to --
16       MR. KING:  Microphone's right there.
17       THE COURT:  Yeah, yeah.  And mute it.  Just push it,
18   mute it, because, otherwise, I can't hear what you're saying,
19   but what we hear in the background is,
20   "Pss-pss-pss-pss-pss-pss."
21       MR. LAROSIERE:  That must be infuriating.
22       THE COURT:  It is, actually.
23       MR. LAROSIERE:  Sorry, Judge.
24       THE COURT:  All right.
25       (Recess, 3:12 p.m. to 3:27 p.m.)

```
 1          (All parties present.  Jury not present.)

 2              COURT SECURITY OFFICER:  All rise, this Honorable

 3     Court is back in session.

 4              Please be seated.

 5              THE COURT:  All right.  I'm told the juror is feeling

 6     better, so we're ready to get going.

 7              But let me hear from you.  What's the objection as to

 8     Number 73, Mr. King?

 9              MR. KING:  Yes, Your Honor.  I apologize.

10              Your Honor, with regard to Number 73, the objections

11     would be both the relevance and that it's an impermissible

12     comment on Mr. Ervin's Sixth Amendment right.

13              To kind of sum up the exhibit and what I expect the

14     testimony to be, is once Mr. Ervin was arrested, Mr. Hoover and

15     others, but certainly spearheaded by Mr. Hoover, led a GoFundMe

16     page to try to rally funds for the defense of Mr. Ervin.

17              I expect that the testimony and the documents in

18     Exhibit 73 relate to the funds that were raised to pay for

19     Mr. Ervin's legal defense.  And so we would object both as to

20     relevance, as we don't believe that would be an object of the

21     conspiracy, first; and second, and probably more importantly,

22     it's an impermissible comment on Mr. Ervin's right to counsel.

23              THE COURT:  Ms. Taylor.

24              MS. TAYLOR:  Your Honor, it's in charged overt act --

25     in the indictment, it's overt act Y, that beginning in late
```

1   March 2021 and continuing through at least July of 2021, that

2   Mr. Hoover and Erica Ibe operated a GoFundMe fundraiser to

3   benefit Ervin with the intention that funds raised --

4              THE COURT:  Ms. Taylor.

5              MS. TAYLOR:  Yes, Your Honor?

6              THE COURT:  Would you be kind to the court reporter

7   and not speed read?

8              MS. TAYLOR:  Sorry.

9              That it would -- that the funds raised would be used

10  in part to obtain the release of Ervin so that Ervin and Hoover

11  could continue to pursue their conspiratorial goals.  So this

12  is a part of the charge.

13             And we also were intending to play some snippets of a

14  jail call that dates from three days after the establishment of

15  the GoFundMe, where -- the transcript is -- it's Exhibit 17.

16  And we broke up Exhibit 17.  To the extent that there's some

17  discussion in there of Mr. Ervin having a Public Defender, we

18  cut that out.

19             But one thing that they do discuss on that jail call

20  is getting Mr. Ervin -- a plan to try and get Mr. Ervin a bond

21  and, "Do you think that we can keep making these things once

22  you get out?"

23             THE COURT:  And setting aside that it's in overt act

24  Y, what does this -- what fact does this evidence go to?

25  Because it does seem rather prejudicial.  So I'm trying to

 1    understand what it's necessary for.

 2            MS. TAYLOR:  Your Honor, it's to prove that even

 3    after being arrested, that -- that Mr. Ervin and Mr. Hoover

 4    continued their conspiracy and intended to continue their

 5    conspiracy.

 6            And with regard to any Sixth Amendment concerns, the

 7    Court could issue a limiting instruction.  To the extent that

 8    there may be redactions that we could discuss with counsel that

 9    might reduce or alleviate their concerns, we're certainly

10    willing to have that discussion.  We have not heard any

11    proposed redactions being made to this point.  But we could

12    certainly consider making redactions and coming back -- I think

13    that we have another witness later in the trial who -- who

14    could testify to the GoFundMe records.  I think that would be

15    Lyndsey Butler, so that could buy us a little bit of time to

16    try and resolve these concerns.

17            THE COURT:  All right.  Let's do that, because I'm --

18    I do have some pause about this exhibit, and I'm not prepared

19    to rule on it right now.  So why don't we put this aside and we

20    can address it later.

21            MS. TAYLOR:  Your Honor, I want to raise -- the next

22    thing that would be in my outline after this exhibit --

23            THE COURT:  May I ask you one question before you go

24    on?

25            MS. TAYLOR:  Yes.

1          THE COURT:  I was looking at this quickly over the

2   break.  Obviously I couldn't digest it entirely, but am I

3   understanding that this money that was raised through this

4   GoFundMe page ultimately was refunded?

5          MS. TAYLOR:  No, Your Honor.  I think there were

6   contentions made about that, but I think Mr. King could

7   probably clarify.  But my understanding is that the money was

8   eventually -- it was released.  We certainly never did anything

9   to try and take the money.

10         And I believe that the GoFundMe records themselves

11  would reflect that ultimately the beneficiary was changed to

12  Mr. Ervin's father and that it was withdrawn.

13         For example, on page 9 of Exhibit 73, it shows a

14  53 -- almost $54,000 withdrawal to Jax Federal Credit Union on

15  May 19th, 2021.  And there's some other smaller withdrawals,

16  but that one, I believe, would account for most of the money

17  that was in the GoFundMe.

18         MR. KING:  Your Honor, I was just going to add, I

19  think that's pretty accurate.  My understanding is that there

20  was an issue with Mr. Hoover being, through the GoFundMe rules,

21  that I frankly don't understand -- but that the beneficiary was

22  changed to Kris Ervin, Sr., and that he took funds.  I'm not

23  sure what he did with that, but I believe that did fund part of

24  our fee, but I'm not sure to what extent.

25         THE COURT:  All right.

1           Mr. Zermay.

2           MR. ZERMAY:  Yes, Your Honor.  Just for the record,

3   we'd be joining Mr. King's objection and adopt all of his

4   arguments.

5           THE COURT:  All right.  Well, we'll address this

6   later.

7           But I will point out that page 18 of this exhibit has

8   Mr. Ervin, Sr.'s date of birth and driver's license number.

9   And his date of birth should be redacted.  And I think for his

10  privacy you should redact a portion of the driver's license

11  number.  That's assuming it gets admitted.  If it does, those

12  corrections need to be made, because as you-all know, all of

13  the evidence gets uploaded onto CM/ECF, so we would need to

14  protect his privacy.

15          MS. TAYLOR:  Yes, Your Honor.

16          THE COURT:  And you were saying the next item in your

17  outline is?

18          MS. TAYLOR:  Before we move on, Your Honor, I think

19  my remaining concern about delaying decision on this case is

20  Special Agent Hooker I think tomorrow is going to be traveling

21  back out of town and would not be available to be re-called to

22  provide a foundation for this exhibit.  And I just want to be

23  sure that there are no hearsay type objections, that there's

24  not a foundation objection that we need to resolve through some

25  sort of proffer or testimony from Special Agent Hooker before

1   he leaves us to go back to his training.

2          THE COURT:  Mr. King, you did make a hearsay

3   objection.  What is the hearsay objection?  What portion of

4   this document is hearsay?

5          MR. KING:  Your Honor, I don't believe I made a

6   hearsay objection, I believe I made a relevancy objection.

7          THE COURT:  You absolutely made a hearsay -- you said

8   "hearsay."  Maybe you meant to move on, but --

9          MR. KING:  If I said "hearsay" it was completely by

10  accident.  There's no issue with the authenticity of those

11  documents.  I think we stipulated awhile back that for purposes

12  of business certification we had no issues with that.

13         And in terms of -- I guess if the jail calls become

14  an issue and it's not this witness, there's a lot of witnesses

15  that are familiar with it that can lay that out.  I don't think

16  that would be an issue in terms of --

17         THE REPORTER:  Mr. King.

18         MR. KING:  I've done it again.

19         THE REPORTER:  Yes.

20         MR. KING:  Speaking way too and not into a

21  microphone.

22         THE REPORTER:  Both.

23         MR. KING:  So Your Honor, if I said "hearsay," that

24  was completely by mistake.  It was relevancy and then the Sixth

25  Amendment issue.

1          THE COURT:  Okay.  So there are no -- there are no

2    foundation objections, it's -- the only objection is the

3    relevance and the Sixth Amendment?

4          MR. KING:  Correct, Your Honor.

5          THE COURT:  All right.  And I'll ask you to be

6    prepared in the morning -- in the morning to identify -- be

7    prepared to discuss with me what it is about the GoFundMe

8    documents that comment on the Sixth Amendment concerns.

9          MR. KING:  Yes, Your Honor.

10         THE COURT:  All right.

11         Yes, Ms. Taylor.

12         MS. TAYLOR:  The next exhibit, it's three -- it's

13   really six exhibits.  It's three snippets of a jail call and

14   then the transcripts that go with those.  The transcripts are

15   17.2 -- sorry, 17.1A, 17.2A and 17.3A.

16         And I wanted to, before the jury is called in, see if

17   there are any objections to these exhibits.

18         THE COURT:  Are there objections to that 17 series,

19   Mr. King?

20         MR. KING:  Your Honor, it would -- if I could have

21   just a moment, Your Honor.

22         THE COURT:  Sure.  And I'm trying to find what

23   notebook those would be in.

24      (Pause in proceedings.)

25         MR. KING:  Your Honor, if I could address that now.

1           THE COURT:  Go ahead.

2           MR. KING:  Your Honor, with regard to 17B, there is

3   discussion, I think consistent with what the government's been

4   discussing, about their plans if Mr. Ervin were to get out.

5   There's no objection to that call.

6           THE COURT:  Okay.  Wait.  Because I don't -- all

7   right.  So -- I don't see a 17B.

8           MR. KING:  Sorry, 17.2A.  The numbers have thrown me

9   off a little bit.

10          THE COURT:  So 17.2 and 2A.  One is the recording,

11  one is the transcript.  No objection to that?

12          MR. KING:  No objection to that one, Your Honor.

13          With regard to 17.3A, we would object to that because

14  that deals directly with the GoFundMe.

15          THE COURT:  And what about 17.1?

16          MR. KING:  There is a brief mention -- the vast

17  majority of it would not be objectionable.  There is -- turning

18  to the transcripts, page 2, lines 17 through 20 -- I'm sorry,

19  17 through 23, where they're talking about the GoFundMe to get

20  an attorney.  Otherwise, I would not have an objection.

21          And in terms of the --

22          THE COURT:  Hold on.

23          MR. KING:  Sorry.

24          THE COURT:  17 through 23.  I -- all right.  I'm

25  looking at the wrong one, I think.

1          Ms. Taylor, what about with regard to 17.A, line --
2   redacting just on line 21 the sentence that starts "You know,
3   all we got to do is get the ball rolling," through the words
4   "bond hearing and get me out"?
5          MS. TAYLOR:  Your Honor, so I guess the first issue
6   from a practical stand port -- sorry, a practical standpoint is
7   we would need to take a break, recreate our exhibits.
8          THE COURT:  Sure.
9          MS. TAYLOR:  And I think my view is, Your Honor, we
10  redacted out the -- I mean, the reason why this is in three
11  pieces is to take out anything that, in my view, would even
12  come close to being a comment on his right to an attorney.
13  This is -- I mean, there's a reference to getting an attorney
14  secured.  I don't think that there's any negative implication
15  to be drawn from that.
16          This Court asked during the voir dire whether any
17  juror would have an issue with defendants being represented by
18  attorneys, and they all indicated that they thought that that
19  was appropriate.
20          I think that this -- given how very minimal it is and
21  that there's no negative implication about it in the
22  transcript, it's not the focus of this part of the call, that a
23  limiting instruction would serve to remedy any negative
24  inference, if one even could be drawn.
25          THE COURT:  And what is there in 17.3, Mr. King?

