1               UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                JACKSONVILLE DIVISION

3  UNITED STATES OF AMERICA,     Case No. 3:21-cr-22(S4)-MMH-MCR

4       Plaintiff,        April 12, 2023

5  v.                9:03 a.m. - 5:45 p.m.

6  KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
   and MATTHEW RAYMOND HOOVER,
7
       Defendants.
8  _____

9
                     **JURY TRIAL**
10                 **(VOLUME 3 of 9)**

11
       BEFORE THE HONORABLE MARCIA MORALES HOWARD
12         UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20       Katharine M. Healey, RMR, CRR, FPR-C
        PO Box 56814
21       Jacksonville, FL 32241
        Telephone: (904) 301-6843
22       KatharineHealey@bellsouth.net

23

24                   (Proceedings reported by stenography;
                  transcript produced by computer.)
25

1                    A P P E A R A N C E S

2

3    COUNSEL FOR THE GOVERNMENT:

4        **LAURA C. TAYLOR, ESQUIRE**
         **DAVID MESROBIAN, ESQUIRE**
5        United States Attorney's Office
         300 North Hogan Street, Suite 700
6        Jacksonville, FL 32202

7

8    COUNSEL FOR DEFENDANT ERVIN:

9        **ALEX KING, ESQUIRE**
         Monroe & King, P.A.
10       1805 Copeland Street
         Jacksonville, FL 32204
11

12
     COUNSEL FOR DEFENDANT HOOVER:
13
         **ZACHARY Z. ZERMAY, ESQUIRE**
14       Zermay Law
         1762 Windward Way
15       Sanibel, FL 33957

16   - A N D -

17       **MATTHEW LAROSIERE, ESQUIRE**
         6964 Houlton Circle
18       Lake Worth, FL 33467

19

20

21

22

23

24

25

1            I N D E X

2                                              PAGE

3   GOVERNMENT'S WITNESSES:

4   **SPECIAL AGENT JESSE HOOKER**

5      REDIRECT EXAMINATION BY MS. TAYLOR.................... 17

6   **POSTAL INSPECTOR KEITH HANNON**

7      DIRECT EXAMINATION BY MS. TAYLOR...................... 28

8      CROSS-EXAMINATION BY MR. LAROSIERE................... 81

9      CROSS-EXAMINATION BY MR. KING........................ 82

10     REDIRECT EXAMINATION BY MS. TAYLOR.................... 89

11  **SPECIAL AGENT JOHN POWLEY**

12     DIRECT EXAMINATION BY MS. TAYLOR...................... 94

13     CROSS-EXAMINATION BY MR. LAROSIERE................... 104

14     CROSS-EXAMINATION BY MR. KING........................ 106

15     REDIRECT EXAMINATION BY MS. TAYLOR................... 107

16  **SPECIAL AGENT MICHAEL MEDLIN**

17     DIRECT EXAMINATION BY MS. TAYLOR..................... 111

18  **POSTAL INSPECTOR RICHARD BATCHELDER**

19     DIRECT EXAMINATION BY MS. TAYLOR..................... 121

20     CROSS-EXAMINATION BY MR. KING....................... 126

21  **POSTAL INSPECTOR CHRISTOPHER MARTIN**

22     DIRECT EXAMINATION BY MS. TAYLOR..................... 128

23  **ANDREA USECHE**

24     DIRECT EXAMINATION BY MR. MESROBIAN................. 133

25     CROSS-EXAMINATION BY MR. KING....................... 154

1                          I N D E X

2                                                    PAGE

3    GOVERNMENT'S WITNESSES:

4    **AMY SARKESE**

5      DIRECT EXAMINATION BY MR. MESROBIAN.................... 158

6      CROSS-EXAMINATION BY MR. KING......................... 174

7      REDIRECT EXAMINATION BY MR. MESROBIAN................. 192

8      RECROSS-EXAMINATION BY MR. KING....................... 197

9    **MATTHEW LeVAY**

10     DIRECT EXAMINATION BY MR. MESROBIAN.................... 204

11     CROSS-EXAMINATION BY MR. KING......................... 217

12     REDIRECT EXAMINATION BY MR. MESROBIAN................. 219

13

14   JUROR NO. 11 RELEASED.................................... 233

15

16   DEFENDANT HOOVER'S MOTION FOR MISTRIAL................... 235

17   DEFENDANT ERVIN'S MOTION FOR MISTRIAL................... 238

18   DEFENDANTS'S MOTIONS FOR MISTRIAL DENIED................ 276

19

20

21

22

23

24

25

1                          E X H I B I T S

2    ADMITTED IN EVIDENCE                                    PAGE

3      GOVERNMENT'S EXHIBIT 26................................  43

4      GOVERNMENT'S EXHIBITS 27A and 27B.....................  47

5      GOVERNMENT'S EXHIBIT 28................................  53

6      GOVERNMENT'S EXHIBIT 29................................  58

7      GOVERNMENT'S EXHIBITS 30 and 30A-30V..................  57

8      GOVERNMENT'S EXHIBIT 31................................  53

9      GOVERNMENT'S EXHIBIT 32................................  66

10     GOVERNMENT'S EXHIBIT 33................................  65

11     GOVERNMENT'S EXHIBITS 34-47...........................  72

12     GOVERNMENT'S EXHIBIT 49...............................  104

13     GOVERNMENT'S EXHIBITS 49A-49Q.........................  120

14     GOVERNMENT'S EXHIBIT 72...............................  36

15     GOVERNMENT'S EXHIBITS 101 and 101A....................  74

16     GOVERNMENT'S EXHIBITS 105 and 105A....................  75

17     GOVERNMENT'S EXHIBITS 124, 124.1, 124.1A, 124.2,
           124.3, and 124.3A.................................  101
18

19     DEFENDANT ERVIN'S EXHIBIT 26..........................  200

20

21   COURT'S EXHIBIT 1 (filed under seal)...................  224

22

23

24

25

1              P R O C E E D I N G S

2    April 12, 2023                              9:03 a.m.

3                          -   -   -

4        (All parties present.  Jury not present.)

5              COURT SECURITY OFFICER:  All rise.  The United States

6    District Court in and for the Middle District of Florida is now

7    in session.  The Honorable Marcia Morales Howard is now

8    presiding.

9              Please be seated, everyone.

10             THE COURT:  All right.  We are back on the record in

11   Case No. 3:21-cr-22(S4)-MMH-MCR, United States of America vs.

12   Kristin Justinboyer Ervin and Matthew Hoover.

13             Ms. Taylor and Mr. Mesrobian are here on behalf of

14   the United States, along with the case agent.

15             Mr. King and Mr. Ervin are in the courtroom.

16             Mr. Zermay and Mr. Larosiere are here, along with

17   Mr. Hoover.

18             I understand from Ms. Wiles that there are some

19   issues we need to address before we bring the jury in.  Who

20   will I be hearing from?

21             MR. MESROBIAN:  Your Honor, it's me.

22             There are two issues.  The first, and I've talked to

23   counsel about this, with resect to the discussion of the emails

24   and Ms. Wolfe yesterday, so Ms. Wolfe advised us during

25   previous interviews that while she was assisting Mr. Ervin with

1   his business when things got busy, he controlled the email

2   accounts and created the admin@autokeycard.com account for her

3   to use.  I think we saw emails yesterday where she wrote him an

4   email, signed it "Carolanne," and addressed it to Justin in

5   that way.

6          After court last night I reviewed her text messages

7   with Mr. Ervin, which go back a number of years and are

8   voluminous.  In the later stages of the conspiracy, in January,

9   February -- or the alleged conspiracy -- there are a couple

10  screenshots that they discussed of emails in the Customer

11  Service account.  And there are other -- Mr. Ervin instructs

12  her at one point, "Don't respond to this email," which is an

13  email we located that's in the Customer Service account.  We

14  did not specifically ask her about those.  She may not have

15  recalled being involved in that account when we spoke to her

16  before.

17         I don't think -- and I've talked to Mr. King about

18  this.  I don't think that this changes anything in terms of

19  whether this is hearsay or not in terms of its an account that

20  Mr. Ervin had access to.

21         And regardless, these are effect on the listener

22  whether or not -- and Mr. King has so far cross-examined, and I

23  imagine he would cross-examine Ms. Wolfe as well, about the

24  lack of direct evidence in terms of whether or not he actually

25  read these emails.

1        However, to the extent that I was not clear or I

2   didn't account for those text messages in my proffer yesterday,

3   I just wanted to make that clear for the Court, and also to

4   counsel, of course.

5        THE COURT:  All right.  Is there anything further

6   that we need to address with regard to that matter?

7        MR. KING:  Not on behalf of Mr. Ervin, Your Honor.

8        THE COURT:  Okay.

9        Go ahead, sir.

10       MR. MESROBIAN:  The other issue was, Your Honor, at

11  some point we would like to discuss with the Court the jail

12  call, Exhibit 17, that we were talking about yesterday and just

13  clarity on the path forward, because there is a summary exhibit

14  for another witness who would likely be the one through whom we

15  would introduce that call if we were allowed to do so, beyond

16  the 17.2 that we already discussed.  It's not necessary to do

17  that now, Your Honor.  I just wanted to put that on your radar

18  so that we could address it down the line if necessary, or now

19  too.

20       THE COURT:  There was one other thing I wanted to

21  look at on that, and so I think we'll do it at the break.

22       MR. MESROBIAN:  Okay.  Thank you, Your Honor.

23       THE COURT:  Well, but with regard to that, Mr. --

24  you're bringing it up.  It was Ms. Taylor.  I don't know who I

25  need to hear from on this, but address for me the specific

1   probative value that you think the GoFundMe page and the 17

2   series items have.  I understand your position to be that it is

3   an overt act in that it is the evidence of Mr. Ervin and

4   Mr. Hoover's desire to continue the conspiracy in order --

5   well, to raise money for the purpose of continuing the

6   conspiracy to engage in the illegal conduct; that is, the

7   manufacture and sale of what the government alleges to be

8   machine gun conversion devices, right?

9        MR. MESROBIAN:  Yes, Your Honor.  And I'm happy to

10  address this.

11       THE COURT:  Okay.  And I guess one concern I have is

12  when I look at Government's Exhibit 73, there's certainly

13  evidence of a desire to help Mr. Ervin get out of jail.  That's

14  it.

15       And then in the 17 series -- what is it specifically

16  in the 17 series that suggests that the purpose of helping him

17  get out is to continue the alleged illegal manufacture and sale

18  of these devices?  Where in the calls -- what's --

19       MR. MESROBIAN:  Well, I mean, I think the most direct

20  evidence of that would be 17.1, page 5 to 6, which is

21  Mr. Hoover, you know, saying, "I wondered if the one case gets

22  thrown out, if you can go back into manufacturing them."  And

23  Mr. Ervin replies, "I don't know.  I was wondering about that.

24  That's one of the things with, um, you know, 'cause then we can

25  ramp that sucker up.  I'll sell it, then we'll pile all that

1    into the new project."

2              You know, Your Honor, I think --

3              THE COURT:  So can I just address that with you?  I

4    read that the exact opposite.  I read that as, "We're not doing

5    this unless the case gets thrown out.  And if the case gets

6    thrown out, it was because the conduct wasn't illegal and then

7    we can go back to it."

8              MR. MESROBIAN:  That's just one example, Your Honor.

9    There's other references where they discuss making videos both

10   now and in the future.  That's 17.1, bottom of page 2; also in

11   17.3, where Mr. Hoover references the previous video as,

12   "Your" -- addressing Mr. Ervin, "Your videos are so hot."

13             Your Honor, there's also discussions of "leveling up,

14   doing more cool things."

15             Your Honor, I think when we're talking about a

16   conspiracy where we have to prove that, among other things,

17   that two or more people agreed to accomplish an unlawful plan

18   and that they understood the unlawful purpose of the plan and

19   joined in it, it's relevant that they knew each other.  It's

20   relevant that Mr. Hoover knew that Mr. Ervin had recently been

21   arrested and called him in jail.  It's relevant that they were

22   friends with each other.  It's relevant that they talk about

23   making videos together both in the past and in the future.

24   It's relevant that they discussed getting Mr. Ervin out on bond

25   because, you know, I think just talking -- whether it's the

 1   case getting thrown out or whether it's Mr. Ervin getting out

 2   on bond, they're talking about, "Can we keep manufacturing

 3   these items?"

 4        I think when the United States is alleging that these

 5   items are illegal, to put this in the Title 21 context, if

 6   Coconspirator 1 calls Coconspirator 2 in jail and says, "I hope

 7   you can get out on bond so that" -- "and maybe we can keep

 8   manufacturing meth," I think that's a much clearer case here.

 9        But that's -- so I was sort of sitting there

10   yesterday listening to the discussion about raising money to

11   get him out on bond and I didn't understand, necessarily, how

12   that implicated the Sixth Amendment right.  And so I was -- I

13   mean, fundamentally, Your Honor, this is a direct conversation

14   between the alleged conspirators where they talk about one

15   conspirator's recent arrest for the conspiracy, what they can

16   do to get him out on bond, and then talking about future plans.

17   Whether that's manufacturing, whether that's making videos,

18   whatever it is, I'm not sure how -- I think the probative value

19   is very strong.

20        And to the extent that there's something to be

21   mitigated in terms of Sixth Amendment concerns, we're happy to

22   do that, but we did excise a large amount of this to try and

23   address those concerns already.

24        The other solution I was going to propose, or

25   compromise, or however you want to phrase it, I think to the

1   extent that there are concerns about the nature of the

2   GoFundMe, I don't think that we would concede that there's a

3   Sixth Amendment right to a GoFundMe.  But we would probably say

4   we don't need to seek introduction of those records related to

5   the GoFundMe.

6          But the call is essential, Your Honor, in terms of

7   the prob- -- these are the conspirators talking to each other

8   after one of them was recently arrested, and they bring up the

9   alleged conspiracy and acts related to it.  I'm not sure how

10  there isn't probative value to that.

11         THE COURT:  All right.  And Mr. King, I was -- well,

12  I reread the GoFundMe documents from start to finish last

13  night, and I don't see how that implicates Mr. Ervin's Sixth

14  Amendment right.  In fact, the GoFundMe page really talks about

15  just helping Mr. Ervin get his life back.

16         So my question really was more related to relevance.

17  But I'm not sure I see any implication on the Sixth Amendment.

18  You'll have to tell me what it is, because I don't see that

19  with regard to the GoFundMe page at all.

20         MR. KING:  And Your Honor, part of it is, you know, I

21  obviously don't know what the witnesses are going to testify to

22  with regard to that, but that's where the money went.  So to --

23  you know, and then that dovetails into the relevance thing.  If

24  the only place the money goes to is for him to obtain

25  counsel . . .

1           THE COURT:  Well, the government's not going to ask

2   what the money was used for, are you?

3           MR. MESROBIAN:  No, Your Honor.

4           THE COURT:  Well, I'm -- so if you want to ask that,

5   Mr. King, then you're bringing it up, but --

6           MR. KING:  I understand, Your Honor.  But then if the

7   only purpose of it is to raise funds for counsel, then what is

8   that relevant to whether or not there's a conspiracy?  And I

9   think it's more of a relevancy issue.  But if it is brought in

10  to show that he raised money for him to get an attorney, and if

11  that's not what we're getting into -- and I understand that a

12  lot's been excised and we're talking about getting away from

13  that because that's more of the conversations in the jail

14  calls.  But from what I saw was there's conversations in the

15  jail calls, "We're raising money for bail" -- which he doesn't

16  have cash bail -- "and for an attorney," the money goes to an

17  attorney, and then we bring the documents showing the GoFundMe

18  account to try to raise the money, and the only document,

19  evidence, or witness that I'm aware of is going to say is the

20  jail call where it says it's to go towards bail and an

21  attorney.

22          And, you know, we all know he is not eligible for a

23  cash bond, so that would be for an attorney.  So that's where

24  it gets into the Sixth Amendment, because there's no other

25  evidence as to where that's going in terms of witnesses or jail

1    calls or things of that nature.

2              THE COURT:  Why do you keep saying he's not eligible

3    for cash bail?

4              MR. KING:  He was detained, Your Honor.  I mean, it's

5    not like in state court, where if he can raise a hundred

6    thousand dollars he can --

7              THE COURT:  I don't know when the calls took place,

8    whether that was before or after.  So March 30th, was that

9    after he was detained?  And when you say we all know --

10             MR. KING:  In terms of -- in terms of us, not the

11   jury.  I think that's fair.

12             THE COURT:  Mr. Mesrobian.

13             MR. MESROBIAN:  Just to say that I'm not sure whether

14   Mr. Hoover would have been aware of that during this call.

15             But the second issue related to this is that there

16   are videos on the exhibit list made by Mr. Hoover, and we

17   talked to Mr. King about this last night, specifically,

18   Exhibits 13 and 14 and possibly another, where he talks at

19   length about the GoFundMe and raising money to support

20   Mr. Ervin.

21             My intent, Your Honor, when -- because I'll be the

22   one introducing those through the witness, was as much

23   as about -- a few of them I'm going to have to play in their

24   entirety, but where I can limit it, I was going to, and just

25   play the relevant portions.

1              I think Mr. Larosiere and Mr. Zermay indicated to us

2    that they wanted the entirety of the videos introduced, and

3    possibly published, either in my presentation of the evidence

4    through a completeness request or in their cross-examination

5    because they would be in evidence.  Then we get into a problem

6    I think a little bit where the cat's a little bit out of the

7    bag about the GoFundMe.  And I'm not sure what the -- you know,

8    how we could say the call isn't allowable where they're

9    discussing the GoFundMe but the videos where Mr. Hoover talks

10   about the GoFundMe are.  So that was the other issue I just

11   wanted to put out there.

12             THE COURT:  All right.  Do I have those videos?

13             MR. MESROBIAN:  Yes.  The transcripts are in the

14   binders.  It's Exhibits 13 and 14.  Those are the ones I think

15   where the GoFundMe is discussed the most.

16             THE COURT:  Okay.  All right.  I'm inclined to allow

17   these, although I may require an additional redaction.  But

18   we'll take it up over the -- either the break in the morning or

19   over the lunch recess.

20             MR. MESROBIAN:  Thank you, Your Honor.

21             THE COURT:  All right.  Anything else we need to

22   address before I bring in the jury, Ms. Taylor?

23             MS. TAYLOR:  No, Your Honor.

24             THE COURT:  Mr. King?

25             MR. KING:  No, Your Honor, just that I -- we can do

 1   it outside the presence of the jury, but I'm going to tender

 2   Agent Hooker for redirect.

 3              THE COURT:  You mean you're done?

 4              MR. KING:  I'm done with my examination.  So just to

 5   save time, if we want to start with Ms. Taylor.

 6              THE COURT:  Okay.  Sure.  Agent Hooker?  Can we get

 7   him.

 8              MR. MESROBIAN:  Sorry, Your Honor, I had asked him to

 9   step out because --

10              THE COURT:  No, thank you.  I appreciate that.

11         (Ms. Taylor and Mr. King confer.)

12         (Witness enters the courtroom.)

13              THE COURT:  Ms. Taylor.

14              MS. TAYLOR:  We were just talking about whether he

15   was going to say he had no further questions in front of the

16   jury or --

17              THE COURT:  Yes.

18              MS. TAYLOR:  Okay.

19              THE COURT:  I think it's appropriate for the jury to

20   understand.

21              If you'll -- let's get the jury in.

22              And Agent Hooker, if you'll resume your . . .

23              COURT SECURITY OFFICER:  All rise for the jurors.

24         (Jury enters, 9:20 a.m.)

25              COURT SECURITY OFFICER:  Please be seated.

1          THE COURT:  All right.  Agent Hooker, you understand

2     that you're still under oath, sir?

3          THE WITNESS:  Yes, ma'am.

4          THE COURT:  All right.  Mr. King.

5          MR. KING:  Your Honor, I tender the witness.

6          THE COURT:  All right.

7          Ms. Taylor, redirect.

8          MS. TAYLOR:  Yes, Your Honor.

9                    REDIRECT EXAMINATION

10    BY MS. TAYLOR:

11    Q.   Agent Hooker, on cross-examination by Mr. Zermay you were

12    asked whether you immediately put the auto key card into a

13    firearm, correct?

14    A.   Yes.

15    Q.   Is that -- is it your role as essentially a Field Special

16    Agent to do that kind of testing on machine gun conversion

17    devices?

18    A.   No, it is not.

19    Q.   And whose role is that?

20    A.   We have individuals classified as Firearms Enforcement

21    Officers.  They're located in Martinsburg, West Virginia, at

22    our facility there.  And we send all such devices to them for

23    examination.

24    Q.   So even if you went on a search warrant and found an M16

25    rifle, machine gun, would it go to them for examination and

1  testing to determine -- to test it to see if it functioned

2  fully automatically?

3  A.   Yes, it would.

4  Q.   You were also asked some questions about the

5  certifications of the searches of the National Firearms

6  Registration and Transfer Record.  Do you remember that?

7  A.   Yes.

8  Q.   And in particular, with Mr. Stennes, that he had some

9  firearms that had been registered under a trust, and that trust

10  didn't come up when you just searched Mr. Stennes's name,

11  correct?

12  A.   Correct.

13  Q.   But when you searched the name of the trust that

14  Mr. Stennes had given to you, then you were able to find those?

15  A.   Yes.

16  Q.   And is it the case that -- if you know, is it the case

17  that in order for a firearm to be registered in the National

18  Firearms Registration and Transfer Record it has to have a

19  serial number?

20  A.   Yes.

21  Q.   Did any of the hundreds of auto key cards that you have

22  seized and examined in your investigation have a serial number

23  on them?

24  A.   No.

25  Q.   You also were asked some questions about the belt sanders

1    and whether the purpose of those was to polish the auto key

2    cards to make them more aesthetically attractive, correct?

3    A.    Correct.

4    Q.    Agent Hooker, you own firearms, correct?

5    A.    I do.

6    Q.    And when you're purchasing a firearm, is one of the things

7    that you consider in making -- in deciding which firearm to

8    choose the aesthetics of the firearm?

9    A.    Yes.  I want it to look nice.

10   Q.    So even though it's a functional firearm, you'd still like

11   it to look nice?

12   A.    Sure.

13          MS. TAYLOR:  And -- Your Honor, may I have a sidebar?

14          THE COURT:  You may.

15      (Proceedings at sidebar:)

16          MS. TAYLOR:  There is another type of machine gun

17   conversion device that -- it's called a portable wall hanger,

18   but it's a two-piece thing.  It's like the auto key card except

19   it was plastic.  And if you just snap the back off of it, then

20   you were done with finishing the manufacturing.

21          And Mr. Ervin had a video on his phone where he had

22   three of these items and he melted them with a torch and then

23   burnt the shipping box, which was addressed to his father at

24   the Kirkwall Court address.

25          In my view, Mr. King's cross-examination of what was

1    found in the house and whether -- how many drop-in auto sears

2    were found in the house opened the door to me asking Agent

3    Hooker whether he had evidence of Mr. Ervin possessing the

4    drop-in auto sear at another time.  But before I go down that

5    road I wanted to address it at sidebar.

6            THE COURT:  Mr. King, I think it did, but I'll hear

7    from you.

8            MR. KING:  Your Honor, the question I asked is what

9    he recovered in the home, which he didn't recover any of this.

10   It's off a video.  It's been untested.  There's no evidence

11   that it works and it's not anything that he recovered in the

12   home.  I asked, "What did you view or recover in the home?"

13           These are videos at an unrelated time that may or may

14   not be machine gun conversion devices.  It's extraordinarily

15   prejudicial and not probative to whether or not any of --

16   either to, A, my question, which was what was recovered in the

17   house, not what has he done in his lifetime; and B, you know,

18   what -- you know, whether or not this particular -- you know,

19   the auto key card is a machine gun conversion device.

20           And more importantly, it's -- you know, it's not

21   evidence to support what is an extraordinarily prejudicial

22   allegation that he had other machine gun conversion devices

23   based on a video that -- of an untested, unknown device that

24   was not even part of the question I asked.  And I can't think

25   of anything more prejudicial than --

 1          THE COURT:  Well, if it's probative, it may still be

 2    prejudicial.

 3          But Ms. Taylor, tell me again what the evidence is.

 4          MS. TAYLOR:  On Mr. Ervin's phone, there is a video,

 5    it's a couple of minutes long, where it's taken -- you can see

 6    a hand in the video, which I believe to be Mr. Ervin's hand.

 7    There's a shipping box.  You can clearly see the label.  And it

 8    says "Portable Wall Hanger" is the return address.  And it's

 9    addressed to Kris Ervin at 2409 Kirkwall Court, which is

10    Mr. Ervin's father.

11          We've asked Mr. Ervin's father about this.  He has

12    said he didn't order the portable wall hanger.  Mr. Ervin would

13    use his father's credit card.  There was nobody else who used

14    the credit cart.

15          And in the video you can see the hand dump these

16    three items out of the box.  Like I said, they're made of

17    plastic.  And then he picks up this blow torch and blow torches

18    the three plastic items until they melt into a puddle.  And

19    then he blow torches the box and lights it on fire.

20          This was -- the video timestamp, sort of

21    automatically-generated for the video, is from November 5th of

22    2020, which is, of course -- I think it's the day after

23    Mr. Hoover releases his first video about the auto key card.

24    So it's within the conspiracy period.

25          And the fact that Mr. Ervin was going to the -- going

1  through the process of melting these into a puddle is evidence

2  of his consciousness of guilt and that he knew what they were

3  and believed that -- at least believed that they could work,

4  so --

5          THE COURT:  Mr. King, I do think that your

6  questioning yesterday opened the door for this.  I'll be happy

7  to give a limiting instruction if you'd like to propose a

8  limiting instruction, but I think you asked a number of

9  questions about whether there were any firearms or other types

10  of devices.  And so I'm -- I'm going to allow it, but if you

11  want me to give an instruction, I'll hear from you now as to

12  what that instruction should be.

13          MR. KING:  No, Your Honor.

14          THE COURT:  Okay.

15      (Proceedings in open court:)

16  BY MS. TAYLOR:

17  Q.   Agent Hooker, yesterday Mr. King asked you a number of

18  questions related to items that you found in Mr. Ervin's home

19  during the search warrant.  Do you recall that?

20  A.   Yes.

21  Q.   And some of those questions were whether you had found any

22  cutup lightning links or auto key cards, and you said no?

23  A.   Correct.

24  Q.   And whether you had found any drop-in auto sears, correct?

25  A.   Yes.

1  Q.   And a drop-in auto sear, what is that?

2  A.   It's just a different type of machine gun conversion

3  device.

4  Q.   And you were also asked if you found in the home any

5  firearms that needed to be registered in the National Firearms

6  Registration and Transfer Record, and your answer was no?

7  A.   Correct.

8  Q.   In your investigation did you find other evidence that

9  Mr. Ervin had possessed a type of machine gun conversion device

10 prior to your search of the home?

11          THE COURT:  Excuse me a moment, Ms. Taylor.

12          Are you all right, ma'am?

13          JUROR:  Yes.  I'm sneezing.

14          THE COURT:  Okay.  God bless you.  Go ahead.

15          MS. TAYLOR:  Sorry.

16 BY MS. TAYLOR:

17 Q.   I'll ask my question again.

18          During your investigation did you find evidence of

19 Mr. Ervin possessing a machine gun conversion device at some

20 time before you executed the search warrant?

21 A.   Yes.

22 Q.   And can you describe what that is and where you found that

23 evidence?

24 A.   Yes.  After his arrest Mr. Ervin's phone was seized, and I

25 subsequently shipped it to a forensic examiner for examination

1    of the phone and the contents of the phone.

2         The -- I guess within the SIM card on the phone were

3    numerous videos.  And in viewing one of the videos I observed a

4    person with a package, maybe eight inches by six inches, maybe

5    three or four inches thick.  It was from the U.S. Postal

6    Service.  It was addressed to Kris Ervin at 2409 Kirkwall Court

7    in Orange Park, Florida, and the return sender was Portable

8    Wall Hanger in West Virginia.

9    Q.    Are you familiar with portable wall hanger?

10   A.    Yes.

11   Q.    What is it?

12   A.    It is a type of drop-in auto sear.  I'm aware that the

13   individual in West Virginia was prosecuted for selling those

14   devices.

15   Q.    And why was it -- but it was called "portable wall

16   hanger"?

17   A.    Yes.  It -- I guess how it was initially marketed was it

18   could be hammered into a wall or inserted into a wall, and you

19   could theoretically hang a coat hanger from it or hang some

20   type of articles of clothing.  But it could also be separated

21   from -- from that and used to convert an AR-15 into a fully

22   automatic machine gun.

23   Q.    Are you aware of, generally, what type of material the

24   portable wall hanger was made out of?

25   A.    I think it was some type of plastic or resin.  Often -- I

1  believe I was under the understanding that they were often 3D

2  printed.

3  Q.    And so a piece of it had to be snapped off for it to work?

4  A.    Correct.  It was a two-piece design, I guess marketed

5  theoretically to hang on your hall or to be inserted through

6  the drywall in the wall, and then if you snapped it from that

7  part, you could drop it into your AR-15.

8  Q.    And let's go back to the video that you were describing.

9  You said that it was a package with the return address of

10  "Portable Wall Hanger"?

11  A.    Yes.

12  Q.    And what else did you observe in that video?

13  A.    The package was opened.  Three portable wall hangers were

14  removed from the package.  The person lit a portable torch,

15  which is just a Coleman propane canister, a small Coleman

16  propane canister with a little torch screwed into the top.

17  They lit that with a cigarette lighter, which caused the torch

18  to ignite, and then they began to melt all three machine gun

19  conversion devices, and they burned the packaging as well.

20  Q.    And when you say there were three machine gun conversion

21  devices, were they still connected to the second piece or not?

22  A.    Two were -- had already been separated from the piece and

23  one was still connected to the wall hanger portion.

24  Q.    And in the video, can you see anybody's face?

25  A.    No.

1    Q.   Can you hear anybody's voice?

2    A.   No.

3    Q.   What -- what can you see that is -- would have potentially

4    be identifying of who was burning these items?

5    A.   You can see the person's hand and a portion of their arm.

6    Q.   And you have reviewed records related to a Discover credit

7    card that is owned by Kris Ervin, correct?

8    A.   Yes.

9    Q.   And who is Kris Ervin?

10   A.   Mr. Ervin's father.

11   Q.   And did it show a purchase for --

12            MR. KING:  Objection, hearsay.

13            THE COURT:  Let me see counsel at sidebar for a

14   moment.

15        (Proceedings at sidebar:)

16            THE COURT:  You're talking about the credit card

17   statement, Ms. Taylor?

18            MS. TAYLOR:  Yes.

19            THE COURT:  Yeah, I mean, that -- I think that would

20   be hearsay, Ms. --

21            MS. TAYLOR:  It's fine.  I can move on.

22            THE COURT:  Okay.

23        (Proceedings in open court:)

24   BY MS. TAYLOR:

25   Q.   Special Agent Hooker, you've spoken on numerous occasions

1    with Kris Ervin, Mr. Ervin's father, correct?

2    A.    Yes.

3    Q.    Are the hands on the video consistent with his hands?

4    A.    No.

5    Q.    Are the hands in the video consistent with Justin Ervin's

6    hands?

7    A.    I believe so.

8              MS. TAYLOR:  I have no further questions, Your Honor.

9              THE COURT:  All right.  Mr. Zermay, anything further

10   from this witness?

11             MR. ZERMAY:  No, Your Honor.

12             THE COURT:  Mr. King?

13             MR. KING:  No, Your Honor.  Thank you.

14             THE COURT:  All right, sir.  You may step down.

15             The government's next witness?

16             MS. TAYLOR:  The United States calls Postal Inspector

17   Keith Hannon.

18             Your Honor, may Special Agent Hooker be released?  We

19   are releasing him.

20             THE COURT:  Okay.  Unless he's under subpoena by the

21   defense.

22             MR. KING:  No, Your Honor, he's free to go.

23             THE COURT:  Mr. Zermay?

24             MR. ZERMAY:  He's not under subpoena from us, Your

25   Honor.

1       THE COURT:  All right.  Thank you.  You're free to
2  go, sir.
3       THE WITNESS:  Thank you.
4    (Witness exits the courtroom.)
5    (Witness enters the courtroom.)
6       THE COURT:  Sir, if you'll come all the way up here,
7  please.
8       COURTROOM DEPUTY:  Please raise your right hand.  Do
9  you solemnly swear that the testimony you're about to give
10  before this Court will be the truth, the whole truth, and
11  nothing but the truth, so help you God?
12       THE WITNESS:  I do.
13       COURTROOM DEPUTY:  You may have a seat.
14       THE WITNESS:  Thank you.
15       COURTROOM DEPUTY:  And if you could please state your
16  name for the record and spell your last name.
17       THE WITNESS:  Keith Hannon, H-a-n-n-o-n.
18       THE COURT:  Go ahead.
19    **POSTAL INSPECTOR KEITH HANNON, GOVERNMENT WITNESS, SWORN,**
20                     DIRECT EXAMINATION
21  BY MS. TAYLOR:
22  Q.   Good morning, Inspector Hannon.  Could you please let the
23  jury know where you work and what your job title is.
24  A.   Absolutely.
25       I'm a U.S. Postal Inspector with the U.S. Postal

1    Inspection Service.  Postal Inspectors are federal agents who

2    investigate crimes that utilize the mail.  Those crimes can

3    range anything from mail theft, identify theft, mail fraud,

4    narcotics trafficking, firearms trafficking, the mailing of

5    hazardous devices, such as bombs or chemical weapons.

6    Q.    And so if -- do you often work with other federal

7    agencies?

8    A.    Yes, I do.

9    Q.    For example, on a drug trafficking case, you might work

10   with DEA?

11   A.    Yes, correct.

12   Q.    And in this particular case related to Mr. Ervin and

13   Mr. Hoover what agency were you working with?

14   A.    In this case I was partnered with ATF.

15   Q.    And how were you -- who first contacted you to ask for

16   your assistance on this matter?

17   A.    ATF Special Agent Jesse Hooker.

18   Q.    And do you know the reason why Agent Hooker contacted you

19   to ask for assistance?

20   A.    Yes.  He requested assistance in a case where he had

21   intercepted or was made aware of an item called an auto key

22   card.  And he believed they were utilizing the U.S. Postal

23   Service to facilitate the mailing of these devices, so he

24   requested my assistance.

25   Q.    And could you tell me whether -- what steps -- what were

1    the first steps that you determined to take in your

2    investigation?

3    A.    Special Agent Hooker had made an undercover purchase of an

4    auto key card device.  He provided me with the tracking

5    information from the parcel that he received containing one of

6    those devices.  Based off information contained on the mailing

7    label, primarily the tracking number, I queried that in some

8    postal databases and determined that the postage was paid for

9    that using a postage meter.

10   Q.    And what -- can you describe what a postage meter is?

11   A.    A postage meter is a way a business or a person can print

12   U.S. postage at home or at a business.  It alleviates them from

13   having to go into a post office, wait in line to pay.  So it's

14   pretty much prepaid postage.  So you can pay the postage on an

15   envelope or a box or any size parcel and either just go into

16   the post office and leave it, leave it in a blue Postal Service

17   collection box, or hand it to your mailman for entry into the

18   mail stream.

19   Q.    Now, if -- if you -- like let's say I'm running a small

20   business selling things on eBay or Etsy or a website like that,

21   would I have my own personal postage meter?

22   A.    Yes, you could.

23   Q.    If I'm using eBay to ship out the packages, I'm buying my

24   postage via eBay or Etsy, then would mine all be on one

25   individual postage meter that was specific to me?

1   A.   Yes.  You could have a postage meter set up that way, yes.

2   Q.   Would it be possible also that eBay or Etsy would have

3   their own postage meter that was being used to ship -- ship

4   items for multiple eBay or Etsy users?

5   A.   Yes, that is possible.

6   Q.   Okay.  In this case -- sorry.  You identified a particular

7   postage meter that had been used to ship the undercover

8   purchased package to Special Agent Hooker?

9   A.   Yes, I did.

10          MS. TAYLOR:  Your Honor, may I approach with

11  Exhibit 72?

12          THE COURT:  You may.

13  BY MS. TAYLOR:

14  Q.   Could you tell the jurors what Exhibit 72 is?

15  A.   Yes.  Exhibit 72 is a document from my agency's

16  Intelligence Unit.  I submitted the documents and the

17  information I had discovered regarding the postage meter from

18  Special Agent Hooker's undercover purchase.  I submitted the

19  information to them.  From there they conducted database

20  searches and obtained the registered user information for that

21  meter as well as a mailing log of all the parcels associated

22  with that meter.

23  Q.   And is that what's reflected in there?

24  A.   Yes.

25  Q.   And so essentially it's just data related to each shipment

1  that was sent using that postage meter?

2  A.    Yes, correct.

3         MS. TAYLOR:  I move for admission of Exhibit 72.

4         MR. KING:  Your Honor, if we could approach sidebar.

5         THE COURT:  You may.

6     (Proceedings at sidebar:)

7         THE COURT:  Yes, Mr. King.

8         MR. KING:  Your Honor, we would object to this

9  exhibit on a couple of grounds.  One, there's not a business

10  records certification.  Two, the first page, if you read it,

11  towards the bottom, it makes it very clear that this was

12  prepared for litigation by law enforcement and only for law

13  enforcement purpose.  And three, the rest of it indicates that

14  it's for a Stamps.com account, not from the government.

15         This witness did not generate this and he's not

16  competent to testify to this, and it is otherwise hearsay

17  without an exception.  It's not a business record and it's not

18  a public record because it was created for litigation.  The

19  first page indicates that it was for the purposes of criminal

20  investigation.

21         MS. TAYLOR:  Your Honor, it's an export of data

22  maintained by the U.S. Postal Service.

23         THE COURT:  Hold on.  Does someone have a copy?

24         MR. LAROSIERE:  It's the very long one.

25         MS. TAYLOR:  I'd be fine with removing the first

1    page.

2           THE COURT:  Is this information maintained by the

3    Postal Service, Ms. Taylor?

4           MS. TAYLOR:  That's my understanding, Your Honor.  I

5    don't think -- Inspector Hannon did not, like, go to Stamps.com

6    and ask them for the mail meter.  It came from their internal

7    databases.  Because even if Stamps.com is selling the meter to

8    the end user, it's still going through the Postal Service to

9    create the labels.  It's maintained by the government.  So

10   there's no business records certification to go with that.  I

11   was entering it as public records.  It's maintained by a

12   government agency.

13          MR. KING:  And Your Honor, if I could respond to

14   that.

15          THE COURT:  Go ahead.

16          MR. KING:  It's not a public record because the first

17   page that says this was created for a criminal investigation

18   tells you it's not a public record.  It makes it very clear

19   that it's not a public record and it's only to be used for --

20   it's that tiny writing in the black bar.  We can -- we had to

21   blow it up on a computer to read it, but that is what it says,

22   that it's only to be used for law enforcement purpose.

23          THE COURT:  Ms. Taylor, I'm not sure that -- you're

24   going to have to explain to me how this qualifies as a public

25   record.

1        MS. TAYLOR:  It's data maintained by the U.S. Postal

2   Service that's been compiled -- just as if we subpoenaed

3   Verizon, they would compile -- you know, if we subpoenaed them,

4   "We want toll records for this particular phone number," they

5   would compile that and send it to us in a spreadsheet similar

6   to this.

7        THE COURT:  Give me one moment.

8        Mr. King, why isn't this admissible under 803(6) as a

9   record of regularly conducted activity?  I know you're saying

10  business record, but it doesn't have to be a business.  It's a

11  record -- it's a compilation -- these -- the information in it

12  is -- well, Ms. Taylor, you may have to go through the

13  elements, but it seems that the information was kept in the

14  course of the regularly conducted activity of the -- of the

15  business, the Postal Service, that it's the regular practice,

16  there's nothing in it that would show that it lacks

17  trustworthiness.

18       MR. KING:  Your Honor, the two issues is the

19  government is -- one, this is the only one that didn't have a

20  business records certification for this, which we raised a few

21  weeks ago.  And two, that because of that, there were concerns

22  that these weren't Postal Service records, but Stamps.com

23  records.  And, you know, if there was a -- you know, and

24  because there was not a business records certification for

25  either Stamps.com or the Postal Service --

1    MS. TAYLOR:  It is not from Stamps.com.  It came from

2 the Postal Service, which is reflected by the front page.

3    THE COURT:  Okay.  The purpose of a business records

4 certification is to obviate the need of a witness to lay the

5 foundation.  If this witness --

6    Ms. Wiles, can you give the jurors some Kleenex or

7 something?

8    If the witness can lay the foundation, I think it

9 comes in as a record of regularly conducted activity.  But I do

10 think that first page needs to be removed.

11    MS. TAYLOR:  Yes, Your Honor.  I'll go to the witness

12 stand and tear off the first page before I go back to the

13 podium.

14    THE COURT:  Go ahead.

15    MR. KING:  Thank you, Your Honor.

16    (Proceedings in open court:)

17 BY MS. TAYLOR:

18 Q.   Special Agent Hannon, turning back to Exhibit Number 72,

19 could you tell us where you -- where you obtained this

20 information.

21 A.   Yes.  This information was based upon a request I made to

22 our Intelligence Unit.

23 Q.   And is this -- the information that is depicted in

24 Exhibit 72, is it transactional information?

25 A.   Yes.

1   Q.   Is it automatically generated?

2   A.   Yes.  It's captured by the Postal Service.

3   Q.   And this came from the Postal Service's own records?

4   A.   It's -- I believe it's information that's shared with the

5   Stamps.com with the Postal Service, and our Intelligence Unit

6   accesses it from Postal Service databases.

7   Q.   Okay.  So the database itself that contains this data in

8   Document 72, that's maintained by the United States Postal

9   Service?

10  A.   Yes, correct.

11  Q.   And is that data kept regularly by the Postal Service?

12  A.   Yes, it is.

13  Q.   And is it part of the Postal Service's normal business

14  activity to maintain records of shipments, the cost for

15  shipments, the return address, the "to" address, the tracking

16  number, and all of the other information that's reflected for

17  the shipments in that -- in that document?

18  A.   Yes, it is.

19       MS. TAYLOR:  Your Honor, I'd move for admission of

20  Exhibit 72.

21       MR. KING:  No objection, Your Honor.

22       MR. LAROSIERE:  Without objection, Your Honor.

23       THE COURT:  72 is admitted.

24     (Government's Exhibit 72 admitted in evidence.)

25  BY MS. TAYLOR:

1    Q.    Inspector Hannon, so if you could please look at what's

2    now the first page of that document.

3              MS. TAYLOR:  It will be page 2 on yours.

4              MS. GANOE:  (Nods head.)

5    BY MS. TAYLOR:

6    Q.    Could you please tell the jurors, is this information from

7    the database about -- well, first let's talk about the meter

8    number.  What's the meter number?

9    A.    The meter number is 13667139.

10   Q.    And is that the meter number that you had identified based

11   upon looking at the tracking for Special Agent Hooker's

12   package?

13   A.    Yes, it was.

14   Q.    So does all of this data in Document 72 relate to that

15   meter number?

16   A.    Yes, it was.

17   Q.    In this case, was this meter assigned to a particular

18   individual?

19   A.    Yes, it was.

20   Q.    And who was that?

21   A.    Kristopher Ervin.

22   Q.    And that's reflected at the top of the page there?

23   A.    Yes, that's correct.

24   Q.    And this page has a summary of the shipments made?

25   A.    Correct.

1    Q.    Could you please go over what -- what's reflected in that

2    summary.

3    A.    In that summary it appears the meter became active in

4    November of 2020.  And since November 2020 through March 2021 a

5    total of 1,334 parcels were sent out utilizing that -- that

6    meter, totaling amount in postage of $4,165.46.

7    Q.    And there's two sort of sets of columns for the cost of

8    the postage and the number of packages, correct?

9    A.    Correct.

10   Q.    One says "First Class" and the other says "Total"?

11   A.    Correct.

12   Q.    And are the figures in those two sets of columns the same?

13   A.    Yes, they are.

14   Q.    What does that indicate?

15   A.    That just indicates that the two numbers there are the

16   number of parcels that were mailed per month between November

17   of 2020 and March 2021 and the amount of postage spent in that

18   month.

19   Q.    Would it indicate that all of the parcels sent with this

20   mail meter were First Class parcels?

21   A.    Yes, it would.

22   Q.    And you stated -- if you look at, I think it's the very

23   last page of that -- of that document, it would show the first

24   shipment that was made using the -- using the mail meter,

25   correct?

1  A.    Correct.

2         MS. TAYLOR:  So Ms. Ganoe, if you could zoom in.

3  Yes, right there.

4  BY MS. TAYLOR:

5  Q.    And it indicates that --

6         I think we may be missing a page on the digital

7  version, but if you could look at your -- at the document that

8  you have in front of you, who was the last -- or the very first

9  shipment sent to?

10 A.    The very first one was sent on November 30th of 2020, was

11 addressed to Kristopher J. Ervin, 2409 Kirkwall Court, Orange

12 Park, Florida.

13 Q.    And so that was the very first package sent?

14 A.    Correct.

15 Q.    And what was the return address on that package?

16 A.    Return address was A Key Card, 950 Blanding Boulevard,

17 Suite 23, PMB 336, Orange Park, Florida.

18 Q.    And looking through the mail meter, on approximately

19 page -- well, two pages before that, is there another package

20 that's sent to Mr. Ervin?

21 A.    Yes, there is.

22 Q.    And what date was that package sent?

23 A.    That was also November 30th, 2020.

24 Q.    And then looking four pages back from that, is there a

25 package that was sent to Joel Moya?

1    A.   Yes, there was.

2    Q.   And I'm not going to have you go page by page because our

3    page numbers are a little off now, but previously you've

4    searched this mail meter and -- for specific parcels that we

5    spoke about, correct?

6    A.   Yes, correct.

7    Q.   Did that include that there's a package that was addressed

8    to Ronald Davis?

9    A.   Yes, correct.

10   Q.   And a package addressed to Steve Duty?

11   A.   Correct.

12   Q.   And a package addressed to I believe it's James, but the

13   last name is Acs, A-c-s?

14   A.   Yes.

15   Q.   And a package addressed to Richard Roberts?

16   A.   Correct.

17   Q.   And was there a package addressed to John O'Leary?

18   A.   Yes, there was.

19   Q.   And what's the significance of that package?

20   A.   The parcel addressed to John O'Leary was the name used on

21   the undercover purchase made by Special Agent Hooker.

22   Q.   And that -- was that the package -- the original tracking

23   number that you used to identify this mail meter?

24   A.   Yes, it was.

25   Q.   And is there also a package addressed to Randy Willis?

1  A.   Yes, there was.

2  Q.   And is there a package addressed to John Holbrook?

3  A.   Yes.

4  Q.   And who is John Holbrook?

5  A.   That was also an alias used by Special Agent Hooker to

6  facilitate an undercover purchase from Auto Key Card.

7  Q.   And a package addressed A. Osso?

8  A.   Yes.

9  Q.   And a package addressed to Phil Wilson?

10  A.   Yes.

11  Q.   Now, you stated you also made an undercover purchase?

12  A.   I did.

13  Q.   And was that on February 2nd of 2021?

14  A.   Yes, it was.

15  Q.   Did you review the Auto Key Card's website prior to making

16  your purchase?

17  A.   I did.

18  Q.   And what --

19       MS. TAYLOR:  I want to bring up Exhibit 26, Your

20  Honor, if I may.

21       THE COURT:  Give me a moment.

22       Ms. Wiles.

23       THE COURT:  Oh, okay.  You want to approach the

24  witness?

25       MS. TAYLOR:  Yes, sorry.

1        THE COURT:  I thought you were asking Ms. Ganoe to

2   bring it up and it's not in evidence.

3        MS. TAYLOR:  I apologize, I meant to say approach the

4   witness.

5        THE COURT:  Yes, you may.

6        MS. TAYLOR:  And actually, I'm going to be bringing

7   up Exhibits 26, 27A and B.

8        MR. KING:  And Your Honor, some of those are physical

9   items.  We would just ask that they be brought up.

10       THE COURT:  Yes.

11       Ms. Taylor, if you could show those to opposing

12   counsel, please.

13       MS. TAYLOR:  For now I'm going to bring up 26, 29,

14   and 32, Your Honor.

15       THE COURT:  Go ahead.

16   BY MS. TAYLOR:

17   Q.   Inspector Hannon, could you please look at Exhibit 26 and

18   tell the jurors what it is.

19   A.   Item -- Exhibit 26 is my documentation from the undercover

20   purchase I made from the Auto Key Card's website.  It's a

21   summary of documents from the order form I completed, the

22   envelope I mailed in for the order, the money order I used to

23   make the purchase, as well as postal tracking records, a copy

24   of the negotiated money order, and pictures of the envelope

25   that I received in response to my order.

1        MS. TAYLOR:  Your Honor, at this time I'd move for

2   admission of Exhibit 26.

3        MR. KING:  Without objection, Your Honor.

4        MR. LAROSIERE:  Without objection, Your Honor.

5        THE COURT:  26 is admitted.  You may publish.

6      (Government's Exhibit 26 admitted in evidence.)

7   BY MS. TAYLOR:

8   Q.   If you could, let's please look at Exhibit 26, page 5.

9   What's shown on this page?

10  A.   That is a copy of the money order that I had mailed in for

11  the order from Auto Key Cards pulled out of a database after it

12  was negotiated.

13  Q.   And if we could also look back at page 1.

14       Well, let me ask you, Inspector Hannon, how did you

15  go about making your purchase?  Did you order it on the website

16  or did you order it some other way?

17  A.   I mailed in a hard-copy order form.

18       MS. TAYLOR:  And could we have page 1, please.

19  BY MS. TAYLOR:

20  Q.   Were you using an alias to make this purchase?

21  A.   Yes, Richard Carter.

22  Q.   And is this your handwriting on the delivery address

23  showing Richard Carter, Savannah, Georgia?

24  A.   Yes, it is.

25  Q.   And could you tell us what items you ordered?

1   A.   Yes.  I ordered two Auto Key Card Stainless Steel Business

2   Cards 1 in 1 for $60 apiece and one Auto Key Card Stainless

3   Steel Business Card 3 in 1 with Bottle Opener at $100.

4   Q.   And you indicated on your -- on your form that your total

5   purchase price was $230?

6   A.   Yes, correct.

7   Q.   And you checked the box for "Approval required to order"?

8   A.   Yes, I did.

9   Q.   And did you make the money order payable as instructed on

10  the order form?

11  A.   I did.

12  Q.   And who was it payable to?

13  A.   J. Ervin.

14  Q.   And looking at page 2 of this exhibit, did you -- is this

15  a composite photo that you took?

16  A.   Yes, it is.

17  Q.   What's in the top right area of this exhibit?

18  A.   The top right is the order form I completed.

19  Q.   And then what is shown in the -- sort of underneath the

20  order form?

21  A.   In this picture currently displayed, the top left is the

22  money order I obtained to mail in for the undercover purchase,

23  and underneath that is the -- the envelope with the tracking

24  number I used to mail in the money order and order form.

25  Q.   And did you then -- did you track that package to see

1  where it went?

2  A.   I did.

3       MS. TAYLOR:   Could we look at page 3.

4  BY MS. TAYLOR:

5  Q.   And is this tracking information that you obtained from

6  the USPS website?

7  A.   Yes.   It's the internal tracking from the Postal Service.

8  Q.   So you -- as a postal inspector, you have additional

9  details that are not viewable to the public?

10 A.   Correct.

11 Q.   And did it indicate on page 4 of this document -- did the

12 tracking indicate to you that the -- that your outgoing package

13 with your order form had been delivered?

14 A.   Yes.   It indicated it was delivered on February 3rd, 2021.

15 Q.   And also, looking at page 5, that money order, did you

16 obtain information about whether the money order was deposited

17 or negotiated?

18 A.   I did.

19 Q.   And how did you obtain that information?

20 A.   That was a request made through an analyst in my office to

21 obtain a copy of the negotiated money order from a database

22 called Fed Image.

23 Q.   And where did that -- is that a government database as

24 well?

25 A.   Yes, it is.

1  Q.    And where did it indicate that this money was deposited?

2  A.    It indicated it was deposited at a Community First Credit

3  Union.

4  Q.    And did it have a date and time for that deposit?

5  A.    Yes, February 3rd, 2021, at 4:09 p.m.

6  Q.    And did you receive information that -- well, first let's

7  look at 95A, page 75.

8         MS. TAYLOR:  If we could zoom in on the two items on

9  the top.

10  BY MS. TAYLOR:

11  Q.    These are Mr. Ervin's banking records.  Is one of these

12  deposited money orders yours?

13  A.    Yes, the top one.

14  Q.    Okay.  And does it have the same date and time stamp for

15  the deposit?

16  A.    It does.

17  Q.    Now, looking back at Exhibit 26, did you receive anything

18  as a result of your purchase?

19  A.    I did.

20         MS. TAYLOR:  And Your Honor, if Mr. Mesrobian could

21  approach with Exhibits 27A and B at this point.

22  BY MS. TAYLOR:

23  Q.    Could you look at Exhibits 27A and B and tell the jurors

24  what they are.

25  A.    Exhibit 27A and 27B is a First -- 27A is a First Class

1    parcel that had received to an undercover P.O. Box in Savannah,

2    Georgia, where I instructed my undercover order to be sent to.

3           And Exhibit 27B are the three auto key cards that I

4    received in that envelope to that undercover P.O. Box in

5    Savannah, Georgia.

6           MS. TAYLOR:  Your Honor, I'd ask for admission of 27A

7    and B.

8           MR. KING:  Without objection, Your Honor.

9           MR. LAROSIERE:  Without objection, Your Honor.

10          THE COURT:  27A and B are admitted.  You may publish.

11       (Government's Exhibits 27A and 27B admitted in evidence.)

12          MS. TAYLOR:  Your Honor, may I retrieve them from the

13   witness?

14          THE COURT:  You may.

15          MS. TAYLOR:  And while I'm doing that, Mr. Mesrobian

16   is also going to bring up Exhibits 30 and 30A through V as well

17   as 33, 33A through Z, and 34 through 47, which are all physical

18   exhibits we will be going through with Inspector Hannon.

19          THE COURT:  Okay.  30 and 30A through V, as in

20   victor?

21          MS. TAYLOR:  Yes.

22          THE COURT:  And then 33 and 33A through what?

23          MS. TAYLOR:  Z, as in zebra.

24          THE COURT:  Okay.

25          MS. TAYLOR:  And then 34 through 47.

1          THE COURT:  Go ahead, Mr. Mesrobian.  And

2    Mr. Mesrobian, if you'll retrieve 27A and B.

3          MR. MESROBIAN:  Yes, Your Honor.

4    BY MS. TAYLOR:

5    Q.   Okay.  I'm going to put 27A on the projector.  And you can

6    see the exhibit tag says 27A, correct?

7    A.   Yes, correct.

8    Q.   And this is the -- this is the bubble mailer that you

9    received with your mailing?

10   A.   Yes, it is.

11   Q.   And it's addressed to Richard Carter?

12   A.   Yes, correct.

13   Q.   And what's the return address?

14   A.   A Key Card, 950 Blanding Boulevard, Suite 23, PMB 336,

15   Orange Park, Florida.

16   Q.   And zooming in, does it indicate a shipping date there?

17   A.   February 4th, 2021.

18   Q.   And did you open this package?

19   A.   I did.

20   Q.   Did you need a search warrant to do that?

21   A.   I did not.

22   Q.   Why is that?

23   A.   That was a parcel obtained through an undercover purchase,

24   and that parcel was in control of the U.S. Postal Inspection

25   Service.

1    Q.    I'm going to put 27B on the projector.  And inside you

2    stated there are three -- the three auto key cards that you

3    purchased?

4    A.    Yes, correct.

5    Q.    And what were they -- was there anything that was packaged

6    with them?

7    A.    They were packaged inside a clear Ziploc baggie and with a

8    green business card.

9    Q.    Each one was individually in a clear Ziploc with a

10   business card?

11   A.    Yes, correct.

12   Q.    Okay.  And you can see, I think here, that this one's the

13   Bottle Opener Edition?

14   A.    Yes, it is.

15   Q.    It's a little bit longer than this other one?

16   A.    Yes.

17   Q.    And there are three in here?

18   A.    Correct.

19   Q.    Okay.

20        MS. TAYLOR:  If we could have Exhibit 26 back up on

21   the screen, page 8.

22   BY MS. TAYLOR:

23   Q.    Are these photos that you took of the package?

24   A.    Yes, they are.

25   Q.    Is this how the package looked when you first received it?

1    A.    Yes, it is.

2    Q.    And if we could look at page 9.  What's here?

3    A.    That is a photograph I took depicting the opening and the

4    contents of that First Class envelope.

5    Q.    Okay.  So that shows the three different envelopes that

6    were inside, each containing an auto key card and a business

7    card?

8    A.    Correct.

9          MS. TAYLOR:  Next page, please.

10   BY MS. TAYLOR:

11   Q.    What's this?

12   A.    That is a picture of the auto key cards that were

13   contained in there.

14   Q.    Is it the back side?

15   A.    It's the back side, yes.  The front side was the business

16   card.  I flipped them over, took a -- this additional picture

17   from the back side, without the business card.  The business

18   cards are facing down in this picture.

19         MS. TAYLOR:  Page 11, please.

20   BY MS. TAYLOR:

21   Q.    What is this?

22   A.    That's the auto key cards removed from the Ziploc baggies.

23   Q.    And so all three of the ones that you ordered were not Pen

24   Holder Editions?

25   A.    No.

1    Q.    Okay.  And so the only full cutout that was on the three

2    you ordered, was that the bottle opener?

3    A.    Correct.

4          MS. TAYLOR:  Next page, please.

5    BY MS. TAYLOR:

6    Q.    And what's this?

7    A.    This is the picture of the auto key card with the bottle

8    opener.

9    Q.    Looking at the -- at the mail meter -- that was

10   Exhibit 72, all that transactional data, right?

11   A.    Yes, ma'am.

12   Q.    Did you find your package in that mail meter?

13   A.    Yes, I did.

14   Q.    Addressed to Richard Carter?

15   A.    Correct.

16   Q.    And at some point did you participate in surveillance of

17   Mr. Ervin?

18   A.    Yes, I did.

19   Q.    And do you recall the day?

20   A.    The first day was February 22nd, 2021.

21   Q.    What did you observe during your surveillance?

22   A.    On that day during my surveillance I observed Mr. Ervin

23   leave his residence, get into a vehicle and drive to the

24   Ridgewood Post Office in Orange Park.

25   Q.    And where was his residence located?

1   A.    2409 Kirkwall Court, Orange Park, Florida.

2   Q.    Did you obtain any camera footage related to what happened

3   during your surveillance?

4   A.    Yes, I did.

5         MS. TAYLOR:  Your Honor, I'm going to approach with

6   20- -- not -- sorry, 28 and 31.

7         THE COURT:  Go ahead.

8   BY MS. TAYLOR:

9   Q.    Could you take a look at Exhibit 28 and tell the jurors

10  what it is.

11  A.    Exhibit 28 is a CD that depicts surveillance video

12  obtained from inside of the Ridgewood Post Office from

13  February 22nd.

14  Q.    How are you able to know that that's what's on that disk?

15  A.    My initials are on that disk.

16  Q.    Did you previously review that disk on a computer and

17  verify that that was what was on it?

18  A.    Yes, I did.

19  Q.    And I'm going to jump forward a little bit to the other

20  exhibit that I just brought you, which was 31, correct?

21  A.    Yes, correct.

22  Q.    What's on that disk?

23  A.    That disk contains surveillance video also obtained from

24  the Ridgewood Post Office on a later date, February 24th, 2021.

25  Q.    And --

1  A.    I recognize that disk from my initials being on it.

2  Q.    And you reviewed the contents of that disk previously?

3  A.    Yes, I did.

4  Q.    And that was Exhibit 31?

5  A.    Correct.

6         MS. TAYLOR:  Your Honor, I move for admission of

7  Exhibit 28 and Exhibit 31.

8         MR. KING:  Without objection, Your Honor.

9         MR. LAROSIERE:  Without objection.

10        THE COURT:  28 and 31 are admitted.

11     (Government's Exhibits 28 and 31 admitted in evidence.)

12  BY MS. TAYLOR:

13  Q.    So Mr. Ervin on that date, he went to the post office?

14  A.    Yes.

15  Q.    Were you able to visually identify him?

16  A.    Yes, I was.

17  Q.    How were you able to identify who he was?

18  A.    He was associated with that residence.  He entered a

19  vehicle that was registered to him.  And I also previously had

20  seen his picture from his Florida driver's license.

21        MS. TAYLOR:  Your Honor, may I publish Exhibit 28?

22        THE COURT:  You may.

23        Ms. Wiles, can you turn down the lights?

24     (Video played.)

25  BY MS. TAYLOR:

1   Q.    All right.  Inspector Hannon, could you -- there's four

2   different camera angles that are depicted within this video,

3   correct?

4   A.    Correct.

5   Q.    And what is the location that is depicted in these four

6   different camera angles?

7   A.    This is the customer lobby of the Ridgewood Post Office in

8   Orange Park.

9   Q.    Have you been there before?

10  A.    Yes, I have.

11  Q.    And you went there the day that this video was taken on

12  February 22nd?

13  A.    Yes, I did.

14        MS. TAYLOR:  Ms. Ganoe, could you please advance the

15  video to 11:23:20.

16  BY MS. TAYLOR:

17  Q.    The time stamp that's on the bottom, is that at least an

18  approximately accurate indication of what time of day this

19  video was captured?

20  A.    Yes, it is.

21  Q.    Bear with us.  The video is being a little bit jumpy.

22        It's currently -- okay.  Do you see anyone in the

23  video currently that you recognize?

24  A.    Yes, Mr. Ervin walking to the front customer counter

25  wearing the blue jeans and black T-shirt.

1    Q.    And what is he doing now?

2    A.    He was dropping off a -- it was a cardboard box that had

3    briefly been opened and white padded envelopes can be seen

4    sticking out of them during the surveillance.  And he is

5    dropping that box with those envelopes on the customer

6    county -- I'm sorry, customer county -- customer counter in the

7    lobby for mailing.

8    Q.    And was he wearing a pair of sunglasses on his head?

9    A.    Yes.  They are white-rimmed or white-framed sunglasses.

10   Q.    And the video is continuing to play, correct?

11   A.    Correct.

12   Q.    And did anyone --

13         MS. TAYLOR:  If we could back it up, Ms. Ganoe, to

14   11:23 and about 55 seconds.

15   BY MS. TAYLOR:

16   Q.    Okay.  We're at 11:23 and 40 seconds now, correct?

17   A.    Correct.

18   Q.    And the video is playing.  And in that lower left-hand

19   corner, was that Mr. Ervin leaving the post office?

20   A.    Yes, it was.

21   Q.    Where were you at the time?  Did you go inside the post

22   office?

23   A.    I did not.  When he turned into the parking lot for the

24   post office, I continued driving.  We had other -- two other

25   postal inspectors who were in vehicles in the parking lot of

1    the post office.

2    Q.   And given how much trouble this video is giving us, I

3    think we'll just watch it for a minute.  But if you could

4    please let us know if around the 11:24 and 18 second mark, did

5    somebody else enter into the video?

6    A.   Yes, I just watched him on the video.  It's Postal

7    Inspector Richard Batchelder.

8    Q.   And is he the man that's wearing black that is now -- he's

9    visible in the bottom right-hand corner?

10   A.   Yes.  He's wearing a black polo shirt.

11   Q.   And you recognize him from working with him?

12   A.   Yes, I do.

13   Q.   And did he obtain anything from the post office that day

14   that was pertinent to your investigation?

15   A.   Yes.  He retrieved the opened cardboard box that contained

16   22 First Class envelopes of the white bubble mailers.

17   Q.   Could you please -- there's a large box next to you, and

18   it should have in it Exhibits 30 and 30A through V.

19            MS. TAYLOR:  And Ms. Ganoe, we can stop the video

20   now.

21        (Video stopped.)

22   BY MS. TAYLOR:

23   Q.   Could you describe first what Exhibit 30 is?  And I'm not

24   sure you have Exhibit 30.

25            Okay.  So Exhibit 30, what is that?

1   A.    Exhibit 30 is a used Amazon box that had been opened.  And

2   this is the box that Postal Inspector Richard Batchelder

3   retrieved from the post office on the 22nd of February.

4   Q.    And what about Exhibits 30A through V?  And if you need to

5   take a minute to look through them, just let us know when

6   you're ready.

7   A.    These are the exhibits -- these are the mailings that were

8   contained within this used Amazon box that we recovered from

9   the post office on February 22nd, 2021.

10          MS. TAYLOR:  Your Honor, at this time I'd move for

11   admission of Exhibits 30 and 30A through V.

12          MR. KING:  Without objection, Your Honor.

13          MR. LAROSIERE:  No objection.

14          THE COURT:  30 and 30A through V, as in victor, are

15   admitted.

16      (Government's Exhibits 30 and 30A through 30V admitted in

17   evidence.)

18   BY MS. TAYLOR:

19   Q.    Inspector Hannon, how many packages were dropped off that

20   day?

21   A.    We recovered 22 packages that day.

22   Q.    And did you search each of those packages?

23   A.    I did.

24   Q.    And did you have to obtain a search warrant for those

25   packages?

1   A.   Yes, I obtained a search warrant for each one of these

2   parcels.

3   Q.   And why did you need a search warrant for these but not

4   for the one you purchased?

5   A.   I needed a search warrant for these parcels because it's

6   sealed U.S. mail.  In order to search U.S. mail, I either need

7   to obtain a federal search warrant or have consent of the

8   sender or receiver.

9   Q.   And what -- so without having to open up each of those

10  individual exhibits, did you also take pictures of those

11  packages and their contents?

12  A.   Yes, I did.

13  Q.   And could you look at Exhibit 29 that -- I believe that's

14  in front of you.  And what is Exhibit 29?

15  A.   Exhibit 29 contains photographs I took documenting the

16  opening of each one of those 22 parcels.

17         MS. TAYLOR:  I would move for admission of

18  Exhibit 29.

19         MR. KING:  Without objection, Your Honor.

20         MR. LAROSIERE:  Without objection, Your Honor.

21         THE COURT:  29 is admitted.

22      (Government's Exhibit 29 admitted in evidence.)

23         MS. TAYLOR:  May we publish 29, Your Honor?

24         THE COURT:  You may.

25  BY MS. TAYLOR:

1    Q.    Looking at the first page of Exhibit 29, this is the

2    package addressed to Blaine McCaleb, IV, correct?

3    A.    Correct.

4    Q.    And did it contain auto key cards?

5    A.    Yes, it did.

6    Q.    How many?

7    A.    Three.

8    Q.    And the next page, please.  Is this a package addressed to

9    Scott Register?

10   A.    Yes.

11   Q.    What did it contain?

12   A.    One auto key card.

13   Q.    And page 3.  Was this package addressed to Jeremy

14   Hendrickson?

15   A.    Yes, and that one also contained one auto key card.

16   Q.    And the next page, a package addressed to Matthew Worden?

17   A.    Yes, containing two auto key cards.

18   Q.    Next page.  A package addressed to Tyler Banicki?

19   A.    Yes, that contains one auto key card.

20   Q.    Next page, a package addressed to Nathan Shoemaker?

21   A.    Yes, correct, containing one auto key card.

22   Q.    Next page is a package addressed to Thomas Rathbone?

23   A.    Yes, containing two auto key cards.

24   Q.    And the next page, a package addressed to Wally Avalos?

25   A.    Yes, that contained one auto key card.

1   Q.   The next page, a package addressed to Michael Bohm?

2   A.   Yes, that contained one auto key card.

3   Q.   Next page, a package addressed to Donald Kleehamer?

4   A.   Yes, with one auto key card.

5   Q.   Next page, a package addressed to Hunter Hood?

6   A.   Yes, also containing one auto key card.

7   Q.   Next page, a package addressed to John Briggs?

8   A.   Yes, with one auto key card.

9   Q.   Next page, a package addressed to Paul W. Sewack, Jr.

10  Sewack [verbatim]?

11  A.   Yes, that contains one auto key card.

12  Q.   Next page, a package addressed to Charles Bennett?

13  A.   Yes, with one auto key card.

14  Q.   Next page, a package addressed to Chris Barton?

15  A.   Yes, with one auto key card.

16  Q.   Next page, a package addressed to Jose Cordova?

17  A.   Yes, with one auto key card.

18  Q.   Next page, package addressed to Hamilton McCaleb?

19  A.   Yes, with one auto key card.

20  Q.   Next page, a package addressed to Skylar Asiala?

21  A.   Yes, with one auto key card.

22  Q.   Next page, a package addressed to Cesar Luna?

23  A.   Yes, with one auto key card.

24  Q.   Next page, a package addressed to Patrick Thomas?

25  A.   Yes, with one auto key card.

1  Q.   Next page, a package addressed to Chris Martinez?

2  A.   Yes, with one auto key card.

3  Q.   And the last one is a package addressed to Kurt Wagner?

4  A.   Yes, with one auto key card.

5  Q.   And there's one more page in this exhibit, correct?  I

6  believe it's -- is this your inventory of those items that you

7  searched?

8  A.   Yes.  Those are notes I took during the opening of those

9  22 parcels.

10  Q.   And did each one of those 22 parcels contain an auto key

11  card?

12  A.   Yes, they did.

13  Q.   How many auto key cards in total were contained in those

14  22 parcels?

15  A.   In all, total was 26 key cards.

16  Q.   And did any of those packages contain any other items of

17  merchandise other than an auto key card?

18  A.   No, they did not.

19  Q.   Did you also check Exhibit 72 -- that's the mail meter

20  information.  Did you check Exhibit 72 to see whether or not

21  all of those packages were shipped using that mail meter?

22  A.   Yes, I did.

23  Q.   Were they?

24  A.   Yes, they were listed on that mailing log.

25  Q.   During your time that you were conducting surveillance on

1  February 22nd, the day that these packages were seized, did you

2  observe anyone who appeared to be with Mr. Ervin?

3  A.   No, I did not.

4  Q.   Did you observe anyone who appeared to be helping him?

5  A.   No, I did not.

6  Q.   Did you obtain other packages from the post office on

7  another day?

8  A.   Yes, I did.

9  Q.   What day was that?

10  A.   That was February 24th, 2021.

11  Q.   Were you doing surveillance that day?

12  A.   I was not.

13  Q.   How did you find out about the packages?

14  A.   A supervisor from the post office, from the Ridgewood Post

15  Office in Orange Park, had contacted Postal Inspector Richard

16  Batchelder and said there was another -- I believe her exact

17  words were "drop of mailings" related to the mailings that we

18  intercepted on February 22nd, 2021.

19       Inspector Batchelder notified me, and I responded to

20  the Ridgewood Post Office and retrieved those mailings.

21  Q.   Could you -- we already reviewed Exhibit 31 and admitted

22  it, so I'd like to pull that up on the -- on the screen now.

23       MS. TAYLOR:  Exhibit 31, please, Ms. Ganoe.

24       (Video played.)

25  BY MS. TAYLOR:

1   Q.    Does this video -- where is it taken?

2   A.    That is surveillance video from the customer lobby of the

3   Ridgewood Post Office on February 24th, 2021.

4   Q.    And there's three different video feeds in this file,

5   correct?

6   A.    Correct.

7           MS. TAYLOR:  If you could attempt, Ms. Ganoe, to fast

8   forward to the time stamp of 9:33 and 20 seconds.  33 and

9   20 seconds.

10       (Video played.)

11  BY MS. TAYLOR:

12  Q.    We're at 9:33 and 7 seconds, and I think I'm not going to

13  push our luck anymore.  So if you could please let us know when

14  you see anything in this video that was pertinent to your

15  investigation.

16  A.    That is Mr. Ervin entering the post office carrying a

17  brown cardboard box wearing the jeans and the hooded

18  sweatshirt.

19  Q.    It is now at 9:33 and 43 seconds.  And what is Mr. Ervin

20  doing?

21  A.    He is at the customer counter, where he appears to drop

22  the mailings and linger for just a few seconds there.

23  Q.    In the previous surveillance video, Mr. Ervin, did he

24  leave immediately?

25  A.    Yes.  He was in the post office a very brief amount of

1    time.

2    Q.   What is Mr. Ervin doing now?  It's 9:34 and 13 seconds.

3    A.   He walks to the other side of the customer counter,

4    lingers a few seconds.

5    Q.   It's now 9:34 and 37 seconds.  What is Mr. Ervin doing?

6    A.   He is exiting the post office.

7    Q.   Is he wearing any article of clothing in this video that

8    he was also wearing in the other surveillance video?

9    A.   Yes, the white-framed sunglasses.

10   Q.   Did you secure these packages that were dropped off on

11   February 24th of 2021?

12   A.   I did.

13   Q.   And could you please look at Exhibits 33 and 33A through

14   Z.

15        Have you had time to look at those exhibits?

16   A.   Yes, I have.

17   Q.   What's Exhibit 33?

18   A.   Exhibit 33 is a used cardboard box that was -- top was

19   opened.  And when I recovered these 24 parcels on -- I'm sorry,

20   the 26 parcels on February 24th, 2021, these were sitting

21   inside this cardboard box.

22   Q.   33 A through Z, are those the 26 parcels?

23   A.   Yes, they are.

24        MS. TAYLOR:  I'd move for admission of 33 and 33A

25   through Z.

1              MR. KING:  Without objection, Your Honor.

2              MR. LAROSIERE:  Without objection, Your Honor.

3              THE COURT:  33 and 33A through Z are admitted.  You

4    may publish if you wish.

5         (Government's Exhibit 33 and 33A through 33Z admitted in

6    evidence.)

7    BY MS. TAYLOR:

8    Q.   Inspector Hannon, did you take photos of these parcels --

9    well, let me go back.

10             When you got these parcels, they were sealed,

11   correct?

12   A.   Correct.

13   Q.   Did you open them?

14   A.   I did not initially.  I obtained -- I did not open them

15   until I obtained a federal search warrant for each one of the

16   mailings.

17   Q.   Okay.  So you got the search warrant for each and every

18   mailing and then you opened the packages?

19   A.   Yes, correct.

20   Q.   After you opened the packages, did you photograph their

21   contents?

22   A.   Yes, I did.

23   Q.   Could you please look at Exhibit 32 in front of you and

24   tell the jurors what that is.

25             THE COURT:  I'm sorry, Ms. Taylor, did you say 32?

1            MS. TAYLOR:  32, Your Honor.

2            THE COURT:  Okay.

3    A.   Exhibit 32 is a compilation of photographs I took

4    documenting the opening of each of these 26 parcels.

5            MS. TAYLOR:  Move for admission of Exhibit 32.

6            MR. KING:  Without objection, Your Honor.

7            MR. LAROSIERE:  Without objection, Your Honor.

8            THE COURT:  32 is admitted.  You may publish.

9        (Government's Exhibit 32 admitted in evidence.)

10   BY MS. TAYLOR:

11   Q.   Looking at page 1 of Exhibit 32, is this a package

12   addressed to John Doe?

13   A.   Yes, it is.

14   Q.   And what's in it?

15   A.   One auto key card.

16   Q.   And the next page, a package addressed to Robert Fontes?

17   A.   Yes, containing four auto key cards.

18   Q.   Page 3, a package addressed to John Cahill?

19   A.   Yes, containing one auto key card.

20   Q.   Fourth page, a package addressed to Ole Shoota?

21   A.   Yes, also containing one auto key card.

22   Q.   Fifth page, a package addressed to Tom Peter?

23   A.   Yes, with one auto key card.

24   Q.   Sixth page, a package addressed to Joseph West?

25   A.   Yes, containing one auto key card.

```
 1   Q.    Seventh page, a package addressed to Jason Bazelyuk?

 2   A.    Yes, also containing one auto key card.

 3   Q.    Eighth page, a package addressed to Steven Costello?

 4   A.    Yes, with one auto key card.

 5   Q.    Ninth page, a package addressed to Clint Buzicka?

 6   A.    Yes, with one auto key card.

 7   Q.    Tenth page, a package addressed to David Hungerschafer?

 8   A.    Yes, with one auto key card.

 9   Q.    Eleventh page, another package addressed to David

10   Hungerschafer?

11   A.    Yes, this one contained one auto key card.

12   Q.    Twelfth page, a package addressed to Robert Anderson?

13   A.    Yes, containing one auto key card.

14   Q.    Thirteen, a package addressed to Gary Merrill?

15   A.    Yes, with one auto key card.

16   Q.    Fourteenth page, a package addressed to Bruce Behringer?

17   A.    Yes, with one auto key card.

18   Q.    Fifteenth page, a package addressed to Jonathan B.

19   Flemmer, II?

20   A.    Yes, with one auto key card.

21   Q.    Sixteenth page, a package addressed to Austin I. Fiffer?

22   A.    Yes, with one auto key card contained inside.

23   Q.    Seventeen, a package addressed to David Tucker?

24   A.    Yes, one auto key card.

25   Q.    Eighteenth page, a package addressed to Derek Von Haag?
```

1   A.   Yes, which contained one auto key card.

2   Q.   Nineteenth page, a package addressed to Roy Tangen?

3   A.   Yes, with one auto key card.

4   Q.   Twentieth page, a package addressed to Edward Morrell?

5   A.   Yes, with one auto key card inside.

6   Q.   Twenty-first page, a package addressed to Ronald Wilson?

7   A.   Yes, with one auto key card inside.

8   Q.   Twenty-second page, a package addressed to Adam Ayvazian?

9   A.   Yes, with one auto key card.

10   Q.   The twenty-third page is a package addressed to Paul

11   Sikorski, Jr.?

12   A.   Yes, with one auto key card.

13   Q.   Twenty-fourth page, a package addressed to David Woods?

14   A.   Yes, with one auto key card.

15   Q.   Twenty-fifth page, a package addressed to William Hendrix?

16   A.   Yes, also containing one auto key card.

17   Q.   And the twenty-sixth package, which is on the twenty-sixth

18   page, a package addressed to Jan Ostrowski?

19   A.   Yes.  This contained one auto key card.

20   Q.   And there's -- oh, sorry, one more.  Is a package

21   addressed --

22          MS. TAYLOR:  Could we move to the next page.

23   BY MS. TAYLOR:

24   Q.   -- to Robert Susag?

25   A.   Yes, containing one auto key card.

1    Q.    And the next page.

2          I'm sorry, let me go back a little bit, because I

3    think we might have moved into -- into some other pictures of a

4    different exhibit.

5          So did you obtain any packages from the Ridgewood

6    Post Office on a third date?

7    A.    Yes, on March 1st, 2021, I obtained another 14 mailings

8    containing auto key cards.

9    Q.    How did you find out about those mailings being at the

10   post office?

11   A.    On that particular day I was attempting to conduct

12   surveillance of Mr. Ervin to try and see him go back into the

13   post office to mail additional parcels.

14         On that particular day I did not see him at his

15   residence or at the post office.

16         On that day, after the post office closed, I went

17   into the back area of the post office where outbound parcels

18   are processed, and I located 14 parcels linked to the

19   investigation.

20   Q.    So you didn't receive notification from anyone at the post

21   office that the parcels had been dropped?

22   A.    No, I did not.

23   Q.    And did you -- did you seize those parcels as potential

24   evidence in your case?

25   A.    Yes, I did.

1    Q.    And did you obtain search warrants for them as well?

2    A.    I did.

3    Q.    Could you please look at Exhibits 34 through 47 and tell

4    the jurors -- identify what those are, please.

5    A.    These are the 14 parcels I recovered from the Ridgewood

6    Post Office on March 1st, 2021.

7    Q.    Did you open those packages?

8    A.    I did.

9    Q.    After obtaining federal search warrants for each and every

10   one of them?

11   A.    Yes.

12   Q.    And so we were looking at Exhibit 32.  And does Exhibit 32

13   actually have pictures of both the February 24th and the

14   March 1st packages?

15   A.    Yes, it does.

16   Q.    Okay.  So let's continue going through Exhibit 32.

17           We were on page 28, which is a package addressed to

18   Max Williams?

19   A.    Yes.  That parcel contained one auto key card.

20   Q.    And page 29, a package addressed to Dennis Mills?

21   A.    Yes, with one auto key card.

22   Q.    And page 30, a package addressed to Neville Thornhill?

23   A.    Yes, with one auto key card.

24   Q.    And page 31, a package addressed to John Monaco?

25   A.    Yes, containing one auto key card.

```
 1    Q.    And page 32, a package addressed to Michaela Thompson?

 2    A.    Yes.  This one contained two auto key cards.

 3    Q.    And page 33, a package addressed to Jordan Clayton?

 4    A.    Yes, which contained one auto key card.

 5    Q.    Page 34, a package addressed to John Raulerson?

 6    A.    Yes, containing one auto key card.

 7    Q.    Oh, sorry, Jason Raulerson.

 8    A.    Yes, Jason.

 9    Q.    Page 35, a package addressed to Jeff Parker?

10    A.    Yes, correct, with one auto key card.

11    Q.    Page 36, a package addressed to Victor Fuentes?

12    A.    Yes, correct, one auto key card.

13    Q.    Page 37, a package addressed to Gary Russell?

14    A.    Correct, with one auto key card.

15    Q.    Page 38, a package addressed to Ray Martinez?

16    A.    Yes, containing one auto key card.

17    Q.    And back up.  There is -- on this one there's a sticker on

18    the internal plastic baggie; is that accurate?

19    A.    Yes, correct.

20    Q.    And it says -- what does it say?

21    A.    It said, "Good news.  Your additional order items are

22    shipping from our manufacturing facility directly to you.

23    Thank you, Autokeycard.com."

24    Q.    Do you know what that additional item was?

25    A.    I do not.
```

1   Q.   But in -- but it also contained an auto key card?

2   A.   It did.

3   Q.   Next page.  A package addressed to Nick McClain?

4   A.   Yes, containing one auto key card.

5   Q.   Next page.  A package addressed to Albert Kaffenberger?

6   A.   Yes, containing one auto key card.

7   Q.   And the next page -- oh, that's it.  Okay.

8        So how many packages were there in total between

9   February 24th and March 1st that you searched?

10  A.   40 parcels.

11  Q.   And did each and every one of them contain an auto key

12  card?

13  A.   Yes.

14  Q.   Did any of them contain other merchandise besides an auto

15  key card?

16  A.   No, they did not.

17       MS. TAYLOR:  Your Honor, I move for admission of 34

18  through 47.  The physical exhibits, Your Honor.

19       THE COURT:  Any objection to 34 through 47?

20       MR. KING:  No objection, Your Honor.

21       MR. LAROSIERE:  No objection, Your Honor.

22       THE COURT:  All right.  34 through 47 are admitted.

23       (Government's Exhibit 34-47 admitted in evidence.)

24  BY MS. TAYLOR:

25  Q.   Inspector Hannon, other than the undercover purchase

1  packages, how many packages in total did you obtain from the

2  mail stream related to this investigation?

3  A.   62 parcels.

4  Q.   And how many of them contained auto key cards?

5  A.   They all did.

6  Q.   Did any of them contain any merchandise other than auto

7  key cards?

8  A.   No, they did not.

9  Q.   Were there any other packages that you seized that you

10  thought might be related to this investigation but didn't

11  contain an auto key card?

12  A.   No, there were not.

13  Q.   Did you also check Exhibit 72 -- that's the mail meter

14  log, correct?

15  A.   Yes.

16  Q.   Did you check Exhibit 72 for all of these packages that

17  were seized out of the mail stream?

18  A.   Yes, I did.

19  Q.   Did you verify -- what did you find?

20  A.   Each one of those parcels is listed on the mailing log.

21  Q.   Did you participate in any other search related to the

22  investigation of Mr. Ervin?

23  A.   I did.  On March 2nd, 2021, I participated in the search

24  warrant of his residence on Kirkwall Court in Orange Park.

25           MS. TAYLOR:  If I could have just a moment, Your

1    Honor.

2              Your Honor, may I approach with Exhibits 105 and

3    105 -- sorry, 101, 105, and 105A?

4              THE COURT:  101, 105, and 105A.  Go ahead.

5              MS. TAYLOR:  Also 101A, Your Honor.

6    BY MS. TAYLOR:

7    Q.   Could you first please look at Exhibit 101 and 101A and

8    tell the Court what those are.

9    A.   Exhibit 101 is a receipt for a UPS Store.

10   Q.   And what is 101A?

11   A.   101A is a picture of that receipt taken at the time of the

12   search warrant.

13   Q.   And is that receipt something that you -- that you've

14   recovered during the search?

15   A.   Yes, it is.

16             MS. TAYLOR:  Move for admission of 101 and 101A.

17             MR. KING:  Without objection, Your Honor.

18             MR. LAROSIERE:  Without objection, Your Honor.

19             THE COURT:  101 and 101A are admitted.

20        (Government's Exhibits 101 and 101A admitted in evidence.)

21   BY MS. TAYLOR:

22   Q.   Could you please look at 105 and 105A and describe what

23   they are.

24   A.   105 is a document, a spreadsheet type document, containing

25   a list of expenses, and Exhibit 105A is a photocopy of that

1    document.

2    Q.   And is that -- is 105 a document that you recovered during

3    the search of Mr. Ervin's residence?

4    A.   Yes, it is.

5         MS. TAYLOR:  Move for admission of 105 and 105A, Your

6    Honor.

7         MR. KING:  Without objection, Your Honor.

8         MR. LAROSIERE:  Without objection.

9         THE COURT:  105 and 105A are admitted.

10        (Government's Exhibit 105 and 105A admitted in evidence.)

11   BY MS. TAYLOR:

12   Q.   Inspector Hannon, when you were searching the residence of

13   Mr. Ervin, did you observe any auto key cards in the residence?

14   A.   Yes, I did.

15   Q.   A large number?

16   A.   Yes.  I would consider it a large number.  They were

17   scattered in multiple rooms within the residence.

18        MS. TAYLOR:  If we could have 101A on the screen,

19   please, Ms. Ganoe.  Could we zoom in on the top part of it.

20   BY MS. TAYLOR:

21   Q.   This is the photo, correct, of the receipt?

22   A.   Correct.

23   Q.   Actually, it's a little blurry.

24        MS. TAYLOR:  Your Honor, if I may approach and get

25   the original exhibit.

1          THE COURT:  Go ahead.

2          MS. TAYLOR:  And I'm going to go ahead and open it so

3     that we can see the full receipt on the projector.

4     BY MS. TAYLOR:

5     Q.    Are you able to see that receipt?

6     A.    Yes, I can.

7     Q.    And what is this receipt from?

8     A.    It's from a UPS Store located at 950 Blanding Boulevard,

9     Suite 23, Orange Park.

10    Q.    And in that mail meter and on your package that you

11    received and all the other packages that you searched, was

12    there a return address for Auto Key Card that was indicated?

13    A.    Yes, 950 Blanding Boulevard.

14    Q.    And so is this that same address?

15    A.    Yes, it is.

16    Q.    And it said PMB 336, I believe?

17    A.    Correct.

18    Q.    What does that mean to you based on your training and

19    experience?

20    A.    A UPS Store can operate as what's called a Commercial Mail

21    Receiving Agency.  They pretty much hold a contract with the

22    Postal Service to provide certain services that the post office

23    normally provides, such as postage and P.O. Box services.

24          So PMB stands for Private Mail Box.  So that's a P.O.

25    Box contained within the UPS Store that will accept delivery of

1    U.S. mail.

2    Q.    And so was this UPS Store operating in that way?

3    A.    Yes, it was.

4    Q.    And what's reflected on this receipt?  In particular, the

5    first item, if you know?

6    A.    Well, it says, "FS business, medium, quantity 12, for

7    $18."

8    Q.    And then the total is $216?

9    A.    Yes, correct.

10    Q.    And then here toward the bottom of the receipt it says,

11    "Mailbox services transaction," correct?

12    A.    Yes, it does.

13    Q.    And it has a mailbox number?

14    A.    It does, Box 336.

15    Q.    And does that appear to correspond with the return address

16    for Auto Key Card?

17    A.    Yes, it does.

18    Q.    And it says, "Customer, Kris Ervin"?

19    A.    Yes, it does.

20            MS. TAYLOR:  Ms. Ganoe, could we have 105A on the

21    screen.

22            THE COURT:  Ms. Taylor?

23            MS. TAYLOR:  Yes, Your Honor?

24            THE COURT:  Could we go ahead and take our morning

25    break?

 1          MS. TAYLOR:  This will be the very last thing for

 2   Inspector Hannon.

 3          THE COURT:  Go ahead.

 4          MS. TAYLOR:  From me.

 5          THE COURT:  Understood.

 6   BY MS. TAYLOR:

 7   Q.   Okay.  Is this -- this is the other document, the expense

 8   document, that you were talking about?

 9   A.   Yes.

10   Q.   And zooming in --

11          MS. TAYLOR:  Yeah, let's just zoom in on the top

12   part.

13   BY MS. TAYLOR:

14   Q.   Does it list expenses, including some expenses for Pirate

15   Ship Postage?

16   A.   Yes, it does.

17   Q.   Expenses for Namecheap.com?

18   A.   Correct.

19   Q.   Expenses for what looks like Google Ads?

20   A.   Yes, it does.

21   Q.   And then more expenses from Namecheap as you scroll down

22   on November 16th, 2020?

23   A.   Yes.

24   Q.   And then does it have a section for American Express?

25   A.   It does.

1   Q.   And under that it has expenses for Primary Arms?

2   A.   It does.

3   Q.   And two lines listed for Namecheap?

4   A.   Yes.

5   Q.   And then a line for Upwork?

6   A.   Yes.

7   Q.   A line for 3D Cart?

8   A.   Yes.

9   Q.   And then the next section is labeled CapitalOne?

10  A.   Yes.

11  Q.   And what is in that section?

12  A.   Expenses for Shopify and Test Run.

13  Q.   Okay.  Looking at the second page of this document --

14  we're zooming in on the top of the second page -- it has a

15  number of expenses listed, correct?

16  A.   It does.

17  Q.   They include multiple expenses for Namecheap?

18  A.   Yes.

19  Q.   Multiple expenses for Squarespace?

20  A.   Yes.

21          MS. TAYLOR:  Your Honor, I have no further questions

22  for Inspector Hannon.

23          THE COURT:  All right, ladies and gentlemen.  We'll

24  go ahead and take our morning break.  I'll ask you to be back

25  at 11:10.

1        Please remember not to discuss the case with one
2   another, your family, your friends, or anybody else.
3        Don't allow anybody to speak to you or in your
4   presence about the case.
5        Don't read, watch, or listen to any media reports.
6        Please don't conduct any independent research about
7   anything in any way relating to the case, including looking on
8   the internet in any way.  And remember not to form or express
9   any opinions until you've heard all the evidence.
10        We'll be in recess until 11:10.
11        COURT SECURITY OFFICER:  All rise for the jury.
12    (Jury exits, 10:53 a.m.)
13        COURT SECURITY OFFICER:  Please be seated.
14        THE COURT:  You may step down.
15        Is there anything we need to address?
16        MR. KING:  No, Your Honor.
17        MR. MESROBIAN:  No, Your Honor.
18        THE COURT:  All right.  We'll be in recess.
19    (Recess, 10:54 a.m. to 11:14 a.m.)
20    (All parties present.  Jury not present.)
21        COURT SECURITY OFFICER:  All rise.  This Honorable
22   Court is back in session.
23        THE COURT:  Who am I going to hear from first?
24        MR. LAROSIERE:  Counsel for Mr. Hoover, Your Honor.
25        THE COURT:  Okay.  Let's get the jury in.

1          And Mr. Larosiere, you can go ahead and get yourself

2     organized up there if you'd like.

3          MR. LAROSIERE:  Thank you.

4          COURT SECURITY OFFICER:  All rise for the jury.

5     (Jury enters, 11:15 a.m.)

6          COURT SECURITY OFFICER:  Please be seated.

7          THE COURT:  Go ahead, Mr. Larosiere.

8          MR. LAROSIERE:  Thank you kindly.

9                        CROSS-EXAMINATION

10    BY MR. LAROSIERE:

11    Q.   Mr. Hannon, thank you so much for your time and attention

12    in this matter today.  We truly appreciate it.  And I won't use

13    too much of your time.

14    A.   Absolutely.

15    Q.   You talked about doing a fairly substantial amount of

16    surveillance in this case, correct?

17    A.   Multiple days of surveillance, yes, sir.

18    Q.   Awesome.

19         In all of that surveillance, did you ever one time

20    see my client, Mr. Matthew Raymond Hoover, in Jacksonville?

21    A.   I did not.

22    Q.   Okay.  Do you know when Mr. Ervin and my client first met

23    in person?

24    A.   I do not.

25         MR. LAROSIERE:  Thank you so much.

1    I have nothing further, Your Honor.

2    THE COURT:  Mr. King.

3    MR. KING:  May it please the Court.

4    THE COURT:  Go ahead.

5                    CROSS-EXAMINATION

6    BY MR. KING:

7    Q.   Good morning, Postal Inspector Hannon.

8    A.   Good morning.

9    Q.   As a Postal Inspector, you're a sworn law enforcement

10   officer?

11   A.   Correct.

12   Q.   Badge and gun?

13   A.   Absolutely.

14   Q.   Arrest authority?

15   A.   Yes, sir.

16   Q.   I want to talk to you a little bit about some of the

17   things hopefully we can agree on.

18        During the course of your investigation, was it very

19   clear to you that Mr. Ervin was, if not solely, primarily

20   mailing auto key cards through the Ridgeview Post Office?

21   A.   Yes, correct.

22   Q.   And was that something that was difficult for you to

23   figure out or was that pretty obvious?

24   A.   Once I received the meter information, based upon the

25   undercover purchases, I can look -- and I obtained the mailing

1   logs and looked at the tracking, I can see that the mailings

2   were being conducted from the Ridgewood Post Office.

3   Q.   If you could turn your attention to Government's

4   Exhibit 72, the second page.  And Postal Inspector Hannon, the

5   Customer Information, the first name, that's Kristopher Ervin?

6   A.   Yes.

7   Q.   And that's the legal name of my client?

8   A.   Correct.

9           MR. KING:  Ms. Ganoe, if we could turn to the next

10  page.

11  BY MR. KING:

12  Q.   And the address on here, that's -- well, the name is

13  Kristopher J. Ervin.  That's my client's name?

14  A.   Yes.

15  Q.   And that's his address?

16  A.   Correct.

17  Q.   And you conducted surveillance.  And you, through other

18  records, know that that's his address?

19  A.   Correct.

20  Q.   And when you conducted your search, that's the address you

21  searched?

22  A.   Correct.

23  Q.   And through your investigation, that's his email address

24  and phone number?

25  A.   I didn't do any follow-up on the email or the phone

1   number, so I couldn't --

2   Q.   Okay.

3   A.   -- confirm that, but the address, yes.

4   Q.   Okay.  And is there anything that he did here to obfuscate

5   or hide who he was?

6   A.   No, he did not.

7        MR. KING:  Ms. Ganoe, if we could turn to Exhibit 26,

8   please.

9   BY MR. KING:

10  Q.   Postal Inspector Hannon, we're going to go to Exhibit 26.

11  If you'll recall, this is the order form.

12       MR. KING:  If we could do the bottom left-hand

13  corner.

14  BY MR. KING:

15  Q.   And Postal Inspector Hannon, the money order is made

16  payable to a "J. Ervin"?

17  A.   Yes.

18  Q.   And Mr. Ervin goes by "Justin"?

19  A.   Yes, he does.

20  Q.   And anything there about obfuscating or hiding his

21  identity?

22  A.   No, he did not.

23  Q.   And the --

24       MR. KING:  And if we could turn to page 3.  And

25  the -- I apologize, it's page 5.  I can't read my own

1  handwriting.  Thanks.

2  BY MR. KING:

3  Q.  And Postal Inspector Hannon, the money order that you did,

4  that was to "J. Ervin."

5       That's Justin Ervin?

6  A.  Yes.

7  Q.  The -- and you had your package that you ordered sent to

8  Savannah, Georgia?

9  A.  I did.

10  Q.  Was there a reason for that?  Because you're here locally,

11  right?

12  A.  I am.  I'm based here in Jacksonville.  A fellow Postal

13  Inspector who I work with quite frequently already had an

14  established undercover P.O. Box in Savannah.

15  Q.  So it was convenient -- there's nothing special or hidden

16  about that; it was just convenient?

17  A.  Correct.

18  Q.  Understood.

19       I want to talk to you a little bit about some of the

20  surveillance you conducted.  You said you conducted

21  surveillance on multiple occasions?

22  A.  On the 22nd of February, 2021, and then also on March 1st

23  of 2021.

24  Q.  Talking a little bit about February 22nd, you weren't

25  alone when you were conducting that surveillance?

1  A.    I was not.

2  Q.    Who else -- and maybe not just Postal Inspectors, but all

3  law enforcement agencies.  Who else was involved in that on

4  February 22nd?

5  A.    Additional Postal Inspectors and ATF agents.

6  Q.    Who was there?  How many people?

7  A.    I know it was myself, Postal Inspector Richard Batchelder,

8  Postal Inspector Chris Martin, Postal Inspector Jerry Moberg,

9  ATF Agent Jesse Hooker.  Who else was there from ATF, I don't

10  recall.

11  Q.    But there were multiple other ATF agents as well?

12  A.    I believe so, yes.

13  Q.    And when we say "surveillance," this was -- this was an

14  all-day thing?

15  A.    Yes.

16  Q.    And we've already kind of talked about I think we're in

17  agreement that Mr. Ervin was sending these mailings?

18  A.    Yes, correct.

19  Q.    And that -- by February 22nd, that was already pretty

20  clear to you?

21  A.    I don't know about "clear," but that was our suspicion.

22  And that was the intent of the surveillance, was to verify he

23  was conducting these mailings.

24  Q.    And we're talking about a whole day, eight, nine, ten

25  people, something in that range?

1    A.    All day?  I believe he went to the post office, you know,

2    mid morning or early afternoon.  So I wouldn't classify it "all

3    day," but yeah, we started that morning.

4    Q.    I want to turn to -- and on the March 1st surveillance,

5    was that you or was that also that big group of people?

6    A.    That was just myself and a task force officer from our

7    office just kind of conducting the periodical surveillance,

8    driving by his residence, driving by the post office, seeing if

9    we could locate him that day.

10   Q.    And I want to talk to you a little bit more about

11   Exhibit 72.  I don't think we need to bring it up, but that's a

12   list of -- and if I'm getting any of this wrong, please correct

13   me.  That is a list of every person that that postal meter sent

14   an auto key card to?

15   A.    That is everything that a postage label was created for on

16   that meter.

17   Q.    And going back a little bit, are you familiar with either

18   drop shipping or shipping that's kind of done by demand?

19   A.    With drop shipments, yes.  I'm not sure what you mean by

20   your second category there.

21   Q.    Sure.

22           MR. KING:  If we could, Ms. Ganoe, pull up 32.  I

23   think it's page 38.

24   BY MR. KING:

25   Q.    Postal Inspector Hannon, do you see the white card above

1   the green card?

2          MR. KING:  If we could zoom in on that.  I appreciate

3   it.

4   BY MR. KING:

5   Q.   Do you see that?

6   A.   Yes, I do.

7   Q.   Is it, in your experience with the Postal Service,

8   uncommon for certain manufacturers to directly fulfill customer

9   orders?

10  A.   Could you ask that one more time?  Sorry.

11  Q.   I sell T-shirts online, and instead of them being at my

12  house, the T-shirt company mails them out as they get ordered?

13  A.   Yeah, that occurs.

14  Q.   Do you know if that occurred here or do you not know?

15  A.   I do not know.

16  Q.   Turning back to Exhibit 72 -- and we don't need to bring

17  it up, thank you -- that's a list of -- and it's got addresses

18  for all of the people who got one of these auto key cards

19  mailed to them?

20  A.   Yes.

21  Q.   Got their names?

22  A.   Yes.

23  Q.   And it's about 931 parcels; is that . . .

24  A.   I believe the last count was somewhere roughly 1,300.

25  Q.   1,300?  And I want to make sure I'm being fair.  Two --

1  one of those was you?

2  A.   Correct.

3  Q.   And I think the first one was Mr. Ervin?

4  A.   Yes.

5  Q.   And two of those were Agent Hooker, I believe?

6  A.   Yes.

7  Q.   And he worked with you on that?

8  A.   Yes.

9  Q.   And then of the other 1,300 that ordered these, how many

10  of those did you investigate criminally or arrest for machine

11  gun violation laws?

12  A.   I did not.  I know ATF was doing some follow-up.  I was

13  not involved in any of those follow-up investigations.

14  Q.   So of those 1,300 addresses, that list that y'all had, you

15  personally did not arrest or do anything with any of those?

16  A.   I did not.

17        MR. KING:  Your Honor, I have no further questions.

18  Thank you.

19        Thank you.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  Ms. Taylor.

22        MS. TAYLOR:  Yes, Your Honor.

23                    REDIRECT EXAMINATION

24  BY MS. TAYLOR:

25  Q.   Inspector Hannon, your part of the investigation was

1    focused on the use of the mail in this case, correct?

2    A.   Yes, correct.

3    Q.   And once the search warrant was executed at Mr. Ervin's

4    residence, you continued to have some involvement in this case,

5    correct?

6    A.   Yes.

7    Q.   Did you -- did you do a lot of follow-up investigation,

8    write search warrants for social media or participate

9    substantively in the investigation as it moved from Mr. Ervin

10   to Mr. Hoover?

11   A.   No, I did not.

12   Q.   Okay.  And with regard to the surveillance that you

13   conducted on February 22nd and March 1st, there was a question

14   about whether it was clear that it was Mr. Ervin sending the

15   packages, correct?

16   A.   Yes, correct.

17   Q.   And while that may have been clear, did you know at that

18   time where he was manufacturing the auto key cards?

19   A.   I did not.

20   Q.   Was that part of the purpose of the surveillance, to try

21   and identify a location where they were being manufactured --

22   A.   Yes, it was.

23   Q.   -- or stored?

24   A.   Yes.

25   Q.   And that wasn't clear just from the fact that he was --

1    you knew he was mailing packages at the post office?

2    A.    Correct.

3    Q.    Now, additionally, as the investigation moved to the end

4    of February and you were -- you started seizing packages out of

5    the mail.  The first time on February 22nd, correct?

6    A.    Yes.

7    Q.    And you got search warrants for those packages, correct?

8    A.    I did.

9    Q.    You verified that every single one of them contained an

10   auto key card, correct?

11   A.    Yes, I did.

12   Q.    And at that point those packages were considered

13   contraband, right?

14   A.    Yes.

15   Q.    And so once you had identified that that is what Mr. Ervin

16   was mailing on his mail meter, by seizing those packages,

17   getting all those search warrants and examining the contents of

18   the packages, was there some urgency to prevent additional

19   contraband from being distributed across the country?

20   A.    Yes.  We wanted to intercept as many of these parcels as

21   we could.  We felt, in conjunction with the investigative team

22   and the U.S. Attorney's Office, that it would be irresponsible

23   of us to allow these auto key cards to continue being mailed

24   across the country.

25   Q.    Turning again to the mail meter information, I believe

1    that the number of packages that -- you reviewed that chart on

2    I think it's the first page, correct?

3    A.    Yes, correct.

4    Q.    It's a summary chart?

5    A.    Yes, it's on the first page.

6    Q.    And it shows that at least during the time that that mail

7    meter was used -- which was starting November 30th, 2022,

8    correct?

9    A.    Of 2021.

10   Q.    Sorry.  Actually, I think it was November 30th, 2020.

11   A.    If we go to November, yes, it was November 2020.

12   Q.    Okay.  It was November 2020 and then up until March of

13   2021 there were how many mailings?

14   A.    1,334 mailings.

15   Q.    Do you know whether there were other mailings that may

16   have been made through a different mail meter prior to the

17   November 30th date?

18   A.    Yes.  I believe he used a different meter that we do not

19   have the records for.

20   Q.    Okay.  You don't have the records?

21   A.    I don't have the records.

22   Q.    Okay.  Now, those 1,300 mailings, did they all go to the

23   Jacksonville area?

24   A.    No.  They were mailed across the country.

25   Q.    And in your capacity as a law enforcement officer, do you

1    enforce firearms laws directly?

2    A.    No, I do not.

3    Q.    What's your responsibility?

4    A.    In this investigation my responsibility was aiding ATF in

5    their firearms investigation.

6    Q.    And when you are conducting investigations -- like let's

7    say, for example, you were -- you were the agent investigating

8    somebody possessing an item illegally.  Would you be

9    investigating people here in the Jacksonville area?

10            In other words, you have an area of responsibility,

11   correct?

12   A.    I do.

13   Q.    And that's not nationwide, right?

14   A.    It is not.  Based out of our Jacksonville office, we cover

15   Northeast Florida.

16            MS. TAYLOR:  I have no other questions, Your Honor.

17            THE COURT:  Mr. Larosiere, anything else for this

18   witness?

19            MR. KING:  No, Your Honor.  Thank you.  Thank you.

20            MR. LAROSIERE:  No, Your Honor.

21            THE COURT:  All right.  You may step down, sir.

22            THE WITNESS:  Thank you.

23            THE COURT:  Who's your next witness?

24            MS. TAYLOR:  The United States calls Special Agent

25   John Powley.

 1          (Witness exits the courtroom.)

 2          (Witness enters the courtroom.)

 3               THE COURT:  Sir, if you'll come right up here.

 4               COURTROOM DEPUTY:  Please raise your right hand.  Do

 5    you solemnly swear that the testimony you're about to give

 6    before this Court will be the truth, the whole truth, and

 7    nothing but the truth, so help you God?

 8               THE WITNESS:  I do.

 9               COURTROOM DEPUTY:  You may have a seat.  And if you

10    could please state your name for the record and spell your last

11    name.

12               THE WITNESS:  John Edward Powley, P-o-w-l-e-y.

13               THE COURT:  Whenever you're ready, Ms. Taylor.

14               MS. TAYLOR:  Yes, Your Honor.

15        **SPECIAL AGENT JOHN POWLEY, GOVERNMENT WITNESS, SWORN**,

16                         DIRECT EXAMINATION

17    BY MS. TAYLOR:

18    Q.   Special Agent Powley, where are you employed?

19    A.   I work for the Bureau of Alcohol, Tobacco and Firearms.

20    Q.   And what's your title?

21    A.   I'm a Special Agent.

22    Q.   What is your responsibility at ATF?

23    A.   ATF investigates crimes involving mostly, these days,

24    violations of arson, explosives, and firearms.

25    Q.   And how long have you been an ATF agent?

1  A.    Just short of 19 years.

2  Q.    How -- what kind of training did you go through to become

3  a federal agent?

4  A.    Well, first, initially you attend academy class at FLETC

5  in Georgia.  This is kind of a generalized class called CITP,

6  Criminal Investigator Training Program.  After that you attend

7  an academy specifically just for ATF concerning their laws and

8  policies and that kind of stuff.

9         Since then I've had continuing education as far as

10  other ancillary duties with ATF since then.

11  Q.    And did you have another career prior to becoming an ATF

12  agent?

13  A.    Yes.  I was a mechanical engineer for ten years prior to

14  coming with ATF and worked in private industry.

15  Q.    Now, how did you come to be involved in the investigation

16  of Mr. Ervin?

17  A.    Agent Hooker was -- applied for and received a search

18  warrant for Mr. Ervin's house and vehicle, and I was involved

19  in those -- that search warrant that day on March 2nd, 2021.

20  Q.    And was your role -- had you had a role in Mr. Hooker's

21  investigation prior to getting pulled in to help with the

22  search warrant?

23  A.    No, I had not.

24  Q.    And so you were not the case agent for any case related to

25  Mr. Ervin or Mr. Hoover?

1   A.    No, I was not.

2   Q.    Now, what was your -- what was it -- what was intended to

3   be your role with regard to the search warrant?

4   A.    Well, surveillance had been conducted of Mr. Ervin several

5   days prior to the warrant, and he had been observed leaving the

6   residence and going to places like the bank and the post

7   office.  So I believe the initial plan was for us to -- some

8   agents to sit on the house, some agents were sitting at the

9   post office, and then myself and a couple other agents were

10  sitting at the bank that he went to once in a while.

11        And our plan was for him to leave the residence and

12  do a traffic stop on him or make contact with him so that he

13  wasn't at the residence, and then basically secure him, find

14  out who was at the residence, maybe gain access, and then from

15  there execute the search warrant on the residence and the

16  vehicle.

17  Q.    And is that how things went?

18  A.    No.

19        We started very early morning, as far as I recall,

20  probably about a 6 a.m. brief.  We sat at our locations most of

21  the day.  It was late in the day, maybe 3 o'clock or so, that

22  somehow we received information that Mr. Ervin was in Lake

23  City.

24        And then it was decided -- someone called some

25  deputies in Lake City that we work with, and they went and

1    confirmed that Mr. Ervin was in Lake City.  And so it was

2    decided that two of us would go to Lake City.

3    Q.    And Agent Powley, so you went to Lake City with another

4    agent?

5    A.    Yes, Agent Chad Lifsey.

6    Q.    And where in particular in Lake City did you go?

7    A.    We actually didn't go to Lake City.  Mr. Ervin was

8    surveilled from Lake City to some rural property outside of

9    Lake City.  It's actually closer to Lake Butler, kind of out in

10   the boonies.  And so Agent Lifsey and I met the deputies there

11   and then proceeded to the rural property.

12   Q.    Was it -- was the property a piece of undeveloped land?

13   A.    It was.

14   Q.    And did you encounter Mr. Ervin there?

15   A.    We did.

16   Q.    Where was he?

17   A.    He was on the property, helping one of his friends clear

18   the property.  His friend was running a bobcat and Mr. Ervin

19   was running a chainsaw at the time cutting up a tree.

20   Q.    When you encountered Mr. Ervin, did you inform him who you

21   were and why you were there?

22   A.    Yes.  We initially took him into custody and secured him,

23   put him in handcuffs.  And then after frisking him we informed

24   him who we were, showed him our credentials, and explained why

25   we were there.

1    Q.    Was Mr. Ervin cooperative throughout?

2    A.    Yes, he was.

3    Q.    And did you search his person?

4    A.    Yes, we did.

5    Q.    Was there anything that you found on his person?

6    A.    Yes.  He had a 9-millimeter handgun in his front

7    waistband.

8    Q.    And did you have a warrant to search anything in

9    particular that was located at that property?

10   A.    We did.  His vehicle.

11          MS. TAYLOR:  And Your Honor, if I may approach

12   Special Agent Powley with Exhibits 124, 124.1A, 124.3A, 1 --

13   49, 124.1, 124.3, 124.2.

14          THE COURT:  Go ahead.

15   BY MS. TAYLOR:

16   Q.    Now, Special Agent Powley, was it Mr. Ervin's vehicle that

17   you had a warrant to search?

18   A.    Yes, it was.

19   Q.    And was the vehicle present at the -- at the undeveloped

20   piece of property where you located Mr. Ervin?

21   A.    It was.

22   Q.    What kind of vehicle was it?

23   A.    It was a Honda CRV.

24   Q.    And could you -- could you look at the exhibit marked 124.

25   What is that?

1  A.   That is a picture I took of Mr. Ervin's vehicle.

2  Q.   And is that the vehicle that you searched?

3  A.   It is.

4  Q.   And if you could please look at Exhibit 124.1.  And let us

5  know what that is.

6  A.   This is a photograph of two receipts that were in the

7  center console of the vehicle which I took as part of the

8  warrant.  The first one is a UPS Store receipt that was dated

9  for that same day.  Looks like something was shipped and

10 there's a tracking number.  And then the second item is a

11 receipt from Community First Bank.

12 Q.   And is that marked 124.1 or 124.1A?

13 A.   124.1A --

14 Q.   Okay.

15 A.   -- has the UPS receipt and half of the Community First

16 receipt.

17 Q.   And that's a photograph?

18 A.   Yes.  It's a photograph I took.

19 Q.   Okay.  Do you also have 124.1?  It should be a physical --

20 A.   Sorry, yes, 124.1.

21 Q.   So what's in 124.1?

22 A.   This is an envelope stating that it's a UPS receipt with a

23 tracking number with my date -- or my signature and a date of

24 3/2.

25 Q.   And is that something that you seized from Mr. Ervin's

1 vehicle on March 2nd?

2 A.    It is.

3 Q.    And if you could look at 124.2.  That should be a physical

4 exhibit.

5 A.    Okay.

6 Q.    What is that?

7 A.    This is $3,700 in U.S. currency that I seized from the

8 vehicle.

9 Q.    And 124.3?

10 A.    This is a receipt for Community First Bank dated 3/1.

11 Q.    And is that the actual physical receipt?

12 A.    It is.

13 Q.    And is that something you seized from the Honda?

14 A.    It is.

15 Q.    And 124.3A, please?

16 A.    124.3A?

17 Q.    Yes.

18 A.    This is a photograph of the Community First receipt that I

19 took the day of the search warrant.

20         MS. TAYLOR:  Your Honor, at this time I would move

21 for admission of all of the 124 series exhibits.

22         MR. KING:  Without objection, Your Honor.

23         MR. LAROSIERE:  Without objection, Your Honor.

24         THE COURT:  So 124, 124.1, point 1A, point 2, point

25 3, and point 3A are admitted.

1          (Government's Exhibits 124, 124.1, 124.1A, 124.2, 124.3,

2    and 124.3 admitted in evidence.)

3    BY MS. TAYLOR:

4    Q.    Special Agent Powley, you testified that -- that you

5    encountered Mr. Ervin at that piece of property, correct?

6    A.    Yes.

7    Q.    And it was a face-to-face encounter?

8    A.    Yes.

9    Q.    And did you have at least some limited interactions with

10   him at that time?

11   A.    Yeah.  The only interaction -- well, I had no interaction

12   with him prior to that.  The only way I knew him was a

13   photograph from the -- that morning's briefing to know what he

14   looked like.

15   Q.    Okay.  But on the day that you executed this search

16   warrant, on March 2nd, 2021, you had face-to-face contact with

17   him then?

18   A.    I did, yes.

19   Q.    And are you able to identify Mr. Ervin in the courtroom?

20   A.    I am.

21   Q.    Could you please describe who he is.

22   A.    He's the individual on the far right with the blue jacket,

23   blue suit -- or blue tie -- or blue shirt, tie, short hair.

24   Q.    And was he raising his finger a moment ago?

25   A.    He was.

1          MS. TAYLOR:  I'd ask for the record to reflect that

2    Agent Powley has identified Mr. Ervin.

3          MR. KING:  We'd stipulate.

4          THE COURT:  The record will so reflect.

5          MS. TAYLOR:  Could we have 124 on the screen.

6    BY MS. TAYLOR:

7    Q.   Is this a picture of the vehicle that you searched?

8    A.   It is.

9    Q.   And is it a Honda SUV?

10   A.   It is.

11   Q.   Silver in color?

12   A.   It is.

13          MS. TAYLOR:  Could we have 124.1A.

14   BY MS. TAYLOR:

15   Q.   All right.  We're zooming in on the receipt to the

16   left-hand side.  That's a UPS Store receipt?

17   A.   It is.

18   Q.   And when is it dated?

19   A.   It's dated 3/2/21, the same day we did the warrant.

20   Q.   And it indicates a shipment was sent?

21   A.   Yes.  It appears so.  There's a receipt for 12.78, it says

22   Ground Residential and then gives a tracking number.

23          MS. TAYLOR:  And could we have 124.3A.

24   BY MS. TAYLOR:

25   Q.   And this is the other receipt from Community First Credit

1  Union?

2  A.   It is.

3  Q.   And who was the accountholder that this receipt is for?

4  A.   The receipt says it's Kristopher Ervin and it's dated

5  3/1/21.

6  Q.   And does it indicate -- what kind of transaction does it

7  indicate?

8  A.   It appears to be a cash withdrawal of $3,000.

9  Q.   And this was the day before you searched that vehicle?

10  A.   Yes.

11  Q.   And Exhibit 124.2, is -- that's cash in an envelope?

12  A.   It is.

13  Q.   And that's the actual cash that you seized from the

14  vehicle?

15  A.   It is.

16  Q.   If you could hold it up -- hold up the exhibit and just

17  show it to the jury, please.

18  A.   (Complies.)

19  Q.   Do you know what the amount of cash is that is in that

20  envelope in total?

21  A.   $3,700.

22       MS. TAYLOR:   I have no other questions for Special

23  Agent -- sorry.  Oh, I apologize, one more.

24  BY MS. TAYLOR:

25  Q.   You still have Exhibit 49 in front of you, correct?

1    A.    I do.

2    Q.    What is Exhibit 49?

3    A.    Exhibit 49 is a cell phone that was on the front passenger

4    seat of Mr. Ervin's car, which we determined was his cell phone

5    and we seized as part of the warrant.

6    Q.    And you didn't search inside of that cell phone

7    personally?

8    A.    No.

9    Q.    But did you put it into evidence?

10   A.    I did.

11            MS. TAYLOR:  Move for admission of 49, Your Honor.

12            MR. KING:  Without objection, Your Honor.

13            MR. LAROSIERE:  Without objection, Your Honor.

14            THE COURT:  49 is admitted.

15       (Government's Exhibit 49 admitted in evidence.)

16   BY MS. TAYLOR:

17   Q.    What kind of cell phone is it?

18   A.    I wrote on here "possibly a Samsung."  It was hard to

19   determine what brand it was.  It's in a case.  So I could just

20   tell that it wasn't an iPhone, it wasn't certain brands.

21            MS. TAYLOR:  Okay.  Now I have no further questions

22   for Special Agent Powley.

23            THE COURT:  All right.  Mr. Larosiere.

24            MR. LAROSIERE:  Yes, Your Honor.

25                           CROSS-EXAMINATION

1  BY MR. LAROSIERE:

2  Q.   Hello, Special Agent Powley.  Thank you for your time

3  today.  Give me just one moment.

4       So you indicated you received information telling you

5  Mr. Ervin was out on this property?

6  A.   We did.

7  Q.   Okay.  How did you find out where that was?

8  A.   Honestly, I don't recall exactly.  Not being the case

9  agent, I'm not sure if he was caught on a license plate reader

10  or that his bank account was being monitored.  But somehow the

11  case agent received information and passed it along that

12  Mr. Ervin was at this bank in Lake City, and that's when some

13  of the deputies in Lake City that we use -- or work with were

14  called and asked about this to confirm he was there.

15  Q.   Okay.  And so in this -- what is it, a Honda CRV?

16  A.   Yes.

17  Q.   And this -- you searched that vehicle, correct?

18  A.   Yes, I did.

19  Q.   And this was part of Operation Lightning Strike?

20  A.   I believe that's the name of the case, yes.

21  Q.   Okay.  You recovered $3,700, correct?

22  A.   Correct.

23  Q.   Is that standard procedure, to take all the money you find

24  out of the vehicle?

25  A.   The warrant listed to take all money that was possible

1    proceeds, so yes, we took the money.

2    Q.    Okay.  Do you remember generating a report on March 2nd,

3    2021?  This would be ROI-12.

4    A.    I -- yes, I generated several reports -- two reports that

5    I recall in this case.

6    Q.    Do you recall saying that you took a piece of metal from

7    the car?

8    A.    Yes, I did.

9             MR. LAROSIERE:  Okay.  Thank you so much for your

10   time.  That's all I have for you.

11            THE COURT:  Mr. King.

12            MR. KING:  Thank you, Your Honor.

13            May it please the Court.

14            THE COURT:  Go ahead.

15                         CROSS-EXAMINATION

16   BY MR. KING:

17   Q.    Special Agent Powley, one of your primary job

18   responsibilities is firearms-related investigations?

19   A.    It is.

20   Q.    And that's probably the bulk of your work?

21   A.    It is.

22   Q.    And how many auto key cards have you recovered during the

23   course of this case?

24   A.    Myself, none.

25   Q.    And of the 1,300 that may have gone out, what steps have

1  you taken to get any of these devices back?

2  A.   I haven't taken any.

3  Q.   And of all the people that may have possessed one, have

4  you, outside of Mr. Ervin, arrested any of them?

5  A.   No.

6         MR. KING:  Your Honor, I have no further questions.

7  Thank you.

8         THE COURT:  Ms. Taylor.

9               REDIRECT EXAMINATION

10 BY MS. TAYLOR:

11 Q.   Special Agent Powley, with regard to the question of

12 whether it's standard procedure to take all of somebody's

13 money, in this case you were not the agent who wrote the search

14 warrant, correct?

15 A.   No, I was not.

16 Q.   You've written search warrants before, correct?

17 A.   I have.

18 Q.   And when you write a search warrant, you have to write out

19 a list of things that you want to seize as evidence or

20 otherwise that could be contraband or proceeds of the crime

21 you're investigating?

22 A.   Yes, that's part of the -- one of the requirements of the

23 warrant, to specify exactly what you intend to seize.

24 Q.   And those basically are the three categories of kinds of

25 things that you can ask a judge to authorize you to seize?

1    A.    Yes.

2    Q.    And in this case -- and you don't just get whatever you

3    ask for, right?

4    A.    No.

5    Q.    A judge has to review your warrant?

6    A.    Yes.

7    Q.    And they have to determine that there's probable cause to

8    take every single thing that you say you want to take?

9    A.    Yes.

10   Q.    And if the judge says, "No, you can't take this," do you

11   take it anyway?

12   A.    No.

13   Q.    Okay.  So in this case, the warrant that you received

14   indicated that the judge who read the affidavit and signed the

15   warrant had authorized for the cash to be seized for some

16   reason, correct?

17   A.    Yes.

18   Q.    Okay.  And so it had to have been seized either because it

19   was proceeds --

20         MR. KING:  Your Honor, can we approach sidebar?

21         THE COURT:  You may.

22      (Proceedings at sidebar:)

23         THE COURT:  Yes, Mr. King.

24         MR. KING:  Your Honor, we'd object that this is

25   getting into putting the imprimatur of the Court in signing off

1    onto the actions of law enforcement.

2         And I understand that to some extent Mr. Larosiere

3    opened the door by his question, but -- which is why I didn't

4    object at first, but it's starting to get very detailed into,

5    you know, the Court essentially signing off and putting the

6    imprimatur of the Court on the action of law enforcement.  And

7    to that extent it's an imprimatur argument.

8         THE COURT:  Ms. Taylor, you've established that he

9    had authority to seize the money.  Do we need to go further

10   into this?

11        MS. TAYLOR:  No, Your Honor.  I just wanted to refute

12   the suggestion that law enforcement just goes and takes

13   people's stuff because they feel like it.

14        THE COURT:  I think you've covered that.

15        MS. TAYLOR:  Yes, Your Honor.

16        MR. LAROSIERE:  And to be fair, the simple suggestion

17   I was making is that there was not a tremendous amount of

18   relation between the acts and the money.  But I understand why

19   you would take it that way.

20        MS. TAYLOR:  We think there is a tremendous amount of

21   relationship.

22        MR. LAROSIERE:  I believe you --

23        THE COURT:  All right, all right.

24        MR. KING:  Thank you, Your Honor.

25        MR. LAROSIERE:  Thank you, Your Honor.

1           (Proceedings in open court:)

2    BY MS. TAYLOR:

3    Q.    And Special Agent Powley, you were also asked whether you

4    had seized a piece of what you described in your report as a

5    piece of metal?

6    A.    Yes, I did.

7    Q.    Do you recall exactly what that piece of metal was?

8    A.    Yes.  It was a piece of metal, maybe a little bit bigger

9    than a credit card size.  It had something cut out.  And I know

10   from the briefing in the case that was the type of material

11   that the auto key cards were being sold under or used.

12   Q.    Okay.  That piece of metal that you seized from the car,

13   did it have any lightning links on it?

14   A.    It did not.

15   Q.    Okay.  So it wasn't an auto key card?

16   A.    No.

17   Q.    Again, this case isn't your case, right?

18   A.    No, it's not.

19   Q.    So you were just there to assist with the search warrant?

20   A.    I was.

21   Q.    You don't have responsibility for any follow-up

22   investigation?

23   A.    I do not.

24              MS. TAYLOR:  No further questions, Your Honor.

25              THE COURT:  Anything further, gentlemen?

1          MR. LAROSIERE:  No, thank you.  Your Honor.

2          MR. KING:  No, thank you.  Your Honor.

3          Thank you, Agent Powley.

4          THE COURT:  You may step down.

5          Who's your next witness?

6          MS. TAYLOR:  Your Honor, the United States would call

7   Mr. Medlin from ATF.

8       (Witness exits the courtroom.)

9       (Witness enters the courtroom.)

10         THE COURT:  Sir, if you'll come all the way up here

11  to the witness stand.

12         COURTROOM DEPUTY:  Please raise your right hand for

13  me.  Do you solemnly swear that the testimony you're about to

14  give before this Court will be the truth, the whole truth, and

15  nothing but the truth, so help you God?

16         THE WITNESS:  Do.

17         COURTROOM DEPUTY:  You may have a seat.  If you could

18  please state your name for the record and spell your last name.

19         THE WITNESS:  Sure.  Michael Medlin, M-e-d-l-i-n.

20     **SPECIAL AGENT MICHAEL MEDLIN, GOVERNMENT WITNESS, SWORN,**

21                     DIRECT EXAMINATION

22  BY MS. TAYLOR:

23  Q.   Mr. Medlin, what -- where do you work?

24  A.   I'm a Special Agent, Digital Forensic Examiner, and I'm

25  stationed in Nashville, Tennessee.

1    Q.    And who's your employer?

2    A.    ATF.

3    Q.    How long have you been a Digital Forensic Examiner?

4    A.    15 years.

5    Q.    And how long have you been a Special Agent?

6    A.    19 years.

7    Q.    And what training did you have to undergo to become a

8    Special Agent for ATF?

9    A.    We have different certifications that we have to maintain.

10   I'm a Certified Computer Examiner.  That's about a year-long

11   program.  I'm a Cellebrite Physical Analyst and Logical

12   Operator.  That course takes a couple weeks.  We have to

13   maintain other certifications, like a Magnet Forensic Examiner,

14   A-plus Certifications.  It's lots of different certifications.

15   Takes about two years to go through our program.

16   Q.    And as part of your duties as a Digital Forensic Examiner,

17   do you sometimes assist other agents with essentially

18   downloading computers and phones and things like that?

19   A.    Yes, ma'am.

20   Q.    And in this case, was that what your role was, in the case

21   related to Mr. Ervin?

22   A.    Yes, ma'am.

23   Q.    Do you know who Mr. Ervin is outside of your --

24   A.    No.

25   Q.    -- downloading his phone?

1    A.    No, ma'am.

2    Q.    Okay.  Do you know who Mr. Hoover is?

3    A.    The agent?

4    Q.    Hoover, with a V.

5    A.    Oh, I'm sorry.  No, ma'am.

6    Q.    Did you perform any downloads of any devices that

7    pertained to or had been possessed by Mr. Hoover, or only

8    Mr. Ervin?

9    A.    I'd have to refer to my report, but I'm -- I do a couple

10   hundred cases a year for agents all over the country, so I

11   typically don't even know the defendants's names or what the

12   crimes are.  I just download the data and provide the data to

13   the field agent.  So I don't know which device belonged to

14   which person.

15   Q.    Okay.  And Special Agent Medlin, is Exhibit 49 still up on

16   the witness stand?

17   A.    I don't see anything.

18           THE COURT:  I don't think so.

19   BY MS. TAYLOR:

20   Q.    All right.  I think that the courtroom deputy is handing

21   it to you.

22   A.    Okay.  Thank you.

23           MS. TAYLOR:  And, Your Honor, may I also approach

24   with Exhibits 49A through Q?

25           THE COURT:  Yes.

1        THE WITNESS:  Thank you.

2   BY MS. TAYLOR:

3   Q.   Mr. Medlin, Number 49's already in evidence.  Do you need

4   to cut it open in order to be able to say whether it's a phone

5   you downloaded?

6   A.   No, it's a phone I attempted to download.

7   Q.   Okay.  Why do you say you attempted to download it?

8   A.   So when we get a mobile device, we -- we're trained to

9   extract the SIM card data first, and then if there's a micro SD

10  card inside the phone we do that next, and then we do the

11  device itself, the phone itself, last.

12       So I did the SIM card, no problems.  I downloaded the

13  micro SD card that was in the phone and there was no problems

14  with that.  But when I tried to extract the data from the phone

15  itself, it started wiping itself.  It started resetting.

16       MR. KING:  Your Honor, I apologize, can we approach

17  sidebar?

18       THE COURT:  You may.

19     (Proceedings at sidebar:)

20       THE COURT:  Yes, Mr. King.

21       MR. KING:  Your Honor, I believe this is expert

22  testimony, and he was not provided as part of the Rule 16

23  disclosure.  You know, I -- this is beyond, "I opened up the

24  phone, scrolled through it."  This is, "I'm a two-year

25  program-trained forensic expert and these are the steps I took

1    to conduct expert forensics on these electronic devices."

2           And he was not Rule-16 disclosed.  We would move to

3    exclude him.

4           MS. TAYLOR:  Your Honor, his testimony is not going

5    to be concerning, you know, doing any sort of analysis of the

6    phone beyond the fact that he got it, he downloaded the

7    contents of the SD card, and then identifying whether those

8    documents are documents that came off of the SD card.  I do not

9    view that as expert testimony.

10          But we also did provide Mr. Medlin's report as well

11   as his CV.  I think I just provided it yesterday, but counsel

12   does have his CV.

13          Given the -- I don't think it's expert testimony in

14   this case.  He's just saying what he did to get the photos off

15   the phone.  We could strike his testimony about any specialized

16   training and ask the jury to disregard it.

17          MR. KING:  Your Honor, if I could raise one other

18   issue.

19          THE COURT:  Sure.

20          MR. KING:  As I'm -- you know, we had Bates numbers,

21   but now as I'm looking through the description that should

22   be -- in the Court's exhibit list, it also says "deleted" in

23   there, which -- and again, I haven't talked to this witness.

24   I'm believing --

25          COURT REPORTER:  I can't hear you.

1           MR. KING:  Let me repeat that, Your Honor.

2           So looking at the Court's exhibit list, you know, as

3    we have it now, there seems to be the word "deleted" after a

4    lot of files he recovered.  I don't know exactly what his

5    testimony would be, but I have concerns that this isn't, "I

6    opened a phone, scrolled through it, and opened up his photos

7    and this is what I saw."  These are recovered photos using

8    forensic, you know, software, whatever forensic parts he went

9    through to recover deleted files, which is -- I would think

10   would clearly be expert testimony.  And I just don't know that

11   that's going to be his testimony, but I do have that concern

12   based on how the name of the file is described in the Court's

13   exhibit list, which, again, on the Bates numbers is not

14   something we can see when it's provided.

15          THE COURT:  Ms. Taylor.

16          MS. TAYLOR:  Well, they were listed that way on our

17   exhibit list with the Bates numbers from the outset.  The names

18   of the photos are exactly the same as they were when I produced

19   them I think over a year ago.  We could change the names and

20   just list them as like "Video 1, 2, 3."

21          THE COURT:  Well, the jury is not going to get the

22   exhibit list, so I'm not sure what the issue with -- I'm not --

23   your issue isn't with the titles of the exhibits, your issue is

24   your belief that he had to use some sort of expertise to

25   extract them?

1        MR. KING:  I don't know for a fact one way or

2   another, but that is my concern based on the title of the

3   documents.

4        THE COURT:  Excuse me.  Mr. King, I'm -- so your

5   premise is that because it took specialized training for him to

6   extract these things, that that makes him an expert witness,

7   even though he's just testified factually about what he did and

8   what he recovered?

9        MR. KING:  That it would be subject to Rule 16

10  because he's using his expertise to go through a non-common --

11  through a way that a layperson would not be able to testify

12  about techniques that he used to get information out of a phone

13  that a lay witness would not be able to get out of a phone.

14       MS. TAYLOR:  Your Honor, I think, frankly, any ATF

15  agent could plug a phone in to Cellebrite and hit "download."

16  It's not that complex of a process.

17      (Pause in proceedings.)

18       THE COURT:  Mr. King, I don't think this is expert

19  opinion testimony.  I think he's testifying factually about

20  what he retrieved from a phone.  The fact that it takes

21  expertise to do it I don't think renders it expert testimony.

22  So I'm going to overrule that objection.

23       MR. KING:  Thank you, Your Honor.

24      (Proceedings in open court:)

25  BY MS. TAYLOR:

1    Q.    Special Agent Medlin, could you describe what happened

2    when you plugged the actual physical phone in to try and

3    download it?

4    A.    So we use a program primarily called Cellebrite.  And it's

5    probably the most widely used third-party vendor in law

6    enforcement to download phones.  And so when you use

7    Cellebrite, it gives you a set of steps for each particular

8    device in order to extract it.  Some of them it's as simple as

9    just plugging it in and hitting "start," and some of them

10   they're a lot more complicated, where you have to hold certain

11   buttons down and put the phone into special modes and things

12   like that.

13           So I was following the directions from Cellebrite to

14   extract the phone, and then suddenly the phone just started

15   wiping, which it just erases all the data.  And I couldn't stop

16   it.  I couldn't turn the phone off.  And it was all wiped.  It

17   was gone.  So I was only able to get data from the SIM card and

18   from the micro SD card.

19   Q.    Have you ever had that happen before?

20   A.    No, ma'am.

21   Q.    With regard to the SIM card -- well, let's talk about the

22   micro SD card.  Did you find any photos or videos stored on the

23   micro SD card?

24   A.    Yes, ma'am.

25   Q.    And that's part of Exhibit 49, the micro SD card?

1   A.   Yes, ma'am, it should be.

2   Q.   Because it was -- it was stored in that phone that was

3   Exhibit 49?

4   A.   Yes, ma'am.

5   Q.   If you could please look at Exhibits 49A through Q.  And

6   let's start with the first four:  A, B, C, and D.  If you could

7   say what those are and how you're able to recognize them.

8   A.   So 49A through D, as I recall, are all videos from the

9   micro SD card.

10  Q.   And how do you -- and those actual exhibits that you're

11  holding right now are disks, right?

12  A.   Yes, ma'am.

13  Q.   How are you able to determine that that's what's on that

14  disk?

15  A.   I reviewed the videos on these disks and verified that

16  they were the same videos from the micro SD card.

17  Q.   And how do you know that that's the same disk that you

18  looked at?

19  A.   I initialed them with my initials.

20  Q.   So those four disks, A, B, C, and D, each have your

21  initials on them?

22  A.   Yes, ma'am.

23  Q.   Okay.  If you could please look at the -- the remainder of

24  those sub exhibits are printouts, correct?

25  A.   Yes, ma'am.

1    Q.    Could you look through those and tell us what they are.

2    A.    They're pictures from the micro SD card.

3    Q.    And you verified that those are pictures that came from

4    the micro SD card stored in Exhibit 49?

5    A.    Yes, ma'am.

6          MS. TAYLOR:  Your Honor, at this time I would move

7    for admission of Exhibits 49A through Q.

8          MR. KING:  Without objection, Your Honor.

9          MR. LAROSIERE:  Without objection, Your Honor.

10         THE COURT:  49A through Q are admitted.

11      (Government's Exhibits 49A-49Q admitted in evidence.)

12         MS. TAYLOR:  Your Honor, I have no other questions

13   for Mr. Medlin -- Special Agent Medlin.

14         MR. KING:  Your Honor, I have no questions for the

15   Special Agent.

16         Thank you, sir.

17         THE COURT:  All right.

18         MR. LAROSIERE:  No questions, sir.  Thank you.

19         THE COURT:  All right, sir.  You may step down.

20         THE WITNESS:  Thank you.  Do I leave these here?

21         THE COURT:  Yes, sir.

22         Who's next, Ms. Taylor?

23         MS. TAYLOR:  I'll call Postal Inspector Richard

24   Batchelder.

25      (Witness exits the courtroom.)

1      (Witness enters the courtroom.)

2           THE COURT:  Sir, if you'll come all the way up here.

3  And remain standing to be sworn, please.

4           COURTROOM DEPUTY:  Please raise your right hand.  Do

5  you solemnly swear that the testimony you're about to give

6  before this Court will be the truth, the whole truth, and

7  nothing but the truth, so help you God?

8           THE WITNESS:  I do.

9           COURTROOM DEPUTY:  You may have a seat.  And if you

10  could please state your name for the record and spell your last

11  name.

12           THE WITNESS:  Name is Richard Batchelder, that's

13  B-a-t-c-h-e-l-d-e-r.

14  **POSTAL INSPECTOR RICHARD BATCHELDER, GOVERNMENT WITNESS, SWORN,**

15                      DIRECT EXAMINATION

16  BY MS. TAYLOR:

17  Q.    Inspector Batchelder, where do you work?

18  A.    I'm currently employed by the United States Postal

19  Inspection Service, Jacksonville Domicile.

20  Q.    And what's your current role?

21  A.    I currently work on miscellaneous teams:  violent crimes,

22  narcotics, and suspicious mail investigations.

23  Q.    Right.  And are you a Postal Inspector?

24  A.    Yes, ma'am.

25  Q.    And how long have you been a Postal Inspector?

1    A.    17 years.

2    Q.    How did you -- did you at some point come to be involved

3    in an investigation of Kristopher Justinboyer Ervin?

4    A.    I did, yes, ma'am.

5    Q.    And how did that come about?

6    A.    There was -- my partner, Inspector Keith Hannon, was

7    working with the ATF.  We did a surveillance on the subject.

8    Inspector Hannon gave us some direction of when the subject was

9    leaving his residence.  We were stationed at the Ridgewood Post

10   Office in Orange Park.  And the subject came to that Ridgewood

11   Post Office in a silver CRV and got out of his vehicle with a

12   parcel, dropped off that parcel, and then left the post office.

13   Q.    And was this surveillance on February 22nd of 2021?

14   A.    It was, yes, ma'am.

15   Q.    And where were you posted during the surveillance?

16   A.    I was posted right outside the Ridgewood Post Office

17   parked in a vehicle in the parking lot.

18   Q.    And at some point did you observe someone who you believed

19   to be Mr. Ervin enter the post office?

20   A.    I did, yes, ma'am.

21   Q.    And what -- did you wait for Mr. Ervin to leave the post

22   office?

23   A.    That's correct, yes, ma'am.  I observed him walking into

24   the post office holding a box.  And when he left a few moments

25   later he was not carrying that box that he had when he entered.

1   Q.   And then what did you do after you saw him leave without

2   the box?

3   A.   Once he left without the box he got back into his vehicle.

4   He left the parking lot.  And then I proceeded to go inside the

5   post office.  I secured the box that was dropped off by the

6   subject and then called Inspector Hannon over, and that's when

7   we reviewed some video and we took possession of the box.

8         MS. TAYLOR:  Ms. Ganoe, could you pull up Exhibit 28,

9   please, and attempt to advance it to 11:23.

10   (Video played.)

11  BY MS. TAYLOR:

12  Q.   And do you recognize -- Inspector Batchelder, do you

13  recognize the location that's depicted in this video?

14  A.   Yes, ma'am.

15  Q.   And what post office is that?

16  A.   It's going to be the Ridgewood Post Office off College

17  Drive.

18  Q.   In this part of the video, it's at 11:23 and 30 seconds,

19  do you see the man that you had seen enter the post office with

20  the box in this part of the video?

21  A.   Yes, ma'am.  He's just dropping off something at the

22  retail counter right now.

23  Q.   And now it's 11:23 and 45 seconds.  What is he doing?

24  A.   He's exiting.

25        MS. TAYLOR:  And let's leave the video running,

1    Ms. Ganoe.

2    BY MS. TAYLOR:

3    Q.    And if you see yourself in the video, please let us know.

4    A.    I entered right there at 11:24 and 20 seconds.

5    Q.    Are you the man wearing the black shirt and gray pants?

6    A.    Black shirt, gray pants, yes, ma'am.

7    Q.    And where are you going right now?  Are you visible in the

8    lower right-hand part of the video?

9    A.    I'm visible in the lower right and in the lower left.

10   I've approached a retail counter.

11   Q.    And at this point in the video what are you attempting to

12   do?

13   A.    Attempting to secure the box that was dropped off.

14   Q.    And did you secure that box?

15   A.    Yes, ma'am.

16   Q.    And did that -- what did that box contain?

17   A.    Contained numerous, I don't know the exact number off the

18   top of my head, of multiple mailings, white in color.

19              MS. TAYLOR:  We can pause the video now.

20        (Video stopped.)

21   BY MS. TAYLOR:

22   Q.    Did you -- and you said that you worked with Inspector

23   Hannon that day?

24   A.    Yes, ma'am.

25   Q.    And did Inspector Hannon thereafter handle the mailings?

1    A.   That's correct, yes, ma'am.

2    Q.   So you -- you tendered them to him at some point?

3    A.   Yes, ma'am.

4    Q.   Would you be able to -- have you ever seen Mr. Ervin

5    face-to-face?

6    A.   No, ma'am.

7    Q.   You did observe him on surveillance, correct?

8    A.   Correct.

9    Q.   Did you review any -- any available documents that would

10   show what he looked like prior to this surveillance so you'd be

11   able to recognize him?

12   A.   Yes, ma'am.  I used the driver's license photo, and plus

13   going by the description of him that Inspector Hannon had given

14   us and what he was wearing that day.

15   Q.   Are you able to recognize Mr. Ervin in the courtroom

16   today?

17   A.   Yes, ma'am.

18   Q.   And could describe him?

19   A.   Be the gentleman wearing the blue shirt and -- is that

20   polka dots?  And a blue suit.

21        MS. TAYLOR:  I would ask for the record to reflect

22   that Inspector Batchelder identified Mr. Ervin.

23        MR. KING:  We'll stipulate to that, Your Honor.

24        THE COURT:  The record will so reflect.

25   BY MS. TAYLOR:

1   Q.   During your surveillance did you observe anyone who
2   appeared to be assisting Mr. Ervin?
3   A.   No, ma'am.
4   Q.   Did you observe anyone who appeared to be with Mr. Ervin?
5   A.   No, ma'am.
6   Q.   Did you receive information on another day about parcels
7   that might be related to Inspector Hannon's investigation of
8   Mr. Ervin?
9   A.   I did.  Just, I believe it was, a day after, possibly two
10  days after, I received a phone call from the manager of the
11  Ridgewood Post Office, who let me know that there was a very
12  similar box containing the same similar envelopes as was --
13  that we intercepted, you know, a few days prior.
14  Q.   And did you secure those packages or did someone else?
15  A.   I relayed that information to Inspector Hannon.  Inspector
16  Hannon then drove to the Ridgewood Post Office and secured
17  those, that package.
18          MS. TAYLOR:  I have no further questions for
19  Inspector Batchelder.
20          THE COURT:  Any questions?
21          MR. KING:  Very briefly, Your Honor.
22                      CROSS-EXAMINATION
23  BY MR. KING:
24  Q.   Postal Inspector Batchelder, good afternoon.
25  A.   How you doing, sir?

1   Q.   I just want to make sure I understand.  So you were part

2   of the surveillance team on February 22nd?

3   A.   Yes, sir.

4   Q.   Big group of all sorts of law enforcement agents?

5   A.   Yes, sir.  There was -- I was with myself and another

6   inspector who was in the vehicle.  That would be Inspector

7   Martin.

8   Q.   Okay.  And there were other law enforcement agents as

9   well?

10  A.   No, no, sir, not that I recall.

11  Q.   And so my understanding of your testimony is you saw

12  Mr. Ervin mail some stuff or put some stuff in the mail, and

13  you took it and then gave it to Inspector Hannon?

14  A.   Yes, sir.

15          MR. KING:  Your Honor, I have no further questions.

16          MR. LAROSIERE:  Nothing for this witness, Your Honor.

17          THE COURT:  Anything else, Ms. Taylor?

18          MS. TAYLOR:  No redirect, Your Honor.

19          THE COURT:  You may step down, sir.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  Who would be your next witness,

22  Ms. Taylor?

23          MS. TAYLOR:  Our next witness would be Postal

24  Inspector Chris Martin, who will be about the same length of

25  testimony as Batchelder, Your Honor.

1          THE COURT:  Then let's go ahead with that before
2    lunch.
3          (Witness exits the room.)
4          (Witness enters the courtroom.)
5          COURTROOM DEPUTY:  Come right up to the witness
6    stand, please.  If you could please raise your right hand.  Do
7    you solemnly swear that the testimony you're about to give
8    before this Court will be the truth, the whole truth, and
9    nothing but the truth, so help you God?
10          THE WITNESS:  I do.
11          COURTROOM DEPUTY:  You may have a seat.
12          THE WITNESS:  Thank you.
13          COURTROOM DEPUTY:  And if you could please state your
14    full name for the record and spell your last name.
15          THE WITNESS:  My name is Christopher Martin,
16    M-a-r-t-i-n.
17    **POSTAL INSPECTOR CHRISTOPHER MARTIN, GOVERNMENT WITNESS, SWORN,**
18                         DIRECT EXAMINATION
19    BY MS. TAYLOR:
20    Q.    Inspector Martin, where are you employed?
21    A.    I'm employed with the United States Postal Inspection
22    Service out of the Miami Division, Jacksonville Domicile.
23    Q.    And are you a Postal Inspector?
24    A.    Yes, I am.
25    Q.    What kinds of things do you do as a Postal Inspector?

1    A.    My job primarily -- I work a miscellaneous assignment,

2    which entails working various cases involving drugs, narcotics

3    through the mail, workplace violence, mail theft, mail fraud.

4    Q.    And how long have you been a Postal Inspector?

5    A.    I will have 20 years in as of April 19th.

6    Q.    Are you looking forward to that day?

7    A.    I am looking forward to that day.

8    Q.    How did you become involved in the investigation of

9    Mr. Ervin?

10   A.    One of the inspectors in our office, Inspector Keith

11   Hannon, was working the case and asked if I could help in

12   facilitating some surveillance with the case.

13   Q.    And did you participate in surveillance?

14   A.    Yes, I did.

15   Q.    Was that on February 22nd, 2021?

16   A.    Yes.

17   Q.    And what was your position during the surveillance?

18   A.    I was posted at the Ridgewood Post Office, looking for an

19   individual that could be possibly mailing some packages that

20   Keith thought were suspect -- suspicious packages.

21   Q.    And when you say "Keith," are you --

22   A.    I'm sorry, Inspector Hannon.

23   Q.    And were you inside or outside the post office?

24   A.    I was outside the post office in my work vehicle.

25   Q.    And did you observe anything pertinent to Inspector

1  Hannon's investigation?

2  A.    I did.

3  Q.    And what was that?

4  A.    On that day I observed a -- based on the operations plan,

5  I observed a vehicle that was suspected to be showing up there.

6  It came to the post office, and the individual that had been

7  identified exited the vehicle and entered the post office.

8  Q.    How were you able to identify that that was the person who

9  you were surveilling?

10  A.    We had information that the suspected individual drove

11  a -- I believe a Honda C- -- CRV, silver in color, and we had a

12  picture of the individual prior to the surveillance.

13  Q.    Were you able -- from your position, were you able to see

14  this individual, whether he was carrying anything?

15  A.    Yes.  When the individual exited the vehicle he was

16  carrying a box, a brown box that had, it looked like, various

17  mailings in it.

18  Q.    Were the mailings poking out of the top of the box?

19  A.    They were.

20  Q.    Approximately how many mailings did you believe were in

21  the box?

22  A.    I believe I reported to Keith 20 to 30.

23  Q.    And were they a particular color?

24  A.    Yeah, I believe they were white.

25  Q.    Did you do anything in terms of securing those packages?

1  A.   I did not.  After the individual entered the post office,

2  a person that was with me, Inspector Richard Batchelder, was

3  sent in to retrieve those parcels.

4  Q.   Did you observe Inspector Batchelder do that?

5  A.   I observed Inspector Batchelder enter the post office.  I

6  remained outside, keeping surveillance on the vehicle and the

7  individual as he left.

8         MS. TAYLOR:  I have no further questions for

9  Inspector Martin.

10        THE COURT:  Mr. King?

11        MR. KING:  No, Your Honor, nothing.

12        THE COURT:  Mr. Larosiere?

13        MR. LAROSIERE:  No, Your Honor.

14        THE COURT:  You may step down, sir.

15        THE WITNESS:  Thank you very much.

16        THE COURT:  Would this be a good time for our lunch

17  break, Ms. Taylor?

18        MS. TAYLOR:  Yes, Your Honor.

19     (Witness exits the courtroom.)

20        THE COURT:  Then, ladies and gentlemen, it's about

21  12:20.  We'll take an hour and ten minutes.

22        I'll ask you to continue to follow all of the

23  instructions that I've been giving you about your contacts and

24  your communications and not conducting research or forming or

25  expressing any opinions.

1          We'll see you back at about 1:30.

2          COURT SECURITY OFFICER:  All rise for the jury.

3     (Jury exits, 12:22 p.m.)

4          COURT SECURITY OFFICER:  Please be seated.

5          THE COURT:  Anything we need to address at this time,

6  Ms. Taylor?

7          MS. TAYLOR:  I don't believe so, Your Honor.

8          THE COURT:  Mr. King?

9          MR. KING:  No, Your Honor.

10          THE COURT:  Mr. Larosiere?

11          MR. LAROSIERE:  No, Your Honor.

12          THE COURT:  All right.  I'll see you back at 1:30.

13          COURT SECURITY OFFICER:  All rise.

14     (Lunch recess, 12:23 p.m. to 1:39 p.m.)

15     (All parties present.  Jury not present.)

16          COURT SECURITY OFFICER:  All rise.  This Honorable

17  Court is back in session.

18          Please be seated.

19          THE COURT:  Who's the next witness going to be?

20          MR. MESROBIAN:  It will be Andrea Useche from the

21  bank, Your Honor.

22          THE COURT:  Okay.  Let's have the jury, please.

23          COURT SECURITY OFFICER:  All rise for the jury.

24     (Jury enters, 1:42 p.m.)

25          COURT SECURITY OFFICER:  Please be seated.

1          THE COURT:  Mr. Mesrobian.

2          MR. MESROBIAN:  United States calls Andrea Useche.

3      (Witness enters the courtroom.)

4          THE COURT:  If you'll come right up here and remain

5   standing for just a moment.

6          THE WITNESS:  Yes, ma'am.

7          COURTROOM DEPUTY:  If you can please raise your right

8   hand.  Do you solemnly swear that the testimony you're about to

9   give before this Court will be the truth, the whole truth, and

10  nothing but the truth, so help you God?

11         THE WITNESS:  I do.

12         COURTROOM DEPUTY:  You may have a seat.

13         THE WITNESS:  Thank you.

14         COURTROOM DEPUTY:  And if you could please state your

15  name for the record and spell your last name.

16         THE WITNESS:  Andrea Useche, U-s-e-c-h-e.

17         **ANDREA USECHE**, **GOVERNMENT WITNESS**, **SWORN**,

18                    DIRECT EXAMINATION

19  BY MR. MESROBIAN:

20  Q.   Ma'am, where are you employed?

21  A.   Community First Credit Union.

22  Q.   And what is your position?

23  A.   I am a fraud investigator.

24  Q.   What office do you work out of?

25  A.   Oh, well, we have a headquarters, so I'm in the

1  headquarters.

2  Q.    And how long have you been a fraud investigator at

3  Community First?

4  A.    Just over three years.

5  Q.    And is Community First Credit Union also known as CFCU?

6  A.    Yes.

7  Q.    And is CFCU a federally insured credit union?

8  A.    Yes.

9  Q.    So Ms. Useche, where were you employed before CFCU?

10  A.    I was a fraud investigator for VyStar for about seven

11  months.

12  Q.    And prior to that were you in law enforcement?

13  A.    Yes, sir.

14  Q.    And could you tell the jury about your law enforcement

15  experience.

16  A.    I graduated the academy in 2003.  I worked for -- was

17  hired by the Lake City Police Department and I worked there

18  from 2003 until 2008, I believe.  I think it was '08 -- '07,

19  2007.  And then I left there and I went to the Columbia County

20  Sheriff's Office.  I didn't go too far, but I went from blue to

21  green.  And I was with the sheriff's office until 2019.

22  Q.    And what roles did you hold at the Columbia County

23  Sheriff's Office?

24  A.    I was in patrol.  I worked for about a little over --

25  about a year and a half in the courthouse, and then in 2012 I

1  became a detective.  That was what I set out to do, was become
2  a detective.
3  Q.    And what type of cases did you investigate as a detective?
4  A.    The first year was all cases.  Everything they gave me.
5  It was everything.  And then after that I decided to specialize
6  in fraud, so I sort of began working with fraud cases, and I
7  did that until I left.
8  Q.    Now, in your current role with CFCU, could you describe
9  your role and responsibilities as a fraud investigator?
10 A.    Sure.  What I do is I -- what I'm tasked with doing is I'm
11 protecting the credit union from financial loss and risk and I
12 also protect our members from financial loss and risk.  And
13 that's a balance that I do.
14         And I do that by looking at the transactions that
15 come in that might have been flagged by our system to look at
16 to do a manual review to see if there's fraud going on.
17         Also, we have members that call in and say, "Hey,
18 this check hit my account.  I didn't write it," and that begins
19 a fraud investigation.
20 Q.    And when law enforcement is seeking information relating
21 to one of their investigations, who at CFCU is usually the
22 point of contact?
23 A.    I am the law enforcement liaison because of my affiliation
24 with law enforcement.  So, yes, I am the one that -- I have all
25 contacts.  Everything would be funneled to me or through me

1    for -- to assist law enforcement.

2    Q.    And similarly, if -- in your role as a fraud investigator

3    or if someone else at CFCU detects something to be reported to

4    law enforcement, who handles that?

5    A.    That would be me, correct.  I would file -- I would look

6    at the case, and then if it needed to be filed with law

7    enforcement, I'm the one who would be filing.

8    Q.    Is there a team within your group at CFCU which is

9    responsible for potential Bank Secrecy Act violations?

10   A.    Yeah, we have a BSA team.  All financial institution are

11   required to have a BSA team, and we have one.

12   Q.    And what type of activities are covered or reviewed by

13   those investigators?

14   A.    So the BSA team is responsible for monitoring accounts for

15   any suspicious activity, such as money laundering or financial

16   terrorism.  That's what we look at, so . . .

17   Q.    And is that team also responsible for filing documents

18   with the government pursuant to the bank's obligations under

19   the BSA?

20   A.    Yes, sir, that's correct.

21   Q.    So I'd like to talk about a few of those types of

22   documents.

23          Are you familiar with something called a Currency

24   Transaction Report?

25   A.    Somewhat familiar, yes, sir.

1   Q.   And is that also known as a CTR?

2   A.   Yes, sir.

3   Q.   And are you aware, what is the CTR designed to report?

4   A.   If the transaction amount that is deposited or withdrawn,

5   or a combination, within a 24-hour period -- but it really

6   wouldn't be 24 hours because it would only be during business

7   hours -- but within that 24-hour period, if the combination is

8   over $10,000, then it has to be reported.

9   Q.   And that's a transaction in cash, correct?

10  A.   Correct.  That is correct.

11  Q.   Separately, are you familiar with something called a

12  Suspicious Activity Report?

13  A.   Yes, sir, I am.

14  Q.   And what is a Suspicious Activity Report?

15  A.   It's a report that our BSA team makes to FinCEN.  It's a

16  required report.  Anytime there's suspicious activity, we are

17  required to report that.

18  Q.   And is there a particular threshold for reporting

19  suspicious activity?

20  A.   There can be.  One instance where a report is required

21  would be is if the transactions that occur, fraudulent or

22  suspicious, is $5,000 or more and the person who is maybe the

23  suspicious actor is known -- in other words, their name, we

24  know who they are, they're able to be identified -- then that

25  report has to be made and that information has to be given.

1            If the actor is unknown then the threshold moves up

2    to 25,000.  So if it's $25,000 or more, then the report has to

3    be given over to FinCEN.

4    Q.    And FinCEN is a United States government organization?

5    A.    Yes, sir.

6    Q.    And to be clear, both the CTR, the Currency Transaction

7    Report, and the Suspicious Activity Report, the SAR, are both

8    legally required for banks to track and file?

9    A.    That's correct, yes, sir.

10   Q.    Separately, are you familiar with something called a

11   Suspicious Incident Report?

12   A.    Yes.

13   Q.    What is that?

14   A.    So a Suspicious Incident Report, or what we call a SIR,

15   would be generated by actually anybody within the credit union

16   who had a feeling that something untoward was going on or

17   suspicious activity.  And it could be anything.  It could be

18   the behavior of a member who forged, behavior of something

19   going on, it could be a physical problem with, you know,

20   "Somebody" -- "I think somebody maybe moved the camera."

21   Anything that is -- would, in your mind, create suspicion of a

22   potential problem can be reported as suspicious activity -- a

23   Suspicious Incident Report.

24            Those reports go to the BSA team.  The BSA team then

25   determines whether or not that rises to a level of a SAR, or a

1  Suspicious Activity Report, or if that report needs to go to

2  another department.

3  Q.   So that's -- the SIR is a way of people working in

4  branches, for example, to report something that could be

5  suspicious for the fraud team to look at?

6  A.   Correct.

7  Q.   Separately, does your team, the fraud investigation team,

8  and the BSA team use computer programs or algorithms to

9  evaluate activity in customer accounts?

10  A.   Correct, yes, we do.

11  Q.   And could you talk a little bit about that and what those

12  programs use for.

13  A.   Right.  So we use a system that is -- we purchased the

14  system, and it is a case management system where we keep all of

15  our cases.

16      But the other thing that it does is it looks at the

17  transactions and the patterns of your accounts, and it looks

18  for anything that is out of pattern, suspicious.  For example,

19  if you were to make a deposit that was well above what you

20  would normally do as a pattern, that computer program would

21  pick up on that and it would send an alert to our team for us

22  to manually review, to see:  Well, what's going on with that?

23      Again, that's a balance between the risk of the

24  credit union and the risk of our member being involved in fraud

25  or being victimized.

1   Q.    And to be clear, it could be both unusual deposits or

2   unusual withdrawals as a means of preventing loss to the

3   accountholder?

4   A.    That's correct.  I was just using deposits as an example,

5   but yes, sir.

6   Q.    Do you, as a fraud investigator, sometimes become involved

7   when a client attempts to close a bank account?

8   A.    Under certain circumstances, yes.

9   Q.    And what would those circumstances be?

10  A.    Well, if somebody comes in and they are wanting to make a

11  large withdrawal of most of their money or all of their money,

12  typically what happens is that they're not going to encounter

13  our department first, they're going to go to a branch.  And

14  then the branch personnel, staff, would ask them, "Okay, well,

15  what are the circumstances?"

16          And if there's anything that would trigger something,

17  a concern, such as -- I'll give you an example.  If an elderly

18  person came in with maybe a younger person and the elderly

19  person said, "I want to withdraw all of my money," and the

20  younger person with them was sort of guiding them and telling

21  them what to do, that would create a suspicion under which they

22  would call my department.

23  Q.    So Ms. Useche, through your work as a fraud investigator,

24  did you become aware of a CFCU accountholder named Kristopher

25  Justinboyer Ervin?

1  A.    Yes.

2  Q.    And was that in or around January 2021?

3  A.    That's correct.

4  Q.    Without going into what anyone may have said to you, did

5  you receive -- specifically receive a referral to investigate

6  Mr. Ervin and both his account activity and any business

7  activity he was engaged in?

8  A.    Yes, sir.

9  Q.    To be clear, you've never met Mr. Ervin, correct?

10  A.    I have not.

11  Q.    Now, first, with respect just to his account activity,

12  what steps did you take to look into this referral?

13  A.    So, of course, you know, we would look at the account

14  transactional history to see what's occurring, to see if it

15  matches the information that we got in.

16          We would also begin looking at transactions, in other

17  words, cash in or cash out, or automatic transfers or automatic

18  deposits, known as ACHs, which stands for automatic

19  clearinghouse.  I don't know why they named it that.  But it

20  would be something like if you get a direct deposit, that comes

21  into your account through ACH.

22          So we would begin looking at that transactional

23  history and activity to see whether or not the information we

24  have is jibing with what we're seeing.

25  Q.    And do you use a particular program available to you in

1    your role to engage in that type of investigation?

2    A.   Our Core system.  Yes.  We have a Core system.  The Core

3    system that we use, it would be a system that everybody in the

4    credit union uses to keep track of the accounts.  We can make

5    notes, you know.  We can see each other's notes, and we can see

6    that transactional history.

7    Q.   And do you also have a program called Verafin?

8    A.   Yes.

9    Q.   And what's that?

10   A.   That was something that I described earlier.  That would

11   be our case management program.  That's also the program that

12   looks every day at the transactions that come in and then

13   generates alerts based on what it thinks we might need to look

14   at and review manually.

15   Q.   So with respect to Mr. Ervin, did you review his account,

16   as we were just discussing, for any significant recent

17   deposits?

18   A.   Yes.

19   Q.   And as well for significant cash withdrawals?

20   A.   Yes.

21   Q.   And do you recall responding -- or assisting with the

22   response to a law enforcement subpoena regarding bank records

23   for Mr. Ervin?

24   A.   Yes, sir, correct.

25            MR. MESROBIAN:  And Your Honor, may we publish what

1  is already in evidence as Government Exhibit 95D, as in delta?

2          THE COURT:  Madam Deputy, do you have 95D?

3          COURTROOM DEPUTY:  Yes, Your Honor.

4          THE COURT:  Okay.  I missed it.

5          Go ahead.

6  BY MR. MESROBIAN:

7  Q.   And Ms. Useche, do you recognize this to be an application

8  for an account at Community First Bank?

9  A.   Yes, I do, yes, sir.

10 Q.   And if you can look, we've zoomed in on the middle portion

11 underneath -- and the heading is Member Information.  Who is

12 the member or applicant here?

13 A.   Kristopher Justinboyer Ervin.

14 Q.   And the address provided is 2409 Kirkwall Court?

15 A.   Yes, sir.

16 Q.   And the cell phone provided is (904) 405-9878?

17 A.   Yes, sir.

18 Q.   And the email address provided is JustinErvin80@aol.com?

19 A.   Yes, sir.

20         MR. MESROBIAN:  And Ms. Ganoe, if you can go to the

21 bottom part.

22 BY MR. MESROBIAN:

23 Q.   Here, does this reflect that there's a joint owner in this

24 account?

25 A.   Yes, sir.  It says "joint with right of survivorship," and

1    the box is checked.

2    Q.   And the name of this individual is Kris A. Ervin?

3    A.   Yes, sir.

4         MR. MESROBIAN:  And Ms. Ganoe, could we go to page 3

5    of this exhibit.

6    BY MR. MESROBIAN:

7    Q.   So if you could take a look at this top part there

8    underneath "Subsequent Actions."  Is this a subsequent

9    adjustment to this account in the account documents produced?

10   A.   Yes, sir.

11   Q.   And here it says "remove"?

12   A.   It does.

13   Q.   Remove a joint owner?

14   A.   Correct.

15   Q.   And if we go down to the bottom where it says "Joint Owner

16   Number 1."  This reflects that Kris A. Ervin, that joint owner

17   we were just looking at, was removed as a joint owner of this

18   account?

19   A.   That's correct, yes, sir.

20        MR. MESROBIAN:  So now, Your Honor, may I publish

21   Government Exhibit 95C?

22        THE COURT:  You may.

23        MR. MESROBIAN:  And Ms. Ganoe, if we can go to page

24   17 and zoom in on the top.  Yeah, down -- from "Kristopher

25   Justinboyer Ervin" down.

1  BY MR. MESROBIAN:

2  Q.   So Ms. Useche, do you recognize this to be an account

3  statement provided by Community First?

4  A.   Yes, it is.

5  Q.   And is this an account statement for -- looks like the

6  middle name is short one letter, but it's Kristopher

7  "Justinboye" Ervin at that same address we just looked at?

8  A.   Yes, sir.

9  Q.   With an account number ending in 3009?

10  A.   That's correct.

11  Q.   And the statement period for this statement is

12  December 1st of 2020 through December 31st of 2020?

13  A.   Yes, sir.

14  Q.   So if we could go to next page.  I'd like to focus just on

15  the top half of the screen here.  So I'd like to talk first

16  about the deposits in this account.

17        Looking at December 1st -- and I'll make -- I'm going

18  to try to make marks as best I can next to them -- is there a

19  deposit that says "ACH Stripe" in the amount of $1,814.69?

20  A.   Yes, sir, that's correct.

21  Q.   The next day, December 2nd, is there a deposit, ACH

22  Stripe, for $6,717.02?

23  A.   Yes, sir.

24  Q.   Day after that, is there a deposit, ACH Stripe, in the

25  amount of $3,734.82?

1    A.   Yes, sir.

2    Q.   Moving down.  The day after the last one we just looked

3    at, this one is December 4th.  Is there a deposit line that

4    says "ACH Stripe, $2,247.58"?

5    A.   Yes, sir.

6    Q.   And then going down to the bottom here, December 7th,

7    deposit, ACH Stripe, in the amount of $1,463.05?

8    A.   Yes, sir.

9         MR. MESROBIAN:  And if we could go to the next page,

10   please, Ms. Ganoe.

11   BY MR. MESROBIAN:

12   Q.   The day after that, December 8th, it says "deposit, ACH

13   Stripe, $2,340.31"?

14   A.   Yes, sir.

15   Q.   December 9th, the next day, deposit, ACH Stripe,

16   $4,620.67?

17   A.   Yes, sir.

18   Q.   Then finally, the day after that, December 10th, deposit,

19   ACH Stripe, $902.31?

20   A.   Yes, sir.

21   Q.   So I'll stop here.

22        Are you familiar with what Stripe is?

23   A.   Somewhat familiar.

24   Q.   And what do you know it to be?

25   A.   I know it to be a payment platform, very similar to

1    Square.  I personally have never paid a purchase with Stripe,
2    but I've made a purchase with Square.  And I understand it to
3    be an online payment platform.
4    Q.   And specifically, do you understand it to be a payment
5    processor for various -- for a business, essentially?
6    A.   Yes, sir, yes.
7    Q.   Is it common to see proceeds from a business or proceeds
8    from Stripe going into personal accounts at CFCU?
9    A.   No, sir.
10   Q.   And in your role as a fraud investigator, or general
11   investigator of the bank, what does that signify to you?
12   A.   So at Community First we do not allow business
13   transactions to flow through a personal account.  You have to
14   have a business account.
15        So when we see business transactions flowing through
16   a personal account, we typically will reach out and let the
17   member know, "You have to stop."  And if they don't stop, then
18   we're probably going to exit the relationship, which is
19   basically closing their account.  We don't allow that.
20        MR. MESROBIAN:  So now, Ms. Ganoe, if we could go to
21   page 22.
22   BY MR. MESROBIAN:
23   Q.   So here we have -- we're still in this December account
24   statement on a subsequent page.  And now I'd like to focus on
25   the balance in the account and then some withdrawals.  If we go

1  down -- actually, I'm sorry.  You're right in the right place.

2          So I'd like to focus on what the account balance was

3  at the beginning of the day on December 28th.  So I guess

4  that's -- the last transaction on December 27th, after that

5  debit of $124 for Amazon, was the balance $59,683.06?

6  A.   Yes, sir.

7          MR. MESROBIAN:  And could we go down to the next

8  half, please.

9  BY MR. MESROBIAN:

10 Q.   So starting on that same day, December 28th, does the

11 account statement reflect a series of cash withdrawals?

12 A.   I do see a series of cash withdrawals on that day, yes,

13 sir.

14 Q.   And these are denoted by the description "withdrawal by

15 cash"?

16 A.   Correct.

17 Q.   So first, on December 28th, there's one for $9,000; is

18 that right?

19 A.   That is the first cash withdrawal, yes.

20 Q.   And immediately below that on the same day, December 28th,

21 there's a withdrawal for $5,000?

22 A.   Correct.

23 Q.   And towards the bottom of the screen, on December 29th, is

24 there another cash withdrawal for $9,000?

25 A.   Correct.

1          MR. MESROBIAN:  If we could go to the next -- or --

2    correct.  Right there.

3    BY MR. MESROBIAN:

4    Q.   And on the next page of this document, on December --

5    well, there's another deposit on December 30th from Stripe of

6    $6,083.71?

7    A.   Yes, sir.

8    Q.   And immediately below that, on December 30th there's

9    another cash withdrawal of $9,000?

10   A.   Yes, sir, correct.

11   Q.   And then the next day after that, there -- on

12   December 31st there is a deposit of Stripe -- from Stripe of

13   $2,445.40?

14   A.   Yes, sir.

15   Q.   And then a withdrawal in cash of, again, $9,000; is that

16   right?

17   A.   Yes, sir, correct.

18          MR. MESROBIAN:  And Ms. Ganoe, could we go to page

19   25.

20   BY MR. MESROBIAN:

21   Q.   And Ms. Useche, do you recognize this to be another

22   account statement relating to this same account belonging to

23   Kristopher Justinboyer Ervin?

24   A.   Yes, sir.  This is the January statement of 2021.

25          MR. MESROBIAN:  So if we could go further down to the

1    next page, please.

2    BY MR. MESROBIAN:

3    Q.   So the last transaction we saw was December 31st, New

4    Year's Eve, I guess.

5         On January 2nd there's a withdrawal by cash again of

6    $9,000, correct?

7    A.   Yes, sir.

8    Q.   And was there a -- does there appear to be a deposit by

9    check that same day into the account?

10   A.   Yes.  I would say $100 deposit by check.

11   Q.   Then on January 5th, a little further down the screen, is

12   there another cash withdrawal for $9,000?

13   A.   Yes, sir.

14   Q.   The day after that, on January 6th, is there another

15   withdrawal of $9,000?

16   A.   Yes, sir.

17   Q.   Other than the second withdrawal we looked at on

18   December 28th for $5,000, were all of these cash withdrawals we

19   just looked at in the amount of $9,000?

20   A.   I believe so.

21   Q.   And the threshold you mentioned earlier for reporting cash

22   transactions is $10,000; is that right?

23   A.   I believe it's $10,000 and one penny.

24   Q.   In your experience, are regular cash transactions just

25   under the reporting threshold a red flag?

1  A.    If there's a series of them, if there's a -- potentially a

2  statement made -- there's a couple of other things that go into

3  it, but generally speaking, yes.

4  Q.    And again, how is that activity monitored at the bank, or

5  at the credit union?  Is it manual or is it -- is there an

6  algorithm that looks for activity like that?

7  A.    Actually, both.  So a Suspicious Incident Report could

8  come through and -- to report, "Hey, this person has come in

9  every day and is withdrawing $9,000," in this case.  Or it

10  could actually be an algorithm through oUr Verafin system and

11  come in as an alert.

12  Q.    So separately, ma'am, I believe you testified earlier that

13  you were also asked to look into the nature of Mr. Ervin's

14  business?

15  A.    Yes, sir.

16  Q.    And without getting into what other individuals may have

17  said to you, did you become concerned that Mr. Ervin was

18  involved in illegal activity?

19  A.    Yes, sir.

20  Q.    Subsequently, did you take any actions in terms of

21  contacting law enforcement?

22  A.    Yes, sir.

23  Q.    And was that also in January of 2021?

24  A.    Yes, sir, that is correct.

25  Q.    Who did you reach out to?

A.    I reached out to Jeff Massie with the ATF.

Q.    And why did you reach out to ATF particularly?  Did --
I'll strike that.

Did you reach out to ATF because you believed
Mr. Ervin was involved in some type of firearms activity?

A.    I wasn't a hundred percent sure, but I had a -- I had a
suspicion that that was the case and I needed confirmation.
And since I'm not -- even though I handled firearms for my
whole career, I'm by no means a firearms expert, so I wanted an
expert opinion.

Q.    So you reached out to Jeff Massie?

A.    Yes, sir.

Q.    And how did you know Jeff Massie?

A.    I worked with Jeff Massie through Columbia County for
years as a detective when I was a detective.  He would help us
out.  He would come in, we would work cases together.  I
personally have never worked a case with Jeff, but I knew him
from his -- our detective division is very small.  It's only
nine of us.  So whenever he would come in, I would know who he
was.  And I had a good rapport with Jeff.

Q.    And was he no longer in the Jacksonville area?

A.    Correct.  I didn't even know that.  He had been reassigned
to Texas.  And he let me know that he was no longer in Columbia
County, or in the North Florida area.  He had been reassigned
to Texas.  So he gave me a referral.

1    Q.    And subsequently did you have contact with Special Agent

2    Hooker from ATF about the investigation into Mr. Ervin?

3    A.    Correct.

4    Q.    After that, after that point, did you respond to ATF when

5    it had requests for assistance from the bank?

6    A.    Yes, sir.

7    Q.    Did that include pulling surveillance video related to

8    certain transactions at a physical bank location?

9    A.    Yes, sir.

10   Q.    And finally, I'd like to talk about the date of

11   Mr. Ervin's arrest, March 2nd, 2021.  Were you in contact with

12   ATF on that date?

13   A.    Yes, sir.

14   Q.    And what was the substance of that contact?

15   A.    I had received a message from Agent Hooker asking me if

16   there had been any debit card activity.  And I looked into the

17   account and I did see there was debit card activity at the

18   Harbor Freight in Lake City, and I let him know that.

19   Q.    And was it your understanding that ATF was going to reach

20   out to Columbia County Sheriff's Office to verify Mr. Ervin's

21   location in Lake City?

22   A.    That's -- that's -- yes, he did communicate that with me,

23   yes, sir.

24            MR. MESROBIAN:  May I have one moment, Your Honor?

25            THE COURT:  You may.

1          (Government's counsel confer.)

2               MR. MESROBIAN:  No further questions at this time.

3               THE COURT:  Mr. King.

4               MR. KING:  May it please the Court.

5               THE COURT:  Go ahead.

6                          CROSS-EXAMINATION

7    BY MR. KING:

8    Q.    Good afternoon, Ms. Useche.

9    A.    Hello.

10   Q.    I wanted to go over just to clarify a couple things from

11   you and make sure that I have an understanding.

12         There's the S-I-R-s, which is the SIR?

13   A.    Yes, sir, correct.

14   Q.    And that is -- is that something that's unique to

15   Community First or is that shared with the federal government?

16   A.    It's unique to Community First.

17   Q.    All right.  And then there's the SAR?

18   A.    Correct.

19   Q.    And your department is responsible for generating those?

20   A.    No, sir.  I actually work in the fraud department.  Our

21   BSA team, they are responsible for filing those.

22   Q.    And how familiar are you with the SARs?

23         How familiar are you with SARs?

24   A.    Well, that's kind of an in-depth question.  Can you be a

25   little bit --

1  Q.   Sure.  Let me ask it this way:  A very large number of

2  SARs are generated compared to law enforcement action

3  investigations; is that fair to say?

4  A.   I would think so.

5  Q.   And so generating an S-A-R is something a bank's obligated

6  to do, but it doesn't mean somebody's committed a crime.  It's

7  just part of their regulatory process?

8  A.   Correct.

9  Q.   And many SARs are generated compared to -- so if this is

10  the universe of SARs, the actual criminal activity is

11  significantly smaller than that?

12  A.   I actually wouldn't know.

13  Q.   Okay.  And if you don't know, that's fine too.

14       I also wanted to clarify just something about how

15  your bank works to make sure that we're not confusing kind of

16  the laws versus how Community First works.

17       So most people who own a business that you've dealt

18  with, those are typically PAs, LLCs, incorporated business

19  entities?  Is that fair?

20  A.   I mean, a lot of them are, but not all of them.

21  Q.   And it is the bank's policy, but not a federal government

22  or a law, that requires to separate out personal and business

23  bankings, correct?

24  A.   I really don't know the answer to that question.  I know

25  it is our policy.  I can't speak to whether it's a law or not.

1    Q.   And that's -- and like I said, if there's something you

2    don't know, I'm not -- it's not TV.  I'm not trying to trip you

3    up or anything.

4             But most businesses that are bigger, professionally

5    run, those are separate legal entities with their own bank

6    accounts; is that fair?

7    A.   Yes.  Typically, yes, sir.

8    Q.   And smaller, less sophisticated operations may do it as

9    kind of a sole proprietorship through their personal stuff?

10   A.   No.

11   Q.   Not with -- not with Community First, but there's no legal

12   requirement that somebody has to have a legal entity to run a

13   business, correct?

14   A.   Oh, I see what you're saying.

15            Correct.  Yes, sir.

16   Q.   And I just want to make sure that we're being clear that

17   there's nothing illegal that you're reporting to law

18   enforcement about somebody doing business accounts out of a

19   personal account, but your bank doesn't allow it and requires

20   people to separate those out?

21   A.   Yes, sir.

22            MR. KING:  That was it.  Thank you, ma'am.  I

23   appreciate your time.

24            THE WITNESS:  You're welcome.

25            MR. LAROSIERE:  Nothing for this witness, Your Honor.

```
 1          THE COURT:  Mr. Mesrobian, anything else?

 2          MR. MESROBIAN:  No, Your Honor.

 3          THE COURT:  All right.  You may step down.  Thank

 4   you.

 5          Next witness.

 6          MR. MESROBIAN:  Your Honor, the United States calls

 7   Amy Sarkese.

 8          THE COURT:  You're free to go.

 9          THE WITNESS:  Your Honor, am I dismissed?

10          THE COURT:  Is the witness excused?

11          MR. MESROBIAN:  Yes, Your Honor.

12          MR. KING:  Yes, Your Honor, I believe so.

13          MR. MESROBIAN:  Yes, Your Honor.

14          THE COURT:  You're free to go.

15      (Witness exits the courtroom.)

16      (Witness enters the courtroom.)

17          COURTROOM DEPUTY:  If you could please raise your

18   right hand.  Do you solemnly swear that the testimony you're

19   about to give before this Court will be the truth, the whole

20   truth, and nothing but the truth, so help you God?

21          THE WITNESS:  Yes.

22          COURTROOM DEPUTY:  You may have a seat.  And if you

23   could please state your full name for the record and spell your

24   last name.

25          THE WITNESS:  It's Amy Sarkese, S-a-r-k-e-s-e.
```

1          THE COURT:  Go ahead, Mr. Mesrobian.

2          MR. MESROBIAN:  Thank you, Your Honor.

3          **AMY SARKESE, GOVERNMENT WITNESS, SWORN,**

4                     DIRECT EXAMINATION

5    BY MR. MESROBIAN:

6    Q.    Ma'am, where are you currently employed?

7    A.    JPMorgan Chase Bank.

8    Q.    And what is your current position?

9    A.    Mortgage processor.

10   Q.    How long have you been at Chase Bank?

11   A.    May of 2021.

12   Q.    Prior to Chase where were you employed?

13   A.    Community First Credit Union.

14   Q.    And how long did you work at CFCU?

15   A.    From 1996 to 2021.

16   Q.    And to your knowledge, is CFCU a federally insured

17   financial restitution?

18   A.    It is.

19   Q.    So could you describe for the jury the positions you held

20   at CFCU over that rather extended time there.

21   A.    Collections -- well, first was a teller, part-time teller,

22   then full-time teller, then collections representative, member

23   service representative, and then the last role was assistant

24   branch manager.

25   Q.    And when you were assistant branch manager did you work at

1  a particular branch?

2  A.   The Orange Park location, 625 Blanding.

3  Q.   So during the 2020 to 2021 time frame, were you then

4  working as the branch manager in Orange Park -- or assistant

5  branch manager in Orange Park?

6  A.   Yes.

7  Q.   What were your duties and responsibilities in that role?

8  A.   Assist with audits; help the teller line if they needed

9  assistance, if they were short staffed up there; help with the

10  vault; help balancing the daily activities at the end of the

11  day; waiting on customers or members; opening accounts; new

12  loans.

13       Kind of everything.

14  Q.   Through your employment at Community First, did you become

15  familiar with an individual named Kristopher Justinboyer Ervin?

16  A.   I did.

17  Q.   And was he a client of the credit union?

18  A.   Yes.

19  Q.   How many times -- did he come to your branch in Orange

20  Park?  I'm sorry, strike that.

21       Did he come to conduct business at your branch in

22  Orange Park?

23  A.   Yes.

24  Q.   Was he a regular customer?

25  A.   Yes.

1    Q.    How often, approximately, would you say?

2    A.    He was usually two to three times a week.

3    Q.    And Ms. Sarkese, do you recognize Mr. Ervin in the

4    courtroom today?

5    A.    Yes.

6    Q.    And could you identify him and an article of clothing he's

7    wearing?

8    A.    Blue suit, blue shirt.

9    Q.    And where is he seated?

10   A.    Over there on the right.

11         MR. MESROBIAN:  Your Honor, would the record reflect

12   that the witness identified Mr. Ervin?

13         MR. KING:  We so stipulate, Your Honor.

14         THE COURT:  The record will so reflect.

15   BY MR. MESROBIAN:

16   Q.    So I believe you said a moment ago that he was coming a

17   couple times a week into the branch in Orange Park?

18   A.    Correct.

19   Q.    And that was during the 2020 to 2021 time frame?

20   A.    Correct.

21   Q.    Do you recall ever discussing with him if he was in a

22   particular business?

23   A.    Yes.

24   Q.    And what did he say about that?

25   A.    At one point he said he was making metal business cards.

1    Q.    So I'd like to talk about cash transactions for a moment.
2    In terms of your role as a teller and an assistant bank manager
3    or branch manager, what were your obligations in terms of
4    tracking and reporting cash transactions?
5    A.    So I would handle, like, the cash orders, or if I was on
6    the teller line doing actual transactions for members, you
7    know, processing them, whether it be cash or checks into their
8    account, depending on the transaction limit, it could have us
9    do a form to report to the IRS.
10   Q.    So are you familiar with something called a Currency
11   Transaction Report, or CTR?
12   A.    Yes.
13   Q.    And what is that?
14   A.    It's a form that we have to fill out if there's a
15   withdrawal of a certain dollar amount or higher.
16          Do you want the dollar amount?
17   Q.    And what is that dollar amount?
18   A.    10,000 or more.
19   Q.    And is that true also with respect to cash deposits in
20   addition to withdrawals?
21   A.    Yes.  It's in or out, cash in or out.
22   Q.    So if you were working as a teller or if you were
23   supervising someone working as a teller, what were you supposed
24   to do if someone deposited or withdrew more than $10,000 in
25   cash?

1    A.    So we have to verify -- make a copy of their driver's

2    license, verify the information in the system is correct, name,

3    address, phone number, occupation, employment, or employer.  We

4    have to make sure all that's correct because we have to fill

5    that in on the form.

6    Q.    When you're doing that and gathering that information, do

7    you advise the customer that you are filing a Currency

8    Transaction Report?

9    A.    No.

10   Q.    And why don't you do that?

11   A.    It's not something that we are to disclose as a financial

12   institution.  So whenever we are gathering that information,

13   we're just basically letting them know, "Hey, we're updating

14   the system," and then that's basically the end of the

15   conversation.

16   Q.    Do you recall ever having a discussion with Mr. Ervin

17   about what the threshold was to -- that the bank would report

18   cash?

19   A.    Yes.

20   Q.    Could you tell the grand jury -- the jury about that.

21   A.    So it was asked to me at one point what that dollar amount

22   is as far as reporting goes.  And obviously I didn't give that

23   information because we're not allowed to.  But it was asked at

24   one point, "Well, how much can I take out so it's not

25   reported?"

1    Q.   Do you recall specifically when that conversation

2    occurred?

3    A.   No, I don't remember the exact date.

4    Q.   And we're going to talk about -- in a few minutes about a

5    series of -- or, rather, a cash withdrawal that occurred at

6    your branch, but was it at some point prior to that cash

7    withdrawal occurring?

8    A.   The withdrawal that we're going to talk about?

9    Q.   The $9,000 cash withdrawal.

10   A.   It was after that.

11   Q.   So first I'd like to direct you to July 20th, 2020.  Do

12   you recall a visit by Mr. Ervin to the bank that day to discuss

13   online banking access?

14   A.   I do.

15          MR. MESROBIAN:  So Your Honor, may we publish

16   Government Exhibit 95B, as in Bravo, page 2?

17          THE COURT:  You may.

18   BY MR. MESROBIAN:

19   Q.   First, do you recognize what this document is?

20   A.   Uh-hmm.

21   Q.   And what --

22          THE COURT:  I'm sorry, is that yes?

23          THE WITNESS:  Yes, I'm sorry.

24          MR. MESROBIAN:  Thank you, Your Honor.

25   BY MR. MESROBIAN:

1    Q.    And what is this document?

2    A.    It's our notes that we use in the -- it's called Symitar.

3    So like on the client's account or the members's accounts, if

4    we need to put notes, this is where it shows up and these are

5    how the notes will appear.

6    Q.    So these are notes created by bank employees entered into

7    the Symitar record of encounters --

8    A.    Correct.

9    Q.    -- with customers?

10   A.    Correct.

11   Q.    Here we see an account note dated July 20th, 2020, 9:58

12   a.m., and there's a user number there.  Whose user number is

13   that?

14   A.    That was mine at the time.

15   Q.    And would you read the note that you wrote here?

16         I take it if the user number is there, that means you

17   entered this note?

18   A.    Correct.

19   Q.    And what did this -- what did you enter here?

20   A.    "Member came in to get into his online banking and when

21   Taylor asked to verify his information with his ID and

22   update" --

23              THE COURT:  Excuse me.  Could you slow down?

24              THE WITNESS:  I'm sorry.

25              THE COURT:  Go ahead.

1  A.   "Member came in to get into his online banking and when

2  Taylor" -- which was our teller at the time -- "asked to verify

3  his info with his ID and update his employer, he lost" -- he

4  got upset -- "saying why did it matter and that he didn't want

5  to give that information to us to type in."

6            He told us to type in "strippers and cocaine" as his

7  occupation.

8            "He refused and just kept saying the same thing.  I

9  walked over to get the ID for him and he walked out stating he

10 was just going to call it a day and that we were always causing

11 problems.  Member stated he had a business account with us and

12 also stated that he plans on running business funds through his

13 personal account and that's why he wanted access to the online

14 banking."

15 Q.   "OLB"?

16 A.   Is online banking.

17 Q.   That stands for online banking?

18 A.   (Nods head.)

19 Q.   So do you recall this incident?

20 A.   I do.

21 Q.   And generally, does it accord with your notes reflecting

22 it?

23 A.   Yes.

24 Q.   And just to be clear, when Mr. Ervin -- Mr. Ervin advised

25 that he didn't want to provide his business, and what did he

1  ask you to write down or ask you --

2  A.    The occupation, it was -- he instructed us to put in

3  "strippers and cocaine" as his occupation.

4  Q.    And you did not do that, correct?

5  A.    Correct.

6  Q.    Ms. Sarkese, did Mr. Ervin, on the occasions when he came

7  into your branch, complain about CFCU or the way he was being

8  treated?

9  A.    Correct.

10 Q.    What would he say on those occasions?

11 A.    Basically that we weren't giving him -- we weren't

12 allowing him access to his money.

13 Q.    Generally, to your recollection, did he use his personal

14 account for transactions?

15 A.    For transactions . . .

16 Q.    When he came into the branch?

17 A.    Yes.

18 Q.    Do you recall him using a business account?

19 A.    At some point, yes, when it was opened.

20 Q.    So I'd like to move forward to Black Friday,

21 approximately, of 2020, the Thanksgiving time period of 2020.

22 Do you recall a visit by Mr. Ervin around that date?

23 A.    (Nods head.)

24 Q.    And what happened on that occasion?

25 A.    So we had denied his debit card.  Evidently it was trying

1    to be used at a Louis Vuitton for a purse purchase that we were
2    told he was using to -- he was going to buy a purse for his
3    boss's wife, and the debit card was declined.
4    Q.   So I'll stop you there.  Did Mr. Ervin come into the
5    branch that day?
6    A.   Yes.
7    Q.   And this was on or about November 27th, 2020?
8    A.   Right.
9    Q.   And do you recall it to be around Black Friday of that
10   year?
11   A.   Yes.
12   Q.   What did he say to you about a debit card transaction?
13   A.   He was upset that the debit card transaction had got
14   declined.
15   Q.   Did he say where he had been that day?
16   A.   Louis Vuitton.
17   Q.   And where is -- the Louis Vuitton store, do you mean?
18   A.   Yes.
19   Q.   And to your knowledge, where is the Louis Vuitton store?
20   A.   In Town Center in Jacksonville, the Town Center mall.
21   Q.   Did that strike you in any particular way, that he had
22   come to the Orange Park branch from the Town Center?
23   A.   Yes.  It's a good distance.
24   Q.   And what did he tell you about this particular transaction
25   he was trying to engage in?

1    A.    That it had been declined for the purchase, and so he was

2    upset and came in and said that, you know, why weren't we

3    giving him access to his money.  It was his money, he can do

4    what he wants to with it, that he was trying to purchase a

5    purse for his boss's wife.

6    Q.    Did he give a particular amount of money that he thought

7    this purse cost to your recollection?

8    A.    No, I don't -- he didn't say a specific amount at that

9    time.

10           MR. MESROBIAN:  And Ms. Ganoe, if we could publish

11   Exhibit 95 Bravo.  And go to the bottom, please.

12   BY MR. MESROBIAN:

13   Q.    Actually, first, the note on November 24 where it says,

14   "Removing JT from account," do you know what that refers to?

15   A.    It would -- it's not from me, but it removes -- it means

16   removing a joint person from the account.

17   Q.    So someone may have been a joint owner on this account and

18   then was removed?

19   A.    Correct.

20   Q.    So above that, on November 25th, 2020, this is not your

21   note, correct?

22   A.    Correct.

23   Q.    But what does this note indicate to you in terms of a card

24   transaction?

25   A.    So he called in and the person that took the call

1  authorized the primary caller, which was him -- advised that

2  they -- he advised that he had received an alert for his debit

3  card.  Advised they responded -- he responded yes, was able to

4  confirm that the purchase went through.  Advised the caller --

5  the employee advised the member that as long as they respond

6  "yes," their transaction will auto override, meaning you're

7  saying yes to the fraud alert.  Also verified card was not

8  blocked and will be able to use the limit of 6,000 for a

9  point-of-sale purchase.

10 Q.    And it was marked at the bottom "dash CS."  What does that

11 mean?

12 A.    That's the person's initials that took the call, the 2104.

13 Q.    And so this appears to be about two days before Mr. Ervin

14 came to the branch and talked about the Louis Vuitton purse?

15 A.    Right.

16          MR. MESROBIAN:  So Ms. Ganoe, if we can go up to the

17 next note, please, the small one.

18 BY MR. MESROBIAN:

19 Q.    So do you recognize this note as being from November 27th,

20 2020?

21 A.    Correct.

22 Q.    And there's a lot of abbreviations in here, so you might

23 have to translate this for the jury.  What does this signify?

24 A.    So it's -- again, it's a call-in.  He called in.

25 Primary -- which is the "pri" -- calls in -- "ci" -- regarding

1  denied debit card transaction.  And the employee of the credit

2  union, the user 1954, transferred the call to Fiserv, which is

3  the fraud department for Visa, the debit card.

4  Q.   So essentially, does this reflect another call regarding a

5  declined --

6  A.   Yes.

7  Q.   -- debit card transaction?

8  A.   Yes.

9  Q.   And transferring it to Fiserv.  What is Fiserv again?

10  A.   The fraud department that handles transactions for your

11  Visa debit card or credit cards.  So if you're disputing or

12  need your transaction to go through, that's who handles it.

13  Q.   To be clear, did you personally, or someone at your

14  branch, deny his debit card transactions?

15  A.   No.

16  Q.   So I'd like to direct you now to December 28th, 2020.  Do

17  you recall a visit by Mr. Ervin to your branch that day?

18  A.   Yes.

19  Q.   What business did Mr. Ervin initially have with your

20  branch on that date?

21  A.   He wanted to deposit a $100 money order, but it was

22  payable to "Auto Key Card," which was a product that he told us

23  that he sells.  When we told him we couldn't take the check the

24  way it was payable -- because he was trying to put it into a

25  personal account and we don't allow that -- he got upset again,

1    said that we wouldn't be getting his business account,

2    mortgages, loans, et cetera, and that he wanted to take all of

3    his money out in cash.

4              We told him it would need to be a special order

5    because of the amount and it wouldn't be available until the

6    end of next week because we don't order every single day.

7              And then he continued to change the dollar amount of

8    what we could give him.  I told him initially, you know, "We

9    can give you 10,000."

10             He said "okay" and then said, "No, give me 9,000 and

11   I'll just come back every day or try other branches until I get

12   all my money."

13             I told him there's no guarantee at other branches

14   that they will have it available.

15   Q.   And to be clear, user 310, that's your user number?

16   A.   Yes.

17   Q.   So break that down.  Mr. Ervin -- and you were interacting

18   with Mr. Ervin on this date, correct?

19   A.   Correct.

20   Q.   When he came in, he initially wanted to deposit a money

21   order payable to Auto Key Card?

22   A.   Correct.

23   Q.   And would the bank do that?

24   A.   No.

25   Q.   And why is that?

1  A.   Because at the time there was no business account.  It was

2  only a personal account.  So we don't allow business

3  transactions into a personal account.

4  Q.   Did Mr. Ervin become upset at that point?

5  A.   Yes.

6  Q.   Did he advise you that he wished to close his account or

7  withdraw his account balance in cash?

8  A.   Yes.

9  Q.   And is that possible, normally, to --

10  A.   I mean, you can, it just depends on the amount.  But the

11  amount at that time, we did not have.

12  Q.   Do you recall approximately how much cash was in his

13  account at that time?

14  A.   60,000.

15  Q.   So you were not able to give him $60,000 in cash?

16  A.   No.

17  Q.   Do you recall if you offered him an alternative way of

18  taking his money out?

19  A.   A certified check, cashier's check.

20  Q.   Did he accept that?

21  A.   No.

22  Q.   So what did you offer him first in terms of the cash you

23  did have available?

24  A.   The 10,000.  I told him, you know, "We can do 10,000."

25  Q.   And did he accept that?

1   A.   At first the answer was, "Sure, give me the 10,000," but

2   then changed his mind and said, "No, just give me 9."

3   Q.   And again, to be clear, what happens on the bank's side of

4   the transaction -- of a cash transaction that exceeds $10,000?

5   A.   We have to do the Currency Transaction Report, the CTR.

6   Q.   And you or a teller would enter Mr. Ervin's information

7   and then it would go to whom?

8   A.   The IRS.

9        MR. MESROBIAN:  Your Honor, may I have a moment,

10  please?

11       THE COURT:  Yes.

12    (Government's counsel confer.)

13  BY MR. MESROBIAN:

14  Q.   So Ms. Sarkese, do you recall Mr. Ervin coming in after

15  December 28th and making any other cash withdrawals?

16  A.   I don't recall, to be honest.

17  Q.   If he had made additional cash withdrawals every day, you

18  know, not in the same 24-hour period, would that trigger a CTR

19  if they exceeded $10,000?  Or -- I'll ask this another way.

20       If someone withdrew $9,000 every 24-hour period,

21  would that exceed the threshold for a CTR?

22  A.   No.  If it's over the 24 hours -- if it's past 24 hours,

23  no, it would not.  If it's within 24 hours, the same -- so like

24  10 a.m. to 10 a.m., then yes.

25       MR. MESROBIAN:  No further questions, Your Honor.

1          THE COURT:  Mr. King.

2                    CROSS-EXAMINATION

3    BY MR. KING:

4    Q.    Good afternoon, ma'am.

5    A.    Hi.

6    Q.    My name's Alex King.  I represent Justin Ervin in this.

7    And I just want to go over a couple things.

8          If there's a question I ask -- because sometimes it's

9    very clear in my head, and when I say it out loud people look

10   at me strangely because it doesn't make sense to them, just let

11   me know and I'll ask it a different way.  If I go too fast,

12   before Madam Court Reporter gets onto me, if you need me to

13   repeat something, I'm not trying to trip you up.  This is not

14   like TV, okay?

15   A.    Okay.

16   Q.    I see you nodding your head.  One of the other things is

17   we do have a court reporter.  So if I ask a question, I

18   understand if you're nodding your head and "uh-hmms" and

19   "unh-unhs," but for our court reporter, it's very difficult to

20   take down.  So I just want to make sure that we're being clear.

21   A.    Okay.

22   Q.    And again, I'm not trying to trip you up.  So if you don't

23   agree with something or you don't understand a question, would

24   you please speak up, and we'll go through it until you're happy

25   and I'm happy that we're on the same page?  Is that fair?

1  A.    Okay.

2  Q.    And again, it's not like TV.  I'm not going to yell at

3  you, I'm not going to interrupt you.  I just want to make sure

4  that I understand exactly what's going on and everybody else

5  here does.

6            Is that fair?

7  A.    Fair.

8  Q.    Prior to coming here today, did you discuss your

9  testimony, or what your testimony would be, with the U.S.

10 Attorney's Office?

11 A.    Yes.

12 Q.    And y'all discussed what you would say when you came to

13 court?

14 A.    Yes.

15 Q.    And this is the first time we've had an opportunity to

16 speak ever?

17 A.    Right.

18 Q.    The -- kind of going through some of this stuff, I want to

19 make sure that I understand kind of two different things, which

20 is some of the factual things and then some of the

21 relationships with Mr. Ervin.

22            So let me start with Mr. Ervin.  And this is where I

23 want to be very careful, because I do not want to put words in

24 your mouth.

25            Would you describe Mr. Ervin as somebody that was

1  easy to get along with you for you and the employees of

2  Community First?

3  A.   No.

4  Q.   We have looked at a couple of kind of status notes in the

5  bank.  And it says -- and the first one I think you read, you

6  said "he lost it"?

7  A.   (Nods head.)

8  Q.   Is that -- I see you nodding your head.  Is that a yes?

9  A.   Correct, yes.

10  Q.   And another one he called in upset?

11  A.   Correct.

12  Q.   And I think you described his whole attitude changing

13  right before the end of the year of -- end of December 2020?

14  A.   Correct.

15  Q.   And would it be fair to say that he was very difficult

16  with you?

17  A.   Yes.

18  Q.   And would it be fair to say that he was very difficult

19  with other tellers and other employees of the bank?

20  A.   Yes.

21  Q.   And he would become upset over relatively small things?

22  A.   Yes.

23  Q.   The -- I want to go back --

24        MR. KING:  Ms. Ganoe, if we could pull up 95B, page

25  2.  And pull up the first -- actually, if we can go back.

1  BY MR. KING:

2  Q.   And Ms. Sarkese, I just want to -- am I pronouncing your

3  name correctly?

4  A.   Sarkese.

5  Q.   Sarkese.  I see that there's a user 806 and it's got your

6  name.  Is that one of the --

7  A.   That's a system number, system-generated user number.

8  It's not an actual person.

9  Q.   Okay.  And I was trying to clarify.

10         So that you're able to understand who generally would

11 put in these notes?

12 A.   Yes.

13 Q.   And if there is -- and we've got some more pages of these

14 notes.  This is just anytime something happens, this is a place

15 to document it for the bank?

16 A.   Correct.

17 Q.   And that's not necessarily that, "Hey, this law has been

18 broken or something really bad happened."  Just anything that's

19 really kind of noteworthy that you want to document goes in

20 there?

21 A.   Correct.

22 Q.   And it's something that you as the assistant manager, the

23 other tellers, the manager, all of you, would put notes in

24 there?

25 A.   Yes.

1   Q.   And if anybody said or did anything unusual, that would

2   be -- that would go in the system?

3   A.   Correct.

4   Q.   And is it also fair to say that the number of times

5   Mr. Ervin got upset is not accurately reflected in the notes

6   here?

7   A.   Say it again.

8   Q.   I appreciate that.

9          So Mr. Ervin became upset more than three or four

10  times over the course of your experience with him?

11  A.   Correct.

12  Q.   But not all of that made it into these notes?

13  A.   Correct.

14         MR. KING:  Ms. Ganoe, if we could talk -- if we could

15  highlight the first . . .

16  BY MR. KING:

17  Q.   I want to talk a little bit about this.  Was this --

18  this -- so just for the record purposes, this is Exhibit 95B,

19  and it's the second page and this is the top note.

20         Is this a note that you entered?

21  A.   It is.

22  Q.   How do you know this is a note you entered as opposed to

23  somebody else's notes?

24  A.   Because that 310.  Everybody has an individual number,

25  it's called a teller number, and that was my number.

1   Q.    Okay.   I was assuming that's what it was, but I didn't

2   want to assume anything.

3         The interaction you had here, was -- in addition to

4   being a little aggressive sometimes, was he sarcastic with you?

5   A.    Yes.

6   Q.    Once or more than once?

7   A.    More than once for sure.

8   Q.    And in terms of putting "strippers and cocaine" for his

9   profession, did you think that's where the money was coming

10  from or did you think he was being sarcastic and --

11  A.    Sarcastic and not wanting to give us information.

12  Q.    And was it uncommon for him to be difficult with things

13  that would be just kind of normal day-to-day banking processes?

14  A.    Was it uncommon?  No.

15  Q.    So frequent -- you know, just kind of general day-to-day

16  requests he would fight and argue and give you a hard time

17  about; is that fair?

18  A.    If it wasn't what he wanted, yes.

19  Q.    And I'm looking -- and I'm fast-forwarding a little bit to

20  that December date.  That seems -- when I read that, it reads

21  to me like a temper tantrum?

22  A.    Correct.

23  Q.    Is that what you -- if I say that, am I putting words in

24  your mouth or is that a fair way to describe that?

25  A.    It was -- the interaction escalated very quickly.  It was,

1    you know, hollering and yelling loud for everybody to hear, you

2    know, to get his point across.

3            But yes, it's basically a fit of unsatisfactory, you

4    know, with us, and not -- saying we're not giving him his

5    money.

6    Q.    And that's -- was that the worst one that had happened?

7    A.    I would say yes.

8    Q.    But there were others?

9    A.    Yes.

10   Q.    And in terms of this interaction, he said that he was

11   putting business money into a personal account?

12   A.    Yes.

13   Q.    And he told you that?

14   A.    Yes.

15   Q.    And my understanding -- it would be my understanding -- if

16   I'm wrong, please correct me -- that the policy of Community

17   First is to not do that and to encourage a member to establish

18   a separate business account?

19   A.    Correct.

20   Q.    But that wasn't done here.  He just said he still wanted

21   to do it through a personal account?

22   A.    Right.  We didn't open anything at that time.

23   Q.    Okay.  But he expressed to you back in July of 2020 that

24   that was his intention?

25   A.    To . . .

1    Q.    Use his personal account for business funds.

2    A.    Correct.

3    Q.    And no business account was created at that time?

4    A.    Right.

5           MR. KING:  Ms. Ganoe, if we could go to the first

6    page again.  And the number two and three from the bottom,

7    so -- yes, ma'am.  Thank you so much.

8    BY MR. KING:

9    Q.    And Ms. Sarkese, I'm taking you back to page 1 of these

10   notes.  And these are kind of in reverse time order.  So the

11   older ones, and this is the newer stuff, fair?

12   A.    Fair.

13   Q.    And this was a series of interactions regarding him trying

14   to put something on his debit card --

15   A.    Correct.

16   Q.    -- from Louis Vuitton?

17   A.    Correct.

18   Q.    And ultimately he paid for that in cash?

19   A.    I mean, he took the money out whenever he came in that

20   day.  I don't know what he did with it after that, but he said

21   he was taking the money out to just go pay cash for it.

22   Q.    Did he seem very upset with the bank about not being able

23   to use his debit card to make that purchase?

24   A.    Yes.

25   Q.    And over the course of two or more days he had tried to

1  make a purchase with the debit card and was unsuccessful?

2  A.    Correct.

3  Q.    Came to the branch?

4  A.    Yes.

5  Q.    I imagine he was not the most pleasant to deal with?

6  A.    Correct.

7  Q.    And then took out the money to ultimately make the

8  purchase?

9  A.    Right.

10  Q.    And I'm trying to think of a way to ask this, so I'm

11  probably going to mess it up the first time, but maybe I'll

12  take a second stab at it.

13        But let me try this.  His patience with the bank and

14  his, kind of, attitude, was it getting better, getting worse,

15  or staying the same?

16  A.    Worse throughout, through time.

17  Q.    Certainly.  And he was very upset at the end of November?

18  A.    Yes.

19  Q.    And you know that because of the way he was talking and

20  acting?

21  A.    Yes.  I was there and witnessed the whole interaction with

22  the lady at the desk, the --

23  Q.    And I think you -- and let me ask you this way:  His

24  behavior got to the point where you would make sure you were

25  around the tellers?

1   A.   Correct.

2   Q.   Can you explain that?

3   A.   As supervising them, it was uncomfortable when he would

4   come in because we never knew if it was going to escalate.

5        So if I saw him come in and go to the teller line, I

6   would be sure that I was near, either just kind of hanging back

7   and observing or just kind of walk up to that teller and just

8   kind of be right there in case the situation escalated, as a

9   manager.

10        So yes, if I was in the branch, I would make sure

11   that I was near or with them during the transaction.

12   Q.   And kind of two follow-up questions to that.  One is:

13   You're doing that to look out for your employees?

14   A.   Correct.

15   Q.   And the second question, which I probably should have

16   asked first, is:  Is that the entire time he's been coming to

17   this bank --

18   A.   No.

19   Q.   -- or is that just towards this time period we're talking

20   about, that November/December?

21   A.   No, it was before November, because there was -- like I

22   said, there was other interactions prior to that.  But like I

23   said before, it just had got -- escalated, or the behavior just

24   got worse as time went on.  So no, it wasn't every single

25   interaction.  It was towards the end.

1    Q.    Okay.  And thank you for clearing that up for me.

2          MR. KING:  Ms. Ganoe, can we go to the big entry, I

3    guess the second one down.

4    BY MR. KING:

5    Q.    Now, I know we have an entry here, but you distinctly

6    remember this.  This isn't something you're having to read --

7    A.    Right.

8    Q.    -- this is from your memory?

9    A.    Right, correct.

10   Q.    Let me walk you through just so I make sure I have an

11   understanding.

12         What in that interaction set him off?  What made him

13   angry?

14   A.    Because I wouldn't -- I said no to depositing the money

15   order for the $100.  That was it.

16   Q.    And the part I want to make sure I understand is when you

17   say you, is this like the bank "me" or is this you personally?

18   A.    Me.  Me-me, because, I mean, that's our procedure.  But I

19   happened to be doing his transactions that particular day and

20   keying everything in.  And then when the money order was

21   presented to me and it said "Auto Key Card," we had to have

22   that conversation, "We can't put this in a personal account."

23   And then it just escalated from there.

24   Q.    And the reason I'm asking is because I want to make sure

25   that this was you personally --

```
1   A.    Yes.

2   Q.    -- not something you're telling somebody else to do.

3   A.    No, this is me.

4   Q.    I thought so, but I like to make sure we're on the same

5   page.

6         The -- you said his whole demeanor changed in this

7   note.

8   A.    Uh-hmm, correct.

9   Q.    Sorry.

10  A.    Correct, sorry.

11  Q.    No, no, it's -- you're doing really well.  I appreciate

12  it.

13        And so when you say his whole demeanor changed, he

14  went from being fine to -- I mean, what are we talking about

15  here?  If you could kind of describe --

16  A.    Just, I mean, the voice, of course, was raised and it was

17  just kind of an aggravated -- I don't know what you want to

18  call it -- aggression, I guess you could say.  The voice

19  elevated, "Why can't I deposit this in my personal account?"

20        And then when I said, "No," you know, "you need to

21  have a business account," then it was just, "Fine, then I'll

22  just take out all my money."

23  Q.    And it was a little bit more to the anger.  He basically

24  said he wasn't going to do any business with your bank?

25  A.    Correct.  We weren't going to have any of his -- he wasn't
```

1  going to take a mortgage with us, wasn't going to do a business

2  account with us, any loans with us, you know, just naming all

3  of the things that we weren't going to get from him because we

4  wouldn't allow him -- or I wouldn't allow him to deposit this

5  check into his personal account, so then therefore, we weren't

6  going to get any further business --

7  Q.   And did it feel --

8  A.   -- of his.

9  Q.   And, I'm sorry, I didn't mean to interrupt.

10          Did it feel kind of personal?

11  A.   I'm sorry?

12  Q.   Did it feel kind of personal the way he was saying it?

13  A.   No.

14  Q.   He was just mad at the bank?

15  A.   Correct.

16  Q.   And he expressed to you that he wanted to have no further

17  business with the bank?

18  A.   Correct.

19  Q.   And he wanted all of his money immediately?

20  A.   Yes.

21  Q.   And you told him it would be, you know, not a day or two,

22  but it would be the end of next week?

23  A.   Correct.

24  Q.   And --

25  A.   Because it would be a special order.

1   Q.    Yeah.  And do you have any reason to believe that he knew

2   that before y'all started that conversation?

3   A.    No.

4   Q.    Do you have any reason to believe that he didn't know that

5   if he asked for all of his cash, that that's not something

6   you'd be able to do?

7   A.    Did I think that he would know that?  No.

8   Q.    And have you ever had -- prior to this date had y'all ever

9   had a conversation that would -- that you know for a fact he

10  would have any reason to know that?

11  A.    That we had that much available or not available?

12  Q.    Correct.

13  A.    No.

14  Q.    Is there anything that you have personal knowledge or know

15  that he would know that his request for all of his money right

16  then and there would not be fulfilled?

17        I'm sorry?

18  A.    No.

19  Q.    And so when he made that request, he expected it to

20  happen?

21  A.    Correct.

22  Q.    And became more, less, or the same amount of angry when

23  you told him that that wasn't going to happen?

24  A.    More upset, because, you know, again, we're, quote,

25  denying his money.  Which I wasn't denying it; I didn't have it

1  available to give in one lump sum.

2  Q.   And did he ask just straight away for 9,000 or did he say,

3  "Give me 55,000," "Give me 50,000"?  Did that part of it

4  happen?

5  A.   No, because after the initial, you know, request for the

6  whole amount I said, "Well, I can give you 10."  And then at

7  first he said, "Okay, fine, do the 10," but then changed his

8  mind to say 9,000.

9  Q.   And my understanding, and correct me if I'm wrong, is a

10  Currency -- a CTR -- are you familiar with that term?

11  A.   Correct.

12  Q.   And I'm going to get it wrong.  Currency Transaction --

13  A.   Report.

14  Q.   -- Report.  So a CTR is done when the cash amount within

15  24 hours is more than $10,000?

16  A.   Correct, 10,000 and one penny and above.

17  Q.   So if he had done exactly as you had asked -- and ignoring

18  all of the other fights and arguments you had before, but if he

19  had said, "I'll take the $10,000," you would not have had to

20  generate a CTR --

21  A.   Correct.

22  Q.   -- because it was under $10,000 and one penny?

23  A.   Correct.

24  Q.   And he told -- and the -- let me ask it this way:  He told

25  you at that point that he was going to come back every day

1  until his money was out?

2  A.   Correct.

3  Q.   And outside of New Year's Day and weekends, it looks like

4  that's what happened?

5  A.   I don't recall like the amount of -- I don't recall the

6  withdrawals after that, but that's what he stated he was going

7  to do.

8  Q.   Okay.  And this was still while he was very upset?

9  A.   Correct.

10  Q.   Now, are you aware that he did a CTR that day?

11  A.   I wasn't aware until later on.

12        MR. KING:  Ms. Ganoe, can we pull up 95E.

13        Your Honor, this has already been admitted.

14        THE COURT:  Yeah, go ahead.

15  BY MR. KING:

16  Q.   And Ms. Sarkese, do you recognize this document generally?

17  A.   It's blurry, but yes.

18  Q.   Okay.

19        MR. KING:  Ms. Ganoe, could we go to page 2 of that.

20  And can we highlight the -- the name first.

21  BY MR. KING:

22  Q.   And Ms. Sarkese, you recognize that name?

23  A.   I do.

24  Q.   And that's Mr. Ervin sitting over here?

25  A.   Correct.

1          MR. KING:  If we could go, Ms. Ganoe, a little bit

2    below to where it says employer and address.

3    BY MR. KING:

4    Q.    What does it say the occupation or business type that he

5    has is for this?

6    A.    "Owner of auto key card."

7    Q.    And the address, do you recognize this address or do you

8    not recognize the address?

9    A.    I recognize it from being in the system.

10   Q.    And that's the address that you know?

11   A.    Correct.

12   Q.    I mean, you probably haven't been to his house --

13   A.    No.

14   Q.    -- based on the interactions y'all have had, but you do

15   recognize this as his address?

16   A.    Correct.

17   Q.    Let me ask you this:  If he had come to the bank every day

18   and taken 10,000 instead of 9,000, would that have generated a

19   Currency Transaction Report?

20   A.    It would depend on the time of day.

21   Q.    But not the amount?

22          Let me ask you this way.  See, I told I was going to

23   ask a bad question.

24          So if -- is there any difference between if he had

25   taken out 9 or $10,000 today and he came at -- and if he took

1  another 9 or 10,000 out tomorrow, does it matter whether it's 9

2  or 10, or just whether it's within a 24-hour period?

3  A.   24 hours.  Cumulatively it has to go over 10,000 in

4  24 hours.

5  Q.   And if he had -- and let me ask this one final question.

6  If you had all of the money in cash in your branch, would you

7  have given it to him?

8  A.   No.  I would have asked for the branch manager first,

9  because then if we did that, then that's shorting --

10 Q.   Everybody else?

11 A.   -- everybody else if they need cash.  I mean, that has to

12 last like a whole week.

13 Q.   And once again, I've asked a very poor question, so let me

14 take another stab at it if it's okay with you.

15       If there wasn't an issue with the amount of physical

16 currency the bank had, was there any reason you could not have

17 processed the request and just given him that money?

18 A.   If there wasn't . . .

19 Q.   If there wasn't a limitation on the physical currency.

20 A.   Oh.  So in other words, if we had an abundance of cash?

21 Q.   Correct.

22 A.   I mean, we could, yes.  We could give it to him.

23 Q.   Okay.  And then you would have filled out a CTR?

24 A.   Correct.

25 Q.   Just like this one?

1    A.   Correct.

2    Q.   And that would have been the end of it?

3    A.   Yes.

4         MR. KING:  Your Honor, I have no further questions.

5    Thank you.

6         THE COURT:  Any questions?

7         MR. LAROSIERE:  No, Your Honor.

8         THE COURT:  Mr. Mesrobian, any other questions?

9         MR. MESROBIAN:  Yes, Your Honor.

10                      REDIRECT EXAMINATION

11   BY MR. MESROBIAN:

12   Q.   Ma'am, I just wanted to ask you, if someone wants to close

13   their bank account -- or while you were working at CFCU, if an

14   accountholder wanted to close their account, did they have

15   options on how to get their money?

16   A.   Yes.

17   Q.   And -- for example, could someone get a certified check or

18   a cashier's check for their account balance?

19   A.   Yes.

20   Q.   And would there have been any difficulty in providing

21   Mr. Ervin, on the date he said he wanted to close his account,

22   with a cashier's check or a certified check?

23   A.   We could have done that, yes.

24   Q.   On the spot?

25   A.   Yes.

1   Q.    Also, could someone request all their money in cash and

2   have you obtain that for them?

3   A.    Yes.

4   Q.    And how does that happen?

5   A.    They would tell us, you know, if they are making --

6   planning on a large withdrawal, "Hey, I need to withdraw

7   50,000," we will let them know, you know, "Typically we have to

8   order that," and then it would be available by the end of the

9   following week.

10          We can't -- we're not supposed to say like a specific

11  day because that's too much information, but we would say, you

12  know, "We could arrange it for you on Thursday or Friday of

13  next week."

14  Q.    So essentially within a week --

15  A.    Yes.

16  Q.    -- or a little over a week someone wanting to close their

17  account but receive everything in cash could do that in one

18  visit?

19  A.    Yes.

20  Q.    Mr. King asked you some questions about Mr. Ervin wanting

21  to close this account.  To your knowledge, did Mr. Ervin

22  actually close his account?

23  A.    I do not believe so, no.

24          MR. MESROBIAN:  So Ms. Ganoe, could we please publish

25  Exhibit 95C.  And start on page 25.  I'd like to focus on the

1    top half.  Yeah, exactly.

2    BY MR. MESROBIAN:

3    Q.   Do you recognize this to be an account statement for CFCU

4    for Mr. Ervin --

5    A.   Correct.

6    Q.   -- for -- and this is for the statement period

7    January 1st, 2021, to January 31st, 2021?

8    A.   Yes.

9           MR. MESROBIAN:  So Ms. Ganoe, if we could go to the

10   next page.  And just focus on the top half of the transactions

11   here.

12   BY MR. MESROBIAN:

13   Q.   The transactions listed here are between January 1st and

14   January 7th, correct?

15   A.   Correct.

16   Q.   And so these all occurred about -- approximately a week

17   after this interaction on December 28th, correct?

18   A.   Correct.

19   Q.   And there are a few cash withdrawals here in the amount of

20   $9,000 on January 2nd, January 5th, and January 6th, correct?

21   A.   Correct.

22   Q.   Are there also deposits on this page?

23   A.   There are, yes.

24   Q.   It looks like there's a check deposit on January 2nd for

25   $100?

1   A.   Yes.

2   Q.   And then several Stripe deposits, each in an amount

3   exceeding $1,000, correct?

4   A.   Correct.

5   Q.   So I --

6        MR. MESROBIAN:  We can go three pages more.

7        THE COURT:  What page is that?

8        MR. MESROBIAN:  That is page 29, Your Honor.

9   Actually, we'll go to page 30.  Just go to the end of the

10  month.  Can you focus on the transactions there?

11  BY MR. MESROBIAN:

12  Q.   So now we've moved ahead to January 27th through the end

13  of the month.  Are there deposits on these days as well?

14  A.   January -- yes, January 27th, 28th, and 28th.

15  Q.   And these appear to be -- well, I guess two of those are

16  adjustments for debit card transactions, it appears?

17  A.   On the 27th, the 199, that's an adjustment, and then the

18  28th for the 340.99 is also an adjustment.  So probably a

19  return is usually what that means.

20  Q.   And going back to page 95C -- or, excuse me, Exhibit 95C,

21  page 25, and the section underneath "Summary of Account" in the

22  middle there.  Do you see a line there -- and there are two

23  numbers -- two account numbers there, OO Share and 80 Advantage

24  Checking?

25  A.   Yes.

1   Q.    And the 80 Advantage Checking is where all the transaction

2   activity appears to be?

3   A.    Correct.

4   Q.    And this is the account that Mr. Ervin wanted to close?

5   A.    Correct.

6   Q.    And he said he wanted to close his account on

7   December 28th of 2020?

8   A.    Correct.

9   Q.    So in that next month, in January 2021, how many deposits

10  did he make, according to this summary here?

11  A.    $8,110.26.

12  Q.    Or is that the ending balance in the account?

13  A.    That is the ending -- well, no, total of deposit balances.

14  Q.    Before that, in the column Credit Amount.

15  A.    Oh, sorry.  $38,581.68.

16  Q.    And then before that it says Total Credits of 24?

17  A.    Where?

18  Q.    In the next column to the left of Credit Amount.

19  A.    Oh, yes.

20  Q.    So does that mean that during January 2021 Mr. Ervin --

21  there are 24 deposits into this account in an amount exceeding

22  $38,000?

23  A.    Correct.

24  Q.    And again, to your knowledge, did Mr. Ervin actually close

25  his account with Community First?

1    A.    No.

2    Q.    Finally, to be clear, you testified on direct that

3    Mr. Ervin at one point asked you about what the cash reporting

4    threshold was?

5    A.    Correct.

6    Q.    Do you recall when in relation to this December 28th

7    incident that was?

8    A.    Before.

9    Q.    And to be clear, did you tell him what the threshold was?

10   A.    No.

11   Q.    And why not?

12   A.    We're not allowed to.

13   Q.    Is that information available on the internet or anywhere,

14   to your knowledge?

15   A.    I'm sure that it is.

16             MR. MESROBIAN:  Your Honor, I have no further

17   questions.

18             THE COURT:  Mr. King?

19             MR. KING:  If I could, Your Honor.

20                         RECROSS-EXAMINATION

21   BY MR. KING:

22   Q.    Ms. Sarkese, I just wanted to follow up on a couple of

23   questions that I wanted to clarify.

24             My recollection of your testimony on direct as to

25   that last question in terms of if he asked, you know, what the

1  reporting requirement was --

2  A.    Yes.

3  Q.    -- my understanding is that was after all of this took

4  place, but you're saying now it was before?

5  A.    Before -- okay, what?  I'm sorry.

6  Q.    The question that he asked regarding the report -- you

7  know, "When would you have to report me to the," whatever he

8  said.

9  A.    Before December?

10  Q.    Yeah.

11  A.    I believe it was before December.

12  Q.    Okay.  Do you recall saying that it was after on direct

13  testimony or --

14  A.    No.

15  Q.    Okay.

16  A.    I don't remember, sorry.

17  Q.    Did you make a note of that anywhere in the account, in

18  the account notes?

19  A.    I don't recall.

20  Q.    Is that something you would normally note in the account

21  notes?

22  A.    Yes.

23  Q.    Okay.  So if it's not in the account notes that we have,

24  is it likely because it's not in this time frame?

25  A.    It's possible.

1    MR. KING:  Your Honor, may I approach with

2  Defendant's Exhibit 26?

3    THE COURT:  You may.

4    MR. KING:  Did I ask if I can approach?

5    THE COURT:  You did.

6    MR. KING:  Okay.

7    THE COURT:  Go ahead.

8  BY MR. KING:

9  Q.   Ms. Sarkese, if you could just take a look at that and

10 just look up at me when you're done going through all that.

11 A.   Okay.

12 Q.   Ms. Sarkese, what do you recognize that to be?

13 A.   The account notes from when I opened the account in 2019.

14 Q.   Okay.  And the -- the notes that you have in front of

15 you -- I know we discussed two of the pages.  Is that the

16 complete account notes with every single page from the history

17 of that account?

18 A.   Unless it was anything after -- I can't tell the date on

19 this one.  Unless it was anything after the top note.

20 Q.   And let me ask it -- once again, I've asked a question

21 that now that I'm thinking about it I could ask a better way.

22    Does that have every single account note that you

23 would have made, or anybody at Community First, prior to that

24 December 28th incident?

25 A.   Yes.  That would be all the account notes that are in the

1   system, yes.

2   Q.   And you said before it would be your practice -- if

3   somebody asked about, you know, how much they could take out

4   with one trip, that it would be your practice to put that in

5   the account notes?

6   A.   I mean, typically, yes, we would put that in the account

7   notes.

8   Q.   Have you had a chance to go through the entirety of that

9   account and read through it?

10  A.   From here, yes.

11  Q.   Yes, ma'am.  Anywhere in there does it say that the --

12  that he asked you that question --

13  A.   No.

14  Q.   -- before that December 28th date?

15  A.   No.

16          MR. KING:  And Your Honor, I'd move that in under FRE

17  803(6).

18          THE COURT:  Any objection?

19          MR. MESROBIAN:  No, Your Honor.

20          THE COURT:  And that was Defendant's 26?

21          MR. KING:  Yes, thank you.  I believe so, Your Honor.

22  Thank you.

23          THE COURT:  Defendant's 26 is admitted.

24      (Defendant Ervin's Exhibit 26 admitted in evidence.)

25  BY MR. KING:

1    Q.    And Ms. Sarkese, I know we went through the January -- let
2    me ask one question in follow up.  Would it be uncommon for him
3    to come in, throw a temper tantrum, get upset, and then come in
4    a couple days later as if nothing happened?
5    A.    That happened often, yes.
6    Q.    So he would blow up at you?
7    A.    Correct.
8    Q.    And then a week or two goes by, you see him, and it's as
9    if that had not occurred?
10   A.    Correct.
11   Q.    Was it unusual to you that he didn't follow through on his
12   threats to close out his account and never come back and never
13   do any business with you?
14   A.    Was it unusual that he didn't close it?
15   Q.    Was that surprising to you?
16   A.    No.
17   Q.    And did you take that as a -- I mean, did it seem like an
18   upset threat, or did it seem like he had actually planned on
19   coming in that day to close the account?
20   A.    It more seemed like an upset threat.
21   Q.    And we talked a little bit about the deposits in January.
22   Did you have a -- as we went through those, would it be fair to
23   say those were mostly automated deposits rather than actual --
24   A.    Correct.
25   Q.    -- checks or cash that he was putting in the bank?

```
 1   A.   Correct.
 2   Q.   And those were almost all entirely automated?
 3   A.   Correct.
 4             MR. KING:  Your Honor, I have nothing further.  Thank
 5   you.
 6             THE COURT:  All right.
 7             MR. KING:  Thank you, Ms. Sarkese.
 8             THE COURT:  You may step down.
 9             MR. MESROBIAN:  Your Honor, may we approach?
10             THE COURT:  Yes.
11        (Proceedings at sidebar:)
12             MR. MESROBIAN:  So Your Honor, there's one more
13   witness from the bank, Mr. LeVay.  I think he'll be relatively
14   brief.  I didn't know when the Court wanted to take the
15   morning -- the break for the afternoon.  We have Special Agent
16   Slosson who can testify as well.  We actually don't -- we
17   attempted to get Mr. Ervin's father -- at the break we tried to
18   get Mr. Ervin's father to come in case we could get to him.  It
19   didn't seem like he could be here.
20             I just want the Court to know about the schedule and
21   whether this would be the right time for the break.
22             THE COURT:  It's way too early to break.  Usually --
23   remember, I try to have them not sit more than an hour and
24   45 minutes.  That means usually we would break around
25   3:45ish -- between 3:30 and 3:45.
```

1          MR. MESROBIAN:  I was just maintaining the schedule.

2    We hadn't mentioned Mr. Ervin, I think, as a potential witness

3    today, so I just wanted to make --

4          MR. KING:  I think we're ahead of schedule, and no

5    complaints about that.

6          THE COURT:  Okay.  Let me say to all defense counsel,

7    stop -- stop introducing yourselves to the witness and the

8    pleasantries.  Just get to the questions.

9          MR. KING:  Okay.

10          THE COURT:  That's not necessary, okay?

11          MR. KING:  Yes, ma'am.

12          THE COURT:  Thank you.

13       (Proceedings in open court:)

14          THE COURT:  Next witness.

15          MR. MESROBIAN:  Your Honor, the United States calls

16    Matthew LeVay.

17       (Witness enters the courtroom.)

18          THE COURT:  Sir, I'll ask you to come all the way up

19    here to the witness stand, and if you'll remain standing.

20          COURTROOM DEPUTY:  If you could please raise your

21    right hand.  Do you solemnly swear that the testimony you're

22    about to give before this Court will be the truth, the whole

23    truth, and nothing but the truth, so help you God?

24          THE WITNESS:  I swear.

25          COURTROOM DEPUTY:  You may have a seat.  And if you

```
 1   could please state your name for the record and spell your last
 2   name.
 3               THE WITNESS:  My name is Matthew LeVay, L-e-V-a-y.
 4          MATTHEW LeVAY, GOVERNMENT WITNESS, SWORN,
 5                         DIRECT EXAMINATION
 6   BY MR. MESROBIAN:
 7   Q.   Sir, where are you currently employed?
 8   A.   I'm currently employed by Fanatics.
 9   Q.   And what is your current position?
10   A.   My current position is social media supervisor.
11   Q.   Prior to Fanatics -- when did you start working at
12   Fanatics?
13   A.   In April of 2021.  So officially two years now.
14   Q.   So prior to Fanatics where were you employed?
15   A.   I was employed by Community First Credit Union.
16   Q.   How long did you work at Community First?
17   A.   I worked at Community First from October of 2019 to -- it
18   would have been January -- or, sorry, March of 2021.  So a year
19   and five months, year and six months.
20   Q.   And could you describe what positions you held at CFCU.
21   A.   Absolutely.  I was a Member Solutions Representative at
22   one of our branches in Fleming Island.  And then for a few
23   short months as well I was also a Commercial Lending Support
24   Specialist in the Commercial Lending Department.
25   Q.   So during December of 2020, what was your particular role?
```

1    A.    I was a Member Solutions Representative at Fleming Island,
2    our Fleming Island branch.
3    Q.    And for those members of the jury who may not know
4    geography south of Jacksonville, where is Fleming Island?
5    A.    Yes, no, of course.  Fleming Island is south -- basically
6    south of Jacksonville.  Yeah, it's in Clay County, the county
7    basically to the south and west of Jacksonville.
8    Q.    And is it near Orange Park?
9    A.    Yes.  Yeah, it's near Orange Park.
10   Q.    So what were your duties and responsibilities as a Member
11   Solutions -- in your Member Solutions role?
12   A.    Yeah, so it was a mixed role.  Part of it involves just
13   being on the teller line, as well as kind of like the banker
14   side, where you open accounts, you do loan applications, things
15   of that nature.  So really just a mixture of teller
16   responsibilities and banking responsibilities as far as loans,
17   things like that.
18              THE COURT:  Sir, I'm going to ask you to pull that
19   microphone a little bit further back from you.
20              THE WITNESS:  Sorry.
21              THE COURT:  No, that's okay.
22              THE WITNESS:  Sorry.  It's a good problem to have.
23              THE COURT:  We usually have the opposite problem.
24              THE WITNESS:  There we go.
25              THE COURT:  Go ahead.

1    BY MR. MESROBIAN:

2    Q.    So Mr. LeVay, I just want to direct you to December 28th

3    of 2020.  Do you recall a visit by an individual named

4    Kristopher Justinboyer Ervin to the Fleming Island branch on

5    that day?

6    A.    Yes.

7    Q.    Had you ever met Mr. Ervin before?

8    A.    No, not to my knowledge, unh-unh.  I did not recognize him

9    or have any interaction before that.

10   Q.    Did you interact with him on that day?

11   A.    Yes.

12   Q.    Did you ever interact with him to your recollection

13   afterwards?

14   A.    No.

15   Q.    So on that date were you working as a teller in your

16   Member Solutions capacity?

17   A.    Yes.  At that moment in time on that day I was at

18   basically the front of the teller line, yep, just right in the

19   middle when you walk in the branch.

20   Q.    And approximately when on December 28th did this occur?

21   A.    This occurred later in the day.  It was pretty close to

22   our closing time from the branch.  I'd say it had to have been

23   probably in the 4 o'clock hour, shortly before we closed.  We

24   closed at 5 p.m., so kind of the afternoon, slash, getting

25   close to evening time.

1   Q.   Did you have an initial impression of Mr. Ervin when he

2   first approached you?

3   A.   Not in particular, no.

4   Q.   Did he tell you anything about having had previous

5   business with another CFCU branch that day?

6   A.   Yes.  I do remember he mentioned that he had been at the

7   Orange Park location, which is also close by, probably about

8   maybe 15 minutes away, 10, 15 minutes away from our location.

9   Q.   What did Mr. Ervin want to do that day at your branch?

10  A.   Yes.  I remember he wanted to make a cash withdrawal as

11  well as deposit a check.

12  Q.   So first, with respect to the withdrawal, do you recall

13  how much he asked to withdraw in cash?

14  A.   So I do not remember the exact amount, but I know that we

15  did not have available the full amount that he wanted at first.

16           So no, I do not recall that.

17  Q.   How much were you able to give him?

18  A.   We were able to give him $5,000 in a mixture of bills.

19  Q.   Did he request a particular type of bill?

20  A.   Yes, larger bills.

21  Q.   So the amount that he requested, you don't remember

22  exactly what it was?

23  A.   I don't remember exactly the amount, no.

24  Q.   But it was some amount greater than $5,000 --

25  A.   Yes.

1  Q.    -- that you could give him?

2  A.    Yes, it was.

3  Q.    Do you recall receiving any alerts on your system in

4  connection with that withdrawal?

5  A.    Yes.

6  Q.    And what was that?

7  A.    That was a Currency Transaction Report.

8  Q.    What happens on your system when you receive that alert?

9  A.    Yeah.  So when we receive a Currency Transaction Report,

10  basically, you know, a message will appear on our screen that

11  we have to complete this form.  And then we will be prompted to

12  basically input information about the person, the most

13  up-to-date information about their name, address, things of

14  that nature.

15  Q.    Why does that alert exist, to your knowledge?

16  A.    That alert exists, to my knowledge, because if a person

17  were to withdraw more than $10,000 in cash, I believe in one

18  day, that is then what would trigger that report.

19  Q.    So when you received that alert, what do you have to do?

20  A.    I have to input the most up-to-date information for that

21  person.  So I believe, to my knowledge, I remember you had to

22  fill out the name, their most current address.  I think you

23  also have to obtain, like, their employer, things of that

24  nature.  Just the most recent updated contact information for

25  that individual.

1  Q.   How do you handle asking customers those questions in this
2  circumstance?
3  A.   In those, I usually do not get very, you know, in depth
4  about what I'm doing.  Obviously I don't tell the customer, the
5  individual, what I'm doing.  I'll just basically say, "Hey,"
6  you know, "we have to just update your account.  I see there's
7  a few things that need updating.  Is this still your good
8  address?"  Things like that.
9       So I never say exactly, like, "We have to do this."
10  Just always ask open-ended questions to just say, "Oh, we have
11  to," you know, "update your account information."
12  Q.   To be clear, you would not advise a customer that their
13  withdrawal exceeded the reporting threshold?
14  A.   No.
15  Q.   Do you recall if you discussed Mr. Ervin's business with
16  him?
17  A.   No.  I remember he mentioned that he had a business, but I
18  do not recall, like, getting in depth at all about the business
19  in and of itself.
20  Q.   Do you recall if Mr. Ervin had any other transactions that
21  day?
22  A.   Yes.  Not to my knowledge any more currency transactions,
23  but we did have a -- he wanted to deposit a check that day.
24  Q.   And do you recall who the check was made out to?
25  A.   I don't remember the exact company, but I do know that it

1  was made out to a company that was not on his account that day

2  or one that had an account with us.  So it wasn't a business or

3  a person that had an account with us at the time.

4  Q.    So he was trying to deposit this item made out to a

5  business into his personal account?

6  A.    Yes.

7  Q.    And what happened with that check or money order?

8  A.    Absolutely.  So we did initially deposit it into his

9  account and then shortly after that realized that the check was

10 actually made out to, you know, the business that was not on

11 his account.  So he could not technically -- you know, compared

12 to what we know at the credit union, we're not allowed to

13 deposit checks from a business into a personal account,

14 especially if it's not -- you know, if it's not that -- that

15 business doesn't have a relationship with us.  So I couldn't

16 just put, you know, a McDonald's check into a Burger King

17 check, something along those lines.  It would have to match

18 what we have on file.

19 Q.    So what happened after you realized there was an issue

20 with this item?

21 A.    Yeah.  So we did end up having to call Mr. Ervin just to

22 let him know that, "Hey, we made a mistake of depositing this

23 check into your account."  We asked him to come back to the

24 branch to give him the check back.

25 Q.    And did he do that?

1   A.   Yes.

2   Q.   So tell the jury about what happened with that.

3   A.   Yeah.  So I remember I did have to call Mr. Ervin that day

4   just to let him know the mistake that we had made in depositing

5   the check into his account and asked him if he could return.

6        So he did ultimately return, you know, probably 10 to

7   15 minutes later.  And it was -- we may have been closed at the

8   time.  It was right around that closing time.  So once he

9   returned I went out and met him basically in the entryway to

10  our branch to give him the check, and that was it.

11  Q.   Did he appear to be upset with you for his issue?

12  A.   No, not upset.  I don't recall him being upset.

13       MR. MESROBIAN:  Finally, Ms. Ganoe, could we publish

14  Government Exhibit 95E, page 1.

15       THE COURT:  Go ahead.

16       MR. MESROBIAN:  And if we could focus on the top,

17  please.

18  BY MR. MESROBIAN:

19  Q.   So Mr. LeVay, do you recognize this type of document?

20  A.   Yes.

21  Q.   And what is it?

22  A.   It is a Currency Transaction Report.

23  Q.   Is this how it looks to you when you're looking on the

24  teller line, or does it look -- are you looking at something

25  different?

1    A.    That -- that, I believe, is pretty much how it looks.  You

2    know, I -- it's been a couple years since I've been doing it,

3    so I don't remember exactly.  But it would definitely be

4    exactly like this how it would appear on our screens.

5              MR. MESROBIAN:  If we could go to the next page,

6    please.

7    BY MR. MESROBIAN:

8    Q.    So at the top, the very top section there, there's a

9    heading that says "Part I, Person Involved in Transaction."

10   And under that it says -- there's a check mark next to "Person

11   conducting transaction on own behalf" and "Multiple

12   Transactions," right?

13             We can make that bigger if you need.

14   A.    Maybe just a little bit.  I'm so sorry.

15   Q.    No, it's fine.

16   A.    Yes, I see those two boxes checked.

17   Q.    And what does "Multiple Transactions" mean?

18   A.    I do not exactly recall.  I would assume that that means

19   they had tried -- it's because -- this report is triggered

20   because this person had conducted multiple transactions

21   throughout the day, which would then trigger the report,

22   because, again, at the 10,000 mark -- if he were to come in

23   and, you know, take out $11,000, that would trigger the report

24   on my end.  But if he were to go take out a certain amount at

25   one bank, come to another bank, take out another amount, it

1  would then trigger this, to where this is, I believe, what it's

2  referencing, multiple transactions to get to the CTR.  Multiple

3  transactions led to the CTR.

4            MR. MESROBIAN:  If we could go further down.

5  Actually just --

6  BY MR. MESROBIAN:

7  Q.   So in the second section here we're highlighting towards

8  the top middle of the page.  The name of the individual about

9  whom this CTR was filed is Kristopher "Justinboye" Ervin?

10 A.   Yes.

11 Q.   And next to occupation it says "owner of Auto Key Card."

12 Would you have entered that information?

13 A.   Yes.  I would have -- if I was filling it out, I would

14 have entered that information, yes.

15 Q.   And do you recall how you got that information?

16 A.   That would have been me just asking, as part of the CTR

17 process, again, those questions of, "What is your most

18 up-to-date employer?  What is your most up-to-date address?"

19            Whatever his answer would have been during that point

20 in time, that's what I would have inputted.

21 Q.   And when you're asking those questions, again, you don't

22 say, "This is for the purposes of a Currency Transaction

23 Report"?

24 A.   Exactly.  I would never say that.  It would just be

25 simple -- you know, if I were talking to any individual, you

1  know, "Hey, we're just trying to know your most up-to-date

2  information.  Where are you employed right now?"

3          MR. MESROBIAN:  And Ms. Ganoe, could we go to the

4  bottom of this page, please.

5  BY MR. MESROBIAN:

6  Q.   And here there is an additional contact information

7  entered, phone number and email address; is that right?

8  A.   Yes.

9  Q.   And at the bottom, in line 22 it says, "Cash out amount,

10  $14,000."  Is that right?

11  A.   Yes.

12  Q.   And only $5,000 -- he had only withdrawn $5,000 in his

13  transaction with you, correct?

14  A.   Yes.

15          MR. MESROBIAN:  Ms. Ganoe, if we could publish page

16  4, please.

17  BY MR. MESROBIAN:

18  Q.   So here we are under the heading Transaction Location.

19  And it says "depository institution."  What does that refer to

20  next to "type of financial institution"?

21  A.   I would assume that's just referring to that we are a

22  place where you can deposit -- as we are a financial

23  institution, you can deposit, you know, funds into the credit

24  union.

25  Q.   Are some of these boxes auto-filled for you when this pops

1    up, or do you have to enter everything as you're going through?

2    A.    I'll be honest, I do not exactly recall that part, but I

3    do believe that there is some information that will populate as

4    part of the process.

5    Q.    In Box 29 it says -- next to "primary federal regulator"

6    it "National Credit Union Administration."  Is that the

7    regulator and insurer of federal credit unions?

8    A.    Yes.

9    Q.    And further down this page it lists Community First Credit

10   Union of Florida, and there's an address in Fleming Island.

11   Was that the branch where you worked?

12   A.    That's the branch, yes.

13   Q.    And then at the bottom of the page, in the box at the

14   bottom, Box 42, it says, "Cash out amount for transaction

15   location, $5,000"?

16   A.    Yes.

17   Q.    And that reflects the cash withdrawal that Mr. Ervin made

18   with you?

19   A.    Yes.

20         MR. MESROBIAN:  And Ms. Ganoe, if we can go to the

21   next page.  And we'll just focus on the bottom -- on the bottom

22   part of this page.  I'm sorry, a little bit higher than that.

23   BY MR. MESROBIAN:

24   Q.    And here, I think that's the next --

25         MR. MESROBIAN:  The next two pages.  The previous

1    page.  There we go.

2    BY MR. MESROBIAN:

3    Q.   So here on this page, is this a similar type of reporting

4    page to the one we were just looking at?

5    A.   Yes.

6    Q.   But on this page the address of Community First Credit

7    Union of Florida is listed as 625 Blanding Boulevard in Orange

8    Park?

9    A.   Yes.

10   Q.   And is that the Orange Park branch we were discussing --

11   or that you referenced a few minutes ago?

12   A.   Yes.

13   Q.   And at the very bottom, next to Box 42, for this one it

14   says, "Cash out amount for transaction location, $9,000"?

15   A.   Yes.

16   Q.   Do you recall filling out this section of the form?

17   A.   I don't recall, no, sir.

18   Q.   To be clear, you would not have been involved in this

19   transaction, right?

20   A.   I would not have been involved in the transaction for

21   $9,000, no.

22   Q.   And just to be clear, we were talking about when Mr. Ervin

23   came back to pick up the check from you after you called him

24   earlier.  But at any point during your interactions with him on

25   that day did he seem overly upset or aggressive with you?

1  A.   I would say just at the beginning he was upset because of

2  an issue at the Orange Park branch.  I know he did not go into

3  detail.  So that's all.

4          But neither here nor there.  I did not -- throughout

5  the whole conversation it was not that I felt Mr. Ervin was

6  upset or anything like that at us, no.

7          MR. MESROBIAN:  May I have one moment, Your Honor?

8          THE COURT:  You may.

9      (Government's counsel confer.)

10         MR. MESROBIAN:  No further questions, Your Honor.

11         THE COURT:  Mr. King.

12                      CROSS-EXAMINATION

13  BY MR. KING:

14  Q.   Good afternoon, Mr. LeVay.

15  A.   Good afternoon.

16  Q.   From your review of that CTR, it's your understanding that

17  the transaction at the Orange Park branch was for $9,000?

18  A.   Yes.  That is my understanding of that yes, sir.

19  Q.   And if somebody were to ask for more than a thousand

20  dollars that day at another branch, you would have to fill out

21  a CTR, and that's, in fact, what happened?

22  A.   Yes.  So if someone -- if a certain person took out

23  $9,000, let's say, at the Orange Park branch that day, if they

24  were to go to another location, whether it be our location in

25  Fleming Island or another location, and that cash withdrawal

1    would be more than a thousand dollars, that report would be

2    triggered.

3    Q.    And did Mr. Ervin at any time he was with you express any

4    concern about taking out more than a thousand dollars?

5    A.    I do not vividly recall, no.  I do not recall that.

6    Q.    And, in fact, he actually asked for significantly more

7    than the 5,000 that you ultimately gave him?

8    A.    Yes, he did ask for a larger amount.  I do not remember

9    the exact amount, but I know it was more than what we could

10   give since it was later in the day and we -- you know, at

11   branches there are sometimes issues with the amount of cash we

12   have on hand.  So I know we did not have the amount to give him

13   what he initially wanted.

14   Q.    And he asked for an amount that would have -- independent

15   of what happened at the Orange Park branch, the amount he was

16   asking for, can we agree, was more than 10,000, would have

17   triggered a CTR by itself?

18   A.    Yes, if it was more than 10,000, that in and of itself

19   would have triggered a CTR.  And then obviously with the

20   addition of what he had taken out, that also would have

21   triggered the CTR.

22   Q.    And he was asking for more than 10,000 from you

23   originally?

24   A.    I do not remember the exact amount, no.  I do not remember

25   the exact amount that he asked for.

1  Q.   Okay.  So you don't know if it was -- it was more than

2  5,000?

3  A.   Yes.

4  Q.   And you said "significantly more," but the details you

5  don't remember?

6  A.   I don't remember that.  I would say probably close to

7  double that.  But again, I do not remember the exact amount.

8  Q.   At any time that he was with you did he express any

9  concern about a CTR or trying to keep an amount under the

10  reporting amount, or was he just trying to get as much money as

11  he could from you?

12  A.   I can't recall that in particular.

13         MR. KING:  I appreciate your time, sir.  Thank you.

14         THE WITNESS:  Yes, sir.

15         THE COURT:  Anything else, Mr. Mesrobian?

16         COURTROOM DEPUTY:  Mr. Larosiere.

17         THE COURT:  Oh, I'm sorry.

18         MR. LAROSIERE:  Nothing, Your Honor.

19         MR. MESROBIAN:  May I have one moment, Your Honor?

20         THE COURT:  Yes.

21         MR. MESROBIAN:  One question, Your Honor.

22                   REDIRECT EXAMINATION

23  BY MR. MESROBIAN:

24  Q.   So Mr. LeVay, Mr. King asked you some questions about

25  Mr. Ervin's cash request to you?

1  A.   Yes.

2  Q.   Do you recall whether Mr. Ervin asked you for an amount

3  just under $10,000?  Strike that.

4       You said that you thought it was perhaps twice the

5  amount of -- that he actually got?

6  A.   Sure.

7  Q.   So do you recall if he asked you for an amount just under

8  $10,000?

9  A.   I don't recall the exact amount, but I know it would have

10 been -- you know, it was more than the 5,000, I know, because

11 we had to come back down to, "We do have 5,000 that we could

12 give you."

13      So I don't remember the exact amount.

14      MR. MESROBIAN:  No further questions.

15      MR. KING:  Nothing further, Your Honor.

16      THE COURT:  All right.  You may step down, sir.

17      And ladies and gentlemen, it's 3:30.  We'll go ahead

18 and take our afternoon break.  We'll take -- you're free to go,

19 sir.

20      THE WITNESS:  Thank you.

21      (Witness exits the courtroom.)

22      THE COURT:  We'll take 15 minutes.  I'll ask you to

23 please be back in the jury room ready to continue with the

24 evidence at 3:45.

25      Please remember to continue following my instructions

1    about not talking to one another or anybody else about this

2    case, not letting anyone talk to you or in your presence about

3    it.

4         Don't conduct any independent research in any way,

5    including with the internet.

6         Don't read, watch, or listen to any media reports.

7         And remember that you must not form or express any

8    opinions.

9         We'll see you back in about 15 minutes.

10        COURT SECURITY OFFICER:  All rise for the jury.

11    (Jury exits, 3:31 p.m.)

12        COURT SECURITY OFFICER:  Please be seated.

13        THE COURT:  Mr. Mesrobian, can you tell me the next

14    witness, just -- oh, Ms. Taylor.

15        MS. TAYLOR:  Your Honor, I think it will be Special

16    Agent Slosson.

17        THE COURT:  And Mr. Larosiere, because those last

18    witnesses didn't relate to the charges against your client is

19    why I wasn't focusing.  It didn't seem that you would be

20    addressing -- because they related only to charges against

21    Mr. Ervin.

22        MR. LAROSIERE:  Yeah, no, I understand.  And I was

23    almost like not wanting to even stand up because it was so

24    obvious, but . . .

25        THE COURT:  Okay.  All right.  So we'll be in recess

 1   for about 15 minutes and then we'll continue with the evidence.

 2            MR. KING:  Your Honor, I apologize.  There is

 3   something.  Just as we were going through the presentation of

 4   the evidence, Government's Exhibit 95D, we noticed on page 3

 5   has Mr. Ervin, Sr.'s full Social Security, driver's license,

 6   and date of birth.  And I just wanted to make sure that that

 7   doesn't accidentally get uploaded into CM/ECF.

 8            THE COURT:  Okay.

 9            MR. MESROBIAN:  And Your Honor, I know Ms. Wiles and

10   I both keep track of when we see PII in the exhibits, because

11   we try and redact as best we can, but we also keep an eye on

12   them as they're coming into evidence.  So we'll be sure to

13   redact those before we provide copies for the Court to enter on

14   the docket.

15            THE COURT:  Okay.  And can you also redact what goes

16   back to the jury?  Because the jury really shouldn't get his

17   Social Security number and date of birth either.

18            MR. MESROBIAN:  Yes, Your Honor.

19            THE COURT:  All right.  Thank you.

20            Thank you, Mr. King.

21        (Recess, 3:33 p.m. to 3:50 p.m.)

22        (Mr. King and Mr. Larosiere not present.  Jury not

23   present.)

24            COURT SECURITY OFFICER:  All rise.  This Honorable

25   Court is now in session.

1              THE COURT:  We're missing people.

2              COURT SECURITY OFFICER:  Please be seated.

3              MS. TAYLOR:  Your Honor, should I go check for

4      Mr. King and Mr. Larosiere?

5              THE COURT:  That would be lovely.

6          (Mr. King and Mr. Larosiere enter the courtroom.)

7              MR. KING:  I'm sorry, Your Honor.  We went to another

8      floor so we weren't near the jurors.

9              THE COURT:  No worries.

10             But we do have a matter we need to address.  One of

11     the jurors expressed a concern to the court security officer.

12     I asked her to separate that juror from the remaining jurors

13     and ask him to write down the concern.

14             And so I have a note, which I'm going to mark Court's

15     Exhibit 1, but I'm going to direct that it be filed under seal

16     so the Court note's not on the public docket.

17             This is from Juror No. 11.  He's the fourth one from

18     the left on the back row.  And he says, "When we were

19     interviewed, I said I work at Duval Schools maintenance.  There

20     are three buildings.  I am concerned about retaliation if

21     guilty from followers."  It's spelled f-o-w-o-l-e-r-s, but I

22     think he means "followers."

23             And I say that in part because what he verbally

24     expressed to the court security officer was that he was

25     concerned that if there was a guilty verdict, there would be

1    retaliation at Duval County Public Schools.

2         And when she asked him to write the note, she said

3    she observed that he was shaking and he expressed that he was

4    fearful.  So that's Court's Exhibit Number 1.

5        (Court's Exhibit 1 filed under seal.)

6         THE COURT:  In my view we don't have a choice but to

7    dismiss this juror, because he clearly is influenced by

8    thoughts other than the -- by concerns other than the evidence.

9    But I will hear from you-all.

10        He expressed to the court security officer that he

11   had not discussed this with any of the other jurors, and

12   that's, in part, why I had him immediately separated from the

13   other jurors.

14        But Ms. Taylor, let me hear your thoughts.

15        MS. TAYLOR:  Your Honor, given the description of his

16   physical demeanor and that he seems genuinely fearful and

17   intimidated to the point of exhibiting physical indications of

18   that, I think there's a serious concern that he would not

19   render a fair verdict in this case.  And I would concur with

20   the Court's judgment that he needs to be dismissed.

21        THE COURT:  Mr. King?

22        MR. KING:  Your Honor, I tend to agree.  I don't

23   think we have much of a choice.

24        My -- my only caveat or suggestion would be I think

25   it would be appropriate -- I know he mentioned to the court

1   security officer that he hasn't talked or mentioned it or had

2   any conversations with the other jurors, but I think it would

3   be -- just for record purposes, make sure that has not caused

4   any issues with any of the other jurors.

5           And, you know, certainly whatever -- I'm not sure how

6   the Court is going to fashion an explanation to the rest of the

7   jury, we can figure that out, but that would be my only

8   concern.  But otherwise, I agree with both of you, I don't

9   think we really have much of a choice.

10          THE COURT:  Okay.  I don't know who wants to address

11  this on behalf of Mr. Hoover.

12          Mr. Larosiere.

13          MR. LAROSIERE:  Yes, Your Honor.  We'll follow

14  basically in tow with what Mr. King said.  Even to the extent

15  that the concerns might not be extremely reasonable, if they

16  are physically manifested in such a way, it's problematic.

17          THE COURT:  Okay.  All right.  So then I think what I

18  would propose that we do is that with the agreement of all

19  parties, I would dismiss Juror No. 11, which would move Juror

20  33 -- sorry, Juror 15 -- no, no, no.  Wait.

21          MR. LAROSIERE:  Is it not 35?

22          THE COURT:  No, 35 was the last alternate.

23      (The judge and the courtroom deputy confer.)

24          THE COURT:  I see.  Yes, yes.  I'm sorry, we're --

25  I'm misreading the chart.  Yes, 35 would now be one of the

1   jurors.  And the remaining alternates would be 36 and 41.

2          But I think consistent with Mr. King's concern, what

3   I should do is bring Juror No. 11 in, let him know that we've

4   received his note, that we appreciate his concern, that we're

5   going to go ahead and dismiss him, but before doing so, I need

6   to inquire about whether he expressed this concern or any other

7   concern to any of the other jurors.  And we'll have to flow

8   from there.

9          Is that acceptable, Ms. Taylor?

10          MS. TAYLOR:  Yes.  And Your Honor, he's -- is he

11   Juror 9?

12          THE COURT:  He's Juror 11.  He was 29 in selection.

13          MS. TAYLOR:  Okay.  All right.  That's -- that's --

14   that's who I thought we were talking about.  Previous 29.  Got

15   it.

16          THE COURT:  Okay.  All right.

17          Mr. King, is my proposal acceptable?

18          MR. KING:  Yes, Your Honor.

19          THE COURT:  And Mr. Larosiere?

20          MR. LAROSIERE:  Yes, Your Honor.

21          THE COURT:  Okay.  So can we have Juror No. 11 only

22   brought in?  Thank you.

23          And what I would intend to do is when we bring the

24   rest in, just tell them that Juror No. 11 had a personal matter

25   that prevents him from being able to continue to participate in

 1   the trial but that doesn't affect our ability to proceed.

 2           Is that okay, Mr. King?

 3           MR. KING:  Your Honor, I assumed you'd do a better

 4   job than I would coming up with that.  I think that's perfect,

 5   thank you.

 6           THE COURT:  And Mr. Larosiere?

 7           MR. LAROSIERE:  Sounds fantastic, Your Honor.  Thank

 8   you.

 9           THE COURT:  Ms. Taylor?

10           MS. TAYLOR:  Yes, Your Honor.

11       (Juror No. 11 enters the courtroom.)

12           THE COURT:  All right, sir.  I'm going to ask you to

13   come up to that podium right there.  You can just stand right

14   there.  I need you in front of that microphone just for a

15   moment.

16           JUROR:  Yes, ma'am.

17           THE COURT:  First of all, thank you for your note.

18   We appreciate your candor and we understand your concern, and

19   so we're going to go ahead and let you go.  And that won't --

20   that won't affect us being able to continue the trial.  But we

21   won't require you to continue with your jury service, okay?

22           JUROR:  Yes, ma'am.

23           THE COURT:  Okay.  I do need to ask you, though, have

24   you expressed any of these concerns to any of the other jurors

25   in any way?

1     JUROR:  No, no.  Not really, no.

2     THE COURT:  Well, "not really" is different than "no,

3  not at all."  I just --

4     JUROR:  I mean, I just said -- well, I would rather

5  tell you in private.

6     THE COURT:  Tell me in private what you said to the

7  other jurors?

8     JUROR:  Just one possibly, yeah.  I mean, it's

9  nothing big.

10     THE COURT:  Okay.  Well, I'll tell you what, I'm

11  going to let the juror come up to sidebar and talk to me

12  briefly and then I'll come back to you-all.

13     So, sir, can you just walk right over here?

14     JUROR:  Yes, ma'am.

15     (At sidebar with the Juror No. 11 only:)

16     JUROR:  I did tell one guy.

17     THE COURT:  I need you to --

18     JUROR:  I did tell one person that I just felt that I

19  was concerned if this goes south what can happen then, because

20  I said that I live in Duval -- or I work in Duval County, and

21  he said, "Well, don't worry about it."

22     THE COURT:  Okay.  Can you tell me who that was if I

23  show you the juror chart?

24     JUROR:  He's -- I'm 11 and he's 12.

25     THE COURT:  He's 12.

```
 1              JUROR:  I'm sorry, but I was just -- my vivid
 2    imagination gets to me and I just get overexcited and anxious.
 3              THE COURT:  Okay.  Are you certain you didn't say it
 4    to anyone other than --
 5              JUROR:  Yes, ma'am, yes, ma'am.
 6              THE COURT:  Just No. 12?
 7              JUROR:  Yes, ma'am.  I'm sorry I said something, but
 8    I -- I don't want to lie.
 9              THE COURT:  It's okay.
10              JUROR:  No, it's not.  I feel bad because I want to
11    finish this, I really do.
12              THE COURT:  Yeah, but you understand that we can't
13    let you finish if you're worried about that?
14              JUROR:  Yes, ma'am.  I'm sorry.  I'm sorry.
15              THE COURT:  No, no, it's okay.  No, no, it's all
16    right, sir.  Sir, please don't be upset.  Honestly.  I've had
17    worse things happen in trials.  So please --
18              JUROR:  I don't want to lie.
19              THE COURT:  No, you don't.  What I'm going to ask you
20    to do is step outside and let me talk to the lawyers and see if
21    there's anything else I need to ask you.  I don't think there
22    will be, but I just want to make sure.
23              JUROR:  Yes, ma'am.
24              THE COURT:  Okay.  Don't worry, you're good.
25              JUROR:  You just want me to --
```

1          (Proceedings in open court:)

2              THE COURT:  Jodi, he needs a piece of chocolate.

3              JUROR:  No, I don't need chocolate.  I need something

4     stronger than that.

5              THE COURT:  Just stand right outside that door for

6     me.

7              JUROR:  On the inside or outside?

8              THE COURT:  Just step right outside.

9          (Juror No. 11 exits the courtroom.)

10             THE COURT:  So first of all, there's no doubt that we

11    have to excuse him.  He's terrified.  He's visibly shaking.

12    His hand is shaking.  His voice is shaking.  He's almost

13    tearful.

14             But he says that he did say something -- and I need

15    to scroll back.  He said he didn't want to lie, which I very

16    much appreciate.  And because of -- I'm confident that he was

17    telling the truth.  Let me find it.

18             He says, "I did tell one guy.  I need to" -- I

19    think -- my recollection is he said, "I need to tell the truth.

20    I did tell one person that I just felt that I was concerned

21    that if this goes south what can happen then, because I said

22    that I live in Duval -- or I work in Duval County, and he said,

23    'Well, don't worry about it.'"

24             So that's what we have.  This time I'll ask you-all

25    what your thoughts are.

1          MR. KING:  Your Honor, can I -- can we take maybe a

2    couple of minutes?  I'm still trying to -- I -- I --

3          THE COURT:  Sure.

4          MR. KING:  I'm struggling to finish a sentence to you

5    to say that I need time to think about this, which tells me I'm

6    not really prepared to answer that question.

7          THE COURT:  All right.

8          And Mr. Larosiere?

9          MR. LAROSIERE:  I may be too prepared to answer that

10   question, so maybe King and I should confer a little bit.

11         THE COURT:  Okay.  So let me throw out a couple of

12   ideas.  We could just bring the juror in and ask him if the

13   other juror made any comments and if he had any concern about

14   that and if it was going to influence his verdict.

15         But I'll -- I'll let you-all -- it's four o'clock.

16   Why don't I give you about five minutes to -- to think about

17   it.  Well, I'm going to stay here.  There's no -- you guys can

18   confer for a moment and we'll come up with a plan.

19         Oh, can I -- Ms. Healey, this is on the record.  I

20   just want to point out that Juror 12 is currently an alternate.

21   He's not actually on the jury right now.  So to the extent that

22   affects your thoughts.

23         MR. LAROSIERE:  Was it not 11?

24         THE COURT:  No, 11 is gone.  The person he spoke to

25   is 12, who was 41 in the selection process, which means he's

 1    currently the last alternate.

 2         (Pause in proceedings.)

 3              THE COURT:  I need that door closed.

 4              Is there any reason why I can't go ahead and let

 5    Juror No. 11 go?  I don't want to increase his anxiety by

 6    making him sit out there.  Is there any -- do you-all want me

 7    to ask him anything else?

 8              MR. KING:  Your Honor, I can't think of anything that

 9    he can add that we don't already know, because if he was able

10    to identify the -- who he spoke to --

11              THE COURT:  I need you at a microphone.

12              MR. KING:  He did identify the juror that he spoke

13    to.

14              THE COURT:  Yes.

15              MR. KING:  Then I don't think there's anything else

16    he can add.

17              THE COURT:  Okay.  And he did assure me that there

18    wasn't anybody else.

19              Mr. Larosiere, anything else I need to do with him

20    before I let him go?

21              MR. LAROSIERE:  Not with him.

22              THE COURT:  Okay.  And Ms. Taylor?

23              MS. TAYLOR:  No, Your Honor.

24              THE COURT:  Okay.

25              All right.  Let's have Juror 11, please.

1      (Juror No. 11 enters the courtroom.)

2          THE COURT:  All right, sir.  You're going to be free

3   to go.  You're fine.  You haven't done anything wrong.  We are

4   very grateful to you for your willingness to serve as a juror.

5   And I know you told me you wanted to finish the case out, but

6   you understand why that really wasn't possible?

7          JUROR:  Yes, ma'am.

8          THE COURT:  But you did participate in your jury

9   service, so you won't get called again for jury duty for three

10  years at least for the federal court.  Now, the state court may

11  call you.

12         But you just need to go down and see the jury

13  administrator.  Do you have any stuff that you need to get out

14  of the jury room?

15         JUROR:  (Shakes head.)

16         THE COURT:  No?  It's okay.  You're fine.  Just go

17  down to see the jury administrator.  He's going to give you a

18  Challenge coin from the Court to thank you for your service.

19  But you're free to go, all right?

20         JUROR:  Yes, ma'am.

21         THE COURT:  All right.  Thank you very much.  And

22  I'll ask you to go out the front door.  Okay.

23     (Juror No. 11 released from duty and exits the courtroom.)

24         THE COURT:  Y'all see what I mean?

25         Counsel is all nodding in agreement at the distress

1    exhibited by the juror.

2            I'll give y'all a few minutes to confer and I'll be

3    right back out.

4            MR. KING:  Thank you, Your Honor.

5            COURT SECURITY OFFICER:  All rise.

6        (Recess, 4:06 p.m. to 4:13 p.m.)

7        (All parties present.  Jury not present.)

8            COURT SECURITY OFFICER:  All rise.

9            MR. KING:  Your Honor, I apologize, could I have two

10   seconds with my client?

11           THE COURT:  Yes.

12           MR. KING:  Thank you, Your Honor.

13           THE COURT:  Before you-all give me your thoughts,

14   I'll mention something that one of my law clerks brought up

15   that we hadn't talked about, which is the concern that even if

16   we -- even if Juror No. 12 suggested that he could continue,

17   there is a concern that he might have expressed to the other

18   jurors why Juror No. 11 had to leave.  And I'm not sure how we

19   could police that.

20           But Mr. King, did you have a thought as to what we

21   should do with Juror 12?

22           MR. KING:  Your Honor, I think -- if I could defer to

23   Mr. Hoover's counsel for now, I think they wanted to --

24           COURT REPORTER:  I'm sorry, "Defer to Mr. Hoover's

25   counsel..."

1          MR. KING:  That they had something they wanted to

2     address with the Court.

3          THE COURT:  Okay.

4          MR. LAROSIERE:  Your Honor, very unfortunately, as

5     the record clearly reflects, Previous Juror 11 was visibly

6     shaking.  I think it was manifest before he even came in and

7     started talking.  I wonder how that demeanor alone wouldn't

8     possibly contaminate the jury pool.  Understanding even if we

9     were to eliminate 11 and 12 -- which counsel for Hoover isn't

10    necessarily suggesting we eliminate 12 as well -- we feel that

11    there's a substantial possibility that the jury pool has been

12    contaminated, and for that reason we must respectfully move for

13    a mistrial.

14         THE COURT:  All right.  Well, I'll hear from you,

15    from Ms. Taylor, on that in a moment, but I will say,

16    Mr. Larosiere, that when he was sitting in the jury box, I

17    didn't see any of this in his demeanor.  I think it wasn't

18    until he said it out loud to the court security officer.  And

19    she did immediately separate him from the other jurors.  So I

20    don't know that we have a record that would suggest that the

21    other jurors have observed anything.

22         And before I grant a mistrial, I think I would have

23    to have some greater basis than just that speculation, because

24    again, as I said, before he expressed this I had not -- I

25    certainly had not seen him visibly showing any concern.

1          But let me -- Ms. Taylor, let me hear from you.

2          MS. TAYLOR:  Your Honor, I think where we come out is

3   that the risk of bringing the other jurors in to inquire with

4   them about this is more likely to harm than do good.

5          I am reluctant to release the third alternate given

6   that we still have quite a bit of trial to go.

7          But I think that if we were to take additional steps,

8   that that might be the reasonable step to take at this point to

9   ensure that this idea has not spread beyond sort of its

10  original source in the one person that Juror 11 -- I think it

11  was 11 -- had shared it with.

12          I do agree with the Court that it is entirely

13  speculative at this point to assume that every member of the

14  jury feels the same way that the one juror did.

15          Your Honor, I --

16          THE COURT:  I don't think that's what Mr. Larosiere

17  said.  I think what Mr. Larosiere was saying was not that they

18  all feel that way, but that they -- he fears -- or he's arguing

19  that the other jurors may have seen Juror 11's anxiety, and

20  that that would influence them.

21          Did I understand your argument correctly?

22          MR. LAROSIERE:  Yes, Your Honor.

23          And the one other bit that I neglected to mention at

24  first was the use of the phrase "going south."  It -- when

25  that's communicated to another juror, it kind of seemed like

1     that may have been a flavor of the room, right.  It's odd to

2     suggest something is "going south" when there is not a

3     consensus.

4          But that -- I think you understand my argument, yes,

5     Your Honor.

6          THE COURT:  Yeah, the clear import of his comment of

7     "going south" was if it went south for the defendants.  So it

8     didn't suggest that there was any flavor of the room in terms

9     of the jury.

10         I don't think, though -- so are you in agreement,

11    Mr. Larosiere, that we would need to -- that we should dismiss

12    the second alternate, Juror 12?

13         I mean, let me put it this way:  I don't know how you

14    can consistently argue that we should keep that juror yet we

15    should -- yet I should grant a mistrial because the comment was

16    communicated to the entire jury, but I'll hear from you.

17         MR. LAROSIERE:  It -- respectfully, I don't think I

18    want to say a position on Juror 12 without some inquiry just

19    because of the way Juror 11 talked about him.  You know,

20    there's just a lot of -- there's a lot of risk and moving

21    parts.  And I think there's independent issues with 11 and 12.

22    And I think that perhaps 12's might be curable, if that's -- if

23    that kind of makes sense.

24         THE COURT:  I'm going to be honest and say I'm not

25    sure it does, but I think that regardless of what we do, we

1    would have to inquire of Juror 12 to make sure that Juror 12

2    did not repeat any comment that he heard from Juror 11.

3           And I know I haven't heard from you yet, Mr. King.  I

4    will in a moment.

5           Ms. Taylor, what is your thought as to me bringing

6    Juror No. 12 in and asking him his recollection of what Juror

7    11 said to him, whether he repeated it, and then inquiring of

8    whether that would influence his verdict in any way?

9           MS. TAYLOR:  I don't oppose that, Your Honor.

10          THE COURT:  All right.  And then we can decide what

11   we do with him after that.

12          Mr. King, is that acceptable to you?

13          MR. KING:  Your Honor, I think just for record

14   purposes, if it -- you know, there is a motion for mistrial,

15   and I think I would join that.  I understand the Court's

16   inclination is not to grant that.

17          My proposal would be to do as the Court has suggested

18   and also make sure that Juror No. 12 has not discussed or

19   speculated with the jurors why we are in a delay or why Juror

20   11 was separated out or brought in.  I think that additional

21   part is very important as well.

22          And then my suggestion would be bring Juror 12 in,

23   have that conversation, segregate him from the rest of the jury

24   pool, unfortunately, discuss what answers he's given.  And my

25   inclination -- you know, I don't like going down to one

1    alternate either, but I -- I think the danger of him

2    discussing, repeating, or -- with the rest of the jury pool,

3    given that he is the last alternate, is significantly more

4    problematic than us only having one alternate.

5         And, you know, unless I -- my guess is that there's

6    not really an answer he can provide where I'm not going to ask

7    him to be segregated from the rest of the jury and then excused

8    before we seat the rest of the jury and resume testimony.

9         THE COURT:  All right.  Give me a moment.

10    (Pause in proceedings.)

11         THE COURT:  All right.  So based on some additional

12    comments by Mr. King, we would bring Juror 12 in here, we would

13    ask him if he recalls Juror No. 11 making any comment to him

14    that related to the case or its outcome, ask him what he

15    recalls about that, ask him whether he repeated it to any other

16    juror, ask him whether he has speculated as to the reason for

17    the delay or the segregation of -- separation of -- of No. 11

18    during this time, and then ask him whether it would influence

19    his verdict.

20         Mr. King, have I covered the subject matter areas

21    that you thought?

22         MR. KING:  Yes, Your Honor.  Thank you.  And thank

23    you for giving us the time to mull this over.  I appreciate it.

24         THE COURT:  Mr. Larosiere, is that -- did I cover the

25    waterfront?

```
 1              MR. LAROSIERE:  Yes, Your Honor.

 2              THE COURT:  All right.  Ms. Taylor, are you in

 3   agreement with that?

 4              MS. TAYLOR:  Yes, Your Honor.

 5              THE COURT:  All right.  May we have Juror 12, please.

 6         (Juror No. 12 enters the courtroom.)

 7              THE COURT:  Juror No. 12, may I ask you to come up to

 8   that microphone right there.

 9              JUROR:  Yes, ma'am.

10              THE COURT:  Juror No. 12, do you recall Juror 11, the

11   gentleman seated to your --

12              JUROR:  To my right, yes, Your Honor.

13              THE COURT:  Do you recall him making any comment to

14   you about the case or its outcome?

15              JUROR:  No.  He just -- he was concerned about

16   himself, if that helps.  I don't even know if I need to

17   clarify, but . . .

18              THE COURT:  Can you tell --

19              JUROR:  Can I -- I don't know if that needs to be

20   private.

21              THE COURT:  Counsel, do you have any objection with

22   me speaking to him privately at sidebar?

23              MR. KING:  No, Your Honor.

24              MR. LAROSIERE:  No, Your Honor.

25              THE COURT:  Okay.  If you'll -- now you'll come up to
```

1   sidebar.

2       (At sidebar with Juror No. 12 only:)

3           JUROR:  So on one of the breaks he was concerned

4   because it was a federal case that somebody from the defense

5   was going to like retaliate against him.  So I just tried to

6   tell him -- because he asked, like, "Should I say something?"

7   And I said, "Well, I mean, that's up to you," I said.  But I'm

8   like, "I don't think anybody would" -- you know, I said -- you

9   know, I said, "Why don't you wait," you know, "and see how it

10  ends," is what I had said.  I mean --

11          THE COURT:  Okay.

12          JUROR:  So I think he was concerned.  So there wasn't

13  a talk about the outcome of the case, but he was worried about

14  I guess, like, his personal well-being.

15          THE COURT:  Okay.  So there's some other questions

16  that I have to ask you.

17          JUROR:  Okay.

18          THE COURT:  That I need to ask you with everybody

19  else.

20          JUROR:  Okay, yes.

21          THE COURT:  And I'm just -- but again, if in

22  answering -- well, let me ask you this.  I'm going to ask you

23  in front of them as well, but before I do, did you repeat to

24  any of the jurors -- did you talk to any of the other jurors

25  about Juror 11's concerns?

1        JUROR:  No, but there was one other juror sitting

2    right next to me at the time during that conversation.  I don't

3    know her name.  I'm here at the table and she's literally right

4    there (indicating).

5        THE COURT:  And you think she heard you?

6        JUROR:  Yeah.

7        THE COURT:  All right.  I'm going to have to ask you

8    that in front of them, but are you okay going back up to the

9    microphone?

10        JUROR:  Yes.  Yes, Your Honor, yep.

11     (Proceedings in open court:)

12        THE COURT:  So Counsel, Juror No. 12 has described to

13    me that -- what Juror 11 said to him.  And it's entirely

14    consistent with what Juror 11 told us that he said.

15        Can you -- Juror No. 12, have you told any of the

16    other jurors what Juror 11 said to you?

17        JUROR:  No, Your Honor, I did not tell any other

18    jurors, no.

19        THE COURT:  Were any of the other jurors in proximity

20    such that they would have heard Juror 11's comments?

21        JUROR:  Yes, Your Honor.  There was one juror next to

22    me at the head of the table that, I mean, I'm almost certain

23    had heard, yes.

24        THE COURT:  And when you say "at the head of the

25    table," was this over lunch or --

1          JUROR:  It was -- I believe it -- it was either lunch
2    or it might have been the first break, and I'm not -- I can't
3    honestly recall, but it was one of the -- it was one of the
4    breaks today, this morning, so . . .
5          THE COURT:  Okay.  Are you able to identify by chair
6    what juror that was?
7          JUROR:  There's no one sitting in the first chair,
8    correct?  And then I'm the fifth chair.  So it's either Chair 3
9    or 4.
10          THE COURT:  So the juror in Chair 4 has very long
11   blonde hair.
12          JUROR:  No, so not that one.  The description of the
13   person to the right of her?  Can you recall?
14          THE COURT:  Ms. Wiles, may I see you a moment.
15          JUROR:  And I could get the side -- it might not be
16   the left, it might be the right.
17          THE COURT:  Well, on the other side of Juror 4, Juror
18   5 is a male, so --
19          JUROR:  So then it's definitely to the right then.
20          THE COURT:  So Juror 3 . . .
21      (The judge and the courtroom deputy confer.)
22          THE COURT:  Counsel, Ms. Wiles's recollection of
23   Juror 3 is that she has long brown hair.
24          JUROR:  Yes, I believe that is her, correct?
25          THE COURT:  Just a moment.

1            Ms. Wiles.

2        (The judge and the courtroom deputy confer.)

3            THE COURT:  All right.  Do you -- was there any

4    speculation or discussion in the jury room about why Juror

5    No. 11 had been separated from everyone else?

6            JUROR:  No.  But being honest, we were kind of

7    figuring that's why we're not coming back in; we -- you know,

8    that's what the delay is about.  But there's not been any

9    speculation, no, ma'am.

10           THE COURT:  So the delay is about the fact that he

11   hasn't come back?

12           JUROR:  Exactly, yes, Your Honor.

13           THE COURT:  Is there any discussion about why that

14   would be happening?

15           JUROR:  No, Your Honor.

16           THE COURT:  You told me at sidebar what Mr. -- what

17   Juror 11 said to you.  Did that cause you any concerns?

18           JUROR:  Personally, me, I did not have any concerns,

19   no.

20           THE COURT:  And would the comments that he made -- do

21   you think those would influence your verdict in this case?

22           JUROR:  My verdict?  No, ma'am.

23           THE COURT:  Would you be able to set aside the -- and

24   let me ask you, did -- when he spoke to you, did he seem

25   nervous?

1          JUROR:  Yes.  He was -- I mean, from day one he was

2    nervous.  I was one of the first people up into the jury room,

3    and you could just see that he was very -- I mean, he was very,

4    like, shaking.  He was very nervous.

5          THE COURT:  From the beginning of the trial?

6          JUROR:  From the beginning, yes, Your Honor.  But he

7    was nervous when we had the -- when he had the conversation,

8    yes, Your Honor.

9          THE COURT:  And would that cause you to be

10   uncomfortable to continue as a juror?

11         JUROR:  No, Your Honor.  Like I said, I don't -- I'm

12   not worried at all.

13         THE COURT:  Let me see counsel at sidebar.

14      (Proceedings at sidebar:)

15         THE COURT:  Thoughts.

16         MS. TAYLOR:  I am not concerned about this juror.

17         MR. LAROSIERE:  I think Juror 12 seems to either be

18   unaffected or rehabilitated.

19         MS. TAYLOR:  And it also seems to me that the juror

20   who was dismissed was just -- may be just have -- has an

21   anxious personality and was just affected by this in an

22   outsized way that was not normal.  So I don't think there are

23   grounds for a mistrial at this point.

24         MR. LAROSIERE:  There's still the question of -- I

25   don't know what her number is.

1           THE COURT:  Yeah.  If you-all are in agreement that
2  we can let Juror 12 continue, I think what we could do is bring
3  in Juror 3 and ask what she heard and go from there.
4           MR. LAROSIERE:  Similar sort of questions?
5           THE COURT:  Is that acceptable, Mr. Larosiere?
6           MR. LAROSIERE:  Yes, Your Honor.
7           THE COURT:  Mr. King?
8           MR. KING:  Yes, Your Honor.  I think if there might
9  be a way to have Juror 12 confirm that the -- if there might be
10 a way to have Juror 12 confirm it's Juror 3, because he didn't
11 seem very confident.  The other thing is to make -- and I'm
12 sure the Court has language on doing this, but I would be
13 remiss to not say instruct Juror 12 not to discuss anything
14 that happened in the court and not any speculation about Juror
15 11.
16          MR. LAROSIERE:  Individually, I will state that on
17 behalf of Hoover, Juror 12 seems very trustworthy and able to
18 act consistently with court orders.
19          THE COURT:  And I will say that even at sidebar what
20 he said -- what the gentleman said, and entirely consistent
21 with what 11 said, he also was sort of dismissive to him,
22 telling him -- you know, seeming not at all concerned about it.
23          So I -- so with the agreement of all, we're going
24 to -- I'm going to instruct him not to talk to anybody else.
25 I'm going to -- Mr. King has very sneakily suggested something

 1   really smart, have him confirm that Juror -- to the court

 2   security officer that it was Juror No. 3, and we'll go from

 3   there.

 4           Is that acceptable, Mr. Larosiere?

 5           MR. LAROSIERE:  Yes, Your Honor.

 6           THE COURT:  Mr. King?

 7           MR. KING:  Yes, Your Honor.

 8           THE COURT:  Ms. Taylor?

 9           MS. TAYLOR:  Yes, Your Honor.

10           THE COURT:  Okay.  Thank you.

11           MR. LAROSIERE:  And I apologize for my last name.

12           THE COURT:  What, am I getting it wrong?

13           MR. LAROSIERE:  No, you do it great, but you're

14   squinting every time.

15           THE COURT:  No, it's because I've got to remember

16   who's talking.

17       (Proceedings in open court:)

18           JUROR:  Your Honor, can I add a comment too?

19           THE COURT:  Absolutely.

20           JUROR:  Like I said, I know my recollection of the

21   time, whether it was the first break or lunch -- but, I mean,

22   it wasn't like the room was completely full either.  I can't

23   tell you exactly how many were there, but, I mean, there might

24   have been four or five of us in there, to my knowledge.  And

25   again, I can't be a hundred percent sure.

1    THE COURT:  What was -- do --

2    JUROR:  I just remember him and then the person at

3    the head of the table and then me where I was sitting across.

4    I mean, that was really, you know, at the time when I was

5    focusing, but --

6    THE COURT:  And was he speaking loudly or just in

7    normal conversation?

8    JUROR:  No, normal.  It wasn't loud or anything like

9    that, no.

10   THE COURT:  Okay.  All right.  So first of all, I'm

11   going to let you go back out and rejoin the other jurors.

12   JUROR:  Yes.

13   THE COURT:  It is of paramount importance that you

14   not talk to them about this discussion.

15   JUROR:  Yes, Your Honor.

16   THE COURT:  And that you not talk to anybody or

17   repeat anything about what Juror No. 11 said to you or about

18   this discussion.  Can you do that?

19   JUROR:  Yes, Your Honor.

20   THE COURT:  Okay.  And I'm going to ask you to just

21   con- -- when -- the court security officer is going to go in

22   with you, and she's going to ask Juror No. 3 to come talk to

23   us.

24   JUROR:  Yes, Your Honor.

25   THE COURT:  When Juror No. 3 gets up to walk in here,

1    if you realize that's not who you meant --

2              JUROR:  Yeah, then say something?

3              THE COURT:  Just let the court security -- just --

4    just look at the court security officer and shake your head at

5    her.

6              And I'll ask you not to bring the juror in and just

7    to bring this gentleman back out.

8              COURT SECURITY OFFICER:  Yes, ma'am.

9              JUROR:  Thank you.

10             THE COURT:  And the last thing I'm going to ask you

11   to do is -- so you've assured me that you're not going to talk

12   about this any further.  And to the extent there's any

13   speculation, just tell your colleagues that you can't discuss

14   it, the Court ordered you not to.

15             JUROR:  Yes.

16             THE COURT:  But later, if as the trial progresses you

17   hear someone talking and realize that they heard this comment,

18   I need you to write a note to the court security officer.

19             JUROR:  Yes, Your Honor.

20             THE COURT:  Don't say anything, just write the court

21   security officer a note, okay?

22             JUROR:  Yes, Your Honor.

23             THE COURT:  Okay.  All right.  So I'll let you go and

24   we'll take it from there.  Thank you very much for your candor.

25             JUROR:  You're welcome.

1       (Juror No. 12 exits the courtroom.)

2            THE COURT:  Only in my courtroom.

3       (Juror No. 3 enters the courtroom.)

4            THE COURT:  Juror No. 3, if you could come up to that

5   podium.  And don't worry, you're not in trouble or anything, I

6   just need to ask you a question.

7            JUROR:  Yes, ma'am.

8            THE COURT:  Over one of the breaks did you by any

9   chance hear Juror No. 11 make any comment about the case or its

10  outcome?

11           JUROR:  Juror No. 11?

12           THE COURT:  Yes.

13           JUROR:  No, ma'am.

14           THE COURT:  Have you heard anybody talk about the

15  case or the outcome of the case?

16           JUROR:  No, ma'am, I have not.

17           THE COURT:  I can't hear you.

18           JUROR:  No, ma'am, I have not.

19           THE COURT:  And when you-all have been waiting here,

20  has there been any speculation about what the delay is?

21           JUROR:  From back there?  We were just -- we didn't

22  know if we were in trouble, the ones that were being called in

23  here.

24           THE COURT:  Nobody's in trouble.  Nobody's in

25  trouble.  So -- all right.  Give me one minute with the

1   attorneys and then I'll be right back with you.

2           Ms. Wiles, can you share some chocolate with her?

3           COURTROOM DEPUTY:  I'm the chocolate fairy today.

4           THE COURT:  May I see counsel.

5           COURTROOM DEPUTY:  But I can't push the button and

6   take chocolate at the same time.

7       (Proceedings at sidebar:)

8           THE COURT:  Okay.  Mr. Larosiere, are you comfortable

9   proceeding with Juror No. 3 on the jury?

10          MR. LAROSIERE:  I -- so this is a two-part thing.  At

11  the direction of my client, I'm not going to be able to

12  withdraw my motion.  Does that speak for itself?

13          THE COURT:  All right.  So let's say -- assuming that

14  I deny the motion for mistrial, to the extent that you sought a

15  mistrial entirely, do you see any basis for excusing Juror

16  No. 3?

17          MR. LAROSIERE:  Frankly, given the candor of the

18  previous two witnesses -- I'm sorry, the previous two jurors,

19  it seemed that Juror 12 indicated that there was no way she

20  couldn't have heard.  It seems -- the response seems odd.  So I

21  think that there might be an excuse -- or a reason to excuse

22  Juror No. 3.  And I think that would be safer.

23          MS. TAYLOR:  Can I respond?

24          THE COURT:  Yes.

25          MS. TAYLOR:  She did not seem evasive to me at all.

1   It's certainly possible she just wasn't paying attention to

2   what the conversation was even if she was proximate, or maybe

3   it has so little impact on her that even if she did hear it,

4   she doesn't remember.

5         But in any event, the thing that we were trying to

6   get at is has the jury pool been tainted such that other --

7   this idea of being fearful might be spreading amongst the

8   jurors, and she has not expressed that she has fear about it.

9         THE COURT:  Why don't I ask her a couple more

10  questions.

11        MR. LAROSIERE:  Thank you.

12        THE COURT:  Okay.

13     (Proceedings in open court:)

14        THE COURT:  So Juror No. 3, Juror No. 11 advised me

15  that he had made a comment that he had relating to some concern

16  he may have about the outcome of the case.  And the comment

17  that -- was apparently made when Juror No. 11 was seated close

18  to you.  And so it's really important for me to know whether

19  you heard anything that Juror 11 may have said about that.

20        JUROR:  So I do recall a comment that he did make.

21  He was concerned, I guess -- I don't even know how to put it.

22  He was concerned maybe for his safety after the fact of the

23  case --

24        THE COURT:  Okay.

25        JUROR:  -- due to there's only so many buildings

 1    where he works or something.  I don't remember the exact

 2    conversation, but something to do with where he works and

 3    there's only so many buildings, so it would be easy to find him

 4    out there.  I don't know.

 5            THE COURT:  And did that cause you personally any

 6    concern?

 7            JUROR:  No, ma'am.

 8            THE COURT:  Do you know if anybody else heard him?

 9            JUROR:  There was me, the two gentlemen that have

10    already been pulled, and No. -- you called 10 and 11 back,

11    correct?

12            THE COURT:  I've spoken to No. 11 and No. 12.

13            JUROR:  Okay.  So then it was Juror No. 10 as well.

14    He sits on the same corner as we do.  I'm not sure if anyone

15    else heard the conversation that was going on or not, but I

16    know he was on the other -- in between me and the gentleman

17    that made the comment.  He sits at the end of that table.

18            THE COURT:  Just a moment.

19            So the only -- so at most you think Juror No. 10

20    might have heard it?

21            JUROR:  Yes, ma'am.

22            THE COURT:  Now, would the comment that Juror No. 11

23    made -- does that cause you any concern about your safety?

24            JUROR:  No, ma'am.  No, ma'am.

25            THE COURT:  Does it -- do you think it would

1   influence your verdict in this case?

2          JUROR:  No, ma'am.

3          THE COURT:  Can you put it out of your mind and

4   decide this case based solely on the evidence and my

5   instructions on the law?

6          JUROR:  Pretty much what goes on in that room, I kind

7   of -- that's why when you at first asked me about it, I was

8   like -- but then when you said something about the

9   conversation -- I can bring pieces back up if I need to, but I

10  try to brush them away unless . . .

11         THE COURT:  Okay.  And you might have just answered

12  this, but did you repeat to any of the other jurors what you

13  recalled -- or what Juror No. 11 said?

14         JUROR:  No, ma'am.  The only time I've heard that

15  conversation was when it was brought up and there was the -- I

16  think there was four of us at the end of the table, or five,

17  however many of us were sitting there.  That's all I've heard

18  anything be said about it.

19         THE COURT:  Okay.  All right.  Let me see counsel

20  again.

21      (Proceedings at sidebar:)

22         THE COURT:  Mr. Larosiere, assuming that I do not

23  grant a mistrial entirely, are you satisfied with Juror No. 3

24  at this time?

25         MR. LAROSIERE:  Can I have 30 seconds with Mr. King?

1        THE COURT:  Yes.

2        MR. LAROSIERE:  Thank you.

3        MR. KING:  Thank you, Your Honor.

4     (Defense counsel confer.)

5        THE COURT:  Yes, sir.

6        MR. LAROSIERE:  So my concern arises from the

7   statements she made when she indicated, "Well, obviously it was

8   about those two guys," right, and then she recalled.  So my

9   concern is the flip-flop from saying, "No, I didn't hear

10  anything about those two men" -- that obviously everyone is

11  speculating about -- to, "oh, now I remember hearing that

12  thing," right.

13       So I do have a concern with Juror No. 3, and I

14  think -- and now she said there's five people.  So the plot

15  is -- this is like a mystery novel that's getting way too

16  thick.  I -- what my hope is, is that excluding her, and

17  talking to that last person, getting a straight answer, would

18  be curative.  That's my hope.

19       THE COURT:  Ms. Taylor.

20       MS. TAYLOR:  I didn't sense that this juror was being

21  evasive in her answer at all so much as she just had brushed it

22  out of her mind, which is what she explained.  And when the

23  Court asked her more pointed, specific questions, she knew what

24  the Court was referring to and answered.

25       THE COURT:  Yeah, I mean, that is my recollection.  I

 1    didn't see it as a flip-flop.  When I gave a more specific

 2    question, she very readily --

 3                MR. LAROSIERE:  Right.

 4                THE COURT:  -- answered the question.

 5                MR. LAROSIERE:  I understand that.  My concern is the

 6    preface, right, which was talking about how, "We knew it was to

 7    do with those two guys."

 8                Do you understand what I'm saying?

 9                THE COURT:  I can't say that I do.

10                MR. LAROSIERE:  Okay.  So the only reason that I have

11    doubts about -- honestly, I would have felt better if she had

12    just continued to say, "No, I didn't hear anything about it."

13    But when she --

14                THE COURT:  Well, she was being honest.

15                MR. LAROSIERE:  Well, no, for sure.  When the change

16    happened she started by saying of course they're speculating

17    that it had something to do with those guys.  And so if she had

18    that in her mind, right, and remembered it was those two guys,

19    it just seems odd that she --

20                THE COURT:  Well --

21                MR. LAROSIERE:  I understand I'm not -- you know, I'm

22    not a mystery novel writer, right.

23                THE COURT:  I guess if once I was more specific about

24    Juror No. 11 saying he had expressed a concern, then that -- it

25    bears to reason that she would then immediately focus on Juror

1    No. 11 and the person she heard Juror No. 11 speaking to.  So

2    that's why her saying "those two guys" doesn't --

3            MR. LAROSIERE:  Yeah, I understand what you're saying

4    though.  You're saying because at first it was brought as "the

5    outcome of the case" and -- yeah.

6            THE COURT:  And at first it was just, "Did you hear

7    anybody, any comment."  And then when we brought -- when we

8    went back more specifically, I identified the juror and I

9    identified as vaguely as I could the content.

10           MR. LAROSIERE:  Right.

11           THE COURT:  And when I did that, she immediately

12   acknowledged who it was and what she understood it to be.  And

13   I think she was very candid in her discussion of what he said.

14   So I don't see a basis to disbelieve her answers,

15   Mr. Larosiere.

16           MR. LAROSIERE:  I understand.

17           THE COURT:  Okay.

18           Mr. King, what's your position?

19           MR. KING:  Your Honor, I see it as I believe the

20   Court does.

21           The only thing I would ask is to just inquire of her

22   further if she's heard other people discussing the conversation

23   or any other -- anything unrelated to discussions about what

24   may be going on in court or that specific conversation with any

25   other jurors.  And then I would suggest we repeat this with

1    No. 10.  And then -- and then it will probably be 5:30 by that

2    time.  But otherwise, I think that's -- that would be our

3    position.

4            THE COURT:  Okay.  And all of you are in agreement

5    with that?

6            MS. TAYLOR:  Yes.

7            MR. LAROSIERE:  Yes, Your Honor.

8            THE COURT:  Okay.

9            MR. KING:  Thank you, Your Honor.

10           MR. LAROSIERE:  Thank you, Your Honor.

11       (Proceedings in open court:)

12           THE COURT:  Okay.  So Juror No. 3, thank you.  Thank

13    you for your candor and for answering our questions.

14           I'm going to ask you, first of all, not to discuss

15    with your fellow jurors anything that we talked about.  They're

16    going to ask you what we wanted.  Please tell them that the

17    Court ordered you not to talk about it.

18           JUROR:  Yes, ma'am.

19           THE COURT:  Did you hear anybody else talking about

20    or commenting on Juror No. 11 or any concerns that he raised?

21           JUROR:  No, ma'am.  Like I said, there was only the

22    four of us kind of at -- and then there was a gap, and then

23    they had a conversation at the other end of the table.  I'm not

24    sure what they were discussing.

25           THE COURT:  Okay.

1        JUROR:  But I know the only people involved in that

2    conversation were the two you guys called in, the other juror

3    number, and myself.

4        THE COURT:  Okay.  All right.  The only other thing

5    I'm going to ask you to do is if in the remainder of the trial

6    you should hear anyone talking about that comment by Juror No.

7    11 --

8        JUROR:  Yes, ma'am.

9        THE COURT:  -- if you would please write a note and

10   give it to the court security officer.

11       JUROR:  Yes, ma'am.

12       THE COURT:  All right.  Counsel, anything else I need

13   to address?

14       MR. KING:  Can we very briefly approach?

15       THE COURT:  Sure.

16   (Proceedings at sidebar:)

17       THE COURT:  What did I forget?

18       MR. KING:  Just to inquire if she's heard any

19   conversations, but -- she focused on the actual conversation,

20   but has she overheard anybody else discussing it subsequent to

21   the conversation.

22       THE COURT:  I thought I asked that.

23       MR. KING:  I think you did, but I think she

24   misinterpreted your question based on her response because her

25   response focused entirely on who was at the table.

1          THE COURT:  Well, I understood that as her saying

2    that's the only thing she heard, but I will follow up.

3          Yes, Mr. Larosiere.

4          MR. LAROSIERE:  And I would just like to, just for

5    certainty's sake, maybe give a physical description of No. 10

6    to make sure she doesn't get the numbers mixed up.

7          THE COURT:  Have you committed to memory what all of

8    the jurors look like?  Because I don't know that I can give a

9    physical description.  I'll ask her to do the same sneaky move

10   that we had -- that Mr. King suggested last time, how's that?

11         MR. LAROSIERE:  Wonderful.

12         MR. KING:  Batting a thousand so far.

13         MR. LAROSIERE:  Fantastic.  Thank you.

14         THE COURT:  Okay.

15      (Proceedings in open court:)

16         THE COURT:  I'm sorry, so just two more things.  I

17   want to make sure that I understood your answer earlier.

18         You heard the conversation that you heard, and you've

19   told me about that.  After that, have you heard anybody else on

20   the jury talk about that conversation?

21         JUROR:  No, ma'am.  And it wasn't even brought up

22   amongst the other gentlemen that I heard.  I haven't been

23   around them the entire time, but that's just where I sit at the

24   table.

25         THE COURT:  Okay.  So here's -- just to make sure

1  that we have the right person, the court security officer is

2  going to go back in there and she's going to ask Juror No. 10

3  to come in.  Do you remember Juror No. 10's first name?

4          JUROR:  I don't remember any of their first names to

5  be honest with you, sorry.

6          THE COURT:  That's fair.  When she calls Juror

7  No. 10, if the person that stands up is not the other person

8  that was at the table, if it turns out that you weren't right

9  about the number, can you just look at the court security

10  officer and shake your head, and she'll bring you back in and

11  we'll try again to figure out who the right person is?

12         JUROR:  Yes, ma'am.

13         THE COURT:  Counsel, anything else?  Did I miss

14  anything?

15         MR. KING:  No, Your Honor.

16         MS. TAYLOR:  No, Your Honor.

17         MR. LAROSIERE:  No, Your Honor.

18         JUROR:  I'm almost positive that's him because he

19  said, "Well, I sit on the other side of the first one that they

20  called in," so that's why I asked about numbers.

21         THE COURT:  And remember, there's going to be

22  speculation about why you were called in, and you shouldn't

23  discuss it at all, okay?

24         JUROR:  Yes, ma'am.

25         THE COURT:  All right.  Thank you.

1          (Juror No. 3 exits the courtroom.)

2          (Juror No. 10 enters the courtroom.)

3          THE COURT:  Hello, Juror No. 10.  I'm sorry about the

4   delay.

5          Do you -- did you hear any of the jurors make any

6   comment about the outcome of the case today?

7          JUROR:  No.

8          THE COURT:  So Juror No. 11 has told us that he

9   personally expressed a concern about the case or its outcome to

10  one of the other jurors, and it seems that you may have been in

11  proximity to them when that conversation was had.  Did you hear

12  it?

13         JUROR:  I heard nothing.

14         THE COURT:  And have you heard anybody talk about why

15  we've had this somewhat lengthy delay this afternoon?

16         JUROR:  No.  Well, I know 11 just came back in and he

17  said he couldn't talk.

18         THE COURT:  So 11 -- oh, No. 12 just came back in?

19         JUROR:  12, 11, 10, I don't know.  I lost count.

20         THE COURT:  Well, you're No. 10.

21         JUROR:  And 3 just walked in before me, so . . .

22         THE COURT:  All right.  So here's the thing.  It's

23  important for me to know whether there's any possibility that

24  you heard Juror No. 11 express a concern about either himself

25  or about the outcome of the case.

1           JUROR:  No, I haven't heard anything.

2           THE COURT:  All right.  And can you assure me that

3    there isn't anything that Juror No. 11 said that would

4    influence your verdict in any way?

5           JUROR:  Absolutely not.

6           THE COURT:  All right.  And -- well, I have a double

7    negative so I'm going to ask my question again.

8           Is there anything that Juror No. 11 has said that you

9    believe would influence your verdict even in the slightest?

10          JUROR:  No.

11          THE COURT:  Can you assure us that you can decide

12   this case based solely on the evidence presented in the

13   courtroom --

14          JUROR:  Yes, ma'am.

15          THE COURT:  -- and my instructions on the law?

16          JUROR:  Yes.

17          THE COURT:  Let me see counsel at sidebar.

18          And Mr. McCroskey, may I see you a moment?

19      (Proceedings at sidebar:)

20          THE COURT:  Mr. Larosiere, any concerns about Juror

21   No. 10?

22          MR. LAROSIERE:  I don't think there could be a

23   sweeter, more straightforward-seeming man, so no, candidly.

24          THE COURT:  All right.  Is he acceptable -- is

25   continuing with him acceptable to Mr. Ervin?

1          MR. KING:  Yes, Your Honor, just with the cautionary

2     instruction you've given the rest of the jurors.

3          THE COURT:  Ms. Taylor?

4          MS. TAYLOR:  No concerns.

5          THE COURT:  Okay.  So what I think I should do is

6     I'll give him the same instruction.  And then I think we should

7     bring all of them back in, and I think I need to say that, "As

8     it turns out, Juror No. 11 realized that he had personal

9     beliefs that would not make him an appropriate juror and he was

10    honest with us and told us that and he's been relieved."

11         And I think what I should say to them is to the

12    extent any of them heard -- heard him, they should let the

13    court security officer know, and that way we'll have a more

14    clear record that nobody else was tainted by him, and also get

15    them to reaffirm their oath to decide the case based solely on

16    the evidence.

17         Is that acceptable, Mr. Larosiere?

18         MR. LAROSIERE:  And perhaps assure them that they

19    wouldn't see a consequence for now coming and saying it?

20         THE COURT:  Okay.

21         Ms. Taylor?

22         MS. TAYLOR:  That sounds fine to me, Your Honor.

23         MR. KING:  Yes, Your Honor.

24         THE COURT:  Okay.  Was there anything else?

25         MR. LAROSIERE:  I'm instructed to make sure my motion

 1   is ruled on.

 2            THE COURT:  Yes.  And I think that --

 3            MR. LAROSIERE:  I understand, Your Honor.

 4            THE COURT:  I think when I hear from everybody I

 5   think your motion is likely to be denied, but I'm going to keep

 6   an open mind until we've finished.

 7            MR. KING:  Just for scheduling purposes, Your Honor,

 8   is the Court's intention to continue with the presentation?

 9            THE COURT:  No.

10            MR. LAROSIERE:  That may be the most curative

11   instruction to do.

12            THE COURT:  We're going to bring them in, talk to

13   them, and we're going to send everybody home.

14            MR. KING:  Thank you, Your Honor.

15         (Proceedings in open court:)

16            THE COURT:  All right.  So Juror No. 10, a couple

17   things.  Number one, I'm going to return you to the rest of the

18   jury, although I'm going to bring everybody out together in

19   just a moment.

20            I need you to assure me that you won't discuss with

21   the other jurors anything that we talked about here in the

22   courtroom.  Can you do that?

23            JUROR:  Yes.

24            THE COURT:  And if they ask you, you need to tell

25   them that I ordered you not to talk about it.  Can you do that?

```
 1              JUROR:  Easily.
 2              THE COURT:  And once again, can you assure me that
 3      you're going to decide this case based solely on the evidence?
 4              JUROR:  Yes.
 5              THE COURT:  All right.  And if later in the trial you
 6      should hear any of the other jurors talking about having heard
 7      something that Juror No. 11 said, would you please write a note
 8      to the court security officer?
 9              JUROR:  Okay.
10              THE COURT:  All right then.  I'm going to let you go
11      back.
12              And if you'll please bring out the jury.
13              COURT SECURITY OFFICER:  Yes.
14              THE COURT:  Although, if you'll give me like three
15      minutes.
16              COURT SECURITY OFFICER:  Yes.
17         (Juror No. 10 exits the courtroom.)
18         (Pause in proceedings.)
19              THE COURT:  So let me tell y'all what I'm thinking
20      about saying.  Something to the effect of, "Ladies and
21      gentlemen, you've seen we've had some delay.  Juror No. 11
22      realized that matters personal" -- "there were matters personal
23      to himself that made him not a suitable juror for this
24      particular case, and to his credit, he told me about it.  And
25      I've decided to release him from his jury service.  And that's
```

1    fine, we can continue the case.  And he absolutely isn't in

2    trouble and he did the right thing because all of the parties

3    to this case are guaranteed, and must have, a fair and

4    impartial jury.  There was concern that No. 11's feelings might

5    have influenced other jurors, and so we took some time to look

6    into that.  We're confident that it didn't."

7            I think at that point I can ask if there's anyone --

8    to just raise your hand if there's anyone that I haven't spoken

9    to that heard or observed anything regarding Juror No. 11 that

10   would influence their verdict.

11           Mr. Larosiere, is that acceptable?

12           MR. LAROSIERE:  Sounds fantastic, Your Honor.

13           THE COURT:  Mr. King?

14           MR. KING:  Yes, Your Honor.  I would also ask the

15   Court to kind of, as you've done with the individual jurors

16   that we've spoken to -- and I'm not sure if the Court is going

17   to address that later, but in terms of the statement, that's

18   perfect, Your Honor.  Thank you.

19           THE COURT:  We hadn't talked about me asking the

20   venire generally a question, and so that's what I was inquiring

21   about now.

22           So Ms. Taylor, if I ask them to raise their hand if

23   any of them that we haven't already spoken to heard or observed

24   anything about Juror No. 11 that they believe would influence

25   their verdict in any way, is that acceptable?

1          MS. TAYLOR:  Yes, Your Honor.

2          THE COURT:  And then I think after that what I would

3    do is ask them to recommit themselves to their juror oath of

4    deciding the case based solely on the evidence, my

5    instructions -- on the evidence and my instructions and to

6    advise me if they hear or observe any outside influence.

7          Is that -- will that suffice, Mr. Larosiere?

8          MR. LAROSIERE:  Yes, Your Honor.

9          THE COURT:  Mr. King?

10         MR. KING:  Yes, Your Honor.

11         THE COURT:  Ms. Taylor?

12         MS. TAYLOR:  Yes, Your Honor.

13         THE COURT:  Let's have the jury.

14         COURT SECURITY OFFICER:  All rise for the jury.

15      (Jury enters, 5:11 p.m.)

16         COURT SECURITY OFFICER:  Please be seated.

17         THE COURT:  All right.  Ladies and gentlemen,

18    obviously we've been a little delayed this afternoon, and I

19    apologize for that.

20         Juror No. 11 realized that there were matters

21    personal to himself that made him just not a suitable juror for

22    this particular case.  And to his credit, he told me that.  And

23    I've decided to release him from his jury service, so he's no

24    longer with you.  And that's fine.  We can continue the trial.

25    And he absolutely is not in trouble and he absolutely did the

1   right thing because all of the parties here are entitled to a

2   fair and impartial jury.  That's what the Constitution

3   guarantees, and that's what we are committed to providing.

4          But there was also some concern that Juror No. 11's

5   feelings might have influenced certain other jurors based upon

6   what he reported to us, and so we've taken some time to look

7   into that, and we -- I say "we" collectively because the

8   lawyers have been in these discussions -- we are confident that

9   Juror No. 11's feelings have not influenced the other jurors

10  with whom we spoke.

11         I do need to ask those that we didn't speak to, if

12  you could raise your hand if you heard or observed anything

13  about Juror No. 11's conduct or comments that would influence

14  your verdict in any way.

15     (No response.)

16         THE COURT:  All right.  And for purposes of the

17  record, none of the jurors have raised their hand.

18         I'm going to ask you not to speculate about what

19  Juror 11's comments were or what Juror 11's concerns were.

20  That's completely irrelevant.  The only thing that matters is

21  the evidence that's presented in this courtroom.

22         At the beginning of the trial you took an oath in

23  which you swore that you would well and truly try the case now

24  before the Court and render a true verdict according to the

25  law, evidence, and instructions of this Court, so help you God.

1        Can all of you assure me that you can continue to

2  follow that oath?

3        JURY:  (Affirmative head nods.)

4        THE COURT:  Can I hear you out loud?

5        JURY:  Yes.

6        THE COURT:  Is there anyone here who believes that

7  they would be influenced by anything outside of the evidence

8  presented in this courtroom, my instructions, and the arguments

9  presented?  Are you going to be influenced by anything other

10  than those three things in deciding your verdict?

11        JURY:  No.

12        THE COURT:  And I'm going to just ask this once

13  again.  Can all of you assure me that you can render a fair and

14  impartial verdict based solely on the evidence presented and my

15  instructions on the law?

16        JURY:  Yes.

17        THE COURT:  Okay.  So what we're going to do is we're

18  going to send you home.  And I apologize for the delay this

19  afternoon.  But we are on track, so please don't be concerned

20  about that.

21        And I will ask you to continue to follow all of the

22  instructions that I've given you throughout the trial.  They

23  are extremely important.  This exercise that we just went

24  through probably shows you why it's so important that even in

25  talking to one another that you not discuss the case in any way

 1   and that you not form or express any opinions about the case

 2   until you are back there deliberating on your verdict with all

 3   of the evidence, my instructions, and the arguments of the

 4   attorneys.

 5          So don't conduct any research; don't read, watch any

 6   media reports; don't let anybody talk to you or in your

 7   presence, and have a lovely evening.

 8          Be back at 8:45 and we will continue.

 9          COURT SECURITY OFFICER:  All rise --

10          THE COURT:  Oh, actually, you know what, I'm sorry,

11   let me just confirm with counsel that I did everything I

12   promised to do.

13          Counsel, may I see you at sidebar.

14      (Proceedings at sidebar:)

15          THE COURT:  Did I --

16          MR. LAROSIERE:  Did you assure them that if they came

17   back and let you know something that they --

18          THE COURT:  Oh, I'll do that.  If they remember later

19   that they heard something, that they should let me know.

20          MR. LAROSIERE:  Yeah.

21          THE COURT:  Okay.  I'll do that.

22          MR. LAROSIERE:  Thank you, Your Honor.

23          THE COURT:  Anything else, Ms. Taylor?

24          MS. TAYLOR:  No, Your Honor.  I'm assured that these

25   jurors are able to follow the law and the evidence and that

1  they have confidently reassured the Court of that.  And I have

2  no concerns about the remaining jurors.

3        THE COURT:  All right.

4        Mr. King, do you disagree with that?

5        MR. KING:  No, Your Honor, I was just -- no, Your

6  Honor.

7        THE COURT:  Okay.  And Mr. Larosiere, other than --

8  other than asking me --

9        MR. LAROSIERE:  It's a hard needle to thread.

10       THE COURT:  Other than asking me -- other than me

11 asking the jurors that last question, do you have any

12 disagreement with Ms. Taylor's assessment?

13       MR. LAROSIERE:  I --

14       THE COURT:  Let me do it differently.  Is there

15 anything else that you need me to ask them?

16       MR. LAROSIERE:  No, Your Honor.

17       THE COURT:  And without waiving your motion for

18 mistrial, can you identify factually any -- any behavior or

19 comment by the jury that is inconsistent with Ms. Taylor's

20 description?

21       MR. LAROSIERE:  Not at this time.

22       THE COURT:  Okay.  And I guess my point is I think

23 Ms. Taylor's description was exactly what I witnessed, and that

24 is, that nobody raised their hand and they all confidently and

25 without hesitation assured me that they could follow the law

1    and were not influenced by Juror No. 11.

2            And so I was giving you the opportunity that if you

3    saw something that I missed -- but what I'm hearing from you is

4    that you're unable to identify anything at this time; is that

5    right?

6            MR. LAROSIERE:  Yes, Your Honor.

7            THE COURT:  Okay.  All right.  Let me just ask that

8    last question.

9            MR. LAROSIERE:  Thank you, Your Honor.

10        (Proceedings in open court:)

11            THE COURT:  All right, ladies and gentlemen.  The

12   only other thing that I need to say to you before you go is if,

13   you know, later tonight or even during the trial, if you

14   realize that there was something that you heard or a concern

15   that you had, I want you to not hesitate in bringing that to my

16   attention.  Just give the court security officer a note.  And

17   you certainly won't be in trouble.  That's what we would

18   absolutely ask you to do, because as I said, the most critical

19   thing in any jury trial is you; it's a fair and impartial jury.

20   That is what is required.  And it's my job to make sure that

21   these folks get exactly that.  And if there's a problem with

22   that, then we'll take care of that.  And nobody will be in

23   trouble.  But that's of the utmost importance.

24            So with that I'm really going to let you go home and

25   we'll see you at 8:45 tomorrow morning.

```
 1              COURT SECURITY OFFICER:  All rise for the jury.
 2         (Jury exits, 5:19 p.m.)
 3              COURT SECURITY OFFICER:  Please be seated.
 4              THE COURT:  Okay.  I think that that last inquiry we
 5    did resolves the motion for mistrial because the motion for
 6    mistrial was based on the concern that the other jurors had
 7    observed Juror No. 11's discomfort and agitation and that that
 8    might somehow influence their verdict.
 9              And I specifically asked them to raise their hand if
10    there was anything about Juror No. 11's -- anything they
11    observed or heard about his conduct or comments that would
12    influence their verdict, and they all -- well, and none of them
13    raised their hand.  So I don't think there's a basis to grant
14    the motion for mistrial.
15              Yes?
16              MR. LAROSIERE:  Sorry.  Mr. Zermay identified for me,
17    and I agree, a somber look on Juror No. 3, and I just wanted
18    that reflected, when you asked about a factual basis, for body
19    language.
20              THE COURT:  A somber look on the face of Juror No. 3,
21    the juror that we individually spoke to?
22              MR. LAROSIERE:  Yes, ma'am.
23              THE COURT:  Okay.  Well, given the fact that we
24    individually spoke to her and she assured us that she could
25    render a fair and impartial verdict and was not concerned --
```

1    and, gosh, I certainly didn't see a somber look on her face.

2           And Mr. Zermay, I don't know why you wouldn't have

3    brought that to our attention at sidebar.

4           MR. ZERMAY:  Your Honor, if I may briefly address

5    that.  We're trying to abide by the one-at-a-time rule,

6    respectfully.

7           THE COURT:  Mr. Zermay, you were whispering in

8    Mr. Larosiere's ear at sidebar at that very moment.  So I'm

9    going to reject that as basis for it not being brought up at

10   sidebar because you were speaking to him, so -- you-all have

11   loosely abided by the one person, and I'm allowing the

12   whispering, and that's fine, but we're not going to turn that

13   around and suggest that that was the reason for why it wasn't

14   brought up at sidebar, so -- in fact, there's even on the

15   record Mr. Larosiere advising the Court that you -- that you

16   had just whispered and reminded him to renew the motion for

17   mistrial.

18          All right.  So -- but on this record there's simply

19   no basis to grant a mistrial.

20          It is not pretty.  Juror No. 11 certainly created a

21   difficult situation, but I am confident that the jurors that

22   are left assured the Court that they would render a fair and

23   impartial verdict, that they were not influenced -- most -- the

24   overall majority of them neither observed nor heard anything

25   reflecting Juror No. 11's concerns.

1        Those that did assured the Court unequivocally that

2   the concerns did not influence them or their thoughts and would

3   not influence their verdict.  And so the motion for mistrial is

4   denied.

5        Ms. Taylor, what do you have in stock for us

6   tomorrow?

7        MS. TAYLOR:  Your Honor, before we hit this bump in

8   the road we were actually on track to be ahead of schedule.

9   Now I think we're essentially where Mr. Mesrobian and I had

10  anticipated when we kind of plotted this out where we would be

11  at the end of the day.

12       Tomorrow we're anticipating testimony from David

13  Bane; John Palmer Clarkson, III; Joncarlos Ruiz; and Patrick

14  Breslend.

15       Mr. Bane is a machine shop owner in town and then

16  Mr. Clarkson, Mr. Ruiz, and Mr. Breslend all work for Orange

17  Park Machine, which was the main machine shop manufacturing the

18  auto key cards.

19       And then we have several witnesses -- well, I still

20  need to put on Special Agent Slosson.  He can essentially, I

21  think, testify at any time.  He may testify tomorrow.  But I've

22  been kind of saving him in reserves for if we run out of

23  witnesses, we can put him on.

24       But then I think after that would be Carolanne Wolfe,

25  Kristin Ervin, Kris Ervin, and Jonathan Monger.

1          And if we get through all of that, then we would be

2    moving on to Lyndsey Butler, who is the ATF Intelligence

3    Research Specialist.  And we were anticipating her taking most

4    of the day.  She has a lot to get through.  So if we can get to

5    her tomorrow, I think she's on tap to be here and start

6    tomorrow afternoon.

7          THE COURT:  Okay.  I was hoping to make sure not to

8    stop -- tomorrow's the -- that awards thing, right?

9          MS. TAYLOR:  Yes, it starts at 1:30, Your Honor.

10          THE COURT:  So here's a little bit of a hiccup that

11    we ran into with that.  I was planning to make sure not to

12    break before 12:30 so that you could just be a little bit late.

13    Unfortunately, one of the jurors has told us that she has an

14    injection that she's required to take, and it has to be taken

15    in a time window.  And that time window is between 12 and

16    12:30.  So I think I'm going to have to break at 12:15 to make

17    sure that that can be accomplished.

18          I'll probably still plan to take about an hour or 10

19    or even an hour and 15 minutes.  I don't mind you being absent

20    for 15 minutes.  There's nothing under the law that prohibits

21    that, but I just wanted to let you know that that's why I'm

22    going to break a little bit early, because I have to

23    accommodate the medical condition of the juror.

24          MS. TAYLOR:  Yes, Your Honor, I certainly understand

25    that, and we will play it by ear.  Mr. Mesrobian has a few

1   witnesses for tomorrow, so hopefully while those witnesses are

2   on the stand it will work for me to be absent for a short

3   period of time.  And otherwise, I know that the office has

4   contingency plans for giving out those awards.

5           I think the only other thing we wanted to raise

6   again, Your Honor, was Exhibit 17, back to the GoFundMe

7   materials.  I think we still needed to come to ground on that.

8           And then one thing that Mr. Mesrobian and I had

9   discussed yesterday after the end of court and that we called

10  Mr. King about was the fact that the GoFundMe is discussed at

11  length in some of the videos that we're intending to introduce

12  that are --

13          THE COURT:  That's 13 and 14 that Mr. Mesrobian

14  mentioned this morning?

15          MS. TAYLOR:  Yes.  There may be others, but I think

16  certainly those discussed it in fair detail.  And so I think in

17  light of that, I'm not sure that being laser focused on the

18  small amount of the mention of the GoFundMe in Exhibit 17 makes

19  a lot of sense without addressing what's in those videos as

20  well, if the concern is the mention of the GoFundMe.

21          THE COURT:  I thought you were going in one

22  direction, and then I think I missed it.

23          But I did have a question about that, because over

24  the lunch hour I tried reading through 13 and 14.  But I

25  remembered Mr. Mesrobian saying that you-all only intended to

1   introduce certain parts of 13 and 14, and that it might be the

2   defense's position that more of that should be introduced.  And

3   I think that would influence my decision, to know what parts of

4   13 and 14 the government was seeking.  And if the defendant was

5   then insisting on introduction of the GoFund- -- of other

6   parts.  So can you give me clarity on that?

7           MS. TAYLOR:  Sure, Your Honor.  So how we had

8   intended to proceed was for all of the videos, we just have the

9   whole video on a disk as an exhibit.  We were only intending to

10  play for the jury certain parts.  And frankly, I'd have to have

11  Mr. Mesrobian address whether those parts include the GoFundMe,

12  because those are his exhibits.

13          But when we were exchanging exhibit lists prior to

14  trial, Mr. Hoover's attorney had indicated that their exhibits

15  were going to be all of the videos of Mr. Hoover's that we play

16  at trial and that they wanted the entire thing played.  And

17  that seemed to be an across-the-board request.

18          I don't have any more specificity on what their

19  request is other than that.

20          THE COURT:  Okay.  Well, you may have just clarified

21  for me.  So you're intending to introduce into evidence the

22  entirety of the video, you just weren't intending to publish to

23  the jury the entirety?

24          MS. TAYLOR:  Correct.  We were only intending to

25  publish the parts that we thought were pertinent.

 1          THE COURT:  But you're introducing the entire
 2    exhibit -- the entire video?
 3          MS. TAYLOR:  Yes, Your Honor.
 4          THE COURT:  Okay.  All right.  Mr. Mesrobian, because
 5    that's actually your evidence, is there any -- do you have
 6    any -- is that consistent with your understanding?
 7          MR. MESROBIAN:  Yes, Your Honor.  And I don't have
 8    that outline in front of me to tell you which precise portions
 9    of 13 and 14 I plan to play, but the entire exhibit would be
10    introduced.  I just -- in the interest of brevity, I was not
11    going to be publishing the entire thing.  And that is true with
12    respect to several of these videos, but it doesn't -- -
13          THE COURT:  If the whole thing is in evidence --
14          MR. MESROBIAN:  Right.
15          THE COURT:  -- then that's the distinction that I
16    misunderstood.  I think I -- I misunderstood that you were only
17    planning to introduce a portion.  But if the whole thing is
18    being introduced, it matters very little that only part --
19          MR. MESROBIAN:  Apologies, Your Honor.
20          THE COURT:  No, I'm sure that was my
21    misunderstanding.
22          All right.  Well, I'll finish my review of those this
23    evening.
24          I'm trying to think.  I felt like there was something
25    else we needed to address.

1          I do -- let me just say this out loud.  Where is the

2    GoFundMe stuff?  In the event that exhibit -- that I admit

3    Exhibit 73, I do think I would -- I do think a couple of

4    redactions would be appropriate.  If you look at page 2 above

5    the paragraph that starts, "Hi, my name is Erica," and it says

6    "lawyer, bail, expert witness," I don't see any reason why we

7    need to include that.

8          And then at the bottom of page 23 and continuing on

9    to page 24 there is an exchange between Mr. Hoover and Jade of

10   the GoFundMe that says, "Really, I think he is stalling until

11   the lawyer is ready to go and then have the lawyer get the

12   money and run everything.  I tried to explain to him that was a

13   stupid idea because if you pay the lawyer in full before the

14   job is done instead of by the hour as needed, the lawyer will

15   most likely just make a bill for 100 percent of the money and

16   say he needs more or just push Kris into taking a plea so he

17   don't have to do any more work," et cetera, I don't see any

18   reason why that needs to remain if I admit the exhibit.

19         Do you disagree with those redactions, assuming it's

20   admissible, Ms. Taylor?

21         MS. TAYLOR:  No, Your Honor.  I'm, frankly, fine with

22   heavily redacting 73.  And, really, the point that we wanted to

23   make with 73 was just to show that -- that Matt Hoover and

24   Erica Ibe were the ones that were actually running the GoFundMe

25   for the benefit of Mr. Ervin.  So I will take a look at giving

1    it a heavy chop.

2         THE COURT:  Okay.  And then with regard to the 17

3    series, I don't think it's possible -- I think it's highly

4    unlikely that anybody would know who "Matt from Fudd Busters"

5    is.  But it seems, just in an abundance of caution, that we

6    should redact that and maybe just make it say "M asterisk

7    asterisk asterisk asterisk."

8         MS. TAYLOR:  Your Honor, Ms. Ganoe performed some

9    sort of --

10        THE COURT:  Magic?

11        MS. TAYLOR:  -- magic and was able to redact that

12   out, and -- yes, so now at the bottom of -- so on clip two, the

13   last line of page 1 it just says, "Yeah, hopefully we'll have

14   enough to cover bail and then," and then there's just a blank

15   line and it says, "And hopefully they can get the case

16   dismissed."

17        And you redacted it out of the audio, correct?

18        MS. GANOE:  Correct.

19        THE COURT:  I'm sorry, can you tell me which one you

20   were just looking at?

21        MS. TAYLOR:  So that would be 17.2A, clip two.

22        THE COURT:  All right.  It also appears in 17.1A on

23   page 2, line 8.  And so if we can remove it from there as well.

24        And then the only other spot, I think -- and I'm

25   still going to look at this over the evening, but when you look

1    at lines 21 through 24, the only possible comment on an

2    attorney I see, the line currently reads, "You know, all we got

3    to do is get the ball rolling.  And then once I -- my plan

4    is -- once we get a attorney secured, get them to work on

5    getting me a bond hearing and get me out."

6            It seemed that if we redacted from the word "and

7    then" up to the word "work" so that it would just be, "You

8    know, all we got to do is get the ball rolling on getting me a

9    bond hearing and get me out," that would remove any reference

10   to the GoFundMe for purposes of counsel.

11           Any objection to that redaction, Ms. Taylor?

12           MS. TAYLOR:  No, Your Honor.

13           THE COURT:  And with that, Mr. King, I don't -- I

14   don't know that I saw anything else in this that could possibly

15   be interpreted as -- and I think I'm probably being overly

16   cautious in the redaction.  I don't think I see it implicating

17   the right to counsel.  And if it doesn't implicate the right to

18   counsel, I don't see a basis to exclude it.

19           It is relevant in that it is probative of the ongoing

20   conspiracy and the relationship between Mr. Ervin and

21   Mr. Hoover and also Mr. Hoover's wife, and a desire to continue

22   that allegedly unlawful business relationship.  So I'm inclined

23   to allow it.

24           Is there any other specific redaction or comment that

25   you would want to make on that?

1            MR. KING:  No, Your Honor.

2            THE COURT:  All right.  So I think with that -- oh,

3     the one thing I will say out loud, though, is I'm allowing this

4     in, but -- I don't know which one of you will be actually

5     handling the witnesses on this, but the United States needs to

6     tread very carefully.  You should not in any way suggest to the

7     jury that Mr. Hoover was raising -- was trying to get Mr. Ervin

8     a lawyer, was trying to buy him a lawyer, was trying to -- I

9     mean, you need to stay away from that.

10           Do you understand that?

11           MR. MESROBIAN:  Absolutely, Your Honor.

12           And the way that this is going to end up happening is

13    that -- oh, sorry -- Ms. Butler is going to be now -- we're

14    going to be playing this through her.  She's not a case agent.

15    She, you know, collated a lot of the documentary evidence in

16    this case and has created a summary timeline, a chart, a

17    demonstrative for the purposes of her testimony.

18           So as we're going through that timeline, rather than

19    just simply referencing the occurrence of the jail call, we'll

20    play it.  I don't think she'll have any comment on it because

21    she doesn't really know anything about it.  It's already been

22    authenticated and so on and so forth.

23           So I guess in some ways we ended up in a place where

24    it's going to be a cleaner testimony, purely playing it, and

25    there isn't anything else to ask her.

1           THE COURT:  Okay.  All right.  And -- yes?

2           MS. TAYLOR:  I'm sorry, because we're now

3      tag-teaming.  But I know we talked before about there's no

4      objection to authenticity of 17 and its sub parts.

5           I think it's necessary for there to be a stipulation

6      or for us to understand that we can represent that the voices

7      on that call are as represented on the transcript; that it's

8      Mr. Hoover, it's Mr. Ervin, and it's Erica Ibe.

9           Special Agent Hooker was prepared to testify to that

10     based upon his personal interactions with the defendants and

11     Ms. Ibe and having listened to their voices on the call.  I

12     don't think that there's any dispute about that, but I think

13     that to streamline this, when we introduce it, fairly, we

14     should be able to represent that those are who the voices are.

15          THE COURT:  Is there any objection to that, Mr. King?

16          MR. KING:  No, Your Honor.  I think that makes a lot

17     of sense, frankly.  And certainly I can say on behalf of

18     Mr. Ervin we won't make any argument that the government hasn't

19     demonstrated who it really is or anything like that.  There

20     won't be any argument or a cross-examination with the

21     witnesses.

22          THE COURT:  Mr. -- I don't know who.  Mr. Larosiere.

23          MR. LAROSIERE:  No objection, Your Honor.

24          THE COURT:  So you'll just have to remember to do

25     that, Ms. Taylor.

 1              MS. TAYLOR:  Yes, Your Honor.

 2              THE COURT:  Yes, Mr. King?

 3              MR. KING:  Your Honor, there was one other matter,

 4    and I just want to bring it to everybody's attention because

 5    I'm not sure where I am on it.

 6              There was some testimony from Agent Hooker on

 7    redirect this morning regarding the coat hanger case, and then

 8    the video where he alleged Mr. Ervin was melting some -- I'd

 9    say coat hanger, but I'm not very familiar with this, but --

10              THE COURT:  I think it was -- go ahead.

11              MR. KING:  But there was a plastic device --

12              THE COURT:  Wall hanger I think.

13              MR. KING:  Wall hanger.  I knew I was getting it

14    wrong but I wasn't sure where.

15              And during the course of the testimony, Agent Hooker

16    did say that the individual involved in that was prosecuted.

17    And I'm still doing some research, but I believe the government

18    ultimately dismissed those charges.  And given the fact that

19    unsolicited Agent Hooker did say that individual was

20    prosecuted, I think it's -- and I'm not sure how I intend on

21    getting into this, but I do think it's misleading to suggest

22    that he was prosecuted, because it suggests he was successfully

23    prosecuted ultimately.

24              And again, this is -- I'm still -- I've been trying

25    to do this during a break, so I'm not a hundred percent

1   confident on this, I just wanted to bring it to everybody's

2   attention.  My understanding is he was arrested on several

3   charges, pled to one charge, and the government ultimately

4   dismissed all of the charges related to the portable wall

5   hanger.  I think I have that right.

6            So I -- I don't say that -- I don't have a motion or

7   anything I'm asking the Court to do, I just want to bring that

8   to everybody's attention that that's something I'm going to be

9   looking into and -- so that everybody has an opportunity to

10  fairly look into that issue, because I'm not sure how I want to

11  address that, but I did want to bring it to everybody's

12  attention.

13           THE COURT:  Okay.  Well, certainly if the charges

14  were dismissed that probably does leave the jury with an

15  incorrect impression.  If that's the case, Ms. Taylor -- well,

16  let me hear from you.

17           MS. TAYLOR:  I do not know what the outcome of that

18  case was.  There was no objection lodged at the time, which I

19  think it probably could have been fair to make a hearsay

20  objection to the extent that Mr. -- that Agent Hooker was

21  testifying about --

22           THE COURT:  Well, but, yeah, I mean, your witness is

23  the one that brought it up, unsolicited.  I will admit at the

24  time I was a little surprised to hear that, and I was surprised

25  that I didn't hear an objection at the time because I probably

1    would have directed the jury to disregard it.

2              MS. TAYLOR:  I think the Court can just give a

3    limiting instruction in that regard, Your Honor.

4              THE COURT:  Well, so Mr. King -- well, a limiting

5    instruction in terms of telling the jury that they heard

6    yesterday somebody was prosecuted for the wall hanger and I'm

7    going to direct them to disregard that comment?

8              MS. TAYLOR:  I think that's sufficient, Your Honor.

9              THE COURT:  All right.  Mr. King, is that sufficient?

10             MR. KING:  I would like some time to look into this.

11   So I'm not asking the Court to do anything, I just wanted to

12   bring that to everybody's attention.

13             You know, I may ultimately ask to introduce, you

14   know, the judgment and sentence in that case.  I'm not sure

15   yet.

16             THE COURT:  Well, I don't know how you're going to

17   have a judgment and sentence if the charges were dismissed.

18             MR. KING:  He entered a plea to -- and again, I'm

19   very much catching up.  And I'm sorry for interrupting.  It's

20   been a little bit of a long day.

21             My understanding is that he pled to an unrelated

22   count on a silencer case, and it looks like -- and just so --

23   and I can go ahead and let everybody know, it's the United

24   States vs. Timothy John Watson.  It's CR -- it's 3:20-cr-42,

25   and I believe it looks like it's the Northern District of West

1   Virginia.  I'm still trying to confirm that that's that case

2   and that individual, and -- but it looks like he pled to

3   possession of a silencer unrelated to the portable wall hanger

4   and the government dismissed the charges in the portable wall

5   hanger case.

6           THE COURT:  All right.  Well, I don't know how much

7   we're going to get into the specifics of that, but I'll let

8   you -- I'll let you look at it and you can bring it up

9   tomorrow.  But at a minimum I'm prepared to tell the jury to

10  disregard any comment about the prosecution for the portable

11  wall hanger.

12          And Ms. Wiles, if you would -- if you wouldn't mind

13  leaving me a note up here so I don't forget to do that if it's

14  not brought up.  But I won't do it without first conferring

15  with you-all about whether that's what we're going to do.

16          All right.  Anything else?  I'm going to stop asking.

17          MS. TAYLOR:  I'm sorry, I wish I didn't have anything

18  else.  We have a couple of witnesses coming up who are family

19  members of the defendants.  And I think that they would fairly

20  be characterized as hostile witnesses and we would be entitled

21  to ask leading questions.

22          I'm not intending to be aggressively leading with

23  these witnesses, but I wanted to bring that up outside of the

24  presence of the jury because I would rather not have a -- you

25  know, a request to treat a witness as hostile made in front of

1    the jury.

2            THE COURT:  Well, you'll come to sidebar.

3            MS. TAYLOR:  Okay.  Yes, Your Honor.

4            THE COURT:  Okay.  Anything else?

5            MR. KING:  No, Your Honor, I promise.

6            THE COURT:  I'm already late for Inns of Court as it

7    is.

8            Mr. Larosiere?  You've been -- you've had most of the

9    day.  Anything further for Mr. Hoover?

10           MR. LAROSIERE:  I'll happily hold my tongue, Your

11   Honor.  Nothing further.

12           THE COURT:  All right.  We're in recess.  I'll see

13   you all at 8:45 tomorrow morning.

14           COURT SECURITY OFFICER:  All rise.

15       (Proceedings adjourned at 5:45, to be continued on

16   Thursday, April 13, 2023.)

17                           -     -     -

18

19

20

21

22

23

24

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3     UNITED STATES DISTRICT COURT)

4     MIDDLE DISTRICT OF FLORIDA )

5

6          I hereby certify that the foregoing transcript is a true

7     and correct computer-aided transcription of my stenotype notes

8     taken at the time and place indicated herein.

9

10          DATED this 5th day of June, 2023.

11

12                              /s/ Katharine M. Healey
                                Katharine M. Healey, RMR, CRR, FPR-C
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25