1           UNITED STATES DISTRICT COURT
            MIDDLE DISTRICT OF FLORIDA
2              JACKSONVILLE DIVISION

3  UNITED STATES OF AMERICA,        Case No. 3:21-cr-22(S4)-MMH-MCR

4        Plaintiff,                 April 19, 2023

5  v.                              9:35 a.m. - 5:20 p.m.

6  KRISTOPHER JUSTINBOYER ERVIN     Courtroom 10B
   and MATTHEW RAYMOND HOOVER,
7
        Defendants.
8  _____

9
                          **JURY TRIAL**
10                       **(VOLUME 7 of 9)**

11
        BEFORE THE HONORABLE MARCIA MORALES HOWARD
12               UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20        Katharine M. Healey, RMR, CRR, FPR-C
          PO Box 56814
21        Jacksonville, FL 32241
          Telephone: (904) 301-6843
22        KatharineHealey@bellsouth.net

23

24                          (Proceedings reported by stenography;
                            transcript produced by computer.)
25

1                    A P P E A R A N C E S

2

3   COUNSEL FOR THE GOVERNMENT:

4        **LAURA C. TAYLOR, ESQUIRE**
         **DAVID MESROBIAN, ESQUIRE**
5        United States Attorney's Office
         300 North Hogan Street, Suite 700
6        Jacksonville, FL 32202

7

8   COUNSEL FOR DEFENDANT ERVIN:

9        **ALEX KING, ESQUIRE**
         Monroe & King, P.A.
10       1805 Copeland Street
         Jacksonville, FL 32204
11

12
    COUNSEL FOR DEFENDANT HOOVER:
13
         **ZACHARY Z. ZERMAY, ESQUIRE**
14       Zermay Law
         1762 Windward Way
15       Sanibel, FL 33957

16  - A N D -

17       **MATTHEW LAROSIERE, ESQUIRE**
         6964 Houlton Circle
18       Lake Worth, FL 33467

19

20

21

22

23

24

25

1                        I N D E X

2                                                    PAGE

3    CHARGE CONFERENCE........................................ 5

4    GOVERNMENT'S WITNESSES:

5    **AGENT ERNEST LINTNER**

6      CROSS-EXAMINATION (CONTINUED) BY MR. LAROSIERE.......... 44

7      CROSS-EXAMINATION BY MR. LAROSIERE..................... 57

8      REDIRECT EXAMINATION BY MR. MESROBIAN.................. 67

9    **SPECIAL AGENT JASON SLOSSON**

10     DIRECT EXAMINATION BY MS. TAYLOR...................... 70

11     CROSS-EXAMINATION BY MR. LAROSIERE.................... 95

12     CROSS-EXAMINATION BY MR. KING......................... 104

13     REDIRECT EXAMINATION BY MS. TAYLOR.................... 122

14     RECROSS-EXAMINATION BY MR. KING....................... 129

15   **OFFICER CODY JAMES TOY**

16     DIRECT EXAMINATION BY MS. TAYLOR...................... 136

17     CROSS-EXAMINATION BY MR. LAROSIERE.................... 170

18     CROSS-EXAMINATION BY MR. KING......................... 206

19     DIRECT EXAMINATION BY MS. TAYLOR...................... 222

20     RECROSS-EXAMINATION BY MR. LAROSIERE.................. 223

21   GOVERNMENT RESTS........................................ 229

22   DEFENDANT ERVIN RESTS................................... 230

23   DEFENDANT HOOVER RESTS.................................. 230

24   DEFENDANT ERVIN'S MOTION FOR JUDGMENT OF ACQUITTAL........ 232

25   DEFENDANT HOOVER's MOTION FOR JUDGMENT OF ACQUITTAL....... 235

1                        E X H I B I T S

2    ADMITTED                                              PAGE

3      GOVERNMENT'S EXHIBIT 63................................ 165

4      GOVERNMENT'S EXHIBIT 64................................ 141

5      GOVERNMENT'S EXHIBIT 65................................ 148

6      GOVERNMENT'S EXHIBIT 66................................ 159

7      GOVERNMENT'S EXHIBIT 109A-109D......................... 74

8      GOVERNMENT'S EXHIBIT 111............................... 75

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2    April 19, 2023                              9:35 a.m.

3                         -   -   -

4        (All parties present.  Jury not present.)

5             COURT SECURITY OFFICER:  All rise.  This Honorable

6    Court is back in session.

7             Please be seated.

8             THE COURT:  We're back on the record in

9    Case No. 3:21-cr-22(S4)-MMH-MCR, United States of America vs.

10   Kristopher Justinboyer Ervin and Matthew Raymond Hoover.

11            Ms. Taylor and Mr. Mesrobian are here for the United

12   States, along with Agent Slosson.

13            Mr. King is here with Mr. Ervin.

14            Mr. Larosiere and Mr. Zermay are here with

15   Mr. Hoover.

16            And we are gathered this morning for the charge

17   conference.  It's now 9:36.  The instructions have been

18   available for counsel to review since about 8:40 this morning.

19   And so we're going to review the Court's proposed instructions.

20            What I did see this morning is that at about 6:40

21   last night the government filed a supplemental instruction.  As

22   I have claimed before, when something is filed, it doesn't

23   automatically come to me.  And unlike counsel, the Court does

24   not get automatic notifications of filings.  So given how many

25   cases we have, if we were getting an email every time something

 1   is filed, it -- we'd be getting emails every five minutes.

 2          So I saw it this morning.  I actually left the

 3   courthouse at ten minutes to 7 last night, but I did not see a

 4   proposed instruction filed at 6:39.  And I frankly don't

 5   understand the issues brought up in it, and I frankly don't

 6   understand why it was filed belatedly because it doesn't appear

 7   to me to have been a new issue.

 8          But regardless, I think most of what is requested

 9   there I'm not inclined to add.  But when we get to the relevant

10   instruction, we can discuss it.

11          So Court's Proposed Instruction No. 1, any objection

12   by the United States?

13          MS. TAYLOR:  No, Your Honor.

14          THE COURT:  Mr. King?

15          MR. KING:  None on behalf of Mr. Ervin, Your Honor.

16          THE COURT:  Mr. -- who's doing the charge conference?

17          MR. ZERMAY:  I am, Your Honor.  No objection to

18   Instruction No. 1, Judge.

19          THE COURT:  Mr. King, has Mr. Hoover made a decision

20   about whether or not he intends to testify?

21          MR. KING:  Mr. Ervin, Your Honor?

22          THE COURT:  I'm sorry, yes.

23          MR. KING:  Yes, Your Honor, he has.

24          THE COURT:  And?

25          MR. KING:  He is choosing not to testify.

1           THE COURT:  Okay.  Mr. Zermay, has Mr. Hoover made a

2   decision of whether or not to testify?

3           MR. ZERMAY:  Yes, Your Honor.  He is not testifying.

4           THE COURT:  Okay.  So then with regard -- I had

5   proposed Court's Proposed 2A, if a defendant testifies, or 2B,

6   when no defendant testifies.  So any objection to -- let me

7   just look at the language to see if I want to change it.

8           Any objection to the Court instructing the jury as

9   set forth in Court's Proposed 2B, Ms. Taylor?

10          MS. TAYLOR:  No, Your Honor.

11          THE COURT:  Mr. King?

12          MR. KING:  No, Your Honor.

13          THE COURT:  Mr. Zermay?

14          MR. ZERMAY:  No, Your Honor.

15          THE COURT:  All right.  So we'll use 2B.

16          Court's Proposed 3, Ms. Taylor?

17          MS. TAYLOR:  No objection, Your Honor.

18          THE COURT:  Mr. King?

19          MR. KING:  No objection, Your Honor.

20          THE COURT:  Mr. Zermay?

21          MR. ZERMAY:  No objection, Judge.

22          THE COURT:  Court's Proposed 4, Ms. Taylor?

23          MS. TAYLOR:  No objection.

24          THE COURT:  Mr. King?

25          MR. KING:  No objection, Your Honor.

1          THE COURT:  Mr. Zermay?

2          MR. ZERMAY:  No objection.

3          THE COURT:  Court's 5, Ms. Taylor?

4          MS. TAYLOR:  No objection.

5          THE COURT:  Mr. King?

6          MR. KING:  Without objection, Your Honor.

7          THE COURT:  Mr. Zermay?

8          MR. ZERMAY:  No objection, Your Honor.

9          MR. KING:  And Your Honor, I apologize, can we remain

10  seated for this?

11          THE COURT:  Yes.  I apologize.  I usually say that we

12  don't need to do the whack-a-mole, and I apologize.

13          And my court reporter is now looking at me as:  How

14  on earth am I supposed to transcribe "whack-a-mole"?

15          So because the defendants have determined that they

16  are not going to testify, any objection to the Court

17  instructing the jury as set forth in Court's Proposed

18  Instruction 6A, Ms. Taylor?

19          MS. TAYLOR:  No objection, Your Honor.

20          THE COURT:  Mr. King?

21          MR. KING:  No objection, Your Honor.

22          THE COURT:  Mr. Zermay?

23          MR. ZERMAY:  No objection, Your Honor.

24          THE COURT:  And so we'll strike 6B because it would

25  only have been applicable if a defendant testified.

1          All right.  Ms. Taylor, any objection to Court's
2   Proposed 7?
3              MS. TAYLOR:  No, Your Honor.
4              THE COURT:  Mr. King?
5              MR. KING:  No, Your Honor.
6              THE COURT:  Mr. Zermay?
7              MR. ZERMAY:  No, Your Honor.
8              THE COURT:  Ms. Taylor, Court's 8?
9              MS. TAYLOR:  No objection, Your Honor.
10             THE COURT:  Mr. King?
11             MR. KING:  No objection, Your Honor.
12             THE COURT:  Mr. Zermay?
13             MR. ZERMAY:  No objection.
14             THE COURT:  Court's 9, Ms. Taylor?
15             MS. TAYLOR:  No objection, Your Honor.
16             THE COURT:  Mr. King?
17             MR. KING:  No objection, Your Honor.
18             THE COURT:  Mr. Zermay?
19             MR. ZERMAY:  No objection, Your Honor.
20             THE COURT:  Court's 10, Ms. Taylor?
21             MS. TAYLOR:  No objection.
22             THE COURT:  Mr. King?
23             MR. KING:  No objection, Your Honor.
24             THE COURT:  Mr. Zermay?
25             MR. ZERMAY:  No objection, Your Honor.

1    THE COURT:  Court's 11, Ms. Taylor?

2    MS. TAYLOR:  No objection, Your Honor.

3    THE COURT:  Mr. King?

4    MR. KING:  Sorry, Your Honor.  There it goes.

5    No objection, Your Honor.

6    THE COURT:  All right.  Court's 12 is the

7    introduction to the offense instruction.

8    Any objection, Ms. Taylor?

9    MS. TAYLOR:  No, Your Honor.

10   THE COURT:  Mr. King?

11   MR. KING:  No, Your Honor.

12   THE COURT:  Mr. Zermay?

13   MR. ZERMAY:  No, Your Honor.

14   THE COURT:  Court's 13 is the instruction regarding

15   the conspiracy charge.

16   Any objection, Ms. Taylor?

17   MS. TAYLOR:  No, Your Honor.

18   THE COURT:  Mr. Zermay -- sorry, Mr. King?

19   MR. KING:  No, Your Honor.

20   MR. ZERMAY:  No, Your Honor.

21   THE COURT:  Okay.  All right.  And now we're on

22   Court's Proposed Jury Instruction 14.  The government filed

23   document number 253 requesting an additional instruction.  I --

24   my thought is that it goes too far, Ms. Taylor, and what --

25   what I'm inclined to do, and then I'll hear from you, is add to

1  the first sentence on page -- well, turning to page 23, which

2  is the last paragraph of the instruction, the first sentence of

3  that paragraph reads, "The government does not have to prove

4  that the defendant knew the item described in the indictment

5  was a firearm that must be legally registered."

6       I would be inclined to add to that, "Or that any

7  purchaser successfully converted a particular firearm into a

8  machine gun."

9       But I think that's as far as I would intend to go.

10      The bottom part --

11      MR. KING:  Your Honor, I apologize, could you repeat

12  that language?  I just want to make sure I have it.

13      THE COURT:  Yes, of course.

14      "The government does not have to prove that the

15  defendant knew the item described in the indictment was a

16  firearm that must be legally registered, or that any purchaser

17  successfully converted a particular firearm into a machine

18  gun."

19      And I'm inclined to add that language because I think

20  that is legally correct.

21      The additional language I think is redundant of

22  what's already in the next sentence because the next sentence

23  says, "The government only has to prove beyond a reasonable

24  doubt that the defendant knew about the specific

25  characteristics or features of the firearm that made it subject

1    to registration, namely, that it was a combination of parts

2    designed and intended for use in converting a weapon to shoot

3    automatically more than one shot, without manual reloading, by

4    a single function of the trigger."

5         So that sentence already says that the government has

6    to prove beyond a reasonable doubt that the defendant knew the

7    item was a combination of parts designed and intended for use,

8    et cetera.

9         So that's what I'm inclined to do with regard to the

10   supplement.  If that had been timely submitted, that's what I

11   would have selected from that to include.

12        Ms. Taylor.

13        MS. TAYLOR:  Your Honor, we agree with the Court's

14   suggestion.  And I apologize for how late yesterday that was

15   submitted.  That's -- frankly, we didn't start discussing the

16   possibility of an additional instruction in this regard until

17   sometime I think late yesterday morning, and I didn't get back

18   to the office until in the afternoon, and so it's entirely due

19   to me that it didn't get filed until late and we are very sorry

20   about that.

21        I think the concern that we had was just whether

22   there would be arguments at closing that could potentially be

23   confusing to the jury to the extent that they may leave the

24   jury under the impression that it was required that the

25   purchaser -- or any purchaser actually had a firearm that was

1    configured in the right way for the -- for the lightning link

2    to work with it.  And I think the case law that we cited would

3    support that that -- that's not required.  What's required is

4    just that the lightning link be a conversion device designed

5    and intended for converting a firearm into a machine gun.

6              THE COURT:  Well, I think one thing that concerned me

7    about the proposed language that you-all suggest -- that

8    you-all gave me is that it suggests that there doesn't have to

9    be any proof -- any proof that the part the defendant -- that

10   the defendants conspired to transfer would ever have been

11   objectively capable of accomplishing fully automatic fire.  And

12   your instruction suggests that there doesn't have to be any

13   proof of that at all.  I'm not sure that the case law you cited

14   supports that, but I also don't think in the context of this

15   case that that's necessary because you're going to have the

16   agent testify that he was able to successfully do it.  So

17   that's why I limited the instruction to it doesn't have to show

18   that a purchaser successfully did it.

19             I don't know that I -- well, I'm not inclined to go

20   any further than that because I think that might -- I'm not

21   convinced that that would be a legally correct instruction if I

22   went further than that.

23             MS. TAYLOR:  And Your Honor, it was not our intention

24   to suggest that we didn't have any burden of proof with regard

25   to showing that it could work.  And as the Court noted, we are

1    intending to present that proof.

2            So to that regard, we are -- we are good with the

3    Court's suggestion.  And again, I think my concern was that

4    there could be arguments at closing like, you know, "This

5    person didn't even have an SP1 bolt carrier in their AR-15; how

6    could you say that this is a machine gun conversion device?"

7    And I think that would be an incorrect argument to make at

8    closing.

9            THE COURT:  But then also further, though, to the

10   extent you're telling me to specifically advise counsel not to

11   make -- I'm not going to tell them what they can and can't

12   argue.  Obviously you can't make an argument that's not

13   supported by the law, and I also don't think that the evidence

14   would support that you couldn't get the bolt -- that SP bolt

15   carrier, because there's contrary evidence.  So I think it

16   would be unwise to make an argument unsupported by the

17   evidence, but I'm going to rely on counsel to make arguments

18   that are consistent with the Court's instructions and supported

19   by the law.

20           With my addition to the last paragraph of Court's

21   Instruction No. 14, does the United States have any objection

22   to No. 14?

23           MS. TAYLOR:  No, Your Honor.

24           THE COURT:  Mr. King?

25           MR. KING:  Your Honor, if I could have a brief moment

1    with for counsel for Mr. Hoover.  Just to let the Court know, I

2    may be asking something a little additional to what the Court

3    said, and I want to work on that language with them, if you

4    could --

5            THE COURT:  Okay.

6            MR. KING:  Thank you.

7        (Defense counsel confer.)

8            MR. KING:  Your Honor, thank you for the indulgence

9    there.

10           Your Honor, in terms of the instruction the Court's

11   prepared to give, I believe that that is an accurate statement

12   of the law in terms of the language the Court has proposed to

13   add.  However, given the addition, we would request an

14   additional sentence after that one, and I'll go slowly so

15   everybody can get this down.  And that sentence would be,

16   "However, the government must prove beyond a reasonable doubt

17   that the item described in the indictment is capable of

18   converting a firearm into a machine gun."

19           And, Your Honor, I think the reason for that language

20   is to clarify that it does not have to -- because I think it's

21   accurate that it would not have to work with a particular set

22   purchaser, but it does -- it would have to objectively work.

23   And, you know, I know the government plans on putting on the

24   testimony of Agent Toy, and I believe they think that will be

25   uncontroverted.  I don't think the testimony will come out that

1  way if our cross-examination is successful, so -- in terms

2  of -- you know, in terms of it needing to actually be capable

3  of functioning.  So that's why we would request that language.

4           I have other issues with regard to this instruction,

5  but specifically as to the modification --

6           THE COURT:  Let me hear what your other issues are

7  first.

8           MR. KING:  Your Honor, the other issue is -- you

9  know, I think we raised this and the Court ruled on it in doc

10 223 in terms of the requests that we've made.

11          In our proposed instructions we had a request that,

12 "Specifically, however, if you find that the defendant

13 transferred a singular part rather than a combination of parts,

14 you should find the defendant not guilty."

15          This instruction is important for several reasons.

16 One is the definition in the National Firearms Act is

17 disjunctive.  As we discussed in the motions, it can be one or

18 the other.  There's three definitions, or if you break "part"

19 and "parts" into two separate, it would be four different

20 definitions.

21          The concern is -- well, the government has made a

22 tactical decision to not proceed generally with all four

23 definitions in the disjunctive, but to proceed specifically

24 under one subsection of the "part/parts."

25          I certainly respect and understand the Court's ruling

1   in terms of the "solely and exclusively."  However, there's a

2   concern that this is now misleading; that a jury could read

3   this and not understand that a singular part under the

4   government's theory would lead to a defendant being found not

5   guilty and that the only way to clarify that it's the

6   government's tactical choice would be to make it clear that if

7   it is a singular part, then the defendant must be found not

8   guilty, because that's not been alleged.  And if it is a

9   singular part, the law is clear they must be found not guilty

10  because all the "solely and exclusively" language has been

11  taken out.

12          To put it another way, this is a tactical decision by

13  the government.  I don't know if I'd make the same one, but I

14  understand why they made it.  But without that clarification,

15  there's a big concern from Mr. Ervin that that's misleading.

16          And, you know, to some extent you live by the sword,

17  you die by the sword.  The reason that the "solely and

18  exclusively" language is out rather than the government

19  explaining to the jury why it would only apply to a "part" as

20  opposed to "parts" based on the Court's ruling is based on the

21  tactical choice they made when they amended the indictment and

22  took out the singular part language.

23          But it's very clear that based on how the indictment

24  was modified, I think it was either the second or third

25  superseding indictment, that the government -- if the jury were

1  to determine that this was a singular part rather than parts,

2  they must find these defendants not guilty because of the way

3  that it was alleged.  And to not include some sort of language

4  explaining "parts" means plural, we believe it is misleading to

5  the jury.

6          And again, this is solely a tactical decision by the

7  government to get rid of that language.  I --

8          THE COURT:  Okay.  You're now repeating yourself a

9  whole lot.

10          MR. KING:  I'm a little circular.

11          THE COURT:  I get the gist of your argument.

12          MR. KING:  Thank you, Your Honor.

13          THE COURT:  And I assume Mr. Hoover joins in that

14  request?  Because you did include similar language in your

15  proposed instructions, Mr. Zermay.

16          MR. ZERMAY:  Yes, Your Honor, we also join in that

17  request.

18          THE COURT:  All right.

19          Ms. Taylor, as to the request that the Court include

20  language that -- instructing the jury that if the defendants

21  transferred only a singular part or no parts, you should find

22  the defendants not guilty, what's the government's response?

23          MS. TAYLOR:  Your Honor, I --

24          THE COURT:  And then we'll talk about the other

25  request he has, but this --

1          MS. TAYLOR:  I think the language is entirely

2    unnecessary.  I think that the definition that's in the Court's

3    instruction as is it now that specifically states it has to be

4    a combination of parts designed and intended for use in

5    converting -- I mean, I think they can make their arguments

6    based upon that language that it's not a combination of parts

7    and that in their view it's a single part.

8          And the jury should understand from the fact that

9    "parts" has an "s" at the end of it that they have to find

10   it's -- and that it says "combination of parts" that they have

11   to make a finding that it is a combination of parts.

12         And I think that the additional language

13   overemphasizes that point and also could be confusing to the

14   jury with regard to -- so, you know, if we find it's a

15   combination of parts but it's on a single part of -- piece of

16   metal, does that mean we have to find him not guilty?  Which I

17   think is the argument that they want to make.

18         But again, I don't think that language is necessary.

19   I think that the definition and what they have to find is clear

20   on its face and leaves open the opportunity for the defendants

21   to make that argument based upon the language that's already in

22   here.

23         THE COURT:  So Mr. King, the reason I didn't include

24   that language that both you and Mr. Zermay proposed was

25   twofold.  One, I thought it was redundant of the definition

1   because the definition says it has to be a combination of

2   parts.  So it didn't seem necessary for you-all to argue to the

3   jury that if -- it did not seem necessary to include that

4   because simply from the definition that we're giving you could

5   argue that it was not a combination of parts.

6          The other thing that concerned me was the way it's

7   phrased -- and when I'm talking about the way it's phrased,

8   right now I'm reading I think from -- I think I'm reading from

9   Mr. Hoover's.  Yeah, I am.

10         But both -- so Mr. Hoover's on page 31 of

11   document 234 and Mr. Ervin at document 232 page 28, the

12   language you're requesting is, "However, if you find that the

13   defendant transferred a singular part rather than a combination

14   of parts" -- that's Mr. Ervin's language.  And Mr. Hoover's is,

15   "If you find the defendant transferred only a single part

16   rather than a combination of parts, you should find the

17   defendant not" -- "the defendant or defendants not guilty."

18         The problem I have with that is I find it to be

19   confusing because the defendants can have transferred a

20   singular item, that is, the metal card, that's what they

21   physically transferred.  It's still up to the jury to decide

22   whether that singular item that was transferred constitutes a

23   combination of parts.  So I think that the language that you're

24   giving me -- that you're asking me to provide to them, which

25   suggests that it has to be one or the other, is misleading.

1          MR. KING:  And, Your Honor, if I could address those

2    a little bit in reverse order with the one we just addressed.

3          The Court rephrased our proposed instruction while we

4    were discussing it, and frankly I think the -- and I'm not sure

5    if it was just kind of ad hoc, but the proposal the Court made

6    in terms of whether it was a, you know, singular part or no

7    parts -- I can't remember the exact language -- I think more

8    accurately would state our position because I understand --

9          THE COURT:  Well, just for clarification, I'm not

10   rephrasing.  That was in Mr. Hoover's.

11         MR. KING:  Before we got to that, when we were having

12   the conversation.  I should have written it down.  You know,

13   the Court's concern with that language is understandable.  And

14   I think the -- and let me put it this way.  The confusion is

15   we've heard testimony from Agent Lintner already that, you

16   know, a singular part can be a machine gun.  That was brought

17   out on direct.  And the government has not traveled under that

18   theory.

19         The concern is if, you know, the defense is required

20   to go through and say it's a combination of parts, but "parts"

21   has an "s" in it and it's not really a singular part, that

22   looks as if we are quibbling and being technical.  It's also

23   misleading in light of the testimony we've heard from Agent

24   Lintner.

25         I don't disagree that there may be a better way to

1    draft what we're trying to get at, but essentially it's, "If it

2    is a singular part rather than a combination of parts or it's

3    no part at all" --

4         THE COURT:  But that's my problem, Mr. King.  You're

5    suggesting that it has to be one or the other.  And it's -- and

6    again, it's in the way you-all are phrasing it.  What the

7    defendant transferred can both be a singular part and a

8    combination -- and ultimately a combination of parts.  I mean,

9    if that's what the jury finds.  I don't know if the jury is

10   going to find that because you can cut it out and use it,

11   that's a combination of parts.  That's why we're here for

12   trial.  If any of us knew what the answer to that would be,

13   there wouldn't be a trial.

14        But your -- the language suggests that if what was

15   transferred is only a singular -- a singular item, then it

16   cannot be a combination of parts.  And I just -- I'm not

17   convinced that that's accurate.

18        MR. KING:  And Your Honor, if I could address one of

19   the Court's concerns.  The Court is saying it has to be one or

20   the other, and normally it would not have to be.  The NFA has

21   four definitions under what a machine gun could be.  The reason

22   it has to be one or the other is because of the charging

23   decision the government made to narrow out one subsection of

24   that sentence.  And the concern we have is that it's misleading

25   to the jury, and --

1          THE COURT:  You're missing my point; that is, it is

2     true that if -- that the government says it has to be a

3     combination of parts.  That doesn't mean -- well, I don't know

4     whether that means that if they transferred one object that the

5     jury cannot still find that object to constitute a combination

6     of parts.  Do you see what I'm saying?

7          MR. KING:  I see exactly what you're saying.

8          THE COURT:  And your language lends itself to the

9     argument that all they transferred was one piece of metal.  And

10    it suggests that that cannot at the same time be a combination

11    of parts.  And that's exactly what this trial is all about, is

12    whether that piece of metal with those etchings is capable of

13    being a combination of parts.

14         MR. KING:  Yes, Your Honor.  On the same token, you

15    know, the language is if it is a singular part, then the

16    "solely and exclusively" language kicks in.

17         If I could make a suggestion.  I understand the

18    Court's concern now, and I think what -- it's the Court's

19    concern, but I do think it has merit.  If we could have a brief

20    moment for counsel for Mr. Hoover and I to get together and

21    propose an instruction that addresses the Court's concern as

22    well as our concern, because I think it's a very big issue.  I

23    think it's misleading to suggest that "part" and "parts" can be

24    used interchangeably because if it is a singular part --

25         THE COURT:  They can't be used interchangeably.  It

1    has to be a combination of parts.  It cannot be a single part.

2    And you can certainly argue that, but to instruct the jury

3    that, "If you find that the defendants transferred only a

4    singular part" -- maybe I can try and rephrase that in some

5    way, but I think that is misleading as it's written.

6            MR. KING:  And Your Honor, in light of the Court's

7    concern, I see what Your Honor is saying.  I don't entirely

8    disagree.  I think we could draft it a little more artfully if

9    we could have a moment to make some effort.

10           THE COURT:  Okay.

11           MR. KING:  And Your Honor, the other thing that may

12   make sense is to address it in the body where "combination of

13   parts listed" -- where it says "combination of parts," it may

14   be better to parse out that it's not a singular part there.

15           If I could have a moment, though, with counsel for

16   Mr. Hoover.

17           THE COURT:  Go ahead.

18       (Defense counsel confer.)

19           THE COURT:  Mr. King.

20           MR. KING:  Your Honor, I -- counsel for Mr. Hoover is

21   preparing a standalone instruction.  I had a modification

22   within the body of the Court's instruction that I've discussed

23   with Mr. Ervin.  I believe they're about done with their

24   proposed instruction, which would be separate from our proposal

25   based on our conversation.

1          THE COURT:  All right.  I can't pretend that I

2   understand what you just said, but let me hear from --

3   Mr. Zermay is standing, so what is it that you're suggesting,

4   Mr. Zermay?

5          MR. ZERMAY:  Yes, Your Honor.  A standalone sentence

6   stating, "To convict, you must find that the" -- or "that each

7   item alleged in the indictment was a combination of parts

8   rather than a single part."

9          THE COURT:  I think that has the same problem that

10  Mr. King's instruction has, and that is, what -- we're not

11  giving the jury a definition of what a "part" is.  And so your

12  suggestion is that something can only be either a combination

13  of parts or a single part, it can't be both.

14          But what you're going to argue, then, is this card is

15  just a single thing; therefore, it can't be a combination of

16  parts.  I think you can argue that to the jury in argument, but

17  ultimately, that distinction of whether the card is a single

18  part or a combination of parts, that's what the jury has to

19  decide.  And because there's not a definition of what a "part"

20  is, that instruction, I think, is misleading because it

21  suggests that something can only be one or the other.  But a

22  single ob- -- but this jury has to decide whether that single

23  object, the auto key card that was transferred, whether that

24  single object is a -- whether it is a combination of parts or

25  whether it is a single part.

1          So I -- let me think for just a moment.  Just a

2     minute.

3          Yeah, I think that that is confusing.  I've tried a

4     couple ways to sketch out something better and I'm not coming

5     up with something better.  I think that what we have is a

6     definition in the instruction that says, "A machine gun

7     conversion device has to be a combination of parts designed and

8     intended for converting a weapon to shoot automatically more

9     than one shot."

10          And I think you're free to argue that the auto key

11     card is not a combination of parts.  "Here, look at it, it's

12     one flat piece of steel.  Our argument is one flat piece of

13     steel cannot be a combination of parts."

14          And the government is going to argue that this one

15     flat piece of steel, with these etchings in it, is, in fact, a

16     combination of parts.  That's jury argument.  That's what

17     you-all -- and ultimately the jury is going to go back in the

18     jury room and they are going to decide whether they think one

19     flat piece of steel with lines on it can be a combination of

20     parts or whether they believe that it is just a single -- a

21     single part.  And if it's just a single part, then it is not a

22     combination of parts designed and intended.

23          But I think trying to say, "If you find that it's a

24     single part rather than a combination of parts," without more,

25     is misleading.  We would have to explain that the mere fact

1   that it's one piece, one object, does not necessarily mean that

2   it cannot be a combination of parts, and that's what they have

3   to figure out.  But to me, that's redundant of what's already

4   in the instruction, which is why I was trying -- I was having

5   difficulty trying to craft something.

6          In other words -- and I go back to saying you-all --

7   your -- both the way you proposed it now and the way it was

8   proposed earlier is that there's a binary choice; it's either a

9   single part or a combination of parts.  And it is true that

10  under the statute, if it's a single part, more has to be

11  proven, and that's not what is alleged.  It has to be a

12  combination of parts.

13         But my fear is that the jury doesn't -- the jury's

14  not going to be able to distinguish without greater explanation

15  that something can be a single -- that it's up to them to

16  decide whether that single object is a single part or a

17  combination of parts.  And that's what I think is missing from

18  your one-sentence addition.

19         Mr. King, you said you had another alternative way of

20  addressing it.  What was that?

21         MR. KING:  Your Honor, the other suggestion I would

22  make is, you know, where it says "consisting of a combination

23  of parts," do a comma and then say, "but not a singular part,"

24  and then another comma.

25         So it would read, "A machine gun conversion device

1  consisting of a combination of parts, but not a singular part,

2  designed and intended for use in converting a weapon to shoot

3  automatically more than one shot."

4          And that would leave both parties to argue exactly

5  the issue the Court has laid out.

6      (Pause in proceedings.)

7          THE COURT:  Ms. Taylor, let me hear from you as to

8  that proposal.

9          MS. TAYLOR:  Your Honor, it -- I believe it has the

10 exact same issue as all the other proposals, which is that it,

11 again, suggests that there's a binary decision and that the

12 item could not possibly be both a single piece and a

13 combination of parts.  I'm not really sure that there is a way

14 to raise what the defendants are asking for that doesn't have

15 that implication.

16         THE COURT:  All right.  Let's go on to the other

17 instructions and we'll come back to this.

18         Court's Proposed 15, Ms. Taylor?

19         MS. TAYLOR:  No objection.

20         THE COURT:  Mr. King?

21         MR. KING:  No objection, Your Honor.

22         THE COURT:  Court's Proposed -- I'm sorry.

23 Mr. Zermay?

24         MR. ZERMAY:  No objection, Your Honor.

25         THE COURT:  16, Ms. Taylor?

1          MS. TAYLOR:  No objection, Your Honor.

2          THE COURT:  Mr. King?

3          MR. KING:  No objection, Your Honor.

4          THE COURT:  Mr. Zermay?

5          MR. ZERMAY:  No objection, Your Honor.

6          THE COURT:  Court's Proposed 17, Ms. Taylor?

7          MS. TAYLOR:  No objection, Your Honor.

8          THE COURT:  Mr. King?

9          MR. KING:  Yes, Your Honor.  There is an issue.  And

10   I understand this is the pattern, but reading through the

11   pattern, I think there is an error.  It describes transactions

12   more than 10,000 and less than 10,000 but fails to address if

13   the transaction is $10,000.

14          So the proposal would -- and I did not notice this

15   when we were doing our proposed, but the proposed would be, "To

16   structure a transaction means to deposit, withdraw, or

17   otherwise participate in transferring" -- I'm sorry, Your

18   Honor.

19          Reading from the other part is the very last sentence

20   where it says "each one involving less than $10,000."  I think

21   it would be more accurate to say "each one involving $10,000 or

22   less," because if it is a $10,000 transaction, the requirement

23   does not kick in.

24          THE COURT:  There's no transaction in this case of

25   exactly $10,000, so why does that matter?

1          MR. KING:  Because the transaction proposed by -- her

2     name is eluding me at the moment, but the assistant manager of

3     the bank suggested a $10,000 transaction on the dot, which

4     would not trigger a Currency Transaction Report.  Only if it

5     was $10,000 and one cent would it trigger a Currency

6     Transaction Report.  So the difference between Mr. Ervin

7     requesting $9,000 or $10,000 does not impact whether a Currency

8     Transaction Report is generated.

9          And so to some extent it is misleading to suggest

10    that it has to be less -- that there's a difference between

11    something less than $10,000, because if it's $10,000 on the

12    nose, the testimony is that a Currency Transaction Report is

13    not generated.  The instruction does not account for

14    transactions exactly $10,000.  It says more than or less than,

15    but not exactly.  And my understanding of the testimony and the

16    law is that if it is $10,000 or less, not less than $10,000.

17         THE COURT:  Ms. Taylor, any objection to me making

18    that change?

19         MS. TAYLOR:  No, Your Honor.

20         THE COURT:  Mr. Zermay, I'm not addressing you on

21    this because it relates only to Mr. Ervin.  Do you disagree

22    with that?

