1               UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2               JACKSONVILLE DIVISION

3  UNITED STATES OF AMERICA,    Case No. 3:21-cr-22(S4)-MMH-MCR

4      Plaintiff,        April 20, 2023

5  v.                 9:28 a.m. - 5:43 p.m.

6  KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
  and MATTHEW RAYMOND HOOVER,
7
      Defendants.
8  _____

9
                  **JURY TRIAL**
10              **(VOLUME 8 of 9)**

11
      BEFORE THE HONORABLE MARCIA MORALES HOWARD
12        UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19  OFFICIAL COURT REPORTER:

20      Katharine M. Healey, RMR, CRR, FPR-C
       PO Box 56814
21      Jacksonville, FL 32241
       Telephone: (904) 301-6843
22      KatharineHealey@bellsouth.net

23

24                   (Proceedings reported by stenography;
                     transcript produced by computer.)
25

1                      A P P E A R A N C E S

2

3    COUNSEL FOR THE GOVERNMENT:

4    **LAURA C. TAYLOR, ESQUIRE**
     **DAVID MESROBIAN, ESQUIRE**
5      United States Attorney's Office
       300 North Hogan Street, Suite 700
6      Jacksonville, FL 32202

7

8    COUNSEL FOR DEFENDANT ERVIN:

9    **ALEX KING, ESQUIRE**
       Monroe & King, P.A.
10     1805 Copeland Street
       Jacksonville, FL 32204
11

12
     COUNSEL FOR DEFENDANT HOOVER:
13
     **ZACHARY Z. ZERMAY, ESQUIRE**
14     Zermay Law
       1762 Windward Way
15     Sanibel, FL 33957

16   - A N D -

17   **MATTHEW LAROSIERE, ESQUIRE**
       6964 Houlton Circle
18     Lake Worth, FL 33467

19

20

21

22

23

24

25

I N D E X

PAGE

COURT'S INSTRUCTIONS TO THE JURY............................ 9

GOVERNMENT'S CLOSING ARGUMENT BY MS. TAYLOR................ 33

DEFENDANT HOOVER'S CLOSING ARGUMENTS BY MR. LAROSIERE...... 67

DEFENDANT ERVIN'S CLOSING ARGUMENTS BY MR. KING........... 102

GOVERNMENT'S REBUTTAL CLOSING ARGUMENTS BY MS. TAYLOR..... 167

JURY RETIRES TO BEGIN DELIBERATIONS....................... 188

ALTERNATE JUROR EXCUSED WITH INSTRUCTIONS................. 189

E X H I B I T S

ADMITTED                                              PAGE

  COURT'S EXHIBIT 1....................................... 191

  COURT'S EXHIBIT 2....................................... 192

  COURT'S EXHIBIT 3....................................... 198

1               P R O C E E D I N G S

2   April 20, 2023                              9:28 a.m.

3                         -   -   -

4       (All parties present.  Jury not present.)

5           COURT SECURITY OFFICER:  All rise.  This Honorable

6   Court is now in session.

7           Please be seated everyone.

8           THE COURT:  All right.  So this -- we're back on the

9   record in Case No. 3:21-cr-22(S4)-MMH-MCR, United States of

10  America vs. Kristopher Justinboyer Ervin and Matthew Raymond

11  Hoover.

12          Ms. Taylor and Mr. Mesrobian are here along with

13  Agent Slosson for the United States.

14          Mr. King is here with Mr. Ervin.

15          Mr. Zermay and Mr. Larosiere are here with

16  Mr. Hoover.

17          We're set to instruct the jury and then proceed with

18  closing arguments.

19          A couple of things.  First of all, given the length

20  that you-all have predicted for your closing arguments, I think

21  that -- well, it seems impossible that we would complete the

22  closing arguments before I would need to let the jury have a

23  lunch break.  I don't love breaking in the middle of closing

24  arguments, so what I would like to do is take a shorter lunch

25  break and bring in lunch for them.  In order to do that, I have

 1    to enter a partial sequestration order; otherwise, we can't

 2    provide them lunch.  So I'm -- and all that means is that they

 3    can't leave the building during the daytime.

 4              So what would make sense to me is to let them know

 5    that we're going to bring in lunch for them.  Do you-all want

 6    me to clarify, though, that that doesn't mean they can't leave

 7    this evening, or just not mention that at all?

 8              MS. TAYLOR:  I don't have strong feelings about this,

 9    Your Honor, but I think they would probably want to know that

10    information.  So I would be inclined to let them know that.

11              MR. KING:  Your Honor, I'd just defer to the Court's

12    preference.

13              THE COURT:  Okay.  Mr. Larosiere?

14              MR. LAROSIERE:  I feel the emphasis might cause undue

15    concern, but I'll defer to the Court's opinion.

16              THE COURT:  The emphasis on what might cause undue

17    concern?  I'm not sure what --

18              MR. LAROSIERE:  On not being able to leave.

19              THE COURT:  I don't have to clarify that -- I think

20    what I can just say to them is that because the lunch hour is

21    going to fall during closing arguments, and for that reason I

22    want to give them a shorter lunch hour, we're just going to

23    bring in lunch for them today.  And I can just say that and

24    nothing else.

25              MR. LAROSIERE:  Yeah, I think that would be

1    absolutely sufficient.

2           THE COURT:  Okay.  Any objection?

3           MS. TAYLOR:  No, Your Honor.

4           MR. KING:  No, Your Honor.

5           THE COURT:  Okay.  So let me just -- and the partial

6    sequestration order simply says that, "At this time, the Court

7    has instructed the jury and the parties have begun their

8    closing arguments.  The lunch hour will fall in the middle of

9    those arguments.  Given the critical stage of the proceedings,

10   the Court finds it appropriate to partially sequester the jury

11   at this time until the conclusion of their deliberations."

12          So it's just a matter of timing.  I want to take a

13   shorter lunch.  I don't want to interfere with the closing

14   arguments.  So today is the --

15          COURTROOM DEPUTY:  20th.

16          THE COURT:  -- 20th.  Madam Deputy, if you'll enter

17   the order and advise the jury administrator.

18          I just want to confirm that we still need to break

19   for one of the jurors today between 12 and 12:30; is that

20   right?

21          COURTROOM DEPUTY:  Yes, Your Honor.

22          THE COURT:  So we'll address that as appropriate

23   during the -- all right.  Is there anything else that we need

24   to do before we bring the jury in to give them their

25   instructions?

1        MS. TAYLOR:  Not from our perspective.

2        THE COURT:  Mr. King?

3        MR. KING:  Nothing on behalf of Mr. Ervin, Your

4   Honor.

5        MR. LAROSIERE:  Nothing for Mr. Hoover, Your Honor.

6        THE COURT:  All right.  Let's have the jury, please.

7        Oh, did we agree on a redacted indictment?

8        COURTROOM DEPUTY:  They did, Your Honor.

9        THE COURT:  And Madam Deputy, go -- if you wouldn't

10  mind going and stopping her, I want to talk to them about one

11  last thing.

12        Ordinarily when I read the -- I usually read the

13  verdict form from beginning to end.  In this instance, the

14  first eight questions of the verdict form, I'll be repeating.

15  Do you-all want me to repeat them or do you want me to just

16  advise them after having read the first eight questions of

17  Mr. Ervin's verdict form, tell them at that point that there's

18  a separate verdict form for Mr. Hoover that asks those same

19  questions as to him and then continue?  It seems like that's

20  kinder than reading both from beginning to end.  But if you-all

21  want me to read both from beginning to end, I will.

22        MS. TAYLOR:  I believe on the -- or I agree with the

23  abbreviated version, Your Honor.

24        THE COURT:  All right.

25        MR. KING:  Defer to the Court, Your Honor.

1          MR. LAROSIERE:  We defer to the Court, Your Honor.

2          THE COURT:  Then I'm going to read the first eight

3    questions on Mr. Ervin's.  I'm going to tell them that there's

4    a separate verdict form for Mr. Hoover, it asks those same

5    first eight questions, and then I'll read the rest of the

6    verdict.

7          Go ahead.

8          COURT SECURITY OFFICER:  All rise for the jurors.

9      (Jury enters, 9:34 a.m.)

10          COURT SECURITY OFFICER:  Please be seated.

11          THE COURT:  Good morning, ladies and gentlemen.

12          We are continuing this morning in

13    Case No. 3:21-cr-22.

14          As I told you, at this time I'm going to be giving

15    you the Court's instructions on the law.  Before I start I want

16    to tell you a few things.

17          First of all, because we're going to start with

18    clos- -- we're going to have the instructions and then we're

19    going to start the closing arguments, I don't know that -- I

20    don't think we'll finish all the closing arguments before it's

21    time for you to have lunch.  But because I don't want to get

22    off track, I'm going to give you a shorter lunch period, but

23    we're going to bring lunch in for you so that you don't have to

24    go out and get it.  So lunch will be provided for you.

25          I also know that we need to make sure to have a break

1    between 12 and 12:30 to accommodate a medical concern, so we

2    will do that.

3          The last thing I want to tell you is I'm going to be

4    reading these instructions to you.  That means as much as I

5    like to look at you when I talk to you, I can't.  I actually

6    have to read them.  I will send copies of the instructions

7    back, so please don't feel like you have to scribble down

8    everything I'm saying.  They are lengthy and you will get

9    written copies.

10         So with those preliminary matters, I will now

11   proceed.

12         Members of the Jury, it is my duty to instruct you on

13   the rules of law you must use in deciding this case.  After I

14   have completed these instructions, you will hear the closing

15   arguments of the attorneys and then you will go to the jury

16   room and begin your instructions, what we call your

17   deliberations.

18         You must decide whether the -- whether the government

19   has proved the specific facts necessary to find each defendant

20   guilty beyond a reasonable doubt.

21         Your decision must be based only on the evidence

22   presented during the trial.  You must not be influenced in any

23   way by either sympathy for or prejudice against any defendant

24   or the government.

25         You must follow the law as I explain it, even if you

1   do not agree with the law, and you must follow all of my

2   instructions as a whole.  You must not single out or disregard

3   any of the Court's instructions on the law.

4          The indictment or formal charge against a defendant

5   is not evidence of guilt.  The law presumes every defendant is

6   innocent.  A defendant does not have to prove his innocence or

7   produce any evidence at all.  A defendant does not have to

8   testify.  And if either defendant chose not to testify, you

9   cannot consider that in any way while making your decision.

10  The government must prove guilt beyond a reasonable doubt.  If

11  it fails to do so as to any defendant on any charge, you must

12  find that defendant not guilty on that charge.

13         The government's burden of proof is heavy, but it

14  does not have to prove a defendant's guilt beyond all possible

15  doubt.  The government's proof only has to exclude any

16  reasonable doubt concerning the defendant's guilt.

17         A "reasonable doubt" is a real doubt based on your

18  reason and common sense after you have carefully and

19  impartially considered all the evidence in the case.

20         "Proof beyond a reasonable doubt" is proof so

21  convincing that you would be willing to rely and act on it

22  without hesitation in the most important of your own affairs.

23  If you are convinced that a defendant has been proved guilty

24  beyond a reasonable doubt, say so.  If you are not convinced,

25  say so.

1        As I said before, you must consider only the evidence

2   that I have admitted in the case.  Evidence includes the

3   testimony of witnesses and the exhibits admitted.  But,

4   anything the lawyers say is not evidence and is not binding on

5   you.

6        You should not assume from anything I have said that

7   I have any opinion about any factual issue in the case.  Except

8   for my instructions to you on the law, you should disregard

9   anything I may have said during the trial in arriving at your

10  own decision about the facts.

11       Your own recollection and interpretation of the

12  evidence is what matters.

13       In considering the evidence you may use reasoning and

14  common sense to make deductions and reach conclusions.  You

15  should not be concerned about whether the evidence is direct or

16  circumstantial.

17       "Direct evidence" is the testimony of a person who

18  asserts that he or she has actual knowledge of a fact, such as

19  an eyewitness.

20       "Circumstantial evidence" is proof of a chain of

21  facts and circumstances that tend to prove or disprove a fact.

22  There is no legal difference in the weight you may give to

23  either direct or circumstantial evidence.

24       When I say you must consider all the evidence, I do

25  not mean that you must accept all the evidence as true or

1    accurate.  You should decide whether you believe what each

2    witness had to say and how important that testimony was.  In

3    making that decision you may believe or disbelieve any witness

4    in whole or in part.  The number of witnesses testifying

5    concerning a particular point does not necessarily matter.

6              To decide whether you believe a witness, I suggest

7    you ask yourself a few questions:

8              Did the witness impress you as one who was telling

9    the truth?

10             Did the witness have any particular reason not to

11   tell the truth?

12             Did the witness have a personal interest in the

13   outcome of the case?

14             Did the witness seem to have a good memory?

15             Did the witness have the opportunity and ability to

16   accurately observe the things he or she testified about?

17             Did the witness appear to understand the questions

18   clearly and answer them directly?

19             Did the witness's testimony differ from other

20   testimony or other evidence?

21             You should also ask yourself whether there was

22   evidence that a witness testified falsely about an important

23   fact.  And ask whether there was evidence that at some other

24   time a witness said or did something, or did not say or do

25   something, that was different from the testimony the witness

1    gave during the trial.

2         But keep in mind that a simple mistake does not mean

3    a witness was not telling the truth as he or she remembers it.

4    People naturally tend to forget some things or remember them

5    inaccurately.  So, if a witness misstated something, you must

6    decide whether it was because of an innocent lapse in memory or

7    an intentional deception.  The significance of your decision

8    may depend on whether the misstatement is about an important

9    fact or about an unimportant detail.

10         You must consider the testimony of some witnesses

11   with more caution than others.

12         For example, a witness who has been promised immunity

13   from prosecution or a witness who hopes to gain more favorable

14   treatment in his own case may have a reason to make a false

15   statement in order to strike a good bargain with the

16   government.

17         So while a witness of that kind may be entirely

18   truthful when testifying, you should consider that testimony

19   with more caution than the testimony of other witnesses.

20         When scientific, technical, or other specialized

21   knowledge might be helpful, a person who has special training

22   or expertise in that field is allowed to state an opinion about

23   the matter.  But that does not mean you must accept the

24   witness's opinion.  As with any other witness's testimony, you

25   must decide for yourself whether to rely upon the opinion.

1          The government has presented agents of the United

2    States who have testified as to the meaning of certain laws --

3    certain terms, laws, and regulations pertaining to firearms.

4    In addition, witnesses may have referred to items as "firearms"

5    or "machine gun conversion devices."  As with any evidence, you

6    may give this testimony as much or as little weight and credit

7    as you determine it deserves.

8          Remember, you must follow my instructions on the law

9    and decide for yourselves based on the evidence in this case

10   and my instructions whether the auto key card is a machine gun

11   subject to firearm laws and regulations.

12         You will recall that a number of exhibits were

13   identified as typewritten transcripts of the oral conversations

14   you heard on audio and video recordings that were in evidence.

15   The transcripts also purport to identify the speakers engaged

16   in the conversations.

17         I admitted the transcripts for the limited and

18   secondary purpose of helping you follow the content of the

19   conversations as you listen to the recordings, and also to help

20   you identify the speakers.  But you are specifically instructed

21   that whether the transcripts correctly reflect the content of

22   the conversation or the identity of the speakers is entirely

23   for you to decide based on your own evaluation of any testimony

24   you heard about the preparation of the transcripts and from

25   your own examination of the transcripts in relation to hearing

1    and viewing the recordings themselves as the primary evidence

2    of their contents.

3            If you determine that any transcript is in any

4    respect incorrect or unreliable, you should disregard it to

5    that extent.

6            You have been permitted to take notes during the

7    trial.  Most of you -- perhaps all of you -- have taken

8    advantage of that opportunity.

9            You must use your notes only as a memory aid during

10   deliberation.  You must not give your notes priority over your

11   independent recollection of the evidence.  And you must not

12   allow yourself to be unduly influenced by the notes of other

13   jurors.

14           I emphasize that notes are not entitled to any

15   greater weight than your memories or impressions about the

16   testimony.

17           The indictment in this case charges the defendants

18   with committing a number of crimes which are set forth

19   separately in what we refer to as "counts."  Each count has a

20   number.  You will be given a copy of the indictment to refer to

21   during your deliberations.  I remind you that the indictment is

22   not evidence of anything.  It is simply the formal document

23   that sets forth the charges.

24           In Count One of the indictment, the defendants are

25   not charged with committing a substantive offense.  Instead,

1    they are charged with conspiring to commit a substantive

2    offense.  Specifically, the defendants are charged with

3    knowingly and willfully conspiring to transfer unregistered

4    machine gun conversion devices.

5          In the remaining counts of the indictment, each

6    defendant is charged with committing certain substantive

7    offenses.  Specifically, in Counts Two through Eight, Mr. Ervin

8    and Mr. Hoover are each charged with knowingly transferring,

9    and aiding and abetting the transfer of, unregistered machine

10   gun conversion devices.  In Count Nine, Mr. Ervin is charged

11   with structuring cash withdrawals for the purpose of evading

12   currency transaction reporting requirements.  And in Counts

13   Ten, Eleven, and Twelve, Mr. Ervin is charged with possessing

14   unregistered machine gun conversion devices on three separate

15   dates.

16         I will explain the law governing those substantive

17   offenses in a moment, but first note that the defendants are

18   not charged in Count One with committing a substantive offense.

19   They are charged with conspiring to commit a particular

20   offense.

21         I will now give you specific instructions on the

22   conspiracy charge.

23         As I previously stated, Count One charges the

24   defendants with conspiring to transfer machine gun conversion

25   devices that were not registered in the National Firearms

1    Registration and Transfer Record.  It is a separate federal

2    crime for anyone to conspire or agree with someone else to do

3    something that would be another federal crime if it was

4    actually carried out.

5         A "conspiracy" is an agreement by two or more people

6    to commit an unlawful act.  In other words, it is a kind of

7    partnership for criminal purposes.  Every member of a

8    conspiracy becomes the agent or partner of every other member.

9         The government does not have to prove that all the

10   people named in the indictment were members of the plan, or

11   that those who were members made any kind of formal agreement.

12        The government does not have to prove that the

13   members planned together all the details of the plan or the

14   overt acts that the indictment charges would be carried out in

15   an effort to commit the intended crime.

16        The heart of a conspiracy is the making of the

17   unlawful plan itself followed by the commission of any overt

18   act.  The government does not have to prove that the

19   conspirators succeeded in carrying out the plan.

20        A defendant can be found guilty of this crime only if

21   all the following facts are proved beyond a reasonable doubt as

22   to him:

23        One, two or more persons in some way agreed to try to

24   accomplish a shared and unlawful plan;

25        Two, the defendant knew the unlawful purpose of the

1   plan and willfully joined in it;

2        Three, during the conspiracy, one of the conspirators

3   knowingly engaged in at least one overt act as described in the

4   indictment; and

5        Four, the overt act was committed at or about the

6   time alleged and with the purpose of carrying out or

7   accomplishing some object of the conspiracy.

8        An "overt act" is any transaction or event, even one

9   that may be entirely innocent when viewed alone, that a

10  conspirator commits to accomplish some object of the

11  conspiracy.

12       A person may be a conspirator without knowing all the

13  details of the unlawful plan or the names and identities of all

14  other alleged conspirators.

15       If a defendant played only a minor part in the plan

16  but had a general understanding of the unlawful purpose of the

17  plan and willfully joined in the plan on at least one occasion,

18  that is sufficient for you to find that defendant guilty.

19       But simply being present at the scene of an event or

20  merely associating with certain people and discussing common

21  goals and interests does not establish proof of a conspiracy.

22  A person who does not know about a conspiracy but happens to

23  act in way that advances some purpose of one does not

24  automatically become a conspirator.

25       Counts Two through Eight charge the defendants with

1   transferring, and aiding and abetting the transfers of, machine

2   gun conversion devices that were not registered in the National

3   Firearms Registration and Transfer Record.  It is a federal

4   crime for anyone to transfer certain kinds of firearms that are

5   not properly registered to him in the National Firearms

6   Registration and Transfer Record.

7           A "firearm" includes a machine gun.  Under the law, a

8   machine gun includes a machine gun conversion device consisting

9   of a combination of parts designed and intended for use in

10  converting a weapon to shoot automatically more than one shot,

11  without manual reloading, by a single function of the trigger.

12  A machine gun must be properly registered in the National

13  Firearms Registration and Transfer Record.

14          To "transfer" a firearm means to deliver it to

15  someone else.

16          A defendant can be found guilty of this crime only if

17  all the following facts are proved beyond a reasonable doubt:

18          One, the defendant knowingly transferred, or aided

19  and abetted the transfer of, a firearm, specifically, a

20  combination of parts designed and intended for use in

21  converting a weapon to shoot automatically more than one shot,

22  without manual reloading, by a single function of the trigger;

23          Two, the firearm was not registered in the National

24  Firearms Registration and Transfer Record; and

25          Three, the defendant knew of the specific

1    characteristics or features of the firearm that made it subject

2    to registration under the National Firearms Registration and

3    Transfer Record.

4         The government does not have to prove that the

5    defendant knew the item described in the indictment was a

6    firearm that must be legally registered or that any purchaser

7    successfully converted a firearm into a machine gun.  The

8    government only has to prove beyond a reasonable doubt that the

9    defendant knew about the specific characteristics or features

10   of the firearm that made it subject to registration, namely,

11   that it was a combination of parts designed and intended for

12   use in converting a weapon to shoot automatically more than one

13   shot, without manual reloading, by a single function of the

14   trigger.

15        During a conspiracy, if a conspirator commits a crime

16   to advance the conspiracy toward its goals, then in some cases

17   a coconspirator may be guilty of the crime even though the

18   coconspirator did not participate directly in the crime.

19        So regarding Counts Two through Eight, if you have

20   first found the defendants guilty of the conspiracy charged in

21   Count One, you may also find a defendant guilty of any of the

22   crimes charged in Counts Two through Eight even though the

23   defendant did not personally participate in the crime.  To do

24   so, you must find beyond a reasonable doubt:

25        One, during the conspiracy, a conspirator committed

1  the additional crime charged to further the conspiracy's

2  purpose;

3  　　　　Two, the defendant was a knowing and willful member

4  of the conspiracy when the crime was committed; and

5  　　　　Three, it was reasonably foreseeable that a

6  coconspirator would commit the crime as a consequence of the

7  conspiracy.

8  　　　　You will note that in Counts Two through Eight the

9  defendants are also charged with aiding and abetting the

10  commission of the alleged crimes.  It is possible to prove a

11  defendant guilty of a crime even without evidence that the

12  defendant personally performed every act charged.

13  　　　　Ordinarily, any act a person can do may be done by

14  directing another person or agent.  Or it may be done by acting

15  with or under the direction of others.

16  　　　　A defendant "aids and abets" a person if the

17  defendant intentionally joins with the person to commit a

18  crime.

19  　　　　A defendant is criminally responsible for the acts of

20  another person if the defendant aids and abets the other

21  person.  A defendant is also responsible if he willfully

22  directs or authorizes the acts of an agent, employee, or other

23  associate.

24  　　　　But finding that a defendant is criminally

25  responsible for the acts of another person requires proof that

1    the defendant intentionally associated with or participated in

2    the crime, not just proof that the defendant was simply present

3    at the scene of a crime or knew about it.

4         In other words, you must find beyond a reasonable

5    doubt that the defendant was a willful participant and not

6    merely a knowing spectator.

7         Count Nine charges Mr. Ervin with structuring cash

8    withdrawals for the purpose of evading currency transaction

9    reporting requirements.  It is a federal crime under certain

10   circumstances for anyone to knowingly evade a currency

11   transaction reporting requirement.

12        Domestic financial institutions and banks -- with

13   specific exceptions -- must file Currency Transaction Reports

14   with the government.  They must list all deposits, withdrawals,

15   transfers, or payments involving more than $10,000 in cash or

16   currency.

17        Mr. Ervin can be found guilty of this crime only if

18   all of the following facts are proved beyond a reasonable

19   doubt:

20        One, the defendant knowingly structured or helped to

21   structure a currency transaction;

22        Two, the purpose of the structured transaction was to

23   avoid the transaction reporting requirements; and

24        Three, the structured transaction involved one or

25   more domestic financial institutions.

1     To "structure" a transaction means to deposit,

2  withdraw, or otherwise participate in transferring a total of

3  more than $10,000 in cash or currency using a financial

4  institution or bank by intentionally setting up or arranging a

5  series of separate transactions, each one involving $10,000 or

6  less, in order to evade the currency reporting requirement that

7  would have applied if fewer transactions had been made.

8     Counts Ten, Eleven, and Twelve charge defendant Ervin

9  with possessing unregistered machine gun conversion devices.

10  It is a federal law -- pardon me.  It is a federal crime for

11  anyone to possess certain kinds of firearms that are not

12  properly registered to him in the National Firearms

13  Registration and Transfer Record.

14     A "firearm" includes a machine gun.  Under the law, a

15  machine gun includes a machine gun conversion device consisting

16  of a combination of parts designed and intended for use in

17  converting a weapon to shoot automatically more than one shot,

18  without manual reloading, by a single function of the trigger.

19  A machine gun must be properly registered in the National

20  Firearms Registration and Transfer Record.

21     Defendant Ervin can be found guilty of this crime

22  only if all the following facts are proved beyond a reasonable

23  doubt:

24     One, the defendant knowingly possessed a firearm,

25  specifically, a combination of parts designed and intended for

1    use in converting a weapon to shoot automatically more than one

2    shot, without manual reloading, by a single function of the

3    trigger;

4            The firearm was not registered to the defendant in

5    the National Firearms Registration and Transfer Record; and

6            The defendant knew of the specific characteristics or

7    features of the firearm that made it subject to registration

8    under the National Firearms Registration and Transfer Record.

9            The government does not have to prove that the

10   defendant knew the item described in the indictment was a

11   firearm that must be legally registered or that any

12   particular -- I'm sorry, or that any purchaser successfully

13   converted a firearm into a machine gun.  The government only

14   has to prove beyond a reasonable doubt that the defendant knew

15   about the specific characteristics or features of the firearm

16   that made it subject to registration, namely, that it was a

17   combination of parts designed and intended for use in

18   converting a weapon to shoot automatically more than one shot,

19   without manual reloading, by a single function of the trigger.

20           The law recognizes several kinds of possession.  A

21   person may have actual possession, constructive possession,

22   sole possession, or joint possession.

23           "Actual possession" of a thing occurs if a person

24   knowingly has direct physical control of it.

25           "Constructive possession" of a thing occurs if a

1    person does not have actual possession of it but has both the

2    power and the intention to take control over it.

3           "Sole possession" of a thing occurs if a person is

4    the only one to possess it.

5           "Joint possession" of a thing occurs if two or more

6    people share possession of it.

7           The term "possession" includes actual, constructive,

8    sole, and joint possession.

9           You will see that the indictment charges that a crime

10   was committed "on or about" a certain date.  The government

11   does not have to prove that the crime occurred on an exact

12   date.  The government only has to prove beyond a reasonable

13   doubt that the crime was committed on a date reasonably close

14   to the date alleged.

15          The word "knowingly" means that an act was done

16   voluntarily and intentionally and not because of a mistake or

17   by accident.

18          The word "willfully" means that the act was committed

19   voluntarily and purposely, with the intent to do something the

20   law forbids; that is, with bad purpose to disobey or disregard

21   the law.  While a person must have acted with intent to do

22   something the law forbids before you can find that the person

23   acted willfully, the person need not be aware of the specific

24   law or rule that his conduct may be violating.

25          Where a statute specifies multiple alternative ways

1   in which an offense may be committed, the indictment may allege

2   the multiple ways in the conjunctive, that is, by using the

3   word "and."  If only one of the alternatives is proved beyond a

4   reasonable doubt, that is sufficient for conviction, so long as

5   you agree unanimously as to that alternative.

6           Each count of the indictment charges a separate crime

7   against one or both of the defendants.  You must consider each

8   crime and the evidence relating to it separately.  And you must

9   consider the case of each defendant separately and

10  individually.  If you find a defendant guilty of one crime,

11  that must not affect your verdict for any other crime or any

12  other defendant.

13          I caution you that each defendant is on trial only

14  for the specific crimes charged in the indictment.  You are

15  here to determine from the evidence in this case whether each

16  defendant is guilty or not guilty of each of those specific

17  crimes.

18          You must never consider punishment in any way to

19  decide whether a defendant is guilty.  If you find a defendant

20  guilty, the punishment is for the judge alone to decide later.

21          Your verdict, whether guilty or not guilty, must be

22  unanimous.  In other words, you must all agree.  Your

23  deliberations are secret, and you will never have to explain

24  your verdict to anyone.

25          Each of you must decide the case for yourself, but

1   only after fully considering the evidence with the other

2   jurors.  So you must discuss the case with one another and try

3   to reach an agreement.  While you are discussing the case, do

4   not hesitate to reexamine your own opinion and change your mind

5   if you become convinced that you were wrong.  But do not give

6   up your honest beliefs just because others think differently or

7   because you simply want to get the case over with.

8          Remember that in a very real way, you are judges --

9   judges of the facts.  Your only interest is to seek the truth

10  from the evidence in the case.

11         When you get to the jury room, choose one of your

12  members to act as your foreperson.  The foreperson will direct

13  your deliberations and will speak for you in court.

14         A verdict form has been prepared for your convenience

15  for each defendant.

16         The verdict form asks a number of questions that you

17  will answer.  I'm going to first read to you from the verdict

18  form for Mr. Ervin, and similar questions are set forth in the

19  verdict form for Mr. Hoover.

20         Question 1 asks:  With regard to Count One of the

21  indictment, which charges the defendant with conspiracy to

22  transfer unregistered machine gun conversion devices, we, the

23  Jury, find Kristopher Justinboyer Ervin -- and you have two

24  options:  not guilty or guilty.

25         Question 2 asks:  With regard to Count Two of the

1    indictment, which charges the defendant with transferring

2    unregistered machine gun conversion devices to a person with

3    the initials D.S., we, the Jury, find Kristopher Justinboyer

4    Ervin -- once again, you have the choice of not guilty or

5    guilty.

6              Question 3 asks:  With regard to Count Three of the

7    indictment, which charges the defendant with transferring

8    unregistered machine gun conversion devices to a person with

9    the initials J.M., we, the Jury, find Kristopher Justinboyer

10   Ervin -- you have the choice of not guilty or guilty.

11             Question 4 asks an identical question with regard to

12   a person with the initials R.D., and you have the option -- you

13   have to choose not guilty or guilty.

