UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                    CASE NO. 3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT OF ACQUITTAL**

Trial in this matter commenced on April 10, 2023, and concluded with the return of guilty verdicts as to all charges for Ervin, and most charges as to Hoover, on April 21, 2023.   Docs. 246, 263, 264.   After the close of the evidence, on April 19, 2023, defendants made their *ore tenus* motions for judgment of acquittal.   Doc. 283 at 232-36.   The government responded, and this Court took the motions under advisement.   *Id.*   After the return of the guilty verdicts, the defendants renewed their motions on April 21, 2023.   Doc. 285 at 20.   This Court denied the motions, stating it was "convinced that the government did present sufficient evidence as to each charge and each defendant to submit each charge to the jury for its consideration."   *Id.*   Hoover's written motion (Doc. 274), which was adopted by Ervin (Doc. 273), was filed on May 19, 2023.   This response follows.

In their motion, defendants make up "facts" to suit their argument, invent quotes that exist nowhere in the trial transcript, and ignore the testimony and evidence presented at trial whenever it is inconvenient to them.   This Court should again reject their motion under Rule 29 for a judgment of acquittal.

## MEMORANDUM[1]

I.   **The government presented sufficient facts to support the jury's verdict, including by demonstrating that the Auto Key Card was a combination of parts designed and intended for converting a weapon into a machinegun.**

Defendants continue to press their already-rejected argument that because the Auto Key Card contained the two pieces of a lightning link engraved onto a single piece of metal that "no reasonable trier of fact could have found the items here at issue to be a 'combination of parts.'"   Doc. 274 at 3.   They imply that this Court was skeptical of the government's prosecution theory that the Auto Key Card was a combination of parts, asserting that "the Court expressed hesitation that it did not want to assert that a single 'object' could not be 'multiple parts.'"   Doc. 274 at 9. This mischaracterizes the discussion of defendants' proposed jury instruction.   In reality, defendants' proposal, if given, would have instructed that if the defendants transferred a single object or part, the jury should acquit them.   Doc. 232 at 28; Doc.

---

[1]   Counsel for the government raised several specific inaccuracies in the motion in an email to Mr. Larosiere, Mr. Zermay, and Mr. King on June 5, 2023, and requested that they let her know if they intended to correct their motions.   Mr. King and Mr. Larosiere both indicated that any errors were due to their reliance on notes and memory in drafting the motions and that their clients could not afford to order transcripts.

The undersigned inquired again on June 6, 2023, whether defendants planned to correct their motions, and pointed out that, since the end of trial, more than $29,000 had been raised online to benefit Hoover and just under $5000 had been raised to benefit Ervin, including for the purpose of helping with legal fees/expenses, and it was therefore not credible that defendants could not afford to order transcripts.   Mr. King did not respond.

On June 8, 2023, Mr. Larosiere stated that "if there is a page or paragraph [of the trial transcript] with a real and actual misrepresentation you can share with me, I'm happy to address it.   That said, from this standpoint, I don't think the issues you raised are material and necessitate an amendment."   It is defendants' obligation to order the transcripts for themselves and their attorneys' ethical duty to ensure that the representations they make to this Court are accurate.

234 at 31; Doc. 283 at 16-18.   After considering defendants' proposed instruction, the Court stated: "The problem I have with that is I find it to be confusing because the defendants can have transferred a singular item . . . .   It's still up to the jury to decide whether that singular item that was transferred constitutes a combination of parts."   *Id.* at 20.   The Court explained that the proposal "which suggests that it has to be one or the other, is misleading."   *Id.*; *see also id.* at 20-28 (the Court repeatedly characterizing defendants' requested instruction as "confusing" and "misleading").   Ultimately, this Court declined to give defendants' requested instruction.

What was obvious to the Court – that a single object can be a combination of parts – was apparently also obvious to the jury because it unanimously rejected defendants' arguments that a "single chunk of steel" could not be a combination of parts.   *See* Doc. 284 at 80, 96-97 (Mr. Larosiere arguing).

