UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                        Case No:        3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
_____/

**SENTENCING MEMORANDUM**
**AND**
**INCORPORATED MEMORANDUM OF LAW**

COMES NOW the Defendant, Kristopher J. Ervin, by and through his undersigned counsel, and hereby files this Sentencing Memorandum and Incorporated Memorandum of Law, and in support thereof, states as follows:

A.      Introduction – Background on Kristopher J. Ervin

1.      Family Background

Mr. Ervin is 43 years of age.  He was born in Jacksonville, Florida, and has resided in the Jacksonville area, all but three years of his life.  PSI at ¶78.  Mr. Ervin's parents are Kris and Karen Ervin.  His father resides in Orange Park and is employed as a project manager.  His mother died in 2017.  Prior to her passing, Mr. Ervin was her caretaker for approximately four years.  PSI at ¶79.  Mr. Ervin's parents were married for 43 years before his mother's death. PSI at ¶81. Mr. Ervin had a good upbringing and was raised in a caring and loving family.

Mr. Ervin has one brother and one sister.  His brother, Jonathan Ervin, is employed with the Jacksonville Sheriff's Office.  His sister, Kristen Ervin, is a corporate trainer in Orange Park. PSI at ¶80.  Mr. Ervin has a healthy relationship with his father and siblings.

Mr. Ervin has never been married, nor has any children.  PSI at ¶82.

2.      Education

Mr. Ervin graduated from Orange Park High School in 1999.   Thereafter, he enrolled in Florida State College at Jacksonville, but did not complete classes to earn a degree.

3.      Employment

As noted above, from 2014 until 2018, when Mr. Ervin's mother was ill, Mr. Ervin was her primary caregiver until she passed.   PSI at ¶100.   Mr. Ervin has attempted to find his niche as an entrepreneur.   Between 2018 and 2019, Mr. Ervin operated an online store named Crazy Uncle Justin.   He sold toys (such as slime and mini drones) on Amazon.   PSI at ¶99.

4.      Medical

Mr. Ervin has a medical history that includes back pain and frequent sinus and ear infections.   Since his incarceration, Mr. Ervin has been treated for back pain, as well as sinus infections.   PSI at ¶86-87.

5.      Substance Abuse

Mr. Ervin reports a history of drug use, including smoking marijuana daily as a "coping mechanism."   PSI at 89.   As a result of his urine screening prior to his initial appearance, Mr. Ervin tested positive for the presence of marijuana.   *Id.*   Mr. Ervin reports daily marijuana use for the last 21 years.   *Id*.   Mr. Ervin recognizes he would greatly benefit from substance abuse treatment and requests the Court to consider ordering him into a RDAP.

6.      Criminal History

It is important to note that Mr. Ervin has no juvenile history, arrest history (other than this matter), or prior convictions.   In 2001, when Mr. Ervin was 21 years old, he was issued a citation for an open house party.   He received a withhold of adjudication and was ordered to pay court costs and fines.   Mr. Ervin does not score for his prior criminal history.   PSI at ¶71-75.

B.      Character Letters

Attached as Composite Exhibit A are four character letters from friends of family of Mr. Ervin.

The first letter is from Louis Bono, who has known the Ervin family for over 45 years. His son and Mr. Ervin were born within a year of each other, and spent a lot of family time together, canoeing, hiking and attending sporting events.   Mr. Bono states that Mr. Ervin "grew up in a good supportive family," and even through these tough times, "his family fully supports him."   Mr. Bono confirms how Mr. Ervin's father has been "devastated by all of this."   Mr. Bono has firsthand knowledge that he has never seen Mr. Ervin even remotely indicate a willingness to break the law, and, to the contrary, that "he [Mr. Ervin] has always avoided people and situations that may be questionable."

The second letter is from Dr. Charles Hudgins.   He has known the Ervin family over 30 years.   Upon learning of Mr. Ervin's arrest, Dr. Hudgins offered Mr. Ervin to live with him, although that option never materialized.   Dr. Hudgins spent a lot of time with Mr. Ervin, who also provided technical support for his dental practice. They shared stories about hiking the Appalachian trail and Mr. Ervin's love of nature.   Dr. Hudgins knows Mr. Ervin would "never willingly break the law," and opines this was "an error in judgement."