1    MR. KING:  Your Honor, that just goes to the raising

2    of the GoFundMe, which, you know, the purpose of that was

3    attorney's fees.  If -- if -- otherwise, I'm not sure what the

4    relevance would be.

5         So to the extent that it comments on the purpose of

6    the funds being for attorney's fees, that raises the Sixth

7    Amendment issue.  To the extent that it doesn't say what the

8    money is for, I think it's irrelevant and misleading to the

9    jury.

10        THE COURT:  Misleading in what way?

11        MR. KING:  If -- what are these funds being raised

12   for?  What's the purpose of this?  Is this part of something

13   impermissible occurring, some illegal conduct?

14        And Your Honor, just from a practical standpoint, if

15   this helps this issue, with those exceptions, you know, we

16   would be willing to stipulate to authenticity and admissibility

17   if the corrections get made.

18        And, you know, I know the intention is to have Agent

19   Hooker go over this, but I think there would be plenty of other

20   witnesses that would be competent enough that the government

21   could play, with those corrections, the jail calls, and we'd

22   have no objections on any other grounds.

23        THE COURT:  Mr Zermay, you're standing because?

24        MR. ZERMAY:  I'm just waiting to address the Court as

25   to 17.2A.

1          THE COURT:  Okay.  What -- go ahead.

2          MR. ZERMAY:  Yes.  We have Sixth Amendment concerns

3    regarding 17.2A, page 1, line 25, and going from line 25 to

4    page 2, lines 1 through 3, where they discuss in the jail call

5    hiring myself and my co-counsel and raising money to get a real

6    heavy hitter if they're unable to get the case dismissed.

7          THE COURT:  "Matt from Foodbusters and his friend" is

8    you?

9          MR. ZERMAY:  I believe they're referencing us, Your

10   Honor.

11         MS. TAYLOR:  I was not intending to highlight that

12   for the jury, Your Honor.  I don't think there would be other

13   evidence that would show that those are the people who are

14   being discussed here.

15         And to the extent that they're talking about an

16   attorney for Mr. Ervin, I'm not -- I'm not sure what ground

17   Mr. Hoover has to object.

18         THE COURT:  Yeah, I'm not sure he does either, other

19   than I don't know that I like the attorney of record being

20   referenced.  But I don't know, Mr. Zermay, how the jury would

21   possibly conclude that that's a reference to you.  I certainly

22   didn't, and I know quite a bit more than the jury does.

23         And Mr. Ervin already stipu- -- agreed to the

24   admissibility, so I'm not sure what objection Mr. Hoover would

25   be able to raise.  Certainly -- so let me -- hold on.  I was

1    trying to read 3A.  Just a moment.

2            All right.  In an abundance of caution, Ms. Taylor,

3    I'm going to -- I think you need to remove the reference to

4    "Matt."  I don't think there's a way that the jury would

5    connect it, but -- that's the reference in page 25 to "Matt."

6            17.2A is admitted.

7        (Government's Exhibit 17.2A admitted in evidence.)

8            THE COURT:  I'm going to sustain the objection to

9    17.3A.  I don't see the probative value --

10           MS. TAYLOR:  Your Honor --

11           THE COURT:  -- especially in light --

12           MS. TAYLOR:  I'm sorry.  Could I -- I don't think I

13   got a chance to respond on 3A.

14           THE COURT:  Okay.  Go ahead.

15           MS. TAYLOR:  It's in the indictment that the GoFundMe

16   was a part of the conspiracy.  And frankly, I think that

17   Mr. King's argument now that we can't even talk about GoFundMe

18   because on the other exhibit it talks about lawyers is really

19   bootstrapping an objection onto 3A.  3A doesn't say anything at

20   all about using the funds from the GoFundMe for lawyer's fees.

21           And moreover, again, it's in the indictment.  The

22   allegation -- the allegation is that Mr. Hoover and Erica Ibe

23   operated a GoFundMe fundraiser to benefit Ervin with the

24   intentions that the funds raised would be used in part to

25   obtain the release of Ervin so that Ervin and Hoover could

1    continue their conspiratorial goals.

2         Your Honor, the grand jury found probable cause to

3    believe that that was an overt act in furtherance of this

4    indictment, and we should be entitled to put in our evidence on

5    that point.

6         There's nothing -- I don't see anything that is

7    impermissibly prejudicial about 3A.  The word "attorney" is not

8    in here.  And it goes directly to showing that overt act.

9         THE COURT:  Yeah, well, alleging it as an overt act,

10   Ms. Taylor, doesn't then bulletproof all of the evidence that

11   you want to introduce to prove it.

12        I'm just going to have you move on from this.  I'm

13   going to look at this over the evening.  You can play these

14   with another witness.

15        All of the authenticity -- any objections other than

16   to relevance and Sixth Amendment are waived, correct, Mr. King?

17        MR. KING:  That's correct, Your Honor.

18        THE COURT:  And Mr. Zermay?

19        MR. ZERMAY:  That's correct, Your Honor.

20        THE COURT:  All right.  So I'm going to look at this

21   over the evening.  You'll need to move on to some other

22   evidence.

23        MS. TAYLOR:  Yes, Your Honor.

24     (Pause in proceedings.)

25        THE COURT:  Oh, I was waiting for you to tell me if

1    you're ready.

2              MS. TAYLOR:  Oh, I'm ready, Your Honor.

3              THE COURT:  Oh, I didn't know if you needed to --

4              MS. TAYLOR:  No, I was just waiting for the jury.

5              THE COURT:  My apologies then.  Let's have the jury.

6              COURT SECURITY OFFICER:  All rise for the jury.

7         (Jury enters, 3:54 p.m.)

8              COURT SECURITY OFFICER:  Please be seated.

9              THE COURT:  Go ahead, Ms. Taylor.

10             MS. TAYLOR:  Yes, Your Honor, I'd like to approach

11   the witness with Exhibits 74 through 88 and 118 through 119.

12             THE COURT:  Yes, but I lost my pen.

13   BY MS. TAYLOR:

14   Q.   Special Agent Hooker, are you familiar with the National

15   Firearms Registration and Transfer Record?

16   A.   Yes.

17   Q.   What is that?

18   A.   That is the record maintained by ATF.  It's where

19   individuals that own certain -- certain weapons, such as

20   machine guns, silencers, destructive devices, register those

21   weapon if they're approved to own them.

22   Q.   Is it correct that not every firearm has to be registered

23   with ATF?

24   A.   That is correct.

25   Q.   And I think we've made reference before to NFA firearms,

1  correct?

2  A.   Correct.

3  Q.   And those -- those particular firearms that you just

4  mentioned, machine guns, silencers, destructive devices,

5  short-barreled rifles, short-barreled shotguns, all of those

6  are governed by the NFA?

7  A.   Correct.

8  Q.   And so if you want to own one of those legally, you have

9  to register it with ATF in that National Firearms Registration

10 and Transfer Record?

11 A.   Correct.

12 Q.   Could you -- have you had a chance to look through

13 Exhibits 74 through 88 and 118 through 119?

14 A.   Yes.

15 Q.   And what are they?

16 A.   They are National Firearms Registration and Transfer

17 Records Search Certificates.

18 Q.   So -- indicating whether a person did or did not have any

19 firearms registered?

20 A.   Correct.

21       MS. TAYLOR:  At this time I would move for admission

22 of these exhibits, 74 through 88 and 118 through 119.

23       MR. KING:  Without objection, Your Honor.

24       MR. ZERMAY:  No objection, Your Honor.

25       THE COURT:  74 through 88 and 118 through 119 are

1    admitted.

2         (Government's Exhibits 74-88 and 118 and 119 admitted in

3    evidence.)

4    BY MS. TAYLOR:

5    Q.    Special Agent Hooker, you spoke with a number of people

6    who had purchased auto key cards, correct?

7    A.    Correct.

8    Q.    And how did you -- how did you identify individuals as

9    having been purchasers of auto key cards?

10   A.    Through the records we received from various sources,

11   grand jury subpoenas and search warrants, as well as -- excuse

12   me, as well as items found at Mr. Ervin's residence.

13   Q.    And I first want to have you look at Exhibit Number 74.

14   A.    Okay.

15   Q.    And this is a certificate with regard to Aric Anthony

16   Osso?

17   A.    Yes.

18   Q.    And he came up in one of the -- an email that we were

19   reviewing earlier today, correct?

20   A.    Yes.

21   Q.    That there was an order that had been shipped to A. Osso?

22   A.    Correct.

23   Q.    And does this certification indicate -- what does this

24   certificate indicate with regard to Mr. Osso?

25   A.    That no evidence of any firearm is registered to Mr. Osso

1  with ATF.

2  Q.    So he would not be able to legally own any type of NFA

3  weapon, including a machine gun?

4  A.    No, that's not what it means.  It just means that no

5  weapon that ATF regulates is currently registered to him.

6  Q.    And if you could please look at Number 75.

7  A.    Okay.

8  Q.    Who was this certificate related to?

9  A.    Darek Stennes.

10  Q.    And is he somebody else who you spoke with?

11  A.    Yes.

12  Q.    And have you found evidence that he had been a purchaser

13  of one or more auto key cards?

14  A.    Yes.

15  Q.    Did this search for him by name indicate whether he owned

16  any -- or whether he had registered any firearms in the

17  National Firearms Registration and Transfer Record under his

18  name?

19  A.    He had no firearms registered under his name.

20  Q.    If you could look at 118, please.  When you spoke with

21  Mr. Stennes, did he provide you with other information about

22  whether he had any firearms registered?

23  A.    Yes.  He later advised that he had a trust.

24  Q.    Is that another -- another way to register firearms?

25  A.    Correct.

1    Q.    Under a trust, rather than in your individual name?

2    A.    Yes.

3    Q.    And is Number 118 a record of firearms that are registered

4    to The Darek Stennes Revocable Living Trust?

5    A.    Yes.

6    Q.    And what does it indicate Mr. Stennes had registered under

7    this trust?

8    A.    He has three weapons:  a short-barreled rifle, a silencer,

9    and an "any other weapon."

10   Q.    What is an "any other weapon"?

11   A.    I'm not certain of the exact federal definition.  In this

12   particular instance, he has a 12 -- a weapon that's 12-gauge

13   and the barrel length is 7.25 inches and the overall length is

14   19.375 inches.

15   Q.    So -- so it's going to be something other than a machine

16   gun, correct?

17   A.    Correct.

18   Q.    Because if it was a machine gun, it would say "machine

19   gun" instead of "any other weapon"?

20   A.    Yes.

21   Q.    Looking at 119, is this a certificate of the search

22   results for The Darek Stennes Trust?

23   A.    It is.

24   Q.    And is this another trust that Mr. Stennes told you he had

25   firearms registered under?

```
1   A.    Correct.

2   Q.    And what did Mr. Stennes have registered under this trust?

3   A.    One silencer and one short-barreled rifle.

4   Q.    And so under any of these two trusts for Mr. Stennes and

5   under his own name, did Mr. Stennes have any machine gun

6   registered?

7   A.    No.

8   Q.    Did he have any auto key card that was registered in the

9   National Firearms Registration and Transfer Record?

10  A.    No.

11  Q.    No lightning links registered?

12  A.    No.

13  Q.    If you could please look at Number 76.  Who does this

14  search certification relate to?

15  A.    Erica Ashley Hoover.

16  Q.    And is that the name that you noted belonged to

17  Mr. Hoover's now-wife?

18  A.    Yes.

19  Q.    And does she have any firearms registered in the National

20  Firearms Registration and Transfer Record?

21  A.    No.

22  Q.    If you could please look at Number 77.  Did you also

23  request a search for any firearms registered under Ms. Hoover's

24  maiden name?

25  A.    Yes.
```

1   Q.    And is this the certificate for that, for Erica Ashley

2   Ibe?

3   A.    Correct.

4   Q.    If you could please look at Number 78.  You spoke

5   previously about having spoken with James Acs, correct?