23         MR. ZERMAY:  I do not disagree with that, Your Honor.

24         THE COURT:  So you want me to change the last

25    sentence to read "each one involving $10,000 or less,"

1    Mr. King?

2             MR. KING:  Yes, Your Honor.

3             THE COURT:  All right.  I've made that change.  With

4    that, Proposed 17 is acceptable to the defense?

5             MR. KING:  Yes, Your Honor.

6             THE COURT:  Court's Proposed 18, Ms. Taylor, with the

7    understanding that with whatever change I make -- I may make,

8    if any, to 14 I would intend to make to 18, and that includes

9    the change that we already discussed, adding the language in

10   the final paragraph which reads "or that any purchaser

11   successfully converted a particular firearm into a machine

12   gun" -- with that change understood, any objection to the

13   Court's proposal, Ms. Taylor?

14            MS. TAYLOR:  No objection, Your Honor.

15            THE COURT:  And Mr. King, recognizing that whatever

16   change I would make to 14 would be applicable to 18, other than

17   that, any objection to Proposed 18?

18            MR. KING:  No, Your Honor.

19            I just did want to remind the Court, we did have an

20   additional proposal, an additional sentence proposed.  And I

21   know we kind of went in reverse order, but we didn't address

22   that either.

23            THE COURT:  Oh, yeah, your -- yeah, I think it went

24   too far.  When you read it to me, I think it went too far.  Let

25   me go back.

1          Tell you what, at this point in time I'm not inclined

2   to include that language.  After I hear the testimony of Agent

3   Toy, I -- we can revisit it.

4          MR. KING:  Thank you, Your Honor.  And with that

5   said, understanding that you'll apply this the same, there's

6   nothing additional or different than the issues we've already

7   raised in the other instruction.

8          THE COURT:  Okay.  And I recognize that Instruction

9   18 doesn't directly relate to Mr. Hoover, but I assume that

10  because it has similarities in the instructions, Mr. Hoover

11  would ask that whatever language I put in 14 be equally

12  reflected in 18; is that right, Mr. Zermay?

13         MR. ZERMAY:  That's correct, Your Honor.

14         THE COURT:  All right.  Court's Proposed 19,

15  Ms. Taylor?

16         MS. TAYLOR:  No objection, Your Honor.

17         THE COURT:  Mr. King?

18         MR. KING:  No objection, Your Honor.

19         THE COURT:  Mr. Hoover isn't charged with possession,

20  so Mr. Zermay, I don't think I need to talk to you about that.

21  Do you agree?

22         MR. ZERMAY:  I agree.  In any event, no objection.

23         THE COURT:  Court's Proposed 20, Ms. Taylor?

24         MS. TAYLOR:  No objection, Your Honor.

25         THE COURT:  Mr. King?

1        MR. KING:  No objection, Your Honor.

2        THE COURT:  Mr. Zermay?

3        MR. ZERMAY:  No objection, Your Honor.

4        THE COURT:  21, Ms. Taylor?

5        MS. TAYLOR:  No objection, Your Honor.

6        THE COURT:  Mr. King?

7        MR. KING:  No objection, Your Honor.

8        THE COURT:  Mr. Zermay?

9        MR. ZERMAY:  No objection, Your Honor.

10        THE COURT:  22, Ms. Taylor?

11        MS. TAYLOR:  No objection, Your Honor.

12        THE COURT:  Mr. King?

13        MR. KING:  No objection, Your Honor.

14        THE COURT:  Mr. Zermay?

15        MR. ZERMAY:  No objection, Your Honor.

16        THE COURT:  23, Ms. Taylor?

17        MS. TAYLOR:  No objection, Your Honor.

18        THE COURT:  Mr. King?

19        MR. KING:  No objection, Your Honor.

20        THE COURT:  And Mr. Zermay?

21        MR. ZERMAY:  No objection, Your Honor.

22        THE COURT:  24, Ms. Taylor?

23        MS. TAYLOR:  No objection, Your Honor.

24        THE COURT:  Mr. King?

25        MR. KING:  No objection, Your Honor.

```
 1            THE COURT:  Mr. Zermay?
 2            MR. ZERMAY:  No objection, Your Honor.
 3            THE COURT:  I've provided you with proposed verdict
 4    forms.
 5            Ms. Taylor, any objection to the proposed verdict
 6    form for Mr. Ervin or Mr. Hoover?
 7            MS. TAYLOR:  No, Your Honor.
 8            THE COURT:  Mr. King, as to Mr. Ervin, any objection
 9    to the Court's Proposed verdict form?
10            MR. KING:  And Your Honor, I apologize, I was --
11    accidentally grabbed Mr. Hoover's.
12            No objection, Your Honor.
13            THE COURT:  Mr. Zermay, any objection to the Court's
14    Proposed verdict form as to Mr. Hoover?
15            MR. ZERMAY:  No objection, Your Honor.
16            THE COURT:  All right.  So I'm going to take under
17    advisement the request for additional language that the
18    government must prove beyond a reasonable doubt that the item
19    described in the indictment is capable of converting a firearm
20    into a machine gun.
21            And I'm also going to take under advisement the
22    request that the Court draft -- or include some language
23    requiring proof -- some additional language beyond what's
24    already in the instruction distinguishing between "a part" and
25    "a combination of parts."  And whatever we decide as to that
```

1  will be included both in Jury Instruction No. 14 and Jury

2  Instruction No. 18.  And I'll try to work on that as we

3  continue.

4           Any other instructions that you would ask the Court

5  to consider, Ms. Taylor?

6           MS. TAYLOR:  No, Your Honor.  Although I did have a

7  question about whether the Court is going to be sending the

8  indictment back with the jury --

9           THE COURT:  Yes.

10          MS. TAYLOR:  -- and whether I need to make any

11 amendments to it.

12          THE COURT:  Oh, I need a redacted indictment.

13          MS. TAYLOR:  What do I need to redact?  Forfeiture

14 or . . .

15          THE COURT:  Forfeiture is what we generally redact.

16 I don't think that there's anything else in the indictment that

17 needs to be redacted.

18          MS. TAYLOR:  Okay.

19          THE COURT:  But usually what we redact is the

20 forfeiture and then you have somebody work their magic and move

21 the --

22          MS. TAYLOR:  It doesn't say "superseding" in the

23 header, it just says it in the number "S4."  I don't think the

24 jury knows the significance of that.

25          THE COURT:  No, the jury won't know what "S4" means.

1   So you just need to take out the forfeiture.

2           MS. TAYLOR:  Yes, Your Honor.

3           THE COURT:  And then generally what you'll need to do

4   is use an indictment that's printed without the header.

5           MS. TAYLOR:  Okay.

6           THE COURT:  And then at the bottom of page 16

7   you'll take off the page numbers so that when you take away

8   pages 17 and 18, that the signature page for the indictment

9   also doesn't have a number on it.

10          MS. TAYLOR:  I think I understand what you're saying.

11  If I have the page number but they're sequential, is that okay?

12          THE COURT:  No, let's not do that.  Let's just delete

13  the page number on those last couple pages.

14          MS. TAYLOR:  Okay, Your Honor.

15          THE COURT:  But make sure you print -- you know how

16  in CM/ECF you can print without the header?  Because -- you

17  know what I mean by the header across?

18          MS. TAYLOR:  I know what you're referring to.  I

19  think I'll just redact it off of there.

20          THE COURT:  However you want to do it.  At least on

21  my version of CM/ECF I can tell it to print it without the

22  header.  But we need that gone because of the page numbers.

23          MS. TAYLOR:  Yes, Your Honor.

24          THE COURT:  Anything else you would request be

25  redacted from the indictment, Mr. King?

```
 1            MR. KING:  No, Your Honor.

 2            THE COURT:  Mr. Zermay?

 3            MR. ZERMAY:  No, Your Honor.

 4            THE COURT:  Is there anything else that we need to

 5   address -- oh, I'm sorry, Mr. King, any other instructions that

 6   you would ask the Court to consider other than those discussed

 7   here today?

 8            MR. KING:  Nothing we've not previously raised, Your

 9   Honor.

10            THE COURT:  Well, no --

11            MR. KING:  Sorry.

12            THE COURT:  -- if there's something that's been

13   raised that -- if it was in your --

14            MR. KING:  I apologize, Your Honor.  Other than what

15   we've already addressed in our motion in limine, which the

16   Court's already ruled on, as well as what we've already

17   discussed today, we have no further instructions.

18            THE COURT:  When you refer to the motion in limine,

19   what you're specifically referring to is the Court's refusal to

20   give the instruction that the firearm --

21            MR. KING:  The "solely and exclusively" language,

22   Your Honor, on the singular part.  But not, as the Court has

23   ruled, the combination of parts.

24            THE COURT:  All right.  So the Court's refusal to

25   instruct the jury that the term includes any part designed and
```

1  intended solely and exclusively for use in converting a weapon

2  into a machine gun; is that correct?

3          MR. KING:  Yes, Your Honor.  And I believe the

4  motion -- the response to the government's motion we filed has

5  the specific instruction we requested, and the Court's already

6  ruled on that.

7          THE COURT:  All right.

8          Mr. Zermay?

9          MR. ZERMAY:  Nothing further, Your Honor.

10          THE COURT:  I'm sorry?

11          MR. ZERMAY:  Nothing further, Your Honor.

12          THE COURT:  All right.

13          Is there anything else we need to address,

14  Ms. Taylor?

15          MS. TAYLOR:  No, Your Honor, other than are we going

16  to get a brief break before we start in with evidence?

17          If not, I'm going to take leave while Mr. Mesrobian

18  handles things.

19          MR. KING:  Your Honor, if I could join in on that.  I

20  know we've been here --

21          THE COURT:  Sure.  Is ten minutes good?

22          MR. KING:  Yes, Your Honor.

23          MS. TAYLOR:  Yes, Your Honor.

24          THE COURT:  All right.  And so when we come back in

25  ten minutes, are we ready to go with the evidence?

1      MS. TAYLOR:  Yes, Your Honor.

2      MR. KING:  Yes, Your Honor.

3      MR. ZERMAY:  Yes, Your Honor.

4      THE COURT:  Okay.  We'll be in recess until 10:50.

5      COURT SECURITY OFFICER:  All rise.

6    (Recess, 10:40 a.m. to 10:57 a.m.)

7    (All parties present.  Jury not present.)

8      COURT SECURITY OFFICER:  All rise.  This Honorable

9  Court is back in session.

10      Please be seated.

11      THE COURT:  Do we have Agent Lintner?

12      MR. MESROBIAN:  Yes, Your Honor.  My understanding,

13  there was one matter Mr. King wanted to address first.

14      THE COURT:  Well, let's go ahead and get him moving

15  this direction.

16      MR. MESROBIAN:  He's right outside.

17      THE COURT:  Okay.  Go ahead.

18      MR. KING:  And Your Honor, just to bring to the

19  Court's attention, I think there's going to be an exhibit that

20  may require a little bit of an extended conversation.  Not as

21  to this witness, but as to Agent Toy.  And so I just wanted to

22  give the Court a heads-up about that.  We had been anticipating

23  something I think was more of an issue than I think the

24  government is intending to, but we'll still want to take it up

25  outside of the jury's presence and outside Agent Toy's

1    presence.

2              THE COURT:   What exhibit is it?

3              MS. TAYLOR:   62, Your Honor.

4              THE COURT:   And can you tell me what 62 is?

5              MS. TAYLOR:   62 was an ATF opinion letter evaluating

6    another -- essentially the same kind of product, a lightning

7    link engraved onto a metal card, that had been submitted to ATF

8    for evaluation in 2018.

9              Yesterday I decided that I should just take the

10   letter off, and so now it's just the photos of the item that

11   were submitted.  And the purpose of the exhibit would be to

12   show that this was not Mr. Ervin's original idea.  He's not the

13   first one to come up with the idea of engraving a lightning

14   link onto a metal card and saying that it wasn't a machine gun.

15             So that's -- and I showed the new exhibit to Mr. King

16   and both of Mr. Hoover's counsel.

17             THE COURT:   All right.  And can you give a copy of it

18   to Ms. Wiles?  And what's the argument going -- is the

19   argument -- what's the objection to it, Mr. King?

20             MR. KING:   Your Honor, if I could have just a moment

21   to gather my notes.  There's going to be a couple of different

22   issues.  One is -- one's going to be an authenticity issue with

23   regard to the images and what's been provided.  What we've been

24   provided, there's -- my understanding of how this works is an

25   individual can send a private letter to ATF and ATF can respond

1    privately, but those are not made part of the CFR and they are

2    not published on ATF's website or otherwise made publicly

3    available.  There's no business record assertion.  And the

4    letter is signed by an individual that is not the witness

5    that's going to be testifying.

6            There's also a relevancy issue.  Part of it is going

7    to tie to the Rule 16 disclosure.  My understanding is it is an

8    expert opinion on whether or not that item is a machine gun

9    under the NFA.  That was not part of Mr. Toy's proposed

10   testimony as provided and essentially was part of what I

11   thought we were going to have on the Daubert issue, but once we

12   got to the testimony, that was withdrawn.  Nowhere in his

13   testimony does it address that he's going to be discussing

14   another item.

15           The other issue we have with that is that there's no

16   indication that this was something that this agent was involved

17   with.  The report does bear the name of another individual.

18           Additionally, there may be -- you know, to the extent

19   that it is hearsay, because it is not publicly available, it is

20   not something Mr. Ervin, even if he had wanted to, even could

21   have come across.  So, you know, there's certainly relevancy

22   issues as well as hearsay issues regarding the image and the

23   item in the argument.

24           The -- it's going to be, frankly, all of those

25   issues.

1          And in terms of its relevancy, the other issue is

2   it's a -- it can be very prejudicial and misleading to the jury

3   to give the impression that this is something that ATF has

4   already publicly decided.  And frankly --

5          And I'm talking too fast, Ms. Healey.  I'll try to

6   get closer to the microphone.

7          You know, obviously I think if the ATF had publicly

8   made this available and Mr. Ervin chose to ignore what is

9   clearly an item similar to the auto key card and manufactured

10  it, that would be horribly prejudicial but not unduly so.  But

11  the fact that it's not publicly available, or anybody would

12  have any way to know about it, would be very misleading and

13  highly prejudicial because it would not have an impact on any

14  element that the jury would decide.  It would solely go to

15  whether, you know, ATF had already made the determination, but

16  because the determination was private as to that branch chief

17  and Mr. Aaron Fouraker, who received the private letter, it

18  would not have any probative value as to whether or not any

19  defendant here was aware of it or should have acted

20  differently.

21         But it would be highly misleading to the jury to

22  suggest that this is an issue that's already been decided and

23  they should have known better.  And frankly, if the government

24  did have evidence of that, it would be -- I think we would be

25  in a very different spot than where we are in terms of our

1  arguments.  I think it would be admissible.  But given the

2  private nature of it and the lack of evidence that neither this

3  agent nor any of the defendants here would have even had the

4  ability to know about it makes it highly misleading to the

5  jury.

6          THE COURT:  Yes, Ms. Taylor.

7          MS. TAYLOR:  Your Honor, I -- not conceding

8  Mr. King's arguments, I'll just withdraw this exhibit.  I do

9  think there is already in evidence another lightning link that

10  was not fully cut out that Mr. Hoover had in one of his videos

11  and talks about how it was problematic, so I think we can just

12  rely on that to make our point that Mr. Ervin wasn't the first

13  one to think of this idea.

14          THE COURT:  Okay.  Then let's get the jury in,

15  please.

16          COURT SECURITY OFFICER:  All rise for the jury.

17      (Jury enters, 11:05 a.m.)

18          COURT SECURITY OFFICER:  Please be seated.

19          THE COURT:  You can take your seat, sir.

20          We are continuing this morning with the evidence in

21  Case No. 3:21-cr-22, United States vs. Kristopher Justinboyer

22  Ervin and Matthew Raymond Hoover.

23          Welcome back, ladies and gentlemen.

24          Sir, do you understand that you are still under oath?

25          THE WITNESS:  Yes, Your Honor.

1          THE COURT:  All right.  Mr. Larosiere, you may

2    continue.

3    **AGENT ERNEST LINTNER, GOVERNMENT WITNESS, PREVIOUSLY SWORN,**

4              CROSS-EXAMINATION (CONTINUED)

5    BY MR. LAROSIERE:

6    Q.    Howdy, Mr. Lintner.  I'll just pick up kind of where we

7    were last time.  Are you aware anywhere in the National

8    Firearms Act specifically of a provision making a design

9    illegal?

10   A.    No.

11   Q.    What about a drawing?

12   A.    No.

13   Q.    Instructions?

14   A.    No.

15   Q.    Manufacturing jig?

16   A.    No.

17   Q.    Stencils?

18   A.    No.

19   Q.    Okay.  So now specifically in the Gun Control Act, are you

20   aware of any provision making a design illegal?

21   A.    No.

22   Q.    What about a drawing?

23   A.    No.

24   Q.    What about instructions?

25   A.    No.

1   Q.   What about a manufacturing jig?

2   A.   No.

3   Q.   And a stencil?

4   A.   No.

5   Q.   Okay.  I'm going to ask you about a series of products,

6   and you can just tell me to your knowledge whether or not they

7   are regulated by the NFA or GCA, okay?

8   A.   Yes, sir.

9   Q.   A magazine over ten rounds?

10   A.   No.

11   Q.   A trigger crank?  If you're not sure, that's okay.

12   A.   I wouldn't be sure on that.

13   Q.   Barrel shroud?

14   A.   No.

15   Q.   Thumb hole stock?

16   A.   No.

17   Q.   Flash hider?

18   A.   No.

19   Q.   Pistol grips?

20   A.   No.

21   Q.   Firearm blueprints and designs?

22   A.   No.

23          MR. LAROSIERE:  Ms. Ganoe, if you could, could we

24   bring up Government's Exhibit 70.  Thank you so much.

25          And could we zoom in on that lower section.  Thank

1   you so much.

2   BY MR. LAROSIERE:

3   Q.    If you would just take a moment to look over this.

4   A.    Okay, sir.

5   Q.    And are a lot of the things on that list similar or the

6   same to what we just talked about?

7   A.    Yes.

8   Q.    So these items are not federally regulated, correct?

9   A.    In and of themselves, no.  They -- some of the items on

10  here I would recognize as probably applying to an imported

11  firearm, potentially, as to whether it would be allowed in or

12  not.

13  Q.    Just as the pistol grips and flash hiders?

14  A.    Yes, sir.

15  Q.    Okay.  Appreciate that.

16          MR. LAROSIERE:  That's all for that exhibit.  Thank

17  you so much.

18  BY MR. LAROSIERE:

19  Q.    So yesterday you spoke with Mr. Mesrobian about a type of

20  letter that ATF can issue when they determine whether something

21  is or is not a regulated item.  Do you remember that?

22  A.    Yes.

23  Q.    And anyone could ask ATF for one of these letters, right?

24  A.    Yes.

25  Q.    Do those letters carry the force and effect of law, or do

1  they reflect the examiner's opinion?

2  A.   I think that answer would probably be out of the scope of

3  my operation.  I -- I think they would reflect the employee's

4  opinion, or the opinion of the office that the letter came

5  from.

6  Q.   Okay.  So to your knowledge, is the letter legally

7  binding?

8  A.   Well, I don't know --

9          MR. MESROBIAN:  Objection, Your Honor, relevance.

10          THE COURT:  Excuse me?

11          MR. MESROBIAN:  Relevance.

12          THE COURT:  Well, I think that the better objection

13  is foundation.  I don't think we have --

14          MR. LAROSIERE:  Okay.  I'll move on.

15          THE COURT:  Okay.

16  BY MR. LAROSIERE:

17  Q.   Are these letter publicly available as soon as they're

18  issued?

19  A.   No, not to -- not to my knowledge and experience.  And I

20  can't speak to what other offices did, but in my past

21  experience, we would not publish or provide a letter that was

22  written to one person and provide it to another.

23  Q.   And in your experience, industry and law enforcement

24  requests would take priority over individual requests, correct?

25  A.   Not -- at least in the office I worked in, we had a lot of

1   requests come in.  And to the best of my recollection, we

2   didn't necessarily sort them as to who submitted it.

3   Q.   Would you say that on average it would take a matter of

4   years to hear back from those?

5   A.   It's possible.  I don't know how likely or how frequent

6   that would be.

7   Q.   To your knowledge, is there any legal requirement that

8   someone request one of these letters?

9   A.   No.

10   Q.   No, there is no requirement?

11   A.   I'm sorry.

12        No requirement that I know of.

13   Q.   To your knowledge, is ATF required to respond to these

14   requests in a particular period of time?

15   A.   Not that I know of.

16   Q.   To your knowledge, is ATF required to respond to these

17   requests at all?

18   A.   I can't think of a statute that would require it.  It

19   would probably be a policy matter.  And I couldn't speak for

20   all the offices in the agency.

21        MR. LAROSIERE:  One moment.  Sorry.

22        If I could have just a moment, Your Honor?

23        THE COURT:  Go ahead.

24   BY MR. LAROSIERE:

25   Q.   Mr. Lintner, are you familiar with 80 percent receivers?

1          MR. MESROBIAN:  Objection, Your Honor.  May we

2  approach?

3          THE COURT:  You may.

4      (Proceedings at sidebar:)

5          MR. MESROBIAN:  Your Honor, this is exactly the same

6  road we were down yesterday with indexing and other examples of

7  products examined by ATF, not by this witness, and not relevant

8  to this case.  And I don't -- I don't understand why we're back

9  here again.

10          THE COURT:  What's the relevance of an 80 percent

11  receiver?

12          MR. LAROSIERE:  So, Your Honor, the government's

13  witness brought up on direct this concept of 80 percent

14  receivers and there was no further discussion of it.  And we

15  have an expert here who can clarify what that is.

16          THE COURT:  When you say the government brought it up

17  on direct --

18          MR. LAROSIERE:  This was Dr. Moya.  He said the auto

19  key card is like an 80 percent receiver.  I want to know what

20  that is.

21          MR. MESROBIAN:  Your Honor, I seem to recall there

22  was a motion in limine to not -- to prevent the testimony of

23  the purchasers as if they were experts.  And we've made it very

24  clear that was not why they were there.  I didn't elicit any

25  testimony from Dr. Moya about 80 percent receivers.  He

1   obviously, I think it's pretty clear, had some sympathy for the

2   defendants's position and began talking about things far afield

3   of this case.

4           I don't know why we're now having Mr. Lintner, who

5   has no expertise about that --

6           THE COURT:  What is the relevance of whether

7   something is or is not an 80 percent receiver?  What does that

8   have to do with anything the jury has to determine in this

9   case?

10          MR. LAROSIERE:  So the exact same theory that the

11  government -- we are anticipating the government to bring to

12  say that this is a completed item, which we've been litigating

13  heavily, is that same series of questions that the government

14  looks at -- that the ATF looks at in whether or not a firearm

15  is a complete receiver or what is colloquially referred to as

16  an 80 percent receiver.  The language is exactly the same.

17  It's whether or not it has reached a stage in the manufacturing

18  process.  So simply because the government --

19          THE COURT:  Don't yell, Mr. Larosiere.

20          MR. LAROSIERE:  I'm so sorry, Your Honor.

21          THE COURT:  I mean, I -- I just don't usually have

22  that problem with counsel at sidebar.  I'm not accustomed to

23  having to tell people to lower their voice.  I usually have the

24  opposite problem of having to tell people to speak up.

25          MR. LAROSIERE:  Your Honor kept telling me to speak

1   up, now I'm overdoing it.  Is this better?

2          THE COURT:  I don't recall telling you -- whatever,

3   Mr. Larosiere, but stop yelling at sidebar.

4          MR. LAROSIERE:  Yes, Your Honor.

5          The government's --

6          THE COURT:  Tell me what you anticipate -- what you

7   anticipate eliciting from this witness.

8          MR. LAROSIERE:  I anticipate that the witness would

9   testify to the effect of there is a certain point where the

10  receiver becomes a firearm, and I would like him to say where

11  that point is.  And then I would like to ask him where that

12  information can be found, because it is my expectation that it

13  cannot; or if it can, it was in something that was published

14  after the events of this trial.

15         THE COURT:  Why does it matter whether information

16  about an 80 percent receiver was published after the events --

17  I think you meant to say giving rise to this trial.

18         MR. LAROSIERE:  Yes.

19         THE COURT:  He's not charged with an 80 percent

20  receiver.

21         MR. LAROSIERE:  In a way he is.  It's not -- and so I

22  would argue that the firearms alleged here are not firearms

23  until a certain point.  ATF has an opinion, which I expect that

24  this witness is familiar with, of when that point is.  And

25  what -- whether or not that information is publicly available I

1    think is incredibly important as to the scienter.

2         THE COURT:  He doesn't have to know -- and you just

3    agreed to a jury instruction that says he doesn't have to

4    know -- that it is illegal.  All he has to know is that it --

5    that it had the physical capability.  So no, it doesn't go to

6    the scienter.

7         MR. LAROSIERE:  Your Honor, physical characteristics

8    that made it regulable.

9         THE COURT:  That made it what?

10        MR. LAROSIERE:  Reg- -- subject to the provisions of

11   the act.  The characteristics, which is a prescient point.

12        THE COURT:  All right.

13        Mr. Mesrobian, go ahead.

14        MR. MESROBIAN:  Your Honor, this case is not about

15   frames or receivers or home machine guns, it's about a

16   combination of parts, as we have discussed at length already

17   today.

18        This is not a witness who is here to testify about

19   theories and opinions that the ATF has issued about particular

20   items.  I don't even think that's relevant to begin with, but

21   certainly not -- there are any number of people who may be

22   aware of certain opinions, but that doesn't mean that they're,

23   number one, qualified to talk about them or when they were

24   issued, or, number two, that they are germane to this trial,

25   because they are not.

1          This is the same ground we trod on Monday afternoon

2     after we let the jury go.  And I don't know why we're asking

3     Mr. Lintner, who is here to talk about how you can register and

4     transfer an NFA firearm and nothing else.

5          MR. KING:  And Your Honor, could I briefly address

6     this?

7          THE COURT:  Go ahead.

8          MR. KING:  The issue goes towards whether or not

9     these defendants knowingly transferred items that had the

10    characteristics that would require them to be registered.  And

11    where they look for that is how the government and how the ATF

12    treats similar items.  And that's what Dr. Moya testified to,

13    is he viewed it, like he does, a similar, analogous item, which

14    is a receiver, where if it is 80 percent or less completed, the

15    government does not consider it a receiver and subject to

16    regulations.

17         Dr. Moya's testimony is that when he looked at the

18    item, he viewed it similarly because of how the government has

19    ruled on other items.

20         So it is analogous for when you're talking about the

21    scienter of these defendants whether there's other items that

22    may or may not be similar that they could look to to see how

23    the government has interpreted the National Firearms Act and

24    how it's being enforced.

25         So for that purpose it's extraordinarily relevant

1    when there are other items that are similar or could be

2    similar, how those are looked at.

3          And that is, frankly, something that was also played

4    in Mr. Hoover's video where he said the ATF has drawn the line

5    and why we believe it to not be past the line.  This is one of

6    the items that was addressed in all of that.

7          And again, that was Dr. Moya's testimony.  I believe

8    on direct, if I'm not mistaken, that he viewed it as analogous

9    to an 80 percent receiver, which the government, you know -- I

10   know there's been back-and-forth regulation, but essentially as

11   it stands now, those are lawfully able to be sold and

12   transferred and are done so in large numbers.  And this witness

13   is an industry expert who could testify to the large number of

14   those items that are regularly sold.

15         And because it is analogous, when you look to the

16   scienter of whether these defendants knowingly were

17   transferring something that would be subject to the act, you

18   have to look at how other objects that are also subject to the

19   act are treated.

20         THE COURT:  Mr. Mesrobian.

21         MR. MESROBIAN:  Your Honor, I think Mr. King has

22   shown two different problems with this line of questioning.

23   Number one, why this witness -- this is not his job.  It's

24   beyond the scope of this direct testimony.  And number two, why

25   are we pointing to Dr. Moya's testimony as somehow being expert

1   in raising issues relevant to these determinations?  Because if

2   we're going to go down that road, I think there's a lot of

3   other testimony from the purchasers that we would like to rely

4   on as expert, but we're not going to do that.  Just because one

5   of the purchaser witnesses may have had a mistaken impression

6   doesn't mean that we get to bring all sorts of non-relevant

7   issues into this trial.

8           Nobody is relying on Dr. Moya's opinion here.  And

9   just because he said a phrase doesn't mean that we now get to

10  spend half an hour, an hour, talking about theories that the

11  ATF has about items, again, not relevant to this case, which is

12  about a part -- a combination of parts that constitutes

13  allegedly a machine gun conversion device.

14          THE COURT:  So, gentlemen, I think, as I said

15  previously, it didn't seem to me that this witness was an

16  appropriate witness to be asking this question of, if the

17  question is proper at all.  I still question whether this line

18  of questioning is an appropriate line of questioning for the

19  reasons that we've just discussed, but I'm still of the view

20  that if it is a proper line of questioning, it's for Agent Toy,

21  not for Mr. Lintner, if at all.

22          I am not terribly inclined to allow it, but I'm

23  certainly not going to allow it at this time with this witness.

24  So move on and we'll see where we go from there.

25          MR. LAROSIERE:  Thank you, Your Honor.

1          (Proceedings in open court:)

2     BY MR. LAROSIERE:

3     Q.    Mr. Lintner, do you recall the other day we talked about

4     the registration of machine guns in the transfer record?

5     A.    Yes.

6     Q.    And we talked about the fact that before 1986, any

7     individual could do it, right?

8     A.    Yes.

9     Q.    Even -- so if an individual attempted to register a

10    machine gun and paid their tax, passed their background check,

11    would it be granted today?

12    A.    This is for an individual filing to build a machine gun?

13    Q.    Yes.

14    A.    I don't believe it would be processed.  I believe it would

15    be sent back.

16    Q.    All right.  Is it fair to say there's no possible way for

17    an individual to comply with the registration component of a

18    post-1986 machine gun?

19    A.    I don't know if it's impossible, but if we caught the

20    mistake and sent it back, I think they wouldn't be able to.

21    Q.    When you say "if we caught the mistake," what did you

22    mean?

23    A.    Well, so if you're a non-licensee and you're submitting an

24    application to build a machine gun and you don't fall into one

25    of the categories that's allowed to have one, we should deny

1    that.  We should -- or disapprove it, actually, is the term.

2    Send it back and refund the tax.

3    Q.    And you said applying to build a machine gun.

4    A.    Yes.

5    Q.    Is that because an individual has to await approval before

6    building a machine gun?

7    A.    Yes, sir.  The Form 1 is used for entities other than a

8    manufacturer.  And with the Form 1, it's not -- more of a

9    permission slip, it's an application to build.  Whereas, the

10   Form 2 used by a manufacturer is a notification, because

11   they're qualified to build, so they're simply telling us what

12   they did.

13   Q.    So the manufacturer builds first and then registers,

14   correct?

15   A.    Correct.

16            MR. LAROSIERE:  I have nothing further.  Thank you

17   for your time.

18            THE COURT:  Mr. King.

19                      CROSS-EXAMINATION

20   BY MR. KING:

21   Q.    Welcome back, Mr. Lintner.

22   A.    Thank you, sir.

23   Q.    I had a couple of questions about some of what you

24   discussed with Mr. Mesrobian and Mr. Larosiere.  One of the

25   things is I heard you discuss is that a shoelace could be a

1  machine gun?

2  A.    I had heard about a shoelace being a machine gun.  I have

3  never seen a shoelace used to convert a semi-auto into it.

4  It's kind of common lore out in the industry.

5  Q.    And you mentioned -- I'm sorry, I didn't mean to --

6  A.    Yes, it's things that you would read about in a firearms

7  discussion forum, industry events.  People would say something

8  about a shoestring being able to convert a firearm.  I've never

9  seen that happen, although I -- if it was used to convert a

10  firearm, then maybe it would meet the definition, but I

11  wouldn't be the one making that determination.

12  Q.    And Mr. Lintner, I wore loafers to be careful today, but

13  why would -- if I was wearing shoes, why would that not be

14  considered a machine gun under the NFA, if I'm just wearing

15  them in my shoes?

16  A.    Because it's not being used to convert a firearm.

17  Q.    So it would have to actually be used for that purpose?

18  A.    Yes, I believe so.

19  Q.    And you also mentioned a paperclip; do you remember that?

20  A.    Yes, sir.

21  Q.    And walk me through that, because I'm not quite sure I

22  understood.

23  A.    That was another one I've never actually seen.  Much like

24  the shoelace, it's something I've heard is possible, that you

25  could use a paperclip to convert some firearms.

1    What else would you like to know, sir?

2 Q.   Kind of -- so a normal paperclip, and I think we've got

3 some at the table over there, those would not be considered

4 machine guns under the NFA?

5 A.   I don't believe so, sir, no.

6 Q.   And so having a paperclip near a machine gun would not be

7 considered a machine gun -- I'm sorry, if I had a paperclip

8 sitting next to a rifle, that would not be considered a machine

9 gun just because they're nearby?

10 A.   I don't believe so.

11 Q.   Would I have to materially alter the paperclip before it

12 was considered a machine gun?

13 A.   I'd say probably.

14 Q.   Well, what would I have to do to take it from a paperclip

15 to machine gun territory?

16    MR. MESROBIAN:  Objection, Your Honor, beyond the

17 scope of this witness's direct testimony.

18    THE COURT:  Sir, do you know the answer to that

19 question?

20    THE WITNESS:  I do not.  I wouldn't have a clue.

21    THE COURT:  All right.  Let's move on, Mr. King.

22 BY MR. KING:

23 Q.   Mr. Lintner, I want to talk to you about some of the other

24 things you talked about with the government.

25    Growing up, did you collect anything?

1        MR. MESROBIAN:  Objection, Your Honor.

2        THE COURT:  Sustained.

3   BY MR. KING:

4   Q.   You know people collect baseball cards?  I'm --

5   A.   (Nods head.)

6   Q.   -- sorry, you're nodding your head.

7   A.   Oh, I'm sorry.  I -- at one time, when I was very young, I

8   think I collected baseball cards.

9   Q.   And you're aware people collect firearms?

10  A.   Yes.

11  Q.   And here's a -- and kind of talking about you worked on

12  the -- let me get back to that in a minute.

13        You worked on the regulatory side of ATF, not the law

14  enforcement side.  Do I have that correct?

15  A.   Correct.

16  Q.   And the regulatory side is you help the industry -- kind

17  of describe what that looks like, if you don't mind.