14             Question 5 asks the same question with regard to a

15   person with the initials S, as in Steven, D, as in dog, and you

16   have those same options.

17             Question 6 asks the same question with regard to an

18   individual with the initials J.A., and you are asked to

19   determine whether the defendant is either not guilty or guilty.

20             Question 7 asks the same question with a person --

21   with regard to a person with the initials R.W., and you have to

22   choose either not guilty or guilty.

23             And question 8 asks the same question with regard to

24   an individual with the initials A.O., and you are asked to

25   determine whether the defendant is not guilty or guilty.

1        Mr. Hoover's verdict form asks those same eight

2   identical questions.  And as to each question with regard to

3   Mr. Hoover, you have the same options.  You must determine

4   whether Mr. Hoover is either not guilty or guilty with regard

5   to each of those eight questions.

6        Mr. Ervin's verdict form goes on to question 9, which

7   asks:  With regard to Count Nine of the indictment, which

8   charges the defendant with structuring, and attempting to

9   structure, currency transactions for the purpose of evading

10  currency transaction reporting requirements, we, the Jury, find

11  Kristopher Justinboyer Ervin, either not guilty or guilty.

12        Question 10 asks:  With regard to Count Ten of the

13  indictment, which charges the defendant with possessing

14  unregistered machine gun conversion devices on February 22nd,

15  2021, we, the Jury, find Kristopher Justinboyer Ervin, either

16  not guilty or guilty.

17        Question 11 asks:  With regard to Count Eleven of the

18  indictment, which charges the defendant with possessing

19  unregistered machine gun conversion devices on or about

20  February 24th, 2021, we, the Jury, find Kristopher Justinboyer

21  Ervin, either not guilty or guilty.

22        Question 12 asks:  With regard to Count Twelve of the

23  indictment, which charges the defendant with possessing

24  unregistered machine gun conversion devices on or about

25  March 2nd, 2021, we, the Jury, find Kristopher Justinboyer

1  Ervin -- and you have those same two options, either not guilty

2  or guilty.

3        There's a place for the foreperson to date the

4  verdict and to sign the verdict.

5        Take the verdict forms with you to the jury room.

6  When you have all agreed on the verdict for each defendant,

7  your foreperson must fill in the verdict forms, sign them, date

8  them, and carry them.  Then you will return the verdict forms

9  to the courtroom.

10        If you wish to communicate with me at any time,

11  please write down your message or question and give it to the

12  court security officer.  The court security officer will bring

13  it to me and I will respond as promptly as possible, either in

14  writing or by talking to you in the courtroom.  But I caution

15  you not to tell me how many jurors have voted one way or the

16  other in any note you may send me.

17        May I see counsel at sidebar.

18     (Proceedings at sidebar:)

19        THE COURT:  Ms. Taylor, any objections to the Court's

20  final instructions to the jury?

21        MS. TAYLOR:  Sorry.  No, no, Your Honor.

22        THE COURT:  Did I misread something that needs to be

23  corrected?

24        MR. MESROBIAN:  Your Honor, the only thing I noticed

25  was that in Jury Instruction No. 17, in the second element, the

1    Court said the purpose was to "avoid" rather than "evade."  You

2    used the word "evade" later in the instruction at the very end.

3    But that was the only discrepancy that I noted and I don't

4    think that is an issue.

5            THE COURT:  In my view, the words have similar

6    meaning and so it's not necessary to correct it, particularly

7    because the jury is given a written copy of the instructions.

8            Do you agree with that, Ms. Taylor?

9            MS. TAYLOR:  I agree.  The words are synonyms.

10           THE COURT:  Mr. King, do you agree with that?

11           MR. KING:  Yes, Your Honor.  I believe the words are

12    synonymous and sound similar.  I don't think that it will have

13    any impact on the jury understanding the instructions,

14    particularly with the written copy.

15           THE COURT:  Mr. Larosiere, are you in agreement with

16    that?

17           MR. LAROSIERE:  Yes, Your Honor.

18           THE COURT:  All right.  So setting that aside,

19    Ms. Taylor, any objections to the Court's final instructions to

20    the jury?

21           MS. TAYLOR:  No, Your Honor.

22           THE COURT:  Did I fail to give any of the

23    instructions we agreed upon?

24           MS. TAYLOR:  No.

25           THE COURT:  Mr. King, any objections to the Court's

1  final instructions to the jury?

2          MR. KING:  Your Honor, no objections or exceptions

3  and you provided all the instructions we discussed.

4          THE COURT:  Mr. Larosiere, any objections to the

5  Court's final instructions to the jury?

6          MR. LAROSIERE:  No, Your Honor.

7          THE COURT:  And did I fail to give any instruction we

8  agreed upon?

9          MR. LAROSIERE:  No, Your Honor.

10          THE COURT:  All right.  Then at this time I'll

11  recognize you, Ms. Taylor, to do the government's closing?

12          MS. TAYLOR:  Yes, Your Honor.

13      (Proceedings in open court:)

14          THE COURT:  All right.  Ladies and gentlemen, at this

15  stage of the case the attorneys will be making their final

16  arguments to you.  Counsel for the government will have the

17  opening argument; counsel for the defendants will then have the

18  opportunity for argument; then, in conclusion, counsel for the

19  government will have an opportunity to reply in rebuttal to the

20  argument of counsel for the defendants.  This is proper under

21  our rules because the government has the burden of proving the

22  case beyond a reasonable doubt.

23          Counsel, in making these arguments to you, will be

24  commenting upon the testimony that you have heard and the

25  evidence that has been presented.  They, as you, will be

1   recalling the testimony and evidence in this case.  They will

2   not intentionally mislead you.  However, if their recollection

3   of the testimony or the evidence differs from your

4   recollection, you must follow your own recollection.

5         These final arguments by counsel are not to be

6   construed by you as evidence or as the instruction on the law.

7   Nevertheless, these arguments are intended to help you

8   understand the contentions of each side, and you should give

9   them your close attention.

10        Go ahead, Ms. Taylor.

11        MS. TAYLOR:  Yes, Your Honor.

12        Ladies and gentlemen, at the beginning of this case

13  Mr. Mesrobian stood before you and told you that he and I would

14  be presenting evidence to you over a period of several days

15  that the United States contends shows that the defendants,

16  Mr. Ervin and Mr. Hoover, are guilty beyond a reasonable doubt

17  of several crimes.  With the exception of the structuring

18  offense that Mr. Ervin is charged with, those crimes relate to

19  the possession and transfer of unregistered machine gun

20  conversion devices.

21        And the evidence that we have presented to you has

22  been extensive.  It includes compelling evidence that Mr. Ervin

23  was the one operating the Auto Key Cards business and that he

24  was working hand-in-hand with Mr. Hoover to advertise and sell

25  auto key cards.  The evidence is also compelling that both

 1    Mr. Ervin and Mr. Hoover knew of the functions of those

 2    devices, and so did the individuals who were purchasing them.

 3              Let's talk about the evidence in this case.

 4              MS. TAYLOR:  Your Honor, may I have a moment?

 5              THE COURT:  You may.

 6              MS. TAYLOR:  May we have a sidebar, Your Honor?

 7              THE COURT:  Yes.

 8         (Proceedings at sidebar:)

 9              MS. TAYLOR:  I somehow have an old version of my

10    presentation that's on Ms. Ganoe's computer.  Can I have five

11    minutes to --

12              THE COURT:  I'll give the jury a quick restroom

13    break.

14              MS. TAYLOR:  I'm so sorry.

15              THE COURT:  That's fine.

16              MR. KING:  No problem.

17         (Proceedings in open court:)

18              THE COURT:  Technology.  We need about five minutes

19    to address technology, so I'll just go ahead and give you a

20    quick restroom break.  But if you'll just go to the restroom

21    and be prepared to come back in shortly.

22              COURT SECURITY OFFICER:  All rise for the jury.

23         (Jury exits, 10:17 a.m.)

24              THE COURT:  The rest of you can run to the restroom,

25    but I mean run, please.

 1          (Recess, 10:18 a.m. to 10:24 a.m.)

 2          (All parties present.  Jury not present.)

 3                COURT SECURITY OFFICER:  All rise.  This Honorable

 4     Court is back in session.

 5                Please be seated.

 6                THE COURT:  Were we able to get that fixed?

 7                MS. TAYLOR:  Yes, Your Honor.

 8                THE COURT:  Okay.  All right.  So let's --

 9     Ms. Taylor, why don't you return to the podium.

10                And let's have the jury, please.

11                COURT SECURITY OFFICER:  All rise for the jury.

12          (Jury enters, 10:25 a.m.)

13                COURT SECURITY OFFICER:  Please be seated.

14                THE COURT:  All right.  Ms. Taylor.  You may

15     continue.

16                MS. TAYLOR:  Yes, Your Honor.

17                Now that we have the correct presentation, let's talk

18     about the evidence.

19                Let's first talk about the evidence that the auto key

20     card was a combination of parts designed and intended for use

21     in converting an AR-15 into a machine gun.  And what's the

22     evidence that Mr. Ervin and Mr. Hoover knew about that?

23                First off, they're the videos that Mr. Ervin made to

24     market it on social media.

25          (Video played.)

1        (Video stopped.)

2          MS. TAYLOR:  And there are the things that he said to

3    his customers about what it was.  When he received an email

4    from a customer in August of 2020 asking, "Thought the package

5    might include some instructions as to the proper use of the

6    card, as intended," Mr. Ervin described that all NFA rules

7    apply and stated, unfortunately, he can't provide instructions

8    as per the NFA, and that's the line that he cannot cross.

9          And then he told the person, though, how to go --

10   instructions for how to find the instructions.  He told them,

11   "Go search these terms, including 'lightning,' 'swift,' 'coat

12   hanger test,' 'link,' and any other terms that you find along

13   the way, and then you would find the instructions that you're

14   looking for."

15         And Mr. Ervin specifically told the person, "As with

16   many legal products, illegal use can occur," and that,

17   "individuals may make the choice to use it in a different way

18   in certain dire circumstances in the future."

19         He told another customer who asked about how it's

20   used, "It's like a solvent trap but not one of those."

21         How is it like a solvent trap?  It's an NFA item

22   disguised as something innocuous.

23         On September 25th Mr. Ervin placed his first order

24   with Orange Park Machine for auto key cards.  Before this he

25   had been selling an older version that were made of thinner

1    metal with the designs that were on the surface rather than

2    etched into the cards like the Orange Park Machine cards.

3          Shortly after, Mr. Ervin messaged his long-time

4    friend, Carolanne Wolfe, on October 5th of 2020 and he told her

5    he was talking to a gun YouTuber to prompt his products.  He

6    tells her that the gun YouTuber said, "I am going to make a

7    metric f-u-c-k ton of money."

8          In the meantime, Mr. Ervin again revealed his intent

9    in making and selling the auto key card when he sent out email

10   blasts advertising his new 30 percent thicker, more durable

11   auto key cards.  In these emails he made a point of emphasizing

12   the functional aspects of the auto key card, describing them as

13   to-scale and repeatedly capitalizing "full auto."  At the end

14   he throws in a "do not cut" at the bottom for good measure.

15         What reason would Mr. Ervin think he needed to warn

16   his customer not to cut it other than he was trying to cover

17   himself when his customers did with the auto key card exactly

18   what Mr. Ervin intended they do with it?

19         Ervin does not even mention in the email that you can

20   also buy a T-shirt with a lightning link outline on it.  Why

21   not just sell that?  Why sell a stainless steel metal card with

22   the design on it?

23         If Ervin had not wanted the auto key card to be used

24   as a machine gun conversion device, he could have made any

25   number of alterations to it so that it would not be functional.

1    But he chose not to do that because he intended it to be used

2    as a firearm.

3         And to be more direct, you heard testimony from

4    Jonathan Monger that Ervin told him that the auto key card was

5    a lightning link.  Ervin also told Monger that he had purchased

6    another one of these pretextual items, the portable wall

7    hanger, and had later destroyed that portable wall hanger.

8         Shortly after Mr. Ervin gets his new durable,

9    to-scale cards in stock, he sends a FedEx Priority Overnight

10   package to Mr. Hoover set to be delivered on November 3rd of

11   2020 and he takes a selfie of himself with the package.

12        The very next day, Mr. Hoover drops his first video

13   about the auto key card titled "Is This an ATF Trap and How

14   Does It Work?"

15        Mr. Hoover is not subtle in his messaging.  Where

16   Mr. Ervin attempted to encode his messaging to customers with

17   vague references to "full auto" and "to scale" and

18   "durability," Mr. Hoover, by contrast, comes right out and

19   calls the auto key card what it is.  He tells his viewers in

20   this video that he will tell them how a lightning link works

21   and what it does.  He repeatedly holds up the auto key card and

22   refers to it as a lightning link.

23        After listing various ways in which an individual can

24   access a machine gun, Mr. Hoover then moved on to this category

25   number six in this video.  You'll recall that's the "zero

1  F-U-C-Ks given" category.  And he said, "If you are a

2  prohibited person, your chains have been broken."  In other

3  words, "If you're prohibited, why follow any laws about

4  firearms at all?"

5         Then he says, "So why not do whatever you want with

6  it?  Make a machine gun."

7         And this is where the lightning link fell in, in the

8  auto key card.  It wasn't with the legal ways that Mr. Hoover

9  talked about earlier in his video to experience full auto, it

10 was here, in the "zero F-U-C-K-s given" category, because he

11 knows it's illegal.

12        Next, Mr. Hoover transitions to talking about the

13 auto key card again, which he calls a novelty.  He then states

14 that he believes the ATF will, at some point, be coming into a

15 courtroom and argue that the auto key card is a machine gun.

16 In other words, Mr. Hoover expected from the very start of his

17 involvement with the auto key cards that the ATF would view

18 them as machine gun conversion devices.  How could that be a

19 surprise to him?

20        To further emphasize his intent in advertising auto

21 key cards, Mr. Hoover then goes into great detail about the

22 different types of bolt carrier designs that exist and which

23 conversion devices work with which bolt carrier.

24        In the top image there, he's discussing bending a

25 coat hanger to make a machine gun conversion device.  In the

1  lower screenshot he is discussing a swift link, which he says

2  was, quote, designed as a little -- sorry, disguised as a

3  little stick-on coat rack.  He says which bolt carrier that

4  device works with and displays a schematic in the corner

5  showing how that swift link fits within an AR-15 receiver.

6        After describing these first two illegal ways to make

7  an AR-15 into a machine gun, Mr. Hoover talks about drilling a

8  third hole into a receiver and the drop-in auto sear.  He

9  discusses his understanding that marking a receiver where the

10  third hole would be would make it a machine gun.

11        Mr. Hoover then transitions into talking about the

12  SP1 bolt carrier and describes in great detail how you would

13  cut the lightning link out of an auto key card, which he's

14  demonstrating in that middle screenshot right there telling

15  you, "You cut right along these lines and put it into your

16  firearm to make a machine gun."  That is, that it would cause

17  the firearm to fire automatically.

18        Hoover, again discussing the auto key card, says,

19  "They are awesome because they're stupid cheap and you can drop

20  it in your rifle or," quote, "if you're actually going to do

21  this legally, then it's just a bottle opener."

22        He states that if you're an SOT or if you qualify for

23  option 6, you could cut the lightning link out and use it as a

24  machine gun conversion device.

25        What was Ervin's reaction to Hoover's first videos?

1   He was thrilled.  He -- the only thing he tells his dad is how

2   much money he had already started making as a result of that

3   video.  And this period between when Mr. Hoover makes that

4   first video and the second video is critical with regard to

5   Mr. Ervin's intent.  We know at this point that the two of them

6   had agreed on a plan.

7           Their cell phone records, clipped up there, show that

8   they had at least two long phone calls with each other between

9   those first two videos.  We don't know what was said on these

10  calls, but we know what wasn't said.

11          Ervin apparently did not tell Hoover to stop calling

12  the auto key card a lightning link.  He didn't say, "Hey, why

13  are you saying all these crazy things about my art?"  Or, "I

14  only meant for those to be used to hold pens."

15          He doesn't cut off his relationship with Hoover.

16  What he does is he sends Hoover another FedEx on November 10th,

17  and Hoover then makes another video.

18          On November 11th, Hoover drops that second video.

19  The very first words out of his mouth in this video, which was

20  titled "The Parts the ATF Wishes Never Existed" are, "So what

21  are some of the very affordable, easy-to-do modifications for

22  you to make your very own machine gun or silencer?"

23          Hoover then criticizes those who actually seek to

24  follow the law.  He calls law-abiding people dangerous because,

25  quote, "They are proving that if any gun law were to come down

1  on these parts that are currently legal" -- and then he

2  corrects himself, "well, kind of legal, they will comply to

3  it."

4          He openly advocates defying firearms laws and states,

5  "Laws only work if we follow them."

6          He refers to the auto key card as "kind of legal,"

7  once again showing that he understood what the auto key card

8  was and what its intended use was.

9          Hoover compares the auto key card to a previous

10  version of the same type of product, a not-fully-cut-out

11  lightning link in a metal card.  He put a picture of it right

12  there in the top of his screen.

13          Hoover states that those were problematic because you

14  had to re- -- because you could remove them from the card

15  easily and you would have a machine gun.  In other words,

16  Hoover understands that it's -- that a conversion device does

17  not need to be 100 percent complete to be governed by federal

18  law and subject to registration.

19          Hoover then says the auto key card is, quote, nothing

20  more than a drawing on a piece of stainless steel.  And

21  immediately contradicts himself by saying, "You have to

22  manufacture it."

23          Once again, he demonstrates his intent to transfer

24  machine gun conversion devices by telling his viewers they can,

25  quote, "Drop them in the receivers, scratch your full auto

1    itch" -- which he demonstrates in that middle screenshot right

2    there -- "and throw them away when you're done."

3             He's not talking about a drawing here, folks, he's

4    talking about using it to make a machine gun.

5             In this part of the video Hoover displays a schematic

6    of how a lightning link from an auto key card fits inside of an

7    AR-15 receiver.

8             That same day that this video comes out, Mr. Ervin

9    texts his dad a link to the video and reports his incredibly

10   high number of sales.  Never does he express any concern about

11   what Hoover is saying the auto key card is used for.  He's

12   solely focused on the immense profits that he was bringing in.

13            And during the time of the conspiracy, Ervin posted

14   to his own social media multiple memes exhibiting his hostility

15   to registering firearms.

16            If all of that were not enough, there's other

17   circumstantial evidence of the intent of Mr. Ervin and

18   Mr. Hoover.  That includes that Mr. Ervin charged a premium for

19   auto key cards with more lightning links on them and more for

20   lightning links where the internal cutouts -- the hardest part

21   to cut -- were already completed.

22            However, Orange Park Machine charged Mr. Ervin the

23   same for those designs regardless of whether the internal

24   cutouts were done or not and regardless of the number of

25   etchings on the surface.

1          Mr. Clarkson testified that the only thing that
2    Mr. Ervin was charged more for was the Bottle Opener Edition
3    because it had more material because it's a bigger card.

4          His markup on these items was something in the range
5    of 5,000 percent, depending on the particular model.  If he was
6    really trying to make art or protest against guns laws, why was
7    he charging so much?  Why would anyone pay $110 for a piece of
8    metal that costs $3 to make?

9          Well, the motivation is obvious.  A transferable
10   lightning link is exorbitantly expensive.  With $100 or so and
11   a common Dremel tool, you get three shots at cutting one of
12   these out.  And even if you had a different bolt carrier that
13   you needed to -- and you needed to get an SP1 or an M16 bolt
14   carrier to make it work, maybe even a whole new rifle, that's
15   an enormous cost savings over obtaining a machine gun legally.

16         Finally, you also heard testimony from Officer Toy
17   that he had cut out the lightning links from one of these auto
18   key cards, that he put it into a semiautomatic rifle, and that
19   it functioned as a machine gun.

20         When he tested it with this firearm, it worked with
21   both an M16 bolt carrier and an SP1 bolt carrier when he
22   brought it down here to Jacksonville.

23         Officer Toy is not an expert machinist.  This was the
24   first time that he had cut one of these devices out of a card
25   like this.  He didn't use any fancy tools or equipment, just a

1    Dremel and a regular-old AR-15-type firearm with off-the-shelf

2    parts.  And what was the result when he tested it?

3         (Video played.)

4         (Video stopped.)

5         MS. TAYLOR:  And while it's not shown in this video,

6    Officer Toy told you that he tested this firearm that was used

7    for the function testing and for the live-fire testing and

8    ensured that it was a semiautomatic firearm until he put the

9    lightning link in it, at which point it did work as a fully

10   automatic firearm.

11        He also testified to you that he cut right along the

12   line on the auto key card.  The only modification he had to

13   make was shaving off about a millimeter or less of material off

14   of that little paddle piece that sticks up so that the gun

15   would close.  That's a very, very small modification.

16        Evidence of consciousness of guilt is another thing

17   that you can consider when deciding a defendant's guilt or

18   innocence.

19        In January of 2021, Mr. Hoover published a video in

20   which he explained that if you were in possession of what he

21   called questionable parts, and explained that you wanted them

22   around in case a zombie apocalypse happens so you can make a

23   machine gun and shoot zombies, that would show your intent to

24   make a machine gun.

25        How is Ervin's marketing of the auto key card any

1  different?  He tells his customers, "Get one and save it."

2         There was a lot of testimony elicited that Ervin was

3  a prepper.  But intending to cut it out at some point in the

4  future is not a defense.  The fact remains that the auto key

5  card was designed and intended to be a combination of parts

6  used to convert an AR-15 into a machine gun, whether you do it

7  now or you save it for later.

8         After Mr. Ervin's arrest, Mr. Hoover again describes

9  the auto key card as a great SOT resource where you could get

10 machine gun parts.  In other words, he knew it was designed and

11 intended to be used for parts for lightning links.

12        After Mr. Ervin's arrest, Mr. Hoover also posted a

13 video explaining his views on the virtues of noncompliance with

14 the law.  This is the video titled "The Meaning of This Very

15 Romantic Statement."

16        He talks about -- openly, in front of everyone --

17 breaking the law, and then he discusses how Ervin -- he

18 discusses Mr. Ervin, the key card guy, and how Mr. Hoover put

19 public support behind Mr. Ervin.  And Mr. Hoover is saying here

20 that he knew Mr. Ervin was openly breaking the law and that

21 Mr. Hoover supported Mr. Ervin in doing that.

22        You can also think of -- consider the fact that the

23 defendants were using deception and secretiveness in carrying

24 out their plan.

25        There was a lot of emphasis put on the fact that

1   Mr. Ervin's bank account was in his real name.  Well, of course

2   it was.  That's required.  You can't just walk into a bank and

3   say, "I want to open an account in the name of Joe Schmoe."

4          But things that Mr. Ervin did that were deceptive:

5   he misled Orange Park Machine about what it was.  He repeatedly

6   evaded their questions.

7          Mr. Clarkson genuinely wanted to help Mr. Ervin with

8   his project, and instead, trusting Mr. Ervin ended up

9   threatening his very business.  Orange Park Machine would never

10  have manufactured this product if they had known what it really

11  was.

12         Ervin called it his original artwork, but it's

13  neither original nor artwork.  That design for a lightning link

14  has been around since the early 1980s.  Mr. Ervin didn't invent

15  it.  He didn't even draw the lightning link that was on the

16  auto key card.  Mr. Bane made some of the schematics for him,

17  and then later on Mr. Ruiz, at Orange Park Machine, made some

18  modifications to those.  That's not even Mr. Ervin's drawing.

19  He didn't even make it.

20         Mr. Ervin lied to his long-time friend, Carolanne

21  Wolfe, about what it was in order to get her to help him with

22  his business.

23         And Mr. Hoover repeatedly encouraged his viewers to

24  use what he called discreet ordering to avoid detection by law

25  enforcement.  This is something that he repeated in all or

1   nearly every one of his videos where he advertised the auto key

2   card:  to use the online mail-in order form, to get a money

3   order, to send it to your anti-gun relative so that your name

4   doesn't get on some sort of watch list.

5        You can also consider that Mr. Ervin repeatedly

6   avoided saying what it really was, and instead, persistently

7   alluded to it being illegal by analogy.  He compared his

8   products to brass knuckles sold as paperweights.  He stated it

9   was like a solvent trap but not one of those.  And he described

10  it as AR related.

11       And you also saw compelling evidence that Ervin knew

12  that his customers were buying auto key cards to use them as

13  machine gun conversion devices.

14       These are all emails -- not all the emails that were

15  reviewed in this case, but these were all the emails where

16  customers emailed Mr. Ervin asking for instructions on how to

17  use the auto key card, instructions on how to cut it out, and

18  information on what configuration the AR-15 needed to be in for

19  it to work correctly.

20       But what did he do with that knowledge?  He chose to

21  ignore it and carry on.  When Carolanne Wolfe texted Mr. Ervin

22  and asked him what would happen if the ATF found a gun with,

23  quote, "your product in it," Ervin was not confused about what

24  she meant.  He knew that the auto key card was designed and

25  intended to be used as a machine gun conversion device.  What

1    he said was, "It's not my responsibility if a customer cuts it
2    out and uses it that way."
3            What's the evidence that Mr. Ervin and Mr. Hoover
4    were conspiring with each other?  Remember, there doesn't have
5    to have been a formal plan.  Mr. Hoover didn't have to travel
6    down here to Florida and, you know, meet with Mr. Ervin in a
7    smokey bar and write it all out and then shake hands at the
8    end.
9            A person can be a conspirator even if they don't know
10   all of the details of the unlawful plan.  The heart of the
11   conspiracy is the making of the unlawful plan followed by at
12   least one of the overt acts that are charged in the indictment.
13   It's not required for you to find that they succeeded in their
14   plan either.
15           These are records of the communications between
16   Mr. Hoover and Mr. Ervin that were reviewed by Ms. Butler and
17   compiled from their cell phone records.  Frequent
18   communications between the two of them.
19           There are messages between Mr. Ervin and Erica
20   Hoover -- who at the time was Mr. Hoover's girlfriend --
21   discussing Mr. Ervin sending cash and gifts.  There are the
22   records about the Louis Vuitton purse purchase that you saw.
23   First, Mr. Hoover sending a link to the particular handbag that
24   he wanted Ervin to buy, then Mr. Ervin going to Louis Vuitton
25   here in Jacksonville, paying almost $2,000 in cash for that bag

1  and then a keychain that he also got and sent to Mr. Hoover and

2  Ms. Hoover.

3      He texted Carolanne Wolfe that same day and said,

4  "Went to Louis Vuitton already.  Bought that $2,000 purse.

5  LOL.  Weird."

6      And the bank employee also knew that Mr. Hoover --

7  or, sorry, Mr. Ervin had said that he was buying a purse for

8  his boss's wife.

9      Carolanne Wolfe also stated that she knew that Ervin

10 was sending the purse in lieu of a cash payment for one of the

11 advertisements.

12     Mr. Hoover put out ten more videos besides the ones

13 that we've discussed, all advertising the auto key card and

14 saying that they were sponsored by Auto Key Card.

15     After Mr. Ervin's arrest, Mr. Hoover runs a GoFundMe

16 for his benefit, and it says in there that they are friends.

17     And in case it wasn't clear what their relationship

18 was, in July of 2021 Mr. Hoover posted the video "The ATF Wants

19 to Know," in which he discussed the financial relationship

20 between himself and Mr. Ervin.

21     He stated Mr. Ervin sent him cash and Hoover did

22 commercials for the auto key card.  That's what they did.

23     Now, what's the evidence that Mr. Hoover's videos led

24 purchasers to buy the auto key card?  Well, the data clearly

25 show that that's what happened.

1        This is a chart that Ms. Butler told you that she had

2   created showing how Mr. Ervin's sales proceeded in the times

3   before Mr. Hoover started making his videos.  That first yellow

4   box at the top -- sort of the middle top of the screen, "Is

5   This an ATF Trap and How Does It Work," that's the November 4th

6   video, the very first one that Mr. Hoover makes about the auto

7   key card.

8        Up until that point, Mr. Ervin's making a handful of

9   sales here and there, sometimes none, sometimes maybe three or

10  four in a day.  Then after that video comes out and then the

11  next video comes out, Mr. Ervin's sales skyrocketed.

12       You also heard testimony from several purchaser

13  witnesses:  Rick Roberts, Darek Stennes, Steve Duty, Joel Moya,

14  Randy Willis, Tristen Alderson, and Phillip Wilson, all of whom

15  identified Mr. Hoover's videos as what caused them to purchase

16  the auto key card.  And all of them understood that it could be

17  used to convert an AR-15 into a machine gun.

18       And there were also the messages between Mr. Ervin

19  and Mr. Hoover's wife where Mr. Ervin attributes, "Your man is

20  one hell of a salesman."  He knew what the reason was that his

21  sales were going up.

22       Let's talk about overt acts.  I'm going to run

23  through these quickly, but just to refresh your memory on what

24  the evidence was to support the overt acts that are charged in

25  the indictment.

1        Remember that an overt act on its own could be

2   entirely innocent.  It does not have to be a criminal act on

3   its own, but it's something that furthered the conspiracy.

4        And you need to find that at least one of these overt

5   acts occurred in order to convict on the conspiracy charge.

6        (A) is that Ervin, beginning around October of 2020,

7   retained Orange Park Machine to manufacture auto key cards.

8   And there you've got the invoice for that, for the first order,

9   which was September 25th.

10        (B), on November 4th, Mr. Hoover posted, "Is This an

11   ATF Trap and How Does It Work?"  We already talked about that

12   video, but again, here's a screenshot and some of the

13   transcript of that video.

14        (C), on November 11th, Mr. Hoover posted "The Parts

15   the ATF Wishes Never Existed."

16        (D), on November 30th of 2020, Mr. Ervin withdrew

17   $5,000 in cash that was proceeds of auto key cards.  And you

18   heard testimony that Mr. Ervin's only source of income during

19   this time was the auto key card business.  And there's the

20   receipt from his bank records.

21        (E), on November 30th of 2020, Ervin ordered

22   approximately 1400 auto key cards from Orange Park Machine, and

23   there's the invoice for that purchase.