Moreover, and contrary to defendants' assertion that the government "forcefully fought against all attempts to delineate what 'parts' were 'in' the Auto Key Card" (Doc. 274 at 7), the government presented testimony at trial about exactly what those parts were, how long it took Officer Toy to cut them from the Auto Key Card, what method he used to cut them out, and how he tested them to verify that they worked to convert an AR-15 into a machinegun.   For example, Officer Toy testified that the Auto Key Card contained etchings for "the two parts that would be needed to make a lightning link."   Doc. 283 at 141.   Officer Toy identified the two pieces of a lightning link in a diagram that defendant Hoover had displayed in one of his videos showing how the two pieces would fit into an AR-15.   *Id.* at 143-44

3

(Officer Toy testifying "[w]hat you're looking at is the internal components of an AR-15-type firearm.   With those components, there's also a lightning link that is depicted in there."); *id.* at 144 (Officer Toy testifying that the larger piece of the lightning link with the two internal cut-outs is the "main body of the device" and the small piece is "the paddle or the connector"); *id.* at 144-45 (Officer Toy describing the main fire control components of an AR-15 and how the lightning link works). Officer Toy testified that he used a common, off-the-shelf Dremel tool to cut both pieces of a lightning link out of an Auto Key Card, and that it took him "approximately 37 minutes" – another fact that defendants fudge in their motion. Doc. 283 at 150; *compare with* Doc. 274 at 7 (defendants claiming that Officer Toy "performed about an hour of transformative labor upon the Auto Key Card").

According to defendants' made-up facts, the government "simply wax[ed] over the critical statutory distinction between a 'part' and 'combination of parts' and [told] the jury, quite literally, not to 'worry' about it."   Doc. 274 at 7.   To be clear: that quote is nowhere in the transcript because that *never happened*.   Rather, consistent with the evidence and the charges, the government argued – and the jury accepted – that the Auto Key Card was a combination of parts designed and intended for converting a weapon into a machinegun.

## II.    The evidence that defendant Hoover knew the Auto Key Card was a machinegun conversion device was overwhelming.

Defendants submit that the evidence was insufficient to show that Hoover knew what the Auto Key Card was because his YouTube videos show "it is manifest

that [Hoover] believed the Auto Key Card to be completely lawful unless cut out and manufactured into a machinegun." *Id.* at 10; *see also id.* at 12-13.   This argument misses the mark.   It is irrelevant whether or not Hoover believed the Auto Key Card to be legal; what is required is that he knew it was a machinegun conversion device. *See* Doc. 262 at 2 (jury instruction that defendant must have known "of the specific characteristics of features of the firearm that made it subject to registration").

The reality is this: Hoover's videos plainly demonstrate that he knew the Auto Key Card was a combination of parts designed and intended to convert a weapon into a machinegun and – although this was not an element of the crime – that it was illegal.   For example, in Hoover's first advertising video, Hoover begins by holding up multiple Auto Key Cards and calling them lightning links, as seen below:



"Is this An ATF Trap And How Does It Work," Trial Ex. 1 & 1a.   Hoover then discusses different methods of legally accessing machineguns.   Then, Hoover discusses his sixth category, which is the "zero fucks given" category, and states:

> This would apply to a prohibited person because a
> prohibited person – when they say you can't have gun rights
> anymore, that doesn't mean you can't have guns.   What
> that means is your chains have been broken.   You can do
> whatever the hell you want with a gun.   You can drill your
> third hole.   .  .  .   If you get caught with the gun anyway,
> you're already screwed.   So why not do whatever you want
> with it.   You make a machine gun.   This next person that
> this would classify to is any single male under the age of 30.

*Id.*   Hoover once again holds up an Auto Key Card and notes that although he

thinks it would be "ridiculous," he believed ATF would view it as a machinegun.

*Id.*   Hoover then discusses multiple ways of converting a firearm into a machinegun.

*Id.*   One of these methods is the Auto Key Card.   *Id.*   Hoover uses an intact Auto Key

Key Card to demonstrate how it interacts with the internal fire control components

of an AR-15 and discusses how the AR-15 would need to be configured to work with

"the lightning link" – which is how he refers to the Auto Key Card throughout the

video.   *Id.*   Hoover – while still holding the Auto Key Card – states "[t]hese are

awesome because they're stupid cheap.   You could drop it in your rifle – or, you

know, if you're actually gonna do this legally, this is just a bottle opener."   *Id.*

Hoover begins his second advertising video with the question: "So what are

kind – some of the very affordable, easy-to-do modifications for you to make your

very own machine gun or silencer?"   "The Parts the ATF Wishes Never Existed,"