The third letter is from James Wucher, who is the stepfather of Mr. Ervin's sister-in-law. Mr. Wucher has known the Ervin family for over 30 years as well.   He is a retired U.S. Naval Aviator and is currently a pilot and Captain for a major U.S. airline. He speaks very highly of Mr. Ervin and refers to him as some who "has always been one to help and do the right thing." Mr. Wucher also comments on Mr. Ervin's relationship with his grandson, who is Mr. Ervin's

nephew.   Mr. Ervin adores his nephew and they miss each other terribly. Mr. Wucher's grandson is who inspired Mr. Ervin to begin his Amazon store, selling children's toys.   Mr. Wucher refers to the Ervin family as "top notch" and who "support each other fully." Similar to Dr. Hudgins, Mr. Wucher states how this has to be a "judgement situation," as he has "never known Justin to be in any type of trouble except this situation."

The fourth and final letter is from Darren Nichols, another over 30-year family friend of the Ervin family.   Mr. Nichols and Mr. Ervin's father were business associates, and Mr. Ervin's sister was an employee of his.   Over the course of the last 30 years, Mr. Nichols also grew to know Mr. Ervin and his brother.   Mr. Nichols refers to the Ervin family as "nothing but the type of American family that has made our country great."   He refers to Mr. Ervin as "very patriotic and [a] law-abiding citizen."   Mr. Nichols has "never known Mr. Ervin to be in any trouble or cause any type of trouble," and how Mr. Ervin thought was he was doing was legal.   In closing, Mr. Nichols states how Mr. Ervin is a "good solid person, always helpful and assists the less fortunate by helping where and when he has an opportunity."

All four of these letter state how Mr. Ervin is a proud American and law-abiding citizen, who would never do anything willfully or intentionally to break the law.   It is apparent by speaking with Mr. Ervin that the only thing he loves more than his patriotic beliefs, is his family.

C.      PSI Objections

The PSI (Doc. 311) was thoroughly prepared by the United States Probation Office and has been revised with the Defendant's minor factual revisions.   Mr. Ervin has one objection to the calculation of the guidelines and the Government has an objection as well.

1.      Mr. Ervin's Objection

The guidelines provide a two level enhancement for Mr. Ervin with regard to the structuring transaction Mr. Ervin was convicted of in Count 9 of the Second Superseding Indictment. The relevant guideline, U.S.S.G. §2S1.3(b)(1)(A), provides that "if the defendant knew or believed that the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by 2 levels."  However, Mr. Ervin denies said knowledge or belief that the funds were proceeds of unlawful activity.   At the time the transactions were completed, Mr. Ervin subjectively did not know or believe that the money he was earning from the Auto Key Card business was unlawful.  Mr. Ervin has maintained his plea of not guilty through trial and subjectively did not believe or know that the proceeds of the business activities he was conducting were unlawful.  During this time and course of conduct, the record is clear that Mr. Ervin was conducting business open and notoriously, which belies any allegation that Mr. Ervin knew or believed his underlying conduct was unlawful.  Although the jury did not agree with the lawfulness of Mr. Ervin's conduct through their verdict, he believed it was lawful at the time.

The clear purpose of this enhancement is to punish individuals who engage in structuring to attempt to hide the proceeds of illicit activity.  Mr. Ervin, while maintaining his innocence as to this count, clearly, albeit erroneously, believed that his conduct selling Auto Key Cards was entirely lawful.  When actually providing information for a currency transaction report completed in the course of conduct Mr. Ervin was convicted of, Mr. Ervin said that his business was the Auto Key Card business.  Specifically, U.S.S.G. §2S1.3(b)(1)(A) only provides for an enhancement if Mr. Ervin "knew or believed that the funds were proceeds of unlawful activity." If the guideline was intended to capture conduct where a defendant engaged in a structuring

transaction while believing the underlying conduct was lawful, even incorrectly, the guideline would merely state "if the funds were proceeds of unlawful activity, or were intended to promote unlawful activity, increase by 2 levels." The plain language of the guideline requires knowledge or belief of the illegality of the underlying conduct, rather than a mere determination as to its illegality.  If the intention of the enhancement was to punish any transaction that involved proceeds of illegal activity, the enhancement would say so.  As worded, the enhancement is intended to punish individuals who knowingly structure financial transactions to conceal evidence of a crime, not to punish individuals who erroneously believe their underlying conduct is lawful.  As such, we do not believe this guideline is appropriately applied in this situation.

       2.       <u>The Government's Objection</u>

The Government provided a nine-page objection letter that undersigned counsel anticipates the Government will argue at sentencing, so counsel is providing a response to those arguments for the Court's consideration prior to sentencing.