6   A.    Correct.

7   Q.    Is this a certification of the firearms -- of the search

8   of whether he had any firearms registered in the National

9   Firearms Registration and Transfer Act?

10  A.    It is.

11  Q.    And did he have any registered?

12  A.    He did not.

13  Q.    If you could please look at Number 79.  Is Joel Moya a

14  person who you spoke with?

15  A.    Yes.

16  Q.    Was he a person who had purchased an auto key card or

17  more?

18  A.    I think four, maybe.

19  Q.    Did he have any firearms registered in the National

20  Firearms Registration and Transfer Record according to this

21  search certificate?

22  A.    No, he did not.

23  Q.    And if you could look at Number 80, please.  Does this

24  relate to whether Kris Anderson Ervin had any firearms

25  registered?

1    A.    It does, and it showed that he had no firearms registered

2    with ATF.

3    Q.    And who is Kris Anderson Ervin?

4    A.    Mr. Ervin's father.

5    Q.    And Number 81, did you ask for a search of whether

6    Kristopher Justinboyer Ervin had any firearms registered in the

7    National Firearms Registration and Transfer Record?

8    A.    Yes.

9    Q.    Did he?

10   A.    He did not.

11   Q.    Number 82, please.  Did you request the results of a

12   search for whether Matthew Raymond Hoover had any firearms

13   registered?

14   A.    I did.

15   Q.    And is this the result of that search?

16   A.    Yes.

17   Q.    Did Mr. Hoover have any firearms registered?

18   A.    He did not.

19   Q.    Did you also request -- if you could look at 88, please.

20   Did you also request a search for firearms registered to Coloma

21   Resale?

22   A.    Yes.

23   Q.    And that is the federal firearms licensee that belongs to

24   Mr. Hoover's family, correct?

25   A.    Yes.

1    Q.    And did Coloma Resale have any firearms registered?

2    A.    Yes.  They had seven silencers registered.

3    Q.    Are there four on the first page?

4    A.    Yes.

5    Q.    And then are there three more on a second page?

6    A.    Yes.

7    Q.    Did Coloma Resale or Mr. Hoover personally have any

8    machine guns registered?

9    A.    No.

10   Q.    Did he have any auto key cards registered?

11   A.    No, he did not.

12   Q.    And then if you could please look at Number 83.  Did you

13   request a registration -- or a search for any firearms

14   registered to Tristan Thomas Anderson [verbatim]?

15   A.    Yes.

16   Q.    How did Mr. Anderson become part of your investigation?

17   Was he in the transactional data anywhere?

18   A.    He was not.

19   Q.    And so how did you -- did you come to believe that he may

20   be in possession of an auto key card?

21   A.    Yes.  I believe we felt that he was in possession of two

22   of them.

23   Q.    And, I'm sorry, it says Tristan Alderson, correct, on the

24   certificate?

25   A.    Tristan Thomas Alderson, correct.

1   Q.   I apologize, I said "Anderson."

2   A.   Oh, I'm sorry.

3   Q.   But what the certificate says is Alderson?

4   A.   His last name is Alderson, yes.

5   Q.   Okay.  How did you come to believe that Mr. Alderson may

6   have possessed an auto key card?

7   A.   During my investigation in Michigan, we interviewed an

8   individual who advised us that he purchased the auto key cards

9   on behalf of Mr. Alderson.

10  Q.   And this search indicates that Tristan Alderson, it says,

11  is the only responsible person listed in the Obsidian BCBB8570

12  Trust?

13  A.   That's correct.

14  Q.   And did that trust have any firearms registered?

15  A.   Yes.

16  Q.   What did it have registered in it?

17  A.   A silencer.

18  Q.   Did it have any machine guns registered?

19  A.   No.

20  Q.   Randy Lee Willis, if you could look at Number 84, is he

21  someone who in your investigation you determined had purchased

22  an auto key card?

23  A.   Yes.

24  Q.   And did you ask for his name to be searched as well?

25  A.   Yes.

1  Q.   Did he have any firearms registered in the National

2  Firearms Registration and Transfer Record?

3  A.   He did not.

4  Q.   And then number 85, Richard Jerome Roberts, did you

5  believe that he had purchased an auto key card?

6  A.   Yes.

7  Q.   Had he sent an email to Mr. Ervin at some point?

8  A.   Yes.

9  Q.   And did we review that email earlier today?

10  A.   Yes, we did.

11  Q.   And did he talk about having tried to cut out the can

12  opener and that he tried it in two different AR-15s?

13       I'll withdraw --

14  A.   I recall him stating that he had a machine shop and that

15  he cut it along the long and that he tried it in an M&P Sport

16  Two.  I'm not certain that I recall he tried it in two

17  different AR-15s.

18  Q.   You searched his name -- or had his name searched as well

19  in the National Firearms Registration and Transfer Record?

20  A.   I did.

21  Q.   Did he have any firearms registered?

22  A.   He did not.

23  Q.   Number 86, did you also come to learn that Ronald Davis

24  had purchased an auto key card?

25  A.   Yes.

1   Q.   And did he -- did he have any firearms registered in the

2   National Firearms Registration and Transfer Record?

3   A.   He did not.

4   Q.   And then 87, you testified earlier regarding Steve Duty,

5   correct?

6   A.   Yes.

7   Q.   And he was one of the individuals who had emailed asking

8   for instructions on cutting it out; is that fair?

9   A.   That's fair.

10  Q.   And did Mr. Duty have any firearms registered in the

11  National Firearms Registration and Transfer Record?

12  A.   No, he did not.

13  Q.   And -- I think I'm actually done now, okay.

14       Special Agent Hooker, I asked you a number of times

15  during the earlier part of your testimony, after you looked at

16  emails where people had written to Mr. Ervin asking where they

17  could find instructions, asking whether it would work with

18  their particular kind of firearm, and I asked you did Mr. Ervin

19  stop -- did Mr. Ervin stop manufacturing and selling auto key

20  cards after receiving any of these emails, and your answer to

21  each of those was no, correct?

22  A.   Correct.

23  Q.   Did Mr. Ervin stop manufacturing and selling auto key

24  cards at any point prior to ATF essentially forcing him to stop

25  that?

```
1    A.    Not to my knowledge.
2    Q.    He was still dropping off packages at the post office
3    within a day or two prior to when you executed the search
4    warrant at his house, correct?
5              MS. TAYLOR:  Your Honor, may I consult with
6    Mr. Mesrobian?
7              THE COURT:  Yes.
8         (Government counsel confer.)
9              MS. TAYLOR:  I have no further questions for Special
10   Agent Hooker.
11             THE COURT:  Who am I going to hear from first?
12             MR. ZERMAY:  Your Honor, from Mr. Hoover's counsel,
13   so me.
14             THE COURT:  Okay.  Go ahead.
15             MR. ZERMAY:  Thank you.  Welcome, Agent Hooker.
16             THE COURT:  If you could go to the podium, please.
17        (Pause in proceedings.)
18             THE COURT:  Go ahead.
19             MR. ZERMAY:  Thank you, Your Honor.
20                         CROSS-EXAMINATION
21   BY MR. ZERMAY:
22   Q.    Welcome, Agent Hooker.  I'll try to keep it brief.  Can
23   you tell me a little bit about your investigation into this
24   matter?  What were the names of the different investigations
25   that you conducted during the course of your, well, I guess,
```

 1    investigations into this matter?

 2    A.   I'm not sure I understand your question, sir.

 3    Q.   So I saw that there was a name, Operation Lightning

 4    Strike.

 5               MS. TAYLOR:  Objection.

 6    Q.   Right?

 7               THE COURT:  So I'm going to sustain that objection.

 8               Can you rephrase?

 9               MR. ZERMAY:  Of course.

10    BY MR. ZERMAY:

11    Q.   So you were the investigating officer on this matter,

12    right?

13    A.   I was the case agent.

14    Q.   Case agent, okay.  You were the case agent for Operation

15    Lightning Strike?

16               MS. TAYLOR:  Objection to the relevance.

17               THE COURT:  Overruled.  Go ahead.

18    BY MR. ZERMAY:

19    Q.   Okay.  Is there any other operation names involved in this

20    case?

21    A.   The case was originally titled Auto Key Cards, and then it

22    was retitled Operation Lightning Strike.

23    Q.   Why was that?

24    A.   It -- I don't know that there was any particular reason

25    other than the fact that the case involved an investigation of

1   lightning links being sold across the country.  And sometimes

2   people just give their -- their case names that are relevant to

3   what the topic is you're investigating.

4   Q.   Okay.  And there was one other one, correct?

5   A.   Not to my knowledge.

6   Q.   Auto Key Card Retrieval?

7   A.   That's not my case, sir.

8   Q.   If there is a report that was titled -- that listed Auto

9   Key Card Retrieval, would you be surprised?

10  A.   No.  I know the case.  It's not my case.  So my case --

11  you asked about my case in particular.  The Auto Key Card

12  Retrieval case that you're referencing was a case opened solely

13  to facilitate the retrieval of these items from individuals

14  that purchased them.

15  Q.   Okay.  Thank you for that.

16        So that would be a no, you wouldn't be surprised if

17  there was a name of an operation called Auto Key Card

18  Retrieval?

19  A.   No.

20  Q.   Okay.  Thank you for that.

21        So how many agencies were involved in Operation

22  Lightning Strike?

23  A.   Three.

24  Q.   Three.  Could you please list them.

25  A.   ATF, the U.S. Postal Investigative Service, and IRS.

1  Q.    Okay.  About how many agents of the IRS -- or, sorry, the
2  ATF were involved in this operation?
3  A.    That would -- that's dependent on the circumstances, sir.
4  I was the sole case agent.  It was my case.  But if we were
5  going to interview somebody, we could typically have two
6  people.  So it's a hard question to answer how you have it
7  phrased.
8  Q.    So you don't know how many agents of the IRS were working
9  on Operation Lightning Strike?
10 A.    I believe you asked how many ATF agents were working --
11 Q.    Oh, sorry, ATF agents.
12 A.    I'm not sure.
13       Have I answered your question?
14 Q.    No, you have not.
15 A.    I said it was dependent on the activity you were doing.
16 If I was conducting paperwork, research, or other aspects, I
17 handled it myself.  If we went to interview people, we might
18 grab one other person.
19 Q.    Okay.
20 A.    If we were executing a search warrant it could be 15 or 20
21 agents.
22 Q.    Okay.  So let's try it like this.  So it's your testimony
23 you can't give an exact number of how many ATF agents were
24 working on Operation Lightning Strike, right?
25 A.    That's not my testimony.  I gave you my answer.

1   Q.   So how many agents of the ATF were working on Operation

2   Lightning Strike?

3   A.   Sir, again, it varies depending on the circumstances.

4   Q.   Okay.  So let's try this.  Was it between 1 and 100 ATF

5   agents working on Operation Lightning Strike?

6   A.   Yes.

7   Q.   Was it between 1 and 50 ATF agents working on Operation

8   Lightning Strike?

9        MS. TAYLOR:  Your Honor, I'm going to object.  The

10   question has been answered.

11        THE COURT:  I'm going to sustain the objection on

12   relevance grounds.

13        Move on.

14   BY MR. ZERMAY:

15   Q.   Okay.  So you traveled to Michigan during the course of

16   Operation Lightning Strike, right?

17   A.   Correct.

18   Q.   And various places throughout the Midwest, right?

19   A.   I don't believe we traveled anywhere other than Michigan

20   in the Midwest.