18  A.   We conduct regulatory compliance inspections, part of our

19  job, which is -- basically it's a records review.

20        Firearms and explosives licensees are required to

21  maintain certain records in conjunction with holding that

22  license.  So when they transfer their product, be it firearms

23  or explosives, certain records are required to be kept.

24        So we basically go into their business and review

25  just make sure they're maintaining their records correctly.

1   Q.    And Mr. Lintner, just a little bit of your background.

2   How long -- I know we went over some of the specific jobs

3   you've had.  How long, total, have you been with the Bureau of

4   Alcohol, Tobacco, Firearms, and Explosives?

5   A.    Over 17 years.  August of 2005 is when I got hired.

6   Q.    I apologize.  So I've got 17 years for that.  And prior to

7   that you were in law enforcement?

8   A.    Yes, sir.

9   Q.    How long was that?

10  A.    Approximately 11 years.

11  Q.    So I'm up to 28 years, that's fair?  I'm not trying to age

12  you here, but do I have that math right?

13  A.    Yes, sir.

14  Q.    And my understanding is that prior to even becoming

15  involved in law enforcement and all the jobs you've had there,

16  that you were a firearms enthusiast, or had them growing up, is

17  that --

18  A.    Yes, that would be accurate.

19  Q.    So, I mean, about how long are we talking about where

20  you've been involved with firearms and . . .

21  A.    Probably around 45 years.

22  Q.    And, sir, you -- for the 17 years you've been with ATF

23  you've worked on, I guess, the regulatory side.  And are the

24  laws involved in firearms complex or simple to understand?

25  A.    I think your answer to that would vary from person to

1   person.

2   Q.   I'm asking you, sir.

3   A.   Oh.  I just never really thought of them in that term.

4   Q.   And that's okay.

5   A.   Not to get -- it would be difficult for me to say.

6   Q.   And I can move on.

7         I want to go back to the baseball cards a little bit.

8   You're aware that people collect firearms?

9   A.   Yes.

10  Q.   And that's a big industry in this country?

11  A.   Yes, sir.

12  Q.   And that's an industry you've worked in for most of your

13  professional career?

14  A.   Yes, sir.

15  Q.   And people collect firearm accessories and other things

16  related to firearms that aren't firearms themselves?

17  A.   Yes.

18  Q.   And that's -- that's a big thing for a lot of people; is

19  that fair to say?

20  A.   Yes, sir.

21  Q.   And, you know, people don't have one or two guns, they may

22  have 30 or 40 or something like that?

23  A.   Yes.

24  Q.   And I've seen it in the movies, I've never seen anybody

25  shoot more than two at once, but it's not for the purpose of it

1  that they collect these things?

2  A.   Yes.

3  Q.   And with any collectors, there's a value to those

4  collections and people enjoy those.  Is that a fair thing to

5  say?

6  A.   Yes.

7  Q.   One of the things we talked about, and I want to make sure

8  I have it right --

9       MR. KING:  Ms. Ganoe, could we pull up Government

10  Exhibit 61.

11  BY MR. KING:

12  Q.   We talked a little bit about --

13       MR. KING:  If we could get the second page there.

14  BY MR. KING:

15  Q.   Do you recognize talking to the government about this?

16  A.   I'm sorry, sir?

17  Q.   Do you remember talking with the government about

18  Government Exhibit 61, which is the -- I guess the SWD item

19  that was auctioned off?

20  A.   Yes.

21  Q.   There's a couple questions I wanted to ask you.  First of

22  all, how many parts do you see involved in that?

23  A.   Total on the page, nine.

24  Q.   Nine.

25  A.   Maybe ten if you count the -- the piece that's

1   perpendicular to the main portion of the connector.

2   Q.   Mr. Lintner, just so that I'm clear and the record is

3   clear, we're looking at page 2 of Government Exhibit 61.  And

4   what you're saying is the part that's all the way to the upper

5   left-hand corner might be one or two parts?

6   A.   Yes.

7   Q.   And that's the bigger piece?

8   A.   Yes.

9   Q.   And we're talking nine or ten total pieces?

10  A.   Yes.

11       MR. KING:  Ms. Ganoe, if we could go to the next page

12  of this.

13  BY MR. KING:

14  Q.   And this item, my understanding is it's an old item?

15       It's an older item?

16  A.   Oh, yes, sir.

17  Q.   And fair to say this would be valuable to collectors?

18  A.   Yes.

19       MR. KING:  And Ms. Ganoe, if we could get the first

20  two lines under where it says Rating Definitions.

21  BY MR. KING:

22  Q.   Mr. Lintner, let me know if you can read that.  I know the

23  writing on here is a little small.

24  A.   Yes, sir.  Go ahead.

25  Q.   And talking about collections, there's, you know, maybe a

1   penny that may be worth significantly more than one cent

2   because it's old and people collect it.  Is that a fair thing

3   to say?

4   A.   Yes.

5   Q.   And the baseball cards you collected as a child, you

6   didn't collect them as a child so that you could look up how

7   many homeruns Babe Ruth hit on the back, it's it was a

8   collection?

9   A.   Yes.

10  Q.   And it had a value to you extrinsic from the thing that it

11  provided to you.  Is that fair to say?

12  A.   Yes.

13  Q.   And baseball cards can be hundreds of thousands of dollars

14  and millions of dollars.  And it's not because of the

15  information printed on a piece of cardboard, it's because it's

16  a collectible?

17  A.   Yes.

18  Q.   And the number of these items is very limited?

19  A.   Yes.

20  Q.   And by "these items" I'm talking about the item we talked

21  about in the auction.  Is that fair to say?

22  A.   Yes.

23  Q.   And they have a collectible value?

24  A.   I would agree.

25  Q.   And, in fact, it actually says that -- and if you could

1  read the second line there until we hit the word "note."

2  A.   At "quality"?

3  Q.   Yes, sir, beginning with "quality."

4  A.   "Qualify of function is not guaranteed.  Adjustments may

5  be necessary.  Note, this weapon is a National Firearms Act,

6  NFA, fully transferable Class 3, which is registered with the

7  Bureau of Alcohol, Tobacco, Firearms, and Explosives, BATFE,

8  under provision 18 U.S.C. Chapter 44 and 27 CFR, part 478."

9  Q.   Mr. Lintner, I read that to mean there's not a guarantee

10  that the thing is going to even work.  Do you read it that same

11  way?

12  A.   I would read it that way too.

13  Q.   And it's still $18,000?

14  A.   Yes.

15       MR. KING:  And -- Your Honor, if I could just have a

16  moment.

17  BY MR. KING:

18  Q.   Kind of one final question, Mr. Lintner.  Would it be fair

19  or accurate for me to say this thing has a value outside of --

20  let me ask it a different way.  That this has a value as a

21  collectible outside of whether it works or not, because it says

22  it might not even work?

23  A.   I think that would be up to the individual buyer, but it

24  seems possible that someone would want it for the fact that

25  it's registered, and that, in itself, may make it somewhat

1  rare.  I don't know how many of these survive to this day.

2  Q.   And fair enough.

3        You weren't the purchaser?

4  A.   Oh, no, sir.

5  Q.   So you didn't spend $18,000 on this?

6  A.   No, sir.

7  Q.   Okay.  So you may not know exactly what that person is

8  thinking, but it's $18,000 for an item that has no guarantee it

9  even works?

10 A.   Yes, sir.  It looks like no warranty.

11          MR. KING:  Your Honor, I have no further questions.

12          THE COURT:  Go ahead, Mr. Mesrobian.

13                      REDIRECT EXAMINATION

14 BY MR. MESROBIAN:

15 Q.   Good morning, Mr. Lintner.

16 A.   Good morning, sir.

17 Q.   So very briefly on Government Exhibit 61 which you were

18 just discussing with Mr. King.  On your -- during your direct

19 testimony you discussed based on your experience in the

20 industry that the price of legal machine guns -- legal,

21 registered machine guns -- rose after the ban in 1986?

22 A.   Yes.

23 Q.   And a price for a drop-in lightning link, such as this

24 one, a machine gun conversion device, also increased after the

25 ban in 1986, correct?

1    A.    Yes.

2    Q.    And is that reflected in the $18,000 price?  Regardless of

3    whether or not --

4              MR. KING:  Objection, counsel testifying.

5              THE COURT:  Overruled.

6    BY MR. MESROBIAN:

7    Q.    Does the price reflect that rarity of a legal,

8    transferable machine gun?

9    A.    I believe so, yes.

10             MR. MESROBIAN:  And you can take that down,

11   Ms. Ganoe.

12   BY MR. MESROBIAN:

13   Q.    Mr. Lintner, my other questions go to questions you

14   answered from Mr. Larosiere on cross-examination, and he asked

15   you about a list of items:  a stencil, a drawing, a jig, and

16   some other things.  Do you recall that?

17   A.    Yes.

18   Q.    What do you understand a drawing to be?

19             And I'll ask this another way.  Do you understand a

20   drawing to be something made with a pen and paper?

21   A.    That would be one way, yes.

22   Q.    Do you understand a drawing to be something laser engraved

23   onto a certain depth on a piece of metal in the shape of

24   certain parts?

25   A.    It wouldn't be the first thing that comes to mind.  Paper

1    and pen or pencil is what I normally think of when I think of a

2    drawing.

3              MR. MESROBIAN:  No further questions, Your Honor.

4              THE COURT:  Mr. Larosiere?

5              MR. LAROSIERE:  One moment, Your Honor.

6              No, Your Honor.

7              THE COURT:  Mr. King?

8              MR. KING:  No, Your Honor.  Thank you.

9              THE COURT:  Let me see counsel at sidebar.

10        (Proceedings at sidebar:)

11             THE COURT:  I think it's unlikely that he'll need to

12   be re-called, but I did leave that open when we spoke on

13   Monday.  So whatever you tell him when he leaves, he needs to

14   be available in the event that I require him to be re-called.

15             MS. TAYLOR:  Yes, Your Honor.

16             THE COURT:  Okay.

17        (Proceedings in open court:)

18             THE COURT:  Sir, you may step down.

19             THE WITNESS:  Thank you, Your Honor.

20             THE COURT:  Ms. Wiles.

21        (Witness exits the courtroom.)

22        (The judge and the courtroom deputy confer.)

23             THE COURT:  Ms. Taylor, who's calling the next

24   witness?

25             MS. TAYLOR:  I am, Your Honor.  The next witness is

1    Special Agent Slosson.

2               THE COURT:  Okay.

3               COURTROOM DEPUTY:  Please raise your right hand.  Do

4    you solemnly swear that the testimony you're about to give

5    before this Court will be the truth, the whole truth, and

6    nothing but the truth, so help you God?

7               THE WITNESS:  I do.

8               COURTROOM DEPUTY:  You may have a seat.  And if you

9    could please state your name for the record and spell your last

10   name.

11              THE WITNESS:  Jason Slosson, S-l-o-s-s-o-n.

12              THE COURT:  Go ahead.

13              MS. TAYLOR:  Yes, Your Honor.

14        **SPECIAL AGENT JASON SLOSSON, GOVERNMENT WITNESS, SWORN,**

15                            DIRECT EXAMINATION

16   BY MS. TAYLOR:

17   Q.   Special Agent Slosson, could you please tell the jurors

18   where you're employed.

19   A.   I'm employed with the Bureau of Alcohol, Tobacco,

20   Firearms, and Explosives.

21   Q.   And how long have you been an ATF employee?

22   A.   Less than 15 years.

23   Q.   And what is your role at ATF?

24   A.   I'm a Special Agent.

25   Q.   And have you been a Special Agent for your entire length

1  of employment by ATF?

2  A.    Yes.   There was a time before ATF -- excuse me, before

3  this time that I was a student intern, then I left for law

4  enforcement, came back, became a Special Agent.   So that was

5  about three years prior to this 15 years I'm telling you about

6  as a Special Agent.

7  Q.    So you also interned at ATF at some point?

8  A.    I did.

9  Q.    And then you had different law enforcement experience

10 prior to coming back?

11 A.    That's correct.

12 Q.    And what was that?

13 A.    1994 I joined the military.   I was a military police

14 officer.   I did that for a combination of about eight years.

15 After that I became a deputy with the Douglas County Sheriff's

16 Office in Nebraska.   That was for approximately three years.

17 After that I was a Omaha police officer and detective for

18 approximately seven years.   And then I joined ATF as a Special

19 Agent.

20 Q.    And as an ATF Special Agent, what types of duties do you

21 perform?

22 A.    Investigate violations of alcohol, tobacco, firearms, and

23 explosives.

24 Q.    And do you primarily focus on firearms?

25 A.    I do.

1  Q.    Have you been involved in the investigation related to the

2  auto key cards for some time now?

3  A.    I have been.

4  Q.    Were you involved from the very beginning of ATF's

5  investigation?

6  A.    Yes.

7  Q.    And Special Agent Slosson, I want to ask you about a few

8  particular things that you did as part of your investigation

9  related to auto key cards.

10        You've been sitting through this entire trial,

11  correct?

12  A.    Correct.

13  Q.    And you previously saw testimony from Darek Stennes,

14  correct?

15  A.    I did.

16  Q.    And Mr. Stennes, he had previously surrendered to you the

17  cut-up pieces of his auto key card?

18  A.    That's correct.

19  Q.    And those were admitted into evidence?

20  A.    They were.

21  Q.    And did you also receive items from Joel Moya?

22  A.    I did.

23  Q.    And he's another person who testified at this trial,

24  correct?

25  A.    That's correct.

1    Q.    And did you also receive items from Randy Willis?

2    A.    I did.

3    Q.    And is he another person who testified at this trial?

4    A.    Correct.

5          MS. TAYLOR:  Your Honor, may I approach with Exhibits

6    109A, 109B, 109C, 109D, and 111?

7          THE COURT:  You may.

8    BY MS. TAYLOR:

9    Q.    Special Agent Slosson, first, looking at Exhibits 109A

10   through D, are you able to identify what those are?

11   A.    I am.

12   Q.    And what are they?

13   A.    They are auto key cards that I've recovered through this

14   investigation.

15   Q.    And were they all recovered from a particular person?

16   A.    No.

17   Q.    No, I'm just asking about 109A through D.

18   A.    Oh, I'm sorry.

19         Yes.

20   Q.    Okay.  Who were those recovered from?

21   A.    Mr. Moya.

22         MS. TAYLOR:  Your Honor, I would move for admission

23   of 109A through D.

24         MR. KING:  Without objection.

25         MR. LAROSIERE:  Without objection, Your Honor.

1          THE COURT:   109A through D are admitted.

2       (Government's Exhibits 109A through 109D admitted in

3    evidence.)

4    BY MS. TAYLOR:

5    Q.   And you heard Mr. Moya testify that he had purchased four

6    of the -- I believe it was the Bottle Opener Edition auto key

7    cards?

8    A.   That's correct.

9    Q.   And the exhibits that you have in front of you, are they

10   manila envelopes?

11   A.   They are.

12   Q.   And are the auto key cards what's contained inside of

13   those four manila envelopes?

14   A.   That's correct.

15   Q.   Could I ask you to maybe open 109A just to verify that

16   that's what's inside?

17           Do you need a pair of scissors?  I guess not.

18           And you have 109A in your hand now?

19   A.   I do.

20   Q.   And what is it?

21   A.   It is referred to as a 3 in 1 Pen Holder Bottle Opener

22   Edition.

23   Q.   And the "pen holder" meaning what?

24   A.   The center cutouts were made on this to hold a pen.

25   Q.   Does it have a total of seven cutouts on its surface,

1   including the bottle opener?

2   A.   It does.

3   Q.   And to your recollection, are the other items in 109B, C,

4   and D the same design of auto key card?

5   A.   I believe they are.

6   Q.   Could I now have you put that back into the envelope so

7   we -- so it doesn't get mixed up.

8         And if you could please look at Exhibit 111.  Who was

9   that -- what is inside of that envelope?

10  A.   An auto key card.

11  Q.   And who was that obtained from?

12  A.   Mr. Randy Willis.

13  Q.   And did you -- did you take that auto key card into

14  possession of ATF?

15  A.   I did.

16  Q.   And if you --

17        MS. TAYLOR:  Your Honor, I would move for admission

18  of 111.

19        MR. KING:  Without objection.

20        MR. LAROSIERE:  Without objection.

21        THE COURT:  111 is admitted.

22     (Government's Exhibit 111 admitted in evidence.)

23  BY MS. TAYLOR:

24  Q.   So you could please open 111 and let us know what type of

25  auto key card that is.

1   A.   This would be the 2 in 1 Pen Holder Edition.

2   Q.   So "pen holder" meaning it has the cutouts?

3   A.   That is correct.

4   Q.   And "2 in 1" meaning it has two etchings for lightning

5   links into the surface?

6   A.   That is correct.

7   Q.   If you could go ahead and put that back into 111.

8        I want to ask you about your -- your role in the

9   case.  In particular, part of your responsibility was doing

10  some of the retrievals of auto key cards that had been shipped

11  out; is that correct?

12  A.   It is.

13  Q.   And you spoke to a number of individuals that were in the

14  Jacksonville area who were on the -- essentially in the

15  transactional data that was obtained in this case?

16  A.   Correct.

17  Q.   And did you also take at least one trip to visit another

18  part of the country and speak to individuals who were located

19  there?

20  A.   I did.

21  Q.   Where did you travel to?

22  A.   Michigan.

23  Q.   And in your investigation you heard testimony before that

24  the total number of transactions or purchasers that was

25  reflected in the data was -- it was well over a thousand; is

1  that accurate?

2  A.   That is.

3  Q.   Have you talked to every single one of those people?

4  A.   I have not.

5  Q.   In your investigation, did you see evidence that fake

6  names were being used by some purchasers?

7  A.   I did.

8         MS. TAYLOR:  Ms. Ganoe, if we could please have on

9  the screen Exhibit 32, page 1.

10  BY MS. TAYLOR:

11  Q.   This is -- if you recall, Special Agent Slosson, is this

12  one of the packages that was seized from the mail stream by

13  Inspector Hannon?

14  A.   It was.

15  Q.   And the name on that package, the addressees's name is

16  what?

17  A.   John Doe.

18         MS. TAYLOR:  And if we could have page 4 of the same

19  exhibit.

20  BY MS. TAYLOR:

21  Q.   What is the -- is this another package that was seized

22  from the mail stream by Inspector Hannon?

23  A.   It was.

24  Q.   And what's the addressee name on the package?

25  A.   Ole Shoota.

1   Q.   Do you believe that to be somebody's real name?

2   A.   I do not.

3   Q.   Special Agent Slosson, when you went to interview

4   purchasers, were they excited to see you?

5   A.   Not a one.

6   Q.   Did you break down anybody's door when you were going to

7   speak with purchasers?

8   A.   I did not.

9   Q.   Was any -- did any dog injuries ensue?

10  A.   No.

11  Q.   And I want to ask you also about bolt carriers.  You've

12  heard a lot of testimony about bolt carriers and which ones may

13  or may not work with an auto key card -- a lightning link from

14  an auto key card, correct?

15  A.   Correct.

16  Q.   Are you familiar with whether an SP1-style bolt carrier is

17  something that can be readily purchased?

18  A.   Yes.

19  Q.   And is it?

20  A.   Yes.

21  Q.   And is a bolt carrier in general, is that a regulated

22  item?

23  A.   No.

24  Q.   Can anyone, including a prohibited person, possess

25  whatever kind of bolt carrier they want?

1   A.   Yes.

2   Q.   You also heard in some of the -- at least one of the

3   videos that Mr. Hoover had published and which was reviewed by

4   the analyst, Ms. Butler, that Mr. Hoover made a claim that ATF

5   had arrested Mr. Ervin's entire family.

6             Do you recall that?

7   A.   I do.

8   Q.   Is that accurate?

9   A.   It is not.

10  Q.   Did you arrest -- did ATF arrest anyone else in

11  Mr. Ervin's family other than Mr. Ervin?

12  A.   Not in his family, no.

13  Q.   And there was also an assertion by Mr. Hoover in his video

14  that ATF had seized all of Mr. Ervin's assets.

15            Do you recall that?

16  A.   I do.

17  Q.   Is that accurate?

18  A.   That is not.

19  Q.   In your investigation did you learn that Mr. Ervin had

20  used proceeds of his auto key cards business to make certain

21  large purchases?

22  A.   I did.

23  Q.   What did those include?

24  A.   He purchased a bus and land in Columbia County.

25  Q.   And did ATF seize either of those items?

1   A.   We did not.

2   Q.   And did Mr. Ervin still have money in his bank account at

3   the time he was arrested?

4   A.   He did.

5   Q.   Did ATF seize that?

6   A.   We did not.

7   Q.   Agent Slosson, I also want to ask you some questions about

8   Exhibit 61.

9        MS. TAYLOR:  If you would put that on the screen,

10  please.

11  BY MS. TAYLOR:

12  Q.   So we're on the second page of Exhibit 61.  You

13  recently -- just a moment ago heard some questions asked of

14  Mr. Lintner regarding how many items there are in this image,

15  correct?

16  A.   Correct.

17  Q.   And could you just identify what these items are that are

18  in this image?  Starting with the top left, what is that?

19  A.   Top left is a lightning link.

20  Q.   So that's the item that was featured in the auction from

21  Rock Island Auctions?

22  A.   Correct.

23  Q.   And then what's to the right of that on the top?

24  A.   It's a spare piece for the lightning link that is more

25  vertical in nature.

1          THE COURT:  I'm sorry, sir, you trailed off.  Can you
2    repeat that?
3          THE WITNESS:  The piece on the right is a piece of
4    the lightning link that would be vertical in nature when used
5    with the lightning link.
6    BY MS. TAYLOR:
7    Q.   So it's a -- you said it was a spare piece?
8    A.   Correct.
9    Q.   So in the left image there's a piece that's kind of
10   sticking up in the image?
11   A.   Yes.
12   Q.   And is the -- so is that a spare of that particular part?
13   A.   Yes, it is.
14   Q.   And then below -- below the lightning link in this image
15   there are two circular items, correct?
16   A.   There are.
17   Q.   What are those?
18   A.   They appear to be common washers.
19   Q.   So same kind that you could purchase at Lowe's or Home
20   Depot?
21   A.   Yes.
22   Q.   Are those regulated by ATF?
23   A.   They are not.
24   Q.   And then to the right of the two washers there are four
25   sort of squarish items, correct?

1    A.    Three are.

2    Q.    And what are those?

3    A.    They appear to be drift adjustable front sights for rifles

4    or for shotguns with front rifle sights.

5    Q.    And are you aware of whether those are regulated by the

6    ATF?

7    A.    They are not.

8    Q.    And do they have any particular intrinsic value that

9    you're aware of?

10   A.    None.

11   Q.    And then there's one more little small item next to the

12   four square items, correct?

13   A.    Correct.

14   Q.    Do you know what that is?

15   A.    Appears to be a front sight that you would commonly use on

16   a shotgun, shotgun --

17   Q.    Is that something that's regulated by ATF?

18   A.    No.

19   Q.    Or regulated by any other law, or any other federal law?

20   A.    No.

21   Q.    And does it have any intrinsic value?

22   A.    No.

23   Q.    So of the items that are in this picture, which of them

24   have value?

25          MR. KING:  Your Honor, I would objection as

1    speculation.

2            THE COURT:   Sustained.

3    BY MS. TAYLOR:

4    Q.   Are there any items besides the lightning link that are in

5    this picture that the transfer of which is restricted or

6    regulated?

7    A.   No.

8    Q.   Are all of the items besides the lightning link pieces

9    readily available?

10   A.   It may be harder to find some of those sights, the rifle

11   sights, but yes, they are readily available.

12   Q.   Agent Slosson, are you generally familiar with the market

13   for machine guns?

14   A.   Yes.

15   Q.   And what I'm talking about is transferable, registered,

16   pre-1986 machine guns.

17            You're familiar with that market?

18   A.   I am.

19   Q.   And in your experience, within approximately the -- well,

20   speaking during the time frame --

21            MR. KING:   Your Honor, can we approach?

22            THE COURT:   Go ahead.

23       (Proceedings at sidebar:)

24            MR. KING:   Your Honor, the government has already

25   elicited a fair amount of expert testimony from this witness

1   that was not previously disclosed under Rule 16.  And it's

2   apparent that they -- very clear to counsel for Mr. Ervin that

3   the intent is to get into the relevant market of firearms and

4   their costs and those sorts of things, which is clearly expert

5   testimony and was not disclosed.  And we would ask the Court to

6   exclude the expert testimony from this witness's . . .

7            THE COURT:  Ms. Taylor.

8            MS. TAYLOR:  Your Honor, I can move on from this, but

9   I would dispute that this is expert testimony.  He's an agent

10  of ATF.  He's familiar with the parts of firearms and which

11  ones are regulated and not.  Just as part of his general job

12  duties, he has to know what is subject to regulation and what

13  isn't.

14           THE COURT:  Your question was about the value of it.

15  I don't think it's expert testimony, but I understand that

16  you're going to move on.

17           MS. TAYLOR:  Yes, Your Honor.

18           THE COURT:  All right.

19      (Proceedings in open court:)

20  BY MS. TAYLOR:

21  Q.   Agent Slosson, you were at the part of the trial, I think

22  it was last week, where there was discussion of items that were

23  extracted from the SD card from Mr. Ervin's phone.

24           Do you recall that?

25  A.   I do.

1   Q.   And those have already been admitted into evidence, but I

2   would like to just review with you now the items that have

3   already been admitted into evidence.

4            MS. TAYLOR:  Ms. Ganoe, if we could please have

5   Exhibit 49A.

6            If we could have the lights dimmed, please.

7        (Video played.)

8        (Video stopped.)

9   BY MS. TAYLOR:

10  Q.   And Special Agent Slosson, I'd now like to review

11  Exhibit 49B.

12       (Video played.)

13           MS. TAYLOR:  Pause the video.

14       (Video stopped.)

15  BY MS. TAYLOR:

16  Q.   We are at a part of the video -- if I could have . . .

17           It's 21 seconds into this exhibit -- and it just

18  jumped a little bit, but if we could get back to that image.

19           Okay.  We're at about 20 seconds into this particular

20  video.  What's visible in this part of the video?

21  A.   Appears a gentleman holding two AK-47-style firearms.

22  Q.   And is he -- he appears to be piggybacking on another

23  individual?

24  A.   That's correct.

25  Q.   And when the video was playing, did it have sounds of

1  rapid fire in the audio of it?

2  A.   It did.

3  Q.   And yet at the bottom of this part of the video, while

4  it's showing a man with two AK-47s and rapid fire noises, it

5  says "great novelty and conversation piece only"?

6  A.   It did.

7        MS. TAYLOR:  If we could go back to maybe five

8  seconds into the video, Ms. Ganoe.

9  BY MS. TAYLOR:

10 Q.   Here, five seconds into the video, does it appear to be

11 the same man holding the fish that was in the previous exhibit?

12 A.   It does.

13 Q.   And transposed over that are some words.  What does it

14 say?

15 A.   "Get one.  AR related.  And save it.  Do not cut."

16 Q.   And this is the same fish that's firing rapid fire --

17 appears to be rapid firing?

18 A.   It does.

19       MS. TAYLOR:  And Ms. Ganoe, could we now advance back

20 to the 20-second portion and play the rest of the video.

21      (Video played.)

22      (Video stopped.)

23 BY MS. TAYLOR:

24 Q.   And right before the very end of that video it displayed

25 an auto key card; is that correct?

1   A.   Correct.

2   Q.   Throughout the video, what sort of audio is playing?  What

3   sort of noises are there throughout the video?

4   A.   Automatic gunfire.

5        MS. TAYLOR:  Ms. Ganoe, could we please have

6   Exhibit 49C.

7        (Video played.)

8   BY MS. TAYLOR:

9   Q.   We're at the beginning of the video.

10       (Video stopped.)

11  Q.   What was at the very beginning of the video?

12  A.   Auto key card.

13  Q.   And then what is -- we've paused it a couple of seconds

14  in.  We are five seconds into the video.  What did it

15  immediately transition to?

16  A.   A short barrel AR-15-style rifle.

17  Q.   And is it being held by an individual?

18  A.   It is.

19  Q.   And is the rifle doing anything?

20  A.   Not at this moment, but it was firing.

21  Q.   Firing in what manner?

22  A.   Fully automatic.

23       MS. TAYLOR:  Could we please continue playing the

24  video.

25       (Video played.)

```
 1        (Video stopped.)
 2   BY MS. TAYLOR:
 3   Q.   And in this video, is it entirely consisting of images of
 4   the auto key card interspersed with individuals firing
 5   automatic rifles?
 6   A.   It is.
 7             MS. TAYLOR:  Could we have 49D, please.
 8        (Video played.)
 9        (Video stopped.)
10   BY MS. TAYLOR:
11   Q.   And 49D is similar to I believe it was 49B, correct?
12   A.   Correct.
13   Q.   In that, it has what kind of sounds playing throughout the
14   video?
15   A.   Fully automatic fire.
16   Q.   And does it also have music?
17   A.   It does.
18   Q.   And what kind of music is it?
19   A.   There's no words, just instrumental music in the
20   background.
21   Q.   And does it also show images of the auto key card
22   interspersed throughout?
23   A.   It does.
24   Q.   And does it also say "AR related"?
25   A.   It does.
```

1    Q.    And does it also say "do not cut"?

2    A.    It does.

3             MS. TAYLOR:  Could we have 49E now, please.

4    BY MS. TAYLOR:

5    Q.    This is another image from Mr. Ervin's SD card from his

6    phone.  What's visible in this image?

7    A.    Different styles of auto key cards.

8    Q.    And how are they pack- -- are they packaged?

9    A.    They are.

10   Q.    And is the packaging consistent with what you've seen

11   throughout this trial in terms of the packages that were seized

12   out of the mail and the packages that were received as a result

13   of the undercover purchases by Special Agent Hooker and

14   Inspector Hannon?

15   A.    Correct.

16            MS. TAYLOR:  Could we have 49F, please.

17   BY MS. TAYLOR:

18   Q.    What is this?

19   A.    Picture of Mr. Ervin.

20   Q.    And what is he wearing?

21   A.    White sunglasses, blue T-shirt.

22            MS TAYLOR:  If we could please have Exhibit 73.

23   BY MS. TAYLOR:

24   Q.    We're looking now at the second page of Exhibit 73,

25   correct?

1  A.   Yes.

2  Q.   And there's an image that's -- it appears -- does there

3  appear to be a filter or some sort of cartoonizing on the

4  image?

5  A.   There does.

6  Q.   And do you recognize that image that's on this -- and

7  these are the GoFundMe records, correct?

8  A.   Correct.

9  Q.   Do you recognize that image as being the same one that was

10 in 49F?

11 A.   I do.

12 Q.   Other than the lack of filtering, correct?

13 A.   Correct.

14      MS. TAYLOR:   Could we have 49G, please.

15 BY MS. TAYLOR:

16 Q.   What's shown in this image?

17 A.   A large stack of auto key cards.

18 Q.   And 49H, what's shown in this image?

19 A.   Auto key cards.

20 Q.   And what -- are they laid out?

21 A.   They are.

22 Q.   And on -- do they appear to be laid out on anything in

23 particular?

24 A.   I believe this is from the manufacturer.

25 Q.   Are they wet?

1    A.   They are.

2           MS. TAYLOR:  And could we have 49I.

3    BY MS. TAYLOR:

4    Q.   What's shown in this image?

5    A.   Four belt and disk sanders and two ammo cans.

6    Q.   Two what?

7    A.   Ammo cans.

8    Q.   Those are the two green items on top of the stack?

9    A.   That is correct.

10          MS. TAYLOR:  And next, 49J.

11   BY MS. TAYLOR:

12   Q.   What is this?

13   A.   It is a package addressed to Mr. Hoover.

14   Q.   And it's a UPS Next Day Air package, correct?

15   A.   That is correct.

16   Q.   And is the return address Auto Key Card?

17   A.   It is.

18          MS. TAYLOR:  And could we move on to 49K.

19   BY MS. TAYLOR:

20   Q.   What is this?

21   A.   Appears to be a large sum of cash.

22   Q.   And does it appear to be in a bank envelope?

23   A.   It does.

24          MS. TAYLOR:  49L.

25   BY MS. TAYLOR:

1    Q.   What is this?

2    A.   It is a package addressed to Mr. Hoover.

3    Q.   And does it have Auto Key Card as the return address?

4    A.   It does.

5    Q.   And is it a FedEx Priority Overnight package that was

6    scheduled for delivery on February 18th?

7    A.   It does.

8         MS. TAYLOR:  Next, M, 49M.  Could we zoom in on the

9    receipt.

10   BY MS. TAYLOR:

11   Q.   What's in this image?

12   A.   Appears to be a Mailbox & More receipt addressed to -- or

13   shipped to Mr. Matt Hoover.

14   Q.   And is the expected arrival on February 18th?

15   A.   It appears so.

16        MS. TAYLOR:  Could we have 49N.

17   BY MS. TAYLOR:

18   Q.   Does this appear to be a larger version of the same image

19   that was on the GoFundMe records?

20   A.   It appears so.

21   Q.   And who is in that image?

22   A.   Mr. Ervin.

23        MS. TAYLOR:  And 49O.  Could we zoom in on the top.

24   BY MS. TAYLOR:

25   Q.   Does this appear to be a screenshot?

1    A.    It does.

2    Q.    And it states in the -- in the top left the date, correct?

3    A.    It does.

4    Q.    And looking at the -- looking at the part on the very left

5    side where it says, "Total sales, $10,577.44," correct?

6    A.    It does.

7    Q.    And there's a line graph below that?

8    A.    Correct.

9    Q.    And does it show increasing -- or a trend toward

10   increasing sales?

11   A.    It does.

12   Q.    And does it -- next to the total sales, does it show an

13   arrow pointing up and then say "15,011 percent"?

14   A.    It does.

15        MS. TAYLOR:   Could we have the next slide, 49P.

16   BY MS. TAYLOR:

17   Q.    What is this?

18        MS. TAYLOR:   If we could zoom in on the top part,

19   Ms. Ganoe.

20   A.    Appears to be dimensions for the auto key card.

21   Q.    Does it have a line drawing of lightning links?

22   A.    It does.

23   Q.    And does this appear to be the bottle opener version?

24   A.    It does.

25   Q.    And it calls out I guess different dimensions for

1    different parts of the engravings?