24        (F), on November 30th of 2020, same day, Mr. Ervin

25   purchased that Louis Vuitton purse and the keychain.  Same day.

1   (G), on December 4th of 2020, Mr. Hoover posted "How

2 to Make Body Armor Fail" and advertised the auto key card which

3 sponsored his video.

4   (H), on December 9th of 2020, Ervin purchased the

5 $841 of video production equipment.  This was discussed in the

6 Instagram messages between Mr. Ervin and Mrs. Hoover.  And you

7 also saw the Amazon records showing their address in his Amazon

8 account and the shipping confirmations being sent to Erica Ibe

9 in Coloma, Wisconsin.

10   (I), December 15th, 2020, Mr. Ervin advertised the

11 auto key card in "How to Buy a Truly Untraceable Firearm."

12   (J), on December 28th of 2020, Mr. Hoover advertised

13 the auto key card in the video "This Is a Strange Turn of

14 Events."

15   (K), on December 30th of 2020, Mr. Hoover advertised

16 the auto key card in the video "The Real Difference Between the

17 Two Platforms."

18   (L), on January 8th, 2021, Mr. Hoover advertised the

19 auto key card in a video titled "This Makes an Illegal Machine

20 Gun."

21   (M), on January 12th of 2021, Mr. Hoover advertised

22 the auto key card in a video called "The Great Purge."

23   (N), on January 15th of 2021, Mr. Ervin ordered more

24 auto key cards from Orange Park Machine, and there's the

25 invoice.

1          (O), on a date in February 2021, Mr. Ervin ordered

2    more auto key cards from Orange Park Machine.  And in that

3    picture are the three boxes of cut-up auto key cards that

4    Orange Park Machine had created for Mr. Ervin and then chopped

5    into bits after they figured out what his product really was.

6          (P), on February 6th, 2021, Mr. Ervin withdraw

7    $5,000, which was proceeds from auto key cards sales.

8          (Q), on February 7th, 2021, Mr. Ervin shipped a

9    package Next Day Air to Mr. Hoover containing what is alleged

10   to be currency and other items of value to compensate

11   Mr. Hoover.

12         (R), on February 16th, 2021, Mr. Hoover posted the

13   video "Important Development," where he advertised auto key

14   cards.

15         (S), on February 17th of 2021, Mr. Ervin shipped a

16   package Priority Overnight to Mr. Hoover.

17         (T), on February 18th, 2021, Mr. Hoover posted

18   "Leveling the Scope to the Rifle is a Waste of Time," where he

19   advertised auto key cards.

20         (U), February 23rd of 2021, Mr. Hoover advertised

21   auto key cards in the video "Unexpected Ammunition Problems."

22         (V), on February 25th of 2021, Mr. Hoover advertised

23   auto key cards in the video "ATF Reclassification on H&K

24   Clones."

25         (U) -- or, sorry, (W), these are the sub overt acts

1   alleging the individual transfers as overt acts to the charged

2   purchasers.  So these are part of the conspiracy too.

3           Up at the top there's data from Stripe showing

4   Mr. Stennes' two orders, and then below that are the mail meter

5   entries showing the shipment of packages to each of those other

6   purchasers:  Joel Moya, Ronald Davis, Steve Duty, James Acs,

7   Randy Willis, and Aric Osso.

8           Next overt act is (X), which is the jail phone call

9   between the two of them.  Now, in this phone call, Mr. Ervin

10  and Mr. Hoover clearly know each other.  It's two old friends

11  excited to speak to each other again and talking about their

12  plans for what they want to do in the future.  They were not

13  strangers.  They were not people who were meeting for the first

14  time.  They know each other.  They were buddies.  And they talk

15  about the plans that they had already been making for new

16  products and also whether they could continue to sell the auto

17  key card if they got the case thrown out.

18          And then (Y) is the maintaining of the GoFundMe by

19  Mr. Hoover to benefit Mr. Ervin.

20          Now, I want to talk to you briefly about the

21  substantive counts, that is, the individual charged transfers

22  of machine gun conversion devices to the purchasers.

23          With regard to these counts, the defendants are

24  charged with aiding and abetting.  So if Mr. Hoover was aiding

25  and abetting Mr. Ervin, you can find him guilty of these

1   counts.

2          You have also been instructed that you can apply

3   something that's been referred to as a Pinkerton instruction.

4   So if you find that Mr. Ervin and Mr. Hoover are guilty of the

5   conspiracy, then you can also find them each guilty of the

6   substantive counts, even if they didn't directly participate,

7   so long as the action that the coconspirator took to make these

8   transfers was a reasonably foreseeable result of the

9   conspiracy.  And I would submit to you that all of these

10  transfers were a reasonably foreseeable result of the

11  conspiracy.

12         Count Two, that's the transfer to Darek Stennes on

13  November 14th of 2020.  Again, there's the Stripe data showing

14  that he made two purchases on November 14th of 2020.  And

15  Mr. Stennes, if you recall, testified that he had some issues

16  with receiving his order initially and that a replacement order

17  was sent.

18         Mr. Stennes has no machine guns or auto key cards

19  registered in the National Firearms Registration and Transfer

20  Record.  And that includes, of course, machine gun conversion

21  devices.  None registered.

22         Mr. Stennes testified that when he received his auto

23  key card, he was uncomfortable because it appeared to him that

24  it was precisely machined, and he believed based on that, that

25  it was intended to be cut out and used as a lightning link.

1            Once he saw the auto key card in person and came to

2      that conclusion, he cut it up and kept the pieces in his safe,

3      which were Exhibit 108 were the pieces of Mr. Stennes' auto key

4      card.

5            Count Three is the transfer to Joel Moya on

6      November 30th, 2020.  On the bottom you have the email

7      confirmation showing that Mr. Moya had ordered four auto key

8      card 3 in 1 Pen Holder Editions with Bottle Opener at a price

9      of over $600.  And on top is the shipment confirmation showing

10     a shipment on the same day to Mr. Moya.

11            Mr. Moya testified that he had ordered the four

12     bottle openers and then put them away.  He had seen that

13     machine gun fish video on Instagram, on the autokeycard.com

14     Instagram, and also had watched at least one of Hoover's

15     videos.  He spent over $600 on these cards.  He testified that

16     he put them away because he's a prepper and he wanted to have

17     them just in case he needed them to use to convert a weapon

18     into a machine gun in the future in case of the collapse of

19     society.

20            Count Four is the transfers to Ronald Davis.  And

21     you've seen the evidence that he placed an order for auto key

22     card 1 in 1 -- that's his order summary on the bottom -- on

23     December 12th of 2020.  And according to the mail meter data on

24     the top, it was shipped to him the same day.

25            Count Five is the transfer to Steven Duty on

1   December 16th of 2020.  You may recall that Mr. Duty was the

2   individual who wrote that email, "How do you cut out a card?"

3   And then asked, "That's all I was needing, the above title?

4   What tool is used or is there a video?  Thanks."

5          Mr. Duty testified that he had watched "The Parts the

6   ATF Wishes Never Existed," and that that video by Mr. Hoover

7   was what introduced him to the auto key card.

8          He testified that he had purchased the auto key card

9   with the intention to use it to convert a gun into a machine

10  gun because he was worried that the United States would be

11  invaded.

12         He had testified that he attempted to cut out the

13  auto key card using a RotoZip, but stopped after an inch or so

14  because it was making a lot of sparks.

15         He put the auto key card away at various places in

16  his house and underneath his deck.  And the day after the ATF

17  came and knocked on his door, he destroyed it, as well as

18  several solvent traps that he had also purchased to use to make

19  into silencers.

20         Count Six is the transfer to James Acs on

21  December 23rd of 2020.  And you have seen the evidence that

22  Mr. Acs placed an order on that date and that an order was

23  shipped to him the same day.  That's in the mail meter data.

24  And that order is for an auto key card 2 in 1 Pen Holder

25  Edition.  Not for a T-shirt, not for a cap.  It's for an auto

1    key card.

2          Count Seven is the transfer to Randy Willis on

3    January 17th of 2021.  Mr. Willis had testified he purchased

4    and received an auto key card.  He learned about it from

5    Mr. Hoover's YouTube channel and knew that it could be used to

6    convert a firearm into a machine gun.  And there is the -- are

7    the documents that's showing his order and the shipment.

8          And then Aric Osso.  Aric with an "A."  You may

9    recall that Mr. Osso testified that the money order shown on

10   the screen right now was the one that he had used to obtain the

11   auto key card for his friend, Tristen Alderson.

12         Alderson testified that he had seen the auto key card

13   on Mr. Hoover's YouTube channel.  Alderson and Osso used the

14   discreet ordering process that was advocated by Mr. Hoover, a

15   process that Mr. Alderson, by the way, had never used before.

16   He's a young man.  He did not know how to obtain a money order,

17   so he roped Mr. Osso into getting that money order for him.

18         Mr. Alderson downloaded and filled out the order

19   form, gave the cash to Mr. Osso, who went and got the money

20   order, put it in the mail, and then received the auto key cards

21   and then gave them to Mr. Alderson.

22         Alderson testified that he planned to cut out the

23   auto key cards and use them to convert his weapons at some

24   point in the future.

25         What do these purchaser witnesses have in common?

1   They each purchased an auto key card from Mr. Ervin and knew it

2   was designed and intended to be used to convert a semiautomatic

3   firearm into a machine gun.  They learned about auto key cards

4   from Mr. Hoover's videos.  And none of them registered these

5   auto key cards as machine guns as required under the NFA.

6           Let's talk about the structuring offense.  You heard

7   testimony from Amy Sarkese of Community First Credit Union --

8   formerly of Community First Credit Union that Ervin was a

9   frequent customer of hers when she worked at CFCU.

10          She recalled having a conversation with Mr. Ervin

11  where he asked her what the reporting threshold was for

12  currency transactions.  She couldn't remember the exact date,

13  but she was confident that it was before December 28th of 2020.

14          On December 28th of 2020, Ms. Sarkese remembered that

15  Ervin came into CFCU and demanded to withdraw all of the money

16  from his account, which was about a little over $60,000.

17  Sarkese told him the bank did not have that amount of cash on

18  hand.  She offered him multiple different options for getting

19  his money out of the bank.  She offered to provide him with a

20  cashier's check for the full amount of his account, but

21  Mr. Ervin refused that.  She also offered to order the bulk

22  cash for him and get it to him in a few days, but he refused

23  that as well.

24          Ms. Sarkese told Mr. Ervin he could have $10,000 that

25  day.  Mr. Ervin agreed.  Then, spontaneously, he changed his

1    mind and said, "How about $9,000 instead?"  What could possibly

2    be the reason for that other than he hoped to avoid a Currency

3    Transaction Report?  Because Mr. Ervin then drove to another

4    branch right away and withdrew another $5,000 in cash, same

5    day.

6              There's no reason why Ervin would decline the full

7    $10,000 offered, after having just asked for 60,000, and then

8    drive to another branch and take out thousands more.  The only

9    reason for that is hoping to avoid the transaction report.

10             You heard testimony that the bank's systems did

11   detect those currency transactions because it was two different

12   branches of the same bank, that they detected that two

13   transactions totaling more than $10,000 had been made in that

14   date, and the CTR was, in fact, filed on the 28th.

15             Now, remember that this count charges attempt to

16   structure the financial transactions to evade the currency

17   transaction reporting requirements.  It's not required that he

18   was successful in evading the Currency Transaction Report.

19             So whether Mr. Ervin mistakenly believes that $10,000

20   was the threshold because the bank employee said it's 10,000

21   and one penny, whether he was mistaken about whether the report

22   would be filed anyway if he went to another branch and pulled

23   out money that would accumulate to over $10,000, what's

24   relevant is his intent in structuring these transactions.  And

25   it's clear that his intent was to avoid the Currency

1    Transaction Report.

2            Then Mr. Ervin went back and, on December 29th, the

3    next day, he withdrew another $9,000.  He went back on

4    December 30th and he withdraw $9,000 again.  He went back on

5    December 31st and he withdrew $9,000.  January 1st, New Year's

6    Day, probably a bank holiday.  January 2nd he's back again

7    withdrawing $9,000 in cash.  And then he withdraws another

8    9,000 on January 5th, and another 9,000 the next day, on

9    January 6th.

10           There was also some testimony elicited that Mr. Ervin

11   really just wanted to close his account and he was just trying

12   to get all of the money out of it.  But his banking records

13   reflect that he didn't close his account.  Even after he drew

14   this money down out of his account, he continued to use CFCU,

15   continued to get large deposits by ACH from Stripe on a regular

16   basis, continued to go to the bank and withdraw large amounts

17   of cash.

18           Finally, I want to talk to you about the three

19   charges that relate to Mr. Ervin's possession of unregistered

20   machine gun conversion devices.  The first is on February 22nd.

21   That's the day that you heard testimony from ATF agents and

22   from the postal inspectors that they had conducted surveillance

23   of Mr. Ervin, saw him going from his house, he ended up at the

24   post office.  He brought in one of these boxes that's sitting

25   here, this big box on the floor, full of packages.  You can see

1  him carrying it in the screenshot from the top.  He then went

2  back to the counter, dropped it off, and then left.  He's

3  wearing his signature white sunglasses.

4          And shortly after he dropped off that package,

5  Inspector Batchelder went and retrieved the box full of

6  packages.

7          And you also heard testimony from Postal Inspector

8  Hannon that he got search warrants for each and every one of

9  those packages that were seized that day.  He opened them all

10 pursuant to the search warrants, and every single one of those

11 packages contained an auto key card.  None of the packages

12 contained any other kind of merchandise.

13         On February 24th Mr. Ervin again was captured on

14 surveillance video going into the same Ridgewood Post Office

15 with another box in his hand, dropping it off at the counter,

16 and then leaving.

17         Inspector Hannon again secured those packages from

18 the post office and -- including the box, which are in this box

19 right here, and he obtained search warrants for all of those

20 packages too, as well as the packages that he had recovered on

21 March 1st from the post office.  And again, every single one of

22 those packages contained an auto key card and no other

23 merchandise.

24         Count Twelve relates to Mr. Ervin's possession of the

25 auto key cards at his home on March 2nd, 2021.  That was the

1  day the search warrant was executed.  You saw many photos from

2  that search warrant.  Here are just a couple of them showing

3  the auto key cards that were strewn throughout Mr. Ervin's

4  residence at Kirkwall Court.

5          Mr. Ervin was not present at the residence that day.

6  He doesn't have to have been.  Judge Howard instructed you on

7  constructive possession, which is that you can have dominion

8  over an item and intend to take possession of it later.

9          Even though Mr. Ervin was not at the house, these

10  were his auto key cards.  They're part of his business.  He was

11  possessing them on that day.

12          And it was a lot of auto key cards.  Special Agent

13  Hooker's testimony was that they counted the number of etchings

14  for lightning links on these auto key cards at the home and

15  that it was approximately 1,550 etchings for lightning links on

16  the auto key cards retrieved that day.

17          Those are all of those packages that are in

18  Exhibit 50, different types and styles of auto key cards that

19  were all over that house.

20          Let's talk about reasonable doubt.  You don't have to

21  find that we've proved the case beyond all possible doubt.  A

22  reasonable doubt is a real doubt.  And you're also supposed to

23  rely on your personal experience, your own logic, and your own

24  sense to determine whether there's reasonable doubt in this

25  case.

1        What's not required?  Again, not required to show

2   that Mr. Ervin and Mr. Hoover met in person to work out the

3   plan or that Mr. Hoover ever met with Mr. Ervin in person or

4   ever came to Florida.  Not required.

5        It's not required that any particular purchaser

6   possessed a gun that the auto key card worked with or even that

7   they possessed a gun at all.

8        What's required -- the machine gun conversion device,

9   under federal law, is a machine gun on its own.  So what you

10  have to find is that the auto key card is a combination of

11  parts designed and intended to be used to convert a weapon into

12  a machine gun and that it worked with some weapon.  And Officer

13  Toy demonstrated that it worked with an AR-15 that is in ATF's

14  collection.

15       It's not required that the ATF warn them prior to

16  arresting them.  That's not how criminal laws work.  You know,

17  we don't go tell the drug dealer, "Hey, you know that's

18  illegal.  You need to stop it."

19       The same with them.  What they were doing was

20  illegal.  They knew it was illegal, and they got arrested for

21  it.  It's not required to send them a letter beforehand to warn

22  them that what they were doing was illegal.

23       Ultimately, what it comes down to is this:  The

24  defendants knew what they were doing, they knew that it was

25  illegal, and they sent out not-quite-completed lightning links

1   through the mail to try and cover themselves.  This wasn't a

2   stand for free speech or art; it was an illegal cash grab.

3           Mr. Hoover said right in his videos what his and

4   Mr. Ervin's intent was:  to willfully violate the law.

5           As Mr. Hoover said, "Laws only work if we follow

6   them.  If there's zero compliance, they have to be removed,

7   because what's the point then?"

8           One of the questions that was asked of each of you by

9   the Court when you were selected to serve on this jury is, "Can

10  you follow the law?"  And that's what we're asking you to do

11  today.

12          Common sense.

13          There are all kinds of nonsensical covers and veils

14  that Mr. Ervin and Mr. Hoover tried to hide behind in this

15  case.  Does it make sense that a rational person would pay $600

16  for four not-especially-attractive or ergonomic bottle openers

17  and then just stick them in a drawer and never use them to open

18  a bottle?

19          Does it look like art to you?

20          Have you ever heard of such an item as a pen holder?

21          The law says that any combination of parts designed

22  and intended for converting a firearm into a machine gun is a

23  machine gun and it must be registered.

24          I submit to you that Mr. Mesrobian and I have

25  presented you to a mountain of evidence that Mr. Ervin and

1   Mr. Hoover intended that the auto key card be used as a

2   combination of parts to convert a firearm into a machine gun.

3   They knew of its true function.  And when they sent -- and they

4   sent each of those auto key cards out with the intent to

5   willfully violate federal firearms laws.

6           And now we're asking you to return the only verdicts

7   that are consistent with the law, the evidence, logic, and

8   common sense, and that is, verdicts that both Mr. Ervin and

9   Mr. Hoover are guilty as charged in the indictment.

10          Thank you.

11          THE COURT:  Mr. Larosiere.

12          MR. LAROSIERE:  Yes, Your Honor.

13          Well, I've certainly got a lot to follow up with, but

14  to start with, I'm going to tell y'all about Matthew Raymond

15  Hoover, my client.

16          But I'd also just like to point out, before we really

17  get going, I am representing Matthew Raymond Hoover only.  You

18  might hear me talk about Mr. Ervin.  I'd encourage you to defer

19  to his counsel on charges relating to him.  I may have opinions

20  on them, but take them with a grain of salt.  My interests are

21  directly aligned with Mr. Hoover.

22          To say that Matthew Hoover is a political provocateur

23  would be a pretty aggressive understatement.  He's a

24  gun-loving, government-distrusting conspiracy theorist from the

25  back woods of Wisconsin.

1          If there's one thing Hoover really knows and cares

2     about, though, it's guns.  He is a firearms dealer at the time

3     of all these events, a Special Occupational Taxpayer that paid

4     for his special permission slip to be able to develop, among

5     other things, machine guns.  He worked in the industry and

6     followed the rules as he knew them.

7          And the government's brought up that Mr. Hoover, in

8     his videos, where he orally processes what's going through his

9     head, quite clearly, and we'll talk a little bit more about

10    that later, he would say, "Well, ATF might argue this, ATF

11    might argue that."

12         Well, we've seen quite a lot of Hoover's videos.  He

13    spends an incredible amount of time talking about his

14    experience in the firearms industry.  How he believes the ATF

15    flip-flops, how he says the ATF might argue something, that's

16    not him believing it's illegal; it's him criticizing what he

17    believes to be an unaccountable, inconsistent government

18    agency.  It's as simple as that.  And he will tell you that in

19    his videos very clearly.

20         In his videos Hoover will tell you where the line is

21    as he sees it.  And he'll tell you that if you cross that line,

22    you are committing a crime.  Sometimes he'll tell you how to

23    cross the line.  And there's nothing illegal about telling

24    somebody, "Hey, if you want to break the law, here's how you

25    would do it."  There's plenty of chemistry books that will tell

1  you how to do a lot of things that are very illegal.  But

2  clearly the government doesn't like that type of information.

3          Now, some of you might agree with some of the things

4  that Mr. Hoover has to say.  Many of you might find his

5  opinions to be absolutely awful.  But that's the great thing

6  about this country.  We don't have to worry about that.  We all

7  have an absolute, irrevocable right to have and express our

8  opinions.  Our right to free speech would be worthless if it

9  only protected idle, pleasant conversation.

10          It just so happens that Mr. Hoover, with his videos,

11  happens to have a massive platform.  And it seems there's lots

12  of people who agree with him; at least hundreds of thousands,

13  possibly millions.

14          I'd like to talk real quick about what we're not

15  doing here.  We are not here to determine whether or not Matt

16  Hoover is a great guy.  We're not here to determine whether or

17  not we want to invite Matt Hoover over for Thanksgiving.  We

18  are not here to determine whether or not the auto key card is a

19  product that we think should be sold.  The auto key card is not

20  on trial; Matt Hoover and Justin Ervin are.

21          What we are here to do is determine whether or not

22  Matt Hoover and Justin Ervin are guilty of the crimes the

23  government is alleging.

24          So what is Matt Hoover charged with?  We're going to

25  talk a little bit about this.  The Honorable Judge Howard has

1   given you the facts of the case, she has given you the law of

2   this case, for which you will apply it to the facts.  Every

3   single word of the instructions that Judge Howard has given are

4   you essential.

5          The government must prove every element, every chunk

6   of words in the offense beyond a reasonable doubt.  That means

7   it's demonstrated with proof of the type that you would rely

8   upon without hesitation in making decisions about the most

9   important of your own affairs.  It's a very high standard.

10         All of the elements are essential.  If the charges

11  were a Jenga tower, to put an illustration, the tower would be

12  at the point where any block getting taken out would cause it

13  all to come falling down.

14         I'd like to talk now a little bit about some of the

15  things the government has told you.  Of course, this all

16  relates back to this, which y'all will get to hold in your

17  hand, and I would encourage you to, this hunk of steel.

18         To me, it almost seems like there might be some

19  dissonance, but we'll talk about it.  The government has

20  referred to an overwhelming amount of evidence.  And you know

21  what?  I agree.  There's a lot of quantity of evidence.  The

22  question is the quality.

23         We've heard from just about all the king's horses and

24  all the king's men about whether or not Justin Ervin used the

25  mail.  Something, by the way, his counsel agreed to on the

1   second day of this trial.

2           Think about that.  Think about the quantity of

3   evidence you've seen with particular things like handbags

4   versus the things that are actually at the core of this matter.

5           I'd like to point out that, something I've noticed,

6   Ervin paid no attention to the thickness of this product.  It

7   was a mechanical component, or intended to be.  Would he leave

8   that entirely up to Orange Park?

9           They keep mentioning the thickness too, while knowing

10  that Ervin paid no mind to it.  There's been no evidence of

11  that.

12          Why sell it?

13          Why not?

14          I'm not here to act as an art critic.  There's no

15  accounting for taste.

16          I think it's important that the government points out

17  he could have made modifications to ensure it was not

18  functional.  Remember that, about these lines, about where they

19  were, and about this claimed functionality.  We'll be getting

20  back to that.

21          They say that Hoover thought there was no legal use

22  for it.  We'll watch that video.  We'll see where that quote

23  came from, and we'll see Hoover immediately talk about all of

24  the legal uses.

25          Mr. Toy is going to be a big subject of discussion.

1 He cut right along the line, they say, and then he made a

2 different line.  Again, talk about a millimeter, right.  In the

3 grand scheme of things, that might not seem like a big amount,

4 but when you hold this and you look at the size, well, one, I

5 don't know if it's a millimeter, seems like more; two, it's a

6 big difference.  Do the lines matter or not?

7          They say that Hoover knew Ervin was violating the

8 law.  We'll see that video.

9          They said that the substantive act witnesses, all the

10 people with the initials we've been talking about, all of them

11 understood it could be used to convert.  Now, I'm not agreeing

12 with that, but what about the one witness they brought out here

13 who endeavored desperately to get the thing to work and

14 couldn't?  The one who worked at a tool and die shop, who cut

15 to the outside of the line, to the inside of the line, and it

16 wouldn't work.  That don't sound like designed and intended to

17 me, but . . .

18          Let's focus on the jail call.  They're clearly

19 friends.  I'm glad to say for my client, they're not charged

20 with being friends.  Not illegal.

21          And it's important to remember that every single one

22 of those witnesses called by the government thought that the

23 product was completely legal.  And the one time the government

24 asked one of the witness why they thought it was legal, he said

25 it all:  "Reason, logic, and common sense."

1          It's not a machine gun.  It's lines on a piece of

2   steel.

3          Matt Hoover is charged with knowingly and willfully

4   conspiring to transfer machine guns.  I think when you boil it

5   down, when you look at all the conduct here that's actually

6   been alleged against Matt Hoover, the only thing he's really

7   accused of is talking about drawings on a piece of sheet metal.

8          So let's just talk a little bit about Count One.  I'm

9   not going to reread all those instructions.  You've got them on

10  paper.  But I want to focus on the things I think are really

11  important.

12         A conspiracy is an agreement by two or move people to

13  commit an unlawful act.  There is some operative language here,

14  "an unlawful act."

15         Next, in the elements, there's one I really want to

16  focus on.  "The defendant knew the unlawful purpose of the plan

17  and willfully joined in it."  Remember that.  Knowledge and

18  willfulness is essential to this case.

19         I'd also like to talk for just a moment about things

20  that are not conspiracies, one of which includes being friends.

21  A person who does not know about a conspiracy -- that being a

22  plan to commit an unlawful act -- but happens to act in a way

23  that advances some purpose of one, does not automatically

24  become a conspirator.

25         The question here as it relates to my client, Matt

1    Hoover, that you must decide is even if whoever acted in some

2    way to advance a conspiracy, did he himself know about a plan

3    to break the law?

4         It's also important to nail down that merely

5    associating with certain people and discussing common goals and

6    interests does not establish proof of a conspiracy.

7         So here's the question:  Has the government proven

8    Hoover to be part of a plan to break the law, rather than

9    somebody who simply took a sponsorship and enjoyed talking to

10   Justin Ervin?  If we aren't sure what a sponsorship is, I think

11   Hoover does a great job explaining it himself.

12       (Video played:)

13        "MR. HOOVER:  . . . ask my girl was, what is a

14   sponsorship?  Now, they can literally go right down the hall

15   and talk to the FTC and get more information on advertisements

16   and sponsorships than I could ever plug in this video, like by

17   a long shot.  But the fact they had to ask my girl just

18   highlights their level of incompetence.

19        "Yes, I'm not perfect.  I make mistakes all the time,

20   but you know what, I'm a dude on YouTube.  I'm not some federal

21   agency that literally has a license to kill and can destroy

22   people's lives making dumbass mistakes.  They should be held to

23   a much higher standard.  Yeah, I make mistakes.  I'm just a

24   dude on YouTube.  I mean, you are a government agency, packing

25   guns, literally ready to trash people's lives, and you're going

1  to ask my girl what a sponsorship is, when you can literally go

2  down to the hall to the FTC and ask them?

3  　　　"I mean, don't get me wrong, the whole thing was a

4  perjury trap.  They were asking her, hoping she would panic,

5  talking about a topic she has no business knowing anything

6  about, and then if she says something wrong or incorrect under

7  oath, then they would correct her, get her to back pedal, boom,

8  they got her for perjury; boom, we're stuck in Florida for

9  30 days.  They can put the grips on us and make us bend or use

10  that as some sort of leverage to get me to sign some sort of

11  government written confession.  But whatever.  It's a video

12  topic to me.

13  　　　"So let's talk about sponsorship.  What is

14  sponsorship?  Well, there's a lot of different types.  There

15  are basic ones -- there's a lot more than this, but I'm just

16  going to talk about the basic.  Product placement.  What that

17  is is say I am selling this marker.  I can do this in a lot of

18  different ways.  I could give it to the influencer and be like,

19  hey, I want you to use this marker every time you write on this

20  board and I'm going to pay you X amount of dollars.  That's

21  one.  That's where you're interacting with the product.

22  　　　"Then another type would be like, hey, I want you to

23  put this marker right here on the shelf and it must be clearly

24  visible for X amount of seconds in every video and I'm going to

25  pay you X amount of dollars.  Another one.

1           "Then there is acknowledging the product.  That's

2    where they're like, hey, I'll send you this marker, you make a

3    video about this marker specifically, a video specifically

4    about this marker -- you don't see that a lot in whole life --

5    and we'll pay you X amount of dollars.  I don't care if the

6    review is good or bad, we just want it in front of the camera.

7    This is what we're willing to pay for that.

8           "Then there's the type of product placement most

9    creators don't identify, and they fall into this trap.  That's

10   where not only are you doing a very valuable standalone video

11   about this particular product, you are paying for it out of

12   your own pocket.  That's product placement, most definitely,

13   but it avoids the FTC because you've purchased it out of your

14   own pocket.  So basically you are paying this company to

15   advertise their product.

16          "That's why I don't do reviews anymore.  If I do a

17   review, it's for a very special reason, because why would I

18   want to spend money out of my own pocket to advertise this

19   company's product?  That makes no sense.

20          "So if they wanted to pay me for a review, I would

21   say no.  If they wanted to do product placement, I would say no

22   because I prefer this type of advertisement.  That is, a paid

23   commercial.  That's where you'll see me -- I like to roll it in

24   within the first 60 seconds of a video, hey, this video is

25   sponsored by whatever -- Dry Erase Marker right here.  So if

1     you'd like to help support the channel, by some Dry Erase

2     Markers.  Show them that you are going there from my video so

3     they continue to sponsor more videos.

4          "Because that is clearcut, everyone knows it's a

5     commercial, there's no denying it.  It doesn't feel

6     disingenuous to the audience because I'm not like, oh, this Dry

7     Erase Marker, as you'll notice, it uses a 2.6-millimeter tip,

8     it's very beautiful, it has a nice coloring to it, the shape is

9     great, it fits right inside your pocket.

10          "You don't know, because I could have bought this out

11     of my own money, in which case I'm paying the company to

12     advertise them for them.  Or they could have paid me to

13     advertise this market.  Either which way, a review is a lose,

14     lose, lose, lose.  Reviews, honestly, should be done by the

15     companies themselves or smaller channels.