Trial Ex. 2 & 2a.   Hoover, again holding an Auto Key Card, compares it to "the old

Lightning Links that did cause problems," which he states were "100% cut out."   *Id.*

Hoover displays an image of "the old Lightning Links," which were *not* fully cut out

– they were part of a single piece of sheet metal:

6



*Id.*   Hoover, continuing to hold the Auto Key Card, states:   "This is just a drawing on a piece of stainless steel.   . . . .   YOU have to manufacture it.   But one of the cool things about the lightning link – now these are designed for Colt SP1s or SP1 style bolt carriers.   You can drop them in your receiver, scratch your full auto itch, throw it away when you're done.   No one's the wiser."   *Id.*

It is crystal clear that Hoover knew the Auto Key Card was a machinegun conversion device.   Had Hoover truly been unsure of whether ATF would view it as such, he could have consulted with ATF and obtained their opinion, potentially avoiding criminal liability.   There is no evidence that he (or Ervin) ever did so.

## III.  The evidence was also overwhelming that Ervin knew the Auto Key Card was designed and intended to be a machinegun conversion device.

The government also presented overwhelming evidence of Ervin's intent in manufacturing and transferring the Auto Key Card.   This included Ervin's advertising videos showing images of the Auto Key Card interspersed with video

7

clips of people firing machineguns and the machinegun fish video.   Trial Ex. 49(c),
49(a).[2]   Ervin informed customers by email that "[a]ll NFA rules apply" to the Auto
Key Card and suggested search terms to locate instructions for the Auto Key Card,
including "lightning" and "link," and advising "as with many legal products, illegal
use can occur."   Trial Ex. 67e, 67f.   Ervin also sent email blasts advertising his
"New 30% Thicker Cards," that were "to scale" and "durable."   Trial Ex. 67j, 67g.

That the lightning link pieces were correctly scaled is further demonstrated by
the fact that Officer Toy was able to cut along the etched line, removing the pieces of
the lightning link from the card, and then insert them into a semi-automatic AR-15
with off-the-shelf parts, and the weapon fired more than one shot with a single pull of
the trigger.   Defendants assert that Officer Toy "re-contour[ed]" the paddle (which is
the smaller of the two pieces of the lightning link), implying a major diversion from
the etched line.[3]   Doc. 274 at 8.   Once again, defendants seek to mislead by
mischaracterizing the testimony and evidence at trial.   In reality, Officer Toy cut
along the etched line on the Auto Key Card.   Doc. 283 at 150-51.   As part of the
hand-fitting process, Officer Toy removed "about a millimeter or less" of material
from the end of one of the two pieces (the paddle) so that he could get the upper
receiver to close with the lightning link installed.   *Id.* at 151, 152.   He did not bend
or thin the material.   *Id.* at 151-52.   That the pieces were cut to the line was visually

---

[2]      Hoover now complains the machinegun fish video "substantially prejudiced" him
although he did not object to its admission.   Doc. 279 at 120.

[3]      Defendants purport to quote Officer Toy referring to the paddle "as a 'flap'" (Doc.
274 at 8); Officer Toy never used that word.   *See* Doc. 283 at 136-229.

demonstrated to the jury through use of the courtroom projector by placing the pieces Officer Toy cut out over an intact etching on an Auto Key Card.   *Id.* at 152. The jury was fully apprised of how Officer Toy cut the pieces out, defendants argued that the removal of less than a millimeter of material from one end of one of the pieces should result in an acquittal, and the jury, exercising common sense, rejected that argument.

Additionally, Officer Toy demonstrated to the jury that the Auto Key Card worked as a machinegun conversion device when installed in a semi-automatic rifle. During one of the test fires, Officer Toy created a video in which he demonstrated that the lightning link cut from an Auto Key Card could be installed in an AR-15 in a matter of seconds by dropping it in.   Doc. 283 at 166; Trial Ex. 63.   The otherwise semi-automatic rifle then fired all of the ammunition in its magazine with a single pull of the trigger.   Doc. 283 at 167; Trial Ex. 63.   Officer Toy also testified that he brought the same rifle to Jacksonville to conduct a test-fire, and that on that occasion, the rifle worked with the lightning link pieces from an Auto Key Card installed using both an M16 bolt carrier and an SP1 bolt carrier that was provided to Officer Toy by an individual attending the demonstration.   Doc. 283 at 168.