The Government's specific objection is their position that it is their belief the Probation Office fails to apply the applicable Specific Offense Characteristics ("SOC") in USSG §2K2.1, specifically, §2K2.1(b)(1)(E) for the offense involving in excess of 200 firearms, and §2K2.1(b)(5) for the defendants being engaged in the trafficking of firearms.  It is the Government's position that failure to apply the SOCs contradicts the plain language of the Guidelines, that results in a massive undercalculation of the Defendants' respective Guideline ranges.

The PSI specifically addresses the Government's issue. The PSI states,

> The Defendant possessed approximately 6,600 auto-sears which according to 26 U.S.C. § 5861 are machineguns.  However, because auto-sears do not meet the definition of "firearm" pursuant

> to 18 U.S.C. § 921(a)(3), the specific offense characteristics at
> USSG § 2K2.1 for the number of firearms possessed is not
> applicable.  If auto-sears were considered firearms, 10-levels
> would have been added to Ervin's offense level, resulting in an
> advisory range of 97 months to 121 months.

PSI at ¶120.

At trial, it was a question for the jury if the Auto Key Card was a machinegun conversion device consisting of a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger.   Pursuant to 26 U.S.C. § 5845(a), the definition of "firearm" means "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."   26 U.S.C. § 5845(b).

The Government prevailed at trial, as the jury determined that the Auto Key Card was a combination of parts designed and intended for use in converting a weapon into a machinegun. As a result, the Defendant was convicted on all counts.   However, the Government fails to recognize the standard and application of the law for a jury to either convict or acquit a defendant of any similar charge, does not apply to the Sentencing Guidelines.

Attached as Exhibit B is a Memorandum Opinion and Order issued in *United v. Hixson*, 624 F. Supp. 3d 930 (N.D. Ill. 2022).   The district court found as follows:

> The Guidelines do *not* include machine guns–including devices that
> convert semiautomatic weapons into fully automatic weapons–in the
> definition of "firearms." *Compare* 18 U.S.C. §921(a)(23) (definition of

machinegun) *with* § 2K2.1 Application Note 1 (defining firearm to mean the definition in 18 U.S.C. § 921(a)(3)). Whether that void is intentional and whether the United States Sentencing Commission intends to fill that void now that it finally has a quorum is beyond the Court's knowledge. [*footnote omitted*]. But, in fashioning a just sentence, the Court can look to the Sentencing Guidelines when it considers the statutory factors identified in 18 U.S.C. § 3553(a). Counsel and the Court were unable to locate any reported decision on the issue raised in this case. It appears that only a few other judges have addressed the issue but not in a written decision. [*footnote omitted*]

Exhibit B at 1.

In *Hixson*, the court specifically addresses the distinction between definitions of "firearm" and "machinegun."

Section 921(a)(3) defines "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). The definition of "machinegun" is stated elsewhere in Title 18. Section 921(a)(23) defines "machinegun" by referencing the National Firearms Act, so that the term "machinegun" "has the meaning given such term in section 5845(b) of the National Firearms Act." 18 U.S.C. § 921(a)(23). Section 5845(b) of the National Firearms Act defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts

from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845 (emphasis added).

In contrast, the Sentencing Guidelines define "firearm" as only having "the meaning given that term in 18 U.S.C. 921(a)(3)." § 2K2.1 Application Note 1. But there exist three references to the statutory definition of a machinegun in § 2K2.1. Specifically, in setting the base offense level, a base level of 26 is required, if the offense involved a machinegun and the defendant committed any part of the offense after receiving at least two felony convictions for either a crime of violence or a controlled substance offense. § 2K2.1(a)(1). Next, in setting the base offense level, a base level of 20 is required if the offense involved a machinegun and the defendant meets three other requirements. § 2K2.1(a)(4). Finally, in setting the base offense level, a base level of 18 is required if the offense simply involved a machinegun. § 2K2.1(a)(5). All specific offense characteristics ("enhancements" providing for an increase in the offense level) under § 2K2.1 refer to "firearm," including the enhancement when three or more "firearms" are involved, and the enhancement for "trafficking of firearms." § 2K2.1(b)(1); § 2K2.1(b)(5).   Exhibit B at 4.