21   Q.   How many flights did you and the ATF agents take to

22   Michigan?

23   A.   One.

24   Q.   One flight.  Okay.  Okay.

25        So we heard a lot about bank records, right?

1    A.    Yes.

2    Q.    A lot about bank videos, emails, Instagram messages,

3    correct?

4    A.    Correct.

5    Q.    Heard a lot about Ms. Hoover's Instagram profile,

6    political cartoons, and even the United States Copyright

7    Office, right?

8    A.    That was mentioned, yes.

9    Q.    Okay.  So let's circle back to the auto key card.  You

10   received a report yourself that described the auto key card as,

11   quote, a flat piece of stainless steel, right?

12   A.    You would have to specify which report.  I'm not sure

13   which one you're talking about.

14   Q.    Okay.  Would an ROI that stated as such refresh your

15   memory?

16   A.    If you can give me the number.

17   Q.    Okay.

18           MR. ZERMAY:  Matt, could you please pull up the ROI.

19           MR. LAROSIERE:  It's Number 28.

20   BY MR. ZERMAY:

21   Q.    It's ROI Number 28.

22   A.    Okay.

23           MS. TAYLOR:  Your Honor, can I ask for clarification?

24   If there's multiple cases, is he talking about -- which ROI 28

25   is Mr. Zermay referring to?

1          THE COURT:  Can you identify it please, Counsel?

2          MR. ZERMAY:  I believe it's Operation Lightning

3     Strike.

4          THE WITNESS:  Okay.

5     BY MR. ZERMAY:

6     Q.   So you received a report that described the auto key card

7     as, quote, a flat piece of stainless steel, correct?

8          MS. TAYLOR:  Objection to the hearsay.

9          THE COURT:  Sustained.  I don't know who this

10    was . . .

11    BY MR. ZERMAY:

12    Q.   You received a report from the Bureau of Alcohol, Tobacco,

13    Firearms and Explosives, your agency, that described the auto

14    key card as a flat piece of stainless steel, correct?

15         MS. TAYLOR:  Objection.

16         THE COURT:  Basis?

17         MS. TAYLOR:  Hearsay.

18         THE COURT:  Let me see counsel at sidebar.  And

19    someone bring me the document, please.

20        (Proceedings at sidebar:)

21         MR. ZERMAY:  Prepared by him.

22         MS. TAYLOR:  Okay.  So you're asking him if he

23    received --

24         MR. ZERMAY:  Right.

25         MS. TAYLOR:  Okay.

1         MR. LAROSIERE:  It was prepared by -- down here.

2         THE COURT:  So then your question makes no sense.

3         MR. ZERMAY:  Well, no, it says on March 16 Special

4    Agent Hooker received ATF --

5         THE COURT:  There's no way she can hear you.

6         MR. ZERMAY:  Sorry.  On March 16, Special Agent

7    Hooker received ATF firearm report of technical examination

8    regarding evidence purchased.  The report described the ATF

9    property as a flat piece of stainless steel.

10        MS. TAYLOR:  Well, that's Cody Toy's report.  And

11   you'll get to cross-examine him, but this appears to be

12   hearsay.

13        MR. ZERMAY:  The report was generated, the ROI --

14        MS. TAYLOR:  But you're asking him to testify about

15   what Cody Toy said.

16        THE COURT:  He's asking him to testify about what he

17   put in his report.  I'm going to allow it.

18        And Mr. Zermay, you referred to Mr. Larosiere as

19   "Matt" in front of the jury.  That's impermissible.

20        MR. ZERMAY:  I apologize, Your Honor.

21        THE COURT:  We don't use first names inside the

22   courtroom.

23        Your objection is overruled.  Go ahead.

24     (Proceedings in open court:)

25        THE COURT:  You might need to rephrase your question,

1  but go ahead.

2           MR. ZERMAY:  Okay.  Thank you, Your Honor.

3  BY MR. ZERMAY:

4  Q.    So Agent Hooker, you received a report that described the

5  auto key card as a, quote, flat piece of stainless steel,

6  correct?

7           THE COURT:  I don't think you rephrased your

8  question.  I think you asked the exact same question.  Why

9  don't you ask -- you've got the report that you're asking him

10  about.  Can you ask a direct question?

11  BY MR. ZERMAY:

12  Q.    Agent Hooker, you generated a ROI in which you described

13  the auto key card as, quote, a flat piece of stainless steel,

14  correct?

15  A.    Would you like me to read the sentence to you?

16  Q.    No, I would not.

17           THE COURT:  You can answer his question, sir.

18  A.    I described -- that was one part of the sentence of my

19  description of the item.

20  Q.    Respectfully, sir, that was nonresponsive.

21           Yes or no?

22  A.    Yes.

23  Q.    Okay.  Thank you for that.

24           MR. ZERMAY:  I'd like to get -- or bring up

25  government's Exhibit 50E for Mr. Hooker.  If I could approach

1    and obtain a copy of Government's Exhibit 50E.

2              THE COURT:  I'm sorry, sir, just a moment.

3              Go ahead.

4              MR. ZERMAY:  I'm approaching the witness, Your Honor.

5    I'm representing that this is Government's Exhibit 50E, and

6    give the witness --

7              THE COURT:  Can I get you to -- do you need to take

8    it back with you?  Because I need you at a microphone.

9              MR. ZERMAY:  Could we open it, Your Honor?

10             THE COURT:  Is that -- has that one been opened?

11             Madam Deputy, scissors.

12             THE WITNESS:  It's open.

13             MR. ZERMAY:  Okay.  I would like to publish it to the

14   jury, Your Honor.

15             THE COURT:  All right.  Go ahead.

16             MR. ZERMAY:  If I could respectfully open up the bag

17   and hand the auto key card to the jury, Your Honor.

18             THE COURT:  No, you can just walk it in front of

19   them.

20             MR. ZERMAY:  Okay.  Thank you, Judge.

21             This is Government's Exhibit --

22             THE REPORTER:  Your Honor, I can't hear him.

23             THE COURT:  Mr. Zermay, you can just publish it and

24   then go to the microphone to speak, please.

25             MR. ZERMAY:  (Inaudible.)

1    THE COURT:  Mr. Zermay, just publish it and go to the
2  microphone, please.
3    MR. ZERMAY:  Thank you.  All right.
4  BY MR. ZERMAY:
5  Q.   So I'm going to represent this is Government's
6  Exhibit 50E.  I'll put it on the ELMO.
7    So on the front side, this is a light etching, a
8  light engraving on this little tchotchke, correct?
9    THE COURT:  You can take it out of the baggie if it
10  makes it clearer, Mr. Zermay.
11    MR. ZERMAY:  Thank you.
12  BY MR. ZERMAY:
13  Q.   So this is the front side of the stainless piece of steel,
14  correct?
15  A.   Correct.
16  Q.   Okay.  And on the back side of it it's -- there's no
17  drawing on it, correct?
18  A.   Correct.
19  Q.   It's a blank piece of steel, correct?
20  A.   Other than the cutouts, yes.
21  Q.   Thank you for that.
22    So you've testified that you made purchases of the
23  auto key card, correct?
24  A.   Yes.
25  Q.   Okay.  And this is the form that they came in, correct?

1  A.   This is one of the types of forms that I purchased.

2  Q.   Is this a fair and accurate representation of the types of

3  auto key cards that you received during the course of your

4  undercover purchasing of them?

5  A.   This is one type that I purchased.  I purchased different

6  types.

7  Q.   Is this a fair and accurate representation of one of the

8  types of auto key cards you purchased during the course of your

9  investigation?

10 A.   Yes.

11 Q.   Thank you.

12         We had -- let's see.

13         So after you received them, you didn't immediately

14 try to put them into a firearm, correct?

15 A.   I took photographs and placed them into evidence.

16 Q.   Respectfully, sir, that wasn't my question.

17         You didn't take this and try to put it into a gun,

18 right?

19 A.   I did not.

20 Q.   Instead, you sent them to Agent Toy to machine or

21 otherwise alter this flat piece of stainless steel, correct?

22 A.   I sent them to Cody Toy for examination.

23 Q.   Did you understand that Mr. Toy was going to materially

24 alter these cards?

25 A.   Yes.

1  Q.   Okay.  Thank you.  So you spoke to a Mr. Richard Roberts

2  during the course of your investigation, correct?

3  A.   Yes.

4  Q.   During -- and when you spoke to him during the course of

5  your investigation, you told him, and I quote, that 95 percent

6  of the people who bought these items -- those being the auto

7  key cards -- understood what they potentially could be,

8  correct?

9  A.   I don't have my report to -- do you have my report?

10 Q.   I have -- respectfully, I'm the one asking questions here,

11 but I will represent and ask you this question.  If we had a

12 recording of those statements, would it help you reflect

13 your --

14 A.   If you have --

15 Q.   -- refresh your recollection?

16 A.   If you have a recording of it and you are asserting that I

17 said that, then I probably said it.

18 Q.   Okay.  So to be clear, you said to Mr. Richard Roberts

19 that 95 percent of the people who bought these auto key cards

20 understood what they potentially could be, correct?

21        MS. TAYLOR:  Your Honor, could we have sidebar?

22        THE COURT:  Yes.

23     (Proceedings at sidebar:)

24        THE COURT:  Go ahead.

25        MS. TAYLOR:  Your Honor, I understood Special Agent

1   Hooker to be asking for the opportunity to refresh himself by

2   looking at his report, and for some reason that opportunity is

3   not being granted.  And I cannot understand why.  I think it is

4   appropriate if he is asking to refresh himself by looking at

5   his report, so that this testimony is accurate, that he should

6   be able to do that and not be bullied into answering without

7   refreshing himself.

8               THE COURT:  Mr. Zermay.

9               MR. ZERMAY:  Your Honor, I believe we have possession

10  of one of his reports regarding Mr. Richards.  It wouldn't be

11  in the report, but we do have a recording that was disclosed in

12  Giglio material where he orally made those statements, and

13  that's where we're trying to refresh his recollection to it, or

14  simply get him to admit that he did make those statements.

15              THE COURT:  I did think he was asking to refresh his

16  recollection, but what you were -- Mr. Zermay seemed to move on

17  and the agent said, "If you have a recording, then I probably

18  said it."

19              Do you -- Ms. Taylor, did -- did he or --

20              MS. TAYLOR:  I don't know because I have not reviewed

21  that recording in probably a year.  So I -- I could not say.

22              THE COURT:  Mr. Zermay, as an officer of the court,

23  is it your representation that that's what's on the recording?

24              MR. ZERMAY:  Yes.  It's 15 minutes into the

25  interview, or one of the three interviews of the person he was

1   interviewing.

2           THE COURT:  All right.  I'm going to allow the line

3   of testimony.

4           Can you review the recording tonight?  If it's

5   inaccurate, Ms. Taylor, we'll deal with it.

6           MS. TAYLOR:  Yes, Your Honor.

7           THE COURT:  But I think given the way that the agent

8   answered it, I think it's all right.

9           MS. TAYLOR:  Yes, Your Honor.

10          THE COURT:  Mr. Zermay, earlier you told the witness

11  that his answer was nonresponsive.  That's not your call to

12  make.