2    A.    That's correct.

3    Q.    And this is a drawing, correct?

4    A.    Excuse me.

5              THE COURT:  Is that yes?

6              THE WITNESS:  I didn't answer, but yes.

7              MS. TAYLOR:  And now could we have 49Q.

8    BY MS. TAYLOR:

9    Q.    Who is that -- is this a picture?

10   A.    Mr. Ervin.

11   Q.    And is he wearing the white sunglasses again?

12   A.    Yes.

13   Q.    He's wearing a T-shirt with a -- it looks like a vehicle

14   on it?

15   A.    Yes.

16   Q.    Are you familiar with that graphic of a vehicle from

17   anywhere?

18   A.    I am.

19   Q.    How are you familiar with it?

20   A.    He sold T-shirts like that on his Auto Key Cards website.

21   Q.    Did the green business cards that were sent with the auto

22   key cards have a similar image as well?

23   A.    They did.

24   Q.    And what is Mr. Ervin holding?

25   A.    Appears to be a Priority Overnight FedEx package to

1   Matthew Hoover.

2   Q.   And it's dated November -- or it's scheduled to be

3   delivered on November 3rd; is that correct?

4   A.   Yes.

5   Q.   And those are all images and videos that were taken from

6   Mr. Ervin's SD card on his phone?

7   A.   That's correct.

8            MS. TAYLOR:   Your Honor, may I have just a moment?

9            THE COURT:   Sure.

10           MS. TAYLOR:   I have no further questions.

11           THE COURT:   Mr. Larosiere.

12           MR. LAROSIERE:   Yes, Your Honor.

13                        CROSS-EXAMINATION

14   BY MR. LAROSIERE:

15   Q.   Agent Slosson, you've done a fair bit of traveling as a

16   part of both operations Lightning Strike and Auto Key Card

17   Retrieval; is that fair to say?

18   A.   With this case, no.  I traveled --

19   Q.   You didn't --

20   A.   -- one time.

21   Q.   I'm sorry, I interrupted you.  What did you say?

22   A.   I've traveled one time out of our area of operations.

23   Q.   And that was to?  What state was that to?

24   A.   Michigan.

25   Q.   So with all of the information your office got about the

1   auto key card sales and where they went, you chose only to go

2   to Michigan?

3   A.   I didn't choose where we went.

4   Q.   But you only went to Michigan?

5   A.   That is correct.

6   Q.   And, of course, the Jacksonville Metro area; is that fair

7   to say?

8   A.   That is correct.

9   Q.   Do you remember your meeting with Tristen Alderson?

10  A.   I do.

11  Q.   Do you remember him smelling of marijuana cigarettes?

12  A.   I do.

13  Q.   And that's something ATF takes very seriously, correct?

14  A.   Correct.

15  Q.   Tristen Alderson, did he tell you he had applied for a

16  suppressor?

17  A.   He did.

18  Q.   And that application was pending?

19  A.   I didn't do research into that, but that's what he

20  referred to, or he told us, yes.

21  Q.   And you witnessed Mr. Alderson carrying a firearm and

22  wreaking of marijuana, right?

23  A.   That's correct.

24  Q.   And, in fact, after you spoke with him, is it true that

25  you had a phone call with a Mr. Aric Osso to nail down his

1  marijuana use?

2  A.   That's correct.

3  Q.   After all that, did you notify NFA division about this?

4  A.   We notified the local United States Attorney's Office of

5  our findings.

6  Q.   But you didn't notify NFA division where his stamp for a

7  suppressor was pending?

8  A.   That's correct.

9  Q.   Correct, you did not?  Just to be clear.

10 A.   Correct, we did not.

11        MR. LAROSIERE:  Ms. Ganoe, if you don't mind, could

12 we pull up 49A and play it real quick.

13      (Video played.)

14        MR. LAROSIERE:  Could we stop that real quick.  Thank

15 you so much.

16      (Video stopped.)

17 BY MR. LAROSIERE:

18 Q.   Mr. Slosson -- sorry, Agent Slosson, are you terribly

19 familiar with fish?

20 A.   No.

21 Q.   In your understanding -- redacted.  Withdrawn, rather.

22        This fish in this video makes two different types of

23 noises, right?

24 A.   I'm not sure what you're speaking about.  Are you talking

25 about the fish chirping and then the automatic gunfire?

1    Q.    Yes.

2    A.    Okay.  Yes, I am.  I've heard that.

3    Q.    So the chirping, does that seem like the type of noise

4    that would come out of this fish?

5    A.    No.  It seemed like a comical type chirping to me.

6    Q.    Would you describe this fish as AR related?

7    A.    I would not.

8             MR. LAROSIERE:  Could we play 49 Bravo, please, and

9    then stop when we get to the claim of two gentlemen, you know,

10   on each other.

11        (Video played.)

12            MR. LAROSIERE:  Right there.  Thank you so much.

13        (Video stopped.)

14   BY MR. LAROSIERE:

15   Q.    Now, Mr. Slosson, could you look closely at the firearms

16   the gentleman who is riding piggyback on the other gentleman is

17   carrying.

18   A.    Yes.

19   Q.    You stated before those are AK-47s; is that accurate?

20   A.    No.  I referred to them as AK-47-style weapons.  There are

21   different names for them, but they are in the AK-47-style

22   family.

23   Q.    So AK type?

24   A.    Yes, that's fair to say.

25   Q.    Are those AR related?

1   A.   They are not.

2   Q.   And do you notice off to the left side of the image

3   there's a -- what would you describe that effect?

4   A.   Some sort of fireworks.

5   Q.   Sort of fireworks swirling around, right?

6   A.   Correct.

7   Q.   Is that typical accurate -- does that typically happen

8   when firing an AK-type firearm?

9   A.   You can get -- not in that pattern, but that can happen

10  with certain type of ammunition and certain type of lighting.

11  You can see things to that extent.

12  Q.   You mean sparks, not the going around in circles?

13  A.   Yes, not in that pattern, correct.

14  Q.   Does this advertisement seem to be any type of portrayal

15  of how an actual product works?

16  A.   I'm sorry, what product are you referring to?  The auto

17  key card?

18  Q.   Between the fish flopping -- withdraw my question.

19       Between the fish flopping, making different noises,

20  and these gentlemen riding piggyback with AKs, does this

21  advertisement strike you more of puffery or a portrayal of a

22  product?

23  A.   To me, it's advertising a machine gun.

24  Q.   The showing of a fish making an unknown chirping noise,

25  correct?

1   A.   I wasn't referring to the chirping.

2   Q.   And two gentlemen riding piggyback with AKs and fireworks?

3   I just want to make sure we're talking about the same

4   advertisement.

5   A.   Correct.  In this photo they were both firing fully

6   automatic AK-style weapons.

7   Q.   You're suggesting that these were fully automatic AKs?

8   A.   That's the rate of fire which it appears to be in the

9   video.

10          MR. LAROSIERE:  Can we play this section?

11      (Video played.)

12          MR. LAROSIERE:  Okay.  Stop.

13      (Video stopped.)

14  BY MR. LAROSIERE:

15  Q.   Were you looking at the trigger fingers when watching that

16  video?

17  A.   Looking at the muzzle fire and how the video has slowed

18  down, it appears that somebody has slowed down the rate of fire

19  on the video, but they are still depicting fully automatic in

20  my opinion.

21          MR. LAROSIERE:  I'd like to just publish that again,

22  that section of the men firing.

23      (Video played.)

24      (Video stopped.)

25          MR. LAROSIERE:  A little more.

1        (Video played.)

2        (Video stopped.)

3    A.    I can see on the left photo what you're referring to now,

4    talking about the trigger finger --

5    Q.    I didn't --

6    A.    I'm sorry.

7    Q.    I didn't ask anything yet.

8            Do you still think that was fully automatic fire?

9    A.    Looking on the left side of the photograph of the firearm,

10   I can see what you're talking about with the trigger finger

11   being depressed.  I can see him pulling the trigger multiple

12   times, you're correct.  That would be semiautomatic fire on

13   that side.

14   Q.    But earlier you said quite confidently it was fully

15   automatic?

16   A.    Yes.  Looking at the discharge from the muzzle that we

17   just looked at, in my opinion, it looks to be fully automatic

18   fire.

19   Q.    Would you say you might be predisposed to see any type of

20   rapid firing as automatic firing?

21   A.    No.

22            MR. LAROSIERE:  Thank you so much for your time.

23            THE COURT:  Mr. King.

24            MR. KING:  Your Honor, can we approach briefly?

25            THE COURT:  Sure.

```
 1          (Proceedings at sidebar:)
 2              THE COURT:  Mr. King.
 3              MR. KING:  Your Honor, I anticipate taking more than
 4     about nine minutes.  I'm not sure if this would be a good time
 5     for our break or if we --
 6              THE COURT:  That's fine.
 7          (Proceedings in open court:)
 8              THE COURT:  Ladies and gentlemen, we're going to go
 9     ahead and break for lunch.  I'm going to ask you to be back at
10     1:40 to continue with the evidence.
11              Please remember not to discuss the case with one
12     another or anybody else.  Please don't let anybody talk about
13     the case in your presence.  Please don't conduct any
14     independent research about anything in any way related to the
15     case or read any media reports about it.  And please don't form
16     or express any opinions.
17              Please be back at 1:40.  Thank you.
18              COURT SECURITY OFFICER:  All rise for the jury.
19          (Jury exits, 12:23 p.m.)
20              COURT SECURITY OFFICER:  Please be seated.
21              THE COURT:  All right, sir.  You may step down.
22              All right.  We'll be in recess until 1:40.
23              COURT SECURITY OFFICER:  All rise.
24              THE COURT:  Oh, I'm sorry, before we do that,
25     Ms. Taylor, I know, Mr. King, you -- how long do you think you
```

1  have with this witness?

2          MR. KING:  I was -- I have probably about 15,

3  20 minutes, but I might reassess that over the lunch hour and

4  it might be a little longer.

5          I'm sorry, did you say for this witness or for

6  closing?

7          THE COURT:  For this witness.

8          MR. KING:  I think probably about 20 minutes, Your

9  Honor.

10         THE COURT:  And Ms. Taylor, your next witness is Toy?

11         MS. TAYLOR:  Yes, Your Honor.  I would anticipate my

12  direct taking half an hour, maybe a little bit more.  Cross is

13  the wild card on that.  I would say I don't anticipate that we

14  would be able to complete closings today.

15         THE COURT:  All right.  And Mr. -- well, that's all

16  right.

17         All right.  Anything else we need to address?

18         MR. KING:  No, Your Honor, I agree with Ms. Taylor's

19  assessment in terms of time.

20         THE COURT:  Well, of course you guys don't want to do

21  closings today.  I've been in your shoes.  I know how this

22  works.

23         MR. KING:  I'm still working on my slides.

24         THE COURT:  All right.  We'll be in recess until

25  1:40.

1          MR. KING:  Thank you, Your Honor.

2      (Lunch recess, 12:25 p.m. to 1:44.)

3      (All parties present.  Jury not present.)

4          COURT SECURITY OFFICER:  All rise.  This Honorable

5  Court is back in session.

6              Please be seated.

7          THE COURT:  Ms. Wiles.

8      (The judge and the courtroom deputy confer.)

9          THE COURT:  Let's have the jury.

10         MR. KING:  Your Honor, do you want me over by the --

11         THE COURT:  Oh, yes, go ahead.

12         COURT SECURITY OFFICER:  All rise for the jury.

13     (Jury enters, 1:46 p.m.)

14         COURT SECURITY OFFICER:  Please be seated.

15         THE COURT:  Go ahead, Mr. King.

16                   CROSS-EXAMINATION

17  BY MR. KING:

18  Q.   Good afternoon, Agent Slosson.

19  A.   Good afternoon.

20  Q.   I want to get into a little bit to make sure I understand

21  your role here.  So my understanding is Agent Hooker was

22  previously the agent with ATF that was responsible for the case

23  that brings us here today?

24  A.   Yes.  We would describe it, he would have been the lead

25  case agent, I would have been a co-case agent assisting him

1  through the investigation.

2  Q.   And the reason I ask this is you've kind of taken over as

3  the primary person in charge?

4  A.   Correct.

5  Q.   And I guess my question is were you with him in the

6  beginning of this or did you join in later on?

7  A.   From the beginning.

8  Q.   And so the big things that we talked about with him during

9  his testimony, you were involved in those processes?  He

10  personally handled some things, but you were involved in all

11  that?

12  A.   I wasn't involved in every aspect of the case.  He did

13  some things independent; I did some things independent of him.

14  But overall, I'm aware of most things that happened.

15  Q.   Generally speaking, you know, obviously you two --

16  wouldn't make a ton of sense for you to be doing the exact same

17  things, but you did work hand-in-hand as far as that goes?

18  A.   I'm sorry, say that one more time.

19  Q.   I'm sorry.

20  A.   It's okay.

21  Q.   It would be probably a little ridiculous if the two of you

22  did literally everything together.  But you worked on together

23  and did similar things and knew what the other one was doing

24  throughout this?

25  A.   For the most part.  I wouldn't know everything he's done

1  and vice versa, he wouldn't know everything I've done.

2  Q.   And I want to talk a little bit about your testimony here

3  today.  So -- and I want to be clear.  The rules allow you to

4  be present during the testimony of every other witness?

5  A.   Yes.

6  Q.   I'm sorry?

7  A.   Yes.

8  Q.   And every other witness has not been present when other

9  witnesses have testified?

10  A.   That's correct.

11  Q.   And you've had the opportunity to hear not only every

12  witness's testimony, but every question that I've asked them as

13  well?

14  A.   That's correct.

15  Q.   And as part of the preparation, you were also present for

16  many of the interviews that I discussed with those witnesses,

17  where they went over what their testimony would be with the

18  government?

19  A.   Present with the government's interviews?

20  Q.   With the attorneys for the government and the witnesses

21  before they came to testify, the questions that we've discussed

22  that they went over?

23  A.   Yes.

24  Q.   And you're the only witness who's had that ability?

25  A.   Yes.

1    Q.    And there's nothing that prevented the government from

2    calling you earlier, before everybody else testified, but

3    you're testifying now that everybody else has testified?

4              MS. TAYLOR:  Objection, relevance, Your Honor.

5              THE COURT:  Overruled.

6    A.    Yes.

7    BY MR. KING:

8    Q.    I want to go over a couple of spots of agreement to make

9    sure that we're on the same page.

10             Is it fair to say based on your investigation the

11   gentleman you know as Justin Ervin sitting over here is the

12   owner of the Auto Key Card business?

13   A.    That's correct.

14   Q.    And though some people assisted him in various ways, he

15   primarily conducted the activities of that business?

16   A.    Correct.

17   Q.    And this is something that you knew who this individual

18   was at the onset of this investigation?

19   A.    Correct.

20   Q.    And we've had a few observations of him conducting

21   mailings?

22   A.    Correct.

23   Q.    His name was on the mailings?

24   A.    Correct.

25   Q.    His name was on the money orders?

1   A.   Correct.

2   Q.   All of the records and things that you've obtained, he

3   used his real name?

4   A.   "J. Ervin" is what he used on most things, yes.

5   Q.   And that includes postal and other governmental records?

6   A.   Yes.

7   Q.   Credit card records?

8   A.   Yes, I believe so.

9   Q.   Bank records?

10  A.   Yes, bank records.

11  Q.   Same address for everything?  There wasn't, you know --

12  other than the post office box where everything mailed out of?

13  A.   Those are the only two addresses I saw, yes.

14  Q.   And he gave his home address with the post office, and

15  those records were easy for you to get?

16  A.   Yes.

17  Q.   And he's the individual who sold the auto key cards?

18  A.   Yes.

19  Q.   He was the one who was primarily responsible for taking

20  them to the post office, putting them in the mail, fulfilling

21  the orders?

22  A.   Correct.

23  Q.   Fair to say other people helped him, but that was mostly

24  what he did?

25  A.   That's correct.

1   Q.   And we agree on all that?

2   A.   Yes.

3   Q.   I want to talk a little bit about some of Agent Hooker's

4   testimony.

5         MR. KING:  Ms. Ganoe, if we can get Exhibit 48 at

6   page 22.

7   BY MR. KING:

8   Q.   Do you remember me going over that with Agent Hooker?

9   A.   I do.

10  Q.   And I guess the purpose of that testimony is -- let me ask

11  it this way:  The auto key cards that were sold were not sold

12  in the same way where they were manufactured, but they were

13  shined and polished?

14  A.   That's my understanding, yes.

15  Q.   And they were packaged?

16  A.   Correct.

17  Q.   And when you read the terms of service, Mr. Ervin

18  described them as art?

19  A.   I don't recall if I personally read it individually, but I

20  do believe he said that, yes.

21  Q.   And in the course of the emails and everything else,

22  that's something he consistently stated?

23  A.   That it's artwork, correct.

24  Q.   And in the course of your investigation you spoke with

25  many witnesses, some of them with the Orange Park Machine?

1   A.   Correct.

2   Q.   And there are times that with Orange Park Machine, they

3   asked if they could cut out the devices and he instructed them

4   not to?

5   A.   That's correct.

6   Q.   And of all of the -- let me ask it this way.  We saw, fair

7   to say, a very small number of the actual emails that occurred

8   in all of the accounts that you were able to obtain during the

9   course of your investigation?

10  A.   I believe so.

11  Q.   And there were a lot of emails -- let me strike that and

12  rephrase that.

13        Fair to say that the bulk of the mail -- the emails

14  back and forth between purchasers of auto key cards and either

15  Mr. Ervin or Ms. Wolfe were about fulfilling orders and orders

16  being available and delayed and things of that nature?

17  A.   There were some of those, and asking how to potentially

18  cut them out, yes, I do recall that.

19  Q.   And in terms of the -- and I want to get to that.  So

20  we're talking probably thousands and thousands of emails?

21  A.   I don't know if I've seen them all, but that would be a

22  guesstimate if I said there was thousands.

23  Q.   Let me ask it in a way -- because I want to make sure I'm

24  being fair here.  There weren't like 30 emails and we've seen

25  25 of them?

1  A.   I agree with that, yes.

2  Q.   We've seen a very small percentage?

3  A.   I would agree, sir.

4  Q.   And in terms of the emails about people asking how to cut

5  it out or, you know, looking for instructions or, "Hey, will it

6  work with this, that, or the other," or some of the kind of coy

7  language we've seen, we've seen all of those, though, correct?

8  A.   I believe so.

9  Q.   And that's a very small percentage, under one percent of

10 the emails that were actually exchanged.  Is that a fair

11 statement?

12 A.   That would be fair.

13 Q.   I want to talk a little bit about some of the --

14      MR. KING:  Ms. Ganoe, could we get Exhibit 54 at page

15 12.

16 BY MR. KING:

17 Q.   Do you remember me going over this with Agent Hooker?

18 A.   I do.

19 Q.   That was about eight days ago?

20 A.   Sounds right.

21 Q.   Yeah, eight days ago that was.

22      And do you remember me asking him what the

23 evidentiary value of this is as to whether or not Mr. Ervin

24 broke any federal laws?

25 A.   I do.

1    Q.    As the case agent on this now, what -- having eight days

2    to think about it, what evidentiary value does this have?

3                 MS. TAYLOR:  Same objection as previously.

4                 THE COURT:  I think I'm going to sustain the

5    objection at this point, Mr. King.  Go ahead.

6                 THE WITNESS:  Would you repeat that?  I'm sorry.

7                 THE COURT:  No, I sustained the objection.

8                 THE WITNESS:  Oh, I'm sorry.  Thank you.

9    BY MR. KING:

10   Q.    Let me rephrase, Agent Slosson.

11               What evidentiary value do you believe this has?

12   A.    I would say it's a frame of mind of what he's thinking.

13   Q.    How do you mean?

14   A.    My assumption would be this is kind of revolutionary

15   times, and that's what this would depict.

16   Q.    And during the course of your investigation, I know we

17   talked with Agent Hooker a little bit about it, but he had

18   stockpiles of food and water and things of that nature in terms

19   of like a prepper or something like that?

20   A.    That's fair.

21   Q.    And other witnesses that you spoke to, without getting

22   into specifics, but that's not an uncommon thing that you came

23   across during the people you were talking to?

24   A.    Of Mr. Ervin or other people?

25   Q.    Other people.

1    A.    Other people?  I would say some of them have described

2    themselves as preppers.

3    Q.    Including Dr. Moya, who we heard testify earlier this

4    week?

5    A.    That's correct.

6    Q.    Of the auto key cards that you -- let me take a step back,

7    ask a different question.

8            The individuals that you spoke to about auto key

9    cards that they have ordered, have we seen all of them testify

10   here during the course of this trial?

11   A.    No.

12   Q.    There were other individuals?

13   A.    Correct.

14   Q.    How many of those individuals still possessed an auto key

15   card?  I'm not going to hold you to an exact answer, but

16   roughly.

17   A.    You're asking how many still possessed auto key cards?

18   Q.    How many still possessed an auto key card or were able to

19   hand you over an auto key card?

20   A.    I'd have to reflect my reports to give you an accurate

21   answer on that one.

22   Q.    Sure.  I'm not trying to trip you up.  Is it one or two,

23   is it ten, is it a thousand?

24   A.    That still possessed them when I spoke with them?

25   Q.    Correct.

1   A.   A ballpark would be 25 to 35 percent I would assume.

2   Again, I --

3   Q.   And of those individuals, how many had what you would call

4   lightning links, or we've heard other people describe as

5   lightning links, actually cut out where they handed you, "Hey,

6   I cut this out and put this in my firearm"?

7   A.   I can't think of any that cut them out and willingly gave

8   it to me.

9   Q.   And we can agree that the individuals that you recovered

10  these from who have ones that handed them to you -- that's what

11  I'm talking about -- this didn't happen a week after they

12  ordered them; is that fair?

13  A.   I'm sorry, a week after what?

14  Q.   After they would have purchased them or ordered them or

15  received them from Mr. Ervin.

16  A.   No.

17  Q.   It would have been months?

18  A.   That would be fair to say.

19  Q.   And of those, they all had fully intact auto key cards,

20  the ones that you recovered?

21  A.   Some had cut them up not following the etched pattern on

22  the cards, but they had cut them up and handed us pieces.

23  Q.   I think Mr. Stennes was one of those?

24  A.   He was.

25  Q.   And some of the other witnesses that we heard from, they,

1   in fact, had -- Dr. Moya, for example, had four auto key cards

2   and he handed you four full, uncut auto key cards?

3   A.   That's correct.

4   Q.   And he's not the only one that had them in that fashion?

5   A.   That's correct.

6   Q.   To your knowledge, during the course of your

7   investigation, other than I believe Mr. Roberts, who had

8   somebody else's cut-up auto key card but didn't cut his, did

9   anybody else -- were you able to recover a cut-up auto key card

10  where it was cut to a lightning link or anything like that?

11  A.   Not to my knowledge.

12        MR. KING:  Ms. Ganoe, could we get Exhibit 32 at page

13  1.

14  BY MR. KING:

15  Q.   Do you remember going over this on your direct testimony

16  with Ms. Taylor?

17  A.   I do.

18  Q.   And I think for all assumptions here, we're assuming that

19  John Doe is not actually that gentleman's name?

20  A.   That's our assumption.

21  Q.   There's a small percent chance, but probably that is a

22  fake name?

23  A.   That would be my assumption.

24        MR. KING:  Could we go to page 4 of this exhibit.

25  BY MR. KING:

1   Q.   And this is Ole Shoota, page 4 of the exhibit?

2   A.   That's correct.

3   Q.   And I don't know if there is an individual named Ole

4   Shoota, but we are all kind of assuming that that's not that

5   individual's real name?

6   A.   That would be my assumption.

7   Q.   And that's probably a pretty fair assumption?

8   A.   I would say so.

9   Q.   This exhibit contains roughly 40 mailings that were

10  recovered by the post office, correct?

11  A.   This exhibit I'm looking at?

12  Q.   Yes, sir.

13  A.   40 mailings, is that what you said?

14  Q.   Yes, sir.

15  A.   I'm looking at one auto key card.

16          MR. KING:  Ms. Ganoe, could we go to 32, page 40.

17  BY MR. KING:

18  Q.   Agent Slosson, do you see the name there?

19  A.   I do.

20  Q.   And do you have any reason to believe that's a fake name?

21  A.   I do not.

22          MR. KING:  Could we get 39.

23  BY MR. KING:

24  Q.   Same questions.

25  A.   I haven't researched that name, but I don't believe it to

1  be fake.

2          MR. KING:  Could we get 38 as well.

3  BY MR. KING:

4  Q.   Mr. Martinez is displayed in number 38?

5  A.   It would be the same answer:  I haven't researched or

6  looked into that name, but I don't believe it to be fake.

7  Q.   You were here when Postal Inspector Hannon said that, "We

8  felt it would be irresponsible to not get the auto key cards

9  off the streets."

10          Do you remember that testimony?

11  A.   I do.

12  Q.   Do you agree with that testimony?

13  A.   I do.

14          MR. KING:  Ms. Ganoe, could we get Government

15  Exhibit 72 and turn to page 3.

16  BY MR. KING:

17  Q.   Do you recognize Government Exhibit 72?  We've discussed

18  it here before.

19  A.   I have seen it.  I can't see what it is right now, but --

20          MR. KING:  Ms. Ganoe, can we just blow up maybe not

21  the first one, but I think the first two or three are

22  Mr. Ervin.  If we could turn to -- let's go to page 38, how

23  about that.  And if we could just do a random highlight here.

24  A.   Okay.

25  Q.   And do you see all of those names?

1  A.   I do.

2  Q.   It looks like there's one "Current Resident," but of that

3  other group, those are all real names?

4  A.   They're all real names, is that what you asked me?

5  Q.   Do they appear to be real names to you?

6  A.   One does not, to me.

7  Q.   Can you give me a number between 1 and 100 -- 100 and 200,

8  how about that?

9  A.   I'm sorry, what's your question?

10  Q.   Can you pick a number for me between 100 and 200, any

11  number, just randomly.  I'm just asking you to pick one of

12  those numbers, so 101 to 200.

13  A.   I'm honestly not following you, what you're trying to --

14  Q.   Sure.  Let me ask you this.  I'm going to ask her to turn

15  to a page that you select for us to review.  I'm sorry, I asked

16  that in a way that was confusing.  That was not my intention.

17          So between 100 and 200, because I know those pages

18  exist, can you pick a number out of a hat for me?

19  A.   100.

20  Q.   100.  All right.

21          MR. KING:  Ms. Ganoe, if we could turn to page 100.

22  BY MR. KING:

23  Q.   And Agent Slosson, I probably won't be surprised, but I

24  did not tell you that I was going to ask you to pick a random

25  number and you did not tell me what number you were going to

1    pick?

2    A.    I was confused.

3    Q.    Fair enough.  So this isn't something we've talked about

4    before?

5    A.    That's correct.

6    Q.    We -- Ms. Ganoe has kind of randomly selected a part of

7    the page, and there's six mailings there.  Do they all appear

8    to be true names and addresses?

9    A.    Minus "Luke M."  I would want to look into that more.

10   Q.    Okay.  And fair enough.  I don't know if any of those are

11   accurate or not.

12         Part of your job with the ATF is to investigate these

13   sorts of things?

14   A.    Investigate the names, yes.

15   Q.    And you have, I think we've seen here at trial,

16   considerable resources to dig into that type of digitally

17   available information?

18   A.    Yes.

19   Q.    Would it be fair of me to say that credit card information

20   has a lot more detail than a name on a postage?

21   A.    Yes.

22   Q.    Would it be fair of me to say that the Stripe data would

23   have a lot more information that you could comb through and get

24   out of than these postal records?

25   A.    I would believe so.

1   Q.   And just to be clear, the Stripe data is the credit card

2   processor where all the online orders were processed; is that

3   your understanding?

4   A.   Yes, it is.

5   Q.   And getting credit cards and credit card information is

6   something that ATF agents regularly do during the course of

7   their job?

8   A.   It can be done.  It's not a regular thing in an

9   investigation I do.

10   Q.   And we had Ms. Butler here testifying about all the

11   records that she had combed through.  Do you remember that?

12   A.   I do.

13   Q.   And I asked her if the bulk of the orders were through

14   credit card numbers, and she answered yes.

15        Based on your personal investigation, do you think

16   that's -- do you agree with that answer?  Let me ask you that.

17   A.   Ms. Butler's testimony?  Yes, I agree with her.

18   Q.   Okay.  And so with the credit card information, if you've

19   got somebody's credit card number, name, account, that's going

20   to have name, address, probably phone number, a lot of

21   biographical information that you can get from the credit card

22   and you can nail down who that person is.  Is that fair?

23   A.   That's fair.

24   Q.   And there -- and I think we talked with Ms. Butler that

25   there was a mailing of an auto key card to -- I think two

1  states only had one, but otherwise, to every state in the
2  United States?
3  A.    Sounds correct.
4  Q.    And I'm not asking to rely on Ms. Butler, but based on
5  your investigation, is that accurate?
6  A.    That sounds accurate to me.
7  Q.    And there are ATF offices in all 50 states?
8  A.    There is.
9  Q.    With ATF agents?
10 A.    Correct.
11 Q.    Do you ever have cause to contact ATF agents in other
12 cities or states and say, "Hey" -- either, "Can you look into
13 this for me," or, "I've got somebody who may have committed a
14 crime in your area for you to take a look at"?
15 A.    Yes.
16 Q.    And that's part of being a big federal law enforcement
17 agency, you have that ability?
18 A.    Correct.
19 Q.    And where it's important, do you do that?
20 A.    Yes.
21 Q.    Of the 50 states, how many did you reach out to to try to
22 recover auto key cards or have agents knock on the doors of any
23 of these people?
24 A.    So what we did in this investigation, we asked our
25 supervisor for a nationwide retrieval.

1    Q.    And what happened?

2    A.    I don't know when it gets to the management level what

3    happens, but they didn't come back and give us the results of

4    that.

5    Q.    Let me ask you, and I don't want to put words in your

6    mouth.  So is it fair to say that that did not happen?

7    A.    I believe that is true.

8    Q.    And do you think that's because your management didn't

9    agree with you and Agent Hannon?

10            MS. TAYLOR:  Objection, calls for speculation.

11            THE COURT:  Sustained.

12   BY MR. KING:

13   Q.    Agent Slosson, I'll ask it like this.  If this was a fully

14   automatic AK-47 that you knew had been mailed to somebody,

15   would you have done everything in your power to make sure that

16   somebody went and knocked on that door and made sure that was

17   recovered?

18   A.    Yes.

19            MR. KING:  Your Honor, I have no further questions.

20            THE COURT:  Ms. Taylor.

21            MS. TAYLOR:  Yes, Your Honor.

22                        REDIRECT EXAMINATION

23   BY MS. TAYLOR:

24   Q.    Agent Slosson, Mr. King asked you some questions about

25   whether Ervin repeatedly described the auto key card as art.

1           Do you recall that?

2    A.   I do.

3    Q.   And he did, right?

4    A.   He did.

5    Q.   Did he also use other terms to describe it?

6    A.   He did.

7    Q.   What kind of term -- what other term did he use to

8    describe it?

9    A.   He stated it was AR related.  And when asked about the

10   card, he gave people, in emails, terms of "lightning link,"

11   "link," things of that nature, how to research for information

12   on the cards.

13   Q.   Do you recall whether at one point Mr. Ervin said that it

14   was "like a solvent trap but not one of those"?

15   A.   Do I recall if Mr. Ervin said that?  That's the question?

16   Q.   Yes.

17   A.   I don't recall that.

18           MS. TAYLOR:  Could we have Exhibit 67E.  And could we

19   zoom in on that middle part.

20   BY MS. TAYLOR:

21   Q.   Do you recall this exhibit?  It's an email sent from

22   customerservice@autokeycard.com on August 24th of 2020.

23   A.   I do.

24   Q.   And was this what you were referring to when you talk

25   about Mr. Ervin providing terms?

1    A.   This is.

2    Q.   And then did Mr. Ervin say that, "As with many legal

3    products, illegal use can occur"?

4    A.   Yes.

5    Q.   And then did he tell the potential customer, "Think of

6    brass knuckles sold as paperweights"?

7    A.   Yes, he did.

8    Q.   Do you have an impression of what Mr. Ervin meant when he

9    said "think of brass knuckles sold as paper weather"?

10            MR. KING:  Objection, calls for speculation.

11            THE COURT:  Sustained.

12   BY MS. TAYLOR:

13   Q.   Did Mr. Ervin also state that the auto key card could be

14   used in a different way under certain dire circumstances in the

15   future?

16   A.   I believe he did.

17   Q.   And if you look in the third paragraph, is that stated in

18   the third paragraph?

19   A.   Yes, it is.

20   Q.   And you've also seen the email blasts that were sent out

21   advertising the new 30 percent thicker auto key cards, correct?

22   A.   That's correct.

23   Q.   And in those, was it advertised as being more durable?

24   A.   That's correct.

25   Q.   Agent Slosson, you were asked to -- whether the emails

1   asking for instructions were under one percent of the emails.

2   Have you personally reviewed every email that was obtained as a

3   result of this investigation?

4   A.    No.

5   Q.    And so you couldn't say for sure what the percentage of

6   those emails are; is that fair?

7   A.    I could not accurately state that.

8   Q.    And you were also asked a question about whether some of

9   the purchasers who you interviewed, whether they were preppers

10  or had stockpiles.

11          Did you enter those people's homes to inspect whether

12  they had stockpiles of food or firearms?

13  A.    I did not.

14  Q.    So your basis of knowledge of whether or not somebody

15  might have been a prepper would just be what they told you?

16  A.    That's correct.

17  Q.    You also were asked how many people still possessed their

18  auto key cards at the time that you went and spoke with them;

19  is that fair?

20  A.    That's true.

21  Q.    Is it fair to say that a significant portion of the

22  individuals who purchased auto key cards were not excited to

23  see you when you came to their door to ask them about the auto

24  key card?

25  A.    That's true.

1   Q.    Do you think it's a majority?

2   A.    Absolutely, yes.

3   Q.    And you heard Mr. Duty -- well, when Mr. Duty was

4   visited -- he was one of the purchaser witnesses who testified,

5   correct?

6   A.    He was.

7   Q.    And his testimony was -- if you recall, was that he

8   destroyed the auto key card the day after ATF agents came to

9   his door.

10              Do you recall that?

11  A.    He attempted to, yes.

12  Q.    And then you also heard testimony from Rick Roberts that

13  he cut up the auto key card and then threw it out the window in

14  little pieces into a ditch?

15  A.    That's correct.

16  Q.    And you didn't seek a search warrant -- for the purchasers

17  whose homes you went to to attempt to recover the auto key

18  card, did you have search warrants to go search their homes for

19  the auto key card?