16          "That's why I would do it as a paid commercial.  And

17     in that paid commercial I could be like:  This video sponsored

18     by Dry Erase Marker.  As you'll notice, it's got a very

19     beautiful blue line, it uses a 2-millimeter tip.

20          "See, that's a commercial.  It's easy to identify as

21     a commercial.  There's no confusion.

22          "This way my channel's black and white; either it's a

23     commercial or it's not.  There's no, well, he did a review

24     about this, and at the same time he dropped his review, 300

25     other channels also dropped a review on this.  But he says it's

1   not a paid advertisement, so do I trust his word?  Is he really

2   saying it's a nice color, or was he paid money to say it's a

3   nice color?

4        "You see what I mean?  Like the line gets really

5   blurry when you do reviews.  It's really hard to tell what is

6   paid and what is not, or I should say what review they paid the

7   company for or the company paid them for, because either way,

8   they fall into the same category.  It don't matter if you buy

9   this product or not, a review is a review is a review is a

10  review.  It doesn't really matter if the company paid you for

11  it or you paid the company for it.

12       "And I understand there's a point and a place for

13  reviews, it's just not for me.  I like to keep it:  This is a

14  product commercial right here, and then I'm going to do other

15  shit, like take a big, old, fat poopy on the ATF, talk shit

16  about the ATF, do my own build projects, because then I'm not

17  advertising for that particular company.

18       "Now, I love doing bad reviews, because that" --

19     (Video stopped.)

20       MR. LAROSIERE:  And I think we've heard enough about

21  sponsorships.  But the government put Mr. Hoover's words up.

22  He was paid to advertise, he was offered a sponsorship, and he

23  took it.  He didn't design anything.  Nothing seems to indicate

24  he intended anything.  He had nothing to do with the business.

25  And it's very clear that he was under a deep-seated belief that

1   what that company was doing was legal.  And we'll get more into

2   that in just a bit.

3          So now Counts Two through Eight, right.  Those are

4   surrounding aiding and abetting these particular transfers.

5   These initial people, we know who they are.  You've heard from

6   I believe all but one of them.

7          As Judge Howard instructed you, one, Hoover would

8   have to be convict- -- found guilty of Count One.  So that's

9   the first hurdle to overcome, which I think is a substantial

10  hurdle.

11         Going forward, as to Counts Two through Eight, as

12  Judge Howard instructed you, a person aids and abets if they

13  intentionally joined with another person to commit a crime.  So

14  this knowledge, this intent, it remains important.

15         We heard testimony from most of these people.  These

16  buyers had immunity letters.  And they still testified that

17  they were completely under the belief that what they were

18  purchasing was not a machine gun.  They may have thought it one

19  day could become one, but that's not what the law is about.

20  And we'll touch on that later as well.

21         So to be convicted on these counts, the government

22  must prove that Matt Hoover was a knowing and willful member of

23  the conspiracy when the crime was committed.  No knowledge, no

24  conviction.  No willfulness, no conviction.  And if there's no

25  underlying crime because the product, this single chunk of

1  steel that the government is saying with a straight face is a
2  combination of parts, safe to say no conviction for conspiracy
3  to commit a crime.
4      So we know the government must prove the knowledge
5  and willfulness and prove the existence of the underlying crime
6  beyond a reasonable doubt.  And you guys have heard the
7  definition of "beyond a reasonable doubt," I won't regale you
8  with that.
9      Let's talk about knowledge.  The word "knowingly"
10 means that an act was done voluntarily and intentionally and
11 not because of a mistake or by accident.  I think that's pretty
12 clear.  You didn't slip and fall into it, right.
13     Let's talk about willfulness.  The word "willfully"
14 means that the act was committed voluntarily and purposely,
15 with the intent to do something the law forbids; that is, with
16 the bad purpose to disobey or disregard the law.  That is not
17 describing a good-faith quibble with the law.  That is not
18 describing an action that you sincerely believed was legal.  A
19 person must have acted with the intent to do something the law
20 forbids before you can find that that person acted willfully.
21     Again, you guys will hold these in your hands.
22 Single chunk of stainless steel, a drawing, where reasonable
23 minds could differ if it even catches your thumbnail.
24     So knowledge, willfulness, intent, this is all stuff
25 that's inside someone's mind, right.  And in many situations

1  this can be a problem.  The nice thing about Matt Hoover is he

2  tells you exactly what he's thinking.  His videos are obviously

3  unscripted, obviously unrehearsed, and very clearly unfiltered.

4  If you're not sure about that, this unscripted, unprepared,

5  unfiltered nature of his videos, let's just take a look at a

6  couple snippets.  It will just take a sec.

7       (Video played:)

8            "DEFENDANT HOOVER:  Again, they're just enforcing

9  their own opinion.  And they change their opinion, fail to

10 notify anybody they change their opinion.  I mean, maybe they

11 sent this guy letters and was like, hey, we have now changed

12 our opinion about this particular product, and maybe he just

13 blatantly ignored them, I don't know.  I'm not that guy.  But I

14 would assume if the ATF sent me a letter and was like, hey,

15 your product is a machine gun, you should probably stop selling

16 it, I would immediately stop selling it, like instantly.  Even

17 if people ordered it, I'd cancel all the orders, return the

18 money back to them.

19           "So I have to assume they never informed the guy that

20 they changed their opinion, which is crazy, because now he's

21 being persecuted by our government for following" --

22           MR. LAROSIERE:  Not just a phone call; sometimes his

23 family shows up.

24      (Video continuing:)

25           "-- what their opinion was before.  So yeah, my

 1    powder-and-bullet combination are not good.  Due to the

 2    scarcity of resources right now, I cannot change that.

 3              "What's up Nina?  Okay.  I'm shooting a video,

 4    though.  I'll come up there in just a little bit, okay?"

 5              "CHILD:  Okay."

 6              "DEFENDANT HOOVER:  Due to the scarcity of resources,

 7    there's" --

 8         (Video stopped.)

 9              MR. LAROSIERE:  I submit that either these videos are

10    a complete stream of consciousness where Matt Hoover is orally

11    processing what he's thinking, his thoughts are forming as the

12    words are coming out of his mouth, it's either that, or he's

13    the greatest actor on the planet.  I don't think it's a close

14    call.

15              So again, did Matt Hoover knowingly -- what have I

16    done? -- knowingly and/or willfully break the law?  Well, let's

17    hear it from the horse's unfiltered mouth again.  These are all

18    videos from before Justin Ervin was arrested.

19         (Video played:)

20              "DEFENDANT HOOVER:  So these are an excellent

21    conversation piece.  They're cool.  It's a novelty item.  It's

22    awesome to have.  This particular one is actually a beer opener

23    that has the designs on it.  And so, see, especially this one

24    where they didn't cut those two little parts, and an ATF agent

25    walking into a courtroom and argue that this piece of metal,

1   with a drawing on it, is a machine gun -- yes, they probably

2   will do that at some point in time -- is just ridiculous.  Drop

3   it in your rifle, or, you know, if you're actually going to do

4   this legally, this is just a bottle opener.

5        "But what this is is a novelty.  Someone sees it,

6   they're like, hey, what is this, you explain to them that

7   because laws are so ridiculous and so out of control, if I were

8   to cut on these lines, I would become a felon.  How ridiculous

9   is that?  And it's just a conversation starter.

10        "But if, for an SOT like me, you were legally allowed

11  to, or you qualified for option number 6, cut along these lines

12  and put it together, I could register this as a machine gun,

13  drop it in my rifle, do testing, demonstration, pull it out,

14  and to the best of my knowledge -- I still got to talk to my

15  ATF specialist for the NFA -- but to the best of my knowledge,

16  I could do testing with, say, this firearm, pull this out, and

17  now I would only have to destroy this.  I don't have to destroy

18  my lower receiver.  But to be honest, this isn't going to get

19  banned.

20        "Now, the difference between these and the old

21  lightning links that did cause problems, these are not cut out;

22  the old ones were 100 percent cut out.  There was just a couple

23  small pieces of metal holding them in the original piece so

24  alls you had to do was take your finger, pop it out, boom you

25  have a machine gun.

1        "This is just a drawing on a piece of stainless

2   steel.  That's it.  Just a drawing.  Nothing more.  You have to

3   manufacture it.

4        "You got to remember, too, this is just a drawing on

5   a piece of metal.  For them to charge you with a machine gun

6   for an auto key card would be like them going to the local

7   grade school and arresting somebody for drawing a machine gun

8   on a piece of paper.  There should be no way at all this will

9   ever be an ATF crime.  But you never know what they're going to

10  do.

11       "Anyway, just wanted to thank autokeycard.com for

12  sponsoring this video."

13      (Video stopped.)

14      (Video played:)

15       "DEFENDANT HOOVER:  And the sponsor for today's video

16  is autokeycards.com.  They are a talking piece, that's it.

17  Just a little design on a piece of metal.  This way you could

18  show it to your friends and be like, hey, at one point in time

19  it used to be legal for me to cut this out.  That's how far we

20  went down the freedom hill."

21      (Video stopped.)

22       MR. LAROSIERE:  I think it's pretty clear what Matt

23  Hoover thought this was:  a fascinating piece of commentary on

24  the state of American law if you cut it out, and then refers to

25  him as a Special Occupational Taxpayer, which you've heard

1    about.  If, he opines, he manufactured a machine gun from this

2    or any other piece of steel, he would register that piece,

3    serialize it.  And the comment on destruction, as we've heard,

4    people talk about SOTs, they're only available to be made with

5    the ultimate goal of law enforcement sales.  We also heard

6    testimony saying they could be made for R&D purposes and

7    otherwise.  So SOTs can make this.  He's not talking about

8    destruction of evidence.  He just said he was going to register

9    it, right.  That's because if you can't sell something, what do

10   you end up doing with it?  Getting rid of it, eventually, by

11   chopping it up.  That's what he was talking about there, him, a

12   licensed SOT, who is allowed to do that.

13          So again, we've seen him speak very clearly what his

14   opinion is on this single chunk of steel with lines on it

15   before Ervin was arrested.  Now let's see what he was thinking

16   afterwards.

17       (Video played:)

18          "DEFENDANT HOOVER:  All right.  So the unthinkable

19   happened.  So just -- I'll wait for a second while you give me

20   your I-told-you-so's.  I honestly legitimately never believed

21   that somebody could get arrested for having a drawing.  If I

22   were to draw a machine gun on that board, it looks like under

23   current law, or how the law is currently being enforced, I

24   would be arrested for manufacturing a machine gun by drawing a

25   picture of one on that board right there.

1        "So what am I talking about?  What's going on?

2    What's happening here?  All right.  So the person that

3    manufactures and distributes and sells the auto key card, which

4    would be Justin S. Ervin, he was born in 7/2/1980, got picked

5    up Tuesday.  Now, we don't actually know why because the

6    indictment is still sealed.  Who knows when that will actually

7    be opened and they will give the details out.  So that's still

8    a mystery.  Usually the easiest answer is the correct answer,

9    which would be the auto key card.  Yes, there are other

10   possibilities.  Maybe he had some sort of drug charge or maybe

11   he manufactured some machine guns, who knows.  But again, the

12   easiest answer is usually the correct answer.  Therefore, he

13   probably got picked up for his auto key card.

14       "Now, his website and everything is still up, which

15   makes no sense at all.  And his phone still rings, which makes

16   no sense at all.  The only reason I know about this is because

17   we talk almost on a daily basis about what's going on, how are

18   things going, because he's actually got a hell of a story.  He

19   moved to Florida, had a professional construction company

20   going.  Florida changed a bunch of rules and regulations which

21   made it almost impossible for him to conduct business.  He sold

22   off his equipment, borrowed a whole crap-ton of money, produced

23   the auto key card, and then started slowly rebuilding his life

24   back.  And just like that, the ATF came and just knocked down

25   his whole house of cards.

1          "From what I understand, they arrested his entire

2    family.  So even if he gets the charges dropped, which it's a

3    50/50 shot if they can get them to stick or not, chances are

4    they'll probably try to get him to plea-bargain out so they can

5    get the charges to stick, then they'll get almost nothing out

6    of it.  But either which way, they seized all of his assets, so

7    he's got to get a Public Defender and try to fight this thing.

8          "But yeah, the only reason I knew about it is because

9    I hadn't heard from him in a while, I was like, what the hell

10   is going on?  So I finally tracked somebody down, I was like,

11   hey, why can I not get ahold of this guy?  Is he in the

12   hospital or something?  What the hell happened?

13         "They were like, yeah, Tuesday the ATF showed up and

14   arrested him, his whole entire family, seized all of his

15   assets.  So he didn't know your number.  And he can't put a

16   retainer on an attorney because they froze all of his bank

17   accounts, so that's why he hasn't got ahold of you yet;

18   otherwise, yeah, his lawyer would have totally got ahold of

19   you, but he hasn't got one yet.  He just has a Public Defender.

20         "So what exactly does this all mean?  What they have

21   to prove is intent, that he intended for people to cut out the

22   auto key card and make lightning links, which I got to admit, I

23   would not want to be the prosecution.  That would be a very,

24   very, very hard thing to put.  Because if you've ever been on

25   his website, there's no instructions, there's no key words,

 1   nothing.  It's just the auto key card with a price.  And alls
 2   it is is a drawing on a piece of metal.  That's about the same
 3   legality as a picture on the internet, or if you were to draw
 4   on that whiteboard right there with an auto key card looks
 5   like.
 6            "It's far easier to drill a third hole in an AR-15
 7   receiver and make that a machine gun over trying to cut out
 8   that piece of metal, because it's nothing.  It's a novelty.
 9   It's just a talking piece.  There's like literally no work done
10   for you.
11            "So they have to prove intent.  Now, you think this
12   would be impossible.  However, they did it in the Polymer 80.
13   So we'll have to see how that's going to unfold and how that's
14   going to go from there.
15            "So what does that -- oh, I did have somebody talk to
16   the GOA to see if they will defend him.  We'll have to see if
17   the GOA takes this on or not.  I would really hope they would
18   because they're literally charging somebody with
19   manufacturing -- if that's what he got arrested for -- they're
20   literally charging somebody for manufacturing a machine gun by
21   simply having a drawing.  So if they can charge him for that,
22   oh, my God, like I don't think there's any American that is
23   safe.  They could literally charge any of you for manufacturing
24   a machine gun for simply having a picture of an M16 on your
25   phone or something like that.

1          "So I think the GOA will pick this up.  It would make

2     sense in my head.  Again, you know, I don't have a crystal

3     ball.  I can't tell you what is or is not going to happen, but

4     I would assume the GOA would pick this case up because that's

5     pretty hard core, charging somebody for a machine gun for a

6     drawing of a part that used to be used to make a machine gun,

7     what, like 30 years ago?  So we'll have to see if they'll pick

8     it up.

9          "What will probably happen to me?  Well, there's two

10    possibilities.  One, nothing, which I think is a likely

11    possibility.  Two, they try to go after me as some sort of

12    conspiracy to distribute machine guns knowing people are going

13    to cut them out or something like that, which is also a

14    possibility.  They very well may do that.  That would be next

15    to impossible to prove.

16         "So if they were to go after me for that, what would

17    probably happen is it would be more just to shut me up, to make

18    my YouTube channel go quiet for a while, because I know they

19    don't like me because I'm always talking shit about the ATF.

20    So that would be a great way to shut me up for a while.  I

21    would most definitely go to jury trial and I would make a

22    circus out of it.

23         "So I don't think they would do that, but you never

24    know.  I mean, tomorrow at 5 a.m. the ATF may show up at my

25    house; we'll have to see.  So that's always something that's

 1   out there for a possibility, but, you know, without risk,

 2   there's no reward.  I've accepted these risks when I first

 3   started making the YouTube channel.  If I was legitimately,

 4   like honest-to-God afraid of being arrested by the ATF, I

 5   wouldn't make a YouTube channel, because chances are sometime

 6   in the future they will ban semiautomatic firearms, and

 7   shutting people up like me would be an excellent way to start

 8   pushing things through.  Plus, I've shown most of my guns on

 9   the YouTube channel, so there's proof that I have firearms,

10   this and that.

11          "So again, would they go after me?  Probably not, but

12   it is a possibility.  That would be a great reason for the

13   indictment to be sealed.  They may even go after the machine

14   shop that was making them for him.  That might be a reason why

15   the indictment is sealed.  You never know.  Best thing to do is

16   just don't order any if you haven't already.

17          "So what could happen to you?  Let's pretend you did

18   order one of these.  Well, if you did cut it out and the ATF

19   does show up at your house, shut your mouth.  If they haven't

20   arrested you yet, they don't have enough to arrest you.  What

21   they're trying to do is talk your way into getting into jail.

22   You can't talk your way out of getting arrested.  If they can

23   arrest you, they will.  What you can do is talk your way into

24   getting arrested.  Keep your mouth shut.

25          "Do you have a warrant?  No.  Okay.  We're done

 1    talking here.  Then I'm free to go.  Am I being detained?  No.

 2    I'm free to go then.  Don't let them talk your way into getting

 3    arrested.

 4           "What will probably happen is the same thing with

 5    like the portable wall hanger and then the solvent trap thing.

 6    They will give you a letter saying, hey, if you have this,

 7    destroy it.  That's about as far as that will go.

 8           "If you did happen to cut one of those out and you

 9    don't have your manufacturing license with an SOT, it's

10    probably a good time to get rid of it.  Just saying.

11           "Now, for the people that won those on my live

12    stream, there is a digital footprint.  If they do come for me,

13    they will see that digital footprint.  I'll have my girl or

14    something -- I'll have somebody upload a video, or what I'll do

15    is I'll upload a video saying I was arrested, and I'll have it

16    scheduled for every 24 hours and I'll just keep resetting it.

17    So if I do get arrested, it will automatically go public so

18    you'll know.  And then anybody that went on the live stream,

19    they'll also know because they'll seize my digital files.

20           "Now, I didn't send out the last winners, and I can't

21    right now, because of the fact that I know that this happened

22    means that I know they consider them a machine gun.  So if I

23    were to send those out, I would be intentionally sending you a

24    machine gun.  So I apologize for the people that haven't got

25    them yet.  You're not going to.  I'll try to come up with some

1   other prize for you guys to get.

2           "I'm just finding out about all this stuff now, so

3   just give me a little bit to work out the bugs and see what the

4   hell is going on and then we'll go from there.

5           "Now, understand, Johnny B's video, he's just putting

6   out his opinion.  It wasn't bad.  It wasn't truly attacking

7   that.  He said the whole donation to the auto key card guy was

8   a stupid idea and then he gave his opinion on how he

9   believes -- and there's nothing wrong with giving your opinion.

10  You can give your opinion, that's totally fine.

11          "I feel he got the three categories wrong.  How I see

12  the three categories is there's the just following orders, I'll

13  do what I'm told.  That would be your Nazi in the courtroom

14  trying to argue that all those people he killed, he was just

15  following orders.  That's what he was told to do, so that's

16  what he's doing.

17          "Then you got the second kind of person.  They won't

18  bear the pole.  They're not going to hold the flag, they're not

19  going to run to the flag to fight for a cause.  However, they

20  will support somebody that's doing it.

21          "And then you got the third type of person.  That's

22  the person that is willing to stand up and fight for what they

23  believe in.

24          "Now, he makes this video that the whole auto key

25  card thing was stupid.  And I had several conversations with

1  the guy.  I'm like, hey, you know, it's kind of an edgy

2  product.  And he's like -- don't quote me on this, this is not

3  exact words and I don't want it to be used in court, but the

4  gist of it is, look, if a drawing on a piece of metal that I

5  have scribed in there is going to be illegal, that's my line in

6  the sand.  That's where I want to fight.  If they come for me,

7  I think it's moronic, I think it's stupid.  However, I'll take

8  that fight on, because that proves to me that the government

9  has been pushed into a spot where I just don't think it's

10  right.  If you don't even have contraband, you can't be charged

11  for contraband.

12          "I'm like, yeah, I get that.  Yeah, that makes sense.

13  I got your back, man.  Something happens, I got your back.

14          "But anyhow, so -- and that's how I feel.  Like he

15  made the three examples.  Like there's people that follow all

16  laws, get all their tax stamps, do everything; there's people

17  that oppose the laws but they do it privately; and there's

18  people that do it publicly.  And that's not quite right.

19  There's the people that follow all the laws regardless of what

20  they are because they don't want to put themselves in a

21  position where they might have to fight some day, then there's

22  the people that will support the pole bearer, and then there's

23  the pole bearer.  That's the guy that's taking it on.  He's the

24  one putting his life on the line.  He's the one taking all the

25  risk.  He's the one fighting.

1        "Now, why is it important to support this guy?

2   Because he did not actually have contraband.  This was not

3   something you could pop out with your finger.  As you'll notice

4   on this document, it took the ATF 45 minutes to make a

5   lightning link out of this piece of card.

6            "Now, this piece of card was awesome because it was a

7   novelty, or if you were an SOT holder, it was a great SOT

8   resource where you could get machine gun parts, like myself.

9            "He absolutely has to win this case because it's

10  going to set precedence for other cases.  Kind of like the bump

11  stock case.  That needs to be won.  If he loses that case, you

12  don't actually have to have contraband, you just have to have

13  something that looks similar or close to contraband for it to

14  be contraband.  Kind of like in California, can't have a

15  detachable magazine, so they make them permanently fixed."

16      (Video stopped.)

17          MR. LAROSIERE:  I promise, no more videos.  But it's

18  pretty clear what he was thinking before and after.  Before the

19  arrest, it's very clear, it's just a drawing.  Kind of like how

20  all of the government's witnesses testified that when they

21  bought it, it's just a drawing.  Logic, reason, and common

22  sense told them it was not a regulated product.

23          After the arrest, to me, Hoover looks kind of like a

24  kicked puppy; he's confused, wandering around in the woods.

25  Doesn't seem like a person who was involved in a plan to

1    knowingly and willfully violate the law.

2            How much time pre-arrest did Hoover spend talking

3    about methods of compliance, mechanisms of compliance, ways to

4    be compliant?  Of course, yes, he did say if you want to not do

5    that, one, you'll be a felon, and sometimes he said, "Here's

6    how I do it."  That's not illegal.  That's not what he's being

7    charged with.

8            There's something really important here, and it was

9    in that last video.  The moment Matt Hoover found out that ATF

10   might be taking action against Ervin, what did he do?  He

11   immediately stopped.  He said to people, "Okay, don't buy it.

12   I'm not sending you any because I don't want to break the law."

13   He even says if he had just heard of a cease-and-desist, he

14   would have distanced himself from it.

15           The government, of course, is going to harp on the

16   fact that Hoover would occasionally say that laws only work if

17   you follow them.  What they're neglecting to remind you is that

18   in that same video Matt Hoover says, "I'm not telling you to go

19   out and make machine guns.  That ship has sailed."

20           He's talking about his deep-seated and

21   very-frequently-repeated concern that eventually the ATF will

22   use its regulatory power to ban all firearms without a change

23   in law.  He said it many, many times.  That's what he's scared

24   of.

25           So let's change gears here and talk about the core of

1    all this.  Auto key cards.  Now, the government's case falls

2    short in a number of ways, but one thing that brings the entire

3    thing down, what everything is connected to, is whether or not

4    this device, as it was sold, is a machine gun.

5         A machine gun conversion device, as the judge has

6    instructed you, is a combination of parts -- which is an amount

7    more than one -- designed and intended for use in converting a

8    weapon to shoot automatically.  I think we need to focus

9    heavily on the parts that I have bolded and underlined there.

10   This is my emphasis.  This is not from your instructions.

11        Now, when I think of a combination of parts, they

12   might be screwed together, they might be interlinked in some

13   way, but it's generally something I can take apart; take one

14   part in my left hand, one part in my right.

15        And, you know, I've been sitting here with this, and

16   this sucker ain't coming apart, because it's a solid chunk of

17   stainless steel of an arbitrary and, frankly, to Ervin,

18   unknown, thickness.

19        So as we said, multiple government witnesses have

20   testified that it's a single hunk of stainless steel.  Agent

21   Jesse Hooker, the main case agent, before it was handed over,

22   on this Operation Lightning Strike, admitted that he had to

23   have Cody Toy materially alter the card to manufacture a

24   lightning link.  And we'll talk about Toy's lightning link in a

25   minute.

1          He also testified about how it has -- what the card

2     has the potential to be.  The law does not refer to

3     "potential."  It is or it isn't.  A block of marble may

4     potentially be a great work of sculpture with material

5     alterations and transformative labor.

6          The government has tried to talk its way around this

7     by saying things like "a hunk of steel contains parts."  I

8     think that's a bit contrived.  It's the same way a block of

9     marble contains the greatest work of sculpture ever.  It's

10    possible.  If somebody materially alters it and performs

11    substantial transformative labor thereupon, yes.  But is the

12    block of marble the great work of sculpture, or is it a block

13    of marble?

14         Let's shift gears here to "designed and intended."

15    And I'm getting to the end.  There's many ways we can infer

16    what something is designed and intended for.  For one, its

17    stated purpose to make it, and another are observations along

18    the way.  And boy, have we got a lot of observations.

19         Stated purpose here is clear.  It's a work of

20    political art.  Commentary on the present state of the law.

21    And as Matt Hoover said, it's an item where you can physically

22    hold and show somebody, hey, the state of the law in this

23    country, as he understood it at the time, is if I cut this, I'm

24    in big trouble.  I view that as a valuable piece of political

25    art, but again, there's no accounting for taste.

1          You heard from multiple witnesses with immunity

2    letters.  They told you why they bought the thing.  And it was

3    for a mix of reasons.  We had somebody who just thought it

4    looked cool.  We had somebody who tried to make a machine gun

5    conversion device out of it, couldn't.  Doomsday preppers who

6    spoke in generalities.

7          I think it's really noteworthy.  In all of this grand

8    effort by the government, remember all of the surveillance and

9    the -- you know, we got to see the CRV go up the parking lot

10   and all the different streets and knew about the speed traps

11   and all of the mail, flights across the country, the

12   involvement of the postal inspector.  They didn't recover a

13   single manufactured machine gun conversion device.  The only

14   ones we heard of being cut out, which were cut out by the

15   government, we heard didn't work.

16         And again, that was the gentleman with an immunity

17   letter who works at a tool and die shop the government was

18   happy to put up there, "I cut right to your line" -- and he

19   later testified both lines, right, outside edge, inside edge --

20   "and it didn't work."

21         Then we get to Cody Toy.  Cody Toy was predisposed to

22   consider this hunk of steel a machine gun from the get.  He had

23   decided by looking at a picture on the internet what it was.

24         He then testified that it was precisely indexed to

25   fit in an AR-15 without further modification and that he cut it

1    to the line.  Of course, when asked which line -- which the

2    other witness was happy to testify to -- he just said "the

3    line."

4            And in any event, guess what?  Cut it to the line, it

5    didn't work.  So he cut it to a different line.  One he made

6    up.  He made a different part.

7            All he can say is this is lines on a sheet of steel.

8    He cut to a different line.

9            And remember again all the videos we saw on that

10   surveillance.  All the government could show of this thing

11   allegedly functioning as a machine gun conversion device was a

12   clip by a guy who admitted both that he changed the size and,

13   guess what, that it was not functioning as he believed a

14   lightning link -- he believed it was a lightning link.  It was

15   not functioning as a lightning link would be designed and

16   intended to.

17           He actually testified it was hammer following, which

18   he also testified was a malfunction.  That does not sound like

19   "designed and intended" to me.

20           Again, why does this all matter?  Why does he have to

21   change it?  Why doesn't it then work?  Because it's not

22   designed and intended to convert a firearm into a machine gun,

23   and it's certainly not a combination of parts.

24           You heard from employees of Orange Park Machine about

25   this.  They wanted to cut it out rather than etch it.  Ervin

1   forcefully told them, "No."  Wonder what his intent was.

2   Certainly not to cut it.

3          We also know that Bane, who made the drawing, made it

4   in such a way that it was not compatible with the laser

5   cutters.  We know that Bane's drawing, that DFX file we talked

6   about, was capable of being engraved lightly because Bane

7   testified that he engraved some himself on his engraver

8   machines.  Then, when Orange Park Machine got the drawing and

9   fed it to their cutting software, which they were trying to

10  force to just do light engraving, it wouldn't work.  So they

11  modified it.  Sounds like it wasn't designed and intended to be

12  cut out.

13         Then, after they modified the file to get it to work

14  with their software, to their annoyance, they used it to only

15  engrave the drawing as lightly as possible.  Again, I'd

16  encourage y'all to scratch your fingers on this.

17         What this case is about, the way I see it, is line

18  drawings.  The auto key card is just a drawing.  And we know

19  from the government's expert witnesses that drawings, designs,

20  schematics, and otherwise are not illegal; except, of course,

21  for Cody Toy, who testified that he could do the same thing he

22  did with a Sharpie.  Who knows if he would follow the lines

23  that were Sharpied, but that's another question.

24         One of two things happened here with regards to the

25  law.  When it comes to the law, there's a duty to clearly

1    articulate what is forbidden.  There's a line that's not to be

2    crossed.  You saw Hoover talk about that line.  So did Ervin.

3    Do not cut it out.

4            So the question is did Ervin and Hoover cross the

5    line written in the law, or did the government draw outside the

6    lines to prosecute them?  As far as the auto key card itself is

7    concerned, it is ultimately for you, the jury, to decide:  Has

8    the government proved in such a way that you would rely and act

9    on that proof without hesitation in the most important

10   decisions in your life that this solid chunk of metal is a

11   combination of parts designed and intended to convert a firearm

12   into a machine gun?  I think it clearly not.  And I thank you

13   for your time.

14           THE COURT:  All right, ladies and gentlemen.  As I

15   said, we're going to stop for lunch.  It's 12:10.  We'll resume

16   at 1 o'clock.

17           If your lunch hasn't arrived, it will be there in

18   about five minutes.

19           So I'm going to remind you that you still have to

20   follow all of the instructions that I've been giving you

21   throughout the trial.  Although you've now heard my

22   instructions and some of the arguments, you haven't heard all

23   of them.  And it's very important that you not form or express

24   any opinions, that you not talk to anybody or conduct any

25   research, and that you not read, watch, or listen to any media

1    reports.

2            Enjoy your lunch and we will see you back in here

3    promptly at 1 p.m.