Defendants also – falsely – claim that the parts cut from an Auto Key Card "did not even function as the type of machinegun conversion device the government alleged it to be."   Doc. 274 at 9.   Defendants do not further articulate this argument, but presumably are rehashing the argument that Mr. King repeatedly pressed in closing that the device "is only a lightning link if it works in the SP1 bolt

carrier" (Doc. 284 at 125) and that "[i]t did not work with an SP1 bolt carrier" (*id.* at

126). *See also id.* at 127 (same), 129 (same), 131 (same), 133 (same), 140 (same), and

165 (same).   As noted above, the lightning link cut from an Auto Key Card *did* work

with an SP1 bolt carrier, as demonstrated during the Jacksonville test fire.   But even

if it had only worked with some other bolt carrier, it would still be a machinegun

conversion device because it converted a semi-automatic rifle to fire more than one

shot with a single function of the trigger.   *See* 26 U.S.C. § 5845(b) ("The term

'machinegun' . . . . shall also include . . . [any] combination of parts designed and

intended, for use in converting a weapon into a machinegun.").

Defendants assert that "one of the government's substantive act witnesses –

who claimed to work at a tool and die shop – testified that when cut precisely to the

lines, he could not get the resulting parts to function."   Doc. 274 at 8.   Although he

was *not* one of the substantive count witnesses, the government assumes that

defendants were intending to refer to Richard Roberts.   According to an email

Roberts sent to Ervin, which was entered into evidence, he owns a tooling shop.

Trial Ex. 67aaa.   Roberts testified at trial that his shop deals with plastics.   Doc.

282 at 104.   According to Roberts's testimony, he did not cut his Auto Key Card,

but rather was given a similar device by mysterious men he encountered on "a

desolate road" who were "shooting automatic rifles."   *Id.* at 111.   Roberts testified

that these men gave him an already cut out device that looked like the design on the

Auto Key Card, told him it did not work, and that he then cut that piece along the

line of the Auto Key Card he had purchased.   *Id.* at 112.   Roberts testified that he is

10

not familiar with the internal parts of an AR-15, does not know what an SP1 bolt carrier is, and does not know what a "high shelf" and "low shelf" are.   *Id.* at 113. Roberts also testified that he later "cut it up and threw it out the window into a county ditch in little pieces."   *Id.* at 114.

Based on this testimony, defendants ask this Court to overturn the jury's verdict, arguing that Mr. Roberts's testimony "proved" that the Auto Key Card would not work "if cut along the lines."   Doc. 274 at 8.   It is clear from the testimony at trial that a lightning link is not a one-size-fits-all conversion device; whether or not it will work depends on how a particular rifle is configured.   Doc. 283 at 157 (Officer Toy describing that different types of conversion devices work with different configurations of AR-15 type rifles).   Because Mr. Roberts destroyed whatever items he had once possessed, there is no way to verify whether Mr. Roberts cut precisely to the line or not, and if he did, whether the device might have worked with a properly configured rifle.   To suggest that the jury's will should be overcome because of this testimony is absurd.

Defendants assert that Ervin requested that the machine shop manufacturing the Auto Key Card for him copy the digital drawing onto stainless steel "*only to the extent that* the image could not be wiped off of it."   Doc. 274 at 6 (emphasis in original).   Defendants do not cite to the record to identify where they believe this testimony could be found, and the undersigned was unable to find it.   One of the machine shop employees testified that there is a method for doing "just basically an oxidation burn over the material that you could . . . potentially smudge off or wipe

11

off," which was not the method used for the Auto Key Card.   Doc. 280 at 64.

Later, that same machine shop employee testified that Ervin "wanted it deep enough

that the lines would stay on the card" after Ervin resurfaced/polished the cards *with a*

*belt sander*.   *Id.* at 41, 71.   He also testified that the shop "spent a lot of time kind of

dialing in this deep etch" for Ervin.   *Id.* at 73.   In any event, defendants do not

articulate why the depth of the etching (or purported lack thereof) shows that the

Auto Key Card was "art" and not a source of machinegun parts – which was how

Hoover characterized it in "Response video To Johnny B's Auto Key Card Video."

Trial. Ex. 14 & 14a.

## IV.   The evidence demonstrated that Ervin and Hoover conspired to transfer unregistered machinegun conversion devices.