Mr. Ervin believes the analysis by the United States Probation Office accurately reflects the correct application of the sentencing guidelines.   The Government contends that it is erroneous to look to the commentary to determine what a "firearm" is, because the definition is clear in the plain language of the Guidelines. *See generally United States v. Dupree,* 57 F.4th 1269 (11th Cir. 2023).   However, it is clear that the Auto Key Card does not fit any normal definition of a firearm, thus reference to the Application Notes is entirely appropriate.   Outside of any individual with specific knowledge of the requirements of the National Firearms Act and

expert level familiarity with the operation of semi-automatic weapons, nobody would believe the Auto Key Card is a firearm.   As Judge Merryday has held, devices like the Auto Key Card "are not necessarily readily recognizable as either a machine gun or a mischievous implement of any kind at all. They are only statutory machine guns. For example, a sere appears disarmingly innocent, but it is a statutory machine gun." *United States v. Aguilar-Espinosa*, 57 F. Supp. 2d 1359, 1367 (M.D. Fla. 1999).   As the Auto Key Card is not clearly a firearm under any plain definition or understanding of the word, it is entirely appropriate to look to the Application Notes for further guidance.   In doing so, it is clear that the items at issue in trial do not meet the definition in the Application Notes and therefore, as to that issue, the guidelines are correctly calculated.

The Government not only disagrees with the *Hixson* court's findings, but the Probation Office's PSI.   The Government is maintaining the position that if the Court decides that the commentary definition of "firearm" controls and that the number of firearms and trafficking enhancements do not apply, it should depart and/or vary upward to account for the large number of auto sears manufactured, marketed, and sold by Ervin and Hoover.   For all the reasons set forth in *Hixson*, and referenced herein, we ask the Court to not accept the Government's arguments in this regard.

D.    Conclusion

Pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are advisory only, and the Court has discretion to impose a sentence below any guidelines range determined by the Court, as well as to consider a variance.   Thus, although the PSI and Mr. Ervin's Sentencing Memorandum has addressed grounds for departure, Mr. Ervin respectfully

requests the Court consider them not only as traditional grounds for departure, but as grounds supporting the Court's exercise of discretion, after ascertaining the guideline range.

Indeed, not only are the Guidelines merely advisory only, but any presumption that a sentence imposed within the Guidelines is "reasonable" – is in error. *Nelson v. United States*, 555 U.S. 350 (2009). *Nelson*, decided January 26, 2009, held that:

> The Guidelines are not only <u>not mandatory</u> on sentencing courts; they are also not to be <u>presumed</u> reasonable.
>
> * * *
>
> Under our recent precedents, [applying a presumption of reasonableness to the Guidelines] constitutes error.

*Id.* at 351.

Thus, the Court is authorized, and indeed, respectfully, required, to impose, and Mr. Ervin is entitled to have imposed, a sentence that "is appropriate for the individual defendant in light of the statutory sentencing factors [of] 18 U.S.C. § 3553(a)." *Id*.

The Sentencing Commission has commented on "the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." Accordingly, the Commission has empowered judges to employ "downward departures" as a means for imposing sentencing below the guideline sentencing range. As the Supreme Court has confirmed, the Sentencing Guidelines "place essentially no limit on the number of potential factors that may warrant a departure." *Koon v. United States*, 518 U.S. 81, 106 (1996).

In closing, Mr. Ervin is an upstanding citizen, with no prior convictions. He is a proud American citizen, who believes in the law and in the Constitution. Mr. Ervin is an appropriate

candidate for RDAP, and we ask this Honorable Court to consider all of the above mitigation and

sentencing issues to determine an appropriate sentence for Mr. Ervin.

WHEREFORE, it is respectfully requested that this Honorable Court consider the

personal characteristics of Mr. Ervin in fashioning a sentence that is sufficient, but not greater

than necessary, in comportment with 18 U.S.C. §371, 18 U.S.C. §5871 and 18 U.S.C.

§3424(d)(1).

**Respectfully submitted,**

**Monroe & King, P.A.**

_____/s/ Alex King_____

Alex King, Esq.
Florida Bar No:   86034
Monroe & King, P.A.
1805 Copeland Street
Jacksonville, Florida 32204
**Pleadings to**: admin@monroekinglaw.com
(904) 355-7777 Telephone
Attorneys for Defendant

Exhibits

A.  Character Letters – Composite
B.  Copy of Memorandum Opinion and Order issued in *United States v. Hixson*, 624 F. Supp.
    3d 930 (N.D. Ill. 2022)

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by email to:   Laura Cofer Taylor, Esq., Office of the United States Attorney, Laura.C.Taylor@usdoj.gov, this 1st day of September, 2023.

_____/s/ Alex King_____
ATTORNEY