13          MR. ZERMAY:  I'm sorry, Your Honor.

14          THE COURT:  No, it's okay.  Just if you think it's

15  not responsive, you can ask me and move to strike it.  If you

16  want to follow up with him, that's fine, but in the future,

17  let's --

18          MR. ZERMAY:  Of course.

19          THE COURT:  That's fine.  Okay.

20          MR. ZERMAY:  Thank you, Judge.

21      (Proceedings in open court:)

22          THE COURT:  Go ahead, Mr. Zermay.

23          MR. ZERMAY:  Thank you, Your Honor.

24  BY MR. ZERMAY:

25  Q.   And just so we have a clean record, you spoke to

1  Mr. Richard Roberts and told him that 95 percent of the people

2  that bought these items -- those items being the auto key

3  cards -- understood what these items could potentially be,

4  correct?

5  A.   Mr. Zermay, my conversation with him was over an hour long

6  and I do not recall all aspects of it.  So I can't answer

7  that -- I can't answer your question as a yes or no.  If you

8  have the portion of the audio to refresh my memory, then I

9  could confirm that.

10  Q.   Okay.  Would it help if we play the portion of that audio?

11  A.   Sure.

12  Q.   Okay.

13       MR. ZERMAY:  Mr. Larosiere, may you please play the

14  portion of the audio.

15       MS. TAYLOR:  Your Honor, could we have sidebar again?

16       THE COURT:  Counsel, let me see you a moment.

17       Sorry, ladies and gentlemen.

18   (Proceedings at sidebar:)

19       THE COURT:  Mr. Zermay, that's not a proper

20  refreshing of a recollection because you're playing it in front

21  of the jury.  When you -- when something is used to refresh the

22  recollection, the witness looks at it, their recollection is

23  refreshed, and then they answer the question.

24       MR. ZERMAY:  Your Honor, it's an audio recording.

25  How would I show the witness an audio recording?

1          THE COURT:  Well, you should have had it transcribed.

2          Can you give him some headphones and let him listen

3     to it?  It's not proper to play that audio recording in front

4     of the jury.  It's not in evidence, so . . .

5          MS. TAYLOR:  Your Honor, I would raise a more

6     fundamental issue, which is there has been a large amount of

7     litigation in this case regarding wanting to keep out whatever

8     the witness's opinion is as to whether it is or is not a

9     machine gun.

10          And it appears that Mr. Zermay wants to go down the

11     road of trying to show that Mr. -- Agent Hooker doesn't think

12     it was a machine gun.  And so to the extent that that's a road

13     he's going down, I think that opens the door for us to ask any

14     witness whether they thought it was or wasn't.  And

15     fundamentally we have been maintaining that it's up to the jury

16     to make that call and that we weren't going to present that

17     kind of testimony.

18          What is the relevance of what -- of whether or not --

19     he said 95 percent of the people know what this -- what it

20     could be?

21          MR. ZERMAY:  It goes to the heart of it's not a

22     machine gun, Your Honor, it's a singular piece of stainless

23     steel.  It's -- that they need to machine, they need to cut

24     out.  And the next question I was going to ask was, "When you

25     spoke to him you were discussing whether or not he cut it out

1    and manufactured a machine gun?"

2            THE COURT:   Okay.   I don't -- again, I'm not

3    understanding the relevance of whether or not he said

4    95 percent -- that the agent said to Mr. Roberts, "95 percent

5    of the people know what this could be," or -- I'm not saying

6    that verbatim, but --

7            MR. ZERMAY:   And perhaps Mr. King would also be able

8    to testify as to the Court's ruling.   I believe that the lay

9    witnesses can testify as to what they believe the item to be,

10   and that would also go to that.   He's saying that 95 percent of

11   them understood what it potentially could be.   And if we have a

12   cherry-picked cadre of people given immunity that's going to

13   say that they thought it was a machine gun from day one, it

14   would tend to show -- you know, rebut that evidence that's

15   already being let in.

16           MS. TAYLOR:   Your Honor, the defense can subpoena

17   anyone they want.   They have the full list of every single

18   person who purchased these things as well as all of the ROIs of

19   the interviews the ATF did.   If they wish to present testimony,

20   they could have done that.   And I think this seems to be an

21   improper way of trying to get around the hearsay rules.

22           THE COURT:   I just -- Mr. Zermay, try as I might, I'm

23   not following the point of you -- of us going down this path

24   with regard to whether or not the agent made that statement.

25   So I'm going to tell you to move on.

```
 1              MR. ZERMAY:  Okay.  Thank you, Your Honor.
 2         (Proceedings in open court:)
 3              MR. ZERMAY:  Well, thank you for your time.  Special
 4    Agent Hooker, that's all the questions I have for you.
 5              THE WITNESS:  Thank you.
 6              THE COURT:  Mr. King.
 7              MR. KING:  Your Honor, may I return Exhibit 50E back
 8    to --
 9              THE COURT:  Yes, please.  Thank you.
10              MR. KING:  May it please the Court.
11              THE COURT:  Go ahead.
12                        CROSS-EXAMINATION
13    BY MR. KING:
14    Q.   Good afternoon, Special Agent Hooker.
15    A.   Good afternoon, Mr. King.
16    Q.   I know it's been a long day.  I will try to get to the
17    point as quickly as I can.
18              I want to talk to you a little bit about spots we can
19    come to an agreement on.  Fair to say that Kris -- I'm sorry,
20    Justin Ervin was the proprietor of Auto Key Cards?
21    A.   Yes.
22    Q.   While he did not personally manufacture them, he did
23    prepare them and mail them out?
24    A.   Yes.
25    Q.   And he got the money into his bank account?
```

1   A.   Yes.

2   Q.   He sold them?

3   A.   Yes.

4   Q.   Over time he became friends with Matt Hoover?

5   A.   Yes.

6   Q.   Matt Hoover had a website -- or a YouTube channel, CRS

7   Firearms, where he discussed many, many things?

8   A.   Right.

9   Q.   Some of those had to do with his feelings towards the

10  government?

11  A.   I'm not certain.  I only watched videos that were related

12  to the auto key card.

13  Q.   And I was going to say, and some of them having to do

14  directly with the auto key card and other things like that.

15       During the -- we've heard that there was a lot of

16  unraveling and difficulty in terms of the investigation getting

17  going.  How long before you were informed that you potentially

18  even had a case that you have Justin Ervin's name?

19  A.   I'm not sure I understand.  Could you maybe repeat it for

20  me?

21  Q.   Sure.  Let me rephrase that.

22       So in terms of the minute the investigation began,

23  you knew Justin Ervin's name?

24  A.   Yes, sir.

25  Q.   You knew his date of birth?

1    A.   I'm not sure I was provided that.  I think it was his name

2    and his address.

3    Q.   And they gave you his address and you knew who he was.

4    Fair to say if not immediately, it took you a matter of

5    minutes, if not hours, to uncover everything about him?

6    A.   Yes.  If -- if -- if -- from the time I took the phone

7    call, if I immediately -- I don't know where I was, if I

8    immediately started an investigation, it wouldn't have been

9    long, yes.

10   Q.   Was there -- let me ask it this way.  Mr. Ervin was not

11   doing a lot of things to conceal who he was selling the auto

12   key card?

13   A.   No, I would agree with you on that.

14   Q.   And the money orders that were out -- went out were in his

15   name?

16   A.   Correct.

17   Q.   The order form that we had -- the order forms that -- they

18   had his name on it?

19   A.   I believe it was first initial -- or "J." and then

20   "Ervin."

21   Q.   Fair.

22        In fact, he tried to copyright this with the United

23   States government?

24   A.   Yes, we saw the application.

25   Q.   And I'm turning your attention to Government's Exhibit 22.

1   Do you see that on the screen there?

2   A.   Yes, sir.

3   Q.   And like we discussed, it says "J. Ervin" and the city.

4   That's the Orange Park?  That's where he lives?

5   A.   Yes, sir.

6   Q.   I want to turn your attention a little bit higher up to

7   that.  The -- there's a check box.  Do you see that?

8   A.   Yes.

9   Q.   Did you check that check box?

10  A.   If -- do you have the -- do you have anything on the form

11  that shows that I'm the one that ordered -- yes.  Okay.  If --

12  yes, that's my name.  Then I would have checked it.  I filled

13  out the form.

14  Q.   And so you would have checked that box?

15  A.   Yes.

16         MR. KING:  Ms. Ganoe, if we can highlight that again.

17  Thank you.

18  BY MR. KING:

19  Q.   And when you checked the box -- when you checked it, was

20  that true or not true what you checked on the box?

21  A.   I'm not sure.  Can you tell me what you're asking me

22  again?

23  Q.   Sure.  I'll ask it another way.

24         It says that, "By sending a mail order to us and by

25  checking the box, you have read the order form, all the terms

1   and conditions, and fully agree to all the AutoKeyCards.com

2   website policies."

3           Did you read those and agree to those or did you not

4   read those?

5   A.   I may have read the terms.  It doesn't mean I agreed with

6   them.  I was conducting an investigation of someone allegedly

7   trafficking machine gun conversion devices.

8   Q.   So where it says, "Check the above to agree to the

9   following," you checked it but you didn't agree.  Is that a

10  fair statement?

11  A.   No, sir.

12  Q.   It's not a fair statement?

13  A.   That I checked it and didn't read it?

14  Q.   Didn't agree to it.

15  A.   Oh, didn't agree to it?

16          Mr. King, I'm not sure I understand the question.  I

17  was conducting an investigation.  Regardless of words printed

18  on the form that said I'm going to agree to the terms of his

19  website, it was fairly irrelevant to me because I had received

20  an allegation that Mr. Ervin was selling machine gun conversion

21  devices and I had to obtain one in order to ascertain if that

22  was true.

23  Q.   Putting that aside and agreeing that you did check the

24  box, did you follow the terms on the website where it said that

25  you would not cut the device or have somebody cut it?

```
 1   A.    I followed my agency's procedures.  I sent my evidence to
 2   my Firearms Enforcement Officer for examination.
 3   Q.    I want to move to --
 4              MR. KING:  Ms. Ganoe, if we could pull up
 5   Government's Exhibit 75.
 6   BY MR. KING:
 7   Q.    If I could have you turn your attention to that, Agent
 8   Hooker.
 9              MR. KING:  And if we could, Ms. Ganoe, highlight the
10   name on there.
11   BY MR. KING:
12   Q.    Do you recognize this document, Agent Hooker?
13   A.    It's a National Firearms Registration and Transfer
14   Certification Record.
15   Q.    Yes, sir.  And who's this record for?
16   A.    Darek Gordon Stennes.
17   Q.    And what does this record tell us in the absence of any
18   other information?  What does this tell you?
19   A.    That Mr. Darek Gordon Stennes has no firearms registered
20   with ATF.
21   Q.    Is it a fair statement for me to make that the vast
22   majority of individuals who have NFA items do them in a trust?
23   A.    I have no idea.
24   Q.    Is it commonplace that you have seen in the course of your
25   many years doing this that people keep NFA items in trusts?
```

1  A.    I have seen items in a trust.  But in my experience, in my

2  career, I've seen more items registered to individuals than to

3  trusts.

4  Q.    Of the individuals we've gone through here, Darek Stennes

5  has a report saying he has no NFA items?

6  A.    Yes, sir.

7  Q.    But we know that he has a trust that the only way you knew

8  about it was he identified it?

9  A.    Yes, sir.

10  Q.    And we have Mr. Tristan Alderson, who also has his items

11  in a trust?

12  A.    Yes.

13  Q.    And do you search for trusts for any of the people where

14  you've got NFA items where it said there's nothing to return?

15  A.    Not unless they advised us that they had a trust.

16  Q.    So unless they tell you of a trust, you didn't search?

17  A.    It's not something that I'm capable of searching.  You

18  would have -- the NFA branch has to have the title of the

19  trust.

20  Q.    And so the only reason you knew to do this with

21  Mr. Stennes is because he told you?

22  A.    Correct.

23  Q.    And if somebody didn't tell you and you searched for their

24  name, like Mr. Stennes, it would come up blank?