20  A.    I did not.

21  Q.    Were you relying upon them to be truthful and cooperative

22  with you with regard to whether they still had the auto key

23  card and whether they had ever attempted to cut it?

24  A.    Yes.

25  Q.    With regard to the false names, you've watched

1  Mr. Hoover's videos that have been presented as part of this

2  trial, correct?

3  A.   I have.

4  Q.   And was it something that Mr. Hoover advised to his

5  viewers repeatedly to "send it to your anti-gun relative"?

6  A.   Yes, he did.

7  Q.   So do you have confidence that the people whose

8  information appeared on the mail meter is the actual final

9  recipient of the auto key card?

10  A.   No.

11  Q.   And, in fact, you found one set of purchasers where that

12  method was used, correct?

13  A.   That's correct.

14  Q.   Who was that?

15  A.   Mr. Alderson used Mr. Osso as his person that would have

16  ordered for him.

17  Q.   And then when Mr. King had you look at Exhibit 72 page 38,

18  that was the mail meter, correct?

19  A.   I believe so.

20        MS. TAYLOR:  And if we could pull that back up,

21  Ms. Ganoe.  Page 38.

22  BY MS. TAYLOR:

23  Q.   And he had you highlight the first section, correct?

24        Is this the same section that you looked at just a

25  moment ago with Mr. King?

1   A.   Yes.

2   Q.   And it had two names on it that you thought were possibly

3   fake names, correct?

4   A.   That's correct.

5   Q.   And that's out of one, two, three, four, five?

6   A.   That's correct.

7   Q.   Now, ATF has considerable resources; is that accurate?

8   A.   That is.

9   Q.   Are they all devoted to this one investigation?

10  A.   No.

11  Q.   Does ATF have to prioritize the use of its resources?

12  A.   Yes.

13  Q.   And in this case, were certain types of purchasers

14  prioritized over others with regard to attempting to retrieve

15  the auto key card?

16  A.   That's correct.

17  Q.   And what types of purchasers were those?

18  A.   Generally, our highest priority would have been convicted

19  felons, people with histories of violence, and a descending

20  order of criminal history.

21  Q.   And with regard to Mr. Alderson, you stated that you did

22  refer him for potential prosecution up in Michigan where he

23  lives, correct?

24  A.   That is correct.

25  Q.   And that was for being an unlawful user of marijuana in

1    possession of a firearm?

2    A.   That's correct.

3    Q.   And you were asked a question about whether marijuana use

4    is something that ATF takes seriously, and so I just want to

5    clarify that.  It's not just the marijuana use itself that ATF

6    is particularly concerned with; is that accurate?

7    A.   That is correct.

8    Q.   So it's the marijuana user in possession of a firearm?

9    A.   That's correct.

10            MS. TAYLOR:  I have no further questions.

11            THE COURT:  Mr. Larosiere?

12            MR. LAROSIERE:  Nothing further, Your Honor.

13            THE COURT:  Mr. King?

14            MR. KING:  Thank you, Your Honor.

15                       RECROSS-EXAMINATION

16   BY MR. KING:

17   Q.   Sir, I want to go back to a little bit about what you just

18   talked about with the government.

19            MR. KING:  Ms. Ganoe, could we get Government's

20   Exhibit 67E.

21   BY MR. KING:

22   Q.   Do you remember just going over that?

23   A.   I do.

24            MR. KING:  Could we get the first full sentence there

25   in that email, the middle there.  Yes, ma'am.

1  BY MR. KING:

2  Q.   And Agent Slosson, if you could read this.

3  A.   "Thank you for your purchase and support of liberty for

4  all.  All NFA rules apply.  Unfortunately we cannot provide

5  instructions as per the NFA.  It is a gray" -- "gray market

6  item and that is the line we cannot cross."

7  Q.   And you understand "the NFA" to be the National Firearms

8  Act?

9  A.   I do.

10        MR. KING:  If we could go down to a little bit later.

11  BY MR. KING:

12  Q.   There was a conversation about dire circumstances.  Do you

13  remember that?

14  A.   I do.

15  Q.   Do you remember talking to -- I guess Mr. Duty's

16  testimony -- and please let me know if this is correct based on

17  your investigation -- was that he was afraid of invasion by

18  foreign adversaries?

19  A.   Correct.

20  Q.   And Mr. Moya said it was kind of a back-up in case -- I'm

21  not sure if the exact quote was the fall of Western

22  Civilization, but essentially at a point in time when the laws

23  of the -- the laws of the United States no longer apply because

24  the United States ceases to exist.  Is that how you understood

25  his testimony?

1   A.    I do.

2   Q.    And we talk about "dire circumstances in the future."  Is

3   that a reasonable interpretation of what that means?

4            MS. TAYLOR:  Objection, calls for speculation.

5            THE COURT:  Mr. King, I think that --

6            MR. KING:  I'll rephrase, Your Honor.

7            THE COURT:  Okay.

8   BY MR. KING:

9   Q.    Would you consider the collapse of Western Civilization a

10  dire circumstance?

11  A.    Yes.

12  Q.    We also talked about -- Ms. Taylor went back with you

13  through some of those postal records.  And when you made

14  contact with individual purchasers, you were able to get their

15  names and address?  That's how you found them?

16  A.    That's correct.

17  Q.    And Ms. Taylor said you did not have search warrants when

18  you approached them?

19  A.    That's correct.

20  Q.    Now, in this case you obtained a search warrant for

21  every -- or I believe it was testified that as part of your

22  investigation, you obtained search warrants for every single of

23  the mailings that were recovered by Postal Inspector Hannon?

24  A.    I did not.

25  Q.    But as part of the investigation that did happen?

1    A.    It did happen.

2    Q.    And we're talking dozens of search warrants?

3    A.    Sounds correct.

4    Q.    And you -- was there anything that prevented you from

5    getting a search warrant to search those homes other than the

6    orders of your boss?

7              MS. TAYLOR:  Your Honor, may we have sidebar?

8              THE COURT:  Yes.

9         (Proceedings at sidebar:)

10             THE COURT:  Go ahead.  I know your argument, but go

11   ahead.

12             MS. TAYLOR:  There would obviously be staleness

13   concerns with regard to asking for a search warrant for a

14   product that was shipped to a location months before without

15   any evidence that it currently exists in that location.  It's a

16   completely different type of situation than the mailings.  And

17   I think this is ultimately misleading to the jury.

18             MR. KING:  Your Honor, I'll move on.

19             THE COURT:  Yeah, Mr. King, thank you.

20        (Proceedings in open court:)

21             MR. KING:  May it please the court.

22             THE COURT:  Go ahead, next question.

23   BY MR. KING:

24   Q.    Agent Slosson, the number of agents who actually worked on

25   retrieving the auto key cards, how many in total was that?

1  A.   Actually physically going out and doing retrievals?

2  Q.   Yes, sir.

3  A.   I would say less than a dozen without reviewing the case

4  file to see all the participants of the case.

5  Q.   Would it be accurate to say that there were more agents,

6  between intelligence and postal inspector and everybody else,

7  working on the case of these two individuals than worked on

8  recovering the auto key cards?

9  A.   Your question is how many intelligence --

10  Q.   Between -- I apologize.  Let me make sure that I'm being

11  clear.  And if I'm not, please let me know.

12  A.   Sure.

13  Q.   But between postal inspectors, IRS agents, ATF

14  intelligence agents, ATF expert witnesses, all of those agents,

15  that number is significantly higher than the number that

16  actually worked on retrieving the auto key cards.  Is that a

17  fair statement?

18  A.   I can't answer for postal or IRS.  I can only say that we

19  had one IRS working with us.

20  Q.   And were you --

21       THE COURT:  Sir, could I get you to pull that

22  microphone closer?  We keep losing you.

23  BY MR. KING:

24  Q.   And were you there when the surveillance was done with the

25  postal inspectors?

1    A.    Some of them.

2    Q.    And there were numerous postal inspectors?

3    A.    I would guesstimate, again, half dozen, dozen, at the

4    very, very most.

5    Q.    Okay.  So even the number of postal inspectors were around

6    the number of people who actually worked on recovering the auto

7    key cards in total, or a little bit less?

8    A.    I don't belive they were -- you were talking about the

9    surveillance?

10   Q.    Yes, sir.

11   A.    I believe that's how many agents I believe were assisting

12   with the surveillance --

13   Q.    I also --

14   A.    -- on the day that I was out there.

15   Q.    I apologize, sir.

16         I also want to talk a little bit -- I know we touched

17   again on Mr. Alderson and Mr. Duty, Mr. Roberts.  Those

18   individuals, they all have immunity?

19   A.    Correct.

20   Q.    Many of those individuals lied to you during the course of

21   your investigation; is that fair to say?

22   A.    It is.

23   Q.    And lying to a federal officer during the course of their

24   investigation, if it's a material lie, is a serious felony

25   punishable by prison?

1  A.   Yes.

2  Q.   Did you make referrals to prosecute any of those

3  individuals?

4  A.   Every single person I spoke to, I documented what they

5  told me and their lie and I referred it to the U.S. Attorney,

6  in all the reports.

7  Q.   So that decision is ultimately made by the U.S. Attorney's

8  Office, not you?

9  A.   Yes.

10 Q.   What about the decision to give an individual immunity, is

11 that a decision you make?

12 A.   No.

13 Q.   Who makes that decision?

14 A.   U.S. Attorney's Office.

15 Q.   And --

16         MR. KING:  Your Honor, I have no further questions.

17         THE COURT:  You may step down, sir.

18         Next witness.

19         MS. TAYLOR:  Your Honor, the United States calls

20 Firearms Enforcement Officer Cody Toy.

21     (Witness exits the courtroom.)

22     (Witness enters the courtroom.)

23         THE COURT:  Sir, if you'll come all the way up here.

24         COURTROOM DEPUTY:  If you could please raise your

25 right hand.  Do you solemnly swear that the testimony you're

1    about to give before this Court will be the truth, the whole

2    truth, and nothing but the truth, so help you God?

3              THE WITNESS:  I do.

4              COURTROOM DEPUTY:  You may have a seat.  If you could

5    please state your name for the record and spell your last name.

6              THE WITNESS:  My name is Cody James Toy, T-o-y.

7              THE COURT:  Go ahead, Ms. Taylor.

8              MS. TAYLOR:  Yes, Your Honor.

9        **OFFICER CODY JAMES TOY, GOVERNMENT WITNESS, SWORN,**

10                       DIRECT EXAMINATION

11   BY MS. TAYLOR:

12   Q.   Officer Toy, could you please tell the jurors where you

13   work.

14   A.   I work for the Bureau of Alcohol, Tobacco, Firearms, and

15   Explosives.

16   Q.   And what's your -- in what capacity?

17   A.   I'm a Firearms Enforcement Officer.  I am currently the

18   Branch Chief of the Firearms Technology Criminal Branch.

19   Q.   And what does a Firearms Enforcement Officer do?

20   A.   We do multiple things in our office.  The two main things

21   that we focus on is criminal evidence evaluations and industry

22   evaluations.

23              Criminal evidence, we evaluate and classify evidence

24   that is sent to us by agents all over the country and classify

25   them -- the different items under federal law.

1          On the industry side, members of the industry, the

2    firearms industry, can send us samples of weapons or other

3    items that they intend to market and sell, and we can give them

4    a classification of what those items are.

5    Q.    And in general, as a Firearms Enforcement Officer, do you

6    personally review some of these items and evaluate them?

7    A.    Yes.

8    Q.    And is that for purposes of whether they may or may not be

9    governed by the National Firearms Act?

10   A.    That is correct, as well as the Gun Control Act.

11   Q.    And in particular, do you have responsibility for

12   evaluating items that may be machine guns?

13   A.    Yes, I do.

14   Q.    And what did you do -- how long have you been a Firearms

15   Enforcement Officer?

16   A.    I've been a Firearms Enforcement Officer for about seven

17   years now.

18   Q.    And what did you do prior to becoming a Firearms

19   Enforcement Officer?

20   A.    Before I worked for the ATF I worked as a contractor for

21   the FBI on the National Name Check Program, running backgrounds

22   on individuals trying to get status for either jobs with the

23   government or immigration status.  Before that I worked

24   security at that location, armed physical security, where I had

25   to maintain proficiency with a side arm on an annual basis.

1    And before that I was in the United States Marine Corps for

2    four years, in the infantry, where I was trained on anything

3    from a 9 millimeter pistol all the way up to heavy machine guns

4    and certain explosives.

5    Q.    And what kind of educational background do you have?

6    A.    I joined the Marine Corps straight out of high school.

7    And I've taken some classes in college.  But outside of that, I

8    have a lot of training in the firearms field; multiple classes

9    with different armorer groups, directly worked with

10   manufacturers, as well as outside individuals that provide

11   classes for certain types of weapons.  I have over ten

12   different certifications on particular firearm groups.  I also

13   have been to courses on silencer manufacturing, silencer design

14   principles.

15          Within the ATF, for our training to become a Firearms

16   Enforcement Officer we have over 800 hours of in-house

17   training.  That's an OJT-style of training.  We have the

18   National Reference Collection at our location, which houses

19   roughly 15,000 different firearms, from pistols and rifles to

20   machine guns, rocket-propelled grenades and things like that,

21   as well as an expansive library that has periodicals as well as

22   books that are written on firearms that we can go back to and

23   see design history and how things function.

24   Q.    And you mentioned armorers.  What is an armorer?

25   A.    So an armorer is basically somebody who is trained on a

1    particular platform of weapon to be able to diagnose issues

2    that that weapon is having as well as make repairs and change

3    parts and things like that.

4    Q.   Are you an armorer?

5    A.   As a profession, no.  I am a certified armorer in multiple

6    different weapons systems, but I am not an armorer.

7    Q.   Now, Officer Toy, at some point did Special Agent Hooker

8    contact you regarding an investigation of suspected lightning

9    links?

10   A.   Yes.

11   Q.   And around when was that?

12   A.   I believe that was January of 2021.

13   Q.   And did you have a conversation with Special Agent Hooker

14   with regard to obtaining a sample for testing?

15   A.   Yes.  The way our process works is the agents will send it

16   in to our office, we will get a workflow through the computer.

17   Once we get that workflow, we then go pick up that piece of

18   evidence from our evidence technician, make sure that the

19   workflow has the correct information on it that is actually

20   received with the package, and then we'll sign the evidence

21   tags to make sure that we have chain of custody.

22        MS. TAYLOR:  Your Honor, may I approach with

23   Government's -- already in evidence is Exhibit 20A, 25A, and

24   25B?

25        THE COURT:  Go ahead.

1             MS. TAYLOR:  And then I would also like to approach

2     with some exhibits that have not been admitted, which are

3     Number 63, 64, 65, and 66.

4             THE COURT:  Okay.

5     BY MS. TAYLOR:

6     Q.    First, Officer Toy, if you could look at Exhibit 20A

7     that's already in evidence.  Is that one of -- is that an item

8     that you received for examination?

9     A.    Yes, it is.

10    Q.    And is this an item that you received from Special Agent

11    Hooker?

12    A.    Yes, it is.

13    Q.    And did you take photos of it as it came into your

14    possession and as you tested it?

15    A.    Yes, I did.

16    Q.    Could you please look at Exhibit 64 and describe what is

17    in Exhibit 64.

18    A.    Exhibit 64 is a series of photographs that I took

19    throughout the process of examining the evidence and cutting it

20    and completing the device.

21    Q.    So the item that's in the photos in Exhibit 64, is that

22    item 20A -- Exhibit 20A?

23    A.    Yes, it is.

24            MS. TAYLOR:  I would move for admission of

25    Exhibit 64, Your Honor.

1          MR. KING:  Without objection.

2          MR. ZERMAY:  Without objection.

3          THE COURT:  54 is admitted.

4          MS. TAYLOR:  Sorry, it's 64, Your Honor.  May we

5    publish Exhibit 64?

6          THE COURT:  You may.

7       (Government's Exhibit 64 admitted in evidence.)

8          MS. TAYLOR:  If we could please have page 1.

9    BY MS. TAYLOR:

10   Q.   So this is a photo that you took?

11   A.   Yes, it is.

12   Q.   And what's depicted in this photo?

13   A.   What's in this photo is the image of the evidence as I

14   received it in my office next to a ruler just to give it some

15   size comparison.

16         MS. TAYLOR:  Could we have page 2, please.

17   BY MS. TAYLOR:

18   Q.   What's shown here?

19   A.   So this is a close-up view of what the actual device is:

20   The picture -- the image on the piece of metal, the two parts

21   that would be needed to make a lightning link.

22   Q.   So you said it's an image on the piece of metal.  Can you

23   describe what the image appeared to be to you when you received

24   this item.

25   A.   It appeared to me that this was a laser etching of a

1   lightning link, which is a machine gun conversion device.

2   Q.    And is the -- and so in this particular picture there's

3   two outlines visible, correct?

4   A.    That is correct.

5   Q.    And are those the two pieces that are required to make a

6   complete lightning link?

7   A.    That is correct.

8   Q.    And were you able to recognize the outlines as being

9   outlines for a lightning link when you received this item?

10  A.    Yes, I did.  We have multiple items like this in the

11  reference collection that I have seen and evaluated.

12  Q.    And you stated that it appeared that the outlines were

13  made using a laser?

14  A.    It appears that they might have been manufactured using a

15  laser etcher that would remove a small amount of material from

16  the surface of the device to show the outline of the device.

17  Q.    So the outline is actually at some depth into the material

18  as opposed to being on the surface of the material?

19  A.    That is correct.  The material has been removed or

20  displaced to create this image.

21  Q.    Now, how are you -- how are you able to recognize this as

22  being a potential lightning link?  Is that a new design or

23  something you had seen before?

24  A.    No.  This is definitely something that's been around

25  since, I believe, the early 1980s.  We have -- like I said, we

1  have some of these devices in our collection.  As well as part

2  of our training to become an FEO, we go through multiple

3  different machine gun conversion devices so that we can

4  identify them when we go on field assists and when we get them

5  into our office.

6  Q.   And I want to talk to you a little bit about how a

7  lightning link works.

8          MS. TAYLOR:  If we could please, Ms. Ganoe, have

9  Exhibit 2 at 4 minutes and 10 seconds.

10          We're good right here.  We're at 4 minutes and I

11  think that said 17 seconds.

12  BY MS. TAYLOR:

13  Q.   This is a still shot from a video, correct?

14  A.   Correct.

15  Q.   And there's a diagram in the corner of that still shot?

16  A.   That is correct.

17  Q.   And in this still shot, what is the -- what's visible in

18  the diagram?

19  A.   What you're looking at is the internal components of an

20  AR-15-type firearm.  With those components, there's also a

21  lightning link that is depicted in there.

22  Q.   I'm going to try to draw on this screen.

23          There's a flat line where I've indicated with a few

24  dots; is that correct?

25  A.   That is correct.

1   Q.    And what is that flat line?

2   A.    That is the larger portion in that -- the close-up picture

3   that I -- that you had up earlier of a lightning link.  We can

4   refer to it sometimes as the body, the main body of the device.

5   Q.    And is that the part that has the two cutouts?

6   A.    That is correct.

7   Q.    And then -- this is not cooperating with me, but towards

8   the right side of where the body is, is there another piece

9   that's sticking up?

10  A.    That is correct.  Right there, where you just were able to

11  get the line on there, that is the other device.  We sometimes

12  refer to it as the paddle or the connector.

13  Q.    And that's the small, kind of rectangular piece?

14  A.    That is correct.

15  Q.    And so is this image -- is this image accurately depicting

16  how a lightning link would fit into an AR-15?

17  A.    Yes, it is.

18  Q.    And can you tell the jurors a little bit about what the

19  other parts are that interact with a lightning link when it's

20  installed?

21  A.    So the big hook piece that you see on the image is the

22  hammer of the firearm.  The hammer is held in place by what is

23  referred to as the disconnector.  The disconnector is at the

24  very front of that main body, and it's also a little hook

25  shape.  The two hooks connect to each other.

1  Q.    This thing that I'm coloring on right now, which one is
2  that?
3  A.    That's the hammer.
4  Q.    All right.  And where is the disconnector?
5  A.    The disconnector is underneath of the hammer at the front
6  of the main body of the device.
7  Q.    Is it kind of shaped like a little wave?
8  A.    Yes.
9  Q.    And then what are the other key parts?
10 A.    So you also see the trigger, which is underneath the
11 disconnector.  And those are your main fire control components
12 of an AR.
13 Q.    So how does the lightning link work to cause automatic
14 firing?
15 A.    The lightning link basically is -- what it does is when
16 the bolt moves across the top of the paddle, it pushes the top
17 of it forward, which pulls the bottom of it backwards using the
18 lug, which is that little hole in front of the paddle that you
19 can see up there.  There will be a pin that goes across there,
20 and it uses that as a fulcrum to pull the bottom of that device
21 backwards, which in turns pulls the disconnector back and
22 releases the hammer to allow it to continue to strike the
23 firing pin.
24 Q.    All right.  And Ms. Ganoe is attempting to help me with a
25 laser pointer because my efforts at using the little drawing

1    tool are not working out very well.

2           But this area kind of along the top, is that where

3    the bolt would be?

4    A.   That is correct.

5    Q.   And then this piece is what?

6    A.   That would be the hammer.

7    Q.   And this piece here, the little wavy shaped piece?

8    A.   That's the disconnector.

9    Q.   And then this piece down here?

10   A.   Would be your trigger.

11   Q.   And so the paddle is the part sticking straight up back

12   here?

13   A.   That is correct.

14   Q.   That's the part of the lightning link?

15   A.   Yes.

16   Q.   Okay.  And you said that part does what?

17   A.   So the hole that's right in front of that paddle is the

18   takedown pin for the device to -- or for the weapon to remove

19   the upper portion and the lower portion from each other.

20   Q.   Am I generally indicating the hole that you're talking

21   about?

22   A.   Yes, you are.

23   Q.   Okay.

24   A.   So the paddle then uses that as a fulcrum to press

25   against.  So when the bolt hits the top of the paddle, it

1  pushes it forward, pulling the bottom of the device backward,

2  or the body backwards, which pulls that hook, the disconnector,

3  off of the hammer, which allows the hammer to then hit the

4  firing pin.

5  Q.   And so when you pull -- if you pull the trigger with the

6  lightning link installed in a properly configured AR-15, what's

7  the result?

8  A.   If it's designed properly and everything works the way

9  it's supposed to, the weapon will fire automatically.

10  Q.   And what would cause that weapon to stop firing

11  automatically if it's working correctly?

12  A.   Run out of ammunition or a malfunction.

13  Q.   Or if you released the trigger, would it stop firing?

14  A.   Yes, and if you release the trigger, yes.

15  Q.   Could we go back to -- well, actually, first, let's talk

16  about what you did with Exhibit -- Exhibit 20A is the auto key

17  card that you received from Special Agent Hooker, correct?

18  A.   That is correct.

19  Q.   How did you proceed to test it?

20  A.   So I took it back to my work station.  And the first thing

21  that I do is take pictures of the device to make sure that we

22  accurately depict what it looks like when it comes to our

23  office.

24          Occasionally we get items in that are unsafe to fire

25  or that during the process of firing they become damaged, so we

1   want to make sure that we take our pictures first so that we

2   can see what they were.

3          With this particular device, we were requested to

4   remove one of the items from it to see if we could get it to

5   actually function in a weapon.

6          So we used -- or I used the most commonly available

7   tool that I had that would do the job, which was a Dremel tool,

8   and a rotary bit on there that is a cutoff wheel.  And then I

9   traced the lines on the device and removed it from the card.

10  Q.   And could you please look at Exhibit 65 and tell us what

11  that is.

12  A.   That is an image of my Dremel with the cutoff wheel and

13  the Exhibit 20A on my work bench.

14  Q.   And is that Dremel the exact tool that you used to cut

15  this lightning link out?

16  A.   Yes, it.

17          MS. TAYLOR:  I move for admission of Exhibit 65.

18          MR. KING:  Without objection.

19          MR. LAROSIERE:  Without objection.

20          THE COURT:  65 is admitted.

21       (Government's Exhibit 65 admitted in evidence.)

22  BY MS. TAYLOR:

23  Q.   And we're pulling up 65 on the screen.

24          MS. TAYLOR:  Ms. Ganoe, could you zoom in on the

25  picture.

1    BY MS. TAYLOR:

2    Q.   So tell me which part -- okay.  You -- was this a

3    standard, off-the-shelf Dremel tool?

4    A.   Yes, it is.

5    Q.   Did it have one accessory added to it?

6    A.   Yes.  I used an extension, which is the long cord off to

7    the left there.

8    Q.   Am I indicating that with a laser pointer?

9    A.   That is correct.

10   Q.   And so where is the cutoff wheel?

11   A.   The cutoff wheel is toward the center of the picture,

12   right there.

13   Q.   So it's sort of at the end of the smaller wand?

14   A.   That is correct.

15   Q.   And then -- and this Dremel, it's something that you could

16   buy at -- where?

17   A.   You could buy it at a hardware store, Walmart, anywhere

18   that sells tools such as this.  And they sell other ones, this

19   is just the brand name, is Dremel.

20   Q.   And Officer Toy, are you a machinist?

21   A.   I am not.

22   Q.   Had you ever cut out a lightning link from a metal card

23   like this before?

24   A.   I had never done that before.

25   Q.   This was the very first time?

1    A.   That is correct.

2    Q.   Do you have experience with metal working?

3    A.   The only experience I have in metal works was high school,

4    in a shop class, about a year of welding, and that was it.

5    Q.   You're not a Dremeling expert?

6    A.   I am not.

7    Q.   Now, were you able to cut one of the lightning links out

8    of Exhibit 20A?

9    A.   I was.

10   Q.   And how did you -- did you do that using the Dremel?

11   A.   I did.

12   Q.   Did you use any other tools?

13   A.   I used a hand file to clean up some of the burrs or little

14   pieces of sharp metal that were left to make sure that it fit

15   together properly.

16   Q.   And how long did it take you to cut that -- both pieces of

17   that first lightning link out of that card?

18   A.   I believe that took approximately 37 minutes.

19   Q.   And this first card, the first lightning link that you cut

20   out, did it have the internal cutouts already completed?

21   A.   The cutouts were already done, yes.

22   Q.   So you didn't -- did you do anything to modify those

23   internal cutouts?

24   A.   I did not.

25   Q.   And you stated you just -- you cut along the line of the

1   outline?

2   A.   That is correct.

3          MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 64,

4   page 3.

5   BY MS. TAYLOR:

6   Q.   And this is another photo that you took?

7   A.   Yes.  That is a photo of the device after I had removed it

8   from the card.

9          MS. TAYLOR:  And could we have page 4, please.

10  BY MS. TAYLOR:

11  Q.   And what are we looking at here?

12  A.   That same device that I had removed from the card.

13  Q.   And the top part being the body and the bottom part being

14  what you're calling the paddle?

15  A.   That is correct.

16  Q.   Did the -- did you have to bend it?

17  A.   No.

18  Q.   Did you do any thinning of it, sanding it to make it

19  thinner?

20  A.   I do believe that I had to remove some of the material off

21  of the paddle.  And I think I used a belt sander or a grinding

22  wheel to remove some of the material because it was just a

23  little bit too tall.

24          Different AR-type firearms from different

25  manufacturers have different tolerances, and so they're not all

1    the same.  So what would work in one firearm might not work in

2    another one.  It would have to be what we refer to as hand

3    fitting to make sure that it works.

4              MS. TAYLOR:  Your Honor, may I --

5    BY MS. TAYLOR:

6    Q.   And did you have to bend it or anything like that?

7    A.   No, I did not bend it.

8              MS. TAYLOR:  Your Honor, may I approach and obtain

9    back from Officer Toy Exhibit 20A?

10             THE COURT:  20A?

11             MS. TAYLOR:  Yes.

12             THE COURT:  Go ahead.

13   BY MS. TAYLOR:

14   Q.   Officer Toy, I was asking you questions about whether the

15   paddle piece fit through the precut hole.

16             MS. TAYLOR:  Could we have Exhibit 64, page 5,

17   please.

18   BY MS. TAYLOR:

19   Q.   What is shown here?

20   A.   That is the device assembled with the paddle through the

21   hole.

22             MS. TAYLOR:  And could we have page 6, please.

23   A.   That is it, just turned upside down to show that it did

24   fit through the hole.

25             MS. TAYLOR:  And if we could have the ELMO, please.

1    BY MS. TAYLOR:

2    Q.   I'm just going to line up the cutout pieces with one of --

3    so there's still two lightning links that you did not cut out

4    on this card, correct?

5    A.   That is correct.

6    Q.   So I'm just going to place the cutout pieces over the --

7    one of the not-cut-out lightning links.

8              And as you said, you cut to the line?

9    A.   That is correct.

10   Q.   I'm zooming in on the end of the paddle area.  Is there

11   a -- you mentioned that there was a small amount of material

12   that you removed from the end of the paddle?

13   A.   That is correct.

14   Q.   Does it appear to be about a millimeter or less?

15   A.   Yes, ma'am.

16   Q.   Otherwise, this cutout lightning link is to the line that

17   was engraved on the auto key card?

18   A.   That is correct.

19   Q.   After you cut out this lightning link, did you do any

20   testing of it to see whether it would function in a rifle?

21   A.   Yes.  I went to the National Reference Collection and I

22   pulled out an AR-type rifle, and I took it back to my work

23   station and installed the device and performed a function test.

24   Q.   What is a function test?

25   A.   A function test tells you how a firearm is functioning,

1  whether it's semiautomatic or fully automatic or if there is a
2  potential malfunction happening with the weapon.
3  Q.   Is that something you do with ammunition in the firearm?
4  A.   No, this would be without ammunition.
5  Q.   And so -- but can you -- do you pull the trigger during
6  the function test?
7  A.   Yes, you do, which is why we don't have ammunition in it.
8  Q.   Okay.  So did you learn anything from the function test
9  that you did?
10  A.   Yes.  This device is typically used with a semiautomatic
11  bolt carrier.  But whenever I used a semiautomatic bolt
12  carrier, it wasn't reliably functioning the way it was supposed
13  to, so I attempted to use a machine gun -- an M16 -- bolt
14  carrier.  And the machine gun bolt carrier actually worked
15  better than the semiautomatic one did.
16  Q.   And when you say "a semiautomatic bolt carrier," was it an
17  SP1 bolt carrier that you --
18  A.   Yes, it was.
19  Q.   And when you said it didn't work how it was supposed to,
20  what do you mean exactly?
21  A.   It wasn't causing the weapon to fire automatically
22  reliably.  Once or twice it would function test as a machine
23  gun, but I couldn't get it to do it consistently.  So at that
24  point I just attempted another bolt.  And that machine gun --
25  the M16 -- bolt carrier actually worked better and it was more

1  consistent, allowing the weapon to appear to be firing

2  automatically.

3  Q.   According to the function test?

4  A.   Correct.

5  Q.   And then did you also test fire the weapon -- and let's

6  talk a little bit about the rifle that you got.  Who owned that

7  rifle?

8  A.   That particular rifle was part of our collection at -- in

9  Martinsburg at the reference collection.

10 Q.   And is it an AR-15 rifle?

11 A.   It is an AR-15 variant, yes.

12 Q.   Is it semiautomatic?

13 A.   Yes, it is.

14 Q.   Without having the auto key card installed, would that

15 rifle fire automatically as a machine gun?

16 A.   No, it would not.

17 Q.   Did it have all off-the-shelf parts in it?

18 A.   Yes, it did.

19 Q.   And when you -- so you did test fire -- test fire the

20 rifle with the auto key card?

21 A.   I did.

22 Q.   And what was the result?

23 A.   I was able to get the rifle to fire automatically more

24 than once.  It wasn't perfect.  There was occasional times

25 where it wouldn't fire automatically, but it was consistently

1    firing at least two to three rounds during the live fire.

2    Q.    And I want to ask you about the M16 bolt carrier.  Is that

3    something that's commonly available?

4    A.    Yes, it is.

5    Q.    Is that a part that is illegal to possess without

6    registering it?

7    A.    No, it is not.

8    Q.    Can anyone possess an M16 bolt carrier?

9    A.    Yes, they can.

10   Q.    Even a prohibited person?

11   A.    Yes.

12   Q.    And so just the design of the M16 bolt carrier for some

13   reason just worked better?

14   A.    Yes.

15   Q.    Now, do you know whether the trigger assembly in that --

16   in the rifle that you tested the auto key card with, was it

17   also a standard trigger assembly?

18   A.    Yes, it was a semiautomatic trigger assembly.

19   Q.    Semiautomatic?

20   A.    Uh-hmm.

21   Q.    Yes?

22   A.    Yes.

23   Q.    And do you know whether it had a high or low shelf?

24   A.    I believe it had a high shelf in it.

25   Q.    And what's the difference between a high shelf and a low

1   shelf?  What does that mean?

2   A.   In the rear of the receiver of AR-type firearms there's an

3   area that is either higher or lower that was used to prevent

4   certain conversion devices from being installed in that

5   firearm.  But there's no requirement for that.  And again, it's

6   all just dependent upon individual manufacturers, what the

7   depth is at that rear area.

8   Q.   Are there different kinds of conversion devices that work

9   better with a high shelf versus a low shelf?

10  A.   Yes.  So a lower shelf you could use something like a

11  drop-in auto sear, which is another machine gun conversion

12  device.  That particular type of conversion device requires

13  more parts to be changed out.  You'd have to use M16 fire

14  control components in that one.  So the hammer, trigger,

15  selector, and disconnector need to be machine gun parts.

16         Where something like the lightning link, the only

17  thing that you have to do is install it.  And typically a

18  semiautomatic bolt carrier will work, and sometimes a machine

19  gun bolt carrier will.

20  Q.   But to be clear, even with the drop-in auto sear, you said

21  that it requires more machine gun parts:  trigger assembly,

22  bolt carrier, et cetera?

23  A.   That is correct.

24  Q.   But the only thing that's the machine gun is the actual

25  drop-in auto sear?

1   A.   That is correct.

2   Q.   And all of those machine gun parts, the trigger assembly,

3   the bolt carrier, those are just available to anyone who wants

4   them?

5   A.   Yes, they are.

6   Q.   In general, not capable of causing automatic fire on their

7   own?

8   A.   If they're all installed on an AR firearm, there's a good

9   likelihood that it will cause it to fire automatically, which

10  is why the ATF doesn't suggest putting the machine gun

11  components in a semiautomatic.  But there's nothing to say that

12  somebody can't.  But once it does fire automatically, that

13  constitutes a machine gun at that point.

14  Q.   Which would need to be registered?

15  A.   That is correct.

16  Q.   Did Special Agent Hooker send you any additional exhibits

17  for examination?