4            COURT SECURITY OFFICER:  All rise for the jury.

5        (Jury exits, 12:11 p.m.)

6            COURT SECURITY OFFICER:  Please be seated.

7            THE COURT:  All right.  We'll take our lunch and

8    then, Mr. King, I'll recognize you promptly at 1 p.m. to

9    present your closing argument.

10           MR. KING:  Thank you.

11           THE COURT:  We're in recess.

12       (Lunch recess, 12:12 p.m. to 1:05 p.m.)

13       (All parties present.  Jury not present.)

14           COURT SECURITY OFFICER:  All rise.  This Honorable

15   Court is now in session.

16           Please be seated.

17           THE COURT:  Let's have the jury, please.

18           COURT SECURITY OFFICER:  All rise for the jurors.

19       (Jury enters, 1:06 p.m.)

20           COURT SECURITY OFFICER:  Please be seated.

21           THE COURT:  All right.  Mr. King.

22           MR. KING:  May it please the Court, counsel.

23           Good afternoon, everybody.  If you'll recall, back on

24   Monday -- not this Monday but the one before that -- I stood

25   right here and told all of you kind of what this trial would

1    look like.  That's our opening statement.  I said that I would

2    come back at the end of that to talk to you a little bit about

3    what the evidence was, some of the arguments that we

4    anticipated, and to go over some of the things that happened.

5           And a trial is where ideas are able to compete.  So a

6    trial is the government has made claims, they've told you

7    things, and they've given you impressions.  And our job is to

8    make sure that those are fair and accurate and complete.

9           And during the course of the trial we've seen a lot

10   of evidence.  So one of the things the government said in their

11   closing arguments is, "The evidence we have presented has been

12   extensive."  And certainly that's true, but we need to talk not

13   just about the quantity of that evidence, but the quality of

14   that evidence and what it really means to you.  So this is

15   where the rubber meets the road.  You've heard all the evidence

16   you are going to hear.  You've seen all the witnesses.  You've

17   seen the piles of evidence.  But this is the time where we talk

18   a little bit about what we've heard, what we've seen, and the

19   law that's going to apply to it.

20          So let's talk about why we're here.

21      (Video played:)

22          "DEFENDANT HOOVER:  I honestly, legitimately never

23   believed that somebody could get arrested for having a drawing.

24   If I were to draw a machine gun on that board, it looks like,

25   under current law, or how the law is currently being enforced,

1    I would be arrested for manufacturing a machine gun by drawing

2    a picture of one on that board right there.

3            "So what am I talking about?  What's going on?

4    What's happening here?"

5        (Video stopped.)

6            MR. KING:  Sometimes when we talk about what's

7    important we have to talk about what's not important, things

8    that we should not consider.  And the judge has given you

9    32 pages of instructions, and you'll get them all typed out.

10   And I'm not going to read them to you or put them up here and

11   read them again to you, but we'll have 32 pages of instructions

12   about what's important and what's not important.

13           One of the instructions I think is very important,

14   before I get into any of this any further, is this instruction,

15   that we are here for this case and this case alone.

16           You've heard Mr. Hoover talk about on his videos, "If

17   somebody told me that they believed the auto key card, or if

18   ATF thought the auto key card was illegal or it crossed a line,

19   that I would have stopped and instructed everybody else to

20   stop."

21           And you can see that he actually did that when he

22   said, "Do not go on this website.  Do not order these.  I do

23   not want any part of this.  And the ones that I have, I'm not

24   sending out to people that I've already promised that I would

25   do so."

1          So what I want to make sure that there's no concern

2     about with any of you is whether or not we are here to decide

3     whether the auto key card should be legal, should be

4     distributed, or any of those things.  We are here to decide if

5     the ATF and the United States have proven their case beyond a

6     reasonable doubt that these defendants have committed a crime.

7          And so what this is not about is whether or not we

8     think the auto key card is a good thing or a bad thing.  It's

9     also not about whether we like ATF or don't like ATF.  It's

10    also not about whether we like Justin Ervin and Matt Hoover.

11         And you've seen videos, you've heard some arguments.

12    Their politics may not be your politics.  Their arguments,

13    their beliefs, Doomsday preppers, worried about things like

14    that, pro-gun stuff, you may not like any of that, you may not

15    believe any of that, but the promise that you have all made,

16    both to the government and to these defendants and to the

17    Court, is to put that aside and judge them based on what's

18    happened here in court and the law.

19        (Video played:)

20         "DEFENDANT HOOVER:  Now, I didn't send out the last

21    winners, and I can't right now, because the fact that I know

22    that this happened means that I know they consider them a

23    machine gun.  So if I were to send those out, I would be

24    intentionally sending you a machine gun.  So I apologize to the

25    people that haven't got them yet, you're not going to.  I'll

1    try to come up with some other prize for you guys to get.

2            "I'm just finding out about all this stuff now, so

3    just give me a little bit to work out the bugs and see what the

4    hell is going on and then we'll go from there.

5            "However, that definitely means you probably

6    shouldn't buy any from the website and you won't be able to get

7    any from me."

8        (Video stopped.)

9        MR. KING:  One of the things the government said in

10   their closing arguments, and what they said in their opening

11   statement, which was they had used a bunch of investigation and

12   things to, you know, uncover this crime.  Let's talk about what

13   they've actually proven.

14           If you'll recall in opening statements, I told you

15   this is not a who-done-it.  This is not a surprise.  This is

16   not a case of we're going to wonder who did what and when.

17   There's no doubt -- and if there is any doubt, there should not

18   be in anybody's minds -- about some of these things.

19           And we can go through them.  This is Government's

20   Exhibit 72, that's the postal -- you saw it I think like four

21   or five different witnesses, that postal chart that they have.

22   It's Kristopher J. Ervin.  He goes by "Justin."  That's his

23   address, which at this point I have it committed to memory.  I

24   probably will not be able to forget that.  That's his phone

25   number and that's his email address.

1          We know that the money orders were made out to him.

2     We know that he filled out a Currency Transaction Report, a

3     government form, and when they said, "What business do you own?

4     What do you do for work," it says right there, "Owner of Auto

5     Key Card."  Not a secret, nobody's hiding, nobody is saying

6     anything otherwise.

7          We watched I think three different postal inspectors

8     walk us through this video.  Forgive me, I didn't search

9     through to look for where he was on this.  He's on there.  I've

10    seen it several times; you've seen it several times.  We saw

11    surveillance.  We've seen -- this is Government's Exhibit 53.

12    We've seen hundreds of pages of Facebook messages.  There's

13    thousands of emails.  There's piles of documents.

14         And when you look at these, I think we talked to

15    Ms. Butler about it, when you take all the paperwork that the

16    government has spent combing through looking for -- and keep in

17    mind, they're not looking for the full, balanced picture,

18    they're looking for the stuff that makes these gentlemen look

19    guilty.  That is their job, by the way.  Something about the

20    size of an eight- or ten-year-old.

21         There's no doubt that Mr. Ervin owned those

22    sunglasses and wore them frequently.  There's no doubt that he

23    drove this silver car.  We saw numerous videos of that car.

24    And just in case you weren't sure, because the postal

25    inspections, all of their videos are a little grainy, there's a

1    screenshot of him walking to the bank where he deposits all of

2    these things into the bank account with his name on it.

3         And one of the things you should ask yourself is:

4    Why?  Why did we go through that?  In opening statement I told

5    you:  None of that's up for question or objection.  Nobody is

6    saying that's not what happened.

7         The first questions I asked Agent Hooker when he took

8    the stand, and I think he thought I was trying to trick him, he

9    didn't want to answer right away, but we got there eventually,

10   is, "Well, can we agree that all of these things happened?

11   This is who ran the business?  This is who did the mailings?

12   This is what happened?  And then can we get to the part where

13   we don't agree?  Can we get to the part that matters?"

14        And what you've seen from the government's case

15   throughout all of these days is days and days and days of

16   testimony of things that nobody's saying didn't happen.  We --

17   you saw in the government's closing argument 14 pages where

18   they carefully collated every text message and phone call and

19   they had the dates and the times and all lined up and whether

20   it was Mr. Hoover or a friend of Mr. Hoover's or his wife or

21   Mr. Ervin or a friend of Mr. Ervin's.  They had all that put

22   into a chart.  None of that's a doubt.

23        And then they get up in their argument and say, "Oh,

24   you heard the jail call, so you know that they were friends."

25   You know they were friends because it's not beyond dispute.

1          So let's talk about what this case is really about.

2      (Video played:)

3          "DEFENDANT HOOVER:  So if they were to go after me

4  for that, what would probably happen is it would be more just

5  to shut me up, to make my YouTube channel go quiet for a while,

6  because I know they don't like me because I'm always talking

7  shit about the ATF.  So that would be a great way to shut me up

8  for a while."

9      (Video stopped.)

10         MR. KING:  As Ms. Butler told you, and another one of

11  these facts that is just completely undisputed, regardless of

12  your feelings about Matt Hoover, regardless of your view of his

13  politics, regardless of your view of who and what he is, he's

14  popular.  This is not the crazy guy out on the street that

15  everybody ignores.  Tens of millions of YouTube views.

16  Hundreds of thousands of internet subscribers.  And he's doing

17  things on there that the government and the ATF do not like.

18  They're legal, but they do not like it.  He's talking about the

19  ATF breaking in and shooting people's dogs.  I think during the

20  questioning one of the government's attorneys even made a joke

21  about that.

22         Whether you agree with Mr. Hoover and his followers

23  that that's something they should be fearful of, when you watch

24  the videos and you see the comments, there's no doubt that this

25  is a sincerely-held belief.  When he's talking about, "You need

1    to hide your orders and discreet them, the ATF is going to come

2    get us even though I don't think that's what the law is," they

3    mean that.  They don't trust the government.  They do not trust

4    ATF.

5         And part of that is they push back.  They don't sit

6    there and stay quiet about it; they talk about it.  They say

7    bad things about it.  You saw a video -- and I'm not going to

8    play it, but you saw a video where they were talking about an

9    ATF agent who had been arrested and they ran his name down and

10   embarrassed him.

11        You've seen countless examples of profanity regarding

12   ATF.  You've seen countless examples of -- here's an example

13   the government puts in Exhibit 53 to show a picture of the auto

14   key card.  What they did not show you is the message above that

15   which is "F the ATF."

16        I asked several government witnesses throughout all

17   this, "Did you see angry things about the ATF, comments about

18   the ATF?"

19        And keep in mind, some of these comments he's making,

20   he's not just telling people, "I don't like the ATF."  He's

21   saying, "If they come to your door, do not talk to them," which

22   is legal advice.  There's nothing illegal about saying that.

23   Makes their job harder.  "If they knock on your door, ask them

24   if they have a warrant, and otherwise don't participate.  Get a

25   lawyer.  Don't cooperate.  Tell them no."  That makes their job

1    harder.  And that's things they do not like to hear.

2              As you can see, take a look at Government's

3    Exhibit 53.  I'm not going to thumb through it, but it's full

4    of comments and redactions of comments of stuff just like this.

5              So as I talked to the agent --

6              MS. TAYLOR:  Your Honor, may we approach?

7              THE COURT:  Yes.

8         (Proceedings at sidebar:)

9              MS. TAYLOR:  Your Honor, I'm concerned that this

10   seems to be going down the retaliatory prosecution route that

11   was previously discussed, but also, in particular, that

12   Mr. King is representing to the jurors what was redacted out of

13   that document, which is not in evidence.

14             THE COURT:  Were you about to say what was covered

15   up?

16             MS. TAYLOR:  He stated that --

17             MR. KING:  There -- I'm sorry.

18             MS. TAYLOR:  He stated it's redactions of comments

19   against ATF, is what he was saying.

20             THE COURT:  I actually don't think that's what it

21   was.  If that was your statement, that's inaccurate.

22             MR. KING:  I don't believe that was my statement.

23             THE COURT:  You said it was "redactions of comments

24   of stuff just like this."  And my recollection of the comments

25   were they were comments about what the auto key card was or was

1    not.  So you need to go correct yourself.

2              MR. KING:  Yes, Your Honor.

3              THE COURT:  And you're -- you're -- I am concerned

4    that you are very close to crossing the line into the

5    vindictive prosecution, and you need to be careful of that.

6              MR. KING:  Yes, Your Honor.

7              THE COURT:  That is not a jury issue.

8              MR. KING:  Yes, Your Honor.

9              THE COURT:  Correct your statement so that I don't

10   have to.

11             MR. KING:  Do you have a suggestion -- I want to make

12   sure I --

13             THE COURT:  Why don't you just tell them --

14             MR. KING:  I think I got it, Your Honor.

15             THE COURT:  Okay.

16        (Proceedings in open court:)

17             MR. KING:  May it please the Court?

18             THE COURT:  Go ahead, Mr. King.

19             MR. KING:  And ladies and gentlemen, as you go

20   through this, look at the evidence with open eyes and with a

21   big picture.

22             And some of these redactions that we have in here, to

23   be clear, you know, and you've seen probably a lot of this,

24   when we have people's Social Security numbers, dates of birth,

25   all of that gets redacted out.

1    But what's uncontroverted when we talked to Agent

2    Slosson and Ms. Butler and all these other agents was there was

3    a lot of that sentiment there.  And Agent Hooker didn't want to

4    agree to it.  When we talked --

5         MS. TAYLOR:  Your Honor, may we approach?

6         THE COURT:  Ladies and gentlemen, you should not --

7    there's no evidence about what was redacted from that document.

8    And so to the extent there was any discussion about what it was

9    or might have been, you should disregard that.

10        Go ahead, Mr. King.

11        MR. KING:  Thank you, Your Honor.

12        When we go through and look at some of the images and

13   when we talked to Agent Hooker and Agent Slosson about, you

14   know, what's the point of some of this, and it's -- I'll put it

15   this way, I'll leave it to you to decide.

16        And one of the things that when you're assessing the

17   credibility of witnesses and what they're telling you is to,

18   with eyes wide open, look at the big picture of what's going

19   on.

20        So let's talk a little bit about the burden of proof.

21   Ultimately -- and again, I don't want to rehash the jury

22   instructions, but the reason the government spoke to you first,

23   the reason they get to talk when I'm done, the reason they put

24   on a case, is they have the sole burden to prove this.

25        We talked a little bit about "reasonable doubt," but

1    I want to make sure before I jump into kind of some of the

2    evidence stuff that there's no doubt in your minds what a

3    reasonable doubt is.  And it falls to the government entirely.

4              So a reasonable doubt is not:  I'm not sure; this is

5    50/50.

6              A reasonable doubt, if you have one, is where you

7    should find somebody not guilty, and that's the instruction the

8    Court gave you.  That's the exact language there.  But a

9    reasonable doubt is a real doubt based on your reason and

10   common sense.  It's not a doubt that you make up and speculate.

11   But what we're going to talk about is actual doubts -- not

12   actual doubts, but actual reasons why the government has flat

13   not proved this case.

14             Proof beyond a reasonable doubt, the way the courts

15   ask you to look at that is if you have a big decision to make,

16   something that's very important to you, if there's a part of

17   you that says, hey, maybe I shouldn't, or I need to reconsider

18   this, or maybe not, or maybe I should talk to somebody else,

19   that's a reasonable doubt.  That's not where you said -- the

20   most serious things in your life, if it gives you pause, that's

21   not a reasonable doubt.  And that's not 50 percent plus a

22   little bit.  That's a huge burden, and the government bears

23   that solely.

24             Ultimately, like we discussed, this is where kind of

25   the rubber meets the road.  The facts and the law equals your

1   verdict.  So you take all the facts, you take the law the judge

2   has applied, and once you do that, you have the ultimate

3   responsibility to decide what happened in accordance with the

4   law.

5           Before I jump too much into the facts, I need to talk

6   about the law, though, a little bit because we've heard a ton

7   of evidence, we've heard witnesses, we've heard the government

8   ask questions, I've asked questions, the other attorneys have

9   asked questions, but what we haven't talked about is how we --

10  kind of the lens we need to view that through.

11          So in terms of the law, what does the government have

12  to prove?  Because ultimately you may not like Matt Hoover, you

13  may not like the ATF, you may not like Justin Ervin, you may

14  not like the auto key card, you may not like anybody that owns

15  a gun, you may not like anybody that does not own a gun.  But

16  ultimately we're here to talk about what the law is and the law

17  that you gave an oath to follow through with.

18          So let's talk a little bit about what the government

19  has -- what the government has to prove and what they have

20  failed to prove.

21          So Count One was conspiracy.  I put a bunch of text

22  up there.  That's all of it.  You will have it back with you.

23  Please do not feel the need to read that as we stand here.

24          Let's talk a little bit about the transfers.  So

25  there's three parts to this.  The one that I have pulled out

1    and the one that I'm going to go into a little more detail with

2    you is some of these terms and why they're important.  There's

3    some other language in there that's very important.

4            One of the tough things as a juror, and one of the

5    tough things when assessing all of the facts and the law to

6    apply, is the law is what the law says the law is.  And I'll

7    put that in different words.  It's not what we would want the

8    law to be, it's not what we think somebody would want the law

9    to be, it's what the words on the page say.  And sometimes

10   these words are very important.  And as I get into the details

11   of it, I hope you'll see what I'm saying.

12           So I've underlined "firearm," "combination or parts,"

13   and "designed and intended."  Those are the three phrases that

14   as we go through this I'm going to ask you to look at very

15   carefully.

16           Number two, the firearm was not registered in the

17   National Firearms Registration and Transfer Record.  So one of

18   the things the government came up in their close and says,

19   "Well, none of these were registered."

20           And I think they put up Mr. Stennes, and they said,

21   "Oh, Mr. Stennes has nothing registered in the National

22   Firearms Transfer."  And I'll get to this later, but that's not

23   accurate.

24           And that's why we have evidence and we have witnesses

25   and we have cross-examination, we have attorneys to put through

1    the paces.

2           So I'm going to show you a little bit of Government's

3    Exhibit 118 where, in fact, Mr. Stennes has four things --

4    three or four things.  I want to make sure I'm right, but it's

5    more than one -- registered in the National Firearms Act

6    through a trust.

7           MS. TAYLOR:  Your Honor, may we approach?

8           THE COURT:  You may.

9       (Proceedings at sidebar:)

10          MS. TAYLOR:  I believe that Mr. King is

11   mischaracterizing what I said in my closing, which what I

12   recall saying is that Mr. Stennes did not have any machine gun

13   registered or any auto key card registered.  He did have other

14   things registered.  But Mr. King is saying that I

15   misrepresented the facts.

16          THE COURT:  You'll fix that in your -- when you have

17   your rebuttal.

18          MS. TAYLOR:  Yes, Your Honor.

19          THE COURT:  But Mr. King, please be careful.

20          MR. KING:  Yes, Your Honor.

21      (Proceedings in open court:)

22          THE COURT:  Go ahead, Mr. King.

23          MR. KING:  Thank you, Your Honor.

24          One of the things that we will look at is they made

25   this big deal about showing you individuals that didn't have

1  anything with the National Firearms Registration and Transfer

2  Record.  And everybody who had something, it's been in a trust,

3  and the only -- and as the agents testified, the only way they

4  knew it was there is because those individuals told them that

5  it was in that trust.

6          Turning to Count Three is the specific

7  characteristics or features, and I've underlined that one.

8  I've also underlined the word "knew" -- because what somebody

9  knows when they do something is very important -- "the specific

10 characteristics or features of the firearm that made it subject

11 to registration."

12         So what that means is does this have -- did this

13 cross the line to the point where it is a machine gun

14 conversion device, or is this a piece of metal?  Some of that

15 is for you to decide.

16         But also important there is it says "knew."  People

17 should not have to guess whether or not they violated the law

18 or not.  That's not how the laws in the United States work.

19 The law is what the law is.  Everybody must follow it, but it

20 should not be a guessing game.  And the law is not required to

21 be a guessing game.

22         The substantive act witnesses, these talk about the

23 transfers.  These are the names.  You heard from six of these

24 individuals.  You have not -- I don't know who J.A. is.  I

25 think the government went through it on their close, but that's

1    not an individual that we heard any evidence from.

2         But back to the things that we can all agree.  There

3    was mailings; these guys placed orders; Mr. Ervin or somebody

4    on Mr. Ervin's behalf fulfilled the orders -- don't spend a lot

5    of time worrying about that -- and they got their auto key

6    cards.  And I'm going to spend more time going through each of

7    these witnesses individually.

8         Counts Ten through Twelve are possession.  It's just

9    like the transfer except "knowingly transferred" becomes

10   "knowingly possessed."  So when you're looking at One, it's the

11   same thing.  The instructions are almost identical.  The big

12   difference is whether something's been transferred or whether

13   something's been possessed.

14        "Firearm ... a combination of parts designed and

15   intended for use in converting a weapon to shoot automatically

16   more than one shot."

17        I'm going to talk to you a little about some of the

18   evidence, but as we go through this and we talk about the

19   actual facts, it doesn't say "singular part."  And that's --

20   that's important.  It doesn't say "could be made."  It does not

21   say "possibly."  It says "designed and intended" and "a

22   combination of parts."  And these words are important, and

23   we're going to go through them in a little more detail as we go

24   through.

25        As the instruction's going to read, there's the

1    enumerated section, but what the judge is going to tell you is

2    that the item alleged in the indictment, which is the auto key

3    card, was a combination of parts designed and intended.

4            And here's why this is important.  The word "was" --

5    and this probably seems very lawyerly and technical, but it's

6    really not.  "Was" does not mean "could be."  "Was" does not

7    mean "potentially."  "Was" does not mean "a design for."  "Was"

8    does not mean "a drawing of," "a template for," "an etching

9    of."  It doesn't mean any of those things.  "Was" means was.

10   As it sits there.  As you physically pick it up.  It does not

11   mean after it's been materially altered.

12           You will not see any language in the 32 pages of

13   instructions you're going to see from the Court that says, "Did

14   this have the potential to become," or, "If somebody does X it

15   will be or could be."

16           So go through all 32 pages.  You will not find that

17   anywhere in there, and that's because that's not what the law

18   is.  The law is what something is at the time.

19           One of the things that we discussed and we talked

20   about, that Agent Hooker said that to get it to function,

21   Mr. Toy materially altered it.  Mr. Lintner said the same

22   thing.  One of the things I asked Mr. Lintner is, "What is" --

23   you know, "What can be considered a machine gun conversion

24   device?"

25           He told you paperclips, he told you shoelaces.  He's

1  been doing this I think 17 years with ATF.  And I was asking

2  him -- you know, he's the expert who's here to tell us about

3  how he's been in the regulatory field for 17 years, law

4  enforcement for much longer.  And I'll get into a little more

5  detail later, but when I asked, "Why is a paper clip, why is a

6  shoelace, why are they not firearms," typically he couldn't

7  answer that question.

8           And so when we look at the language, the words on the

9  page matter a great deal.  And it seems nitpicky, but it's

10 really not.  It's the difference between somebody who's trying

11 to follow the law and somebody who's been breaking the law.

12          When we talk about "a combination of parts" --

13 Mr. Larosiere talked a great deal about this in his closing

14 argument.  I'm not going to repeat the things he said, but a

15 combination of parts is not a combination of parts until it's a

16 combination of parts.  That's why that "was" is important.

17          So when you look at what the government has alleged

18 and what you've heard these witnesses say -- keep in mind,

19 these are the government's witnesses.  They have brought them

20 here.  Many of them ATF agents, who talk about what things

21 could potentially be, what it could be, what if everything

22 could -- you know, went right, you know, somebody has the

23 ability to do.

24          And certainly if I grab my chair and throw it through

25 a window, I have committed a crime, but that's not what that

1   chair is.  It's not what it's designed and intended for.  And

2   that's certainly not what we're talking about here.  We're

3   talking about the combination of parts.

4           That's why you heard in Matt Hoover's videos over and

5   over again, he said, "This is where the line is.  When you cut

6   it out, you better be a Special Occupational Taxpayer, because

7   otherwise you are committing a felony."

8           Now, he didn't seem that burdened by that.  He didn't

9   seem to think that was a big deal.  And certainly I'm not

10  asking you to agree with him saying, "Hey, this is how you

11  commit a felony."  I'm not asking you to do that.  But he has a

12  legal right to do so in the United States of America.  He can

13  talk about it.  And some of you may not like that talk, but he

14  made it very clear.  And if you're not sure, it's video 2 and

15  7.  You can watch.  He makes it abundantly clear.  He says --

16  and I think the government -- "Zero Fs given.  If you want to

17  break the law and you are not a Special Occupational Taxpayer,

18  the minute you cut this out to try to turn it into something

19  that it's not as it is, you have created a combination of parts

20  and you have violated the law."  And he was as clear as he

21  could be on that.

22          One of the things the government discussed in their

23  closing was having to manufacture, the only modifications you

24  have to make, and why would he tell people not to cut it.  He

25  told people not to cut it.  If you read the terms of the

1    service, if you read the agreements, the emails that he sent

2    out, he said, "Don't cut it, because if you cut it, you're

3    breaking the law.  If you create something out of this solid

4    piece of metal and it works as designed and functioned, you are

5    breaking the law."  And he was very clear with that, and so was

6    Mr. Hoover; Mr. Hoover in a certainly more dramatic fashion in

7    the course of his videos, but he made the same point.

8            "Design and intended."  As I go through all of this

9    evidence, what I want you to focus on is "designed and

10   intended."  What is the auto key card designed and intended

11   for?

12           As Mr. Ervin emailed people and told them, "You can't

13   take that, materially alter it, and do illegal things with it."

14   That is true with almost anything in this room if that is your

15   intention.

16           And every time one of those people asked him, "Hey,

17   what do I do to break the law," or, "How do I do it," he didn't

18   respond.  I think in two emails he told people, "This is a line

19   I will not cross.  I will not help you do this.  I will not

20   answer.  If you want to go break the law on your own" -- kind

21   of like Mr. Hoover said -- "here's what you can look up, but

22   I'm not giving you any advice, information, specifications, any

23   of that."

24           Now that we've talked a little bit about that law, I

25   want to talk a little bit about the facts.  And I'm going to

1    start with Mr. Toy.

2            Mr. Toy, or Officer Toy with the ATF, works up in

3    Martinsburg, Virginia.  And we heard him testify.  Some of the

4    things that he said gave me some pause, and I would ask that

5    you to really consider his testimony.  The video that we saw is

6    dramatic, it's interesting, it's brief, and it's the only one

7    you saw.

8            Mr. Toy said that his ability to cut out the item

9    that he tried to create -- and I'm showing you what's

10   Government's Exhibit 20A -- he said that the line on that piece

11   of metal, it was just as easy as if it was a Sharpie.

12           And we talked -- and I'm going to get into Agent

13   Lintner's testimony after I get through Agent Toy's -- but he

14   said it's as easy as a Sharpie.  And what that tells you is

15   exactly what these gentlemen have been telling and what

16   Mr. Hoover made internet these videos on, is these are

17   instructions if you choose to do that.  There are very much

18   other legitimate purposes and other reasons, I'm going to get

19   into those, but, "If you want to break the law, this is how you

20   do it."

21           The internet is full of, "This is how you break the

22   law if you want to."  None of that is illegal, but it makes the

23   ATF's job a lot harder.

24           He also said that if it worked -- and so I want to

25   slow this part down, because it was a little confusing to me

1    when we went through it, but I think it's very important.

2          So what he says is, "If you perfectly cut it out" --

3    which I also have some issues with that that we'll get to, but,

4    "If you perfectly cut this out, it will form what's called a

5    lightning link."

6          And it looks different than the one that the

7    government's been showing us from 40 years ago, but we'll get

8    to that as well.

9          If you take that lightning link and put it in a

10   semiautomatic rifle with an SP1 bolt carrier, based on this

11   design and intention, it will work, and it will only work with

12   an SP1 bolt carrier.  It is not designed, the lightning link,

13   for any other firearm or any other bolt carrier.

14         So with -- if the object that is in there is a

15   properly-designed-and-intended lightning link, even cut out,

16   and we've discussed some of that, it is only a lightning link

17   if it works in the SP1 bolt carrier.

18         Of the 15,000-plus firearms that were available to

19   him for testing, numerous of which had SP1 bolt carriers, his

20   testimony was, "I did not get it to work as designed."  Those

21   were his words.  I asked him, that's what he said, "Did not get

22   this to work as designed."  It did not work with an SP1 bolt

23   carrier.

24         So he did the next best thing, put in machine gun

25   parts.  And the other thing he said, "If you put machine gun

1    parts in this thing, and you put in all machine gun parts, you

2    would expect it to fire automatically."

3           On one side he's saying, "Hey, this is clearly a

4    lightning link, and those will only work with SP1 bolt carriers

5    and that's what the design is for."  And on the other side he

6    says, "Oh, it doesn't actually work with an SP1 bolt carrier,

7    it only works with a machine gun part."  Keeping in mind, of

8    course, of all of the witnesses you've heard, he's the only one

9    who was able to get it to work at all.

10          Now, the Court will instruct you that just because

11   nobody could get anything to work in terms of the individuals

12   who purchased it does not mean that the government has a burden

13   to prove that.  They do not.

14          At the same time, one of the best ways to know what

15   something's designed and intended for is to see what it

16   actually does.  If you have a chair that collapses every time

17   you sit in it, that chair was not designed and intended to hold

18   you.  If you have a pen that doesn't write anything, you don't

19   have a pen that was designed and intended to be a pen.  It may

20   be a lot of things, but it ain't a pen unless it works as

21   designed and intended.

22          He himself referred to the auto key card as a

23   template.  But keep in mind, this is the government's firearm

24   expert armorer guy.  Why that's important is, and I'm going to

25   get to it, but Agent -- Mr. Lintner, the witness literally

 1   before him, said that templates aren't controlled by the

 2   National Firearms Act.  And that's what we're here for, it's

 3   the National Firearms Act.

 4        He also said that it took him, as an armorer, almost

 5   an hour to do this; that it was difficult.  You heard Dr. Moya

 6   say this is 40-year-old, antiquated technology that nobody

 7   really used but it does have historic value.  And he said,

 8   "Well, if you actually want to convert an AR-15, you just hit

 9   the disconnector, takes a few minutes, it's simple to do."