Defendants obliquely suggest that, perhaps, Hoover was "swept into the

conspiratorial net" by accident.   Doc. 274 at 11-13.   According to defendants,

Hoover merely "talk[ed] about a card with a drawing on it" and had no reason to

believe this could be criminal.   *Id.* at 21.   First, to characterize what Hoover did as

"talking about a card with a drawing on it" is an incredible understatement of what

the evidence showed was Hoover's role in the conspiracy.   The government proved

that Hoover and Ervin were in regular contact with one another (Trial Summary Ex.

100), that Ervin mailed multiple packages to Hoover as part of the conspiracy – some

of them containing cash payments or luxury goods to compensate Hoover for his

Auto Key Card advertisements (Trial Ex. 49q, 52, 53 at 185, 71), that Ervin

attributed his success in selling Auto Key Cards to Hoover, who he referred to as

"one hell of a salesman," (Trial Ex. 53 at 185), and that Hoover's videos correlated with a substantial increase in Ervin's sales, as shown below (Trial Ex. 117):



Finally, Hoover outlined his agreement with Ervin to be paid for advertising the Auto Key Card in "The ATF Wants To Know" (Trial Ex. 16 & 16a) and described in "The Meaning Of This Very Romantic Statement" (Trial Ex. 15 & 15a) how he intended to support Ervin's open non-compliance with the law.   There is no question that Hoover was all in on this conspiracy.

## V.   There was no constructive amendment of the indictment.

Defendants argue that "this case reflects the compounded danger 'when the grand jury indicts on one theory of the illegal conduct, but the government prosecutes the case on an entirely different theory," citing *United States v. Chandler*, 388 F.3d 796, 798 (11th Cir. 2004).   Doc. 274 at 11.   In support of their argument,

defendants allege that "[t]he government originally indicted Defendant using the 'part' definition, but over the course of several superseding indictments, shifted strategy to a 'combination of parts.'"   *Id.*   Once again, because the facts do not support defendants' arguments, they have invented their own facts.

The reality is that the indictments have included "combination of parts" from the very beginning.   In the original indictment, the government incorporated *all* definitions of a machinegun under 26 U.S.C. §§ 5845(a) and (b) (which includes "part" and "combination of parts" as well as other categories of machineguns) by reference.   Doc. 17.   In the Superseding Indictment, the government narrowed the scope by specifying that the transferred items were "machinegun conversion devices," again incorporating the definitions in 26 U.S.C. § 5845(a) and (b) (i.e., incorporating both "part" and "combination of parts").   Doc. 25.   The Second Superseding Indictment contained the same definitional language as the First Superseding Indictment.   Doc. 57.   In the Third Superseding Indictment, the government again *narrowed* its prosecution theory by specifying that the subject devices were "a combination of parts," making clear the exact sub-definition on which the prosecution relied.   Doc. 120.   The Fourth Superseding Indictment used the same language.   Doc. 204.

Defendants' representation to this Court that the prosecution theory "shifted" from "part" to "combination of parts" is, simply, unfounded.   The Auto Key Card was alleged to be a "combination of parts" from the first indictment and throughout the case.   Moreover, the suggestion that there was a variance in proof at trial as

14

compared to the theory in the indictment is also completely baseless.   The only parties arguing that the Auto Key Card was a single "part" at trial were the defendants.

## VI.   The relevant statutes are not unconstitutionally vague as applied to these defendants.

Hoover advances a mishmash of legal theories for close to a dozen pages in support of his motion.   Doc. 274 at 9-21.   Several of those arguments have already been rejected by the Court, have nothing to do with whether there were sufficient facts presented at trial for the jury to convict, and/or are wholly irrelevant.   For example, the defendant again argues that the Auto Key Card was an unregulated "tchotchke," citing *United States v. Prince*, No. 09-10008-JTM, 2009 WL 1875709, (D. Kan. June 26, 2009), *rev'd*, 593 F.3d 1178 (10th Cir. 2010)).   This Court already addressed and rejected similar arguments when denying the motions to dismiss in this case, noting during the hearing on defendant Ervin's motion that "reliance on that, the *Prince* case . . . is really not persuasive for a myriad of reasons."   Doc. 48 at 14.   The defendant also argues about what is required to "prove an illegal attempt," even though no attempted transfers were charged in this case.   Doc. 274 at 12-13.