25  A.    I assume so.  I do not conduct the NFA record search.

1    That's done by another part of our agency.  But my

2    understanding is you need to have the specific name of the

3    trust.

4    Q.    I want to turn your attention to a little -- kind of

5    earlier in your testimony.  You discussed conducting a search

6    of Mr. Ervin's home.

7    A.    Okay.

8    Q.    At the time you said that it was his father's home.  It's

9    your understanding his father wasn't actually living there, he

10   was essentially living alone.  His father was staying with a

11   girlfriend?

12   A.    No.  We -- we -- I spoke to his father, and his father

13   advised me that he stayed off and on there and he would come

14   back and do laundry and that maybe he stayed a couple nights a

15   week.  But he did spend a significant amount of time with his

16   girlfriend.

17   Q.    And during your direct testimony you discussed finding

18   many Pen Holder Edition auto key cards throughout the home?

19   A.    Yes, sir.

20   Q.    And do you recall the government asking you if any of them

21   were holding a pen?

22   A.    Yes, sir.

23   Q.    Do you remember being asked that more than once?

24   A.    Probably.  I'm not sure.

25   Q.    And none of them were holding a pen?

1   A.   Not that I saw, sir.

2   Q.   Of the number of auto key card -- approximately how many

3   auto key cards -- not how many devices you think there were,

4   but how many actual auto key cards, roughly, did you come

5   across in that home?

6   A.   I don't know the answer to that.  The decision was made

7   to -- because each lightning link on the card was considered a

8   machine gun, the decision was made to classify in that manner.

9   That's why I said earlier, 1,550 lightning link machine gun

10  conversion devices were seized.

11  Q.   Let me ask you this:  Do you think it would be fair for me

12  to say that there were hundreds of auto key cards in that home?

13  A.   Yes, sir.

14  Q.   And you searched the home very thoroughly?

15  A.   Yes, sir.

16  Q.   And there were many other state and local law enforcement

17  that were -- and federal law enforcement that was there

18  conducting the search?

19  A.   Yes, sir.

20  Q.   During the course of your search, how many cutout auto key

21  cards did you come across?

22  A.   None.

23  Q.   How many cutout lightning links or drop in-auto sears did

24  you come across?

25  A.   None.

1  Q.    How many firearms that needed to be registered with the

2  NFA -- and understand we're going to disagree about the auto

3  key card, but putting those aside -- how many did you come

4  across in that home?

5  A.    None.

6  Q.    Did you come across any other modified or unlawful

7  firearms anywhere in that home?

8  A.    No, sir.

9  Q.    What about Mr. Hoover's home?

10  A.    We never searched Mr. Hoover's home, sir.

11  Q.    And did you ever recover any cutout lightning links or

12  cut-up pieces of auto key cards from either of those gentlemen?

13  A.    No, sir.

14  Q.    If I could have you turn your attention to 48-22.  It's

15  one of the photos of the search.  And Agent Hooker, we

16  discussed these a little bit earlier in the day, but --

17         THE COURT:  Hold on a minute.  There are -- in

18  evidence they're by letter.

19         Ms. Ganoe, can you tell us what -- he said -- he

20  referred to it as "4822."  Can you --

21         MR. KING:  Your Honor, I apologize.  I believe it's a

22  composite.  And so it's page 22 of the composite.

23         THE COURT:  Okay.  All right.  So page 22 of

24  Exhibit 48.  Go ahead.

25  BY MR. KING:

1  Q.   I know we talked about these a little bit.  What are these

2  items?

3  A.   Belt sanders.

4  Q.   And what purpose did you surmise these had in Mr. Ervin's

5  home during the course of your investigation?

6  A.   These were located in the detached garage, and we surmised

7  that they were used to polish the auto key cards.

8  Q.   If the auto key card -- let me ask it this way:  The auto

9  key card, if somebody were to cut out and make a lightning link

10 with pieces of the metal in the auto key card, is there any

11 reason that would need to be polished?

12 A.   I don't believe so.

13 Q.   Is there any utility to having it polished?

14 A.   Maybe increase sales because of the look of it, but -- as

15 far as utility, as far as functioning?

16 Q.   Yes, sir.

17 A.   I don't believe so.

18 Q.   So the only purpose of that would be aesthetics from what

19 you understand?

20 A.   I would agree with that.

21 Q.   During the course of your investigation of Mr. Ervin, in

22 his home did you -- let me ask it this way:  Was there a

23 reasonable amount of food for primarily one person living there

24 or did there seem to be stockpiles of food?

25 A.   There were stockpiles of food in the bedroom.

1  Q.   Were there stockpiles of ammunition?

2  A.   Yes.

3  Q.   Have you heard of the term Doomsday prepper, those sort of

4  things?

5  A.   I've heard of the term.

6        MR. KING:  Ms. Ganoe, if we could turn to --

7  BY MR. KING:

8  Q.   And Agent Hooker, if I could have you turn your attention

9  to Government's Exhibit 67E.  I believe it's one of the emails

10 we discussed earlier in the day.

11       Agent Hooker, if I could have you look kind of third

12 sentence down.  Do you see that okay?

13 A.   Sure.

14 Q.   And what -- can you read the full sentence that is on

15 there?  There's a word, but ignore that and just the full

16 sentence.

17 A.   Beginning with "individuals."

18 Q.   Yes, sir.  Thank you.

19 A.   "Individuals may make the choice to use it in a different

20 way under certain dire circumstances in the future."

21 Q.   What does that mean to you?

22 A.   I believe he is -- Mr. Ervin is saying that someone may

23 use the card as a machine gun conversion device if

24 circumstances become dire in the future.

25 Q.   And you, through the course of your investigation, had

1   opportunity to speak to many members of the Ervin family?

2   A.   Yes.

3   Q.   Including Mr. Ervin's father?

4   A.   Yes.

5   Q.   And there was an incident where Mr. Ervin, Sr., the

6   father, had a friend over and Justin Ervin became upset?

7           MS. TAYLOR:  Objection, hearsay.

8           THE COURT:  Sustained.

9   BY MR. KING:

10  Q.   During the course of your investigation, I'm sure it's

11  important to get the details correct?

12  A.   Sure.

13  Q.   And one of the things that -- were you aware Mr. Ervin was

14  also trying to start a lighting company or lighting business?

15  Christmas trees, stuff like that?  Did you come across those

16  documents?

17  A.   I don't recall that, sir.

18          MR. KING:  Ms. Ganoe, if we can pull up 48-6.

19  BY MR. KING:

20  Q.   And Agent Hooker, if I could have you turn your attention

21  to 48-6.  I'm sorry, Composite Exhibit 46, Number 6.

22          THE COURT:  Page 6.

23          MR. KING:  I apologize, I'm trying to figure out

24  where to zoom in.  If you could bear with me.

25  BY MR. KING:

1    Q.    Agent Hooker, do you see what's on the screen in

2    Government's Exhibit 48, page -- composite, and it's page 6?

3    A.    Yes.

4    Q.    Do you remember going over this testimony with the

5    government?

6    A.    Yes.

7    Q.    And it was your testimony that you believed these were

8    discussing lightning and words for lightning links?

9    A.    Yes.

10   Q.    What is the word that is in every single one of those?

11         Agent Hooker, I'll ask it this way:  Is it "lighting"

12   or is it "lightning"?

13   A.    I think it may be "lighting."

14   Q.    I'm sorry?

15   A.    It's a little blurry.  I don't know if Ms. Ganoe can

16   highlight it a little larger.

17   Q.    Agent Hooker, I want to move on a little bit.

18         We had a lot of -- let me ask you this.  You

19   interpret that as "lightning" because you had Operation

20   Lightning -- I can't remember the name of it, but something

21   along those lines?

22   A.    Yes, sir.

23   Q.    And that was why you interpreted it that way?

24   A.    I thought that's what the word said there, sir.

25   Q.    Fair enough.

1    I want to turn your attention now to some of the

2  emails.  And we've been over a lot of emails today.  During the

3  course of your examination with the government, it's fair to

4  say that, at least the way the questions were asked, is there

5  was an assumption that every single email went to Mr. Hoover --

6  I'm sorry, to Mr. Ervin?

7  A.   Can you ask again, please, sir?

8  Q.   The email addresses were -- you know, it might be

9  autokeycard, autokeycardadmin, something like that.  But the

10 question was that Mr. Ervin got this email.  Do you remember

11 that testimony?

12 A.   Yes.

13 Q.   And it's true that there was another individual, Carolanne

14 Wolfe, who was also working and answering emails for Mr. Ervin?

15 A.   Correct.

16 Q.   And so you were making an assumption that those emails

17 went to Mr. Ervin?

18 A.   I think it would be fair to say that the assumption was

19 based on interviews, including that of Ms. Wolfe.

20 Q.   And let me -- let me make sure I ask this the right way.

21 The -- that was an assumption you made?

22 A.   Sure.

23 Q.   That was based on an assumption you're making?

24 A.   Okay.

25 Q.   Over the course of the investigation, there were computer

1    forensic experts working for ATF?

2    A.    Yes, sir.

3    Q.    And there's numerous agents, and people pored through

4    these computers and digital devices and digital files?

5    A.    Yes, sir.

6    Q.    And did anybody --

7              MS. TAYLOR:  Your Honor, could we have sidebar?

8              THE COURT:  You may.

9         (Proceedings at sidebar:)

10             MS. TAYLOR:  My concern with this line of questioning

11   is that there was a taint team review that was conducted in

12   this case because we had reason to believe that Mr. Ervin had

13   retained attorneys for other reasons and we did not want to

14   view attorney-client privileged material.  And to the extent

15   that there's a question about did multiple agents pore through

16   his computers, it was looking for attorney-client privileged

17   material, not for evidence in the case, the review of the

18   computers for evidence in the case, I believe, was done by

19   Agent Hooker and Lyndsey Butler.  And so I don't -- I just

20   don't want to get to a point of having to get into that.

21             THE COURT:  Mr. King, where are you going with this?

22             MR. KING:  I wasn't going to go in that direction

23   with a ten-foot pole.  I was just going to ask him what direct

24   evidence he had that Mr. Ervin actually, physically read the

25   emails and reviewed them.  I was about done with this whole

 1   line.
 2            THE COURT:  Let's skip how many people looked at it
 3   and let's just ask your question about --
 4            MR. KING:  Yes, Your Honor.
 5            THE COURT:  Okay.
 6            MR. KING:  That was my next question, thank you.
 7            THE COURT:  Go ahead.
 8        (Proceedings in open court:)
 9            MR. KING:  May it please the Court.
10            THE COURT:  Go ahead.
11            MR. KING:  Thank you, Your Honor.
12   BY MR. KING:
13   Q.   Agent Hooker, I'll get to the point here.  In all of that
14   review, was there any direct evidence that Mr. Ervin personally
15   reviewed all those emails?
16   A.   I'm not sure I can answer the question.  I didn't extract
17   them.  I don't know if the techniques they used to do that can
18   show them that someone read it.  That was done by an individual
19   that I believe is scheduled to testify in this trial on the
20   extraction.
21   Q.   And I can ask them, but I guess as the case agent I'm
22   asking you if you're aware of direct evidence that he actually
23   read all those emails?
24   A.   I don't -- no one told me that, no.
25   Q.   And I think probably more importantly here, the vast

1   majority of those emails that we went through, would it be fair

2   to say that those weren't responded to?

3   A.    There was a lot that had no response.  I don't know if

4   it's the majority, sir, without going through them.

5   Q.    And certainly not every email that's ever sent.  I'm just

6   talking about the ones we talked about today.  Would it be fair

7   to say the ones that you testified to and specifically went

8   over, the vast majority of them were not responded to?