18  A.   Yes.

19  Q.   Did he ask you to cut out one of the types of auto key

20  cards that did not have the internal cutouts already made?

21  A.   Yes, he did.

22  Q.   Could you please -- you have Exhibit 25A in front of you,

23  correct?

24  A.   Yes.

25  Q.   And do you recognize that as being another auto key card

1  that you tested?

2  A.   Yes, I do.

3  Q.   And could you please look at Exhibit 66 and describe

4  what's in Exhibit 66.

5  A.   Exhibit 66 is more photographs that I took of Exhibit 25A.

6          MS. TAYLOR:  I would move --

7  BY MS. TAYLOR:

8  Q.   And those were taken while you were conducting your

9  examination?

10  A.   That is correct.

11          MS. TAYLOR:  I would move for admittance of

12  Exhibit 66.

13          MR. KING:  Without objection, Your Honor.

14          MR. LAROSIERE:  Without objection.

15          THE COURT:  66 is admitted.

16      (Government's Exhibit 66 admitted in evidence.)

17          MS. TAYLOR:  Could we please have the first page?

18          I think we need to switch over to the . . .

19  BY MS. TAYLOR:

20  Q.   So we're looking at the first page of Exhibit 66.  Is this

21  a photo that you took of the next item that you tested for

22  Special Agent Hooker?

23  A.   Yes, it is.

24  Q.   And this was -- no cutouts had been completed on this

25  particular card, correct?

1  A.   That is correct.

2  Q.   And did you -- did you attempt to cut out the lightning

3  links from this card?

4  A.   Yes, I did.

5  Q.   How did you go about doing that?

6  A.   I did it in the same manner as I did with the previous

7  card, by using a Dremel tool.

8  Q.   Did you -- how did you try to cut out the internal

9  cutouts?

10  A.   The internal cutouts I used a drill press to put roughly

11  four holes into the cutout areas, and then I connected the

12  holes by using the cutoff wheel.

13  Q.   Were you successful the first time you tried to cut out

14  one of these?

15  A.   No, I was not.

16  Q.   What happened?

17  A.   I ended up accidentally cutting the side of the main body,

18  putting a gap between the front of it.

19         MS. TAYLOR:  Could we have the next page.

20  BY MS. TAYLOR:

21  Q.   Is that what's shown in this second page of Exhibit 66?

22  A.   Yes, it is.

23         MS. TAYLOR:  And could we zoom in on that picture.

24  BY MS. TAYLOR:

25  Q.   So there's a little arrow pointing to the main body of the

1    lightning link, correct?

2    A.    Yes.

3    Q.    And so you accidentally nicked it there; is that what

4    happened?

5    A.    Yes, I did.

6    Q.    And did you test this particular device to see whether it

7    function tested as a fully automatic machine gun?

8    A.    I did attempt to, yes.

9    Q.    What happened when you function tested it?

10   A.    It function tested as if it was going to allow it to fire

11   automatically, so at that point I took it to the range and

12   attempted to actually live fire it.

13         But when I got to the range and put live ammo in, it

14   wouldn't function.  And I attributed that to that cut being

15   there and allowing it to flex.  So whenever the main body were

16   to pull back because of that cut, it allowed it to flex and

17   wouldn't pull the disconnector off the hammer.

18   Q.    And did you then attempt to cut out the second lightning

19   link from that card, Exhibit 25A?

20   A.    Yes, I did.

21   Q.    And were you successful that time?

22   A.    Yes, I was.

23   Q.    Did you go about that any differently?

24   A.    No.  I attempted to cut it out the exact same way as the

25   previous one.

1    Q.    How long did it take you to cut out this second one?

2    A.    The second one I believe took 53 minutes, I believe.

3    Q.    And including cutting out the interior cutouts?

4    A.    Correct.  I took a little more time on this one so I

5    didn't cut the side of it out, which is why it took longer.

6    Q.    And we're looking now at page 3 of Exhibit 66.  This is

7    a -- is this showing -- I guess you had partially cut it out at

8    that point?

9    A.    That is correct.

10         MS. TAYLOR:  And could we have the next page.

11   BY MS. TAYLOR:

12   Q.    This is page 4.  It's still only partially -- the main

13   body piece on the left is still only partially cut out,

14   correct?

15   A.    That is correct.

16   Q.    How did you -- did you cut out that -- along the entire --

17   I guess the entire material that was etched on this one?

18   A.    Yes, I did.

19   Q.    Initially did you cut the entire material?

20   A.    On this one I cut just a portion of it out on the --

21   actually, on the other one I cut a portion of it out that

22   didn't end up working out because it didn't allow the hammer to

23   go down far enough, and so I ended up having to cut the whole

24   area out.

25         But on this one, I believe I cut everything out on

1   this particular one.

2   Q.   And did you -- once you finished cutting out the second

3   lightning link from this particular auto key card, did you --

4   did you function test with it?

5   A.   I did.

6   Q.   And did it -- what was the result of the function test?

7   A.   The weapon fired automatically.

8   Q.   Sorry, it would or would not?

9   A.   It would, yes.

10  Q.   And then did you test fire it as well with ammunition?

11  A.   Yes.

12  Q.   And what was the result?

13  A.   It fired automatically.

14  Q.   And did it work perfectly or somewhat less than perfectly?

15  A.   It was occasional.  Just, again, because of tolerances and

16  hand fitting, sometimes they don't always work reliably.  And

17  because of using the machine gun bolt carrier, I was getting

18  some hammer follow, which is where the hammer is not retained

19  and it just follows the bolt back into the battery, which

20  caused some of the test fire not to work.

21  Q.   Did you later conduct an additional test fire of the

22  lightning link that you cut from Exhibit 20A?  That was the

23  first one.

24  A.   I'm sorry, what was that?

25  Q.   Did you later conduct an additional test fire of the first

1  lightning link that you cut out?

2  A.   Yes, I did.

3  Q.   And did you use multiple different firearms to test fire

4  it?

5  A.   I did.

6  Q.   The first firearm that you -- that you chose, was it an

7  AR-15?

8  A.   Yes.  They were all AR-15s.

9  Q.   That first firearm that you tested it with, did it work

10 with that firearm?

11 A.   It would not work with that particular firearm.

12 Q.   Did it at least occasionally shoot more than one shot?

13 A.   The first time that I shot it, I believe it fired two

14 rounds automatically with a single function of the trigger, but

15 from that point on I couldn't get it to function as a machine

16 gun.

17 Q.   Did you test fire it again using the original AR-15 that

18 you had tested it with?

19 A.   Yes, I did.

20 Q.   And did you -- did that work better than --

21 A.   Yes, it definitely worked better.

22 Q.   Okay.  Did you create a video demonstrating this

23 particular test fire?

24 A.   Yes, I did.

25 Q.   I would like for you to look at Exhibit 63, please.  And

1    tell us whether you recognize what's in that exhibit.

2    A.    This is a DVD of the recorded test fire.

3    Q.    How do you recognize that that's what's on the DVD?

4    A.    Because I watched the video and my initials are on the

5    DVD.

6    Q.    And you see your initials on it here today?

7    A.    Yes, I do.

8              MS. TAYLOR:  I'd move for admission of Exhibit 63.

9              MR. KING:  Without objection, Your Honor.

10             MR. LAROSIERE:  Without objection.

11             THE COURT:  63 is admitted.  You may publish.

12       (Government's Exhibit 63 admitted in evidence.)

13       (Video played.)

14       (Video stopped.)

15   BY MS. TAYLOR:

16   Q.    We just watched Exhibit 63 in its entirety, Officer Toy.

17             Who is that man in Exhibit 63?

18   A.    That was me.

19   Q.    You had more hair then?

20   A.    I had a bit more hair, yes.

21             MS. TAYLOR:  And if we could go back, Ms. Ganoe, to

22   the first couple seconds of the video.

23   BY MS. TAYLOR:

24   Q.    So we're at the very beginning of the video.  And it's a

25   little blurry, to be fair, correct?

1    A.    Yes.

2    Q.    But you're -- you've got the AR-15 kind of opened up at

3    this point, correct?

4    A.    That is correct.

5    Q.    And you have something in your right hand.  What is that?

6    A.    That is Exhibit 25A.

7    Q.    That's the two pieces of the lightning link?

8    A.    Yes.

9    Q.    And are you holding it -- it looks like maybe you're

10   holding it by that paddle piece?

11   A.    That is correct.

12   Q.    And how long did it take you to install that lightning

13   link into the AR-15?

14   A.    Just a matter of seconds.

15   Q.    Had you done anything to the AR-15 prior to the taking of

16   this video to speed up how long it took you to install this

17   lightning link?

18   A.    No.  These devices installed that easily anytime -- all

19   the ones I have seen, that is all that it takes, is just to

20   drop it in over the hook of the disconnector and place it in

21   and then close it down.

22         Sometimes they can be difficult to close the upper

23   portion and the lower portion together just because of

24   tolerances, but typically that's all it takes.

25   Q.    And talking about the difficulty closing it, was that why

1  you had to take off that little millimeter-ish amount off the
2  paddle?

3  A.    That is correct.

4  Q.    And otherwise, that was the only alteration you made to
5  the lightning link?

6  A.    Correct.

7         MS. TAYLOR:  Ms. Ganoe, let's play the video through
8  one more time.

9      (Video played.)

10     (Video stopped.)

11  BY MS. TAYLOR:

12  Q.    Officer Toy, when you conducted this test fire, what was
13  it that caused the rifle to stop shooting?

14  A.    It ran out of ammunition.

15  Q.    And on this occasion you were still using it with the M16
16  bolt carrier?

17  A.    That is correct.

18  Q.    Now, around the end of 2022, did you conduct an additional
19  demonstration test fire of that same lightning link that you
20  had cut out from the auto key card?

21  A.    Yes, I did.

22  Q.    Was that down here in Jacksonville?

23  A.    Yes, it was.

24  Q.    Were you using the same rifle that you used in the video?

25  A.    Yes.

1   Q.    What happened when you test fired -- did the test fire

2   here in Jacksonville?

3   A.    When we did the test fire here in Jacksonville, I inserted

4   a single round of ammunition, fired it just to make sure that

5   the weapon was safe.  Then I fired two rounds of ammo.  I fired

6   both of them automatically with a single function of the

7   trigger.  And then I inserted five rounds and then fired off

8   all five rounds automatically with one single pull of the

9   trigger.  That was with the machine gun bolt carrier in it.

10          And then I was asked to put an SP1 bolt carrier in

11   it, which is the semiautomatic version -- or a semiautomatic

12   version, and put another five rounds of ammunition in, pulled

13   the trigger one time, and it fired all five rounds

14   automatically.

15   Q.    And that SP1 bolt carrier, was that your bolt carrier?

16   A.    No, it was not.

17   Q.    Did somebody provide it to you and ask you to try it?

18   A.    Yes, they did.

19   Q.    And on that date, this weapon fired both with the M16 bolt

20   carrier that ATF owns and with the SP1 bolt carrier that you

21   were provided with?

22   A.    Correct, without a problem.

23   Q.    Are you familiar with markings that are required to be

24   placed on firearms?

25   A.    Yes, I am.

1   Q.    And what are they?

2   A.    Firearms are required to have -- that are made by a

3   firearms manufacturer are required to have the manufacturer's

4   name, the city and state of manufacture, a serial number,

5   caliber, and model name, normally.

6   Q.    And is that -- does that apply to machine gun conversion

7   devices as well?

8   A.    Machine gun conversion devices would have to be marked so

9   that they could be registered in the National Firearms Transfer

10  Record.

11  Q.    And for example, if an SOT has manufactured a new machine

12  gun, they have to let ATF know about that, right?

13  A.    That's correct.

14  Q.    What's the process for that?

15  A.    They have to submit their forms, a notification letting

16  the NFA know that they have manufactured one, and at that point

17  they'll get it put in the registry.

18  Q.    Is it a short period of time that the SOT has to notify?

19  A.    Yes, it is.

20  Q.    What is it?

21  A.    I believe it's close of business the following day, but

22  I'm not a hundred percent sure on that.

23  Q.    And is an SOT permitted to outsource manufacturing of

24  machine guns?

25  A.    Only if they're outsourcing to another SOT.

1  Q.   And if they are doing that, do they have to let ATF know

2  about that as well?

3  A.   Yes.  So we have what we call the -- a marking variance.

4  And a marking variance allows one manufacturer to use another

5  manufacturer to manufacture their items.

6            So if Company A doesn't have the machinery to

7  manufacture a certain piece, they would go to this other

8  vendor, this other company, and ask them to manufacture it for

9  them.  But in order to do that, they have to have the marking

10  variance approved through our office.  And we keep a -- the

11  information in our records about the different marking

12  variances.

13            MS. TAYLOR:  I have no further questions, Your Honor.

14            THE COURT:  Who's first?  Mr. Larosiere?

15            MR. LAROSIERE:  Yes, Your Honor.

16                        CROSS-EXAMINATION

17  BY MR. LAROSIERE:

18  Q.   Howdy, Mr. Toy.  Thank you for your time.

19            I'd just like to nail down the timeline here, if you

20  don't mind.

21  A.   Sure.

22  Q.   And I don't want to put any words in your mouth, so if I

23  say something you don't agree with or I'm missing something,

24  let me know.  But I just want to really quickly go through the

25  timeline.  Is that okay?

1    A.    Sure.

2    Q.    In early January of 2021 you talked to Agent Hooker on the

3    phone; is that right?

4    A.    That is correct.

5    Q.    And as a result of that conversation, you went and looked

6    at a picture on the internet of the auto key card; is that

7    right?

8    A.    That is correct.

9    Q.    And then, as a result of looking at that picture on the

10   internet, you told Hooker --

11            MS. TAYLOR:  Objection, hearsay.

12            THE COURT:  Let me see you at sidebar.

13       (Proceedings at sidebar:)

14            THE COURT:  Tell me what you anticipate.

15            MR. LAROSIERE:  I'm asking -- it's exactly from his

16   report.  He told Hooker that he thought it was a machine gun.

17   Yeah, he did.  I'm not asking what Hooker said at all.

18            THE COURT:  I don't think it's offered for the truth

19   of that is a machine gun.  That is his impression at that point

20   in time.

21            MS. TAYLOR:  Okay.

22       (Proceedings in open court:)

23            THE COURT:  Go ahead.

24   BY MR. LAROSIERE:

25   Q.    As a result of looking at that picture on the internet,

1  you told Agent Hooker that you thought if cut out and machined

2  properly, that product might make a gun fire automatically,

3  right?

4  A.    That is correct.

5  Q.    And this was based solely on a picture you saw on the

6  internet, correct?

7  A.    Correct.

8  Q.    So then January 15th, you received that pen holder auto

9  key card plate.  I believe it's Exhibit 20 Alpha?

10  A.    I believe so, yes.

11  Q.    On the 27th, that's when you took the rifle disclosed in

12  that report to test, right?

13  A.    Correct.

14  Q.    So on the 1st of April [verbatim] you generated your first

15  report in this matter.  Does that sound right?

16  A.    I don't have my report in front of me.  I'm not sure

17  exactly the days, but that's roughly correct, yes.

18  Q.    Then on the 8th of February you generated an amended

19  report; is that right?

20  A.    Correct.

21  Q.    Then later on, I believe in March, is when you received

22  the Exhibit 25 Alpha?

23  A.    Correct.

24  Q.    And you generated another report mid March?

25  A.    Yes.

1    Q.    So I'm going to pull up here -- does the name Ron Davis

2    appear anywhere in your reports?

3    A.    I don't believe it does.  But I could be wrong.  He might

4    have been acting at the time.

5    Q.    Who is Ron Davis?

6    A.    Ron Davis is another FEO in the Firearms Ammunition

7    Technology Division.

8    Q.    And in that January/February timeline, was he supervising

9    you or approving your reports?

10   A.    He might have been at one point in time, but I'm not a

11   hundred percent sure.  People act occasionally in our office

12   and I don't remember the exact days.

13   Q.    Okay.  Does the name Phillip Peters appear anywhere in

14   your report?

15   A.    I don't believe so.

16   Q.    Who is Phillip Peters?

17   A.    Also another FEO that works in our division.

18   Q.    Does the name James Barlow appear anywhere in your

19   reports?

20   A.    No.

21   Q.    Who is James Barlow?

22   A.    Another FEO.

23   Q.    So you showed a video, right -- or you watched a video

24   just now, right?

25   A.    Correct.

1    Q.    Who took that video?

2    A.    I honestly don't remember who took the video.  It was

3    another one of the FEOs in the office.

4    Q.    Do you expect it was Phillip Peters or James Barlow?

5    A.    It could very well have been.

6    Q.    And who is Gregory Stimmell?

7    A.    Greg Stimmell was our branch chief at that point in time.

8    Q.    Okay.

9          MR. LAROSIERE:  Your Honor, may I approach for

10   sidebar?

11         THE COURT:  Sure.

12      (Proceedings at sidebar:)

13         MR. LAROSIERE:  I'm about to enter a very problematic

14   line of questioning.  We received information from a retired

15   ATF agent indicating that there may be Brady evidence that was

16   being withheld here.  Of course, that's not -- that's double or

17   triple hearsay.  I'm wanting to ask whether he was told to

18   delete any videos.

19         MR. KING:  Keep your voice down.

20         MR. LAROSIERE:  I'm so sorry.  I'm guessing you heard

21   me.

22         THE COURT:  I can hear you fine.

23         MR. LAROSIERE:  Yeah.

24         MS. TAYLOR:  Your Honor, this is the first I've ever

25   heard of this.

1     MR. LAROSIERE:  It's my understanding that Stimmell

2 directed this video, and it appears to get rid of earlier

3 videos of the item not functioning.  And I am not sure how to

4 attack that without going into hearsay.

5     MS. TAYLOR:  Your Honor, I can't really imagine if

6 this is true, which I've never heard of it and I've had no

7 opportunity to investigate whether it could be.  We have told

8 the jury that it did not always function and that he had to do

9 things to make it function.  There's no Brady issue here.

10     MR. LAROSIERE:  If the government knowingly,

11 intentionally got rid of these videos of the item not

12 functioning or the modifications that were required to function

13 and he was directed by his supervisor to get rid of the videos,

14 I think that's a very clear Brady problem.

15     THE COURT:  Why don't we get -- let the jury take

16 their break, and outside the presence of the jury you can --

17 I'll let you ask him if he was directed to destroy any videos.

18 And depending on the answer to that, we can argue about what to

19 do with it.  How does that sound?

20     MR. LAROSIERE:  Okay.

21     THE COURT:  Ms. Taylor?

22     MS. TAYLOR:  That sounds good to me, Your Honor.

23     THE COURT:  Okay.

24   (Proceedings in open court:)

25     THE COURT:  Ladies and gentlemen, we're going to go

1   ahead and take our afternoon break.  I'll give you about

2   20 minutes.  So if you'll be here a little after -- be ready to

3   come back in a little after 3:30, and we'll continue with the

4   evidence at that time.

5          Please remember to continue to follow all of the

6   instructions that I've been giving since the beginning of the

7   trial.  Thank you.

8          COURT SECURITY OFFICER:  All rise for the jury.

9      (Jury exits, 3:13 p.m.)

10         COURT SECURITY OFFICER:  Please be seated.

11         THE COURT:  All right.  For purposes of the record,

12  I'm going to hear a proffer at this time.  Go ahead with your

13  question, Mr. Larosiere.

14         And actually, let me see you at sidebar for just a

15  moment.

16     (Proceedings at sidebar:)

17         THE COURT:  Just to be clear, Mr. Larosiere, the

18  question is asking him whether anybody ever told him to destroy

19  videos.  It's not that, "Some other agent told you X, Y, or Z,"

20  just the specific question that you said up here, which is,

21  "Did anybody tell you to destroy videos?"  As I understand --

22         MR. LAROSIERE:  So the question is whether he himself

23  or Phillip Peters, who was recording videos, was asked to

24  destroy them.  So how I would like to ask it is, "To your

25  knowledge, was anyone in your office, joking or not, told to

1   destroy any of these videos, whether you understood that" --

2         THE COURT:  "Joking or not isn't" --

3         MR. LAROSIERE:  So I guess --

4         THE COURT:  The question is whether -- the question

5   is whether any videos were destroyed.  If they joked about

6   destroying videos, that may be poor form, but it wouldn't be

7   evidence of anything.  So --

8         MR. LAROSIERE:  I think the question is whether he

9   was aware of that being said.  And I am wanting to know how to

10  get at that.

11        MS. TAYLOR:  I have no idea what the relevance of

12  this would be.  And I'm, furthermore, troubled that this is the

13  first I'm hearing of it when we're on our last witness.  And if

14  there was an allegation that there was Brady evidence out there

15  and I had been made aware of it, I would have investigated it

16  myself before we got to nearly the end of the trial.

17        MR. LAROSIERE:  To be fair, I wasn't sitting on this

18  information.

19        THE COURT:  What do you mean by that, Mr. Larosiere?

20        MR. LAROSIERE:  I had only heard about it I think

21  last night.

22        THE COURT:  And how was it that you heard about it

23  last night?

24        MR. LAROSIERE:  I was contacted -- there was a series

25  of texts, "You need to call this guy, you need to call this

1   guy."

2          And so I contacted this former -- this retired ATF

3   agent who spilled all these beans on me.  And I was like,

4   this -- this isn't evidence, but I feel like I would be remiss

5   not to try to explore it.

6          MS. TAYLOR:  I'm not even sure there's a good-faith

7   basis to really be asking about this based upon the stated

8   origin of this information, but --

9          MR. KING:  Your Honor, if I could add that I think

10  the good-faith basis is this individual provided the names of

11  individuals who were present who don't appear in any of the

12  almost 40,000 pages of government discovery.  They said that's

13  who was there, that's who those individuals were, and that's

14  the details of who was present for what conversations.

15         But the good-faith basis is those are the individuals

16  who were there.  We have no other way of knowing that other

17  than --

18         MS. TAYLOR:  It has not been established that any of

19  those individuals were there.  Agent Toy stated he could not

20  remember who was filming the videos.  I still haven't heard a

21  name of the person from which this information came, much less

22  the apparent chain of "telephone" that was engaged in for it to

23  get to Mr. Larosiere.

24         THE COURT:  Who is the former agent from which this

25  information came from, Mr. Larosiere?

1           MR. LAROSIERE:  Luettke.

2           THE COURT:  That's not a full name, Mr. Larosiere.

3           MR. LAROSIERE:  Brian Luettke.

4           THE COURT:  Can you spell that for the court

5    reporter?

6           MR. LAROSIERE:  L-u-t-k-e-e (sic).

7           THE COURT:  Why don't we start with you asking him

8    whether he destroyed any videos of the -- any videos of it and

9    asking him whether he is aware of anyone being directed to

10   destroy any videos.  And then we can go from there.

11          MR. LAROSIERE:  And if the answers are in the

12   negative, then I think it's over.

13          MS. TAYLOR:  Your Honor, I would also just note for

14   the record that we produced in discovery three videos of test

15   firing that were all taken during that session, which Special

16   Agent -- or, sorry, Officer Toy has testified to that he tried

17   it in a different rifle and it only shot two rounds one time.

18   That's on video.  It was produced.

19          And then there's a separate video where I don't think

20   it shoots more than one round at any point in the video.  Those

21   were produced.

22          So again, to the -- I think there -- even if there

23   was a video that was destroyed, I can't fathom how it would --

24   it would be cumulative to the videos and the testimony here

25   today that it -- you know, "We tried it in one rifle and it

1   didn't work right."

2          MR. LAROSIERE:  Well, the issue is the subsequent

3   material alterations, which he testified in -- anyway . . .

4          THE COURT:  Let's ask the two questions and we'll see

5   where we go from there.

6          MR. LAROSIERE:  So to be clear, I'm asking, "Did

7   anyone direct you to destroy any videos," and then, "Are you

8   aware" -- "are you aware of anyone being directed to destroy

9   videos?"  Is that what I'm cleared to ask?

10         THE COURT:  The two questions I said is whether he

11  destroyed any videos or whether he was aware of anyone being

12  directed to destroy videos.  Okay?

13         MR. LAROSIERE:  Okay.  Thank you.

14         THE COURT:  Those questions, Ms. Taylor.

15         MS. TAYLOR:  Yes, Your Honor.

16         THE COURT:  All right.

17     (Proceedings in open court:)

18  BY MR. LAROSIERE:

19  Q.   Mr. Toy --

20  A.   Yes, sir.

21  Q.   -- are you aware of anyone being directed to destroy

22  videos --

23  A.   No, I'm not.

24  Q.   -- in the course of this?

25         Okay.  Did you destroy any videos in the course of

1   this investigation?

2   A.   I don't remember destroying any videos.

3   Q.   Is that a --

4   A.   I don't remember.  I don't remember destroying any videos.

5   If they were videos that maybe the quality didn't turn out very

6   well, that might have got deleted because they were grainy and

7   didn't focus, but other than that, no.

8            MR. LAROSIERE:  Can we continue with the proffer?

9            THE COURT:  I think that we agreed at sidebar if the

10   answer was in the negative that that resolved the issue, right?

11            MR. LAROSIERE:  Do we -- yeah.

12            THE COURT:  I don't think there's -- -- he addressed

13   the issue that you brought up before me.  I don't think there's

14   anything further.  You can -- if you want to tell me

15   differently, tell me differently now.

16            MR. LAROSIERE:  I think it's okay to bring the jury

17   back.

18            THE COURT:  All right.  We'll bring the jury back,

19   but those -- that's -- you're not inquiring of that in front of

20   the jury.

21            MR. LAROSIERE:  No.

22            THE COURT:  Okay.  All right.  Well, we told the jury

23   that they had until -- they have about 12 more minutes,

24   so . . .

25            COURT SECURITY OFFICER:  All rise.

```
 1        (Recess, 3:22 p.m. to 3:35 p.m.)

 2        (All parties present.  Jury not present.)

 3             COURT SECURITY OFFICER:  All rise.  This Honorable

 4   Court is back in session.

 5             Please be seated.

 6             THE COURT:  Yes, Mr. King.

 7             MR. KING:  I just wanted to apologize to the Court

 8   for Agent Slosson regarding the search warrants to the

 9   purchaser, the staleness issue.  In the moment I just did not

10   think about that.  I would not intentionally go into that

11   because I do think it was misleading.  And Ms. Taylor raised

12   that, and I wanted to apologize with that in mind.  So I

13   apologize to the Court.

14             THE COURT:  All right.  Ms. Taylor, do we need to do

15   anything else with that?

16             MS. TAYLOR:  I don't think so, Your Honor.

17             THE COURT:  All right.  And we've put to bed the

18   issue that was raised about destruction of videos, is that

19   correct, Mr. Larosiere?

20             MR. LAROSIERE:  Yes, Your Honor.

21             THE COURT:  Mr. King?

22             MR. KING:  Yes, Your Honor.

23             THE COURT:  All right.  Then let's have the jury,

24   please.

25             COURT SECURITY OFFICER:  All rise for the jury.
```

1          (Jury enters, 3:36 p.m.)

2               COURT SECURITY OFFICER:  Please be seated.

3               THE COURT:  All right.  Mr. Larosiere, you may

4     continue.

5     BY MR. LAROSIERE:

6     Q.   So Mr. Toy, I'd like to talk about lightning links

7     conceptually with you a little bit; is that okay?

8     A.   Okay.

9               MR. LAROSIERE:  Ms. Ganoe, if you would, would you

10    bring up Government's Exhibit 2 at 4:20 seconds, where Mr. King

11    had paused.

12    BY MR. LAROSIERE:

13    Q.   So in the top left corner of this screen, would you say

14    that's an accurate representation of how a lightning link would

15    function in an AR-15?

16    A.   How it would appear inside of it, yes.

17    Q.   So the paddle that we talked about, this piece here --

18    A.   Yes.

19    Q.   -- am I correct in understanding that that is what causes

20    the body to release the disconnector?

21    A.   When it's hit at the top by the bolt, it fulcrums on the

22    takedown pin and will pull the disconnector back.

23    Q.   So the top of this paddle is struck by the bolt, right?

24    A.   Correct.

25    Q.   And the timing here is pretty critical; is that correct?

1   A.   It's critical for it to function the way the original

2   designer intended it to be because the idea is for the bolt to

3   be in battery when the hammer is released.

4              In this situation, using the machine gun bolt

5   carrier, it hits it before it's in battery, so it's releasing

6   the hammer before the bolt goes all the way in the battery or

7   locks up, and creating basically a hammer follow situation.

8   Q.   So the -- I'll ask the question in a more pointed way.  In

9   the original design of the lightning link, the timing of

10  striking this paddle is correct for the firearm to function

11  safely and reliably, correct?

12  A.   Yes.

13  Q.   And so we talked a lot about the disconnector, but I just

14  want to nail this down a little bit more.  The disconnector is

15  this piece that I'm highlighting, correct?

16  A.   Correct.

17  Q.   And the disconnector is a piece that's separate from the

18  hammer and the trigger, correct?

19  A.   That is correct.

20  Q.   And is it true that the disconnector is what allows the

21  firearm to function semiautomatically?

22  A.   That is correct.

23  Q.   Would you say that the disconnector holds the hammer back

24  until the trigger is released?

25  A.   Yes.

1   Q.   And so then what holds the hammer back after the trigger
2   is released?
3   A.   The trigger does.
4   Q.   Would you say the trigger sear, right here?
5   A.   Yes.
6   Q.   If one removes the disconnector, what would happen?
7   A.   You would have a hammer follow situation, and it could
8   possibly, and most likely, fire automatically.
9   Q.   Is it difficult to remove the disconnector in an AR-15?
10  A.   No, it is not.
11  Q.   About how long would it take to remove the disconnector in
12  an AR-15?
13  A.   Depending on skill level, a matter of minutes.  Maybe five
14  minutes.
15  Q.   And would it be accurate to say that removal of the
16  disconnector would require drifting one pin?
17  A.   Correct.
18  Q.   And again, that situation, which would be called -- which
19  could be caused by either no or an absent disconnector, is
20  called hammer follow?
21  A.   That's what we refer to it as typically, yes.
22  Q.   And this is so called because the hammer will follow the
23  bolt home, correct?
24  A.   Right, yes.
25  Q.   And that's potentially unsafe, correct?

1    A.    Unsafe?  Not necessarily.  But it would potentially cause

2    it to fire automatically, which, in turn, would require it to

3    be regulated just like any other machine gun.

4    Q.    Could that cause the firearm to fire out of battery?

5    A.    Possibly, but --

6    Q.    Can you describe what is an out-of-battery discharge?

7    A.    Out of battery is when the bolt doesn't lock into the

8    barrel, causing it to maintain the pressure inside of the

9    chamber.  So if the case doesn't go all the way in and it

10   fires, it could explode.  The case could explode and cause a

11   malfunction or could be catastrophic to the weapon and

12   potentially dangerous to the shooter.

13   Q.    And so is it fair to say that as the lightning link was

14   designed and intended, functioning correctly, it does not

15   induce hammer follow?

16   A.    Typically, no.

17          MR. LAROSIERE:  Ms. Ganoe, can I get you to pull up

18   Government's Exhibit 1 at 8:45.  Just pause.

19   BY MR. LAROSIERE:

20   Q.    You can see my client has provided us several different

21   technical images in his videos.  Do you see this on the top

22   left corner?

23   A.    Yes.

24   Q.    What do you see?

25   A.    I see the different types of AR-type bolts and an M16

1  bolt.

2  Q.    Okay.  What is the top left bolt?

3  A.    The top left appears to be an SP1 bolt carrier.

4  Q.    And the middle bolt?

5  A.    Would be a standard semiautomatic bolt carrier.

6  Q.    Would that be the type that would be used like on

7  Bushmasters, et cetera?

8  A.    Potentially.  Some manufacturers send out their ARs

9  currently with machine gun bolts in them.  So it just depends

10 on which variation you buy.

11 Q.    And this bottom bolt, what is that?

12 A.    That would be an M16 bolt carrier.

13 Q.    Which -- and is that the same bolt carrier that you've

14 referred to as a machine gun bolt carrier?

15 A.    That is correct.

16 Q.    Is it this surface here that engages with the trip?

17 A.    The front of that that you're pointing at, yes.

18 Q.    Okay.  So it would be the front of this -- shall we call

19 that the -- what shall we call that, the front of this surface?

20 A.    I would refer to it as trip surface.

21 Q.    Trip surface.

22         THE COURT:  When you're saying "this," for purposes

23 of the record, you're pointing at the far left end of the bolt

24 carriers, correct?

25         THE WITNESS:  That is correct.

1            MR. LAROSIERE:  The far left end of the underside of

2    the bolt carriers.

3    BY MR. LAROSIERE:

4    Q.    So the lightning link, as it was originally designed,

5    works with which of these bolt carriers?

6    A.    What it was intended to work with was the SP1.

7    Q.    This one was the very short bolt carrier, right?

8    A.    That's correct.

9    Q.    I'm sorry, very short trip service.

10            At the bottom, does this reflect the type of bolt

11    carrier you claimed to have used in your testing?

12    A.    It is the one I used in my testing.

13    Q.    And I'm pointing at the one that is marked M16?

14    A.    Correct.

15    Q.    Would you say that's a substantial difference in the -- in

16    the length of the trip service?

17    A.    Yes.

18    Q.    About how far?  Would you agree it's about half an inch?

19    A.    Probably, if not a little bit more.

20    Q.    And it's true that engaging the trip, that quickly causes

21    a hammer fall situation?

22    A.    Potentially, yes.

23    Q.    True that if the trip was engaged on an M16 bolt carrier,

24    the bolt would not be in battery?

25    A.    When --

1    Q.    At the moment the trip is engaged.

2    A.    That's correct.

3            THE COURT:  Mr. Larosiere, you'll have to let him

4    finish an answer.

5            MR. LAROSIERE:  Sorry.

6            THE COURT:  Thank you.

7    BY MR. LAROSIERE:

8    Q.    Is it true that at the moment the trip is engaged, if

9    using a lightning link with an M16 bolt carrier, the bolt would

10   not be locked into battery?

11   A.    When it actually trips the surface, that is correct, it

12   would not be in battery yet.

13   Q.    And you would agree that is not how the lightning link was

14   originally designed and intended?

15   A.    That is correct.

16            MR. LAROSIERE:  That's all for that.  Thank you so

17   much.

18   BY MR. LAROSIERE:

19   Q.    And just to be clear, that's a hammer follow situation as

20   you've described it?

21   A.    Correct.

22   Q.    So I want to go back to your reports.  On your first

23   report, that's February 1st, you wrote -- withdrawn.