10        Ultimately, it can't be both ways.  It can't be a

11   lightning link because it works as intended with an SP1 bolt

12   carrier and that's the only thing a lightning link works and at

13   the same time it not work.  Those two things are just

14   incongruent.  If it works as intended, it should work with a

15   SP1 bolt carrier, not a machine gun part.

16        What he said is that there may have been, when using

17   a machine gun part, something known as hammer follow, which is

18   a malfunction.  That's not it operating correctly or as

19   designed and intended if it's actually a functioning lightning

20   link.

21        One of the things the government has made a big deal

22   about is, "Oh, well, if you pick it up it works perfectly.  It

23   follows through.  You don't have to make any modifications.

24   You cut it across the line.  That's why it's somehow crossed

25   the line," even though the language that the Court has given

1  you doesn't say that.  It still has to be a combination of

2  parts.

3          But putting that aside, what they have said is, "Oh,

4  you just do it perfectly."

5          And what did we hear?  "Well, with the 15,000 guns

6  that we had, I tried to make it work a whole bunch.  I cut it

7  to the lines.  It didn't work, so I made a different cut.  I

8  did something extra to it and I had to fiddle with it."

9          The fact that it didn't work shows you exactly how

10  it's designed and intended.

11          And speaking of which, I want to talk a little bit --

12  you know, he talked about it not working without modifying, not

13  working with an SP1 bolt, not actually ever functioning as a

14  properly functioning lightning link, but due to a malfunction

15  known as hammer follow.

16          But I also want to talk about his video.  It was

17  maybe ten seconds long.  One of the first things I asked him.

18  And he had already seen his video in court right before I asked

19  the question, "Hey, is it important to demonstrate to anybody

20  that this thing fires" -- "that the gun you were using to

21  demonstrate fires semiautomatically with a test-shot before you

22  do something to it to, you know, allegedly make it fire as a

23  machine gun?"

24          "Oh, very important.  We always do that."

25          And then we hit play on the video, lo and behold, it

1    wasn't there.

2         His testimony was he tried numerous times with

3    numerous guns to dry-fire or figure-fit or -- you know,

4    everything he could do to try to get this to work.  He took no

5    videos of him cutting it out.  He took a small number of

6    pictures afterwards.  He took no videos of him testing this

7    thing properly.

8         The government here -- you have literally boxes and

9    boxes and boxes and boxes of evidence, dozens of agents,

10   spreadsheets that are showing you all of -- you know, the

11   number -- 14 pages collated of how many phone calls people had.

12   But when asked why the most important part -- "Does this thing

13   work as you say it does?"  "Oh, we really don't have" -- "we

14   have 15,000 guns but we don't have a cell phone that can record

15   a video.  We don't have the ability to show you what it really

16   looks like.  15,000 firearms, piles and piles of every email

17   and text message and Facebook message, but we can't provide

18   that."  Even though he agreed moments before me asking about it

19   that it was very important to do.

20        When you are assessing evidence, when you are looking

21   at things, the government has the burden of proof.  They have

22   to show it, they have to tell it.  And they have failed

23   spectacularly when it comes to actually demonstrating that this

24   thing is a lightning link which is designed for an SP1 bolt

25   carrier and it works as it's supposed to.  They haven't shown

1    you the goods.  They have not shown you -- you know, "Where's

2    the beef?" is the old thing from the '80s.  They haven't done

3    it.  And it's their burden to do that.

4          The excuses Mr. Toy came up with are simply

5    unacceptable.  It's not like they didn't have the resources to

6    do it.  We know for a fact that that's not true.

7          I want to talk to you a little bit about Mr. Lintner.

8    One of the things we talked about with him is the SWD lightning

9    link.  Once again, you'll see here, this is ten pieces.  The

10   auto key card is a solid piece of steel with a very light

11   etching in it.

12         The government made a couple big deals about that.

13   One is if you look at that design and then you look at an auto

14   key card, you can actually see that they're not the same

15   design.  The cutouts are different.  They're shaped

16   differently.  They're not the same thing.  The government has

17   tried to make it look that way and discussed it as being the

18   same, but if you look at a picture of a lightning link -- I'm

19   sorry, this lightning link versus an auto key card, there's

20   different tabs, there's different shapes.  It's not the same.

21         And you'll have Defense Exhibit 8.  The government

22   has had many pictures.  There's piles of these things.  Take a

23   look at that picture and then take a look at what the -- you

24   know, that's Government Exhibit 61.  That's the picture of it.

25   Take a look at that and say is that the same thing as even --

1   what's even depicted in the auto key card that we don't know to

2   function correctly because they said it doesn't with an

3   SP1 bolt carrier, it only works with machine gun parts.

4          The other reason the government brought this up is

5   because of how valuable machine guns are and the whole thing is

6   a cash grab.  The reason we have cross-examination, I brought

7   this up with Mr. Lintner, is, "Hey, do people collect guns?"

8          "Absolutely."

9          "Do they collect gun-related things?"

10         And I'll go ahead and preview a little bit.  There's

11  videos where Mr. Ervin is talking about how this is AR related.

12  Yes, these are imperfect, non-functioning pictures of lightning

13  links which were, as Dr. Moya said, something that was

14  out-of-date technology from 40 years ago but has historical

15  meaning and value as collector items for gun collectors.

16         And you say, boy, if it was -- you know, this was a

17  cash grab because they were trying to make machine guns and

18  machine guns are worth $18,000.  And there's kind of two issues

19  with that.  One is, this is a huge collectible item.  And they

20  tried to make it look like, oh, the only reason this thing --

21  this piece of metal is worth $18,000 is because it's a

22  registered machine gun and that's why it's important.  And then

23  you read the actual description of the item and it says that

24  there's no guarantee this works.  It's a collectible item, just

25  like a baseball card, just like coins.  I mean, you find an old

1   penny, and some of those old pennies are worth tens of

2   thousands of dollars, for reasons I personally will never

3   understand.  I don't collect anything.  But it is -- there's

4   people that collect things.  You heard Dr. Moya has 40 guns.

5   You may or may not know people that have large quantities of

6   collections.  People who like guns really like guns.  You've

7   seen Mr. Hoover's videos.  There's clearly a market.  We're

8   talking tens of millions of YouTube views and hundreds of

9   thousands of followers.  There are people that like these

10  things.  Whatever your personal feelings or my personal

11  feelings about it, there's no doubt that there's a big

12  collector's market for these sort of things.

13          I said I would come back to this.  I asked Agent

14  Lintner, "Why" -- I'm wearing loafers today just to be on the

15  safe side, but, "Why are my shoelaces not a machine gun under

16  the National Firearms Act?  Why is a paperclip not a machine

17  gun under the National Firearms Act?"

18          He's been with the ATF 17 years, law enforcement for

19  28 years.  For 45 years he has been with firearms.  He could

20  not give a straight answer to what should be a simple question.

21          And so when I say the language is important and the

22  details when the judge gives you the law, that's why it's so

23  important.  Somebody with this amount of experience couldn't

24  answer what I thought was a very straightforward question.

25  Whether you thought it was a straightforward question is for

1   you to decide.  But why is a paper clip, even though you can

2   turn it into a machine gun conversion device, not always

3   considered a machine gun?  And we didn't get a straight answer.

4           Mr. Lintner said some other things.  He talked about

5   things being materially altered.  You can take a piece of

6   paper, but it's not a paper airplane until you fold it and you

7   throw it and it works.  It always has that potential.

8           One of the things he said -- and he talked about

9   things regulated by the National Firearms Act.  Blueprints,

10  drawings, stencils, designs, schematics, none of those apply.

11          Now, keep in mind, I don't think the government has

12  come close to proving that these are actual schematics of

13  functioning lightning links because it didn't work without the

14  machine gun parts, it didn't work in the SP1 bolt carrier,

15  which is the only one where a lightning link like this should

16  ever work.  But putting all that aside, even then, schematics.

17          I've talked about those witnesses.  I want to talk

18  about a couple of the others.  One of the things that you'll be

19  asked to assess is the credibility of witnesses.  You will have

20  this list.  It probably won't be too surprising to you what

21  some of this looks like.

22          For the most part the witnesses came here under oath

23  and answered questions.  They answered the government's

24  questions.  I asked them questions and they were

25  straightforward.  That's what you should expect.  We had some

1   people from Orange Park Machine, they don't care.  They just

2   said, "Hey, here's what happened."  You had some folks from

3   Community First Credit Union, "Hey, here's what happened,

4   here's what I remember."

5           And that's how most witnesses are, but sometimes

6   people have a little motivation.  Sometimes people have some

7   pressure on them.

8           And so one of the things that the judge is going to

9   go through is give you these instruction to take back, and is

10  this somebody who was telling the truth or somebody who didn't

11  want to tell the truth?  Is this somebody who had a reason not

12  to tell the truth?  And sometimes it's:  Does this person have

13  a reason to look good in front of the government?  And that's

14  immunity, and we'll talk about that some.  And in terms of --

15  and then, you know, did they answer questions that were asked

16  of them fairly and correctly?

17          And the first witness I'm going to jump to is Agent

18  Hooker.  And you had the ability to see essentially two case

19  agents that were on this case that -- it's a little awkward

20  because Agent Slosson is right here, but you had the ability to

21  hear both of them get asked questions and answer those

22  questions.  I would submit to you Agent Slosson was very

23  straightforward in answering my questions.  You know, there's

24  things he agreed with, things he didn't agree with.  That's

25  part of how this goes.

1        Agent Hooker didn't want to answer the questions.

2   One of things that he said on his cross-examination is that

3   people who bought the items understood what the items could

4   potentially be.  And that goes back to what we talked about

5   with the jury instructions and why those words are so important

6   in the 32 pages.  Please go through it.  Please be careful.

7   Please take your time, because this is a huge decision you're

8   being asked to make.  The word "potential," "could be," "in the

9   future," "drawing," "schematic," none of those words appear.

10  They will not appear.  You will no hear those words.  They're

11  not there.

12       But he said the quiet part out loud, which is --

13       (Telephone interruption.)

14       MR. KING:  Agent Hooker said the quiet part out loud,

15  which is, "These aren't machine gun conversion devices, but if

16  somebody wants to break the law, they can be machine gun

17  conversion devices, and at that point it's very difficult for

18  the ATF to track them down."  And we talked about some of that

19  with the witnesses.

20       We talked a little bit about this with Agent Toy's

21  testimony, but Agent Hooker, on cross-examination, said in

22  order to get these to be machine gun conversion devices and

23  lightning links, Agent Toy had to materially alter the auto key

24  card.

25       I asked Agent Hooker several questions.  We talked a

1    little bit about what's the purpose of polishing something if

2    it's a tool or an item to be used.  We talked a little bit

3    about the "get lit lighting" and "lighting" or "lightning."

4    I'll be blunt with you, the fact that it's "lighting" and not

5    "lightning," not really a big deal.  But it's not unimportant.

6         The reason it's important is it tells you how that

7    individual was approaching things, but the other thing is we

8    went back and forth for several minutes, and he just didn't

9    want to admit that he'd made a mistake.  So when you're looking

10   at a witness's testimony, when I say, "Could you have made a

11   mistake?  Could it have been 'lighting' instead of

12   'lightning,'" it was like pulling teeth.

13        And why is that important?  That's important because

14   that should tell you a little bit about that witness and how

15   honest and straightforward they're being when answering

16   questions.  When they're being asked what's important, what's

17   not important, are they being straightforward or do they look

18   like they have an agenda?  And I would submit based on the way

19   Agent Hooker answered the questions, he kind of had an agenda,

20   Because anything I asked him, like, "Hey, was there a lot of

21   anti-ATF rhetoric in all of the emails and Facebook posts, text

22   messages, all that stuff," he didn't want to answer the

23   question.  He knew the answer.

24        And to their credit, every other witness with ATF

25   that I asked that answered, "Yeah, no, it's chock full of it."

1   No problems.

2          So when you're assessing the testimony of Agent

3   Hooker and the things that he has done in this case, you need

4   to assess them against that background.

5          We talked to him a little bit about whether he was --

6   signed the -- I asked him a basic question, "Did you say that

7   you would agree by the terms of services on the auto key card

8   website," which very clearly say this is political sculpture,

9   this is art, do not cut this, if you cut this you're breaking

10  the law, and he didn't even want to answer that basic question.

11         Agent Hooker is also the one that talked to Tristen

12  Alderson and said, "You can be on Team USA or you can be

13  against Team USA."  And you obviously heard the testimony from

14  Mr. Alderson.  He testified later.  But when you're looking at

15  the backdrop of, again, how to assess witnesses and what's

16  important and what's not important and who you can trust and

17  who's being straightforward, it's something you need to look

18  at.

19         Let's talk about some of the substantive things he

20  talked about.  There were zero cutout auto key cards at

21  Mr. Ervin's home.  There were zero cutout auto key cards in

22  Mr. Ervin's car.  When they dealt with Mr. Hoover, they

23  recovered zero cutout auto key cards.

24         And not only that, even with those two individuals,

25  putting them aside, in the universe of the -- the numbers kind

1    of changed if we were looking at postal records or credit card

2    records, but in the universe of somewhere between 900 and 3,000

3    people, Agent Toy did not test a single auto key card that came

4    from anybody but Agent Hooker.

5           Agent Hooker did not recover a single auto key card

6    that had been -- had -- you know, some people had destroyed

7    them because there was a law enforcement investigation.  And

8    those people have been given immunity that you've heard from.

9    But Agent Hooker did not recover a single functional lightning

10   link that anybody could tell you about or was tested from any

11   of those minimum 900 people, probably closer to 3,000.

12          One of the things we talked about is "designed and

13   intended."  One of the best ways to know what somebody intends

14   to do is what they actually do.  And you've probably

15   experienced in your own lives, a lot of people will talk the

16   talk but they won't walk the walk.  And what you're hearing

17   from the government is the argument:  The only reason anybody

18   would purchase an auto key card is to turn it into a machine

19   gun conversion device and to break the law.

20          Here's where that falls apart.  Of the people that

21   they talked to, a large percentage of them -- and keep in mind,

22   this isn't they knocked on the door a day later, this is months

23   and months later.  Of the people they talked to, Agent Slosson,

24   Agent Hooker, not that many, probably should have been more,

25   knocking on people's doors, "Hey, do you have an auto key

1    card?"  A large percent, very large percentage of them had

2    completely intact auto key cards.  Completely intact.  And if

3    the only reason to purchase one of these is -- and again, we

4    skip a step here -- is for that person to materially alter it

5    and turn it into a machine gun conversion device, then why are

6    there any complete auto key cards?

7            And they had several witnesses here.  Every one of

8    those people who took the stand said, "At the time that I

9    bought this I did not think I was doing anything wrong or

10   illegal."  Every single one of them.  Every single one, you

11   know.  And there's a couple that say, "Now, I knew if I cut it

12   I would be doing something illegal," and some of them did do

13   that.  Some of them did make the choice to break the law.

14   They've been given immunity, but they did have that choice.

15           But the other thing is there's a large number of them

16   that bought it solely -- and had it and kept it completely

17   intact and they returned it to the government.  And we'll go

18   through some of those witnesses here in a bit.

19           One of the things that I think is important is we had

20   Agent -- Postal Inspector Batchelder -- and I made sure to

21   write this down, and we talked about it with Agent Slosson --

22   "We felt it would be irresponsible to not get the auto key

23   cards off the streets."

24           And what you have seen here is an incredible

25   investigation into whether or not Justin Ervin bought and sold

1   the auto key card.  And you've seen a lot of videos of Matt

2   Hoover talking about various things, but including the

3   sponsorship.  But there's two big things that you haven't seen,

4   and it's a real effort to actually get these things off the

5   street, and the other thing is actual evidence that it works as

6   they're telling you it works as designed and intended as a

7   lightning link with an SP1 bolt carrier.

8          So the big -- so as we talked about in opening

9   statement, the big things that we said, "Hey, this is what

10  we're here for, this is what we're contesting, this is what the

11  issue is," you didn't hear any evidence.  That's not the

12  evidence you heard.  You heard a lot about mailings.  You heard

13  a lot about videos.

14         As Agent Slosson himself said, if this were a fully

15  automatic AK-47, they would be treating this a lot differently.

16  And I think that speaks volumes.

17         I'm going to start going through these witnesses and

18  I'm to go pick up the pace.  I know y'all have been here for a

19  long time.  The scary part for me is once I sit down, this is

20  the last time I'm going to have an opportunity to address any

21  of this with you.  So I want to make sure I'm being thorough,

22  but I'm trying to be respectful of your time and attention.

23  And I know we just had lunch as well, and I'm always a little

24  slow after lunch, so we've kept the lights up even though we've

25  got the PowerPoints on.

1     There were three witnesses with Orange Park Machine.

2  I'm going to fly through these guys.  It was John Clarkson,

3  Joncarlos Ruiz, and Patrick Breslend.  They all added a little

4  something different.

5     With Mr. Clarkson, he talked a little bit about how

6  they were actually machined.  And the design was as close to a

7  line as possible where once it was filed down it would not be

8  completely obliterated.  He said if they go super, super thin

9  with the laser, you can literally just wipe it off with a

10 cloth.

11     And what you heard from him and Mr. Breslend was

12 Mr. Ervin wanted to go as close as he could to being just a

13 drawing on the top of it.  And they gave him opportunities to

14 do other things, and he said, "No.  To the extent that I can

15 polish it up and make it look pretty I want to do that, but

16 that's it."  As light as possible so that he could rebrand it.

17     There was an implication that oh, the government

18 found out -- I'm sorry, that the Orange Park Machine shop found

19 out that he was doing this horrible illegal thing and that he

20 did the same thing with Shopify, and I'm going to talk about

21 that.  But they did this horrible illegal thing and Mr. Ervin

22 was hiding from them and all this other stuff.  And then we

23 talked to Mr. Clarkson, "Hey, you're a business owner?"

24     "Yep."

25     "Is this a business" -- "is this the type of work

1    that you guys like to do?"

2            "No."

3            "Were you making a bunch of money on this?"

4            "The opposite."

5            "You were losing money?"

6            "We were."

7            "Well, at least Mr. Ervin was easy to deal with?"

8            And we'll get into that as well later, but no, he

9    wasn't.  He kept calling and emailing and asking questions, and

10   he was keeping them from actually making money.  And so when

11   they decided to discontinue service with it, they had issues

12   with him and how he shared information.  And they were losing

13   money.

14           And that's why this cross-examination is important,

15   because that's how that came out.  Mr. Ervin and his business

16   was peanuts to them.  They have 25 employees.  It's a huge

17   shop.  They have big government contracts.  Mr. Ervin was a

18   distraction for them.

19           Mr. Ruiz, he was helping them design a coaster.

20   Mr. Breslend -- I keep wanting to say Breezeland, it's

21   Breslend -- I want to get with him with the "designed and

22   intended" part to.  He offered, on more than one occasion,

23   "Hey, Mr. Ervin, if you're trying to take these parts out, what

24   you want to do is you want to cut" -- "we have a laser.  We can

25   cut right through.  We can leave it so that you can punch it

1  out."  And you actually heard Mr. Hoover talk about their

2  belief that that's illegal on a video.  But, "We can make this

3  a lot deeper.  We can make it much easier."

4          And he said, "No.  I don't want that.  Do not do

5  that."  And he stopped them.

6          It was easier for the machine shop.  They encouraged

7  him to do it.  But at the same token, he said no.  He declined

8  their invitation to do so.  And if the intention was to make

9  machine gun parts, that's what he would have done.  It would

10  have been much easier.

11          One of the other things that came out is they talked

12  about, "Oh, he was lying and hiding, obfuscating about what he

13  was really doing."  The implication, of course, is that he was

14  trying to hide the true nature of the auto key card, which is

15  clearly in everybody's mind -- except for the people who bought

16  them and a lot of the other witnesses that you've heard from --

17  is just so clearly on its face a machine gun conversion device.

18          And when we actually started talking to Mr. Breslend

19  about it, it's like, well, there's -- he had a patent issue

20  with it.  You actually saw it.  He tried to copyright the

21  thing.  And we talked about what his state of mind was.  If

22  he's trying to commit a crime, you don't copyright that.  That

23  makes zero sense.  And so that's another one of those things

24  when you look at the big picture, if you're doing something

25  that is clearly in your mind criminal, you don't send it to the

1    national copyright office.

2         But as Mr. Breslend said, as they went through it,

3    Mr. Ervin didn't want him to do the cutouts because it was his

4    artistic design, and more importantly, he didn't understand how

5    patents and copyrights work, so he didn't want to tell them

6    what was really going on because he was worried they were going

7    to rip off his design.  Because while other people could see it

8    on the internet and order one, they're the ones that had the

9    actual digital file where they could turn around and make it.

10   And if he did not properly patent it and copyright it, they

11   could have turned around and made a million of them and sold

12   them.  And that's his fear.

13        You heard the Ervin family testify.  I'm not going to

14   get too much into that.

15        I will say, one of the things I'm going to ask you to

16   assess is how straightforward things have been.  So we had a

17   text message, "Hey, be careful driving home.  I think I saw an

18   unmarked car."  And it's one of those things where there's --

19   there's certainly ways to look at it.

20        But Mr. Ervin had met with them, he had answered

21   their questions, he had been thorough with them.  They didn't

22   ask him about that, but they came up and read it to you.  And

23   it's like, "Yeah, we live near a speed trap and they pull

24   people over."

25        There's a lot of evidence that we've gone through

1   that without the benefit of cross-examination it might look one

2   way -- we just talked about three witnesses where it certainly

3   did -- and then when we get up and talk to them and they're

4   honest and straightforward, it winds up being a little

5   different than they're making it out to be.

6          And a lot of the testimony from the Ervin family was

7   about that.  They put these people under subpoena, they dragged

8   them to court to testify against a family member, and they gave

9   them immunity letters.

10         You also heard Jonathan Monger, who's a friend of

11  Mr. Ervin's.  Now, one of the things the judge is going to tell

12  you is that a witness who hopes to gain more favorable

13  treatment in his own case -- or "her" case.  It's been all

14  "hims" -- may have a reason to make a false statement in order

15  to strike a good bargain with the government.

16         There were a lot of people here who were given

17  immunity letters.  I think most of them were straightforward.

18  Some of them were in fear.  And when we talk about Jonathan

19  Monger, we're talking about somebody who was living in fear.

20         So I want to be very clear.  We have the -- Mr. Ervin

21  has the ability to call whatever witnesses that he wants.  We

22  could call everybody -- you know, we could get on that list and

23  start calling up everybody who may have purchased an auto key

24  card.

25         What we don't have is the ability to grant immunity

1    letters and to tell somebody that, "Hey, you may have violated

2    the law."  We may have complete evidence -- and there were

3    several witnesses who knowingly lied to law enforcement, which

4    is its own crime completely separate and apart from this.

5            We had Tristen Alderson, who, by my count, committed

6    three or four federal felony offenses separate and apart from

7    the auto key card stuff.  The ability to tell somebody, "Hey,

8    you can come to court and say whatever you want.  As long as we

9    believe it to be truthful" -- because that's a decision the

10   government gets to make -- "as long as we believe it to be

11   truthful, have no fear."

12           Jonathan Monger came up and testified, and at the end

13   of it -- and, again, that's why we have cross-examination.

14   Don't be mad at Jonathan Monger.  It was sad, but he made it

15   very clear his sole intention was to get home to his wife and

16   kids.  That's what he cared about.  And he knew he was under an

17   extraordinary amount of pressure.  And I said, "Hey, are you

18   nervous?  Are you telling the truth?  What's going on?"

19           "I just want to get home to my wife and kids."

20           I want to talk a little bit about some of the other

21   witnesses that we discussed.  These are the -- we'll call them

22   the substantive act witnesses.  We had that list.  I will try

23   to go through these relatively quickly.

24           Again, these are the people that the government chose

25   to give the get-out-of-jail-free card to.  In terms of these

1   individuals, there's really -- I've come up with five reasons

2   for an individual to purchase an auto key card.  The government

3   will tell you there's only one.

4           So the first is -- two.  Strike that.  It's going to

5   be two.  The first is federal agents investigating Justin Ervin

6   and Matthew Hoover.  We've heard two of those testify.  That is

7   a very small subset of the purchasers of the auto key card.

8           The next is firearms collectors, art and conversation

9   piece.  The government brought witnesses before you, and many

10  of them had fully intact auto key cards months later.

11          Mr. Stennes got a little nervous and cut his up and

12  provided them the pieces.  But he purchased it because he

13  thought it was a really cool design and he was a big gun

14  aficionado, and he wanted to show people -- use it as a pen

15  holder to show people what these are and to talk to them about

16  it.  And he admitted, that's an expensive pen holder, but he

17  said, "Yeah, this is what I'm into.  This is what I'm about."

18          Dr. Moya told you the exact same thing.  He thought

19  they were really interesting.  And you know these guys are

20  telling the truth about that because they've had these for

21  months and didn't do anything other than keep them in their

22  homes.

23          There's the Special Occupational Taxpayers, the SOTs.

24  You've heard Matt Hoover talk about that.  You've heard Mr. --

25  counsel for Mr. Hoover talk about that, and I'm not going to go

1    through that.

2            We talked a little bit about preppers and Doomsday

3    preppers.  And I want to push back on something the government

4    said.  The quote is:  Intentions in the future is not a

5    defense.  And to some extent that's absolutely true.  If you

6    have a machine gun conversion device, as defined by the statute

7    and the law the judge has given you, but you're not planning on

8    doing any -- you know, doing any harm with it until down the

9    road, you're still breaking the law.

10           However, if you have a stainless steel piece of metal

11   that could not be become a machine gun conversion device until

12   you machine it out and do all the things you need to do, test

13   it and get that going, you can possess that.  There's

14   absolutely nothing wrong with that.  And if your intention is

15   to not -- and again, I'm not asking you to agree with these

16   people and some of the things they've said, but you've heard

17   Dr. Moya testify and you've heard some of the interactions

18   Justin Ervin's had.  I'm not particularly worried that the

19   downfall of Western Civilization is going to happen any day

20   now.  I don't have stockpiles of food and water and ammunition

21   and batteries at my house.  But the people that do fear that,

22   the people that do believe that, that is a sincerely-held

23   belief.  And there's absolutely nothing wrong with preparing

24   for something.  And as long as you don't cut it out and

25   actually transform it into a combination of parts, you have not

1    broken the law.

2            And there's a large quantity of people that kept

3    those.  And of the six or seven we heard from, Mr. Duty had the

4    same concerns.  He said he was afraid.  And again, these guys

5    are under oath, but they also have immunity.  They can tell you

6    what they're thinking.  Mr. Duty said he was afraid of invasion

7    by foreign adversaries and that's why he wanted to have an auto

8    key card.  And that's why he wanted to do a lot of other

9    things.  Whether his belief is well founded, it is a sincere

10   belief that he has.

11           We talked a little bit about Aric Osso and Tristen

12   Alderson.  Mr. Alderson, we've talked about, "You can be on

13   Team USA or against Team USA."  Mr. Alderson has lied on -- it

14   appears, lied to federal agents.  He admitted to doing so.  He

15   lied on his forms to get his silencer.

16           One of the things that's particularly noteworthy, he

17   applied for an item that does require the registration that

18   we've all been talking about.  Agent Slosson knew that he had

19   been breaking the law and did nothing to prevent him from

20   getting that firearm, that silencer.  And you've seen evidence

21   that he has it and he told you he has it.

22           When you're assessing the credibility of a witness

23   and the things that come out of their mouths, when the

24   government does them favors like that, grants them immunity and

25   they don't get prosecuted for the crimes they've committed, and

1    then even though they are a prohibited person because of their

2    drug use they still get a silencer which you're not allowed to

3    get and that doesn't get reported, you have to assess that

4    testimony for what it is.  And that's the issue with the

5    immunity.

6            We talked a little bit about Phillip Wilson.  And,

7    you know, one of the things we discussed is the -- prior to

8    testifying, the witnesses you've heard from met with the

9    government.  They went over what they were going to say.

10   There's nothing wrong with that.  That's them doing their job.

11   That's them being prepared.  But sometimes it goes off track.

12           If you'll recall, at one point Mr. Wilson was asked,

13   "Hey, why did you buy the auto key card?"

14           I think the answer that was expected is, "Oh, well,

15   I" -- you know, "Did you think it was legal when you purchased

16   it," sorry.  I think the answer they were expecting to hear

17   was, "Well, I heard Mr. Hoover tell me I could."

18           And to be fair, if you watch Mr. Hoover's videos, he

19   says, "Unless you are a Special Occupational Taxpayer, if you

20   cut this out, you have violated the law."

21           Putting all of that aside, that's the answer they

22   were expecting.  The answer they got is, "Why did you think

23   what you did was legal?"

24           "Logic and reason."  That was his answer.

25           "Why did you think the auto key card was legal?"

1          "Logic and reason."

2          You heard from several witnesses for the government,

3    all of whom have immunity, all of whom were asked, "When you

4    purchased the auto key card, did you think you were breaking

5    the law or doing anything illegal?"

6          Many of them have substantial experience with

7    firearms.  And down to the last man they said, "I did not think

8    I was doing anything illegal."

9          You heard from Mr. Roberts.  Mr. Roberts is a little

10   different because Mr. Roberts seemed pretty intent on being in

11   that -- go back a little bit, that -- that last category,

12   people who want to commit a crime.

13         Mr. Roberts met up with a group of guys out in the

14   woods.  They were firing automatic weapons.  It was unclear if

15   they could legally do so.  They hand him an auto key card that

16   one of them had chopped up.  Mr. Roberts then takes it home and

17   does everything in his power to fix it, and lo and behold, like

18   the other witnesses that we've heard, cannot get it to work as

19   he believes it's designed and intended because it's not

20   designed and intended to actually function as a lightning link.

21   And we know that because ATF, in Martinsburg, Virginia, with

22   their 15,000 firearms, could not get it to work as it's

23   designed and intended.

24         You heard from Mr. Willis.  He bought it for a friend

25   of his.  He also lied to the ATF and he said, "Hey, my

1    understanding of the law" -- and it's something that he saw in

2    Mr. Hoover's videos -- "if the" -- "if there's a punch-out

3    where you just have to push it, that's crossed the line.

4    That's illegal because you don't have to manufacture or

5    materially alter it."

6              And they told him, "Nope, that's not what we think it

7    is."

8              We heard from Mr. Duty.  I talked a little bit about

9    what he said.  He was terrified the ATF was going to kick his

10   door in, shoot his dog.  And again, he was also afraid we were

11   going to get invaded by foreign adversaries.  And again,

12   whether you think those are reasonable beliefs or not, it's

13   very clear that he sincerely believed them.