Defendant Hoover's most relevant legal arguments are an "as-applied" vagueness challenge to 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2.   The Eleventh Circuit has held that "[v]oid for vagueness 'means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed.'"   *United States v. Duran*, 596 F.3d 1283, 1290

(11th Cir. 2010) (quoting *United States v. Nat'l Dairy Prods. Corp.,* 372 U.S. 29, 32–33 (1963)).   Statutes are not "'automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language,' and there is a strong presumption supporting the constitutionality of legislation."   *Id.* (quoting *Nat'l Dairy Prods. Corp.*, 372 U.S. at 32).   Ignorance of the law or a mistake of law are not defenses to criminal prosecution.   *United States v. Nelson*, 712 F.3d 498, 504 (11th Cir. 2013).

Hoover and Ervin made similar vagueness arguments in their motions to dismiss, and the United States incorporates its previous responses.   *See* Doc. 35 at 8-10; Doc. 138 at 4-5.   At the hearing addressing Ervin's motion to dismiss, the Court found that this same argument was not meritorious based on binding case law. Doc. 48 at 15.   The Court also rejected the vagueness issue in its Order denying Hoover's motions to dismiss, but observed that an "as applied" vagueness challenge should "'properly be raised through a Rule 29 motion for judgment of acquittal, when the Court can assess whether a reasonable person would have understood that the conduct adduced to prove the offenses was prohibited.'"   Doc. 141 at 27 (quoting *United States v. Ferguson*, 142 F. Supp. 2d 1350, 1355 (S.D. Fla. 2000)).

The Court noted, however, that Hoover's vagueness argument was fundamentally flawed.   Doc. 132 at 15.   The Court first found that this argument did not explain how the ordinary meaning of the statute's language failed to put Hoover on notice that his conduct was prohibited.   Doc. 141 at 22-23.   Second, the Court found that Hoover was improperly characterizing an argument that the Auto

16

Key Card fell outside the statutory definition of machinegun in § 5845(b) as "vagueness," and made clear that whether or not the Auto Key Card was a machinegun conversion device was a question of fact for the jury.   Doc. 141 at 23-26.   The Court also noted that "many circuit courts that have addressed vagueness challenges to the language in § 5845(b) have found the statute to be constitutional." Doc. 141 at 22-23 n.10 (collecting cases).

In the instant motion, Hoover argues again that a "reasonably intelligent person" would not foresee that the conduct charged—which he mischaracterizes as "talking about a card with a drawing on it"—could be criminal, "much less that a homogenous [sic] piece of steel with a drawing on it would be deemed a combination of parts."   Doc. 274 at 21.   Again echoing his motion to dismiss, Hoover further states that he "had no reason to believe, at any point, that he would be engaging in criminal conduct if—as alleged—he entered into an agreement with a tchotchke salesman to discuss stainless steel cards with a design on them on his YouTube channel."[4]   Doc. 274 at 21.

This argument fails in this Rule 29 motion for the same reasons set forth by the Court at the motion to dismiss stage:   there is nothing vague about the definition

---

[4]      Though irrelevant to the issue of whether the relevant statutes are void for vagueness, the defendant's description of his conduct as "talking about" or "entering into an agreement . . . to discuss" the Auto Key Card are, of course, incomplete.   Hoover agreed to pump sales of the Auto Key Card by advertising the product on his YouTube channel as an illegal, "zero fucks given" means of converting an AR-15 into a machinegun, in exchange for payments by Ervin.   He instructed viewers how to cut the lightning link out of the Auto Key Card, and install it into an AR-15.   *See* Trial Ex. 1.   Calling it "talking" and "discussing" is a fruitless attempt to whitewash the conduct.

of machinegun in 26 U.S.C. § 5845(b), including that it encompasses a "combination of parts designed and intended, for use in converting a weapon into a machinegun." The defendant never clearly states, at any point, what is vague about this statute. There is no question that Hoover was aware of what a lightning link was and the law restricting them,[5] because he discussed his beliefs about it—repeatedly, and at length—in the videos introduced at trial.   Nor does the defendant ever address the binding precedent in this Circuit which forecloses his argument.   *See United States v. Campbell*, 427 F.2d 892, 893 (5th Cir. 1970) ("The main thrust of the appellant's defense and his argument on appeal is that the language 'any combination of parts designed and intended for use in converting a weapon into a machine gun' is unconstitutionally vague. We find nothing . . . to sustain the position of the appellant that the language quoted is not sufficiently clear to put any person of reasonable intelligence on notice as to what is forbidden.")