9   A.    Again, if this is sufficient for you, I know -- I know a

10  significant portion were not responded to.  I just don't know

11  that I would describe it as "vast majority."

12  Q.    And we know for a fact that the responses to those emails

13  were available to you through that search process because we

14  saw all of your email back and forth from your undercover

15  account?

16  A.    Yes.

17  Q.    And so you would expect that if those were responded to,

18  we would have seen it?

19  A.    I would expect that, yes.

20  Q.    If -- if Justin Ervin or Carolanne Wolfe or anybody else

21  were to say, "Hey, this" -- "if you cut this out and put this

22  here and put in it this specific type of AR-15 with this

23  specific bolt carrier, it will do what you're looking for," we

24  would expect to see that email?

25  A.    I would have expected to see it, yes.

1  Q.   Did you come across an email like the one I just

2  described?

3  A.   Not like that one.

4  Q.   I want to talk a little bit about some of the kind of

5  substantive act witnesses, and some those are the names you

6  went through with those NFA forms towards the end of your

7  testimony.

8        During the course of your investigation, you --

9  between records and third parties and documents that Mr. Ervin

10  had and everything else, you have a pretty good idea of about

11  exactly who got mailed what and when; is that fair to say?

12  A.   Yes.

13  Q.   And you had the opportunity, whether you took it or not,

14  to talk to those 900-plus individuals who did receive an auto

15  key card in the mail?

16  A.   Correct.

17  Q.   And you talked to a great many number of those people?

18  A.   Correct.

19  Q.   I want to talk to you a little bit about some of them

20  specifically.

21        If you could tell the jury what a 922 -- 922(g)

22  charge is.  I know we discussed it a little bit earlier on

23  direct.

24  A.   That is a prohibited person charge under the United States

25  code.

1  Q.   Yes, sir.  If you could just generally describe to the

2  jury what that means.

3  A.   It's a charge that we prosecute people under, and it has

4  different categories of prohibited persons listed under -- as I

5  discussed before:  convicted felons, unlawful drug users,

6  illegal aliens, persons convicted of a misdemeanor crime of

7  domestic violence, persons under a protection order, persons

8  that have been dishonorably discharged from the military,

9  persons that have renounced their citizenship.  And I may have

10 missed one, Mr. King, but --

11 Q.   You've done, actually, a much better job than I could

12 have, so I appreciate that.  I was looking for you there.

13          In terms of a 922(g) charge, can you get a 922(g)

14 charge if you are a user of marijuana and possess a firearm?

15 A.   Yes.

16 Q.   And you've personally arrested people for that exact

17 thing?

18 A.   I have.

19 Q.   And that's a serious felony?

20 A.   Yes, sir.

21 Q.   And I want to talk to you specifically about Tristan

22 Alderson.  Do you remember Tristan Alderson?

23 A.   Yes, sir.

24 Q.   And when you first met with him, where were you?

25 A.   In Michigan.

1   Q.   And who were you with?

2   A.   Agent Slosson.

3   Q.   And Agent Slosson -- I feel like we're talking about him.

4   Agent Slosson is the gentleman here seated at counsel table for

5   the government?

6   A.   Correct.

7   Q.   And he's now the case agent, and he's kind of taken over

8   for you?

9   A.   Yes.

10   Q.   And you were with him when you went and spoke with Tristan

11   Alderson?

12   A.   Correct.

13   Q.   And you observed Tristan Alderson to smell of marijuana?

14   A.   Yes.

15   Q.   He gave indicators of impairment by marijuana?

16   A.   I'm sorry?

17   Q.   Did he have any indicators of impairment by marijuana?

18   A.   Mr. King, it's been a long time.  He may have.  I do

19   recall the odor of marijuana being present when we discussed

20   with him.  I'm not certain that I recall the impairment issues.

21   I would have to review my report.

22   Q.   And I certainly don't ask you to have perfect memory.  I

23   can appreciate that.  I guess the question I have is at the

24   time you interacted with him, he had a firearm on him?

25   A.   Correct.

1  Q.   And there were other witnesses that said he was a user of

2  illegal drugs?

3  A.   I believe so.

4  Q.   And that's something that you normally would arrest

5  somebody for?

6  A.   That's not -- I wouldn't say that's an accurate statement.

7  Q.   Let me ask you this:  That's something that you have

8  arrested people for in the past?

9  A.   Yes.

10  Q.   And that is a serious felony charge?

11  A.   It is.

12  Q.   Did you arrest Tristan Alderson for this?

13  A.   No.

14  Q.   At any point in time has Tristan Alderson been arrested

15  for that?

16  A.   Not to my knowledge.

17  Q.   Is that a decision that you made solely?

18  A.   No.

19  Q.   Is that ultimately a decision that you get to make or is

20  that up to someone else?

21        MS. TAYLOR:  Objection to the privilege, Your Honor.

22        THE COURT:  I'm going to sustain the objection.  Move

23  on.

24  BY MR. KING:

25  Q.   I want to talk more about these individuals in general.

1  When Mr. Zermay was up here it was -- and let me ask it

2  differently.

3       You're under the belief that the auto key card is a

4  machine gun?

5  A.   That --

6       MS. TAYLOR:  Objection, Your Honor.

7       THE COURT:  I don't think he testified to that,

8  Mr. King.

9       MR. KING:  Yes, Your Honor.  Your Honor, if I could

10 ask it a little differently, I think that would --

11      THE COURT:  Okay.

12 BY MR. KING:

13 Q.   Of the more than 900 people that you had on that list that

14 you know for a fact had an auto key card shipped to them, what

15 percentage or how many of those people did you arrest?

16 A.   None.

17 Q.   How many of those people have received immunity for their

18 testimony, if you know?

19 A.   I do not know.

20 Q.   Is that a decision that you make?

21 A.   I don't make those decisions.

22 Q.   That's -- those are made by the U.S. Attorney's Office?

23 A.   Correct.

24 Q.   There was a little bit of a conversation about an Auto Key

25 Card Retrieval.  My understanding was that was not your case

1    and that kind of split off from this?  Do I have that correct,

2    the Auto Key Card --

3    A.   Are you talking about the case that's titled that?

4    Q.   Yes, sir.

5    A.   Correct, that's not my case.

6    Q.   However, during the course of this and when you interacted

7    with people, you received several auto key cards from people?

8    A.   Correct.

9    Q.   How many of them that you received had been cut out to

10   where they actually had a lightning link that was usable?

11   A.   I don't believe any that I received, sir.

12   Q.   Of the 900, did you find an individual that was able to

13   hand you one that had been cut out and was used to turn a --

14   anything into a -- make an AR-15 fire fully automatically?

15   A.   I would have to review my records, but I would -- I would

16   estimate that I have -- that we have made less than 50

17   retrievals.

18          You assert that 900 people received the cards, but we

19   haven't spoken to those people or made the retrievals from

20   them.  But of the retrievals that we have made, I don't have

21   any that have been cut out.

22   Q.   You don't have any that have been cut up.  Did I

23   understand that correctly?

24   A.   I did not seize any that had been cut.

25   Q.   Okay.  And we say "cut."  There were people who told you

1    they destroyed them once they saw you had arrested Mr. Ervin.

2    And we're not talking about that.  We're talking about cut out

3    to turn into a --

4            MS. TAYLOR:  Objection to hearsay.

5            THE COURT:  I'm going to sustain the objection,

6    direct the jury to disregard the question.

7            Rephrase.

8    BY MR. KING:

9    Q.   Of those individuals that you -- let me ask you this way:

10    Of the individuals that you dealt with, did you have Agent Toy

11    test any of the items that they had?

12    A.   The only submissions that I sent to Agent Toy were the

13    undercover purchases that I made, and there may have been one

14    additional submission later during the case, but it was not

15    from anyone that we retrieved an auto key card from.

16    Q.   And of the many, many people that you have talked to about

17    this, other than Cody Toy, who works for ATF, did any of them

18    tell you they were able to successfully get this to --

19            MS. TAYLOR:  Objection, hearsay.

20            THE COURT:  Sustained.

21    BY MR. KING:

22    Q.   Are you aware of any witness that was able to successfully

23    create an auto key card into a machine gun?

24            MS. TAYLOR:  Objection, hearsay.

25            THE COURT:  Sustained.

1   BY MR. KING:

2   Q.   I want to turn your attention to some of the other

3   exhibits that we looked at.

4           MR. KING:  Ms. Ganoe, if we could go to Exhibit 54,

5   and I'm not sure if it's a composite.  It is 54, page 12

6   (inaudible).

7           THE COURT:  I'm sorry, Mr. King?

8           MR. KING:  I'm sorry, Your Honor.

9   BY MR. KING:

10  Q.   And Agent Hooker, Composite Exhibit 54, page 12, it's some

11  of the Instagram and Facebook images that we were looking at

12  before.

13          THE COURT:  Thank you.

14          MR. KING:  And I'm sorry about that.  I got Ms. Ganoe

15  right here, so I'm talking to her.  So I apologize.

16  BY MR. KING:

17  Q.   Do you remember going over this with the government?

18  A.   Yes.

19  Q.   Why do you think this tends to prove why we're here?

20  What's the point of this?

21  A.   Can you repeat the question, sir?

22          MS. TAYLOR:  Objection to relevance, Your Honor.

23          THE COURT:  I think you need to rephrase your

24  question, Mr. King.  I may be able to allow it, but --

25          MR. KING:  Yes, Your Honor.

 1              THE COURT:  -- it's Ms. Taylor who --

 2   BY MR. KING:

 3   Q.   Agent Hooker, this was an exhibit that you went through

 4   with the government on direct examination.  What relevance do

 5   you believe this exhibit had or has on your investigation?

 6              MS. TAYLOR:  I'm going to renew my objection, Your

 7   Honor.

 8              THE COURT:  Let me see counsel at sidebar.

 9        (Proceedings at sidebar:)

10              THE COURT:  Mr. King, I think if you ask him, as the

11   case agent, what, if any, evidentiary value he thought it had,

12   that would be an appropriate question.  Asking him what

13   relevance it had, that's Ms. Taylor's call.

14              But Ms. Taylor, I think he can be asked what

15   evidentiary value the item had, just as you many times asked

16   what the evidentiary value of things were.

17              So let's proceed that way.

18              MR. KING:  Sure.  Thank you.

19        (Proceedings in open court:)

20              THE COURT:  We're going to break in just a little

21   bit.

22   BY MR. KING:

23   Q.   Agent Hooker, I promise I'm wrapping up, so . . .

24              Agent Hooker, let me ask it this way:  What

25   evidentiary value does this image from Justin Ervin's Instagram

1  have?

2  A.   It -- can you tell me specifically which Instagram account

3  this is from?

4  Q.   This is from -- I know this is --

5       MR. KING:  If I could have a moment, Your Honor.

6       THE COURT:  54 is @realJustinErvin, Mr. King.

7       MR. KING:  Yes, Your Honor.

8  BY MR. KING:

9  Q.   Agent Hooker, do I need to repeat that or . . .

10 A.   Could you repeat your question now, sir?  Please, yes.

11 Q.   What evidentiary value does this photo on his personal

12 Instagram have?

13 A.   I would say it might go to his state of mind or his

14 beliefs.

15 Q.   And what --

16 A.   I think it's fair to argue that one puts things on their

17 Facebook or their Instagram that they believe in.

18      MR. KING:  Ms. Ganoe, could I have you turn to page

19 18 of this exhibit.

20 BY MR. KING:

21 Q.   Agent Hooker, other than potentially being embarrassing

22 for Mr. Ervin, what evidentiary value do you believe this

23 exhibit has?

24 A.   I would say it was the same answer as I gave before.  I

25 think it -- it shows that Mr. Ervin has a love for firearms.