24            Did you write --

25            MS. TAYLOR:  Objection, Your Honor.

1           THE COURT:  Ask your questions of the witness,

2      Mr. Larosiere.

3      BY MR. LAROSIERE:

4      Q.    Did you write that the parts were --

5           THE COURT:  Mr. Larosiere, rather than asking what he

6      wrote, ask your questions of him factually.

7      BY MR. LAROSIERE:

8      Q.    The report reflects that the parts were precisely indexed

9      in the correct size to fit AR-15 --

10          MS. TAYLOR:  Your Honor --

11          THE COURT:  Let me see counsel at sidebar.

12      (Proceedings at sidebar:)

13          THE COURT:  Mr. Larosiere, what I meant was ask him

14     your factual questions rather than asking him what's in his

15     report.

16          MR. LAROSIERE:  So to be clear, would that be asking

17     were the parts precisely indexed?  Which is -- I'm getting

18     information it was deleted from the amended report, and I think

19     it's very material that it was deleted.

20          THE COURT:  I'm not -- you're going to have to

21     explain to me --

22          MR. LAROSIERE:  In his original report, this witness

23     writes that the parts -- well, in both reports he writes that

24     the parts were precisely indexed to fit into the AR-15 without

25     further modification.  He then writes that, as he testified,

1    that they didn't -- that he had to remove material to get it to

2    function.  In his amended report he deletes technical data and

3    deletes the fact that he had to remove material in order to get

4    it to function, leaving that it was precisely indexed and did

5    not require further modification.

6            THE COURT:  Ms. Taylor.

7            MS. TAYLOR:  I'd have to look at the reports to

8    understand what Mr. Larosiere is referring to, but obviously we

9    produced both of the reports, so I'm not sure what the point of

10   the questioning is.

11           THE COURT:  Mr. Larosiere, you want to tell us what

12   the relevance of it is?

13           MR. LAROSIERE:  The relevance is he originally

14   indicated that they were precisely indexed and then that he

15   removed material.  And he conspicuously deletes that and other

16   technical data from the report.  I think it goes to credibility

17   of the witness.  And I want to ask him why that information was

18   removed, because it's very pertinent information.  The report

19   is very bare bones as it is.

20           MS. TAYLOR:  It's what?

21           MR. LAROSIERE:  Bare bones.

22           THE COURT:  I'm going to allow the question because I

23   don't see an evidentiary -- I'm not hearing an evidentiary

24   objection.

25           MS. TAYLOR:  I don't know what the relevance is, Your

1    Honor.

2          THE COURT:  We'll see how it plays out.  Go ahead.

3      (Proceedings in open court:)

4    BY MR. LAROSIERE:

5    Q.    Mr. Toy, in your original report you report that the parts

6    were precisely indexed --

7          THE COURT:  Mr. Larosiere, that's not the way we

8    talked about the question being asked.

9    BY MR. LAROSIERE:

10   Q.    As you recall, before you cut out any devices from the

11   card, were the parts precisely indexed in the correct size to

12   fit AR-15 firearms without further modification?

13   A.    They were to the size that would work in AR-15s.  Again,

14   because of different manufacturers having different tolerances,

15   not every single one is going to work in every single platform.

16   But yes, they were of the size to do that, yes.

17   Q.    The correct size to fit AR-15-type firearms without

18   further modification?

19          Yes or no?

20   A.    They were of the size that they would be able to go into

21   them without hand fitting, maybe not, but we're talking minor

22   tweaks to the dimensions.

23   Q.    And after you cut along the lines, the rifle would not

24   function as a machine gun because the paddle was too long,

25   correct?

1   A.   That is correct.

2   Q.   And so you ground down the paddle?

3   A.   Yes.

4   Q.   You testified to that just now; is that right?

5   A.   That is correct.

6   Q.   Did you delete that information from your subsequent

7   report?

8   A.   I don't remember what the modification between the two

9   reports was.

10   Q.   Would it refresh your recollection if I brought them to

11   you?

12   A.   Yes.

13        (Pause in proceedings.)

14        (Mr. Larosiere confers with Ms. Taylor).

15             THE COURT:   What's your question?

16   BY MR. LAROSIERE:

17   Q.   Did you delete your reference to the rifle not functioning

18   because the paddle was too long in your second report?

19   A.   I'm not sure why the information was deleted.  I do

20   remember that Chief Stimmell had come back to me and asked me

21   to change some verbiage in the report, and so I just took his

22   edits for it.  Nobody was intentionally trying to prevent that

23   information from being out there, especially considering the

24   report was already out there that had the modification to it.

25   And I've already stated that conversion devices, no matter what

1  the type, frequently require hand fitting and modifications to

2  them.  They don't work in every single weapon.

3  Q.   Mr. Toy, yes or no, did you delete that type of --

4        MS. TAYLOR:  Your Honor, may we have sidebar?

5        THE COURT:  Yeah.  And disregard that last comment

6  from counsel.

7        Sidebar.

8    (Proceedings at sidebar:)

9        THE COURT:  Mr. Larosiere, he answered your question.

10  Don't -- don't -- if you don't think he answered the question

11  you can ask me to tell him, but don't do that again.

12       MR. LAROSIERE:  I'm sorry.

13       MS. TAYLOR:  He has both of the reports.  They were

14  produced at the same time in discovery.  To the extent he's

15  trying to make it look like Officer Toy was hiding information

16  or the government's suppressing information, it's completely

17  baseless.

18       THE COURT:  Yeah, I mean, he answered your question.

19  You have both of the reports.  I'm not sure why we need to go

20  into this further.  What more do you want to do with it,

21  Mr. Larosiere?

22       MR. LAROSIERE:  I think you're right, I think he did

23  acknowledge that the information was deleted.  I'm sorry, I may

24  not have -- my brain may have glanced over that.

25       THE COURT:  Well --

1        MR. LAROSIERE:  So I think he did answer my question

2  at this time.

3        THE COURT:  All right.

4        MR. LAROSIERE:  I apologize.

5        MS. TAYLOR:  I feel like there needs to be some

6  clarification that both of these reports were produced because

7  it's now looking to the jury like this other report with the

8  secret information was deleted and hidden, and I can't -- I

9  don't really know how to address that with Agent Toy because

10 he's not the one that produced discovery, I did.  But he has

11 both the reports.

12       THE COURT:  Yeah, no, I think that it is accurate.

13 And I feel like his testimony addressed that in some respects

14 because he was saying that the report -- the original report

15 was already -- it was still there.  And I'm concerned about

16 what you want me to try to do with that when I hear the way you

17 described it, saying that he acknowledged that he deleted it,

18 because when he said that, he also said that it was in the

19 original report, so . . .

20       MR. LAROSIERE:  And that he didn't know why.  I --

21       THE COURT:  Well, I don't know what the relevance is

22 of that.  I mean, you said it went to his credibility, but he's

23 answered that, so . . .

24       MR. LAROSIERE:  So I don't have anything further

25 about any deletion.

1          THE COURT:  Well, my concern, Mr. Larosiere, is what

2     you are going to imply with it.

3          MR. LAROSIERE:  The main implication is that the tech

4     branch -- at the end of the day, he isn't sure or doesn't think

5     it's a machine gun.  I don't -- so the only -- I'll tell you

6     right now, the only other testimony I'm going to elicit from

7     him is regarding the relative lack of information, the fact

8     that he doesn't know exactly what parts were in the guns and

9     that the gun in the video was -- the gun in the video is one

10     that was different from that which is disclosed in any of the

11     reports.

12          MS. TAYLOR:  It's not.  Also, when Agent Toy brought

13     the gun down here to Jacksonville, I think it was at the end of

14     November, Mr. Larosiere and Mr. Zermay were given the

15     opportunity to inspect the firearm.  That's when the test

16     firing was done that Officer Toy described, including using the

17     SP1 bolt carrier, which their proposed expert provided to

18     Officer Toy.  They have seen the gun, they have inspected the

19     gun, and they have seen it function with both kinds of bolt

20     carrier.  It's completely baseless.

21          THE COURT:  What is it that you're going to ask of

22     him, Mr. Larosiere?

23          MR. LAROSIERE:  What specific components are in the

24     receiver of that firearm.  And to be frank, the firearm that

25     was disclosed in the reports is an SI-15.  That's the firearm

1    that was in the two other videos that we do have, the one with

2    the M16 carrier.  It's very clear that that's not the same

3    firearm in the video that y'all showed on direct.  The

4    firearm --

5            MS. TAYLOR:  You've seen the demonstration.

6            MR. LAROSIERE:  I've seen --

7            MS. TAYLOR:  If we go down this road, then I think

8    I'm entitled on redirect to ask Officer Toy if he allowed these

9    attorneys to inspect this specific firearm that he used and

10   then conducted the test fire demonstration, at which it

11   functioned perfectly.  I don't imagine that that's what you

12   want, but that would be what I would intend to do if we keep

13   going down this road.

14           And I also continue to not understand what the

15   relevance is of this implication or attempt to imply that ATF

16   doesn't believe that it's a machine gun.  That's the question

17   for the jury to decide.

18           THE COURT:  So going back two steps, to clarify the

19   issue about the two reports, I do think that I need to instruct

20   the jury that both of Agent Toy's reports were provided to the

21   defense to avoid any implication that there was an attempt to

22   not provide truthful information.

23           Does that address that first issue, Ms. Taylor?

24           MS. TAYLOR:  Yes, Your Honor.

25           THE COURT:  All right.  As to the next issue, because

1   I don't know what the testimony is and I wasn't there, I didn't

2   witness these -- these test fires, you can ask your questions,

3   Mr. Larosiere, but Ms. Taylor is correct that if the questions

4   imply -- depending on what you ask, it will be fair game for

5   her to ask -- to establish who was present at those test fires.

6   And I'm not really sure that that's the direction you want to

7   go, but it would be, I think, inappropriate to allow you to

8   suggest otherwise, if -- and remember, I don't know the facts,

9   so if it's as Ms. Taylor has described, it would be improper,

10  and frankly inappropriate on your part, to suggest otherwise.

11  But I'll see what the testimony is.

12          MR. LAROSIERE:  Your Honor, if -- if I may ask for

13  help guardrailing myself.  Can I get clarity?  What is the

14  implication that I am to avoid?  That the firearm is not -- is

15  undisclosed or something?

16          THE COURT:  Look, Mr. Larosiere, here's the thing.

17  You're saying that you're -- you think it's a different

18  firearm, or you're suggesting something is a different firearm.

19  I don't know the evidence.  I wasn't there.  It is not entirely

20  clear to me what you are trying to imply, but if it's going to

21  inaccurately reflect what happened or what the test fires are,

22  or what was test fired, then I'm going to let Ms. Taylor do

23  that.  I don't know the evidence in the case, you-all do.  And

24  it's your job to know the guardrails.

25          MR. LAROSIERE:  Which is why I'm struggling here.

1    The point I'm trying to make is that the rifle that is being

2    fired in that video, yes, it is the one I inspected.  It is not

3    the one he inspected in making his technical questions.

4            MS. TAYLOR:  Then ask him that question.

5            MR. LAROSIERE:  So we're okay with that?

6            MS. TAYLOR:  Just ask him, "Is that the same one

7    that's referred to in your report?"

8            MR. LAROSIERE:  That's what I'm getting at.

9            MR. KING:  Just to clarify something, just in case it

10   does come up in my cross-examination.  Nobody on behalf of

11   Mr. Ervin was present for any test fires or anything like that

12   here.

13           THE COURT:  Well, I don't think -- who was present

14   for test fires should not come up.  We shouldn't have to ask

15   whether the lawyers were there.  That's -- we would only get

16   into that if an inappropriate question or an inappropriate

17   implication is put before the jury that has to be corrected.

18           All right.  So when we go back I am going to just

19   advise the jury -- tell them that there's been testimony about

20   different reports, that I advise them that both the original

21   and subsequent reports were produced to the defense in

22   discovery in this case.

23           Is that acceptable, Mr. Larosiere?

24           MR. LAROSIERE:  Yes, Your Honor.

25           THE COURT:  Mr. King?

1        MR. KING:  Yes, Your Honor.

2        THE COURT:  Ms. Taylor?

3        MS. TAYLOR:  Yes, Your Honor.

4        THE COURT:  All right.

5     (Proceedings in open court:)

6        THE COURT:  Ladies and gentlemen, before we continue

7  with the evidence, you heard testimony about an additional --

8  an original report and then a subsequent report.  I just want

9  to advise you that both of those reports were disclosed to the

10 defense during discovery in this case.  Okay?

11       Go ahead.

12 BY MR. LAROSIERE:

13 Q.   Mr. Toy, you still have Exhibit 25 Alpha, correct?

14 A.   That is correct.

15 Q.   And are you familiar with it?  Have you familiarized

16 yourself with it?

17 A.   Yes.

18       MR. LAROSIERE:  Your Honor, may I retrieve 25 Alpha

19 and Bravo from the witness?

20       THE COURT:  Yes, sir.

21 BY MR. LAROSIERE:

22 Q.   So here we have 25 Alpha; is that correct?

23 A.   That is correct.

24 Q.   And you said that you had cut along the lines, right?

25 A.   Correct.

1    Q.    Is that true when referring to this piece?

2    A.    Yes, it is.

3           THE COURT:  Mr. Larosiere, do you want to make a

4    record of what you're pointing at when you say "this piece."

5           MR. LAROSIERE:  I am pointing at the main body of 25

6    Alpha.

7    BY MR. LAROSIERE:

8    Q.    And I have here 25 Bravo.

9           Let me take a step back.

10          And Mr. Toy, you've testified that 25 Alpha function

11   tested as a machine gun, correct?

12   A.    Yes, it did.

13   Q.    Do you recognize this as 25 Bravo?

14   A.    Yes, I do.

15   Q.    And you cut along the lines to make this link?

16   A.    That's correct.

17   Q.    I was pointing there at the main body of 25 Bravo.

18          This is the paddle of 25 Bravo; is that correct?

19   A.    That is correct.

20   Q.    You had indicated that no bending was necessary; is that

21   correct?

22   A.    That is correct.

23          MS. TAYLOR:  Your Honor, that's misstating the

24   testimony.  That was in reference to Exhibit 20A and this is

25   25B.

1          THE COURT:  All right.  Mr. -- why don't you restate

2    your question, Mr. Larosiere.

3    BY MR. LAROSIERE:

4    Q.    Is this piece bent?

5    A.    Yes, it is.  That bent -- bend, excuse me, was created

6    whenever I test fired the -- or function tested, at the very

7    least, the exhibit.  The bolt hitting the top of it caused it

8    to bend, which is very common with these devices.

9    Q.    Very well.

10          Mr. Toy, are the lines drawn on the auto key card

11   identical between the cards, or virtually identical?

12   A.    As far as the dimensions?  I believe so, yes.

13   Q.    And so this is the unmodified drawing on 25B; is that

14   correct?

15   A.    That is correct.

16   Q.    And this is 25A; is that correct?

17   A.    That's correct.

18   Q.    And just to be clear, you had testified that you followed

19   the lines?

20   A.    That is correct.  Now, it's a round, rotary tool that

21   isn't as fine as the line is, so it's going to remove more

22   material than what the actual line is.  And again, I am not a

23   master machinist, so they may not be perfect lines.

24   Q.    But you are a certified armorer; is that correct?

25   A.    That is correct.

1    Q.    What is this shape here?  And I'm pointing at the back of

2    the -- what generally looks like a silhouette cutout on 25A.

3    A.    That is a portion where I cut into the body of the device

4    whenever I was cutting it out.  I believe that might have

5    happened with a drill press, possibly, on that hole.

6              MR. LAROSIERE:  No more need for the ELMO, thank you.

7    BY MR. LAROSIERE:

8    Q.    Now, Mr. Toy, I know you've made it very clear that you're

9    not a machinist, right?

10   A.    (Nods head.)

11   Q.    But as an armorer, you're fairly familiar with tools,

12   correct?

13   A.    Right.

14   Q.    If an individual drew with a Sharpie marker these same

15   lines on a piece of metal, would you be able to cut out a

16   lightning link?

17   A.    More than likely, yes, as long as it's the correct

18   dimensions and the thickness is appropriate for a lightning

19   link use.

20   Q.    If an individual used a stencil, perhaps --

21             MS. TAYLOR:  Your Honor, may we have sidebar?

22             THE COURT:  You may.

23        (Proceedings at sidebar:)

24             THE COURT:  Yes.

25             MS. TAYLOR:  My concern is I don't think any of this

1  is relevant.  What if somebody did it this way or that way,

2  that's not what happened in this case.

3          THE COURT:  She has a point, Mr. Larosiere.

4          MR. LAROSIERE:  The ultimate concern is whether it's

5  a drawing or something else.  The government's very forcefully

6  stating that this is something more material to a drawing.  And

7  I can't think of any better way to elicit the fact that there

8  is no really objective difference between this and a drawing.

9  I can rephrase my questions in terms of his ability.

10          THE COURT:  You mean if it was a -- well, I think --

11          MR. LAROSIERE:  Yeah, if you had --

12          THE COURT:  Hold on.  First of all, you've already

13  asked the question about the drawing.  A stencil is something

14  different.

15          MR. LAROSIERE:  Yes.

16          THE COURT:  So I don't think stencil is appropriate.

17  But you've already asked about a Sharpie marker, so --

18          MR. LAROSIERE:  I have one more.

19          THE COURT:  Which is?

20          MR. LAROSIERE:  A piece of paper then glued to a

21  piece of steel.

22          MS. TAYLOR:  I would further object that it calls for

23  speculation.

24          MR. LAROSIERE:  I feel I'm asking about his technical

25  abilities as somebody who completed one of these.

1           THE COURT:  But whether a piece of paper glued to a
2   piece of steel would work or not I don't think is the issue.  I
3   think you've made your point with the Sharpie marker, and you
4   can make your argument with a Sharpie marker.
5           MR. LAROSIERE:  Thank you, Your Honor.
6       (Proceedings in open court:)
7   BY MR. LAROSIERE:
8   Q.   Mr. Coy, in the course of your testing, did you have
9   difficulties with the thickness of the material here?
10  A.   Occasionally.
11  Q.   And is it true you used a belt sander to thin it out?
12  A.   Yes, but that didn't end up being the reason why I was
13  having issue with that particular device.
14           I tried to cut some time off of how long it would
15  take to remove the material, so I didn't remove the entire
16  front portion where the hole is, and then realized that I
17  needed it to open up bigger so the hammer would fit through it
18  so it would function correctly.
19  Q.   And when you cut the designs out of the auto key card, did
20  you cut on the line leaving the line or obscuring the line?
21  A.   I'm not following your question, sir.
22  Q.   So the auto key card contains an etching, right?
23  A.   Correct.
24  Q.   And that line has thickness, right?
25  A.   Correct.

1  Q.   So did you cut along the outside edge of the line, dead

2  center on the line, or ensuring that the line was completely

3  removed?

4  A.   I did my best to cut right along the line, not removing

5  any more material than what was required.

6  Q.   So leaving the etch or obliterating the etch?

7  A.   I believe in some circumstances most of the etching was

8  removed.  I can't say for certain that every tiny little bit of

9  it was, but to the best of my abilities, I traced the line.

10 Q.   And how did you know where to make that cut?

11 A.   Because there was a line there, sir.

12 Q.   How did you know whether to cut outside, on, or within the

13 line?

14 A.   I just followed the line.  I just cut the line out because

15 that's where it was at.  And it's a template to be cut out, and

16 so that's what I did, I cut the template out.

17 Q.   So you didn't have any particular instruction to cut,

18 again, on the outside of the edge of the line or over the line

19 itself?

20 A.   No, sir.

21          MR. LAROSIERE:  Thank you, Mr. Toy.

22          THE COURT:  Mr. King.

23          MR. KING:  May it please the Court.

24          THE COURT:  Go ahead.

25                    CROSS-EXAMINATION

1    BY MR. KING:

2    Q.   Good afternoon, sir.

3    A.   Good afternoon.

4    Q.   I want to make sure I get your title right and I'm doing

5    this correctly.  Mr. Toy, Agent Toy, Officer Toy?

6    A.   Mr. Toy is fine.

7    Q.   All rightie.  You've received a lot of training from the

8    ATF?

9    A.   Yes.

10   Q.   I noticed when you were on direct examination you were

11   looking over, making eye contact with the jury.  Is that

12   something they trained you to do?

13   A.   We have been trained on courtroom demeanor, yes.

14   Q.   And prior to coming to court here today you discussed your

15   expected testimony with the attorneys for the government?

16   A.   Yes.

17   Q.   And prior to preparing any reports or doing any real

18   investigation, you initially had a conversation with Agent

19   Hooker?

20   A.   That is correct.

21   Q.   I want to talk to you a little bit about some of the

22   things that you've done here.

23        How many different times did you -- you said test

24   function?

25   A.   Function test, yes, sir.

1    Q.    Function test.  Can you explain a little bit better what

2    that is?  I want to make sure I understand.

3    A.    Sure.  So a function test is just a test where you see how

4    a weapon is operating.  So basically it's showing it how it

5    would be firing if there was ammunition in it but without ammo

6    so that you don't end up shooting and hurting somebody during

7    the test of it, the function test of it.

8          It basically allows you to determine whether or not

9    it's operating correctly as designed and whether or not that

10   design is a semiautomatic weapon or a fully automatic weapon.

11   Q.    And my understanding from what I'm hearing today is the

12   design for a lightning link, when it's working as it's designed

13   and intended, is it would only work with an SP1 bolt carrier.

14         Do I have that correct?

15   A.    That was the assumption that most people had, but we

16   proved that that is not necessarily always the case.

17   Q.    Well, and ultimately when you did your initial test and

18   reports and videos, that was not with an SP1 bolt carrier.

19         Do I have that correct?

20   A.    My initial function test of it was with an SP1.  I did use

21   an SP1 in it to try it, but like I said, it wasn't working as

22   designed, and it wasn't as consistent as a machine gun bolt

23   carrier.

24   Q.    So it did work with an M16 bolt carrier.  Do I have that

25   right?

1    A.    Yes, sir.

2    Q.    And when Mr. Larosiere was talking -- and it looked -- and

3    I can't remember the name y'all used, but it looked like a

4    little -- I can't remember the name you used.

5    A.    The disconnector?

6    Q.    No, sir.  There was the little piece at the top of the

7    SP1, but there was one below where it was a little bigger, and

8    then the M16 had a bigger one.

9    A.    The trip service.

10   Q.    The trip service.  How does that process work?

11   A.    So the M16 is designed with that additional surface so

12   that when you insert the automatic sear in an M16, when the

13   bolt's in the battery, it trips right at that particular

14   moment, allowing the hammer to be released.

15          The semiautomatic doesn't need to trip that surface,

16   so it's even further back.

17          And then the SP1, the design on that was to make it

18   even smaller, or shorter.

19          So those are just the differences between them.

20   Q.    And the -- the M16, if I'm not mistaken, is a -- and the

21   things we're talking about, the M16 itself is a fully automatic

22   assault rifle, military weapon?

23   A.    That is correct, sir.

24   Q.    And the M16 bolt carrier, you referred to that as a

25   machine gun bolt carrier?

1  A.    Correct.

2  Q.    And you said it worked with the M16 but it did not work as

3  designed, is that correct, because there was something called

4  hammer follow?

5  A.    Correct.

6  Q.    And what -- and hammer follow is not -- is something

7  different than a lightning link working as designed.  Is that

8  fair to say?

9  A.    Yes, it is.

10 Q.    My understanding is you were given two of these devices by

11 Agent Hooker through the mail.  He didn't drive it up or

12 anything like that?

13 A.    No, no, he did not hand deliver them.

14 Q.    And did you get any other devices that you were asked to

15 test?

16 A.    There was another one that came in.  There was, I believe,

17 three different submissions total.

18 Q.    Okay.  And the ones with Agent Hooker, those are the ones

19 that you cut out?

20 A.    Correct.

21 Q.    And you said it took about somewhere between I think

22 37 minutes on the short end to a little under an hour on the

23 long end?

24 A.    That's -- yeah, I believe so.

25 Q.    And certainly if I say something and I get some of my --

1   I'm trying to take notes.  If I get one of my details wrong,

2   please let me know.

3   A.    Yes, sir.

4   Q.    The -- when you originally cut along the lines, it did not

5   work because you had to shorten one of the parts?

6   A.    That is correct.

7   Q.    And so it -- instead of doing it as it was designed, you

8   cut it shorter?

9   A.    Correct.

10  Q.    And when it was cut as designed, it would not work.  Is

11  that fair to say?

12  A.    To be perfectly honest, whenever I cut it out, I might

13  have cut not enough material off.  Like I said, I tried to

14  follow the lines as best as possible.  But using my hand,

15  free-handing it, without any kind of tooling to help me keep a

16  steady hand and cut a straight line, there's a chance that I

17  could have just cut too much material off of the end of it --

18  Q.    Sure.  And --

19  A.    -- or not enough material.

20  Q.    I'm sorry, sir.

21  A.    I'm sorry.

22        Or not enough material or not too much.

23  Q.    I knew what you meant, but -- and that brings me to kind

24  of my next question.  The -- y'all have a lot of video

25  recording equipment up there in Martinsburg?

1   A.   No, we do not.

2   Q.   All right.  And do you have the -- let me ask you this:

3   Did you have the ability to record actually cutting the thing

4   out and taking photos during the course of this and all that?

5   A.   During the course of it I did take photos of different

6   stages of me cutting it out, which you saw in some of the

7   exhibits earlier.

8        But as far as the videos went, I thought that I had

9   my camera set up well enough that I could record the whole

10  thing.  Unfortunately, my camera kept cutting off at a certain

11  time point, and I didn't realize it until afterwards.  And, of

12  course, once I had already started cutting it out, it was too

13  late to start over.

14  Q.   Sure.  And that's fair.  But my understanding is you cut

15  out three different devices.

16  A.   I can't remember the exact number of devices I cut out.  I

17  believe that it was two out of one of the cards and then the

18  one out of the other.

19  Q.   And my understanding is the first one you cut out and you

20  might have had the issue with the video, but the second one was

21  done weeks later, is that --

22  A.   The first one wasn't videoed.  We weren't videoing the

23  first one.  I just cut it out.  There was no attempt to video

24  that one.

25  Q.   Why not?

1  A.   It's not a standard practice that we do, mainly because we

2  don't have the equipment set up for doing video like that.

3  Q.   I want to talk a little bit more about some of the other

4  videos.

5         If I say that, you know, documenting and recording

6  things is important, would you agree with that statement?

7  A.   Yes.

8  Q.   And one of the -- I guess, you know, when you were in math

9  class, your teacher told you to show your work?

10  A.   Sure.

11  Q.   And fair to say that be can pretty important on technical

12  issues?

13  A.   It could be.

14  Q.   And would you consider this, what we're talking about --

15  mainly because I didn't follow some of it, but would you

16  consider these pretty technical issues?

17  A.   Sure.

18  Q.   The video that we saw was roughly, what, ten seconds long?

19  A.   Yes.

20  Q.   How many different times with three different devices cut

21  out did you perform that function testing?

22  A.   The actual live fire with video, I'm really not sure how

23  many times we videotaped it.  I know that the first one was

24  test fired multiple times.  I don't have an exact number.

25  Again, occasionally we fired two rounds automatically,

1  sometimes three.  Sometimes it would only fire one and then it

2  would no longer fire again.

3       So I really don't have a count on the exact number of

4  times each one of them was fired.

5  Q.   And I understand.  And maybe I asked a poor question, so

6  let me try that again.

7       The function testing that you did -- correct?

8  A.   I'm not sure if you're referring to the live fire, sir --

9  Q.   I'm not.

10 A.   -- or the function test.

11 Q.   When you're --

12 A.   Gotcha.

13 Q.   And this is the part where I don't know the terms as well.

14 So the function test is where you take it, you load it in, you

15 see kind of what it looks like and if it looks like it might

16 work when loaded with live ammunition.

17      Have I accurately described a function test?

18 A.   Yes.

19 Q.   And did you record all those?

20 A.   No, I don't think we recorded any of the function test

21 portions.

22 Q.   Did you think that was not important?

23 A.   No, because for us to classify something as a machine gun,

24 it doesn't matter if it function tests properly or not or

25 whether it's recorded.  The only thing it has to do is, in this

1  situation, with a conversion device, it just has to show that
2  it can convert a weapon to expel more than one projectile by a
3  single function of the trigger.
4  Q.   Well, and I want to get into that a little bit.  You said
5  if we -- it worked with an M16 bolt carrier, not an SP1.  Do I
6  have that correct, in the function testing?
7  A.   It had been used with both, yes.
8  Q.   And you -- and if I have this wrong, please correct me,
9  but my understanding is if you used all M16 parts, it would
10 fire automatically?
11 A.   It could, yes.
12 Q.   And if it's done -- understanding if somebody installed
13 something improperly or messes that part up, it won't work.
14 But if you install all M16 parts, it would fire automatically.
15 That would be your expectation?
16 A.   Yes.
17 Q.   And with the -- let me ask it this way:  Is it your
18 protocol, prior to firing off -- trying to show that something
19 fires automatically, to maybe before installing something, pull
20 the trigger to show that it fires semiautomatically before
21 installing that device?
22 A.   Correct.
23         MR. KING:  Your Honor, could I have a brief second?
24         THE COURT:  Sure.
25 BY MR. KING:

1    Q.   And I want to make sure that I'm asking a clear question.

2    So before a demonstration that a device -- any device makes a

3    weapon fire automatically, before installing, you want to

4    demonstrate that it fires semiautomatically without that

5    device?

6    A.   Yes, sir.

7    Q.   And the reason you do that is because just showing

8    somebody shooting a device automatically doesn't mean that

9    anything that you've added or done makes it shoot

10   automatically, it just means that it shoots automatically; is

11   that fair?

12   A.   Yes, sir.

13   Q.   And so is there a reason --

14        MR. KING:  Ms. Ganoe, can we play Government's

15   Exhibit 63.

16        (Video played.)

17        (Video stopped.)

18        MS. TAYLOR:  Your Honor, may we have sidebar?

19        THE COURT:  You may.

20        (Proceedings at sidebar:)

21        THE COURT:  What's the issue?

22        MS. TAYLOR:  Your Honor, Mr. King, although he did

23   not attend the demonstration test fire, was notified of it and

24   invited to attend.  And it appears at this point the

25   direction -- the intended direction of this testimony is just

1    to suggest that there was never any showing that the rifle was

2    a semiautomatic rifle absent the lightning link.  And I, again,

3    don't think there is a good-faith basis to say that.

4           And I think, again, we are getting into inviting

5    testimony about the fact that Mr. King was invited and

6    Mr. Larosiere and Mr. Zermay attended this test fire where it

7    was clearly demonstrated that this same rifle that's in the

8    video, this semiautomatic, then fired automatically with the

9    lightning link and then both bolt carriers.

10           THE COURT:  Mr. King, is that where you're going?

11           MR. KING:  Your Honor, I understand that's the

12    government's contention that happened.  I wasn't there for any

13    of that.

14           My point is that this officer has said that it is

15    important to show all of these things, and he had the ability

16    to do it and then did not do it, and that he did not

17    demonstrate on the video that is in evidence that the -- that

18    rifle fired semiautomatically before installing any devices.  I

19    think that's -- I think that's fair for the jury to consider.

20    That's the only video in evidence before the jury to consider

21    whether or not he did it, and they didn't show a lot of things

22    that probably they should have shown.

23           I think it's a fair commentary when they failed to

24    produce that evidence, notwithstanding the government's

25    assertions that -- I mean, he testified that he did all these

1    other things, but that's not what the video shows.  And I think

2    it's a fair comment on the video, as it existed, to comment

3    what the evidence shows.

4              THE COURT:  Ms. Taylor, this is not unlike any other

5    time that cross-examination is about whether or not -- or the

6    fact that there wasn't audio recording and when the agent

7    testifies about what an individual said.

8              I think it's fair for him to ask whether he videoed

9    the test fire, and you, on redirect, can point out that it

10   was -- that it was -- that he did first test fire it as a

11   semi- -- showed that it was only semiautomatic without the

12   lightning link.  But I don't think that gets into saying that

13   Mr. King was invited to view the test fire.

14             MR. KING:  And Your Honor, just to be --

15             THE COURT:  Whoa.  It was her turn.

16             MR. KING:  I apologize.

17             MS. TAYLOR:  I don't have any further comment on it,

18   Your Honor.

19             THE COURT:  Then what, Mr. King?

20             MR. KING:  I just want to make sure I understand.

21   This video is not of any test fire that counsel does, it's from

22   a test conducted up in Martinsburg, West Virginia.

23             THE COURT:  Right.  My understanding is what you want

24   to say is that there is no video or evidence showing that

25   before he did this it couldn't fire automatically.

```
 1              MR. KING:  Correct.

 2              THE COURT:  That's fair.

 3              MS. TAYLOR:  Then do I get to ask the question of,

 4    "Did you make this rifle available for inspection?"

 5              MR. LAROSIERE:  If I may, Your Honor, here's

 6    something I'm desperate to avoid there.

 7              THE COURT:  Okay.

 8              MR. LAROSIERE:  I never once saw it fire

 9    semiautomatically, and I was there.

10              MS. TAYLOR:  You were there and able to inspect it.

11              MR. LAROSIERE:  Yes, and it was hammer following,

12    right, and he told me it was hammer following, which is why I

13    went that direction.  I don't want to get into that, which we

14    can't, because I can't testify.

15              THE COURT:  No, you cannot.

16              MR. LAROSIERE:  So I want to just avoid anywhere near

17    that.

18              MS. TAYLOR:  That's fine.  Just, I think the point

19    has been belabored and it should be gotten to and I will

20    address it on redirect.

21              THE COURT:  All right.  Go ahead, Mr. King.

22              MR. KING:  Thank you, Your Honor.

23          (Proceedings in open court:)

24              THE COURT:  Mr. King.

25              MR. KING:  Thank you, Your Honor.
```

1    BY MR. KING:

2    Q.    Agent Toy, did you get a chance to watch that video?

3    A.    This one you just played, sir?

4    Q.    Yes.

5    A.    Yes.

6    Q.    Would you agree with me that it does not show the weapon

7    that you were using with the M16 bolt carrier firing

8    semiautomatically prior to the demonstration?

9    A.    That's correct.

10   Q.    Is there anything during your testing in Martinsburg where

11   you were videoing that prevented you from being able to do

12   that?

13   A.    No.

14   Q.    Do you think it important or unimportant that that was

15   done or not done?