14             He was also intent on being one of those people who

15   wanted to break the law.  He was also given complete immunity

16   to come through.  And he also told you that when he purchased

17   the auto key card, he was intending to break the law, but at

18   the time he purchased it he did not think he had broken the

19   law.  He did not think he had done anything wrong.  He did not

20   think purchasing the auto key card was illegal.

21             It's when he took his DeWalt drill to it and tried to

22   actually manufacture a machine gun conversion device that he

23   crossed the line.  But even though he's admitted all that, and

24   as he told you guys, he admitted to all that well before he got

25   his immunity letter, he still has his immunity letter.  He

1  still has not been prosecuted for admitting trying to make a

2  machine gun conversion device.  Mr. Roberts is in the exact

3  same boat.

4          And that's what he said.  He said, "It's legal when

5  you buy it, but then it's not."  And what he meant is when you

6  take the steps to cut it out, just like Mr. Hoover said in his

7  videos, that's when you've crossed the line.  That's when

8  you've chosen to break the law.

9          We also had Dr. Joel Moya.  Dr. Moya bought four auto

10 key cards.  He stored them away.  He did not cut them at all.

11 He collected firearms-related items.  He had close to 40

12 firearms.  He thought they were very interesting and wanted to

13 show people about them.

14         He also told you that this is -- and Mr. Toy told you

15 the same thing, this is a completely obsolete design, old

16 technology, doesn't really work with anything, but it's a

17 historic thing, it's interesting.  And for gun collectors and

18 enthusiasts, it's an interesting thing.

19         And then he started talking about the end of Western

20 Civilization, if things were to go to lawlessness, he had the

21 ability to potentially cut one of them out once the government

22 of the United States collapsed and we were no longer subject to

23 its laws.  Again, whether you subscribe to his beliefs or not,

24 they are sincerely held.

25         And then we talked a little bit about Mr. Stennes,

1  who purchased an auto key card and wanted to talk to his
2  friends about it.
3           One of the things that the Court's going to instruct
4  you is that the government's proof is beyond a reasonable doubt
5  that the defendant knew about the specific characteristics or
6  features of the firearm that made it subject to registration.
7           And what this means is what you've heard.  All of the
8  government's witnesses who have the get-out-of-jail-free card,
9  the immunity, tell you, and what you've heard Mr. Hoover say on
10 his videos and what Mr. Ervin said in his emails, is, "This is
11 the line.  We are not crossing it.  And I'm not even going to
12 help you cross it."
13          And we talked about what's Justin Ervin's state of
14 mind.  If he -- as we discussed this with several of the
15 witnesses, if these were just parts to be -- or a combination
16 of parts to turn something into a machine gun conversion
17 device, there's no need to polish them up, there's no need to
18 advertise, there's no need to have the T-shirts, there was no
19 need for him to meet with Mr. Ruiz to start getting coasters
20 designed, but that is what was happening.
21          Mr. Ervin -- and this is Government Exhibit 114.  I
22 am not going to read it to you, but he makes it very clear that
23 he has no intention for anybody to cut these.  And the
24 government says, "Well, why tell people not to cut it?"  It's
25 because if you do cut it, you have broken the law.  You have

1    created a machine gun conversion device by creating a

2    combination of parts out of a solid piece of metal.

3         And he makes it very clear that his purpose is as a

4    conversation piece and for people to talk about it.  It doesn't

5    make a ton of sense to me, admittedly so.  I don't know about

6    lightning links and I am not a firearms collector and it's not

7    a big important thing to me, but we're talking hundreds of

8    thousands of subscribers on YouTube, tens of millions of views.

9    This is a big community.  And this is the type of stuff that

10   they're exited about, collections.  Doesn't make a ton of sense

11   to me, and it may not make a ton of sense to you, but it's

12   naive to think that there's not people who spent just untold,

13   unseemly amounts of money on what would otherwise be trinkets

14   because it's a collection that is important to them.  And the

15   government wants you to ignore that.

16        We've got a couple of the other emails the government

17   showed you.  I counted 14 total.  Of the thousands of emails,

18   the government pulled up 14 total where somebody asked a

19   question, some of them barely made any sense, but that could be

20   construed as, "Hey, how do I cut this?  If I want to break the

21   law, how would I do it?"

22        Mr. Ervin responded to all but -- almost -- I think

23   two or three of them at most.  And that's in the thousands and

24   thousands of emails that you've heard about.  And the

25   implication is, oh, well, he knew everybody was breaking the

1    law.  But in the context of it, like I said, I counted 14

2    emails on their closing statement in the context of thousands

3    and thousands of emails, and he did not respond to the vast

4    majority of those.

5          But when he did, this is what he told them.  And this

6    is Government Exhibit 67JJ.  Conversation piece and

7    liberty-minded individuals.  "All NFA rules apply.  We can not

8    provide instructions.  We will not cross that line."

9          They said, "This is what we know the line to be.

10   That's what all the purchasers of this item came and testified

11   they knew that line to be.  He made a video about what he knew

12   that line to be.  And they said, "We are not crossing that

13   line."  Very clear.  Every single time.

14         And you don't have just, "Oh, this is what he told

15   somebody that might have been a federal agent."  You have his

16   sister, his father, his closest friends and family, and he told

17   them all the exact same thing.  There's not a text message that

18   says otherwise.  There's not an email that says otherwise.

19         We have his Currency Transaction Report as well.  And

20   finally, this is going to be the last little bit I get into, is

21   the structuring of financial transactions.  We've talked a lot

22   about machine gun conversion devices and the auto key card and

23   the legal technical language.  This is a serious crime that

24   Mr. Ervin is charged with, and I want to make sure that I'm

25   giving it the attention that it is due.

1          Mr. Ervin, plain as day, did not commit this crime.

2     I'm going to talk to you a little bit about the law and I'm

3     going talk to you about how you know.  There's no way in the

4     world he committed this crime, and to suggest so is simply

5     ridiculous.

6          "The defendant knowingly structured or helped to

7     structure a currency transaction."

8          By "structuring" we mean change the order we do

9     things to hide from the government.

10         The purpose was to evade the transaction reporting

11    requirements.  So not we did it because the bank didn't have

12    enough money, but because we are trying to hide from the

13    government what we are doing.

14         "And involved one or more domestic financial

15    institutions."  There was testimony that CFCU was a domestic

16    financial institution.  Please don't spend a lot of time on

17    that.

18         One of the exhibits we submitted was the notes for

19    the entire account file for Mr. Ervin.  So I want to go through

20    this very clearly.

21         Mr. Ervin, as you have heard, has a bit of a temper.

22    He can be a little difficult to get along with.  The bank

23    employees told you that.  The Orange Park Machine shop

24    employees told you he was ornery and difficult to work with.

25    Not the best thing.  You may not like him for it, but hopefully

1  you will not hold it against him when you're deciding something

2  this important.

3          Putting that aside, he's difficult, he comes in the

4  bank, he has a money order for Auto Key Card, says, "Hey, I'd

5  like to cash this."

6          And they say, "No.  Your name is not Auto Key Card,

7  your name is Justin Ervin."

8          And so he throws what could probably best be

9  described, and I think Ms. Sarkese with the bank described it

10  the same way, as a hissy fit.  "I'm not coming back here.  I'm

11  not taking your accounts.  I'm not doing anything here.  I'm

12  not going to use your loans.  I want all of my money right now

13  in cash.  Give me, give me, give me."

14          What the government needs you to believe for this is

15  that at the time Mr. Ervin walked into the bank, he had a plan

16  to get less than 10,000 -- $10,000 or less, knowing that the

17  bank, when he made that request, wouldn't have enough money and

18  that he was going to continue to act in that way, and that this

19  hissy fit, for lack of a better term, was all for show.

20          He goes in there and he says, "I want all of my

21  money," and they say, "No."

22          And they go back and forth and they argue and he

23  carries on and they say, "We'll give you $10,000."  And he

24  says, "I want $9,000 or I'm going to come back" -- "I'll just

25  come back every day or try other branches until I get it."  He,

1    in fact, did both.

2            The government wants you to say, "Oh, well, he said

3    9,000 instead of 10,000."  And you say, "Oh, well, that's a big

4    deal."

5            If you read the jury instruction, and as we discussed

6    with all those witnesses, if it's $10,000 and a penny, they

7    have to fill out a Currency Transaction Report.  If it's

8    $10,000, as Ms. Sarkese said she would give, or 9,000 or 8,000,

9    or any number between 10,000 and zero, they don't fill out a

10   Currency Transaction Report.

11           So the government needs you to believe that Mr. Ervin

12   intentionally threw this temper tantrum, was offered a dollar

13   amount below the currency transaction requirement, and then

14   came and requested the same amount of money for the next couple

15   of days because he was trying to avoid a reporting requirement,

16   which, by the way, he already did.  If he knew those rules and

17   his intention was to not do those rules, he would have done

18   something significantly differently.

19           He went to the bank and said, "I want 9" -- "I want

20   all of my money in cash right now."  They said, "We don't do

21   that.  That's not a thing because you're throwing a temper

22   tantrum."  And he says, "Fine, I'm going to go to other

23   branches."

24           And lo and behold, what he does is he goes to another

25   branch and he says, "I want all of my money."  And the

 1  gentleman, in all fairness, could not remember the exact
 2  amount --
 3         MS. TAYLOR:  Your Honor, may we approach?
 4         THE COURT:  You may.
 5     (Proceedings at sidebar:)
 6         THE COURT:  Go ahead, Ms. Taylor.
 7         MS. TAYLOR:  There was no testimony from Mr. LeVay
 8  that Mr. Ervin requested all of his money at the second branch.
 9         THE COURT:  I agree that there wasn't.  I told the
10  jury that they should rely on their recollection, and you'll be
11  able to correct it.
12         But Mr. King, I would suggest to you that your
13  factual representations to this jury have been very different
14  than my recollection of the testimony.  And I'm not sure that's
15  a wise move, and we may talk about it later.
16         But Ms. Taylor, I'm simply going to remind the jury
17  that it's their recollection of the evidence that they should
18  rely on.  Is that sufficient?
19         MS. TAYLOR:  Yes, Your Honor.
20         THE COURT:  Mr. King, you agree?
21         MR. KING:  Yes, Your Honor.
22         THE COURT:  All right.
23     (Proceedings in open court:)
24         THE COURT:  Ladies and gentlemen, I'm just going to
25  remind you that you have to rely on your recollection of what

1    the evidence was.

2             Go ahead, Mr. King.

3             MR. KING:  When we talked to Mr. LeVay he said that

4    Mr. Ervin requested a significant amount of money.  And at the

5    time, if he requested anything more than $1,000, he would have

6    triggered a Currency Transaction Report.  And that is, in fact,

7    exactly what he did.

8             For you to convict Mr. Ervin you would need to

9    believe that he faked his temper tantrum, knew how exactly --

10   that the bank would not submit to his request for all of his

11   money when he first made it with Ms. Sarkese, that she would

12   offer him an amount that is below the currency transaction

13   reporting requirement, but all at the same time he did not know

14   when he went to the other branch, just like he told her he

15   would, that it would trigger a Currency Transaction Report.

16            And when he went in to see Mr. LeVay with the other

17   branch -- that was the Fleming Island, not the Orange Park

18   branch -- he didn't say, "I'd like $1,000.  I don't want to

19   take out $1,000.01 because that would put me over the Currency

20   Transaction Report."  He said, "I would like a significant

21   amount of money."  Mr. LeVay says, "The most I can give you,

22   because we're about to close, is $5,000."  He takes that, and

23   it triggers a Currency Transaction Report.

24            To believe that he was intending to avoid that would

25   be to believe that he knew exactly how much money the bank had,

1    how much money the bank would be willing to give him, and that

2    he created an elaborate hoax to then get that money out of the

3    bank, even though he knew the rule so poorly that his actions

4    triggered a Currency Transaction Report.

5            And then he was able to get 9,000 from his branch.

6    And so lo and behold, as he says to her and she puts in her

7    notes, he comes in every day that they are open, not weekends

8    and not the New Year's Day, and he takes out the amount of

9    money that she had given him before.  And that's what the

10   records reflect.

11           To believe that he set all of that up and had both a

12   very precise amount of understanding of the internal workings

13   of that bank, how much money they would be willing to give him

14   and exactly how Currency Transactions Reports work, but also

15   have no idea how they work because he triggered one and had one

16   filed literally the first day this happened, not only did they

17   not prove that beyond a reasonable doubt, it doesn't make

18   common sense.  It just doesn't make any sense.

19           And then on -- when discussing this in their closing,

20   the government said that Mr. Ervin said he really wanted to

21   close his account but he kept it open and still did that.  And

22   they asked Ms. Sarkese the same thing.  And then I went up, and

23   I asked her, "Ms. Sarkese, when Mr. Ervin was having his hissy

24   fit, did you believe" -- "based on all of your knowledge and

25   experience and time with him, did you believe that he was

1   really trying to close all of his accounts or that he was

2   throwing a temper tantrum?"

3            And she laughed a little bit.  She said no doubt in

4   her mind, temper tantrum.

5            And sure enough, he threw a temper tantrum.  He came

6   and got the money out.  He got the exact same amount that he

7   had gotten out the previous days.  He did exactly what he said

8   in that note.  He went to another branch, they gave him even

9   less money, so he said, "I'll go back to my branch and get the

10  9,000 out."  To believe anything but that simply doesn't make

11  any sense.

12           One of the other things we talked about is, you know,

13  have things been straightforward; have -- has the evidence that

14  you've seen been what it's purported to be.

15           One of -- and we've talked about a lot of these

16  examples.  Here's one another, Government Exhibit 70.

17  Mr. Ervin gets kicked off of Shopify.  The implication is that

18  he has violated the laws related to the United States and

19  firearms.  Shopify has made that determination, though nobody

20  from Shopify came here and said that, but they read an email

21  where it's informing him, "Hey, you violated our terms and

22  policies," and because of that, that's why he was terminated.

23  That's the implication of all of that evidence and all of those

24  emails and all of that testimony.

25           The problem is when you look into it and you dig into

1    it, the list of things in Government Exhibit 70, we went

2    through with Mr. Lintner.  "Hey, Mr. Lintner, if I have a

3    magazine with more than" -- and candidly, I don't know what a

4    large percentage of those things are -- "but a magazine with

5    more than ten rounds, is that federally controlled or regulated

6    in any way?"

7              "No, sir."

8              And then you look, it's a host of firearm things.

9    But it's just like the Orange Park Machine Shop.  The reason

10   Shopify -- I don't know why Shopify doesn't want to deal in

11   firearms, but neither do you, because nobody from Shopify has

12   told you why they don't want to deal in firearms or

13   firearm-related anything.  A lot of those things aren't

14   firearms.  The vast majority of them aren't.  They include

15   pictures, drawings, designs, all of which are completely legal,

16   but Shopify doesn't want to do it.

17             The implication with Orange Park Machine was, oh,

18   they knew he was doing something wrong or illegal so they cut

19   him off.  That's simply not the case.  It was bad for business.

20             And Shopify has maybe made a business decision.  They

21   may have even decided they -- who knows.  And we don't.  But

22   that's kind of the point, is when we look at all these things,

23   it's what's the implication.

24             When we start talking about the evidence we've heard

25   and the evidence that we haven't heard, we've heard more about

1   this Louis Vuitton purse than we have seen actual evidence that

2   this thing was designed and intended to be a lightning link

3   that will work in an SP1 bolt carrier and that it would work

4   without a machine gun part and that that's what it was designed

5   and intended for.  We've heard about this from several

6   witnesses almost every single day.  And I'll submit to you,

7   when you dig into it, when you look at the facts, when you read

8   the law and really apply the facts to the law, what this case

9   is, it's not a Louis Vuitton purse.  It's not fancy.  It

10  doesn't really have it.  It's not the luxury item that it is

11  made out to be.

12          At the end of the day what this case is is a

13  knockoff.  It is a $50 purse that you buy from a guy in an

14  alley.

15          And ladies and gentlemen, this is my last opportunity

16  to address everything.  This is what's difficult for me.  So

17  the way it works is I have said my piece.  I promise I'm done.

18  I'm sure we're going to let you stretch your legs here.  The

19  thing of it is, is we've talked a lot about things the

20  government's witnesses have said and what I would consider

21  impressions for you to be given based on what the evidence is

22  and what things really mean.  I'm not going to have an

23  opportunity to come back up here and address it.  So I'd like

24  you to hear from the government, listen to everything they say,

25  take it to heart, take it sincerely, but keep an open mind, and

 1   in the back of your head please think:  What would Mr. King say

 2   to this if he had an opportunity to respond?

 3           And ladies and gentlemen, I know you've all been --

 4   it's a long time to ask you to sit in one fell swoop.  I know

 5   you've all been paying very diligent attention.  On behalf of

 6   Mr. Ervin, I just want to thank you for taking the time and for

 7   the not only patience you've shown me, because I'm afraid I'm

 8   going to forget to say something that's going to hurt

 9   Mr. Ervin, but also for the amount of attention you've paid for

10   what is the most serious thing that is going to happen in his

11   life.  So thank you very much.

12           THE COURT:  Ladies and gentlemen, we still have the

13   government's rebuttal, but I think I should give you a brief

14   break before we do that.  So why don't we take about ten

15   minutes.  And if you'll be back in the jury room ready to come

16   back in a little after 2:40, we'll continue.

17           COURT SECURITY OFFICER:  All rise for the jury.

18       (Jury exits, 2:32 p.m.)

19           COURT SECURITY OFFICER:  Please be seated.

20           THE COURT:  Mr. King, you may need a personal

21   protection detail to protect you from my court reporter,

22   because the speed at which you were speaking was insane.

23           Ms. Healey, you are amazing, and I'm sorry.

24           We'll be in recess.

25           COURT SECURITY OFFICER:  All rise.

1        (Recess, 2:33 p.m. to 2:42 p.m.)

2        (All parties present.  Jury not present.)

3             COURT SECURITY OFFICER:  All rise.  This Honorable

4    Court is back in session.

5             Please be seated.

6             MS. TAYLOR:  You want me here or at counsel table?

7             THE COURT:  Whatever you prefer.  It doesn't matter.

8             Let's go ahead and get the jury back in.

9             COURT SECURITY OFFICER:  All rise for the jury.

10       (Jury enters, 2:44 p.m.)

11            COURT SECURITY OFFICER:  Please be seated.

12            THE COURT:  Go ahead, Ms. Taylor.

13            MS. TAYLOR:  Yes, Your Honor.

14            Ladies and gentlemen, when I stood up before you this

15   morning and gave my closing argument, I put the evidence up on

16   the screen.  We walked through it.  I showed you documents.  I

17   put together the timeline.  It was all clear.  There was no

18   hiding.  There was no mischaracterization of what the evidence

19   was.

20            As I've sat here listening to the subsequent closing

21   arguments, I've wondered whether I was sitting through the same

22   trial that everyone else did.

23            I'm going to start with the structuring because

24   that's the most straightforward.  Mr. King said in order to

25   find Mr. Ervin guilty of structuring, you'd have to believe

1    that he planned all along to structure before he even walked

2    into the bank, and then he had a hissy fit all for show.

3           That's not what's required.  That's not what's in the

4    jury instructions.  What you have to find is that at some point

5    before he made those transactions he had the intent to avoid

6    the currency transactions reporting requirement.

7           It's not required to show that he knew that it was

8    $10,000 and one cent, and not $10,000 even.  What's relevant is

9    what his intent was.

10           He was told, "You can have $10,000."  He said,

11    "Okay."  Then he said, "Wait, give me 9 instead."  There's only

12    one reason why he would do that.

13           And it doesn't matter that he also didn't understand

14    that if he went to another branch on the same day and withdrew

15    a thousand more that that would, indeed, trigger a report.

16           Mr. King also indicated that Mr. Ervin was the one

17    who filled out that Currency Transaction Report and willingly

18    gave accurate information about being the owner of Auto Key

19    Cards.  But what the testimony from Mr. LeVay was, was that he

20    had to collect that information in sort of a secretive way and

21    he files a report.  He didn't tell Mr. Ervin, "Hey, I'm going

22    to file a Currency Transaction Report on you now.  Could you

23    just give me all the information that I need for it?"  That's

24    not how it works.

25           Now, I also want to talk some about all the arguments

1    that you have heard about whether it was or wasn't a machine

2    gun conversion device.  Mr. King made some very forceful

3    arguments that it had to be -- it had to be a machine gun

4    conversion device -- essentially a completed machine gun

5    conversion device when it was sent out.  And that -- that's

6    not -- he says it doesn't mean after material -- materially

7    altered.  You won't see any language about that in the jury

8    instructions.

9         Judge Howard told you what the standard is that you

10   have to apply, and that is was the item that was transferred

11   designed and intended to be a combination of parts that would

12   convert a weapon into a machine gun.

13        MR. KING:  Your Honor, can we approach sidebar?

14        THE COURT:  You may.

15      (Proceedings at sidebar:)

16        MR. KING:  Your Honor, that's a misstatement of law.

17   It doesn't have to be designed and intended to be a combination

18   of parts.  It's a combination of parts designed and intended.

19   The meaning is dramatically different.  And I'd ask the Court

20   to instruct the jury --

21        THE COURT:  I -- Ms. Taylor, you need to just go back

22   and rephrase that.

23        MS. TAYLOR:  Yes, Your Honor.

24        THE COURT:  Go ahead.  Ms. Taylor, you just need to

25   say that you misspoke.

1           MS. TAYLOR:  Yes.

2        (Proceedings in open court:)

3           MS. TAYLOR:  I apologize for misspeaking.  But I'm

4    going to read it.  What the jury instructions say is that you

5    have to find beyond a reasonable doubt that the defendant

6    knowingly transferred, or aided and abetted the transfer of, a

7    firearm, specifically, a combination of parts designed and

8    intended for use in converting a weapon to shoot automatically

9    more than one shot, without manual reloading, by a single

10   function of the trigger, which we've all been sort of

11   compressing down into saying it's designed -- a combination of

12   parts designed and intended to be a machine gun conversion

13   device.

14          There's nothing in there about material alterations.

15   There's nothing in there about what is was at the time.  This

16   is what the instruction says.  That's the law that you have to

17   apply.  In light of all of the facts of this case, you have to

18   think about what the intention was, the evidence that we have

19   presented to you of what the defendant's intent was in

20   transferring these devices, and make a determination of whether

21   it meets that definition of being a combination of parts

22   designed and intended.

23          Now, there was a lot of argument about where that

24   line gets crossed.  There was argument that it couldn't -- from

25   Mr. Larosiere, it couldn't possibly be a combination of parts

1   designed and intended, because even once Mr. Toy cut it out, he

2   had to shave a millimeter off the end of that paddle, the

3   little piece that sticks up.

4          So by Mr. Larosiere's definition, it would be

5   perfectly legal to send out that combination of parts with an

6   extra millimeter on the end because it's not a machine gun

7   conversion device yet until you shave that millimeter off.

8          MR. LAROSIERE:  Your Honor, may we approach?

9          THE COURT:  Yes.

10      (Proceedings at sidebar:)

11         THE COURT:  Yes, Mr. Larosiere.

12         MR. LAROSIERE:  That is not at all what I stated.  I

13  bifurcated my argument, and it was focused on whether or not it

14  was, first, a combination of parts, and then, separately,

15  designed and intended.  I had only spoken to the extra

16  millimeter when speaking about "designed and intended."

17         THE COURT:  I don't think there's any --

18         MR. LAROSIERE:  She's suggesting that I argued that

19  if he -- if it was cut out, or if -- and I believe you just

20  stated if the parts were already cut out and there was an extra

21  millimeter, that I had stated that that would not be a machine

22  gun.  I never made that claim.

23         MS. TAYLOR:  You did make that argument.

24         THE COURT:  As I did earlier, I'm going to have to

25  let the jury rely on their own memories, so let's continue.

1      (Proceedings in open court:)

2          MS. TAYLOR:  You heard Mr. Larosiere argue that if

3     you had to -- because you had to shave that extra millimeter

4     off of the end, then it couldn't possibly be designed and

5     intended to be a machine gun conversion device.  So the logical

6     extension of his argument is any alteration whatsoever would

7     make it not a machine gun conversion device.

8          So where is the line?  And that's really the question

9     that you-all have to answer when you deliberate in this case.

10    How do you draw -- how do you draw a line of saying what's

11    legal and what's illegal?

12         You heard -- you heard at the earlier part of my

13    argument Mr. Hoover, where he pointed at, on the screen, the

14    image of the not-fully-cut-out lightning link.

15         And Ms. Ganoe, I don't know if you can pull up slide

16    20.

17         He had that image on his screen in his video.  That's

18    part of "The Parts the ATF Wishes Never Existed."

19         And he says, "The difference between these" --

20    meaning the auto key card -- "and the old lightning link that

21    did cause problems is these are not cut out."  He says, "The

22    old ones were a hundred percent cut out," but you can see from

23    the image that they were not a hundred percent cut out, which

24    hopefully -- oh, we can't bring it up?  Well, in any event, you

25    all rely on your memories, but recall that he put that image of

1   another product that was very much like the auto key card where

2   the pieces of the lightning link were still embedded into the

3   piece of metal.  And Mr. Hoover stated that they were one

4   hundred percent cut out, which was not actually true.  They

5   were still embedded in the piece of metal as well, but he

6   represented that you could pop them out with your finger and

7   then you would have a machine gun.  How is that not a material

8   alteration of the card with the parts cut out?  Where do you

9   draw that line?

10          Mr. Hoover understood that having the lightning link

11   pieces still imbedded in a card was problematic, where they

12   could be removed from the card and cause a firearm to function

13   as a machine gun.

14          Mr. King also spent a lot of time talking about

15   Mr. Lintner and saying he couldn't tell you why a paperclip and

16   a shoelace could be a machine gun conversion device and why

17   they may not.  That's not Mr. Lintner's job.

18          Mr. Lintner was here to testify to you about what are

19   the rules and regulations that govern how to transfer firearms,

20   registration of firearms, things like that.  He's not the

21   person who makes the classification decisions or makes

22   evaluations about whether things are or are not machine guns.

23   Not his job.  Never been his job.  That person who actually

24   does do that job is Mr. Toy.

25          And you also heard Mr. King -- I lost count of how

1  many times Mr. King repeated this point that Officer Toy could

2  not get the rifle to fire with the lightning link automatically

3  with an SP1 bolt carrier.  That's not what Officer Toy

4  testified to.

5         He testified that he came down here to Jacksonville,

6  he had the same rifle that was in the video that you saw,

7  brought it here to Jacksonville, and he did a test fire at the

8  range here in Jacksonville, that he first did a fire -- a test

9  fire without the lightning link installed, and the rifle

10  functions semiautomatically.

11         He did have that M16 bolt carrier in the rifle, which

12  as he told you, is not sufficient to make it function as a

13  machine gun.

14         And then he put the pieces of the lightning link in

15  and it fired automatically perfectly.

16         Then another individual who was at that test fire

17  gave Officer Toy an SP1 bolt carrier.  Officer Toy put the SP1

18  bolt carrier into the rifle too, and he test fired it, and it

19  functioned as a machine gun perfectly.  So this repeated

20  representation that Officer Toy could not make it work with an

21  SP1 bolt carrier is false.

22         There was also representation by Mr. King that in

23  order for it to be designed and intended you have to find that

24  it worked with an SP1 because it was a lightning link, although

25  then he said but it's not really a lightning link because the

1 lightning link is the thing from the Rock Island Auction. I

2 mean, that's -- that's getting way in the weeds. Again, not

3 something that's in the jury instruction. There's nothing in

4 this case that requires that you find it is, quote/unquote, a

5 lightning link.

6         What the elements say, again, is that you have to

7 find that it is a combination of parts designed and intended

8 for converting a weapon to shoot automatically more than one

9 shot.

10        What kind of bolt carrier was used with it is

11 irrelevant to that question. The only question that you have

12 to answer is did it perform that function and was it designed

13 and intended to do so.

14        And moreover, there was mischaracterization of

15 Mr. Toy's testimony with regard to putting M16 parts into an

16 AR-15. What Mr. Toy said was that if you replaced all of those

17 internal components of the AR-15 with M16 versions, not just

18 the bolt carrier, but all those other parts that were in there

19 too, then there was the possibility that it could function

20 automatically.

21        But he wasn't talking about just using an M16 bolt

22 carrier. He said that many -- many manufacturers commonly use

23 an M16 bolt carrier and sell it in their AR-15s and that's not

24 an automatic firearm. So to imply that by using an M16 bolt

25 carrier, that that was what the cause was of it firing

1   automatically, is completely unsupported by the evidence.

2        Mr. King also made a lot of hay, or tried to, about

3   Mr. Toy not having made a video of himself cutting it out.  I

4   mean, frankly you saw the one video that was presented of

5   Officer Toy test firing it.  It was kind of blurry.  It's not

6   the best video.  You could see what was happening.  You could

7   see that he was putting the lightning link pieces in.

8        When he was asked whether they have video equipment

9   to do -- to make these kinds of videos, he said no.  And it

10  appears that that video, it was probably shot on a cell phone.

11  They simply, at FATD, do not have the equipment set up to take

12  professional videos of every single time they test an item.

13       You also heard it suggested that Officer Toy was just

14  going to say this thing was a machine gun no matter what; that

15  he just looked at that picture of it and said, "Yep, that's a

16  machine gun," and he was predisposed to think that.  Well,

17  that's not what the testimony was.  Again, your recollection of

18  the testimony controls here.

19       You -- and I know there's been a lot of it, and it's

20  been a lot of information to take in.  But what Special Agent

21  Hooker testified to was that he consulted with Officer Toy and

22  learned that he needed to get a sample for testing in order to

23  decide whether to proceed with his case.  That's why he made

24  his first undercover purchase.  He sent it up to Officer Toy.

25  Officer Toy cut it out.  Mr. King stated it took him about an

 1  hour, but in reality, I believe it was 37 or 38 minutes to cut

 2  it out.  Whether or not that's an hour is up, I guess, for

 3  discretion.