Hoover's argument falls in on itself on page 19, where he avers that the government "has conclusively demonstrated that the Auto Key Cards are not machinegun conversions [sic] devices as a matter of law because as pled in the

---

[5]      As discussed above, the evidence at trial made clear that Ervin was equally aware of the law regarding machinegun conversion devices.   Among other things, he sent emails to purchasers referencing "NFA rules" and the "gray market" status of the Auto Key Card. *See* Trial Exs. 67e, 67f, 67h.   He watched Hoover's videos discussing the Auto Key Card being a lightning link, sent them to his father and Ms. Wolfe, and remarked on their effect on his sales.   Trial Exs. 59, 60.   When Ms. Wolfe asked Ervin "what would happen if the ATF found a gun with your product and traced it back to you," Ervin replied, "Not my responsibility.   I have individual responsibility for myself, not others.   That person should have a problem.   I sell a piece of metal.   If someone turns it into something illegal it's there [sic] ass."   Trial Ex. 59.   This and other evidence at trial all demonstrated that defendant Ervin was also aware of the law and its implications for his product.

Indictment, the Auto Key Card cannot possibly even be a 'part,' much less 'parts' beyond a reasonable doubt."   Doc. 274 at 19-20.   Indeed, defendants discuss at length the "plain and ordinary language" of the word "part," as used in "combination of parts."   Doc. 274 at 20.   Hoover states that the statute "refers, quite simply, to something that *is* a *combination of parts*."   Doc. 274 at 20-21 (emphasis in original).   The defendant, however, cannot simultaneously believe that a statute is vague, but also that the statute is "quite simpl[e]," and that evidence adduced at trial proved "conclusively" that he is not guilty under its plain language.

Ultimately, nothing has changed:   Hoover's argument is not that any of the relevant statutes are vague, but rather it is simply that he (still) does not believe the Auto Key Card is a combination of parts.   Astonishingly, Hoover maintains in several places that the jury was not entitled to serve as factfinder and apply the law as instructed.   *See* Doc. 274 at 10 ("It is not for the jury to decide where the line is drawn – that is Congress's role alone.   The jury does not, and cannot serve as a legislative sub-assembly to define terms of law."); Doc. 274 at 19 ("While the government pawned off on the jury the question of where to draw the line, that is not – and cannot – be their job, and the government cannot be allowed to unload its failure to prove its case on the jury.").   This contention is substantively identical to that of the defendant in *United States v. Jimenez*, 191 F. Supp. 3d 1038, 1040 (N.D. Cal. 2016), which the Court addressed at length in its Order denying the motions to dismiss.   Doc. 141 at 23-25.   Hoover's quibble, therefore, is not with the statute, but with the American criminal jury trial system.   As the Court previously found,

whether the Auto Key Card was a machinegun conversion device was a question of fact for the jury based on the evidence.   All that the jury was asked to do in this case was to determine whether the facts and evidence presented to them demonstrated that the defendants committed the crimes alleged in the indictment – all of which were charged mirroring the statutory language of the National Firearms Act.   For most counts, the jury's unanimous answer to that question was "yes."

## **CONCLUSION**

The evidence of guilt at trial was overwhelming.   This Court should deny the Motion.

Respectfully submitted,

ROGER B. HANDBERG
United States Attorney

By:      _s/ Laura Cofer Taylor_____
LAURA COFER TAYLOR
Assistant United States Attorney
USA No. 170
E-mail: Laura.C.Taylor@usdoj.gov

DAVID B. MESROBIAN
Assistant United States Attorney
USA No. 188
E-mail: David.Mesrobian@usdoj.gov

300 N. Hogan Street, Suite 700
Jacksonville, Florida 32202
Telephone:   (904) 301-6300
Facsimile:    (904) 301-6310

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 16, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Zachary Zermay
Matthew Larosiere
*Counsel for defendant Matthew Raymond Hoover*

Alex King
*Counsel for defendant Kristopher Justinboyer Ervin*


<u>*s/ Laura Cofer Taylor*</u>
LAURA COFER TAYLOR
Assistant United States Attorney