1    Q.    Agent Hooker, going through the -- and I'm not going to

2    have us go through a whole bunch of Instagram pictures and

3    photos and things like that.

4              Would it be fair to say that not all the comments by

5    Mr. Ervin and Mr. Hoover on social media were anti ATF -- were

6    anti ATF?  Is that a fair statement?

7    A.    What was the first part of the question?

8    Q.    In the course of all of the emails and Instagram and other

9    social media, including YouTube, would it be fair to say that

10   there were many anti-ATF statements by Mr. Ervin and

11   Mr. Hoover?

12   A.    I don't think we reviewed many anti-ATF statements today,

13   sir.

14   Q.    And I'm not disagreeing with that.  I don't think we went

15   through a lot of anti-ATF statements today.  What I'm asking

16   for is all the things we didn't look at, all the other pages

17   and all the other things.

18   A.    I'm -- I'm having difficulty quantifying it, but I guess I

19   would answer it this way:  I've seen individuals that had a lot

20   less love for ATF than those two, and I've seen them that have

21   had more.

22   Q.    I think that's a fair statement.

23              And in terms of the social media, the individuals,

24   excluding these two gentlemen, that were interacting with them,

25   would it be fair, kind of same statement?

1              MS. TAYLOR:  Objection, foundation.

2              THE COURT:  And I think it's vague, so rephrase.

3    BY MR. KING:

4    Q.   Let me rephrase this.

5              The other individuals who were responding and

6    interacting on all of the social media that you've reviewed,

7    did many of them share anti-ATF statements?

8              MS. TAYLOR:  Objection, foundation.

9              MR. KING:  Your Honor, if I could address that.

10             THE COURT:  Go ahead.

11             MR. KING:  Your Honor, it's his testimony that he

12   reviewed all the social media and all the Instagram and all the

13   Facebook prior to their admission today.

14             THE COURT:  To the extent the objection is to

15   foundation, it's overruled.

16             MS. TAYLOR:  Your Honor, I think my objection is

17   really to how Mr. -- how Agent Hooker would know the state of

18   mind of these people who made a comment on Mr. Ervin's account.

19             THE COURT:  I don't -- I don't think the question

20   asked for a state of mind, it asked for whether they shared

21   anti-ATF statements.

22             MS. TAYLOR:  Okay.

23             THE COURT:  So with that understanding, the objection

24   is overruled.

25             Go ahead.

1    A.    I saw numerous anti-ATF statements.

2          MR. KING:  Ms. Ganoe, if we could -- and I promise

3    I'm finishing up here.  If we could turn to Composite 53, page

4    45.

5    BY MR. KING:

6    Q.    Agent Hooker, this is an exhibit that you went over with

7    the government.  Do you remember that testimony?

8    A.    Yes, sir.

9    Q.    Is that image that you have in front of you how that came

10   from Facebook?

11         MS. TAYLOR:  Objection.  Could we have sidebar, Your

12   Honor?

13         THE COURT:  Yes.

14      (Proceedings at sidebar:)

15         THE COURT:  Let me start with I don't understand the

16   question.  Is that image how that came to you from Facebook?

17         MR. KING:  It's been redacted, Your Honor.  And

18   there's anti-ATF messages on there that have been redacted out

19   even though the government displayed it.

20         THE COURT:  Okay.  Ms. Taylor?

21         MS. TAYLOR:  I did the redacting, not Agent Hooker.

22   I don't know that he would even know in particular without

23   having the original in front of him what was redacted out.  But

24   to the extent that Mr. King wants to try and introduce other

25   parts of the exhibit, then he's welcome to do that.  But I

 1    don't think it's fair to ask Agent Hooker about -- I'm not even

 2    sure what the relevance is to what's been redacted.

 3          THE COURT:  Response, Mr. King.

 4          MR. KING:  Your Honor, it goes to the agent's bias,

 5    because it's anti-ATF messages that were directly responding to

 6    this message.  I have the -- and we previously listed that.

 7          MS. TAYLOR:  Why don't you try to enter that into

 8    evidence then.

 9          THE COURT:  Why don't you go ahead and do that,

10    Mr. --

11          MR. KING:  That was my next step, Your Honor.

12          THE COURT:  Okay.

13          MS. TAYLOR:  You never gave me a copy of it.  Sorry,

14    I don't have a copy of that.

15          MR. KING:  You don't have a copy of this?

16          MS. TAYLOR:  No.  You never gave us copies, so -- but

17    can I look at it, please?

18          MR. KING:  Sure.

19          MS. TAYLOR:  I think it's hearsay and irrelevant, so

20    those would be my objections.

21          THE COURT:  Well, to the extent the -- that it's

22    hearsay, I'm not sure the statement, "F the ATF," is offered

23    for the truth of anything.  Although I am concerned about

24    the -- here, I'm going to let the jury go.  But this statement

25    at the top, "and this is a machine gun, what a joke," that is

1  hearsay and I do think that that is completely inappropriate.

2          MR. KING:  Your Honor, I was only attempting to

3  elicit the last statement, not the prior one.  I have no

4  problem --

5          THE COURT:  Well, then, why don't you redact this

6  over the evening and we'll --

7          MR. KING:  The only reason being this was literally

8  my last question.  I was done with Agent Hooker.  I don't want

9  to bring him back just for that.

10         THE COURT:  Well, he's -- even if that's your last

11 question, are you going to have redirect?

12         MS. TAYLOR:  Yes.  It will be brief, but I don't know

13 that we're going to get done in 11 minutes.

14         THE COURT:  No.  I'm going to go ahead and let the

15 jury go.

16     (Proceedings in open court:)

17         THE COURT:  Okay.  It's 5:20, ladies and gentlemen,

18 and we're not going to finish this witness, so we're going to

19 go ahead -- sorry.  We're going to go ahead and let you go.

20         I'll ask you to be back at 8:45 tomorrow morning.

21 I'm going to remind you of your instructions.  You can't

22 discuss the case with one another, your family, your friends,

23 or anybody at all.

24         If anybody attempts to speak to you or about the case

25 in your presence, please stop them and notify the court

1   security officer immediately.

2           Please do not read, watch, or any -- or listen to any

3   media reports about the case.

4           Do not conduct any independent research.  And that

5   means don't go on the internet and look for any information in

6   any way related to the case.

7           And please do not form or express any opinions of the

8   case until you've heard all of the evidence, the arguments of

9   the attorneys, and my instructions.

10          We'll see you back in the morning at 8:45.  Have a

11  nice evening.

12          COURT SECURITY OFFICER:  All rise for the jury.

13      (Jury exits, 5:21 p.m.)

14          COURT SECURITY OFFICER:  Please be seated.

15          THE COURT:  Okay.  Let's see.  Agent Hooker, you can

16  step down.

17          Mr. King, to the extent you're going to use the

18  exhibit that we talked about, you're going to have to redact

19  the top portion.  There are two statements at the top that I

20  think are --

21          MR. KING:  Yes, Your Honor.

22          THE COURT:  -- inadmissible, and you'll need to

23  redact those.

24          MR. KING:  Yes, Your Honor.

25          THE COURT:  And Ms. Taylor, I'm a little concerned

1     about our pace, just because you had identified like six

2     witnesses.  I know I said over disclose, but I didn't expect

3     we'd be on Agent Hooker all day.

4               So tell me what your thoughts are.

5               MS. TAYLOR:  We had anticipated that Hooker and

6     Hannon would be completed today.  I disclosed additional

7     witnesses in case it went more quickly than I expected.

8               Hannon is going to be -- should be substantially

9     quicker than Agent Hooker.  And the rest of the law enforcement

10    witnesses should all be pretty quick as well.

11              So I don't think we're terribly off pace here, Your

12    Honor.  And I also think that we've spent some extra time that

13    I didn't factor in today on resolving hearsay objections and

14    things like that that I don't anticipate are going to be as big

15    of an issue going forward.  I think we've largely addressed

16    what those objections were.

17              Tomorrow I would expect to finish up with Agent

18    Hooker.  I think my redirect will be pretty brief.  And then I

19    would expect to call Postal Inspector Hannon.  He will take a

20    little bit of time.  I would think it will be an hour,

21    approximately.  Special Agent Slosson would have some very

22    brief testimony.  And then Special Agent Powley would also be

23    brief, half an hour or less.

24              The digital forensic examiner, from my perspective, I

25    would expect him to take about ten minutes, but --

1          THE COURT:  I don't know who that is.

2          MS. TAYLOR:  -- from what's happened today, I -- all

3     I'm planning to ask him about is, "Did you download Mr. Ervin's

4     phone?"  And, "Are these, you know, ten pictures that were

5     stored on his phone?"  I don't know if the defense might

6     have -- it sounded like they may have a lot of questions for

7     him, I'm not sure.

8          THE COURT:  Which witness is that?

9          MS. TAYLOR:  Forensic -- Digital Forensic Examiner

10    Michael Medlin.

11         THE COURT:  Okay.

12         MS. TAYLOR:  And then there's two more postal

13    inspectors, Martin and Batchelder.  And they both participated

14    in the surveillance on February 22nd at the post office when

15    Mr. Ervin dropped off some packages.  I anticipate that they

16    would both be pretty quick, like probably 15 minutes.

17         THE COURT:  Okay.

18         MS. TAYLOR:  And then after that we would be moving

19    on to the bank employees if we get through all that tomorrow,

20    which are Sarkese, Useche, and LeVay.

21         THE COURT:  I'm sorry, you'll have to say those names

22    again.

23         MS. TAYLOR:  Amy Sarkese, Andrea Useche, and Matthew

24    LeVay.

25         THE COURT:  Okay.

 1          MS. TAYLOR:  Those are Mr. Mesrobian's witnesses, so
 2     I'm not sure exactly -- do you think that there's a chance that
 3     we get past that?
 4          MR. MESROBIAN:  I don't think so, Your Honor.
 5          THE COURT:  Okay.  All right.
 6          We did have a request from a juror about our schedule
 7     for Friday afternoon.  And I was going to need to address
 8     Friday anyway because of something that I've unavoidably had to
 9     deal with, but also, one of our jurors advises that she was
10     successful in getting Taylor Swift tickets for Friday night in
11     Tampa.
12          And my intention would be to stop around 3 on Friday.
13     My experience is that after a long week, a jury never minds if
14     they get off a little bit early on Friday afternoon.  And I
15     recall reading many media reports about how hard those tickets
16     were to get.  To her credit, she didn't try and avoid jury
17     service on that basis, so I'm inclined to honor that.
18          Any objection?
19          MS. TAYLOR:  Not from us, Your Honor.
20          MR. KING:  Your Honor, I'm losing a defensive
21     percentage of my staff to that exact concert, so certainly no
22     objection.
23          MR. ZERMAY:  Your Honor, I'm green with jealousy, but
24     with that on the record, no objection.
25          THE COURT:  All right.  So I'm going to advise them

1  at some point tomorrow we'll be leaving -- ending early on

2  Friday so that they can make arrangements if they want to make

3  some sort of plans.

4          Please be here at 8:45 and we will continue at that

5  time.  We'll be in recess.

6          COURT SECURITY OFFICER:  All rise.

7      (Proceedings adjourned at 5:27 p.m., to be continued on

8  Wednesday, April 12, 2023.)

9                          -    -    -

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3    UNITED STATES DISTRICT COURT)

4    MIDDLE DISTRICT OF FLORIDA )

5

6          I hereby certify that the foregoing transcript is a true

7    and correct computer-aided transcription of my stenotype notes

8    taken at the time and place indicated herein.

9

10          DATED this 1st day of June, 2023.

11

12                         /s/ Katharine M. Healey
                           Katharine M. Healey, RMR, CRR, FPR-C
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25