16   A.    Again, I don't think that it really matters in the scheme

17   of classification of this device because the device was a

18   semiautomatic weapon with all semiautomatic components that did

19   not fire automatically.

20   Q.    And I apologize, because I want to make sure I understand

21   that.  You said it had all semiautomatic components.  My

22   understanding is that the M16 bolt carrier is a machine gun

23   component.  Do I have that wrong?

24   A.    My apologies.  The M16 bolt carrier was in it, that's

25   correct.

1    Q.    I want to talk a little bit about the -- and I don't

2    remember -- and I don't think I have the term exactly.  Where

3    did you get these rifles from?  Is there like a collection you

4    have?

5    A.    Yes, it's the National Firearms Collection.

6    Q.    Is this a handful of weapons and firearms or is this a

7    large collection?

8    A.    It's a very large collection.

9    Q.    And when we're talking "very large," to me, ten seems like

10   a lot, but I imagine I'm way off?

11   A.    Yes, sir.  The collection is roughly 15,000 firearms.

12   Q.    And did many of them have SP1 bolt carriers?

13   A.    A few of them did.  I'm not sure exactly how many.  I

14   don't have that -- a count on those.

15          Plus, we have other parts in the collection that we

16   consider to be part of the collection that aren't necessarily

17   firearms that I don't have accounting for, but they're just

18   extra spare parts that we have.

19          I know that most FEOs have at least a couple

20   different variations of AR or M16 bolt carrier at their desk.

21   Q.    And my understanding is that when you made this video and

22   did your tests and generated reports, it was with the M16, not

23   with any of those SP1 bolt carriers; is that correct?

24   A.    The video, yes, it was with an M16 bolt carrier.

25          MR. KING:  Your Honor, I have no further questions.

```
 1              THE COURT:  Ms. Taylor.
 2              MS. TAYLOR:  Thank you, Your Honor.
 3                      REDIRECT EXAMINATION
 4   BY MS. TAYLOR:
 5   Q.    To be clear, Officer Toy, the firearm that is in the
 6   demonstration video, that's a semiautomatic firearm?
 7   A.    Yes, it is.
 8   Q.    Absent the lightning link, would that firearm fire
 9   automatically?
10   A.    Absolutely not.
11   Q.    Have you tested it?
12   A.    Yes, I have.
13   Q.    Have you verified that it only fires semiautomatically
14   absent the lightning link?
15   A.    Yes, I did.  In fact, when we did the test fire in
16   Jacksonville, I belive that we fired it semiautomatically
17   without the lightning link in it.
18   Q.    And even if it has an M16 bolt carrier in it, would it
19   fire automatic or semiautomatic?
20   A.    It would still be semiautomatic.
21   Q.    And to be clear, again, you test fired it here in
22   Jacksonville with both an SP1 bolt carrier and with an M16 bolt
23   carrier?
24   A.    That is correct.
25   Q.    And in both cases it fired automatically with the
```

1  lightning link installed?

2  A.   That is correct.

3           MS. TAYLOR:  No further questions, Your Honor.

4           THE COURT:  Anything further?

5           MR. LAROSIERE:  Just one moment.

6                    RECROSS-EXAMINATION

7  BY MR. LAROSIERE:

8  Q.   Mr. Toy, we've talked a lot about the different guns,

9  different videos.  When you tested -- when you first tested an

10 auto key card that you had cut out, it was late January, right?

11 A.   I believe so, yes.

12 Q.   The video we just watched, is that the same gun or is that

13 a different gun?

14 A.   It's the same one, I believe.  I'm pretty sure it's the

15 same one, yeah, as -- from when to when?  I'm not sure what

16 you're referring to.  Same gun as what?

17 Q.   The first time you tested -- was the first gun you tested

18 the gun we're seeing in the video?

19           MS. TAYLOR:  Your Honor, this is outside of the scope

20 of redirect.

21           THE COURT:  It is.  Let me see counsel for a moment.

22    (Proceedings at sidebar:)

23           THE COURT:  Mr. Larosiere, wasn't that the question

24 that you told me earlier that you wanted to ask and I said you

25 could ask it and then you didn't ask it?

1       MR. LAROSIERE:  Yes.  And they've still been talking

2   about test fires, and so I asked it.  And they were talking

3   about that specific video, and I asked it and now I got the

4   best answer I could have gotten.

5       THE COURT:  I don't understand.

6       MR. LAROSIERE:  He said no, but that it's a different

7   gun in the video, so I feel like I should be able to confront

8   him with that.  The video, like the January 1st, 2021 --

9   January 27th, 2021, video is an entirely different gun, and it

10  shows a series of malfunctions.  And that is the specific gun

11  that is identified in the reports.

12      MS. TAYLOR:  There's no January 27th, 2021, video.

13      MR. LAROSIERE:  The camera -- okay.  The camera's

14  date is off.  If you look at the report, he specifically

15  identifies what happened with the firearm.  What happens

16  with -- in these videos that I'm talking about is the one from

17  those reports.  Exactly as he describes it, two rounds, hammer

18  follow; one round, hammer follow.  It's a different gun.

19      MS. TAYLOR:  The only thing I asked on redirect is

20  whether he tested the gun in the video and confirmed that it

21  fired semiautomatically and what happened at the range when he

22  did the test fire here in Jacksonville.  And now we're going

23  way back into other topics.

24      MR. LAROSIERE:  I think it's relevant.  Is the gun in

25  the video, is that the same gun.  I'm sorry.

1          THE COURT:  Is it the same gun as the very first gun
2     he tested?
3          MR. LAROSIERE:  The gun that is the foundation of
4     this entire thing, his reports, his determinations, because
5     that is what caused the rest of the ATF to act.
6          THE COURT:  Well, what --
7          MR. LAROSIERE:  And it's not the same gun.
8          THE COURT:  Okay.  But what caused the ATF to act I
9     don't think is what the jury has to decide.  What the jury has
10    to decide is whether or not the gun, using the lightning link,
11    was capable of fully automatic fire.
12          I'm not understanding what -- what it matters whether
13    the video shown here today was the same gun, because he said he
14    used different guns and he tested it at different times.  So
15    explain -- if it fired automatically in the video, what are you
16    trying to establish that goes to an issue that the jury has to
17    determine?
18          MR. LAROSIERE:  I think what I have to lean on right
19    now is just credibility.  I -- I -- I think it's clear that
20    that's an untruth.  They're demonstrating different firearms.
21    Like you don't have to be an expert to tell the difference.
22    They're very shockingly different.
23          THE COURT:  What are?
24          MR. LAROSIERE:  The firearms shown in this video and
25    the firearms that he tested it, that his reports are based on.

1    We have the video demonstration.

2         MS. TAYLOR:  I don't even really follow what

3    Mr. Larosiere is talking about.  I would probably have to read

4    the transcript to see if there was anything -- I don't

5    understand the relevance of any of this.

6         THE COURT:  Okay.  I'm trying very hard to follow the

7    argument.  So give me a moment.

8         You're saying that the firearms he tested it with

9    originally in January are different firearms than the firearms

10   shown in this video?

11        MR. LAROSIERE:  Yes, Your Honor.

12        THE COURT:  Okay.  And that matters because what?

13        MR. LAROSIERE:  At this point it would just be

14   impeachment.

15        THE COURT:  About -- you've got to explain --

16        MR. LAROSIERE:  Because he said that it was the same

17   gun on the stand, under oath.

18        THE COURT:  Just now?

19        MR. LAROSIERE:  Yes.

20        THE COURT:  So he started to answer your question and

21   then he said he didn't understand from when to when or what

22   video you were talking about.  So I don't think the answer is

23   what you were suggesting.

24        MR. LAROSIERE:  As I recall, he said "yes" and then

25   paused and proceeded.  Is that correct?

1           THE COURT:  I don't recall a pause.  I recall him

2   saying "yes" and then asking you questions back to clarify the

3   question.  And that's what the transcript -- the realtime

4   shows.

5           MS. TAYLOR:  If anything, I would suggest that to the

6   extent his answer was purportedly inaccurate, it's because he

7   didn't understand the question and not because he was being

8   untruthful.  So I don't see what the purpose of any further

9   impeachment would be.  I frankly didn't understand the question

10  either.

11          MR. LAROSIERE:  I thought the question was very

12  clear.

13          THE COURT:  Of course you did; and of course you

14  didn't.  You-all are being really obvious.

15          I will let you ask him, to be clear, acknowledge that

16  he tested firearms on separate occasions, and you can ask him

17  whether the firearm tested -- that he first -- I'm just trying

18  to figure out how to --

19          MR. LAROSIERE:  May I suggest perhaps, "Understanding

20  that you tested multiple firearms, the firearm that you tested

21  in this video, the video we showed here in court today, is that

22  the same firearm that you originally tested in late January,

23  which you reference in your reports?"  Or perhaps, "Is that the

24  same firearm referenced in your reports of late January?"

25          THE COURT:  No, I don't think you should say

1   "referenced in your report."

2         MR. LAROSIERE:  Okay.

3         THE COURT:  Go ahead, Ms. Taylor.

4         MS. TAYLOR:  It's still outside the scope of

5   redirect.  And I also don't think it's really relevant.  He

6   could have asked this question --

7         THE COURT:  That's part of what I'm -- but here's

8   what I'll do to address that.  I'll let you ask him, but I'm

9   going to let Ms. Taylor -- because if you had asked it

10  originally when you told me you were going to ask it and when I

11  said it was a permissible question, then she would have the

12  opportunity to address any confusion that there might be on

13  redirect.  And I think if I'm letting you ask the question, I

14  have to let her -- or it is appropriate for me to let her

15  address it.

16        MR. LAROSIERE:  Your Honor, I don't want to take up

17  any more time and I don't think it's probative enough to

18  justify all this.  I'm willing to just step down now.  If the

19  government's okay with that.

20        THE COURT:  Excuse me?

21        MS. TAYLOR:  I'm fine with that.

22        THE COURT:  Okay.

23     (Proceedings in open court:)

24        MR. LAROSIERE:  No further questions, Mr. Toy.  Thank

25  you.

1         THE COURT:  Mr. King?

2         MR. KING:  Nothing, Your Honor.  Thank you.

3         THE COURT:  You may step down.

4         THE WITNESS:  Thank you, Your Honor.

5     (Witness exits the courtroom.)

6         THE COURT:  Ms. Taylor.

7         MS. TAYLOR:  Your Honor, at this time the government

8  rests.

9         THE COURT:  All right.  Let me see counsel at sidebar

10  for a moment.

11     (Proceedings at sidebar:)

12         THE COURT:  Mr. King, what's your intention at this

13  time?

14         MR. KING:  Your Honor, it would be our intention to

15  announce rest as well, now that the government has rested, and

16  move for JOA.  It looks like we're not going to be able to

17  charge the jury today, so I suggest that we excuse them, go

18  through JOA on that.  Assuming the Court doesn't grant it,

19  obviously, then I can announce rest on the record when we get

20  back tomorrow.

21         THE COURT:  Mr. Larosiere, what's your intention at

22  this time?

23         MR. LAROSIERE:  Identical, Your Honor.

24         THE COURT:  Okay.  The only thing I would suggest we

25  do differently, Mr. King, is you and Mr. Larosiere have both

1    announced an intention to make a JOA argument, and so what I

2    suggest we do is you go ahead and announce rest this afternoon

3    so that we can let the jury know that the evidence is closed,

4    and then I'll hear your JOA arguments after we let the jury go.

5    But they are preserved as if made at the close of the

6    government's evidence.

7            MR. KING:  As long as that's preserved, Your Honor, I

8    think that's a more functional way.

9            THE COURT:  That's the way we usually do it.

10           Is that acceptable to the government?

11           MS. TAYLOR:  Yes, Your Honor.

12           MR. KING:  Thank you, Your Honor.

13           MR. LAROSIERE:  Thank you, Your Honor.

14           THE COURT:  All right.

15       (Proceedings in open court:)

16           THE COURT:  Mr. King.

17           MR. KING:  Your Honor, on behalf of Mr. Ervin, we

18   announce that we rest as well.

19           THE COURT:  All right.  Mr. Larosiere?

20           MR. LAROSIERE:  Your Honor, on behalf of Mr. Hoover,

21   we rest.

22           THE COURT:  All right.  So, ladies and gentlemen,

23   what that means is the evidence portion of the case is

24   complete.

25           The next thing that happens is I give you my

1  instructions on the law and then you'll hear the closing

2  arguments of the attorneys.  It's too late in the day for us to

3  do that because the instructions themselves will probably take

4  about a half hour and then you'd have the arguments.  So what

5  we're going to do is let you go home.

6          I'll ask you to be here at 9:15 tomorrow morning and

7  then we will -- as soon as everybody is here we'll bring you in

8  and -- well, actually 9 o'clock, please.  We'll bring you in,

9  I'll give you my instructions on the law, and then I'll ask you

10  to give the attorneys your attention for their closing

11  arguments, and then we will give you the case to begin your

12  deliberations.

13          It's really important that you still not talk to

14  anybody, that you not research anything.  You may, in your

15  mind, have questions that you feel were unanswered in this

16  case.  If you feel they were unanswered so far, you have to

17  talk to your fellow jurors about that, but you can't go outside

18  the record to find any additional information.  If you do that,

19  that would be a mistrial and the past almost two weeks that

20  we've spent here would be wasted.

21          So please don't -- resist the urge to talk to anybody

22  about the case, to get anybody's opinion.  You must not do

23  that.  You must not read, watch, or listen to any media

24  reports.  And you still should not form or express any opinions

25  because you haven't heard my instructions as to what the law is

 1   and you haven't heard the parties's arguments explaining their

 2   positions now that all the evidence is in.

 3        So I'll ask you:  Can you-all assure me that you will

 4   continue to follow those instructions?

 5        JURY:  (Affirmative responses.)

 6        THE COURT:  Okay.  So be back at 9 tomorrow morning

 7   and we will pick up the case there.

 8        COURT SECURITY OFFICER:  All rise for the jury.

 9     (Jury exits, 4:49 p.m.)

10        COURT SECURITY OFFICER:  Please be seated.

11        THE COURT:  All right.  Mr. King, on behalf of

12   Mr. Ervin, you said you wanted to make a Rule 29 motion.  I

13   will hear your 29 motion at this time.

14        MR. KING:  Your Honor, on behalf of Mr. Ervin we'd

15   move for a judgment of acquittal as to -- specifically as to

16   Counts -- I lost my indictment, Your Honor.

17        THE COURT:  Oh, while you're looking for that, I'm

18   sorry, Mr. McCroskey, I actually need the jury instruction

19   notebook for the JOA.

20        MR. KING:  Your Honor, as to Count One, which is the

21   conspiracy, as to Counts Two through Eight, which are the

22   substantive counts, and as to Counts Ten, Eleven, and Twelve,

23   on behalf of Mr. Ervin we'd move for a judgment of acquittal.

24        The government's failed to establish a prima facie

25   case that the auto key card that was alleged to have been

1    transferred or conspired to be transferred or possessed by

2    Mr. Ervin is, in fact, a machine gun under the National

3    Firearms Act both because it fails to allege -- both because

4    the government failed to prove that it was designed and

5    intended to act as a machine gun under the Gun Control Act and

6    National Firearms Act as well as that the government failed to

7    prove that it is a combination of parts that's designed and

8    intended to make a semiautomatic firearm fire as a machine gun

9    under the definitions of the National Firearms Act and the Gun

10   Control Act.

11          THE COURT:  Ms. Wiles.

12       (The judge confers with the courtroom deputy.)

13          THE COURT:  Ms. Taylor.

14          MS. TAYLOR:  Your Honor, the United States would

15   submit that we have established a compelling case that the jury

16   should decide with regard to whether the auto key card is

17   designed and intended to be used as a machine gun.

18          The jury has seen ample evidence that that was both

19   Mr. Ervin's intent from the advertising videos that he created,

20   from the emails that he sent out stating that it was durable,

21   that it was -- you know, capitalizing "full" and "auto" in the

22   email, that it was -- I'm trying to remember the words that he

23   used, but to the extent of -- oh, to scale, that was the words

24   that he used.

25          And additionally, that Mr. Hoover also intended it to

1  be used as a machine gun conversion device, which he stated

2  repeatedly in the advertising videos that he made with

3  Mr. Ervin.

4          As well, the United States has demonstrated that it

5  does perform that function because Officer Toy was able to cut

6  it with a common household tool and remove the two pieces of

7  the lightning link from the card and place them into a

8  semiautomatic firearm and cause that firearm to fire and

9  function fully automatically as a machine gun.  And we saw a

10  video demonstration of that as well.

11          This is, I believe, more than sufficient to -- for

12  the jury to find that it was designed and intended to be used

13  as a machine gun.

14          Additionally, we would submit that we have proven

15  that it is a combination of parts and that each auto key card

16  was advertised by Mr. Ervin as -- you know, for example, a 1 in

17  1, if it had two etchings in it, that were the two pieces of a

18  lightning link.  So he clearly intended for it to be one

19  lightning link on that 1 in 1 card that contained two etchings

20  of the two separate parts; four etchings if it was a 2 in 1;

21  six etchings if it was a 3 in 1, et cetera.  It clearly shows

22  his intent and understanding that it was a combination of

23  parts.

24          And additionally, again, Officer Toy cut out the two

25  parts, and they do function in combination to convert a firearm

1   into a machine gun.  And we would submit under the language of

2   the statute that we have provided evidence that is sufficient

3   to get past this motion and also to prove this case beyond a

4   reasonable doubt.

5           THE COURT:  Anything further, Mr. King?

6           MR. KING:  No, Your Honor.

7           THE COURT:  All right.  Mr. Larosiere?

8           MR. LAROSIERE:  Your Honor, on behalf of Mr. Hoover,

9   we feel that the government has not presented a prima facie

10  case of any of the counts charged against our client.  So we

11  can repeat and reallege, for convenience, everything Mr. King

12  just said, with the addition that the government has not proven

13  that Mr. Hoover had any criminal intent whatsoever.  In fact,

14  of all of the testimony that the government put forth, it's

15  incredibly exculpatory.

16          Additionally, every time that the government has

17  referred to the auto key card actually being removed -- a

18  lightning link being manufactured from an auto key card, the

19  government's witnesses have admitted that it was materially

20  altered.  And frankly, that is just not a prima facie case of

21  transferring a machine gun, much less a conspiracy to do so,

22  when it's so clear from all of the evidence that Mr. Hoover

23  believed that all of the conduct was lawful.

24          THE COURT:  Believed that what?

25          MR. LAROSIERE:  The conduct was lawful.  And not a

1   combination of parts.

2        THE COURT:  All right.  I will take the Rule 29

3   arguments under advisement.

4        MS. TAYLOR:  Your Honor, should I address the

5   additional argument?

6        THE COURT:  Yes.

7        MS. TAYLOR:  So I'll just incorporate my previous

8   response to the arguments as to Mr. Ervin.

9        And then as to the additional arguments that were

10  made on behalf of Mr. Hoover, the argument was that the

11  government hasn't proven any criminal intent.  There's a

12  mountain of criminal-intent evidence in this case as to

13  Mr. Hoover.

14       He starts out one of his videos by saying, "What are

15  some of the" -- I'm paraphrasing, but he says, "What are some

16  of the cool ways to make your very own machine gun or

17  silencer?"

18       He specifically markets the auto key card as an

19  option to make a machine gun to people who are in the "zero

20  F-U-C-Ks given" category and states, "If you are a prohibited

21  person, it doesn't matter if you have a firearm anymore.  Your

22  chains have been broken.  So if you're going to have a firearm,

23  why not make a machine gun?"

24       He repeatedly refers to the auto key card as a

25  lightning link in his videos.  He demonstrates how to --

1  exactly what you would do to cut it out and install it in a

2  firearm and exactly how it operates.  It is crystal clear that

3  Mr. Hoover understood what a lightning link was and what an

4  auto key card was.

5          And he also specifically advocates that laws only

6  work if we follow them, and repeatedly advocates willfully

7  breaking the law.

8          Additionally, in some of his later videos he talks

9  about the fact that he knew that Ervin was willfully

10  disregarding the law by making the auto key card and that

11  Mr. Hoover wished to support Mr. Ervin in his willful disregard

12  and disobedience of the law.

13          And additionally, we've presented evidence regarding

14  transfer.  We have shown through the mail meter, through the

15  seized packages that were seized by Inspector Hannon, that that

16  is what was being sent out through that mail meter, which was

17  Exhibit 73, I believe.  That all of those items that were being

18  sent out were auto key cards.  None of them contained any other

19  items.

20          And again, we believe that there is sufficient

21  evidence to show that the auto key card is a combination of

22  parts designed and intended to be used to convert a weapon into

23  a machine gun.

24          THE COURT:  Give me a moment.

25      (Pause in proceedings.)

1        THE COURT:  All right.  I was checking on one thing

2   in the statute that I couldn't recall, but it's still my

3   intention to take the motions for judgment of acquittal under

4   advisement and submit the case to the jury.

5        Mr. McCroskey, do you have the revised instructions?

6        LAW CLERK:  Yes, Your Honor.

7        THE COURT:  Could you give me a copy of it?

8        LAW CLERK:  Yes.

9        THE COURT:  So Mr. McCroskey is distributing to you

10   what I've titled the Court's Revised Proposed Jury Instruction

11   for No. 14 and No. 18.

12        In addition to the change that we previously agreed

13   to, the change in this revised proposed instruction is in the

14   first element of what the government has to prove beyond a

15   reasonable doubt, and that is, previously it read that the

16   government has to prove -- "A defendant can be found guilty of

17   this crime only if all the following facts are proved beyond a

18   reasonable doubt.  One, the defendant knowingly transferred, or

19   aided and abetted the transfer of, a firearm."  And that's

20   where it ended previously.

21        To address the concern that the defendant has about

22   the fact that the government has to prove it's a combination of

23   parts and not a single part, as I previously said, the language

24   that was being proposed, I think it was misleading because it

25   suggests that a single thing could not be a combination of

1    parts.

2         So what I've done is added that, "The first element

3    requires proof beyond a reasonable doubt that the defendant

4    knowingly transferred, or aided and abetted the transfer of, a

5    firearm, specifically, a combination of parts designed and

6    intended for use in converting a weapon to shoot automatically

7    more than one shot, without manual reloading, by single

8    function of the trigger."

9         That's what's charged in the indictment.  And you are

10   both free to argue from that whether the government has proven

11   a combination of parts designed and intended for that purpose

12   or not.  So that would be my intention.

13        Ms. Taylor, any further objection -- and I've made

14   that change both in Court's Proposed 14 and Court's Proposed

15   18.

16        Let me start with you on that, and then I have some

17   further comments.  But Ms. Taylor, any objection to that, to

18   Court's revised proposed 14?

19        MS. TAYLOR:  No, Your Honor.

20        I am considering whether to ask -- I'm looking at

21   page 2, and this is, I think, the language that was added at

22   our request about, "The government does not have to prove that

23   the defendant knew the item described in the indictment was a

24   firearm that must be legally registered or that any purchaser

25   successfully converted a particular firearm into a machine

1  gun."  I think I might ask for the Court to strike the word

2  "particular."

3         THE COURT:  I don't have a -- it might also be better

4  to say that "any purchaser successfully committed" -- or

5  "converted a firearm into a" -- "into an automatic weapon."

6         But before we get to that, let me just ask, Mr. King,

7  let me hear from you on my proposal.

8         MR. KING:  Your Honor, we would have no objection to

9  the addition as long as the record is clear, we would maintain

10 our previous request and objections.  But otherwise, the --

11 there's no objection to the addition.

12        THE COURT:  Okay.  And do you have an objection to

13 removing the word -- removing the word "particular"?

14        MR. KING:  I don't, Your Honor.  If the Court thinks

15 it's more appropriate to say "automatic fire," or something

16 like that, I think that's -- I have no strong feelings one way

17 or the other and would not object to either one.

18        THE COURT:  And I'm going to hear from you in a

19 moment.  I can't remember who did -- who's doing instructions.

20 Is that Mr. Zermay, right?

21        MR. ZERMAY:  It was me, Your Honor.

22        THE COURT:  Okay.  So -- "or that any purchaser

23 converted a firearm into a fully automatic weapon"?

24        MR. ZERMAY:  Your Honor, respectfully, we'd request

25 that we maintain the term "machine gun."

1        And just for the record, as to the binary choice

2   discussion earlier, we would maintain the position that there

3   is a binary choice in the statute, whether or not there is a

4   part versus a combination of parts, plural.  And so we'd just

5   like to maintain that objection for the record with respect to

6   that.

7        THE COURT:  Okay.  And I agree with you, in the

8   statute it is a binary choice.  My concern is that the way

9   you-all are wanting me to instruct it is confusing to the jury.

10       And I think that you are free to argue, and I fully

11  expect that you will argue, that what the defendants

12  transferred was not a combination of parts; it was a single

13  piece of metal steel.  And it wasn't until the purchasers

14  bought it and cut out the pieces that it became a combination

15  of parts.

16       And you're still free to argue that, but the way --

17  the language that you've asked -- are asking me to instruct the

18  jury suggests that if it's a single item when it is -- at the

19  time of transfer, that that, by definition, cannot be a

20  combination of parts.  And that's what I think is misleading to

21  the jury.

22       And so my effort to clarify that is that in this

23  instruction, both this -- both in Jury Instruction No. 14 and

24  in Jury Instruction No. 18, the jury is going to be told three

25  separate times -- that is, by the time I finish reading the

1    instructions they're going to have been told six times -- that

2    it has to be a combination of parts.  If you can't argue that

3    it's not a single part from that, that's not a failure of the

4    instructions, so . . .

5         They have been clearly instructed that the only way

6    the defendants can be convicted in this case is if the

7    government proves beyond a reasonable doubt that the item that

8    was conspired to be transferred, that was transferred, or that

9    was possessed is a combination of parts designed and intended

10   for use in converting a weapon.

11        So to the extent that you-all want the single -- it's

12   a single part rather than a combination of parts, I decline to

13   give that instruction.

14        Anything else with regard to -- oh, and I am going to

15   change -- and you wanted to leave "machine gun."  So that last

16   paragraph will read, "The government does not have to prove

17   that the defendant knew the item described in the indictment

18   was a firearm that must be legally registered or that any

19   purchaser successfully converted a firearm into a machine gun."

20        Reserving your objection about the binary choice,

21   single versus combination of parts, is Jury Instruction No. 14

22   acceptable to Mr. Hoover?

23        MR. ZERMAY:  Yes, Your Honor.

24        THE COURT:  Mr. King, reserving your objection on

25   that same issue, is Jury Instruction 14 acceptable to

1   Mr. Ervin?

2           MR. KING:  Yes, Your Honor.

3           THE COURT:  And with that change, is it acceptable to

4   the United States?

5           MS. TAYLOR:  Yes, Your Honor.

6           THE COURT:  Same question as to Jury Instruction

7   No. 18, Ms. Taylor?

8           MS. TAYLOR:  Yes, Your Honor.

9           THE COURT:  And reserving your objection to the

10  single versus combination of -- you know, the request that I

11  include the language that says, "If you find that it's a single

12  part rather than a combination of parts, you must find the

13  defendants not guilty," reserving your objection to my failure

14  to give that instruction, is 18 acceptable to Mr. Ervin?

15          MR. KING:  Yes, Your Honor, as well as reserving the

16  arguments made in the motion in limine that the Court's already

17  ruled on.

18          THE COURT:  Okay.

19          And is it -- reserving that same objection, is it

20  acceptable to Mr. Hoover?

21          MR. ZERMAY:  Yes, Your Honor, subject to the same

22  arguments made in motion in limine too.

23          THE COURT:  Yeah, I don't remember who made what

24  argument in the motion in limine, but the record is what it is

25  on that.

1          All right.  Then we will have the -- you've already
2     made all the other edits, right?
3          LAW CLERK:  Yes, Your Honor.
4          THE COURT:  So we'll go ahead and docket the final
5     instructions this evening so that you'll have them.  I don't
6     usually docket them before I read them, but at least that way
7     you'll -- to the extent you want to look at them, they'll have
8     them.
9          Remember that when you do your closing arguments, I
10    will already have read the instructions to the jury.  And in my
11    experience, it's about a minute a page, so the jury will have
12    heard about 30 minutes of me reading these instructions.
13         Please do not reread the instructions to them in your
14    closings.  If there's particular language that's important --
15    and there absolutely is in this case, I understand that -- but
16    don't wholesale read the instructions to them.  It's painful
17    for them.  It's actually one of the reasons that I instruct the
18    jury before closing arguments, so you don't feel the need to do
19    that.
20         So you can focus on your arguments and know that they
21    will get a copy of the instructions to go back to the jury.
22         Speaking of things going back to the jury, do we have
23    a redacted indictment?
24         MS. TAYLOR:  I'll work on that tonight, Your Honor.
25    And we'll email it to chambers?  I haven't had a chance to make

1    it yet.

2              THE COURT:  Okay.  Well, email it to opposing

3    counsel, make sure that you-all reach an agreement on it so

4    that by the time we get here in the morning there's an

5    agreement on it.

6              MS. TAYLOR:  Yes, Your Honor.

7              THE COURT:  Okay.

8              MR. KING:  Thank you, Your Honor.

9              THE COURT:  And Ms. Taylor, who's closing?

10             MS. TAYLOR:  I am, Your Honor.

11             THE COURT:  And what's your anticipated length?

12             MS. TAYLOR:  I'm hoping to keep my first close to an

13   hour.

14             THE COURT:  And rebuttal?

15             MS. TAYLOR:  30 minutes.  I'm hoping the rebuttal

16   will be shorter than that, but I will make it as brief as I

17   can.  There's a lot to go through in this case, Your Honor.

18             THE COURT:  Mr. King, what's your intention?  And

19   what order are you guys going in?  Tell me now.

20             MR. KING:  Your Honor, if I could just have a moment.

21        (Defense counsel confer.)

22             MR. KING:  Your Honor, I believe Mr. Larosiere will

23   be going first.  I will be going second.  At this point it's

24   looking about an hour and 15 minutes, hour and a half.  But I'm

25   going to spend tonight trying to get that closer to an hour,

1  without having to speak so fast that Ms. Healey feels the need

2  to throw things at me.

3          THE COURT:  And Mr. Larosiere?

4          MR. LAROSIERE:  Your Honor, it was looking like an

5  hour and a half, but after hearing the Court's warning, I

6  expect I will pare it down substantially.

7          THE COURT:  All right.  In my experience, you're hard

8  pressed to keep their attention once you get beyond 45 minutes.

9          I'm not going to give you -- I'm not going to

10  necessarily give you time limits.  I am going to say that,

11  yes -- I think -- both Ms. Taylor and Mr. King, if you really

12  think you need an hour and a half, I'm concerned about that.

13  But I'll say this, if you go beyond that, I will cut you off.

14  I think it's too long, particularly in one sitting.

15          The jury hearing one person talking for an hour and a

16  half, Mr. King, I think you run the very, very real risk that

17  they have stopped listening.  It's just a long time to listen

18  to one person talking without any other interruption.

19          MR. KING:  Your Honor, I completely agree, which is

20  why my effort this evening will be to pare down, not to add.

21          THE COURT:  Yeah, I would strongly suggest that.

22          All right.  And I told them -- what time did I tell

23  them?  I told them 9 o'clock in the end?

24          MR. LAROSIERE:  9:15.

25          THE COURT:  No, I said 9:15, and then I backed it up

1    to 9 o'clock.

2              All right.  Madam Deputy, have we already confirmed

3    all the evidence?

4              COURTROOM DEPUTY:  Ms. Ganoe and I have, Your Honor.

5              THE COURT:  All right.  So then is there anything --

6    and Mr. Hoover and Mr. Ervin both advised the Court that if

7    their attorneys announced rest and they had not testified, that

8    that reflected their own decision.

9              And so Mr. King, can the record reflect that that was

10   Mr. Ervin's own decision --

11             MR. KING:  Yes, Your Honor.

12             THE COURT:  -- not to testify?

13             MR. KING:  Yes, Your Honor.

14             THE COURT:  And Mr. Zermay, can the record reflect

15   that it was Mr. Hoover's own decision not to testify?

16             MR. ZERMAY:  Yes, Your Honor.

17             THE COURT:  All right.  Anything else I need to

18   address from the perspective of the United States, Ms. Taylor?

19             MS. TAYLOR:  No, Your Honor.

20             THE COURT:  Mr. King?

21             MR. KING:  No, Your Honor.

22             THE COURT:  Mr. Zermay?

23             MR. ZERMAY:  No, Your Honor.

24             THE COURT:  Hold on.

25        (The judge and the courtroom deputy confer.)

1      THE COURT:  So you will recall that last Thursday we

2  had to break at a particular time because one of the jurors

3  needed an injection.  I guess it must be an every- -- it must

4  be a weekly thing, but it has to be at a particular time.  So

5  I'm going to have to find a time to break between 12 and 12:30.

6  It is my hope that I won't interrupt.

7      And what we'll likely do -- we'll see where we are,

8  and if there's going to have to be an interruption in the midst

9  of someone's closing argument, we'll talk about how to do that.

10 But I cannot risk the health or well-being of the juror by

11 not -- by delaying a medically-required injection.  So we'll

12 make sure to address that.

13     Anything else?

14     MR. KING:  Your Honor, Mr. Mesrobian reminded me that

15 I did not address with the Court the Court's offer to make a

16 limiting instruction regarding the prosecution of the portable

17 wall hanger case.

18     I met with Mr. Ervin in person.  We went over that,

19 and he has -- in consultation with me, we are not going to be

20 asking for that instruction.

21     THE COURT:  Okay.

22     MR. KING:  I just wanted to make sure the record is

23 clear.

24     THE COURT:  Okay.  So the matter of the portable wall

25 hanger is resolved.  And I do have a sticky note somewhere on

1    this desk to ask about that, but I lost it.  So thank you,

2    Mr. Mesrobian.

3            All right.  If there's nothing further, we will be in

4    recess until 9 a.m. tomorrow morning.

5            COURT SECURITY OFFICER:  All rise.

6        (Proceedings adjourned at 5:20 p.m., to be continued on

7    Thursday, April 20, 2023.)

8                              -    -    -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 CERTIFICATE OF OFFICIAL COURT REPORTER

2

3     UNITED STATES DISTRICT COURT)

4     MIDDLE DISTRICT OF FLORIDA )

5

6          I hereby certify that the foregoing transcript is a true

7     and correct computer-aided transcription of my stenotype notes

8     taken at the time and place indicated herein.

9

10         DATED this 29th day of May, 2023.

11

12                           /s/ Katharine M. Healey
                             Katharine M. Healey, RMR, CRR, FPR-C
13                           Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25