 4          But Officer Toy then cut it out with that Dremel.

 5  You saw the picture of the Dremel, common household Dremel.

 6  And he was able to cut the two pieces out.  And the only

 7  alteration that he made beyond cutting it at the line was to

 8  shave off a tiny bit of material to get those two pieces, the

 9  upper and the lower part of the AR-15, to close.  That's an

10  obvious modification.  You know, if you're trying to get

11  something to close and it's jamming up and you're trying to

12  figure out what to do to it, I mean it doesn't take a rocket

13  scientist to figure out:  Maybe I need to shave a tiny bit of

14  material off of here so it will shut.  Again, if that's the

15  line, then it would be extraordinarily easy to skirt the laws

16  of this country.

17          Moreover, Officer Toy told you that it is not

18  uncommon to have to hand fit parts for firearms.  Different

19  AR-15s' parts are not all completely interchangeable.  There's

20  high shelves, there's low shelves, there's different bolt

21  carriers.  You know, it was not surprising to him that he might

22  have to make very minor adjustments to get it to function

23  properly, which is what he did.  Again, these adjustments were

24  extremely minor.

25          You also, frankly, saw, even on the Rock Island

1    Auction records where it was describing that lightning link

2    that sold for $18,400.  I'm paraphrasing, but it said something

3    to the likes of, you know, "Hand adjustment may be required."

4            That's not unusual.  That doesn't make it not a

5    machine gun conversion device.

6            It was also asserted that there are simpler ways to

7    make a machine gun than this.  Probably true.  It probably is

8    true.

9            Is that what's in the jury instructions?  Does it

10   say, "Must be the easiest way to make a machine gun"?  "Must be

11   completed as a machine gun in less than an hour"?  It does not

12   say that.

13           Again, the question that you have to answer is, is it

14   a combination of parts designed and intended for use in

15   converting a weapon to shoot automatically more than one shot.

16   That is, is it a combination of parts designed and intended to

17   make a machine gun.

18           There was also some argument about whether they knew

19   of the specific features or characteristics that made it

20   subject to registration.  That's one of the elements that you

21   have to find as well.  I went over that in detail in my first

22   close, but remember, being aware of its specific features and

23   characteristics means did they know what it was.  It doesn't

24   mean did they know that they had to register it or did they

25   know that it was illegal.  It means they knew what it was.

1  They clearly knew what it was.  They were both selling it,

2  saying -- especially Mr. Hoover directly saying what it was and

3  how you use it and how to cut it and how to put it in your gun.

4         And Mr. Ervin, again, he was a little bit cagier

5  about it, but all of the messages that he was putting out,

6  including, of course, the messages that he put out indirectly

7  by paying Mr. Hoover to make ads for him in which Mr. Hoover

8  said what it was, clearly shows that both Mr. Ervin and

9  Mr. Hoover knew what this thing was.

10        Additionally, you were told at the outset of this

11 case that there was going to be some kind of compelling

12 evidence that this was a prosecution aimed at, I guess,

13 punishing Mr. Hoover for saying bad things about the ATF.  And

14 you also heard testimony, there's a lot of people who don't

15 like the ATF.

16        And moreover, this case did not start out with

17 Mr. Hoover.  It started out with Mr. Ervin and -- and the fact

18 that he was selling what were believed to be illegal conversion

19 devices via the internet.  It wasn't until later in the case

20 that it was determined that the way that Mr. Ervin was

21 advertising these things was by having Mr. Hoover do it for

22 him.  This is not a case that was opened to target Mr. Hoover

23 for saying bad things about the ATF.  The ATF would have

24 endless fodder for going after people who don't like them,

25 don't like gun laws, if that was the basis on which they chose

1   which cases to target.  And it's clearly not.  And you didn't

2   see any evidence that that was what was going on here.

3         There was also a suggestion that because some of the

4   purchaser witnesses had items that were registered in a trust

5   that there was no way to know whether other people who

6   purchased the auto key card might have had them registered in a

7   trust and it just didn't come up when their names were

8   searched.

9         Well, each of those purchaser witnesses was asked

10  whether they registered it, and they said no.  None of them had

11  registered an auto key card as a machine gun.

12        But moreover, you also heard testimony at the case

13  that -- or at the trial that in order to register an item in

14  the National Firearms Registration and Transfer Record, it has

15  to have a serial number.  And you heard Special Agent Hooker

16  tell you that none of the auto key cards that he recovered at

17  Mr. Ervin's house had a serial number.

18        And if you don't want to take his word for it,

19  they're all right here on the table, and you can look at them

20  and see if they have those markings that would allow them to be

21  registered.  None of these people registered the auto key card

22  as a lightning link.

23        There was also some complaining at the outset of some

24  of these closings about, you know, why did we spend time

25  proving to you that Mr. Ervin was one operating this business.

1    Well, again, it's our burden of proof.  I have to prove to you

2    all of the elements of all of these crimes.  That includes

3    who's doing it, how they're doing it, who's receiving it, how

4    the communication worked, where's the conspiracy, and what's

5    the evidence of their intent.  That's what I focused on in my

6    closing, to show you those parts that are the things that you

7    really need to be thinking about.

8            Now, moving on to some more of the things that

9    Mr. Larosiere addressed, he said that Mr. Hoover is accused of

10   talking about drawings on a piece of sheet metal.  That's not

11   what's in the indictment.  That's not what's in the jury

12   instructions.

13           What Mr. Hoover is accused of is conspiring with

14   Mr. Ervin to transfer these unregistered machine gun conversion

15   devices.  Just because Mr. Hoover wasn't the one that designed

16   it doesn't mean that he can't be held accountable for his role

17   in the conspiracy, which was to be the salesman, to be the guy

18   that went on his gun YouTube channel and talked to his hundreds

19   of thousands of subscribers and told them all the things that

20   you have heard from his own mouth in his videos him say and

21   that I went back over in my first close.

22           I think both of the defense attorneys highlighted

23   that after Mr. Hoover found out that Mr. Ervin was arrested, he

24   made a video where he said, you know, "I was going to give some

25   of these away, but now I can't because I know" -- "I know that

1   they're illegal." He clearly knew that they were illegal

2   before that. That's not a -- that's not a showing of

3   Mr. Hoover not wanting to break the law; that's a showing that

4   Mr. Hoover didn't want to get arrested.

5           After that Mr. Hoover makes more videos where he

6   talks about willful defiance of the law. And he talks about

7   how he knew Mr. Ervin was willfully defying the law and that he

8   was there to support Mr. Ervin in willfully defying the law.

9           And there was also a suggestion that Mr. Hoover was

10  really just advertising these to SOTs. You know, Special

11  Occupation Taxpayers, they're allowed to make NFA items,

12  including machine guns, and then they have to report it within

13  the next business day to ATF if they make a new machine gun.

14          That's not what Mr. Hoover was doing. When he made

15  his video "The Parts the ATF Never Wishes Existed," he had a

16  number of different categories of people up on his whiteboard.

17  He had different ways to legally make -- access a machine gun.

18  He had binary trigger, a transferable machine gun, which, as he

19  noted, he said it was at least $10,000. He suggested you could

20  become an SOT. Pay for your tax stamp, pay to become an SOT,

21  and then just like him, you can legally manufacture a machine

22  gun. That was category three. Then it was make your own, I

23  think, binary trigger, rent a machine gun, and then is

24  category six. That's the "zero Fs given" category. That's not

25  the SOT category. That's who he was speaking to in that video,

1   who he was selling the auto key card to, as an individual who

2   has had their chains broken, no longer needs to follow any

3   laws, because if they're going to have guns, they might as well

4   have a machine gun.  That's what Mr. Hoover said.

5            And then there were arguments that, well, he really

6   just intended this to be a source of parts for SOTs.  So if

7   you're an SOT then it's parts, but if you're not an SOT then

8   it's artwork and a conversation piece?  I mean, how does that

9   work?  You can't have it both ways.

10           There was also numerous times in Mr. Larosiere's

11  presentation where he emphasized that Ervin didn't care about

12  how thick it was or didn't even know how thick the auto key

13  card was.  That's false.  That email blast that Mr. Ervin sends

14  out that was on my eighth slide of my opening presentation is

15  the one where he says, "Introducing the new 30 percent thicker

16  cards."  That's the first thing that email says in big, bold

17  letters.  Clearly the thickness of the card was of importance

18  to Mr. Ervin.

19           And then later in the email he gives the dimensions.

20  He says, "54 millimeters by 86 millimeters by 1.3 millimeters

21  thick."  Of course he knew how thick the card was, and of

22  course it mattered to him.  That was the highlight of this

23  email blast that he was sending when he started getting the new

24  auto key cards manufactured by Orange Park Machine.

25           Mr. Larosiere also said, "Well, the stated purpose is

1    that it's a work of political art."  So we're just going to

2    pick one of the stated purposes and say that's what it is,

3    whichever one that favors them?  And we're going to ignore all

4    the other times where they say it's a machine gun conversion

5    device?  That's not how this works either.

6              And again, of course Mr. Hoover can get on YouTube

7    and he can say whatever he wants as long as it's within

8    YouTube's terms of service, but that doesn't mean that he's not

9    going to be held accountable when the things that he says show

10   that he is intending to sell an illegal item.  Just like if

11   you're a drug dealer out on the corner, you know, you're not

12   protected from prosecution just because you're the one saying

13   like, "Hey, the guy around the corner is the one with the

14   crack.  You pay me and then you go get it from him."  It's

15   still illegal.  The speech that you're doing is part of a

16   crime.  It doesn't -- it doesn't give you a

17   get-out-of-jail-free card.

18             There's a lot of emphasis on drawings are not

19   illegal, schematics are not illegal.  Is this a drawing?

20   When's the last time, you know, you went to a kid or grandkid

21   and said, "Make me a drawing.  Just go" -- "can you just go on

22   the CNC machine and etch your drawing into a piece of metal for

23   me"?

24             This is not a drawing.  There was a schematic, I

25   think it's in Exhibit 49, one of the pictures from Mr. Ervin's

1    phone that had the mechanical drawing of the designs on it.

2    And that's a drawing.  That's the digital drawing that is what

3    led to this physical thing, the auto key card.

4            No person draws -- no normal person would call

5    etching a line into a piece of stainless steel, or, moreover,

6    having a machine shop do it for you on mass scale, a drawing.

7    That's not what this is.

8            There's a lot of emphasis placed, too, on, "Oh, it's

9    just a flat piece of metal.  I mean, how could it be anything

10   if it's just a flat piece of metal?"

11           Well, these are the two pieces of the lightning link

12   that Officer Toy cut out.  They're just flat pieces of metal.

13   I mean, I could stick the paddle through the body.  I'm going

14   to put it right here on the edge of this lectern, and it's a

15   table sculpture.  It's not.  It's still a machine gun

16   conversion device.

17           There's no requirement that it have been a complex

18   design, that it have been easy or difficult to cut out.

19   There's no requirement, frankly, that it even be durable or

20   cause a firearm to fire automatically more than once, or even

21   that it require a firearm -- or that it allow a firearm to fire

22   more than two shots.  The only thing that's required in these

23   jury instructions is that it's a combination of parts designed

24   and intended to at least one time convert a weapon to shoot

25   more than one shot with a single function of the trigger.

1    That's it.  And that's the question ultimately that you have to

2    answer here.

3            Your Honor, may I have one moment?

4            THE COURT:  You may.

5        (Government counsel confer.)

6            MS. TAYLOR:  Again, ladies and gentlemen, your

7    recollection of the testimony at this trial is what controls.

8    You've been paying attention, you've been taking notes.

9    There's been a lot of evidence presented.  But you also have

10   all of the physical evidence that's out here on the table to

11   aid you in your recollection.  You can go back through those

12   emails, you can go back through the Instagram messages, you can

13   go back through all of those documents that were reviewed with

14   you throughout the course of this trial and refresh your memory

15   of what that testimony was, refresh your memory of what these

16   defendants's intent was when they got together, conspired to

17   sell the auto key card on a massive scale.  And again, the view

18   of the United States is that they clearly did, and we're asking

19   you to return that verdict.  Thank you.

20           THE COURT:  All right.  May I see counsel at sidebar

21   for one moment.

22       (Proceedings at sidebar:)

23           THE COURT:  It would be my intention at this time to

24   excuse the alternate, Juror No. 41, with instructions, in case

25   we need to call them back.  Is there anything else I need to do

1   other than that, Ms. Taylor?

2           MS. TAYLOR:  No, Your Honor.

3           THE COURT:  Mr. King?

4           MR. KING:  No, Your Honor.

5           THE COURT:  Mr. Larosiere?

6           MR. LAROSIERE:  No, Your Honor.

7           THE COURT:  And you-all agree that 41 is the

8   alternate, right?

9           MR. KING:  That's the gentleman in the middle with

10  the goatee?

11          THE COURT:  Yes.

12          MR. KING:  Yes, Your Honor.

13          MR. LAROSIERE:  Yes.

14          MS. TAYLOR:  Yes.

15      (Proceedings in open court:)

16          THE COURT:  All right.  Ladies and gentlemen, at this

17  time we're going to let you go back to the jury room to begin

18  your deliberations.  I'm going to ask every -- ask Juror No.

19  41 -- well, it's Juror No. 12, you were 41 in the selection

20  process -- ask you to remain seated.  The rest of you-all can

21  go into the deliberations room.  But I'll ask you to wait to

22  begin your deliberations until Juror No. 41 has been through

23  there, all right?

24          COURT SECURITY OFFICER:  All rise for the jury.

25          THE COURT:  Juror No. 12, sorry.

1      (Jury exits, 3:16 p.m.)

2          COURT SECURITY OFFICER:  Please be seated.

3          THE COURT:  So Juror No. 12, when we pick a jury for

4   a criminal case, we seat alternate jurors.  That means we seat

5   more than we actually need.  And as you saw, the way this trial

6   played out, there's a reason we do that.

7          JUROR:  Right, right.

8          THE COURT:  And so we started with three alternates.

9   We are down to one alternate.  But you are the last remaining

10  alternate, so at this time you're not going to participate in

11  the deliberations.  I'm going to let you go home.  But

12  sometimes, even after a jury begins to deliberate, we have to

13  call the alternates back --

14         JUROR:  Okay.

15         THE COURT:  -- and they join the jury and the jury

16  begins their deliberations anew.  So I have to ask you to

17  continue to follow all of the instructions that I've been

18  giving throughout the case --

19         JUROR:  Okay.

20         THE COURT:  -- until Ms. Wiles calls you.

21         JUROR:  Okay.

22         THE COURT:  And so as soon as there is a verdict or

23  we need you to come back, either way, she will call you.

24         JUROR:  Okay.  Yes.

25         THE COURT:  It's very important that you not read,

1    watch, or listen to any news reports or conduct any research.

2    All the same rules apply until you hear from Ms. Wiles.

3             JUROR:  Yes, Your Honor.

4             THE COURT:  Now, in the event we don't end up calling

5    you back, on behalf of the lawyers and the parties and the

6    citizens of the Middle District of Florida, I want to thank you

7    very much for your time and your patience and your attention.

8    We are grateful to you for your jury service.

9             JUROR:  You're welcome.

10            THE COURT:  Leave your notepad there, and if you're

11   called back, Ms. Wiles will keep it.  We shred the notes,

12   nobody rereads them.

13            JUROR:  Okay.  That was my question, my notes.

14            THE COURT:  Yes, yes.  Oh, yes.  And on behalf of the

15   Court, Ms. Wiles is going to give you a Challenge coin from the

16   Middle District of Florida to thank you for your jury service.

17            JUROR:  And Your Honor, I'm free to go?

18            THE COURT:  Yes, sir.  Just walk through there, but

19   don't talk about anything.  Just let them know that you're an

20   alternate and you're going home.

21            JUROR:  Yes, Your Honor.

22            COURT SECURITY OFFICER:  All rise for the juror.

23        (Alternate juror excused.)

24            THE COURT:  All right.  At this time Ms. Wiles will

25   be -- that's why that big cart is out there.

1          COURTROOM DEPUTY:  Yes, Your Honor.

2          THE COURT:  I wondered.  It confused me.  I thought I

3    was in the wrong place.

4          Ms. Wiles will be taking the evidence, copies of the

5    jury instructions, and the redacted indictment back to the

6    jury.

7          I will ask you-all to go -- I think I'd like for you

8    to remain in the building and we'll see what they do.

9          I can tell you that my normal practice is that if we

10   have not heard from them by 5:30, my normal practice is at 5:30

11   to send them a note telling them that they can continue their

12   deliberations if they wish or they can come back tomorrow, they

13   just have to tell us.

14         So if we haven't heard from them by 5:30, do you have

15   any objection to me proceeding in that way, Ms. Taylor?

16         MS. TAYLOR:  No objection, Your Honor.

17         THE COURT:  Mr. King?

18         MR. KING:  No, Your Honor.

19         THE COURT:  Mr. Larosiere?

20         MR. LAROSIERE:  No, Your Honor.

21         THE COURT:  Okay.  So that's what I'll do.  If they

22   tell us they want to go home, what I do is I bring them in,

23   give them instructions about what they can and can't do over

24   the evening and when they need to report, and then send them

25   home.  And I will want you there for that.

1          MR. KING:  Your Honor, not leaving, but could we run

2  across the street, grab a coffee?

3          THE COURT:  Yes, yes.

4          We're in recess, awaiting the jury.

5          COURT SECURITY OFFICER:  All rise.

6      (Recess, 3:20 p.m. to 4:42 p.m.)

7      (All parties present.  Jury not present.)

8          COURT SECURITY OFFICER:  All rise.  This Honorable

9  Court is back in session.

10          Please be seated.

11          THE COURT:  So initially we got one note, and then

12  while we were waiting to get all of you back into the

13  courtroom, we got a second note.

14          The -- sorry.  Give me a moment.

15          All right.  So the first note is the one that starts

16  "Number 1" and reads, "For Counts Two through Eight where it

17  lists specific personal, I have question on wording.  The words

18  'transferring' versus 'aiding and abetting.'  Is the count for

19  Matt H. just transferring, just aiding and abetting, or both?"

20          And for purposes of the record, counsel have been

21  given copies of these notes.  And I'll attach that first note

22  as Court's Exhibit 1.

23      (Court's Exhibit 1 admitted.)

24          THE COURT:  The second note reads, "Ask about J.A.

25  order 12/23/20.  If he watched any of CRS Firearms video, did

1    he purchase through his link?"

2          That's Court's Exhibit Number 2.

3       (Court's Exhibit 2 admitted.)

4          THE COURT:  I think the easy answer -- the easy

5    question to answer is number 2, which is that -- something to

6    the effect of, "The jury has to rely on its own memories as to

7    the facts," or something like that.  But, I mean, that --

8    question number 2 is clearly asking the Court to tell the jury

9    facts, and that's not the role of the Court.  So I think we can

10   craft an answer to that one fairly easily.

11         Question number 1, which asks whether Mr. Hoover is

12   charged with transferring -- with just transferring, just

13   aiding and abetting, or both, I think he's charged with both,

14   but I'll hear from you as to your thoughts.

15         Let's start with question 1.

16         Ms. Taylor?

17         MS. TAYLOR:  Yes, Your Honor.  And I had a moment to

18   speak with Mr. King about both of these, and I think we're in

19   agreement that for number 1, yes, the answer is he's charged

20   with both.  I don't know if it makes sense at this point to

21   clarify that he's charged with both and you can find him guilty

22   based on transferring -- if you find he transferred, or he

23   aided and abetted the transfer, or if you find both of those

24   things.

25         With regard to 2, I agree it seems to be asking

1    essentially for additional evidence or for us to point out

2    where the evidence is, which we can't do.

3          The only further thought I had about question number

4    2 is whether we could identify who J.A. is, because obviously

5    the identity was masked in the indictment.  I said the name in

6    my closing, but -- but it may not be clear to the -- they may

7    not -- I don't know that they have another way of knowing who

8    "J.A." refers to.

9          THE COURT:  All right.  Let me hear from -- well,

10   Count -- the question in Count Two relates specifically to

11   Mr. Hoover, so who's speaking on behalf of Mr. Hoover for this

12   matter?  Mr. Larosiere?

13         MR. LAROSIERE:  Yes, Your Honor.

14         THE COURT:  And you can keep your seat,

15   Mr. Larosiere.

16         MR. LAROSIERE:  Okay.  Good.

17         So for question number 2 --

18         THE COURT:  No, I was starting with question number

19   1.

20         MR. LAROSIERE:  Okay.  So I do think the correct

21   answer is "both."  I don't think I agree on additional

22   instructions.  Perhaps the answer could be crafted by referring

23   them back to the jury instructions for those substantive acts,

24   which I think covers it pretty thoroughly.  But the short

25   answer is "both."

1          THE COURT:  Okay.  And since I'm hearing from you,

2    what about question 2?

3          MR. LAROSIERE:  I don't agree with unmasking J.A.

4    That evidence didn't come out at any point during the actual

5    evidence stage of the trial.  It's not the Court's place to

6    really place facts in.  And I don't know whether the Court even

7    could indicate that a specific link was never discussed.  But

8    that's -- I think those are all the thoughts we have on that

9    question.

10          THE COURT:  All right.

11          Mr. King, question 1 doesn't specifically refer to

12    Mr. Ervin, but I'll hear from you.

13          MR. KING:  Your Honor, I don't -- I would just adopt

14    Mr. Larosiere's answer with regard to that issue.

15          With regard to the second, we would request the Court

16    to instruct the jury that they have all of the evidence before

17    them and that they would have to rely on their memory and the

18    evidence that they have.

19          THE COURT:  All right.  So -- give me a moment.

20          All right.  Well, with regard to question number 2, I

21    think -- I understand your request, Ms. Taylor, but the

22    evidence is closed.  And if there is a piece of evidence that

23    the government did not introduce, I don't -- I don't think it's

24    appropriate for the Court to cure that at this point in time.

25    So I think that the answer -- the appropriate answer is

1   something to the effect of, "You have all of the evidence

2   before you.  You must determine your verdict based on the

3   evidence that you have received, applying my instructions on

4   the law."

5            Is that acceptable to the government?

6            MS. TAYLOR:  Yes, Your Honor.  And -- well, in

7   general, yes.  This isn't -- stating who the person is that's

8   in the indictment isn't an evidentiary matter.  The evidence

9   was presented.  I mean, the evidence is in about Mr. Acs'

10  purchase.  He's in the mail meter.  The order confirmation is

11  in there.  I --

12           THE COURT:  But what you're asking me to do is to

13  draw the lines for them that they apparently aren't drawing.

14           You're right, the mail meter is in there.  And if

15  they look at the transaction for December 23rd, they have --

16  they arguably have that evidence.  I don't think it's the

17  Court's role to clarify evidence for the jury.  They're asking

18  me facts, and I just don't think that I can do that.

19           MS. TAYLOR:  Yes, Your Honor.

20           THE COURT:  Let me . . .

21           So what I proposed was, "You have all the evidence

22  before you.  You must determine your verdict based on the

23  evidence that you received, applying my instructions on the

24  law."

25           Is that acceptable to Mr. Hoover?

1           MR. LAROSIERE:  Yes, Your Honor.

2           THE COURT:  And to Mr. King -- or to Mr. Ervin?

3           MR. KING:  Yes, Your Honor.

4           THE COURT:  Madam Deputy, do you have that for me?

5           COURTROOM DEPUTY:  Yes, Your Honor.

6           THE COURT:  If you'll print that.

7           And then going back to -- so with regard to question

8    1, I could instruct them -- I could respond by saying,

9    "Mr. Hoover is charged with both.  I refer you to my

10   instructions on the law."

11          I don't know that I need to say more than that.

12          Mr. Larosiere?

13          MR. LAROSIERE:  No objection, Your Honor.

14          THE COURT:  Mr. King?

15          MR. KING:  No objection, Your Honor.

16          THE COURT:  Ms. Taylor?

17          MS. TAYLOR:  May I have just a moment, Your Honor?

18          THE COURT:  Certainly.

19      (Government counsel confer.)

20          MS. TAYLOR:  We have no concerns about the Court's

21   proposed response, Your Honor.

22          THE COURT:  Okay.  So Madam Deputy, could you put

23   those both on the same page and identify the first as question

24   1 and the second as question 2.

25          COURTROOM DEPUTY:  (Complies.)

1           THE COURT:  Madam Deputy, could you reprint that?
2   Could you reprint that?  I misspelled my own name.
3           All right.  We will send this back.  I'll ask the
4   court security officer to make sure to ask the jury to retain
5   the notes.
6           It is almost five o'clock.  As I told you-all, at
7   5:30 I'm going to send back a note giving them the option of
8   continuing or going home.  Because, as I told you, if they
9   decide to go home, I'll need you immediately, when we recess in
10  a moment, I'm going to ask you not to go -- not to leave the
11  building.  So stay in the building.  You can go to an
12  attorney's conference room or whatever, but I don't want to
13  have -- if they tell me they want to go home, I don't want to
14  keep them waiting to regather everybody.
15          I did want to just tell you-all that I thought you --
16  that I thought y'all tried a fine case and you should
17  certainly -- I can tell that everybody put a lot of hard work
18  into it, and you were very prepared and I appreciate that.  And
19  I'm going to come down and I'm going to shake your hands now,
20  while -- oh, thank you, yes.
21          So I've never had PowerPoint presentations play
22  videos quite so prominently in a closing, and in particular in
23  the way that you-all did it, where you didn't identify what the
24  exhibit was or what portion was played.  And so in an abundance
25  of caution, and knowing that one of the jobs of a trial judge

1   is to make sure there is a proper record, I'm going to require

2   you-all to submit your PowerPoints so that we can include them

3   on the record so that if there's any question as to what the

4   arguments were on closing, what was played -- Ms. Healey was

5   taking it down, but they were rather fast.  And the court

6   reporters don't usually take down video.  When it's video, we

7   just play it.  So in an abundance of caution, I'm going to

8   include your PowerPoints in the record so that we know exactly

9   what was -- what was shown.

10          So with that, I'm going to come thank you-all for

11  trying a fine case and then I'll let you be in recess until

12  Ms. Wiles calls you back.

13      (Recess, 4:58 p.m. to 5:37 p.m.)

14      (All parties present.  Jury not present.)

15          COURT SECURITY OFFICER:  All rise.  This Honorable

16  court is back in session.

17          Please be seated.

18          THE COURT:  I sent the jury a note, which will be

19  Court's 3.  What did we make the answer?

20      (Court's Exhibit 3 admitted.)

21          COURTROOM DEPUTY:  I was going to attach the answer

22  to the questions.  I was just going to copy it for each one.

23          THE COURT:  Okay.  So Court's 3, it says -- this is

24  the note I sent, "Ladies and gentlemen, you may continue to

25  deliberate this evening if you wish to do so.  However, if you

1    would prefer to go home and return tomorrow morning to continue

2    your deliberations, you may do that as well.  The choice is

3    yours.

4            "If you wish to go home, please send me a note

5    telling me that so that I can give you further instructions.

6            "Signed, Judge Howard."

7            And they wrote a note that says, "We, the Jury, have

8    decided that we will go home now and return tomorrow morning to

9    continue."

10           So we'll bring them in and I will give them

11   instructions.  I'm going to tell them to be here at 9 a.m.  I

12   will tell them that they don't have to come into the courtroom,

13   that as soon as all of their number have arrived, they can

14   simply begin their deliberations.

15           And so let me bring them in, tell them that, and then

16   I'll give you-all further instructions as well.

17           Let's have the jury, please.

18           COURT SECURITY OFFICER:  All rise for the jury.

19       (Jury enters, 5:39 p.m.)

20           COURT SECURITY OFFICER:  Please be seated.

21           THE COURT:  All right, ladies and gentlemen.  I

22   understand that you are ready to go home for the evening, and

23   that's perfectly fine, but, of course, there are rules and

24   instructions that I have to give you about your conduct over

25   the evening.

1          You have begun your deliberations, and it's very

2    important that you not talk -- that you continue to follow all

3    of the rules I told you about.  So if there's a question that

4    has been unanswered at this point, you absolutely cannot go

5    look for information about it.  Please don't look for or watch

6    or read any media reports, whether on the internet or anywhere

7    else.

8          You may be tempted to ask a family member or a friend

9    who you trust their opinion.  You absolutely cannot do that.

10   That would be a violation of your oath as jurors, and it would

11   deny the -- it would deny the right to a fair trial.  So please

12   continue to follow all of the instructions that I've given to

13   you until tomorrow morning.

14         I'll ask you to be back here at 9 a.m. tomorrow

15   morning.  And go straight to the jury room.  You can't start

16   talking about the case until all 12 of you have arrived.  So if

17   somebody is running late, you just have to wait.  Once all 12

18   of you have arrived, then, and only then, you restart your

19   deliberations.  And you don't have to come in and tell us, just

20   when all 12 of you are there, you start again.  And we will

21   wait until we hear from you.

22         Do all of you understand those instructions?

23         JURY:  Yes.

24         THE COURT:  Can all of you assure me you'll follow

25   those instructions?

1           JURY:  Yes.

2           THE COURT:  All right.  Have a great evening and we

3    will hear from you tomorrow.

4           COURT SECURITY OFFICER:  All rise for the jury.

5        (Jury exits the courtroom, 5:42 p.m.)

6           COURT SECURITY OFFICER:  Please be seated.

7           THE COURT:  All right.  So the jury has to be back at

8    9, so I'd like everybody back at the courthouse at 9 tomorrow

9    morning, that way if they have a question or if anything comes

10   up we don't have to keep them waiting.  And it is often the

11   case when a jury goes out at night that we do hear from them

12   pretty quickly in the morning, either because it's a question

13   that they want to ask or something else.  So please be here --

14   please be available in the courthouse tomorrow morning at

15   9 a.m.

16          I don't think there's anything else to address.

17          Madam Deputy, am I forgetting anything?

18          COURTROOM DEPUTY:  No, Your Honor.

19          THE COURT:  Okay.  Then you-all have a nice evening

20   and I will see you in the morning.

21          COURT SECURITY OFFICER:  All rise.

22       (Proceedings adjourned at 5:43 p.m., to be continued on

23   Friday, April 21, 2023.)

24                        -    -    -

25

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3   UNITED STATES DISTRICT COURT)

4   MIDDLE DISTRICT OF FLORIDA )

5

6        I hereby certify that the foregoing transcript is a true

7   and correct computer-aided transcription of my stenotype notes

8   taken at the time and place indicated herein.

9

10        DATED this 29th day of May, 2023.

11

12                         /s/ Katharine M. Healey
                           Katharine M. Healey, RMR, CRR, FPR-C
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25