1                   UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
2                      JACKSONVILLE DIVISION

3    UNITED STATES OF AMERICA,      Case No. 3:21-cr-22(S4)-MMH-MCR

4          Plaintiff,               Wednesday, September 6, 2023

5    v.                             9:45 a.m. - 3:05 p.m.

6    KRISTOPHER JUSTINBOYER ERVIN    Courtroom 10B
     and MATTHEW RAYMOND HOOVER,
7
           Defendants.
8    _____

9
                            **SENTENCING**
10                        **(VOLUME 1 of 2)**

11
               BEFORE THE HONORABLE MARCIA MORALES HOWARD
12                   UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19   OFFICIAL COURT REPORTER:

20     Katharine M. Healey, RMR, CRR, FPR-C
       PO Box 56814
21     Jacksonville, FL 32241
       Telephone: (904) 301-6843
22     KatharineHealey@bellsouth.net

23

24                         (Proceedings reported by stenography;
                           transcript produced by computer.)
25

```
 1                         A P P E A R A N C E S

 2

 3   COUNSEL FOR THE GOVERNMENT:

 4      LAURA C. TAYLOR, ESQUIRE
        DAVID MESROBIAN, ESQUIRE
 5      United States Attorney's Office
        300 North Hogan Street, Suite 700
 6      Jacksonville, FL 32202

 7

 8   COUNSEL FOR DEFENDANT ERVIN:

 9      ALEX KING, ESQUIRE
        Monroe & King, P.A.
10      1805 Copeland Street
        Jacksonville, FL 32204
11

12
     COUNSEL FOR DEFENDANT HOOVER:
13
        ZACHARY Z. ZERMAY, ESQUIRE
14      Zermay Law
        1762 Windward Way
15      Sanibel, FL 33957

16   - A N D -

17      MATTHEW LAROSIERE, ESQUIRE
        6964 Houlton Circle
18      Lake Worth, FL 33467

19

20

21

22

23

24

25
```

1                            I N D E X

2                                                            PAGE

3      INITIAL MATTERS........................................... 4

4      DEFENDANT ERVIN'S GUIDELINES OBJECTIONS.................... 7

5      DEFENDANT HOOVER'S GUIDELINES OBJECTIONS.................. 13

6      GOVERNMENT'S OBJECTIONS TO FACTUAL STATEMENTS IN PSR........ 19

7      DEFENDANT ERVIN'S ARGUMENTS............................... 21

8      GOVERNMENT'S RESPONSE TO DEFENDANTS' OBJECTIONS............ 22

9      DEFENDANT ERVIN'S RESPONSE TO GOVERNMENT'S OBJECTIONS....... 37

10     DEFENDANT HOOVER'S RESPONSE TO GOVERNMENT'S OBJECTIONS...... 42

11     COURT'S RULING ON GUIDELINES OBJECTIONS.................... 48

12     GOVERNMENT'S PROFFER BY MS. TAYLOR........................ 63

13     STATEMENT BY KRIS ERVIN ON BEHALF OF DEFENDANT ERVIN........ 89

14     STATEMENT BY DEFENDANT ERVIN.............................. 94

15     DEFENDANT ERVIN'S PROFFER BY MR. KING..................... 105

16     STATEMENT BY DEFENDANT HOOVER............................. 113

17     STATEMENT BY MICHAEL HOOVER ON BEHALF OF DEFENDANT HOOVER.. 118

18     STATEMENT BY RICHARD HUGHES ON BEHALF OF DEFENDANT HOOVER.. 119

19     DEFENDANT HOOVER'S PROFFER BY MR. LAROSIERE............... 123

20     GOVERNMENT'S REBUTTAL ARGUMENTS BY MS. TAYLOR............. 135

21

22

23

24

25

1                          P R O C E E D I N G S

2    September 6, 2023                                    9:45 a.m.

3                              -   -   -

4           COURT SECURITY OFFICER:  All rise.  The United States

5    District Court in and for the Middle District of Florida is now

6    in session.  The Honorable Marcia Morales Howard presiding.

7           Please be seated.

8           THE COURT:  Give me one moment.

9           All right.  This is Case No. 3:21-cr-22(S4)-MMH-MCR,

10   the United States of America vs. Kristopher Justinboyer Ervin

11   and Matthew Raymond Hoover.

12          Ms. Taylor and Mr. Mesrobian are here on behalf of

13   the United States.  And Ms. Taylor, if you could please

14   introduce the case agent for the record.

15          MS. TAYLOR:  Yes, Your Honor.  At the front table is

16   Special Agent Jesse Hooker of the Bureau of Alcohol, Tobacco,

17   Firearms, and Explosives, and at the back table is Special

18   Agent Jason Slosson, also with ATF.

19          Your Honor, just as a preliminary matter, if it's

20   okay with the Court today, our intention is for Mr. Mesrobian

21   to handle guidelines and for me to handle 3553.

22          THE COURT:  Okay.

23          All right.  And Mr. King is here on behalf of

24   Mr. Ervin.  And Ms. Hall, his paralegal, is here with us as

25   well.

1        Mr. Zermay and Mr. Larosiere are here for Mr. Hoover.

2    Mr. Hoover is here.  And Ms. Katzenberger is here as well.

3        All right.  So we have our appearances.  And we're

4    scheduled for sentencings in these cases.

5        Mr. Mesrobian and Ms. Taylor, are you prepared to

6    proceed?

7        MS. TAYLOR:  Yes, Your Honor.

8        THE COURT:  All right.

9        Mr. King?

10        MR. KING:  Yes, Your Honor.

11        THE COURT:  And I don't know who will -- Mr. Zermay

12    and Mr. Larosiere, am I hearing from both of you or just one of

13    you today?

14        MR. LAROSIERE:  Just Mr. Larosiere, Your Honor, and

15    we're ready.

16        THE COURT:  Okay.  All right.  So we'll start with

17    Mr. Ervin.

18        Mr. Ervin, on April 21st of 2023 the jury found you

19    guilty of a number of charges in the Fourth Superseding

20    Indictment, including Counts One, Two, Three, Four, Five, Six,

21    Seven, Eight, each of which charged -- well, Count One charged

22    you with conspiracy to transfer unregistered machine gun

23    conversion devices, in violation of Title 26, United States

24    Code, Sections 5861(e) and 5871, and 18 U.S.C., Section 371.

25        Counts Two through Eight charged you with

1    transferring unregistered machine gun conversion devices, in

2    violation of Title 26, United States Code, Sections 5861(e) and

3    5871, as well as 18 U.S.C., Section 2.

4           And the jury also found you guilty in Counts Nine,

5    Ten, Eleven, and Twelve of structuring and attempting to

6    structure currency transactions for the purpose of evading

7    Currency Transaction Reporting requirements, in violation of

8    Sections 5324(a)(3) and (d)(1).  Pardon me, that was Count

9    Nine.

10          Counts Ten, Eleven, and Twelve charged you with

11   possessing unregistered machine gun devices, in violation of

12   Title 26, 5861(d).

13          The jury, as I said, convicted you of those -- each

14   of those counts, and so we're at the stage of the proceedings

15   where the Court needs to determine an appropriate sentence.

16          There's a process that we follow for that in federal

17   court, and it begins with the preparation of a presentence

18   report.  And the next thing that's supposed to happen is that

19   you're supposed to review that presentence report with your

20   attorney, Mr. King.

21          Did you have a chance to do that, Mr. Ervin?

22          DEFENDANT ERVIN:  Yes, ma'am.  I got it right here.

23          THE COURT:  Okay.  And did Mr. King answer any

24   questions that you had about the presentence report?

25          DEFENDANT ERVIN:  Yes, ma'am, he did.

1          THE COURT:  Okay.  All right.

2          Mr. King, does Mr. Ervin have any objections to the

3  factual statements set forth in the guidelines -- in the -- I'm

4  sorry, in the presentence report?

5          MR. KING:  No, Your Honor.

6          THE COURT:  All right.  So then let me hear from you

7  as to any guideline objections that Mr. Ervin has.

8          MR. KING:  Your Honor, the only objection Mr. Ervin

9  has outstanding is -- if you'll -- I apologize.

10          THE COURT:  As to the structuring?

11          MR. KING:  Yes, Your Honor.  It's as to the

12  structuring.  It's the two-level enhancement.  I'm trying to

13  find the paragraph.  It is --

14          THE COURT:  I think 59, maybe?

15          MR. KING:  I believe 59.  I'm having trouble finding

16  it in my papers.

17          Yes, Your Honor, it is 59.

18          THE COURT:  And let me hear your argument on that.

19          MR. KING:  Your Honor, essentially the argument is

20  that the specific offense characteristics applies where the

21  defendant knew or believed that the funds were proceeds of

22  unlawful activity.

23          In this case Mr. Ervin had no belief or knowledge at

24  the time he committed those transactions that they were

25  proceeds of unlawful activity.  He believed the activity that

1  he was being -- that he was conducting was lawful at the time

2  that he engaged in these transactions.  The jury made clear by

3  their verdict that they disagree.

4  　　　　However, the guideline here does not say that if the

5  proceeds are, in fact, proceeds of illegal activity, which

6  would clearly apply, you know, whether the defendant

7  subjectively believed it or not, but at the time he believed

8  it -- at the time that the guideline was -- I'm sorry, at the

9  time of the activity that leads to the conviction in Count

10 Nine, Mr. Ervin believed that his business was lawful.

11 　　　　You know, the -- I won't belabor the -- too much in

12 terms of what was before the jury, but Mr. Ervin was

13 advertising this.  He was using his name.  He -- you know, he

14 did actually commit -- fill out a CTR with Community First that

15 very first day when he went to the second bank, not the bank

16 that he normally went to, but when he went to the second bank

17 to have that second transaction that triggered the CTR, and he

18 told them he worked for Auto Key Card.

19 　　　　I was not able to find any case law for or against

20 the application of this guideline or anything that I thought

21 was a good metaphor to kind of explain this, but, you know,

22 Mr. Ervin's position is that if it was the intention of the

23 guidelines to punish the mere fact that, you know, it was later

24 determined that the funds were proceeds of illegal activity,

25 then that's what the guideline would say, as opposed to this

1   knowledge and belief of the defendant.

2          And it makes sense to an extent.  You want to punish

3   individuals who are engaged in these types of structuring

4   offenses to try to hide the proceeds of illegal activity

5   differently than you would punish individuals that just don't

6   want to make a report, don't trust the government, like

7   Mr. Ervin does not trust.

8          And that's why we believe this two-level enhancement

9   would not be applicable here, because at the time he actually

10  committed those offenses -- those transactions, he strongly

11  believed that the activity that he was conducting was lawful,

12  and he's maintained that that activity was lawful since then.

13         THE COURT:  Mr. King, in order to find Mr. Ervin

14  guilty as to Count One of the indictment, the jury had to find,

15  amongst other things -- and that's the conspiracy count,

16  obviously.  But amongst other things, the jury had to find that

17  the defendant knew the unlawful purpose of the plan and

18  willfully joined in it.  So would that not -- would that

19  finding not show that he knew the funds were the proceeds of

20  unlawful activity?

21         MR. KING:  Your Honor, I do think that that is a --

22  is a problem for the argument.

23         You know, I believe Mr. Ervin's -- and this gets into

24  kind of subjective and objective intent.  The jury clearly

25  believed he objectively believed that what he was doing was

1  unlawful at the time.  You know, our submission is that

2  Mr. Ervin subjectively did not believe that what he was doing

3  was unlawful and therefore that that two-level enhancement

4  should not be applicable because of, you know, what his

5  subjective belief was, but understanding that the jury's

6  verdict does undermine that to some pretty significant extent

7  given that they determined that he did so knowingly.

8          THE COURT:  All right.  Any other guideline

9  objections on behalf of Mr. Ervin?

10          MR. KING:  No, Your Honor.

11          DEFENDANT ERVIN:  (Raises hand.)

12          THE COURT:  All right.

13          DEFENDANT ERVIN:  Your Honor --

14          MR. KING:  No, no.

15          THE COURT:  Mr. Ervin, I'm going to hear from your

16  lawyer.  If you want to speak to him, you may.

17          MR. KING:  Your Honor, could I have a moment with

18  Mr. Ervin?

19          THE COURT:  Of course.

20      (Mr. King confers with Defendant Ervin.)

21          MR. KING:  Your Honor, if I can just address one more

22  matter?

23          THE COURT:  Certainly.

24          MR. KING:  Mr. Ervin has asked me to object to

25  paragraph 52, the base offense level.

1           I've reviewed that.  I've discussed it with him.  I

2    don't believe I have a legal basis to make that objection.

3           THE COURT:  Let me hear what Mr. Ervin's objection

4    would be.

5           MR. KING:  Mr. Ervin's objection would be that based

6    on -- and I suspect when we get to the government's objections,

7    that whether machine gun conversion devices are firearms for

8    certain purposes in the guidelines, that because he believes

9    they're not firearms for other purposes, that it would not

10   apply to this base offense level.

11          However, the base offense level specifically cites to

12   the statute that Mr. Ervin is convicted of violating, so I

13   don't believe there's a legal basis for that objection.

14          THE COURT:  All right.  Thank you, Mr. King.

15          MR. KING:  Yes, Your Honor.

16          THE COURT:  And let me just go ahead and address

17   that.

18          Mr. Ervin was convicted by the jury of violating

19   Title 26, United States Code, Section 5861.  For purposes of

20   that statute, there is a definition of a firearm in Section

21   5845.  The jury was instructed as to that definition of a

22   firearm and found that the machine gun conversion devices that

23   were being manufactured by Mr. Ervin, and that the jury

24   determined he conspired to transfer with Mr. Hoover, fell

25   within that definition.  That's the jury's finding.

1        The appendix to the guidelines tells us that for a

2   conviction of -- under 26, United States Code, Section 5861,

3   the Court looks to the guideline at 2K2.1.

4        2K2.1 addresses the unlawful receipt, possession, or

5   transportation of firearms.  And under that there are various

6   different base offense levels.

7        The base offense level for a firearm described in 26,

8   United States Code, Section 5845, which is what the jury found

9   in this case, is a level 18.  So at a minimum, the correct

10  offense level is a level 18.  And so I don't think there is a

11  basis to object to that.

12       I understand that Mr. Hoover's counsel may make a

13  similar argument.  And I won't pretermit your argument and I'll

14  hear it, but to the extent that Mr. Ervin is seeking to raise

15  that argument, I don't think it's well placed.  And I can

16  understand why Mr. King has expressed the view that there's not

17  a legal basis for it.

18       Turning now to Mr. Hoover.  Mr. Hoover, on that same

19  date, April 21st of 2023, a jury found you guilty of Count One

20  of the Fourth Superseding Indictment, which charged you with

21  conspiracy to transfer unregistered machine gun conversion

22  devices, in violation of 26, United States Code, Sections

23  5861(e) and 5871, as well as 18, United States Code, Section 2.

24       And the jury also found you guilty of Counts Two,

25  Three, Five, and Seven, which charged you with transferring

1    unregistered machine gun conversion devices to individuals, in

2    violation of Title 26, United States Code, Sections 5861(e) and

3    5871 and Section 2.  And the Court has adjudicated you of those

4    offenses.  The conspiracy charge was also in violation of 18,

5    United States Code, Section 371.  The Court has adjudicated you

6    guilty on those offenses based upon the jury verdict.

7              And we have a presentence report that's been prepared

8    by the probation office with respect to you.

9              Did you have an opportunity to review that

10   presentence report with your attorneys?

11             DEFENDANT HOOVER:  Yes, ma'am.

12             THE COURT:  Did they answer any questions you had

13   about the presentence report?

14             DEFENDANT HOOVER:  Yes, ma'am.

15             THE COURT:  All right.  Mr. Larosiere, did you have

16   sufficient opportunity to review the PSR with Mr. Hoover?

17             MR. LAROSIERE:  Yes, Your Honor.

18             THE COURT:  Does he have any outstanding objections

19   to the factual statements?

20             MR. LAROSIERE:  Not to the factual statements, Your

21   Honor.

22             THE COURT:  Let me hear your guideline objections.

23             MR. LAROSIERE:  So, Your Honor, we object to the use

24   of 2K2.1(a)(5) as the base level in this specific instance.

25             Understanding what this Court has said, every word of

1    the guidelines is very intentionally written.  And, in fact,

2    the definition of "firearms" in the guidelines -- because --

3    let me just stop for a second.

4           "Firearms" as a term, I think we understand from

5    going through this case, needs a definition.  There's multiple

6    divergent definitions of "firearm" in federal law.  And just in

7    2K2.1, divergent definitions are used.

8           There is one definition of "firearm" in 2K2.1, which

9    is 921(a)(3).  And 921(a)(3), which is under Title 18, refers

10   to things that we would ordinarily think of as firearms, you

11   know, explosive, bullet comes out, et cetera, plus silencers.

12          In (a)(5) it refers to a firearm described in -- not

13   defined in -- Title 26, 5845(a).  5845(a) contains items that

14   are 921(a)(3) firearms and are not 921(a)(3) firearms.

15          And it seems clear to Defendant Hoover, Your Honor,

16   that there is an intention in 2K2.1 to more severely punish

17   those weapons which cause harm directly and those individuals

18   which have directly caused -- caused harm or caused harm --

19   forced delivery instruments to be delivered, as we can see in

20   2K2.1(b)(2), which refers to a six-point reduction in firearms

21   that were not used for an unlawful purpose.  And naturally the

22   counterargument there would be, well, if the firearms are

23   legal, there's not an unlawful purpose.  Well, if they're being

24   sentenced under 2K2.1, naturally there was something unlawful

25   about the firearms.

1          So it seems -- we agree with the probation office,

2     which says that later on in the statute --

3          THE COURT:  You agree with the probation office to

4     the extent that they say that under -- for special offense

5     characteristics under (b)(1) it's not a firearm, but you

6     disagree with them with respect to it being a firearm for

7     purposes of (a)(5)?

8          MR. LAROSIERE:  Yes.  So we would follow their same

9     logic.  Following the same logic, Your Honor, we believe that

10    the base level is 12 because it is not a 921(a)(3) firearm.  It

11    may be an item which is described in 5845(a), but it is a

12    non-921(a)(3) firearm.  So it is not a firearm as defined by

13    2K2.1 described in 5845(a).  And that seems clear.

14         In fact, it's clear from the cases that both

15    Defendant Hoover and the government cited.  I think it was the

16    Bixley case.  And there's not much case law on this because

17    ordinarily, in all of the other case law that was cited, there

18    is a -- what I would call colloquially an actual machine gun --

19    you know, one that spits out bullets -- involved, thus setting

20    the base level is pretty easily calculable.  I think here it's

21    a little bit different.

22         THE COURT:  Why isn't the machine gun conversion

23    device a firearm described under 5845(a) given the fact that

24    5845(a) has a definition of "firearm," the definition of

25    "firearm" includes a machine gun, and the definition of

1   "machine gun" includes a machine gun conversion device?

2          MR. LAROSIERE:  So, Your Honor, again, it's in the

3   context of 2K2.1.

4          2K2.1 defines the term "firearm" universally

5   throughout that section as a 921(a)(3) firearm --

6          THE COURT:  Well --

7          MR. LAROSIERE:  -- so --

8          THE COURT:  -- that's in the commentary.

9          MR. LAROSIERE:  So, yes.  And I think that it's

10  important to look to the commentary because the word "firearm"

11  on its own is ambiguous, which I think we're evidencing right

12  here by having this confusion over whether or not it is a

13  firearm.  And I think certainly colloquially it's not, right.

14         THE COURT:  Well, colloquially, the frame of a

15  firearm isn't one, nor is a muffler nor a silencer, but under

16  the law, they're all firearms.

17         MR. LAROSIERE:  In 921(a)(3), Your Honor, I agree,

18  differentially defined such.

19         Also, later on in 2K2.1 it refers to specific 5845(a)

20  firearms as offense enhancement.  And I think that holding

21  otherwise would be to rewrite the guidelines to say "a firearm

22  as defined by 5845(a)."

23         In reality, what the guidelines are saying, if we

24  look at them strictly, is "a 921(a)(3) firearm described in

25  5845(a)."  And that fits with the purposes of the guideline.

1    It fits with the nature and spirit of the guideline.  And it is

2    the only way that every single provision within 2K2.1 could

3    make sense.

4           THE COURT:  So in your view, a level 18 applies to

5    basically everything in Section 5845(a) other than a machine

6    gun conversion device?

7           MR. LAROSIERE:  Machine gun conversion devices, the

8    frame or receiver of a suppressor, and a couple other distinct

9    areas that are not covered, because 921(a)(3) is divergent and

10   it also includes destructive devices, whereas 5845(a) goes into

11   more specific granularity.

12          And it's more just machine gun kits, right.  There's

13   the single parts; there's the combination of parts.  There's

14   several areas of 5845 which, for example, we can look back to

15   the trial, where we learned that sometimes shoelaces can be

16   5845(a) firearms.

17          And so I think it's natural for the guidelines, which

18   target harmful conduct -- you know, projection of force -- and

19   discount conduct that is not itself harmful, that a shoelace

20   does not fit under 2K2.1(a)(5).

21          THE COURT:  If you're saying that the guidelines

22   target more harmful conduct and discount conduct that's less

23   dangerous, how would you account for the fact that the frame of

24   a firearm is subject to the number-of-firearms enhancement but

25   the machine gun conversion device wouldn't be?

1        MR. LAROSIERE:  Well, Your Honor, I would look to the

2   legislative history there, where that was added ex post facto

3   because it had become practice to separate the receivers from

4   firearms.

5        THE COURT:  I don't think that's what "ex post facto"

6   means, but go ahead.

7        MR. LAROSIERE:  Well, it was added after, right.  It

8   was added after the original drafts were passed to cure that

9   hole, and thus, again, that comports nicely as well.

10        If you've got a, you know, gunrunner who's running

11   guns, the type of stuff that I think we all agree the ATF

12   should be enforcing, like running guns to Mexico, we wouldn't

13   want them to be able to avoid that by separating the upper from

14   the lower.

15        But in this instance there's no firearm.  There's no

16   forced-projection instrument.  There is a -- you know, we may

17   respectfully disagree, but it's -- what the jury found to be a

18   combination of parts, and what we allege to be a homogenous

19   piece of steel with a drawing on it, I think that's closer to

20   shoelaces.  And I think the guidelines fit with that idea, that

21   a shoelace could be found by a jury to be a 5845(a) machine

22   gun, but I don't think it's a 921(a)(3) firearm, and thus it

23   would have the lower base offense level.  And it logically

24   follows.

25        THE COURT:  All right.  What are Mr. -- does

1    Mr. Hoover have any other objections to the guideline

2    calculations before I hear from the government?

3              MR. LAROSIERE:  Your Honor, may I talk with my client

4    for a moment?

5              THE COURT:  Sure.

6              MR. LAROSIERE:  Thank you.

7         (Mr. Larosiere and Mr. Zermay confer with Defendant

8    Hoover.)

9              MR. LAROSIERE:  No, Your Honor.  Thank you so much.

10             THE COURT:  All right.

11             Mr. Mesrobian, does the United States have any

12   objections to the factual statements set forth in the

13   presentence report?

14             MR. MESROBIAN:  Your Honor, the only additional fact

15   we would submit might be relevant here is Mr. Ervin's firearms

16   that were present at his home during the execution of the

17   search warrant.  Our understanding is that part of perhaps the

18   distinction the probation office was drawing was that in other

19   cases where they have scored or applied the specific offense

20   characteristics to cases where the individual possessed auto --

21   auto sears is because they were in close proximity to the

22   firearms they could be installed in, as we heard testimony at

23   trial from a number of witnesses that Mr. Ervin had AR-15s in

24   his home and those were located during the execution of the

25   search warrant.  Obviously that was not an issue, you know,

1    relevant to the criminal conduct that he engaged in in this

2    case so it wasn't dwelled on in front of the jury, but it is in

3    the record.  And to the extent that that is somehow a

4    distinguishing factor -- I don't know why that would be, but

5    for the probation office's purposes, if that were a

6    distinguishing factor, that may be a fact that would be

7    relevant to add to Mr. Ervin's presentence report.

8              THE COURT:  Do you want to remind me of what the

9    weapons were that were found in the home and where they were in

10   relation to the auto sears?

11             MR. MESROBIAN:  Well, Your Honor, several of the

12   witnesses, Mr. Ervin's father -- at his trial -- trial

13   transcript -- actually, all of these are trial transcript

14   Volume 4.  Mr. Ervin's father, Ms. Wolfe, and Mr. Ervin's

15   sister all testified that to their knowledge, he owned an

16   AR-15.

17             There was testimony regarding the execution of the

18   search warrant.  I don't believe we entered the pictures into

19   evidence, but there were pictures taken of a number of AR-15s

20   hanging, basically, on the shelving that was discussed during

21   the trial testimony where Mr. Ervin had his preparation

22   supplies, the food and other items, and there were a number of

23   firearms, including several AR-15s.  According to the record

24   from ATF when they executed the warrant, it was six complete

25   AR-15-style rifles, one complete AK-47-style rifle, and seven

1    AR-15 lower receivers.

2         And the testimony at trial as well was that the auto

3    key cards were located all over the house:  in the kitchen, in

4    the living room area, by the computer, and so forth.

5         THE COURT:  Mr. King, does Mr. Ervin dispute the

6    accuracy of that recitation of facts presented at trial?

7         MR. KING:  Your Honor, I think a clarification would

8    be important.  You know, one of the big issues is the device

9    only works with very specific bolt carriers.

10        And had this been raised earlier I could have

11   researched it in the transcript.  But my recollection of the

12   testimony was that there were no auto key cards cut out,

13   converted, and that none of the AR-15s that were in Mr. Ervin's

14   home had SP1 bolt carriers or would otherwise be able to

15   operate or work with an auto key card if correctly cut out.

16        I believe -- it's been since April, so I'm relying on

17   my memory here, but I believe that was Agent Hooker's testimony

18   on cross-examination, if my memory serves me.  But again, I've

19   not had an opportunity -- because that wasn't raised, I've not

20   had a chance to review a transcript of it.

21        And Your Honor, I apologize, otherwise, I think that

22   is an accurate recitation of the firearms that were in the

23   house.  And there were -- based on the photographs that were

24   both placed into evidence and that I've reviewed, there were

25   auto key cards throughout the home.

1          THE COURT:  All right.

2          Mr. Mesrobian.

3          MR. MESROBIAN:  I agree with Mr. King.  I don't think

4    there was any testimony, or I'm not aware of an analysis of

5    which bolt carriers were in the AR-15s in Mr. Ervin's home.

6          However, I do disagree about the testimony at trial,

7    because the testimony was -- at trial was that the auto key

8    card worked in converting a -- an AR-15, both using the M16

9    machine gun bolt carrier as well as the SP1 bolt carriers.  So

10   there were multiple types of bolt carriers that worked with it.

11         THE COURT:  And that was in Agent Hooker's -- whose

12   testimony was that in?

13         MR. MESROBIAN:  That was in Officer Toy's testimony

14   regarding the testing of the device both at the facility in

15   West Virginia as well as when he came to Jacksonville to do the

16   test here.

17         THE COURT:  All right.  Let me hear your -- I think

18   your response to the -- well, start with your response to

19   Mr. Ervin's objection to 59, and then I think in your response

20   to Mr. Hoover's objection you'll probably -- that will also be

21   your argument with regard to the government's objections.

22         MR. MESROBIAN:  And forgive me, Your Honor, with

23   respect to paragraph 59, is that the structuring?

24         THE COURT:  It is.

25         MR. MESROBIAN:  Okay.  So beginning there, Your

1   Honor, the Court presaged what my response would be, which is

2   that the evidence at trial showed that the funds that Mr. Ervin

3   structured were the funds that he earned through the conspiracy

4   to distribute the auto key cards.

5         I understand that Mr. Ervin is persisting in his

6   assertion that he did not believe his conduct was unlawful, but

7   that was not the evidence at trial and that was not the jury's

8   conclusion in finding him guilty beyond a reasonable doubt of

9   Counts One through Eight.

10         They found that he knowingly and willfully entered

11  into the criminal conspiracy and made a number of substantive

12  transfers of the auto key cards.  And from the government's

13  perspective, that pretty much ends the inquiry, because if he

14  was found guilty of those offenses, then the transitive

15  property is that he knew he was structuring the proceeds of an

16  unlawful activity.

17         THE COURT:  All right.  Go ahead with your argument

18  regarding the firearms guidelines.

19         MR. MESROBIAN:  Your Honor, much of this was covered

20  in our response to the initial PSR and in our memorandum for

21  the Court.  I don't want to belabor it too much, but I'm happy

22  to hit the high points and then respond to some of the

23  arguments today.

24         THE COURT:  Well, let me ask you this.  In the *Hixson*

25  case, the government -- an AUSA in your position -- took the

1   position that the machine gun conversion devices were not

2   firearms for purposes of the specific offense characteristics

3   and argued, instead, that the Court should depart upward under

4   5K2.0, or vary upward.

5         I guess I'm interested in understanding why the

6   position of the United States would be different on a

7   black-and-white guideline calculation.

8         MR. MESROBIAN:  Well, I can't speak to necessarily

9   what that office's calculations were in terms of making their

10  argument, however, what I can say is that --

11        THE COURT:  I just read their sentencing memorandum,

12  and their sentencing memorandum says that.

13        MR. MESROBIAN:  I understand, Your Honor.  What I

14  meant was that in terms of the legal landscape in their

15  district, I don't know where their office is in terms of making

16  these determinations on their arguments.  However, what I do

17  know is that district is not governed by *Dupree*.  And that is

18  sort of one of the instructive parts of our argument and in our

19  memorandum.

20        But, Your Honor, from our perspective, the text of

21  the guideline is not ambiguous in terms of whether or not

22  5845(a) firearms are firearms for the purposes of both the base

23  offense level and the specific offense characteristics.

24        And respectfully, I'm not aware of another guideline

25  where the probation -- where we would take the position -- or

1    the probation office would take the position that a term means

2    one thing in the first subsection of a guideline and then means

3    something different in another, because when we read -- in the

4    specific offense characteristics, because, I mean, we have to

5    start with the fact that for recent history, as we showed in

6    the supplemental memorandum we provided, probation has been

7    applying the specific offense characteristics to auto sears in

8    all of these cases.  And that's as recently as April 2023, this

9    year, in the James King case, it's Case Number 6:22-cr-51,

10   where probation applied the specific offense characteristics in

11   an auto sear case, counting each one individually as a firearm,

12   none of which, based on the factual recitation, were installed

13   or near an AR-15.  And nobody objected and Judge Berger agreed.

14   And that's been the consistent application.

15           THE COURT:  And I inquired of the probation office

16   about that this morning.  And my understanding is that both

17   *Hixson* and further consultation with the Sentencing Commission

18   convinced them that that probably had not been the best reading

19   of the guidelines that they were applying previously.

20           MR. MESROBIAN:  I -- that's an interesting position

21   for them to take.  I, however, think it's, frankly, incorrect.

22   And that's based on a plain-language reading of the guideline

23   and also the fact that *Hixson* is a non-binding case from a

24   district where the circuit court of appeals law is different.

25           We are governed by *Dupree* here and we have to start

1    with the plain language of 2K2.1.

2         I think the apparent premise, I guess now, from the

3    probation office, is that this very large category of

4    firearms -- machine gun conversion devices -- was excluded

5    accidentally, I suppose, by the Sentencing Commission in the

6    drafting of 2K2.1.  I think perhaps the defendants believe that

7    it was an intentional exclusion.  That exclusion would

8    purportedly exist because, as the Court noted -- it exists

9    despite the fact, as the Court has already noted, those

10   firearms, including machine gun conversion devices, are notated

11   specifically in the base offense levels in 5845(a).

12        The problem that I think this interpretation of 2K2.1

13   has is that it ignores the fact that it's scoring the base

14   offense level based on different criteria.  It assigns a 26

15   level, a 24, 22, depending on different criteria, and that

16   includes the criminal history of the defendant or the type of

17   firearm.

18        And there are two different types or subsets of

19   firearms which cause an elevated base offense level here:  a

20   firearm as described in 5845(a), or a semiautomatic firearm

21   capable of accepting a large-capacity magazine.  And those

22   categories are referenced together in several places:

23   2K2.1(a)(1), (a)(3), and (a)(4)(B), sub B.

24        The problem is, how are we supposed to read the plain

25   text of 2K2.1 and conclude that these categories are not

1    firearms later on in the exact same guideline?

2            THE COURT:  Well, but what their argument is is that

3    it's a -- it has to be -- in order to apply the enhancement in

4    (a)(1), (a)(3) and (4)(B), as well as (a)(5), it has to be both

5    a 921(a)(3) firearm and a Section 5845(a) firearm.  So an

6    actual machine gun, or the frame or receiver of an actual

7    machine gun, but not just the machine gun conversion device.

8    That's their contention.

9            MR. MESROBIAN:  That's Mr. Hoover's contention.

10           THE COURT:  That is correct, yes.

11           MR. MESROBIAN:  And I don't think that holds water

12   for a couple reasons.  The first is exactly what the Court

13   pointed to, which is that to the extent that Mr. Hoover is

14   arguing that this is logical because the guidelines and

15   Congress intended to punish -- it only applies to things

16   where -- I think "projection of force" was the phrase that we

17   heard a lot today, and not punish things that potentially could

18   become or potentially could be installed into a 921(a)(3)

19   firearm, that's a quote from their memorandum, and the

20   rationale, I guess, is that an item that can't project force or

21   cause harm on its own is less serious.  That would obviously be

22   very convenient for him in calculating the PSR here, but there

23   are two flaws.

24           The first is that, as the Court pointed out,

25   921(a)(3) specifically includes things that potentially could

1   become or be installed because 921(a)(3) includes frames and

2   receivers.

3            THE COURT:  Right.  But, I mean, his point is those

4   are 921(a)(3) firearms, but the machine gun conversion device

5   isn't.

6            MR. MESROBIAN:  But when you read the actual

7   guideline and it talks about 5845(a) firearms, that -- they

8   specifically reference the statute that includes machine gun

9   conversion devices.

10           And it's hard to understand -- when looking at the

11  case -- the second part of this is that looking at the case

12  that Mr. Ervin cited in his memorandum, Judge Merryday's case,

13  that's the *Aguilar-Espinosa* case, 57 F.Supp.2d 1359, there, I

14  think Mr. Ervin was citing to that case as -- for the

15  proposition that auto key cards are, quote, only statutory

16  machine guns, and that therefore somehow resorting to the

17  commentary is appropriate.

18           However, that is not -- and I haven't even addressed

19  *Dupree* yet, we'll get there in a moment, but that's not the

20  rule in *Dupree*.

21           In that case, *Aguilar-Espinosa* was not about the

22  guidelines, it was about the level of evidence of proof of

23  knowledge required to find someone guilty for possessing, in

24  that case, an auto sear.

25           What Judge Merryday was getting at was that under

1    *Staples*, there has to be evidence that the person knew the

2    nature of the thing that they possessed.  It was not a

3    guidelines calculation case.

4           However, there is a lot of interesting language in

5    that opinion regarding the purpose of the statute and what

6    Congress was trying to regulate here.

7           You know, at one point the judge wrote, beginning on

8    page 1363, that "Congress obviously intended to regulate

9    possession of even an incipient machine gun; that is, a device

10   the possession of which is either tantamount to possessing a

11   machine gun or the distinctive precursor of the automatic

12   operation of a weapon."

13          He then went on to say in reference to the same 5845

14   statute that is at issue in the guideline, "The second sentence

15   of section 5845(b) suggests definitively that Congress intended

16   to the extent feasible to statutorily govern disbursement of

17   the capacity to discharge weapons automatically.  The capacity

18   to initiate automatic weapons fire, although a capacity that is

19   often subtly dispensed and inconspicuously harbored, is a

20   brutally lethal capacity, the possession of which imminently

21   threatens the public, whether appearing in the form of a shiny,

22   newly manufactured, and complete weapon or in the form of one

23   of those finely constructed and not widely understood parts

24   that contribute decisively to the onset of automatic firing.

25   Congress decided that the possessor of hardware bearing the

1    capacity to enable automatic fire also possesses the hardware

2    and a considerable risk of criminal liability if the possessor

3    knows the endangering nature of the goods possessed."

4         That case -- it's hard to read the well-reasoned

5    analysis in that case and think that, well, the Sentencing

6    Commission clearly meant to omit those devices from the ambit

7    of 2K2.1 for the base offense level or the specific offense

8    characteristics.

9         And this change in the probation office's position in

10   reading 2K2.1 is hinging solely on the line in the commentary

11   regarding, you know, the definition of a firearm is -- under --

12   is -- has the meaning given that term in 18 U.S.C. 921(a)(3).

13        THE COURT:  Well, I mean, the probation office

14   routinely and regularly and correctly goes -- looks to the

15   application notes for definitions of terms used in the

16   guidelines, right?

17        MR. MESROBIAN:  Correct, where they're unambiguous

18   and where -- I believe what the probation office said in their

19   response to our objections was that a reference to a statute in

20   the guideline makes it ambiguous.  And I -- respectfully, I

21   don't understand what that means.

22        There are any number of references to statutory

23   definitions and guidelines, and those make the guidelines less

24   ambiguous, not more.  It's pretty common.  And 2A3.4 sets the

25   base offense level based on whether the offense involved

1    conduct described in 18 U.S.C. 2241(a) or (b) versus conduct

2    described in 18 U.S.C. 2242.

3          That's repeated, similarly, in 2G2.1.

4          In 2B1.1 it refers to conduct described in 18 U.S.C.

5    670.

6          Those references are not meant to create ambiguity.

7    They define terms.  They define the conduct that is governed by

8    that particular guideline.

9          In those situations there is no need to resort to the

10   commentary.

11         And that's, again, exactly the problem that we have

12   here.  The guidelines refer -- the guideline here, 2K2.1,

13   refers specifically to a firearm that is described in 26 U.S.C.

14   5845(a).

15         THE COURT:  Mr. Mesrobian, is it your position --

16   because I don't think this is right -- is that -- is it your

17   position that you only look to commentary or that the

18   Sentencing Commission should only provide commentary where

19   there's ambiguity?  I don't think that that's accurate.

20         Now, I think what you're saying is that under *Dupree*,

21   if the guideline is not ambiguous, you can't look to commentary

22   that contradicts the guidelines.  But is it your position that

23   there's only -- that commentary is only appropriate when

24   there's ambiguity in the guidelines?

25         MR. MESROBIAN:  Well, that is what *Dupree* essentially

1    says.  I mean, the first principle is that the commentary

2    cannot expand the interpretation of an otherwise unambiguous

3    guideline.

4            THE COURT:  Right.

5            MR. MESROBIAN:  I think when we're dealing with this

6    situation here, what's good for the goose is good for the

7    gander.  And it cannot contract an otherwise unambiguous

8    guideline either.

9            If the meaning of the guideline is in doubt, as the

10   Court noted, the Court can consider the commentary.  But even

11   then what *Dupree* says -- and that's citing to *Seminole Rock* --

12   is that the Court cannot give controlling weight to the

13   commentary if it is plainly erroneous or inconsistent with the

14   guideline.

15           And that is with -- when we're talking about this

16   reference to 921(a)(3) in the commentary, that's what we have.

17   It's an unambiguous guideline, in our view, we submit, with

18   respect to what types of firearms are regulated by 2K2.1.  And

19   there is no need to look further to the commentary to limit

20   that unambiguous definition.

21           But even if you did, that definition is plainly

22   erroneous and inconsistent with the reference to 5845(a) above.

23           THE COURT:  Didn't the Court reject that plainly

24   erroneous and incon- -- I thought that was a higher standard

25   than had to be shown.

1      MR. MESROBIAN:  That was the reference when -- when

2  it refers to *Seminole Rock* and it's talking about the reference

3  to regulations and whether or not you can -- has that been

4  since -- or that's the reference in *Dupree*.  And I can provide

5  the case number, or the page number.

6      I think this is in the passage where it's discussing

7  *Seminole Rock* and *Stinson* and whether or not -- *Stinson* was

8  being careful to note that the analogy was not precise.  And

9  I'm looking at page 1295 of *Dupree*, I think.

10      THE COURT:  Hold on, let me --

11      MR. MESROBIAN:  "Congress has a role in promulgating

12  the guidelines."

13      "That's why *Stinson* gave more deference to the

14  guidelines commentary than *Seminole Rock* gave to an agency's

15  interpretation of its own regulations."

16      But again, when it -- the -- the analysis here is

17  very clear in referring to Congress's role in promulgating the

18  sentencing guidelines.  And we run, again, into Judge

19  Merryday's case, that Congress intended to regulate machine gun

20  conversion devices because of the inherent danger of automatic

21  fire, but then sought to exclude them or approved the exclusion

22  of them from 2K2.1?  It simply doesn't comport.  The more

23  logical conclusion here is that the language of 2K2.1 is

24  unambiguous in its reference to 5845(a) firearms.

25      And to the extent that there is a need under *Dupree*

1    to resort to the commentary for further information, that

2    definition just simply does not align with the specific

3    reference to 5845 in the guideline.

4            THE COURT:  Give me a moment.

5        (Pause in proceedings.)

6            THE COURT:  So, Mr. Mesrobian, let's say,

7    hypothetically, this was a mistake by the Sentencing

8    Commission.  What is the Court supposed to do with that in

9    terms of -- I mean, the definition proposed by counsel for

10   Mr. Hoover, that is, that it has to be a 921 -- it has to be

11   both a 921(a)(3) firearm and a 5845 firearm, why can't the

12   Court accept that definition if that's what the Sentencing

13   Commission approved?  Even if they may change it later.

14           MR. MESROBIAN:  Well, firstly, in the commentary,

15   that line, with respect to the definition of "firearm," it does

16   not say "firearm" has only the meaning ascribed to it in

17   921(a)(3).

18           And I think that's important to read that in

19   conjunction with the, again, specific reference to firearms in

20   5845(a).  There is no specific exclusion in either the

21   guideline or the commentary to find that machine gun conversion

22   devices were intentionally excluded from this guideline.

23           But I think what the Court would do here, in the

24   government's recommendation, is to find that the guideline

25   refers -- 2K2.1 applies to machine gun conversion devices

1  because they are firearms as described in 5845(a) and apply

2  both the level-18 base offense level and the specific offense

3  characteristics.

4  However, I think the alternative here is what the

5  Court did in *Hixson*, which is, in their view, in a world

6  without *Dupree*, in terms of, you know, the prescription of how

7  the Court should read the guideline in conjunction with the

8  commentary, the Court upwardly departed under 5K2.0(a)(1)(A) to

9  account for, again, in their view, a perceived hole in the

10 guidelines.

11 2K2.1 itself is structured to increase the offense

12 level when defendants traffic in firearms and to account for

13 the volume at which they engage in that activity.

14 By accounting for that -- well, by not accounting for

15 that here under this interpretation of 2K2.1, that would

16 clearly create an aggravating circumstance that the Sentencing

17 Commission did not adequately take into account.

18 Essentially that would be -- and what -- the Court in

19 *Hixson* essentially was throwing the issue onto the Sentencing

20 Commission by saying that they mistakenly created this gap for

21 auto sears, even though, you know, for years people have been

22 reading this guideline and not seeing that this gap existed.

23 The solution, however, is baked into section 5K of

24 the guidelines, and that's the upward departure.  And as we

25 said in our memo, our recommendation is 20 levels of an upward

1    departure to account for the trafficking and the extremely

2    large number of NFA firearms involved in this case.

3         So our recommendation to the Court would be to find

4    that these -- that the machine gun conversion devices are

5    firearms under 5845(a) as set forth in 2K2.1 and calculate the

6    guidelines accordingly.  But if that were to be an incorrect

7    conclusion -- incorrect interpretation of the guidelines, there

8    would be cause to upwardly depart in the absence of the

9    application of those levels, offense levels.

10        THE COURT:  All right.  So the government's

11   objections are to the failure to include the special offense

12   characteristics for the number of firearms and the failure to

13   include the special offense characteristics for trafficking?

14        MR. MESROBIAN:  Correct, Your Honor.

15        THE COURT:  All right.  And Mr. -- all right.

16   Anything else, Mr. Mesrobian?

17        MR. MESROBIAN:  May I have one moment, Your Honor?

18        THE COURT:  Sure.

19     (Mr. Mesrobian and Ms. Taylor confer.)

20        MR. MESROBIAN:  One final point with respect to I

21   guess what is the defendants' argument and not the probation

22   office's argument with respect to the guidelines is that there

23   is a distinction if one is going to look at the commentary

24   guideline definition of "firearm," that there is only ambiguity

25   in the guideline in the specific offense characteristics if one

1    wants to take that view.

2           There's a specific reference to 5845(a) firearms in

3    the base offense level in sub (1), (3), (4), (5).  There is

4    only a reference to "firearm" in specific offense

5    characteristics, and that is giving credit to the argument here

6    that that is -- that there is ambiguity in the guideline.

7    However, there is no need to resort to the definition in the

8    commentary for "firearm" for the base offense level section.

9           That would be a distinction we would draw, and I

10   think that is probably the distinction that the probation

11   office is drawing as well.

12           THE COURT:  All right.

13           MR. MESROBIAN:  Thank you, Your Honor.

14           THE COURT:  Mr. King, do you want to be heard as to

15   any of those arguments?

16           MR. KING:  Yes, Your Honor, just briefly.

17           THE COURT:  All right.  Go ahead, Mr. King.

18           MR. KING:  You know, the reason for -- you know, when

19   talking about *Dupree*, the reason, you know, we cited to Judge

20   Merryday's opinion was not for any of the legal holdings, but I

21   think he did a very good job of explaining that statutory

22   firearms are not firearms as they are regularly understood in

23   terms of what would be ambiguous or not to a court.

24           So if you took an auto key card to a thousand people,

25   probably excluding the individuals in this courtroom and maybe

1   the 7th and 8th floors of this building and showed it to them,

2   a thousand people would tell you that that's not a firearm.

3           THE COURT:  Except the 12 jurors.

4           MR. KING:  Except -- well, after given the

5   instructions of the Court and the law.  And, you know, to that

6   extent, without those instructions of the Court and the law, if

7   we had asked the 12 jurors "is this a firearm?" at the

8   beginning of the trial before the Court's instructions, I

9   strongly suspect all 12 of them would have said "no."  That's

10  why the specific definitions are important.

11          One of the things I'd like to turn the Court's

12  attention to is Section 1B1.1, which is the application

13  instructions.  And looking at it, in terms of the application

14  notes --

15          THE COURT:  It has the same definition as 921.

16          MR. KING:  It does.  And it starts off by saying,

17  "The following are definitions of terms that are frequently

18  used in the guidelines and are of general applicability, except

19  to the extent expressly modified in respect to a particular

20  guideline or policy statement."

21          So the base offense level is the exception because it

22  specifically cites to a different statute.  But yeah,

23  Subsection H provides that definition of a firearm as well.

24          THE COURT:  But so the -- how do you get around the

25  fact that the jury convicted these individuals of a violation

1   of 5861?  5861 governs the transfer of firearms, and it

2   defines -- and it incorporates the definition of "firearm" from

3   5845.  5845 specifically includes these as a firearm.  So the

4   machine gun conversion devices are unequivocally -- under

5   duly-enacted statute by Congress they are machine guns and they

6   are, therefore, firearms.  And if you look at the guidelines,

7   the guidelines say:  If you violate 5861, you turn -- you go to

8   2K2.1.

9        How can you -- and 2K2.1 presumes that the item that

10  we're dealing with is a firearm.  So how do you then exclude it

11  from the definition?  It starts out being within the definition

12  of a firearm.  How do you then exclude it from the definition

13  of a firearm and use a different definition for "firearm" when

14  you get to the special offense characteristics?

15       MR. KING:  And that's what -- that's exactly what

16  1B1.1 deals with, is unless it is expressly modified by citing

17  to a specific statute, which is done to determine the base

18  offense level, then this is what defines a firearm.  And then

19  it also has that in the application notes.

20       So firearms are defined differently, you know.  What

21  was a firearm under the -- I'm sorry.

22       THE COURT:  Under the argument that you're making

23  right now, this firearm, it -- this machine gun conversion

24  device wouldn't -- if it doesn't fall within the definition of

25  a firearm at all, then how would it be covered by 2K2.1?  If

1   you're saying it has to fall within the 1B1.1 definition, how

2   would it ever qualify under any base offense level?

3           MR. KING:  Because the base offense level

4   specifically cites firearms as defined -- as described in 26

5   U.S.C. 5845.

6           THE COURT:  So you're not -- but Mr. Hoover's

7   argument is that a machine gun conversion device doesn't fall

8   within that definition.

9           MR. KING:  For determining the base offense level.

10          THE COURT:  Right.

11          MR. KING:  Correct.

12          THE COURT:  So where would it -- where would it fall

13  within the base offense level under --

14          MR. KING:  I'm afraid I'm not following you, Your

15  Honor.  I know this is a -- it's a little --

16          THE COURT:  Well, but -- I think probably because the

17  argument is circular, but I'm trying to follow it.

18          If "firearm" has to have the definition in 1B1.1,

19  where would -- how could a machine gun conversion device fall

20  within the ambit of any of the offense levels in 2K2.1?

21          MR. KING:  So -- Your Honor, if I could just have a

22  moment --

23          THE COURT:  Sure.

24          MR. KING:  -- because I think I also turned myself

25  into a little bit of a twist here.

1        Your Honor, the base offense level uses a more

2   specific definition than "firearm" as it is used throughout the

3   guidelines.  And by using a more specific definition, looking

4   to 2B1.1, that's when you apply more specific or different

5   definitions.  So that is modified, and that is how the rules

6   are supposed to be interpreted according to the application

7   notes there.

8        So generally, it should be defined as Subsection H in

9   2B1.1, which is the same as it is defined in 921(a)(3), but

10  the -- anytime that there needs to be a different definition,

11  that has to specifically cite to a statute or provide a

12  different definition.

13       So for the specific offense characteristics -- I'm

14  sorry, for the base level offense, it applies a definition that

15  is different than is used throughout the rest of the guidelines

16  to determine that base offense level.

17       But the rest of that guideline doesn't say if -- you

18  know, if -- you know, does not change the definition of

19  "firearm" as it's applied throughout the rest of the

20  guidelines.  And if it did so, it would specifically say so,

21  and it does not.

22       THE COURT:  Okay.  Anything else, Mr. King?

23       MR. KING:  No, Your Honor.  Just, you know, briefly,

24  you know, in this -- you know, turning to the government's

25  supplemental sentencing memorandum, of the three cases cited in

1   the Jacksonville Division, I was the attorney on two of those.

2   And, you know, I know this is -- you know, I can tell the Court

3   this is just not an issue we addressed.

4          I know in terms of Mr. Blocker, my understanding,

5   which is the first one they cited, that those were -- that he

6   was a heroin and methamphetamine addict who had guns sitting

7   out in his house.  My understanding was the guns that were

8   calculated for that were the actual firearms that he had in his

9   home, and that the Glock switches that they originally came

10  for, because ultimately that's what he pled to, was the

11  possession while an unlawful user of drugs.

12         And in terms of Mr. Schade, you know, I know he had a

13  probationary sentence and that's been terminated.

14         But that's just not an issue that we came up with or

15  addressed.  You know, had I been as familiar with this issue, I

16  think we would have probably handled it differently, I can say

17  that.  But, you know, it wasn't objected to because it was just

18  not an issue that I had seen raised before or was familiar

19  with.

20         THE COURT:  All right.  Thank you.

21         MR. KING:  Thank you, Your Honor.

22         THE COURT:  Mr. Larosiere.

23         MR. LAROSIERE:  Yes, Your Honor.  Just one moment.

24         Thank you, Your Honor.

25         Just very briefly.  To agree with the position of the

1    government we'd have to agree that this is unambiguously in

2    every way a machine gun.  It's ambiguous factually, legally.

3    This is ambiguous every which way.

4         And again, I'm not contesting that my client was

5    convicted.  He was.  The question is:  How do the guidelines

6    handle this?

7         We talked about the cases earlier.  The government

8    pointed out, there was no objection.  Those arguments were

9    waived, so they're not precedential here.

10         And to deal with the suggestion that the guidelines

11    simply forgot or excluded, that's not true.  There's a catchall

12    in 2K2.1.  That's (a)(7).  And I think it flows perfectly

13    logically that something that -- and again, the guidelines say:

14    Violative of this statute, convicted of this statute, proceed

15    to 2K2.1.

16         You would have people whose convictions involved

17    everything from rocket launchers, for which there's a specific

18    sub application, to an AK-47 machine gun, which was

19    unambiguously a machine gun, which would fall under (a)(5), and

20    then there's got to be everything else for (a)(7).

21         THE COURT:  Well, doesn't (a)(7) deal with a pistol

22    or a silencer, a frame, a receiver?

23         MR. LAROSIERE:  Well, Your Honor, it just -- it's

24    silent.  It just says "in all other," I believe is the word.

25         THE COURT:  No, it's "except as provided below," 12.

1          MR. LAROSIERE:  Right.  And so that is the base-base

2     level.  And I think that in -- in the case of something like a

3     homogenous piece of steel with a drawing on it that the jury

4     convicted somebody as a machine gun, you know, it makes sense

5     for that to fall under the catchall.

6          And it's not as if this is not punished.  That's

7     12 points.  That's not a slap on the wrist.  It's clearly very

8     seriously regulated conduct.  And our reading is the only way

9     every single subsection means something.

10          THE COURT:  Well, isn't it only if you look to the

11     definition of "firearm" in the application note that there's

12     ambiguity?  Because otherwise -- otherwise, I'm told to go to

13     2K2.1, which deals with the punishment of receipt, possession,

14     or transportation of firearms.  And it provides punishments

15     based on the character of the firearm or the character of the

16     individual possessing the firearm.

17          It only becomes ambiguous if you turn -- because a

18     jury has already found this to be a firearm.  That's the

19     offense of conviction.  So don't you start with 2K2.1 with the

20     presumption that the object at issue is a firearm, and then the

21     question is:  Does it fall within one of these special

22     categories that enhances the penalty?

23          The penalty's enhanced if it's a semiautomatic

24     firearm that's capable of accepting a large magazine, or the

25     penalty is enhanced if it's a firearm that's described in 5845,

1    which in this case it is.

2            You only get to a -- and when you get to the specific

3    offense characteristics, again, a jury has determined that the

4    item is a firearm.  I'm not aware of anywhere else in the

5    guidelines that the guidelines would identify something that is

6    statutorily defined to be a thing and then the guidelines say,

7    "Oh, but for sentencing it's not a thing."

8            How is it, then, that the ambiguity isn't created by

9    the commentary?

10           MR. LAROSIERE:  Your Honor, with unbelievable

11   respect, I think that there's no way a simple, bare reference

12   to "firearm" is not ambiguous.

13           This would be a very different case if the guidelines

14   said under (a)(5), "Firearm as defined in."  And we know the

15   guidelines drafters knew how to do that.

16           THE COURT:  What's the difference -- you said that

17   earlier and I'm not sure I caught the import of the difference

18   between the word "defined" or "described."

19           MR. LAROSIERE:  Right, Your Honor.

20           So "firearm" -- the word "firearm," the noun, is

21   defined in 2K2.1.  Again, we've already gotten there from 1.1,

22   so now we're at 2.1.  And the word "firearm" takes on that

23   meaning because it's ambiguous.  And I think it's ambiguous in

24   every possible way.  And it is given a meaning that causes all

25   of the pieces to fall into place.  921(a)(3).

1          So if it is a 921(a)(3) firearm, which I would submit
2     is the most federally colloquial definition of "firearm" that
3     we have --
4          THE COURT:  But it's not what they were convicted of.
5     I mean, Congress passed a separate statute.  Congress said,
6     "These are also firearms."  And they're convicted of that
7     firearm offense.
8          Can you give me any other example of a place in the
9     guidelines where the guidelines remove from consideration for
10    sentencing purposes the very item that the individual was
11    convicted of dealing with?
12         MR. LAROSIERE:  Well, I cannot, Your Honor, and that
13    is because there are no other areas in the federal law that
14    deal with such a wide range of divergent articles as 5845 does.
15    And the only way that the relative seriousness of those
16    articles makes sense is if we give 2K2.1 the meaning that the
17    commentary says it has, which, again, is that a firearm under
18    2K2.1 is a 921(a)(3) firearm, that being a real firearm or --
19    and a silencer.  I would say that that was the most, you know,
20    odd thing there, but the public and Congress believed that
21    silencers, on their own, had a unique propensity to do whatever
22    it is they believed they did.
23         It just fits.  It, frankly, just comports.  And our
24    reading is that a shoelace -- which, as we know, can sustain a
25    5845-related conviction -- would fall under (a)(7) and be at

1    12 points.  And I think that fits compared to an AK-47.

2         I think that when the statute covers this broad range

3    between shoelace and literally rocket launcher, it makes sense

4    that they would be punished slightly differently.

5         THE COURT:  All right.

6         MR. LAROSIERE:  Thank you, Your Honor.

7         THE COURT:  Mr. Mesrobian, was there something you

8    wanted to add?

9         MR. MESROBIAN:  Just very briefly, Your Honor, just

10   to clarify the record.

11        Mr. King, when he was talking about Mr. Blocker, in

12   his PSR he was held accountable for 69 firearms.  That included

13   67 non-antique firearms and two Glock switches, which were not

14   installed.  So he was -- those were individually counted in his

15   PSR as firearms.

16        THE COURT:  Of course, they would have made no

17   difference between -- because the difference between 67 and 69

18   makes no impact in the guidelines.

19        MR. MESROBIAN:  Correct, just reciting the probation

20   office's analysis in there.

21        And, Your Honor, just one final thing.  The only --

22   as the Court noted, I think the only ambiguity here is created

23   by the commentary.  This item is a firearm.  They were

24   prosecuted for transferring these items as firearms and found

25   guilty.

1          Judge Merryday's opinion lays out exactly Congress's

2     intent and thought process behind regulating these items.  To

3     think that they and the Sentencing Commission then excluded

4     them from 2K2.1, what would be the reason?  There is not one.

5     No one's talked about why the reason that would be for them to

6     do that.  They meant to regulate these.

7          The Court is right.  This is the correct guideline to

8     apply here.  These items are specifically referenced in the

9     subsection of the base offense level, and that's our position.

10          THE COURT:  All right.  I think the difficulty here

11     is that -- well, let me take a step back.

12          First of all, the definition of "firearm" in 1B1.1

13     and the definition of "firearm" that we're talking about here

14     in 2K2.1, both of those definitions are found in the

15     commentary, not in guidelines themselves.

16          And the probation office correctly relies on the

17     commentary.  And I think the probation office, reading the

18     guideline and applying the commentary, scores the guidelines

19     consistent with what's written in black and white in the

20     guideline manual.  And so I credit the probation office for

21     that determination.

22          The problem, though, I think we have, is that *Dupree*

23     makes clear that you can't defer to the commentary in the

24     guidelines if -- to the commentary to the guidelines if the

25     guideline itself is not ambiguous.  And so the Court has to

1   start with the question of determining whether the meaning of

2   the guideline itself is in doubt.

3           And if it's genuinely ambiguous, then the Court

4   applies deference.  But if it's not ambiguous, then the Court

5   can't apply deference.  And it certainly can't apply deference

6   if the commentary is inconsistent with the guideline.

7           And *Dupree* looked at that issue, and *Dupree* also

8   relied on *Kisor*, which instructs that in determining whether

9   there's ambiguity, you have to look at the text, the structure,

10  the history, and the purpose of the regulations.  And again,

11  *Kisor* says you don't give deference unless there's ambiguity.

12          And I'm just not convinced that when you look at the

13  text, the structure, the history, and the purpose of the

14  regulation that there's ambiguity in what a firearm is when

15  you're applying these guidelines.

16          As I said earlier, you start with the premise that

17  the individual who's being sentenced through the application of

18  2K2.1 is an individual who has been convicted of an offense

19  involving a firearm.  If it wasn't a firearm, we wouldn't be at

20  2K2.1 at all.

21          And then 2K2.1 proceeds to apply different offense

22  levels based upon the character of the firearm or based upon

23  the criminal history of the individual that possessed or

24  engaged with the firearm.

25          And, for example, as Mr. Larosiere notes, paragraph

1    (a)(7) just says it's a level 12, "except as provided below."

2    So what -- it doesn't have to be -- it doesn't say it has to be

3    a firearm, it just -- it presumes that it's a firearm because

4    the individual is being sentenced for a firearm offense.  And

5    so it seems inconsistent to me that whatever the item would be

6    would be a firearm but not be a firearm when you get to the

7    specific offense characteristics.

8              And as I noted earlier, you're only applying 2K2.1

9    because the guidelines instruct you to apply that if the

10   individual is convicted under 26 U.S. Code, Section 5861.

11             So it is a firearm for the offense of conviction, so

12   it has to be a firearm, then, for the base offense level as

13   well, because if it's not a firearm, it wouldn't even apply

14   under (a)(7).

15             And then for it not -- looking at the text, for it

16   not to then -- for the definition of "firearm" to then change

17   for the specific offense characteristics simply doesn't make

18   sense.

19             The structure of 2K2.1 also suggests that the

20   ambiguity comes not from the structure or the language of the

21   guideline itself, but, rather, from the limiting definition of

22   "firearm" in the commentary.

23             At each level of 2K2.1, the guidelines provide an

24   increased penalty for a semiautomatic weapon and for a firearm

25   as described in 5845.

1        And so the structure of the guidelines evidences the

2   Sentencing Commission's intention to treat certain types of

3   firearms -- the semiautomatic firearms capable of accepting

4   large magazines and the firearms as described in 5845 -- more

5   seriously than other firearms.

6        But if you exclude firearms that don't fall in the

7   definition of 921 from the specific offense characteristic, it

8   would lead to the anomalous result that an individual who

9   possesses, let's say, 25 silencers is going to end up with a

10  higher offense level -- a significantly higher offense level

11  than an individual who possesses the same number of machine gun

12  conversion devices or 250 machine gun conversion devices,

13  because there would be no enhancement for the number of machine

14  gun conversion devices.

15       It also means that an individual who possesses a

16  silencer or just the frame or just the receiver would be

17  subject to an enhancement under paragraph (a)(6) if they were

18  transferring that item out of the country or if they had reason

19  to know that it would be used in connection with another felony

20  offense.  But an individual with a machine gun conversion

21  device wouldn't be subject to an enhancement under (a)(6).

22       And that interpretation is just not internally

23  consistent with the structure of the guideline at all.  And

24  it's contrary to the statute itself that defines what

25  constitutes a firearm for purposes of the National Firearm Act.

1   And the jury convicted the defendants and determined that the

2   items they were conspiring to transfer were firearms.

3        So the interpretation that is -- the definition that

4   is in the commentary seems to me to be what creates the

5   ambiguity, because if you don't look to that, you start with

6   the premise that it was a firearm, because that's what the jury

7   said it was, and then you apply the various application notes

8   assuming that the item is a firearm.

9        And then you look at the history of the regulation,

10  and there's nothing in the history of the regulation that

11  evidences any intention to remove or protect or treat less

12  harshly machine gun conversion devices.

13       Up until 1991, the guidelines specifically said if

14  you're dealing with a firearm as defined under 921, you use the

15  921 definition; if you're dealing with a firearm under 5845(a),

16  you use the 5845(a) definition.

17       They changed it in 1991, but nothing in that history

18  reflects that they were trying to alter the treatment of the

19  machine gun conversion devices, and nothing in the history of

20  the changes in 2003 suggests an intention to treat machine gun

21  conversion devices differently than other items that aren't in

22  and of themselves operable as a firearm; again, such as a

23  muffler or a silencer.

24       And when you look at the purpose of the regulations,

25  it's apparent throughout 2K2.1 that there was an intention to

1   treat Section 5845 weapons more severely in recognition of, as

2   Mr. Larosiere acknowledged, the increased danger that they are

3   believed to pose to public safety, and to punish the firearms

4   offenses in a manner commensurate with the danger of the weapon

5   possessed or the danger of the person possessing the weapon.

6           And excluding the machine gun conversion device from

7   that definition of "firearm," that creates the ambiguity, and

8   it's inconsistent with the overall purpose of the guidelines.

9           And so I don't think I can give deference to the

10  limited definition of "firearm" that is found in the commentary

11  to 2K2.1 at Application Note 1.  I think it's inconsistent with

12  the guideline itself.  It's inconsistent with the offense of

13  conviction.  And I don't think that the guidelines become

14  ambiguous until you read in that application note.

15          And so to the extent -- to the extent that either

16  Mr. Ervin or Mr. Hoover object to the base offense level of 18,

17  I have to overrule the objection because *Dupree* -- I'm bound by

18  *Dupree*, and *Dupree* says I can't give deference if it's

19  inconsistent or if the guideline is not ambiguous.

20          And one other thing I'll note in terms of the history

21  and whether the history of the guidelines suggests that this is

22  an intentional deletion -- just a moment, let me find it.

23          Recently the Sentencing Commission has put out for

24  public comment additional questions about various guidelines.

25  One of those reads as follows:

1          "The general definition of firearm in 2K2.1 at

2     Application Note 1 is drawn from 18 U.S.C., Section 921(a)(3).

3     However, 2K2.1 applies a higher base offense level to offenses

4     involving firearms described in 26 U.S.C., Section 5845(a).

5     Although Section 5845(a) generally defines a more limited class

6     of firearms than Section 921(a)(3), there are a limited number

7     of devices, such as those designed and intended solely and

8     exclusively for use in converting a weapon into a machine gun,

9     which are firearms under 5845, but not Section 921(a)(3).

10    Thus, such devices are firearms for purposes of the increased

11    base offense levels in 2K2.1(a)(1), (3), (4)(B)(i)(II), and

12    (6), but not for purposes of the specific offense

13    characteristics referring to firearms such as 2K2.1(b)(1),

14    which is the number of firearms.  The Commission seeks comment

15    on whether it should amend the definition of 'firearms' in

16    application note 2K2.1 to include devices which are firearms

17    under Section 5845(a) but not Section 921."

18          That reflects that this was not an intentional change

19    by the Sentencing Commission.  And in fact, if anything, the

20    Sentencing Commission is considering whether to close the gap

21    identified by the Court in *Hixson*.

22          And I'll note that the Sentencing Commission clearly

23    thinks that a machine gun conversion device, under the

24    guidelines, would start out at a level 18 because it

25    specifically says so.  It's only that if -- they are currently

1  excluded under the special offense characteristics.  And so

2  those comments also support a conclusion that the history of

3  the guidelines doesn't indicate that that limiting definition

4  should be applied if inconsistent with the statute and

5  inconsistent with the guidelines themselves.

6          So for purposes of the guidelines, the objection to

7  the offense level of 18 is overruled.  And then it would seem

8  that the defendants would be subject to the enhancements, so

9  there would be the special offense characteristic -- paragraph

10  53 would add a special offense characteristic for the number of

11  the firearms, which would be 10, and the special offense

12  characteristic under (a)(5) for trafficking, which would

13  increase by four levels.  So we would be at a level 30- --

14  paragraph 57 would be level 32.  And I'm looking at Mr. Ervin's

15  presentence report.

16          I need to confer with the probation officer about the

17  grouping.  So it's -- why don't I -- have I addressed all the

18  guideline objections at this point, Mr. King?

19          MR. KING:  Your Honor, the one on Count Nine, the

20  structuring, I don't think you've ruled, but I . . .

21          THE COURT:  But you suspected my ruling from my

22  question earlier, yeah.

23          The problem with the argument, and I understand the

24  argument, but the jury did find beyond a reasonable doubt that

25  Mr. Ervin knew the unlawful purpose of the conspiracy.  And the

 1   funds that he had were generated from the conspiracy.  And so I

 2   think the jury rejected the idea that he had a subjective

 3   belief that what he was doing was lawful, and so for that

 4   reason I have to overrule the objection to 59.  So it's

 5   preserved, certainly, for purposes of review.

 6           Any other guideline objections that I need to address

 7   for Mr. Hoover?

 8           MR. LAROSIERE:  Your Honor, just for purposes of the

 9   record, Hoover would also object to the special offense

10   characteristics enhancements as well as the base level offense,

11   just for the record.

12           THE COURT:  Certainly.

13           Mr. Mesrobian, I'm not going to deal with the 5K2.0

14   departure issue at this time.

15           MR. MESROBIAN:  Understood, Your Honor.  And I think

16   Ms. Taylor will address that in the 3553 factors in terms of

17   the appropriate sentence in this case and the factors.

18           THE COURT:  Okay.  Then let me take -- let's take

19   about -- it's 11:20 and we've been going for a couple hours.

20   We'll take about a 20-minute recess and then we'll reconvene.

21           COURT SECURITY OFFICER:  All rise.

22      (Recess, 11:20 a.m. to 11:39 a.m.)

23           COURT SECURITY OFFICER:  All rise.  This Honorable

24   Court is back in session.

25           Please be seated.

1          THE COURT:  All right.  So what we need to do is

2    determine the guidelines based upon the Court's rulings on the

3    objections.

4          And so looking at Mr. Ervin's presentence report, at

5    page 12, there would be two specific offense characteristics.

6    I think earlier I said (a)(1) and (a)(5).  I meant to say

7    (b)(1) and (b)(5).  But there's a 10-level increase for (b)(1)

8    for the more than 200 firearms, and there's a 4-level

9    enhancement -- special offense characteristic enhancement under

10   (b)(5), which yields a total offense level of 32.  That takes

11   us down to paragraph 64 for the grouping.

12         Count Nine no longer receives any additional units

13   because it's more than ten levels below the offense in Count

14   One.  And so there's one unit for Count One.  Under 3D1.4,

15   where there's only one unit, there is no increase.  So the

16   Total Offense Level simply remains at 32.

17         And paragraph 66, then, would be stricken.

18         And I think we would also strike 67.

19         Ms. Anderson, is that right?  Do you want to look at

20   mine?

21         PROBATION OFFICER:  Well --

22         THE COURT:  Come up to sidebar.

23    (The judge and the probation officer confer at sidebar.)

24         THE COURT:  So the probation officer's suggestion is

25   rather than striking 67, we just indicate that there was no --

1    there was no increase, which is what we have done.

2         So the Total Offense Level in paragraph 70 for

3    Mr. Hoover -- I'm sorry, Mr. Ervin, becomes 32, with a Criminal

4    History Category of I.  That yields a guideline term of

5    imprisonment of 121 to 151 months.

6         So in paragraph -- paragraph 106 needs to change to

7    reflect the offense level of 32 and the guideline.

8         And the fine range -- the maximum fine in 113 remains

9    the same.  The guideline provision in 115 increases to 35,000

10   to 250,000.

11        Ms. Anderson, are there any other places that we need

12   to make corrections -- or changes to the PSR to be consistent

13   with the Court's rulings?

14        PROBATION OFFICER:  No, Your Honor.

15        THE COURT:  Okay.

16        Turning to Mr. Hoover, at page 13 we would add

17   special offense characteristic of (b)(1)(E), which increases

18   ten levels; special offense characteristic of (b)(5) increases

19   four levels.  Paragraph 60 becomes 32 instead of 18.  His

20   Criminal History Category is also I.

21        So when we go to paragraph 96 we correct the offense

22   level and we correct the guideline range to 121 to 151.

23        And the fines in paragraph 105 increase to 35,000 to

24   250,000.

25        So then with respect -- oh, any other changes I need

1   to make to the Hoover PSR, Ms. Anderson?

2          PROBATION OFFICER:  No, Your Honor.

3          THE COURT:  So then with respect to -- based on the

4   Court's determinations of the applicable guideline range for

5   both Mr. Hoover and Mr. Ervin, Total Offense Level is 32,

6   Criminal History Category is I, which yields a guideline term

7   of imprisonment of 121 to 151 months, supervised release of 1

8   to 3 years for each count.  There's no restitution.  The fines

9   range from $35,000 to $250,000.  Mr. Hoover has special

10  assessments of $500.  Mr. Ervin has special assessments of

11  $1,200.

12         Mr. King, preserving all of your objections to the

13  Court's rulings, is my calculation of the guidelines consistent

14  with my rulings?

15         MR. KING:  Yes, Your Honor, in light of the Court's

16  rulings.

17         THE COURT:  All right.  Mr. Larosiere, preserving all

18  of your objections as well, is my calculation of the guidelines

19  consistent with your understanding of the guidelines as to

20  Mr. Hoover?

21         MR. LAROSIERE:  Your Honor, with the added objection

22  that the -- assuming it wasn't already covered by my previous

23  objection, the enhancement for the number of firearms ought not

24  be applicable to Hoover.  Aside from that, no, Your Honor, it's

25  consistent with your rulings.

1          So if you -- if my previous objections include

2     that -- because I said object to the application.  So I guess I

3     would just like to incorporate into my previous objection not

4     just the definitional issues, but the quantity issues.

5          THE COURT:  How would the -- if he was convicted of

6     the conspiracy, why wouldn't the conspiracy have included 200

7     or more machine gun conversion devices based on the jury's

8     finding?

9          MR. LAROSIERE:  I'm not sure if the jury's finding

10    could support that quantity, Your Honor.

11         THE COURT:  Can you tell me why not?

12         MR. LAROSIERE:  It's not clear that any of this -- of

13    the cards transferred, aside from those substantive acts which

14    were actually convicted, are attributable to Hoover.  And in

15    fact, the fact that certain substantive acts Hoover was not

16    convicted of I think underlies that objection.

17         THE COURT:  Wasn't the evidence presented at trial

18    the significant spike in sales after each of the CRS Firearms

19    videos?

20         MR. LAROSIERE:  I don't think that's a particular

21    factual finding that was relevant to the jury's conclusions,

22    Your Honor, or necessary for the jury's conclusion.

23         THE COURT:  Well, but the Court -- in determining

24    whether there was more than 200 -- whether the offense involved

25    more than 200 firearms, the Court makes that determination

1  based on a preponderance of the evidence, relying on the

2  evidence presented at trial.  Wouldn't that support the

3  finding?

4          I won't make you answer that.

5          MR. LAROSIERE:  Thank you, Your Honor.

6          THE COURT:  Mr. Mesrobian, would you like to address

7  that issue?

8          MR. MESROBIAN:  No, Your Honor, other than to say

9  that I believe the Court is correct based on the charged

10  conspiracy and the date range therein.  In combination with the

11  evidence at trial, I think that, by a preponderance of the

12  evidence, that shows that the conspiracy involved more than 200

13  auto key cards.

14          And if the next question was if the United States

15  agrees with the calculation as ruled by the -- based on the

16  rulings by the Court, we do.

17          THE COURT:  Okay.  All right.  So then we have

18  determined the guidelines, and the next step in the process is

19  to determine the appropriate sentence.

20          And I'm aware that Mr. Mesrobian had suggested that

21  there should be a 5K2.0 upward departure of 20 levels if the

22  Court did not accept the government's position with regard to

23  the guideline calculations.  And I suspect that there's going

24  to be an argument that there should be either still an upward

25  departure or a variance upward because the number of firearms

1   scored, which is 200, is substantially less than the 6,600

2   firearms at issue.

3          I think I need to just say out loud that, if

4   anything, at this point I think the guidelines are greater than

5   necessary for purposes of this offense.  And I'll say it's

6   highly unlikely that I would be convinced to even impose a

7   sentence within the guideline range, much less above it.  I'm

8   just putting that out there so that the government is aware.

9          I've calculated the guidelines in the manner that I

10  think is required under the law, but I think it drives a

11  sentence that is greater than necessary when one considers the

12  history and characteristics and the actual offense conduct.

13         And so that -- and I will say that, at the same time,

14  if I had accepted the defendants' contentions and the

15  guidelines were what the defendants argued for the way the

16  probation office scored them, I likely would have applied a

17  5K2.0 upward departure because I think that not including any

18  special offense characteristics for the number of firearms and

19  the significant nature of the activity of the defendants, that

20  would be inadequate.

21         And so I think the guidelines on either end probably

22  are not quite right.  And I'll address that in my final

23  findings, but I just put that out there so that you-all know

24  kind of where I'm starting from.  Having ruled on the

25  guidelines in the manner that I think the law requires me to

1  rule, I do think that they result in a higher-than-necessary

2  guideline range.

3       With that, Ms. Taylor, I think the floor is yours.

4  If you'll just let me find my notepad.

5       Go ahead.

6       MS. TAYLOR:  Yes, Your Honor.

7       Your Honor, understanding the Court's current

8  viewpoint about whether any sort of further upward departure

9  would be warranted, the United States does submit --

10      THE COURT:  Yeah.  And let me just say for the

11  record, I'm not pretermiting your ability to make your record

12  and to make the argument.  I just wanted to give you a heads-up

13  on which way I was leaning on that.  But you're certainly --

14  just as the defendants, you will make your argument.  I'm not

15  suggesting that you can't make that argument, Ms. Taylor.

16      MS. TAYLOR:  Yes, Your Honor.

17      And so based upon the Court's ruling on the

18  guidelines objections, what the government is asking for is an

19  upward departure of six levels to account for the inadequacy of

20  the guidelines with regard to the number of firearms.  I

21  believe that we've already outlined this argument in our memo.

22  And also to account for the fact that all of those firearms

23  were machine gun conversion devices, which, as Mr. Mesrobian

24  has previously argued, pose an especially dangerous

25  characteristic to the public.

1          And with that, Your Honor, I'll just proceed with my
2   sentencing argument under 3553.
3          This case involves two men who conspired together for
4   an extended period of time to sell what they knew to be illegal
5   machine gun conversion devices.  They have never accepted
6   responsibility for what they did.  In fact, they explicitly
7   continue to reject any sort of responsibility or any suggestion
8   that what they did was illegal.
9          So it's -- there's no contrition here.  There's only
10  continued assertions that -- for example, in Mr. Hoover's
11  sentencing memo, that he stands convicted of talking about
12  laser etchings on a homogenous piece of steel.  So the
13  minimization of what he did is readily apparent.  That's not
14  what he stands convicted of.  There's no statute that says you
15  can't talk about laser etchings on a homogenous piece of steel.
16         What he's convicted of, and what the evidence
17  overwhelmingly showed and what the jury decided, was that what
18  Mr. Hoover did was conspire to transfer machine gun conversion
19  devices that were thinly veiled as conversation pieces, or
20  bottle openers, to his viewers on YouTube.
21         As the Court heard during the trial, his viewership
22  on YouTube at various times reached upwards of almost 200,000
23  viewers.  So he had a substantial audience of people to sell
24  these items to.
25         And the Court just moments ago referenced the chart

1    that was presented at the trial as well which had the

2    correlation between the numbers of Mr. Ervin's sales of auto

3    key cards and when Mr. Hoover starting releasing his videos,

4    which clearly demonstrate Mr. Hoover's extreme -- or critical

5    role in getting Mr. Ervin's business off the ground.

6           When I think about which of them is the more culpable

7    in this scenario, I have a difficult time determining that one

8    or the other of them is more culpable.  Initially you could say

9    it's Mr. Ervin because he's the one that came up with this

10   idea.  He's the one that got -- you know, tricked the machine

11   shop, essentially, into manufacturing them for him by being --

12   by lying about what they really were and saying they were a

13   construction tool.  And he obviously was endeavoring to sell

14   these things -- sell the auto key cards before he ever came

15   into contact with Mr. Hoover.

16          But it's also abundantly clear that Mr. Ervin never

17   would have reached the audience that he did or achieved the

18   level of success that he did without Mr. Hoover saying, "Yes,

19   I'm" -- "I'm ready to go and tell people on my YouTube videos

20   exactly what this thing is and how they can turn it" -- "use it

21   to turn their AR-15 into a machine gun."

22          Mr. Ervin seemed to want to blanket himself under the

23   idea that, well, if I don't tell people how to do it, if I just

24   send them emails saying, you know, "Just Google these search

25   terms and then you'll find the instructions," that that

1  protected him or veiled him from any sort of responsibility for

2  what he was doing.

3         He made other comments in his messages to Ms. Wolfe

4  that were presented at the trial along the lines of, "I can't

5  help what people do with it once it's out of my hands."

6         And -- but -- but what he did, then, was he got

7  Mr. Hoover to say those things for him.  He got Mr. Hoover to

8  say the quiet part out loud to his audience of over a hundred

9  thousand viewers and tell them exactly what it was, exactly

10  what you could do with it, exactly how you needed to configure

11  your firearm, and how to put the piece together inside of your

12  firearm to cause it to fire fully automatically.

13         And moreover, Mr. Hoover didn't just give those

14  instructions, but he explicitly advocated for prohibited

15  persons to obtain these devices.  One of the things that he

16  said in one of his first videos was, "Once you are prohibited,

17  that doesn't mean you can't have firearms anymore."  And I'm

18  paraphrasing, but he said, "That doesn't mean you can't have

19  firearms anymore, what that means is your chains have been

20  broken.  You can do whatever you want with a firearm, so why

21  not make a machine gun?"

22         And that sort of advocacy of lawlessness, which

23  Mr. Hoover clearly was engaging in, was click-bait, I'm sure,

24  to get him more views to his videos, but also led to an

25  enormous increase in the sales of the auto key card.  It led to

1  Mr. Ervin reaping enormous profits on the auto key card, which

2  he paid approximately 2 to $3 for each one to get it

3  manufactured and then was charging between 60 to about $150 for

4  each one that he sold.  So this was enormously profitable to

5  Mr. Ervin.

6           Mr. Ervin, again, continuing to try to conceal what

7  he was doing and conceal himself from law enforcement, made

8  efforts to hide what he was doing with his bank as well by

9  structuring these cash withdrawals.

10          THE COURT:  How was that trying to hide what he was

11  doing from his bank?

12          MS. TAYLOR:  Because he was not -- well, I guess to

13  be more accurate, I think he was trying to hide what he was

14  doing from the government by making the money untraceable and

15  refusing to engage in any sort of transaction; for example, the

16  bank check that was offered by the bank that he could have

17  taken and deposited in another bank, or doing an electronic

18  transfer or something like that to take his money out of the

19  bank.

20          And he also concealed his activities from the

21  government by paying Mr. Hoover in cash; sending money through

22  the mail to Mr. Hoover rather than what an ordinary person

23  would do in sending Venmo or Zelle or PayPal or any of the

24  number of other electronic payment -- instant payments that

25  could be sent for essentially no fee whatsoever.  Instead, he

1    was FedExing cash to Mr. Hoover.

2         THE COURT:  Or people like me that still write

3    hard-copy checks.

4         MS. TAYLOR:  Still slightly different than FedExing

5    cash, Your Honor.

6         But Mr. Ervin's intent in making these things was

7    not, as he said, free speech.  And that was clear from the

8    messaging that he put out, in particular, before he hooked up

9    with Mr. Hoover in this conspiracy.

10        He sent messages where he told his potential

11   purchasers, you know, "It's designed to be legal as-is, but

12   certain individuals may choose to use it in an illegal way in

13   the future under certain dire circumstances."

14        There was testimony at the trial about Mr. Ervin

15   being a prepper.  And it appears that his engagement in this

16   auto key cards conspiracy was part of that mindset that he had,

17   that the government is imminently going to fall and that once

18   that -- I guess at some point in that process that everybody's

19   going to be able to cut these things out and convert their

20   weapons into machine guns because there would be complete and

21   utter lawlessness.

22        But again, Mr. Ervin himself was telling his

23   customers, "You can choose to use it in a different way" -- in

24   other words, an illegal way, in other words, to use it to

25   convert your weapon into a machine gun -- "in the future."

1      Your Honor, there was a lot of argument about --

2  well, there's a lot of argument in particular in Mr. Hoover's

3  sentencing memo about this case being outside the heartland of

4  cases contemplated by the guidelines.  It's not clear exactly

5  what Mr. Hoover means by that except that he repeatedly

6  suggests that this case that he cites, I believe at least three

7  times in his sentencing memo, the *Vest* case, stated that the

8  NFA is intended to go after crime weapons and not tchotchkes.

9  The *Vest* case doesn't ever say the word "tchotchkes."  It

10  doesn't have anything to do with tchotchkes.

11      What the *Vest* case is about is a police officer who

12  apparently believed that he was lawfully purchasing a machine

13  gun under the authority of his police department and was

14  prosecuted for possessing an unregistered -- or an NFA weapon

15  that was not registered to him.

16      And so what the Court in *Vest* was saying was this

17  statute was not intended to go after law enforcement weapons.

18  That's actually what it says.  It's not minimizing that

19  tchotchkes are not really that important or in any way

20  suggesting that machine gun conversion devices are tchotchkes.

21  That's not part of the case.

22      But to the extent that this case is outside the

23  heartland or different from other cases that have been

24  prosecuted in this district, first off, it's clear from the

25  supplemental memo that the government filed that violations of

1   Section 5845 or Section 5861 relating to conversion devices are

2   happening in this district fairly regularly.  And they only

3   seem to be on the increase with 3D printing and Glock switches,

4   which are sort of the fad right now.  But there's really no

5   argument to be made that this is something that the government

6   ordinarily just turns a blind eye to and doesn't pursue.

7           The only way in which this case is outside the

8   heartland or different from those cases is the massive scale at

9   which Mr. Ervin and Mr. Hoover conducted their criminal

10  activity.  The other cases that are discussed in this

11  supplemental sentencing memorandum involved maybe up to dozens

12  of machine gun conversion devices.  Nothing where two men got

13  together, agreed to engage in illegal conduct over a term of

14  months, engaged an unwitting manufacturer to make the machine

15  gun conversion devices, and then advertised them on YouTube to

16  an audience of at least tens of thousands, leading to the sale

17  of, in this case, what the Court has credited -- and it -- the

18  fact in the PSR was not objected to, that the offense involved

19  at least 6,600 auto sears, which may be, actually, an

20  undercount, because as shown at the trial, there's at least one

21  other manufacturer that made the auto key card for Mr. Ervin

22  before he finally started working with Orange Park Machine.

23  But the amounts of those key cards that were manufactured at

24  that point is unknown at least to the government.

25          So the only way in which this case is outside of the

1    heartland or distinguishable from those other cases is that

2    this case involved a massive scale.  It involved the massive

3    online marketing of these things as exactly what they were,

4    which was machine gun conversion devices, and the encouragement

5    of purchasers to use them to convert their firearms into

6    machine guns.

7            As the government argued in its sentencing memo and

8    as Judge Merryday's opinion in *Aguilar-Espinosa* makes clear,

9    machine gun conversion devices are dangerous.  And that's so --

10   I mean, really whether or not we're looking at bump stocks,

11   which are -- Mr. Larosiere I think referred to at one point, or

12   maybe it's in their sentencing memo, that firearms regulations

13   are in flux.  Well, that -- the law about bump stocks certainly

14   is in flux, but the law about these is not.  Machine gun

15   conversion devices have been part of the NFA for decades.

16           And the definition that was used in this case by the

17   government to prosecute, that was presented to the jury in the

18   jury instructions, comes straight out of the statute.

19           There's nothing about the ATF doing rulemaking or,

20   you know, trying to slip something past the public that nobody

21   knew about in this case.  Not that I'm saying that happens in

22   other cases, but it's just that -- those arguments are

23   completely irrelevant to what happened in this case because the

24   device is a machine gun as defined under the statute, and

25   that's what the jury's verdict reflected.

1    Your Honor, Mr. Hoover argues that -- for one thing,

2    he argues that it serves 5K2.0's purpose to point out that

3    firearms law is in an incredible state of flux and a reasonable

4    person could be confused as to whether these things were

5    illegal.  Well, again, the law as to machine gun conversion

6    devices is not in flux.  It's not in question.  And it's also

7    clear that Mr. Hoover and Mr. Ervin both understood exactly

8    what the items were and what function they performed.  So

9    whether some other reasonable person could, perhaps, be

10   confused about whether or not they were firearms is really

11   beside the point.

12        But regardless of whether something is a hundred

13   percent within the statutory definition of a firearm, as the

14   auto key card was, or whether it's something like a bump stock,

15   which courts -- circuit courts are currently in disagreement

16   over whether it meets the definition or not, the point that the

17   government was making in its sentencing memo, and the point

18   that I make to you today, is that any kind of device that

19   causes the rapid fire of a firearm enables mass destruction.

20   It doesn't matter whether that thing -- whether it's a bump

21   stock that, again, courts can reasonably disagree about whether

22   or not it meets the definition of a machine gun or whether it's

23   the auto key card, which clearly does.  Either way, those are

24   both devices that are meant to convert a rifle to fire rapidly.

25   And it's that rapid firing that is what gives the auto key

1   card, any kind of auto sear, or a bump stock its destructive

2   power.

3          That's exactly what Judge Merryday was describing

4   when he described "brutally lethal capacity, the possession of

5   which imminently threatens the public" when describing auto

6   sears.

7          THE COURT:  I guess, Ms. Taylor, the concern I have

8   about the government's reliance on that -- and there's no doubt

9   that a machine gun is capable of mass destruction.  But in

10   terms of the level of danger of these particular devices, I

11   think the evidence at trial was that the only person who

12   successfully converted it was the agent.

13          But if these items are so very dangerous -- and they

14   absolutely fall within the definition of a machine gun based on

15   the jury's verdict.  But if they're so dangerous -- the

16   government certainly didn't prosecute any of the individual

17   purchasers, but the government also hasn't -- based on the

18   testimony at trial, hasn't made any effort to go get them off

19   the street.

20          And so I have a hard time reconciling in my mind how

21   these devices are so dangerous, yet the government has in its

22   possession names and addresses of over a thousand purchasers.

23   But unless it's changed since trial, there hasn't been -- and

24   I'm not suggesting that every purchaser should be prosecuted,

25   but a knock on the door to take back the device, similar to

1    what was done with the other individual purchasers, would seem

2    to be more reflective of this "brutally lethal capacity" that

3    you're arguing that I should enhance their sentences for, but

4    yet there's no effort to take them off the street.  I'm

5    struggling with that.

6            MS. TAYLOR:  Your Honor, what I would say in response

7    to that is with regard to the argument that I anticipate the

8    defendants likely will make, that no one else successfully

9    converted one of these things into -- or actually, you know,

10   cut it out and successfully installed it in a weapon, first

11   off, was what I was referencing earlier with regard to

12   Mr. Ervin's instructions to -- or intentions for how they be

13   used, you know:  Keep this and use it later, when essentially,

14   you know, the government falls and everything is in disarray.

15           So to the extent that that's how he was marketing, we

16   heard from Mr. Moya, he was one of the purchasers that

17   testified at trial, that he purchased four of them and put them

18   away, to have them for later, because he also believed that the

19   United States is about to devolve into chaos and lawlessness,

20   and that was when he intended to use them, at that later time.

21           So that's one potential reason why we haven't seen

22   somebody else successfully convert one.

23           Another reason why is, frankly, I believe there was

24   testimony about this at trial as well, but not all of the names

25   in that database are the names of the real person.

1          THE COURT:  Right.

2          MS. TAYLOR:  Some -- Mr. Hoover explicitly instructed

3     his viewers to "send it to your anti-gun relative."  And we

4     know that at least of our sample size that Mr. Osso and

5     Mr. Alderson did that in order to conceal who was really

6     possessing it.

7          And moreover, in large part, we're relying on what

8     people tell us when they say, "Oh, I cut it up into little

9     pieces and threw it in a ditch."  I don't have any way to

10    verify that that's true.  That was Mr. Roberts's testimony.

11         We had a sidebar at one point during the trial

12    about -- where it was suggested that we should have gotten a

13    search warrant and gone and searched the houses of every single

14    purchaser, and it was the Court's ruling that that was

15    something that we would obviously have staleness issues on.

16         So unless the people who purchased an auto key card

17    are willing to come to their door when ATF knocks, which is a

18    question unto itself, if they don't come to the door, ATF's

19    probably leaving a card there and asking them to call back.

20    And then when they do, all they have to do is just lie about it

21    and say, "No, I don't" -- "I never got that" or "I don't know

22    what you're talking about" or "I destroyed it" or "I threw it

23    away" or "I gave it to my friend Goose," which is what one of

24    the purchasers told the agent, which was a lie.

25         So ATF would be reliant upon thousands of people who

1   are viewers of Mr. Hoover and have been told by Mr. Hoover not

2   to talk to the ATF and that if ATF comes to the door they're

3   going to kill your dog.  So we're relying on these people to be

4   compliant with ATF coming and telling the truth to ATF, which

5   certainly was not our experience of what happened in the couple

6   of -- I think it was a couple of dozen purchasers that were

7   approached in the Jacksonville area as part of this

8   investigation.

9           So for all of those reasons, it is unfortunately

10   unrealistic that ATF is going to be able to achieve the goal of

11   doing a nationwide recovery of thousands of auto key cards in

12   this case and is also the reason that -- I think it assumes a

13   lot to say that nobody else has been able to use one to convert

14   their gun because there are maybe people out there who haven't

15   gotten around to cutting it yet.

16           There are probably -- we know from our interviews

17   that there are people out there who had it, intended to cut it

18   in the future, and then watched Mr. Hoover's videos about the

19   takedown and decided to get rid of it before they got the

20   chance to cut it.  I believe that included Mr. Alderson.  And

21   Mr. Stennes as well.  He had talked about trying to cut it.  He

22   had bought auto key cards and solvent traps.  He had tried to

23   cut the auto key cards, but it was making too many sparks so he

24   hid it in various places around his house -- or, sorry, I'm

25   thinking about Mr. -- I apologize, Your Honor, I have to go

1   back and look through the names.

2           But that was the testimony of one of the purchasers,

3   that he had been unable to cut it and then was keeping it

4   stored for later, when he might -- I guess might try again.

5   And then when ATF knocked on his door, he destroyed his auto

6   key cards and the solvent traps, presumably knowing that he

7   could get in trouble for having them.

8           So again, there's unfortunately no way for us to

9   know -- oh, sorry, that was Mr. Duty.

10          There's unfortunately not a good way for us to know

11  who did and did not successfully cut it out and use it to

12  convert a weapon.

13          Mr. Roberts also had testified at the trial that he

14  had heard automatic fire in the woods when he was out near his

15  home and went up and talked to the strange men in the woods who

16  had a cut-out auto key card.  And that was his testimony.

17  Again, I --

18          THE COURT:  We don't know that that was from

19  Mr. Ervin's, right?  I didn't think there was any evidence

20  about where that had come from.

21          MS. TAYLOR:  I don't believe that he would have been

22  able to say for sure whether that was from Mr. Ervin or

23  somebody else that might have been making a similar product.

24          So for all of those reasons, Your Honor,

25  unfortunately it's unrealistic for us to either know decisively

1  who -- whether anybody has or has not, and to the extent that

2  people have cut it out and used it to convert their weapons,

3  how many.

4          Again, there are people who may have it and still be

5  planning to use it later.  There are people who likely had it

6  and were intending to cut it out but then destroyed it or

7  discarded it because they did not want to get into trouble.

8          And furthermore, our problem here is the lack of

9  cooperation and truthfulness that ATF encountered when trying

10  to interview purchasers and recover the auto key cards, which,

11  in part, is due to the messaging that Mr. Hoover put out after

12  Mr. Ervin was arrested where he told people, "If ATF knocks on

13  your door," you know, "don't talk to them," and, frankly,

14  scared the -- many purchasers, or at least some of the

15  purchasers who testified, into believing that ATF was going to

16  kick down your door and shoot their dog if they came to your

17  house.

18          So obviously ATF is dealing with a portion of the

19  population that have been indoctrinated to believing these

20  things about the ATF, are hostile to the ATF, and are also

21  fearful of prosecution if they were to be truthful about having

22  purchased it and possessing it and/or what they did with it.

23          Your Honor, another point that I wanted to touch on

24  is with regard to Mr. Ervin.  It's apparent from his sentencing

25  memorandum that he's been an unlawful user of marijuana all

1    throughout the time of this conspiracy and apparently for the

2    last 20 years.  So he, additionally, is a prohibited person.

3         The investigation in this case revealed that all of

4    those ARs that Mr. Ervin purchased -- all or almost all of them

5    were purchased with the proceeds of this conspiracy.  And they

6    were purchased during the time frame of the conspiracy, which

7    means that Mr. Ervin was also lying on ATF 4473 forms about

8    whether he was an unlawful user when he made each of those

9    purchases.

10        I'm not -- the government's not seeking to enhance

11   his guidelines range based on those factors.  I personally do

12   not seek to hold people accountable for things that they

13   disclose to probation in terms of enhancing their guidelines,

14   but certainly it's been highlighted as being part of his

15   history and characteristics that he's been an unlawful user of

16   marijuana for 20 years.

17        And clearly he has committed other federal crimes in

18   the course of purchasing and possessing all of the firearms

19   that he was purchasing and possessing during the time frame of

20   the conspiracy as well.

21        Your Honor, I also want to touch on what Mr. Hoover

22   said in his sentencing memo and what was -- and I guess before

23   I get there, there were letters that were submitted on his

24   behalf to the Court.  I spoke with Mr. Larosiere before this

25   hearing today.  We had not received the letters until right

1    before court today.  They did provide me with a copy of them

2    and explain that they were trying to file them under seal and

3    that the motion hadn't been ruled on yet.

4           And I did get a chance to read them after I was

5    provided with them in court today.  And I spoke to

6    Mr. Larosiere about what I understood to be the ordinary

7    procedures, which is that letters of support are filed on the

8    public docket.  And so I just want -- I don't want to talk

9    about anything that's potentially under seal before I move into

10   this topic, but there is information in the letters that should

11   be redacted.

12          THE COURT:  There is information in the letters that

13   would need to be redacted if it was on the public docket.  The

14   truth is that letters come to the Court in a lot of different

15   ways.  Some people write to me directly; some people provide

16   them to the probation office and they're appended to the PSR so

17   they're not on the public docket; and then sometimes they are

18   filed on the public docket, though I don't think there's a

19   requirement that it be on the public docket.  There are

20   certainly names and dates of births of minors and some personal

21   information about Mrs. Hoover that probably doesn't belong on

22   the public docket.

23          So I don't know that those items need to be filed on

24   the public docket, but I also don't think that prohibits you

25   from talking about any matters that you think were relevant

1    from the letters.

2         MS. TAYLOR:  Yes, Your Honor.

3         And the point that I particularly want to talk about

4    is referenced separately in Mr. Hoover's sentencing memorandum,

5    which is this idea that's just thrown into the sentencing memo

6    that Mr. Hoover called the ATF and, you know, got the ATF to

7    tell him that the auto key card was legal.  And that's a --

8    that's something that is repeated in Mr. Hoover's father's

9    letter of support as well.  There is no record evidence that

10   that happened, Your Honor.  None at all.

11        Mr. Hoover apparently began making this claim shortly

12   after he was arrested.  And I know this because there was a

13   request to depose this -- this ATF employee, who is not an

14   agent.  He is a -- essentially an inspector for FFLs in

15   Wisconsin.  There was a request by Mr. Hoover's attorneys that

16   we allow that man to be deposed.  That's Mr. Ruiz.  Of course,

17   depositions are not ordinarily done in federal criminal cases.

18        And I -- but -- but Agent Hooker and I did

19   investigate this claim based on its *Brady* potential.  And we

20   interviewed Mr. Ruiz.  And in sum, Mr. Ruiz denied knowing

21   Mr. Hoover.  Stated that he had looked through his records and

22   saw that he had conducted a -- an inspection of Coloma Resale,

23   which was Mr. Hoover's shop -- Mr. Hoover's father's shop,

24   really -- and that he had conducted that inspection in 2015,

25   which is five years before this conspiracy commenced.  And he

1   did not remember anything about that interview.  And he would

2   only really remember it because -- if something remarkable had

3   happened.

4           Mr. Ruiz stated that he watched some of Mr. Hoover's

5   videos and he did not recognize Mr. Hoover, that he had

6   never -- did not recall ever having talked to Mr. Hoover.  And

7   he stated that if someone asked him a question about something

8   like a lightning link or auto sear or machine gun, he would

9   always refer that person to the proper authorities within ATF

10  that are responsible for those items, including the NFA branch

11  or the Firearms and Ammunition Technology Branch, which I

12  believe has been renamed, but essentially is where Officer Toy

13  works.  And stated that he -- Mr. Ruiz stated he's very

14  cautious about any items that may have a dimple, have been

15  drilled or have been cut, because it could be indicative of an

16  item that's been converted and may not be legal.

17          He stated that he viewed one of Mr. Hoover's

18  videos -- this was after we had requested the interview -- that

19  he viewed one of Mr. Hoover's videos with the auto key card in

20  it.  He could see that it had been cut in places and appeared

21  to have a lightning link drawn or etched on it.  And he felt

22  that the auto key card was a blueprint for making a lightning

23  link, and he would never suggest that something like that might

24  be legal.  And again, did not recall ever having discussed auto

25  key cards or lightning links with Mr. Hoover.

1              So we also had a year of phone records of

2     Mr. Hoover's and of his wife's cell phones.  Ms. Butler

3     performed a search of those records to see if there were any

4     records of phone calls between either of those numbers and

5     Mr. Ruiz, and there were not.

6              We had Mr. Ruiz search his ATF email account for

7     search terms "Matthew Hoover," "Hoover," "Coloma Resale," an

8     email address that was associated I believe with the FFL, and

9     an email address for Mr. Hoover, and he did not find any emails

10    from the period of 2018 to the time of the interview that

11    referred to any of those things.

12             He also reached out to the other industry operations

13    people in his office asking if anyone had had any prior contact

14    with Mr. Hoover and no one had.

15             In short, Your Honor, we investigated this claim.

16    Special Agent Hooker wrote a report about it.  I produced it in

17    discovery.  Mr. Hoover could have asked for a subpoena from

18    Mr. Ruiz in the trial if this had really happened.  Mr. Hoover

19    had the right to testify at trial and say that this happened.

20    His attorneys could have presented any other documentary

21    evidence that this happened.  But none of that happened because

22    there is no evidence that this ever happened except that

23    Mr. Hoover says it happened.

24             So even assuming that he did at some point have a

25    conversation with somebody at ATF about this, it's clear from

1   how he has described it, including up and through his

2   sentencing memo, that he wouldn't have said, "It's a piece of

3   metal with a lightning link etched on it and I'm going to tell

4   people that they should cut it out and use it to make a machine

5   gun.  Is that okay?"

6           Even now, he and his attorneys, in the sentencing

7   memo, are still saying he's convicted of talking about etchings

8   on a homogenous piece of steel.  They just refuse to describe

9   it in any sort of accurate way.

10          So, again, you know, if this were equivalent to like

11  an advice-of-counsel defense, he would have been required to

12  fully disclose all of the pertinent details of what he was

13  planning to do in order to rely on an opinion that he got.  So

14  even assuming that he did get an opinion -- and again, there's

15  no evidence of that -- we have no idea what he said to whoever

16  he may have talked to about what this thing was and what he was

17  planning on doing with it.  And all of the evidence in this

18  case suggests that he likely would have minimized what it was,

19  not described it accurately, in an attempt to veil its true

20  purpose.

21          And Your Honor, I just would ask the Court, frankly,

22  unless there's going to be some evidence that this happened and

23  what the conversation was and that he actually got an opinion

24  from ATF, that the Court should disregard these assertions in

25  coming up with an appropriate sentence because they're

1    certainly not proof to a preponderance.  There's not even

2    probable cause at this point that this happened.

3           Your Honor, the auto key card was determined by a

4    jury to be a machine gun conversion device, that it was a

5    combination of parts designed and intended to convert a weapon

6    into a machine gun.  They heard testimony from Officer Toy, who

7    was able to -- his testimony was he had never cut one of these

8    things out before.  He was using ordinary tools that are

9    accessible to anyone.  He cut along the line.  And the pieces

10   that he cut out, he had to shave less than a millimeter off the

11   end of the paddle piece to get the firearm to close, but that

12   they functioned to convert the weapon into a machine gun.

13   That's what the jury credited.  That's what all of the evidence

14   in this case showed.

15          The evidence in this case also showed that the

16   purpose of these defendants in engaging in this conspiracy was

17   explicitly to subvert the laws of this country.  They knew what

18   they were doing.  They knew what the auto key card was.  They

19   knew what they were intending it to be used for.  And they sold

20   them at a massive scale to -- instructing buyers, you know, to

21   hide their purpose, to hide who they really are, and, of

22   course, not instructing anybody that it needs to be registered

23   on the National Firearms Registration and Transfer Record,

24   which Congress has determined is necessary for machine gun

25   conversion devices to be legally possessed.

1        Had these items been registered, then, of course, it

2   would be much easier for ATF to go knock on the doors of the

3   legally registered owner of the item and ask them questions.

4   But that's not what happened.  Instead, this was all done under

5   a veil of secrecy and misdirection in order to engage in

6   large-scale criminal conduct.

7        Your Honor, again, it's the government's request that

8   the Court should depart upward and/or vary upward because the

9   number-of-firearms enhancement that's in the guidelines is

10  vastly lower at its top end than the number of firearms that

11  were actually trafficked by Mr. Ervin and Mr. Hoover.  It is

12  necessary in this case to apply a sentence that reflects the

13  seriousness of this offense, that provides for deterrence,

14  which has not been provided for yet.

15       Again, the defendants, both of them, still entirely

16  reject any sort of responsibility for what they did; entirely

17  reject that what they did was criminal.

18       There's no indication that they have been deterred in

19  any way, shape, or form from engaging in this kind of conduct.

20       Your Honor, for all of those reasons the government

21  submits that there really is very little mitigation here.

22  Mr. Hoover talks about his family.  And as this Court knows,

23  it's a sad reality that a large portion of the defendants that

24  come before this Court have families that care for them,

25  families that depend on them, small children that need them.

1    Frankly, Mr. Ervin, you know, doesn't have small

2  children depending on him, really doesn't have anybody

3  depending on him.  He does have a family that loves him.  But

4  it would be -- it would be unjust to give Mr. Hoover a lighter

5  sentence based on the fact that he has a wife and children who

6  are financially dependent on him and Mr. Ervin does not.  That

7  would not -- that would not be appropriate in this case, Your

8  Honor.  And the guidelines instruct that a departure based on

9  family circumstances is only warranted in exceptional cases.

10  And this case, sadly, is not exceptional.

11    Your Honor, I would reserve any other comments that I

12  would have for rebuttal, but at this time there's very little

13  in the way of mitigation and little basis, the government

14  submits, for imposing a sentence that's below the guidelines.

15    And that's our request, Your Honor.

16    THE COURT:  Below the guidelines as departed upward.

17    MS. TAYLOR:  Our request is for the upward departure.

18  But assuming that the Court stays with what it was inclined to

19  do and does not issue a further upward departure, again, we

20  would be asking for an upward variance.  If the Court declines

21  that, then our third step would be the sentence should be

22  within the guidelines as the Court has previously ruled on them

23  earlier today.

24    THE COURT:  Thank you, Ms. Taylor.

25    It's a little after 12:30 and I suspect that we've

1  got a good bit left.  I don't think I should starve everybody,

2  so I think we'll take about an hour.  I'll ask us to be back at

3  1:30 to continue with the presentations.  I'll start with you,

4  Mr. King.

5          Mr. Ervin, I'm going to give you an opportunity to

6  speak if you wish to speak --

7          DEFENDANT ERVIN:  Yes, ma'am, I do.

8          THE COURT:  -- but you don't have to.  Okay.  That's

9  your right, and I'll hear from you then.

10          And then, Mr. Larosiere, I'll hear from you.

11          And Mr. Hoover, I'll give you an opportunity to speak

12  as well.

13          And if there are any witnesses either of you --

14  Mr. King or Mr. Larosiere, that you-all want to present, I'll

15  hear from them this afternoon.

16          MR. KING:  And Your Honor, just for the Court's

17  planning purposes, we have one witness to read a letter, but

18  otherwise we don't have any witnesses.

19          THE COURT:  Okay.  Mr. Larosiere, are you

20  anticipating calling any additional witnesses other than

21  perhaps Mr. Hoover?

22          MR. LAROSIERE:  Your Honor, should we take it that

23  our motion to file the letters under seal is granted and that

24  the Court has taken them into consideration?

25          THE COURT:  I think what I'm going to do is just

 1   strike the letters from the docket and treat them as if you had

 2   submitted them directly to me.

 3           MR. LAROSIERE:  Okay.  In that case, it would be a

 4   maximum of two witnesses, Your Honor.

 5           THE COURT:  Okay.  Can you go ahead and let us know

 6   who those witnesses would be?

 7           MR. LAROSIERE:  It would be Mr. Hoover's father and

 8   Mr. Hughes.

 9           THE COURT:  And Mr. King, who are we going to hear

10   from?

11           MR. KING:  Mr. Ervin, Mr. Ervin's father.

12           THE COURT:  Okay.  We're in recess till 1:30.

13           COURT SECURITY OFFICER:  All rise.

14      (Lunch recess, 12:35 p.m. to 1:34 p.m.)

15           COURT SECURITY OFFICER:  All rise.  This Honorable

16   Court is back in session.

17           Please be seated.

18           THE COURT:  All right, Mr. King.

19           MR. KING:  Your Honor, Mr. Ervin, Sr. has a statement

20   he'd like to read to the Court.

21           MR. KRIS ERVIN:  Right here?

22           MR. KING:  Yes, sir.

23           THE COURT:  Sir, I'm going to ask you to start by

24   telling my court reporter your full name, please.

25           MR. KRIS ERVIN:  Sure.  I'm Kris Anderson Ervin, and

1   I'm the father of Justin, who goes by "Justin."

2          THE COURT:  Go ahead, sir.

3          MR. KRIS ERVIN:  First of all, thank you for the

4   lunch break.  We were all very hungry.

5          I just thank you for the opportunity to talk with you

6   today and provide you some additional information about my son,

7   Justin.  And hopefully that will help you in your decision in

8   sentencing him.

9          I've got a great deal of respect for you, your job,

10  the things you've done.  You seem nothing but fair and

11  professional.  I've been in the court for a long time with you,

12  and I appreciate that.

13         Justin is good, hard-working, and passionate about

14  the things he believes in.  My wife and I raised all three of

15  my children with those attributes.  They're all strong

16  children.  Unfortunately, my wife passed away in 2017.

17         Your Honor, the last time I was in your courtroom,

18  you spoke of having respect for the rule of law.  And as you're

19  aware, in Justin's 40-plus years, he has been respectful of

20  authority and the law.  He's never been arrested prior to this

21  case that I know of.  He does cherish the rule of law,

22  fairness, our country, and the Constitution.

23         His grandfather, my dad, was in World War II, was

24  severely wounded in the Pacific.  His great uncle was shot down

25  in a B-17 bomber and killed while defending our freedom.  So

1    patriotism actually runs in his DNA.

2         Since you've heard so many unfavorable things that

3    were presented to you by the government, I thought it might be

4    helpful if I could bring up a couple of good things that Justin

5    has done.

6         He stayed at home with his mother while she was sick

7    when she became ill.  And what that did is that allowed me to

8    work and travel in my job to support my family.  And he did

9    that up until the time she passed away.

10         He provided mechanical services on his mother's car.

11    He provided it on his aunt, he provided it on neighbors and

12    anybody else that was in need.  At no charge.  That was merely

13    out of the kindness of his heart.

14         When our neighbor became blind, Justin took it upon

15    himself to take him to his appointments, doctor's appointments,

16    errands, all at no charge.  Just, once again, being very

17    helpful, as he has all of his life.

18         He worked on base at Naval Air Station on the Navy

19    Marine Corps internet project, which required him to pass their

20    background check, which was quite stringent.  He worked on IT

21    projects for Wounded Warrior.

22         And recently he helped a fellow inmate pass his GED

23    test with an A.  This inmate had failed the test several times

24    and Justin kind of took him under his wing, encouraged him to

25    do the best he can, became his teacher, and he was able to pass

1  his GED test.

2      And there are many, many other examples of Justin

3  doing good things for people.

4      A lady at the -- at Publix, her son was very sick and

5  Justin helped her.  She works behind the deli.  And Justin

6  helped her out with that.  Once again, just out of kindness.

7      I assure you Justin is a danger to no one.  Over the

8  course of his life there have been no victims, no acts of

9  violence, theft, harm in any way, no one's been hurt, no

10  restraining orders, no domestic violence, nothing.  And that's

11  how I raised my children.

12      He has had a concealed weapons permit for over

13  15 years with no issues.

14      I can also assure you he did not wake up one day and

15  decide to be a criminal.  And a very bad one at that.

16  Everything Justin did was in the light of day.  No concealment.

17  And that may have been something that kind of fooled all of us

18  into thinking this was just legitimate, because there was no

19  dark web, no meetings of the night.  Going straight to the

20  bank, the post office.  Everything was natural as you would be

21  running a business.

22      I -- Ms. Taylor brought up "knocks at the door."  I

23  said I wish I had been told about that, that we did receive in

24  January a knock at the door and a card at the door to say "call

25  me," because what would have happened, it would have stopped

1   this, and the items that were shipped from January to March

2   would never have been out in the public.

3        I feel very badly that I didn't recognize the

4   severity of this.  It bothers me as a father very, very badly.

5   And it bothers my daughter and my son because had we -- any of

6   us recognized that, we would not be here today.

7        As a parent I was proud of him during that time

8   because he was so excited about this idea.  And to me, it was

9   just -- to me, it was kind of like the pet rock.  He found an

10  internet niche and it was going to blossom and then die away.

11  He was so excited.  And it was the first time I'd seen a spark

12  in him since his mother passed away.

13        He bought land with the money.  Sure, he bought some

14  firearms, but he bought land.  He put a well on that land.  He

15  bulldozed that land.  He improved it.  He bought a bus to

16  convert to an RV with plans to park it out there until he could

17  get his home built.  He was working to build a good home and a

18  good life for himself.

19        My family has suffered greatly, Your Honor.  I have

20  suffered greatly.  This has taken a toll on my health.  And I

21  know how much Justin has suffered being in jail two and a half

22  years.  I talk to him every night.

23        I'm nearly 70 years old.  I ask for your compassion

24  and leniency.  Any sentence given to Justin may become a life

25  sentence for me.  Please allow my son to come home at the

1  earliest possible moment.  We'll make sure he follows all of

2  your rules and he shall never return here again.

3       Thank you.  And thank you for your consideration.

4  And if you have any questions, I'll be glad to answer them.

5       THE COURT:  I don't have any questions, sir.  Thank

6  you very much for taking the time to speak today.

7       MR. KRIS ERVIN:  Thank you for hearing me.

8       MR. KING:  And Your Honor, at this time Mr. Ervin

9  would like to address the Court.  And Your Honor, we had a

10  prepared statement, but Mr. Ervin said he wanted to speak from

11  the heart, so he's going to be . . .

12       DEFENDANT ERVIN:  I'm going to need a second, Your

13  Honor.

14       THE COURT:  Sure, of course.  You want to --

15       DEFENDANT ERVIN:  Get a drink of water?

16       THE COURT:  Yes, a good idea.

17       DEFENDANT ERVIN:  I love my dad very much, and my

18  family, all of them.

19       Thank you, sir.

20       THE COURT:  Take your time, sir.

21       It's okay.  I understand.

22       DEFENDANT ERVIN:  Your Honor, can you hear me?

23       THE COURT:  Yes, sir.

24       DEFENDANT ERVIN:  All right.  I remember ever since I

25  was young loving this country.  I remember being in elementary

1  school and saying "I pledge allegiance to the flag of the

2  United States of America and to the Republic for which it

3  stands, one nation under God, indivisible with liberty and

4  justice for all."  And I meant it in my heart.  No one can

5  question how much I love this nation and how much I respect the

6  rule of law.  I mean, I love all my fellow Americans.  I love

7  everyone in this courtroom and I want a future for everyone.

8       And this whole thing has hurt me very much.  It has

9  broken my heart.  And this is very difficult for me because as

10  much as I love this nation, and to think the government wants

11  to hurt me and my family, I mean, it -- I mean, it's turned

12  into a nightmare.  I've -- I mean, I can't even think of

13  everything I needed to say, but I'm going to do the best I can

14  here today.

15       But I remember being at the Naval Air Station

16  Jacksonville.  I've been to every air show for 20 years since I

17  was little until about age 20.  I remember seeing the Blue

18  Angels flying over Jacksonville, all around here.  And I was

19  just so proud of my country.  And I love the United States so

20  much.

21       And I love artwork, I love the First Amendment, I

22  love the Second Amendment, I love the U.S. Constitution.  I

23  know that miracles do not cluster in history.

24       And the founding of this nation is a miracle.  And we

25  can't let it go quietly into the night.

1           And it really made my heart feel good where -- one

2    little stitch to bring my heart back together, when at the

3    hearing, the last Friday ago, I heard you say that the First

4    Amendment, the Second Amendment, the U.S. Constitution is the

5    supreme law of the land and should be upheld.  I mean, that

6    really, really was a bright point in the last two and a half

7    years.

8           And I've been put under a lot of pressure, both by

9    these proceedings and by everything that I've been exposed to

10   being in detention.  I mean, I've seen people overdose; I've

11   seen people die; I've seen people get beat up.  I've been

12   exposed to all kinds of horrors, but I've focused on the

13   positive.

14          So I helped people learn how to read that couldn't

15   read.  I helped them write letters to their attorneys to help

16   them communicate their wishes.  I tried to turn a bad situation

17   into the best possible to show who I am, because you can put me

18   under pressure, you can try to make me break, but I'm still

19   going to be who I am and stand up for what is right.

20          And there are certain things that I can't stand by

21   and watch.  There's a couple gangs that had a war while I was

22   in there and they went to try to beat up the Mexican-Spanish

23   guys.  And there's only three of them in there.  In the other

24   dorm I was in I seen it happen before and I stopped it.  And

25   they said, "Nobody stands up to that guy, but you did."  You

1  know, because I couldn't stand there and watch someone else get

2  beat up again or their food stolen.  I mean, it's just horrible

3  what I've seen.

4          And a lot of those guys that are hardened and gang

5  members and stuff like that, I would teach them the message of

6  freedom and liberty and teach them how important the country is

7  and its values and standing up and doing the right thing.  And

8  some of them changed.  Other drug addicts turned back and went

9  home to their families.  A couple of them started businesses

10  and they're doing really good.  Another one stopped doing

11  drugs.  I told him he has a good family, go home to them.

12  Like, I have a good family, I want to go home to them, and you

13  can.  So I've sat there for so long it seems like, and everyone

14  gets to go home but me.  And some of them come back, and it's a

15  travesty.

16          And I've been put under great pressure.  And I'm

17  dressed like an orange today in this big orange suit, like an

18  adult baby.  And I don't like it.  But when you put an orange

19  under pressure, orange juice comes out.  So I've been put under

20  horrendous pressure, but my good has come out.  I've helped

21  many people.

22          I'm on a first-name basis with most of the guards

23  there.  I mean, my brother is a Jacksonville Sheriff's officer,

24  a sergeant.  I've been on police ride-alongs for citizen

25  oversight in everywhere you can see out here with JSO before

1    this.

2         I love the Second Amendment.  All my firearms are

3    legal.  There's no issues with my firearms collection, my

4    ammunition, or my body armor.  I mean, I go shooting with my

5    family on Thanksgiving.  And many of my friends are police

6    officers too that I played baseball with through high school

7    and college.

8         I'm a born champion and have a champion inside me.

9    And I was a champion in baseball, a district champion, and I

10   was a champion in swimming.  And I actually went to state.  In

11   1998 I was the twentieth fastest in the state of Florida.

12        I work hard.  I'm a serial entrepreneur.  And not all

13   my businesses succeed forever.  Some of them died.  Some of

14   them went on.  But I still continued to endure and go forward.

15        And failure is an event, it is not a person.  The

16   important thing about failure is that you learn from it so that

17   you can deal with what's coming in the future.  And with the

18   additional challenges, it takes courage to get up every single

19   day for me.  It takes courage to continue.  It takes courage to

20   admit when you've failed.

21        And my whole life I've enjoyed the First Amendment.

22   Whenever I started Auto Key Card -- I had a dream when I was

23   ten years old, and it was to cause debate in the public square.

24   A lot of this debate has occurred here today.  And I intended

25   it as a conversation piece.

1          And there was a year or two -- there's many years I

2     thought about it and I watched what was going on.  And I wanted

3     to cause a nationwide debate at a serious time in American

4     history because very few of us get to come to the defense of

5     the First Amendment when it is being extinguished across the

6     land.  And I enjoyed being a part of that process.

7          And you've seen the YouTube videos.  You've seen the

8     millions of Americans that me and Mr. Hoover represent.  And we

9     have great support from the people.  So it just -- it hurts my

10    heart so much everything that has happened.  And it is also a

11    great success, the amount of debate that has occurred.

12         And I don't seek to cause problems.  I don't seek to

13    destroy people or have -- be a danger.  I've never been a

14    danger.  I've saved over 30 people in my whole life, from

15    drowning, getting beat to death.  One guy almost got beat to

16    death by -- a bunch of guys were chasing him down the road with

17    a baseball bat and golf clubs and they cornered him on the

18    porch of this house, where he was boxed in.  And I got out of

19    my car, run up there, said, "Hey, man, what are y'all doing?"

20         "It was the guy that ran there."

21         And I didn't even know what was going on, okay.

22         And they said, "oh, okay," and they ran off.  And

23    that guy told me, "Thank you so much, sir.  I appreciate it.  I

24    thought they were going to kill me."

25         I said, "No problem, man," and I got in the car and

1    left because I don't need any glory.

2         I don't need to be known.  I don't seek to be known.

3    I help people and I don't need to say, "Hey, well, I saved that

4    person's life.  I saved them from drowning," you know, "I did

5    the right thing."

6         I don't need the recognition, but I do the right

7    thing no matter what.  And I believe I was sent here by God to

8    do the right thing.

9         And before I started my business, I had a card that I

10   made myself and I engraved myself.  And I went around to gun

11   shows talking to people and gun ranges talking to people.  And

12   there were people that said, "That's very interesting, like I

13   want one of those."

14        This is the market-research stage of my business.  I

15   talked to attorneys, I talked to law enforcement.  And

16   everybody said, "I don't even think you can be in trouble for a

17   picture."

18        And so I acted in good faith.  I even -- I even -- I

19   remember talking to -- they had a booth at the gun shows of the

20   ATF.  I remember talking to them, and they just laughed it off

21   and thought I was some stupid guy.  It was no big deal.  And no

22   one tried to arrest me.  I sold over 15 different unique pieces

23   of artwork with unique designs.  I mean, are 10 a crime?  Is 5

24   a crime?  Is it 3?  I mean, there was ways to mitigate and

25   prevent all of this from occurring and I never got the

1    opportunity to.

2           And I understand what the jury has decided.  I do not

3    agree with it.  I still maintain my innocence, not in --

4    against this Court and not in accepting responsibility for my

5    actions.  I accept responsibility for my actions, I just do not

6    believe that -- that -- that I committed a crime.  And I don't

7    want you to get mad and I don't want you to -- don't want you

8    to be angry at me maintaining my innocence.

9           And I don't want you to punish Mr. Hoover for me

10   telling him about my due diligence.  And we talked on the phone

11   and have text messages between us.  And my phone erased itself

12   and his disappeared?  Like, it's very disconcerting to me.  And

13   I don't know everything that occurred with it, but I think

14   there is a better way that all of this could have been handled.

15          And I have great faith.  And I'm willing to endure

16   whatever it takes to make it through this hard time, because

17   there's a great future ahead.

18          I am a very capable individual.  I am very good at

19   all kinds of internet things, computer software.  I've built

20   data centers.  I've worked for the U.S. military.  I mean,

21   everybody that comes in contact with me, most of the time, is

22   better off by me coming in contact with them.

23          There's times whenever I might have had an argument

24   or something, but we're all only human and I never hurt nobody.

25   And I don't seek to hurt anybody.  I don't seek the will to

1    dominate over anyone.

2         So with me being like an orange and under all this

3    pressure, love came out.  And I love my family.  I love my

4    friend Matt Hoover and his family.

5         I have my father and my six-year-old -- or, I'm

6    sorry, my five-year-old nephew at the time I was arrested is

7    eight now.  And I was a very, very integral part to his life.

8    And now it's -- to him it's like aliens came and abducted me

9    and I've disappeared.  And there are core developmental years

10   left that I need to be there for him.  My father, I need to be

11   there for him.  I'm willing to do whatever it takes to take

12   care of them in the future.

13        So this all has been very difficult for me, but the

14   only thing I can ask for is mercy, because it's the only way

15   out for any of us.

16        And I look behind you and see the great seal of the

17   United States District Court, and it has a symbol of freedom

18   and liberty and of justice.  And I am thirsty for justice.  And

19   I feel that if I was to say that that was a bald eagle and it

20   was a violation of the Endangered Species Act, that would be

21   disingenuous.

22        But I respect the rule of law, I just don't agree

23   with what has happened.  But I don't want to be extra punished

24   or hurt for doing the right thing, because I will always do the

25   right thing and I strive to do the right thing.  It's the moral

1    high ground.

2            You see, Archimedes said:  Give me a place to stand

3    and a lever long enough and I will move the world.

4            The world has been changed by people talking about

5    the auto key card.  But everybody focuses on the lever, the

6    second part, about leverage over someone.  What can you do to

7    them?  I focus on the first part, the most important, the place

8    to stand, because that's the moral high ground.  And that's

9    what was in my heart the whole time that I was running my

10   business.

11           And my little business is destroyed, you know.  I

12   made a hundred-some-thousand dollars, not even that much.  I

13   mean, it's gone.  Okay.  Fine.

14           Like, please, please have mercy, because a government

15   that has no mercy is not one that I want to be a part of.  And

16   it's a scary thing in the history of the world.

17           I love history.  There's a reason for the First

18   Amendment, because once they get rid of what you can say, then

19   they can take the weapons and they can -- and there's a great

20   history of genocide throughout all governments in the history

21   of the world, which is why the American Constitution, the

22   Second Amendment, and the First Amendment are so important.

23   And it made me feel so good when you said that those are

24   important.

25           And I don't seek to cause problems.  I want to be

1  part of the solution in the future, for freedom and liberty for

2  all, so that we can have prosperity, because if we don't have

3  freedom and liberty and prosperity, we have no future.

4         And there are many, many Americans that feel the same

5  way I do.  And they're my friends and they're my supporters.

6  They've donated money so I could have an attorney.  Otherwise,

7  I would be defenseless.  And they donated money so that

8  Mr. Hoover could have attorneys, so that we could have a

9  chance.  So we have great support among the American people.

10         And freedom of speech was my intention the entire

11  time.  But it just seems like that the auto key card is a

12  mirror, and it just shows who everybody is.  And I do the best

13  I can.

14         So I don't know what else to say, Your Honor, but I

15  did not seek to cause any problems or issues with this Court,

16  with anyone, any danger, or nothing at all.

17         And I've been through hell and back.  I mean, these

18  bags under my eyes, I never had this in my life.  I look at

19  myself in the mirror, I don't even recognize myself in the

20  morning.

21         And there's just an unending sea of the worst humans

22  that flow into that jail and just antagonize, you know, a good

23  person like me.  And I don't -- I have nothing against them.  I

24  have great hope for them.  I hope that they get their lives

25  together.

1              But that's what I was trying to do.  I wanted to

2      build a house.  I wanted to have a future.  I wanted to have a

3      business.  And I love everything that's American.

4              So that's pretty much it, Your Honor.  Thank you so

5      much for letting me speak.

6              I know I went a little extra on time, but I just want

7      to tell everyone here, I appreciate all of y'all, everyone, and

8      I love everybody.  And I only want a future for all of us.

9              Thank you very much.

10             THE COURT:  Thank you, Mr. Ervin.

11             Mr. King.

12             MR. KING:  Your Honor, we don't have any additional

13     witnesses or evidence.  I'm not sure if you'd like me to

14     proceed to argument or --

15             THE COURT:  Go ahead.

16             MR. KING:  Your Honor, could I have a moment?

17             THE COURT:  Sure.

18         (Pause in proceedings.)

19             THE COURT:  Go ahead.

20             MR. KING:  Thank you, Your Honor.

21             You know, the Court's in a unique position to have

22     sat through a lengthy trial and heard about some of the

23     conduct.  And what I'd like to address today is some of the

24     things that were not before the Court and some of Mr. Ervin's

25     background.

1        During the course of this case I've gotten to know

2   Mr. Ervin's family very well.  And I can honestly say his

3   father is probably one of the nicest human beings I've ever

4   met.  His sister is fantastic.  His brother has worked with a

5   lot of people I know at the Jacksonville Sheriff's Office.

6   They're a really good family.  And for this to happen to

7   Mr. Ervin, for him to find himself in this position, I don't

8   think is a reflection on them or their character.

9        And one of the things that I look for in situations

10  like this is:  How did we get here?

11        And in talking to Mr. Ervin's family and in talking

12  to Mr. Ervin, in 2017, but the two years prior, his mother was

13  suffering from alcoholism and wound up essentially drinking

14  herself to medical issues and having other medical issues.  And

15  because of where they were in their family, Justin Ervin was

16  the one who was there to take care of it and to watch it unfold

17  over the course of years.  It wasn't a sudden dramatic or

18  traumatic thing; it was something that built up over time.

19        In talking to them, it's very clear that the person

20  that he was before that happened and the person he was after

21  that happened were very different.

22        The probation interview I did with Ms. Anderson was

23  probably one of the most emotional ones -- it is, by far, the

24  most emotional one I've ever participated in.

25        It's clear that there is a lot of trauma that has not

1    been addressed with Mr. Ervin as a result of his mother's death

2    and living through that.  And, you know, one of the things

3    that's recommended, certainly, is mental health treatment as

4    part of the probation sentence.  I think that's needed.

5            One of the things that has happened is he started

6    abusing marijuana right after his mother's death.  Thankfully

7    he stopped using to that extent during the course of the times

8    alleged in the indictment, but he was -- he was struggling with

9    mental health and not getting the correct treatment.  And

10   unfortunately, what he turned to was the internet and

11   individuals who -- you know, he's certainly not blameless in

12   this, but individuals who put ideas in his head and individuals

13   that he put ideas in their head, and he was kind of off to the

14   races.

15           And unfortunately, he finds himself in a situation

16   where, you know, during the course of our conversations, I

17   think you heard some of that today, he truly believes that he

18   was making political statements and, you know, it was art and

19   protest and things like that.  I don't doubt his sincerity, but

20   I view that as a symptom of kind of where he is and what has

21   happened to him.

22           The 40-plus years that he lived on this earth before

23   getting into this situation he was law-abiding, he was

24   responsible, he worked, he took care of family, he took care of

25   friends.

1        I have little doubt that the specific deterrence for

2   him, you know, addressing the 3553 factors, is necessary.  I

3   have no concerns that he is going to re-offend or commit

4   offenses once he has completed his sentence here.  I don't fear

5   for the public for anything that he would do.

6        The rehabilitation part is a lot tougher because I

7   think a lot of the issues, you know, incarceration doesn't

8   address.  And one of the things I did want to address with the

9   Court is he's spent over two and a half years in the Baker

10  County Jail.  And time at the Baker County Jail is very

11  different from time spent at the Bureau of Prisons.  And I

12  would ask the Court to consider the difficulty of that time in

13  determining a fair and reasonable sentence because of the

14  conditions.

15       You know, he shared with me there was an inmate who

16  was overdosing and none of the guards in the area knew CPR, but

17  he did.  He tried to administer CPR and was pulled back and put

18  in a cell where he watched that individual pass away because

19  they did not get the life- -- you know, life-saving measures

20  that were needed.  And he's talked about that with me a lot.

21       One of the difficulties here is you have somebody

22  who's, you know, never been in trouble before, misguidedly but

23  genuinely believed that they were acting lawfully, but then you

24  have promotion for respect for the law.  And understanding that

25  that factor, you know, it's going to require an incarcerative

1    sentence of Mr. Ervin, you know.  Obviously whether you think a

2    political protest is important to you, there's ways to do it

3    and there's ways to not do it.  And this is clearly a way not

4    to do it.

5         THE COURT:  Well, I -- Mr. King, I don't think there

6    was anything about the evidence that was presented in this case

7    that supports that this was a -- simply a political protest,

8    that this was simply freedom-of-speech activity.

9         The evidence shows that Mr. Ervin was manufacturing

10   these devices that would convert an item into a firearm, that

11   he was selling them with videos and other propaganda that told

12   people exactly that.

13        So this case is not about the First Amendment.  This

14   case is not about political debate.  And respectfully,

15   Mr. Ervin, it's not about creating a forum for debate.  It's

16   about manufacturing devices that were put in the hands of other

17   people who could then use them to convert their firearm into an

18   exceedingly dangerous weapon.

19        So let's keep the arguments grounded in what this

20   case is actually about.  It really -- it's not about the First

21   Amendment.

22        MR. KING:  Your Honor, I agree with you.  And I think

23   my point, which I think I failed to make, is this is where

24   Mr. Ervin's head was at.  Because I agree with you, this is not

25   about the First Amendment, this is about somebody distributing

1    dangerous items.

2        And where he mentally went after his mother's death

3    was a sincere belief that -- you know, I think the Court is

4    right in everything you've said, but a sincere belief that this

5    was how people protest.  And it's not.  It's the wrong way to

6    handle things.

7        So in terms of promoting respect for the law, the

8    Court has to address that.  And, you know, like I said, I have

9    very little concern that Mr. Ervin is going to re-offend.

10       You know, I think a recommendation to RDAP would be

11   appropriate given that he has had in the past issues with

12   needing to -- self-medicating with illegal drugs.  And given

13   his mental health issues, I think that would be an appropriate

14   thing.

15       The -- you know, looking at the guidelines, the --

16   you know, one of the questions the Court had of the government

17   was, you know, why were these things not collected.  I think

18   part of the answer is these were bad auto sears to some extent.

19   They were very difficult to work with and manufacture.

20       You know, I've been involved in cases with Glock

21   switches.  I fired a firearm I think once in my life.  And

22   those Glock switches, I could -- I could probably watch a

23   ten-minute YouTube video and do those.

24       These were inartfully done, you know.  And that

25   doesn't mitigate the danger that they create.  But I think

1    that's a big part of it, is these were -- you know, to some

2    extent these were poorly done.  They were not something that

3    would -- somebody would be easily or readily able to convert.

4    And as that ties to the guidelines, you know, certainly given

5    the number of items, it's a very large number.  And it went out

6    to I think every state in this country, at least one of those

7    items.  You know, that's not lost upon me or Mr. Ervin.

8            But the actual dangerousness of the item -- you know,

9    again, the templates of these things are something freely

10   publicly available.  You can get them online.  Metal is readily

11   available.  Individuals who want to do this have shown time and

12   time again they can do this.  It's not like the Glock switches.

13           Again, not to say that it's not serious, but in terms

14   of relative seriousness of machine gun conversion devices,

15   these were, to some extent, very poor machine gun conversion

16   devices, very difficult for any of the individuals to use.  And

17   I think Officer Toy's testimony kind of bears that out, the

18   difficulty that he had in actually getting it to work with

19   various parts and how long it took him.

20           At the end of the day, you know, in order to promote

21   respect for the law, obviously this Court has a difficult task

22   ahead.  I know Mr. Ervin was very misguided in his beliefs in

23   terms of the political stance that he thought he was taking.

24   There's -- the Court is completely accurate that this is not a

25   political protest and that's not what it's really about, but in

1    Mr. Ervin's head it has been.

2            And so in terms of looking at the 3553 factors, this

3    is somebody who up until this point, who got this idea in his

4    head based on where his mental health was, has a great family

5    who's been -- like I said, his father is a wonderful person,

6    his brother and sister are truly wonderful people who are very

7    productive, very good individuals in our society.

8            And I'm hoping that the help that Mr. Ervin will get

9    through services and supervision after he's served his

10   incarcerative period will help him get to the point where he

11   realizes the gravity of the situation.  And based on that, and

12   my conversations with him, I don't think he's a danger to

13   commit new offenses or continue on this conduct once his

14   sentence has been completed.

15           May I just have a moment?

16           THE COURT:  Yes.

17     (Pause in proceedings.)

18           MR. KING:  Your Honor, I want to thank you for the

19   time and attention you've paid not only in this sentencing

20   hearing, but the trial as well.  And on behalf of Mr. Ervin,

21   thank you.

22           THE COURT:  All right.  Thank you, Mr. King.

23           Let me -- I'll give you an opportunity to respond

24   after I have heard from counsel for both defendants,

25   Ms. Taylor.

1          MS. TAYLOR:  Yes, Your Honor.

2          THE COURT:  Mr. Larosiere.  And you can proceed in

3   whatever order you choose.

4          MR. LAROSIERE:  Thank you, Your Honor.  And may it

5   please the Court.  We'd like to have my client, Mr. Hoover,

6   speak first.

7          THE COURT:  Okay.

8          DEFENDANT HOOVER:  Good afternoon, Your Honor.

9   Sorry.

10          MR. LAROSIERE:  Volume down.

11          DEFENDANT HOOVER:  I just talk loud because I have

12   excessive hearing damage.

13          THE COURT:  Okay.  Go ahead.

14          DEFENDANT HOOVER:  I apologize.

15          THE COURT:  That's okay.

16          DEFENDANT HOOVER:  Anyway, the only thing I'm really

17   hoping you take into consideration with this whole trial and

18   like how everything is going and my sentencing, I'm really

19   hoping you take into consideration like the chain of events

20   that led me right up to this point.

21          And it all started off with the COVID lockdowns.  My

22   truck-driving job got cut by about 30 or 40 percent.  Needless

23   to say, it got to the point where I wasn't going to be able to

24   make my bills.

25          Now, I believe in God.  I'm not saying, like, I'm the

1   perfect Christian.  I definitely swear too much and I should

2   probably go to some more church, I'm just saying that.  But

3   when I feel God's compelling me in a certain way, I go that

4   way, because I've read the story of Jonah and the whale.

5   That's just what I do.  And I've went through it personally.

6   Like I've been compelled to do something before, like help this

7   person out or something like that, and I didn't, and I wind up

8   getting forced to do that in a much more undesirable way.

9        Anyway, my truck-driving job got cut by like 30, 40

10  percent, as I was saying, and I'm freaking out.  I'm like, you

11  know, I don't know what to do.

12       THE COURT:  Mr. Hoover, my court reporter is giving

13  me the look that she gives me when --

14       DEFENDANT HOOVER:  I apologize.

15       THE COURT:  -- you're talking way too fast.

16       DEFENDANT HOOVER:  Let me know when I can go on.

17       THE COURT:  Just try to slow down a bit, okay?

18       DEFENDANT HOOVER:  Okay.

19       MR. LAROSIERE:  Breathe.

20       DEFENDANT HOOVER:  So I did some praying and I did

21  some crying, and a little bit more praying, because I thought I

22  was going to lose my house that we had just got, and then by

23  like the sleight of a hand, the flick of a switch, all of a

24  sudden I get this email from Mr. Ervin, "Hey, I'd like to

25  sponsor your channel.  I have this website called Auto Key Card

1    and I sell various products."

2         And I went to the website and I contact him back, I'm

3    like, "Everything looks good.  Nowhere in the NFA does it say

4    anything about the potential for" --

5         COURT REPORTER:  I'm sorry.  It's too fast.

6         MS. TAYLOR:  Your Honor, I'm going to object at this

7    point to the extent that Mr. Hoover is essentially testifying

8    as part of his allocution.  I think if he wants to testify

9    about things that are not in the record, then he needs to go on

10   the witness stand and be subject to cross-examination.

11        THE COURT:  Mr. Larosiere, can we maybe narrow the

12   scope of Mr. Hoover's --

13        MR. LAROSIERE:  Your Honor, can I have an aside with

14   my client for a --

15        THE COURT:  You may, of course.

16      (Mr. Larosiere confers with Defendant Hoover.)

17        THE COURT:  Go ahead, sir.

18        DEFENDANT HOOVER:  So essentially I was approached

19   with the contract.  And I was like, I need to do my due

20   diligence.  I'm a newly licensed machine gun manufacturer and

21   I'm on YouTube.  So I called up Miguel.  I'm like, "Hey,

22   Miguel, does" --

23        MS. TAYLOR:  Your Honor, I object to this.

24        DEFENDANT HOOVER:  I'm just making the point that I

25   truly believed in my heart what I was doing was lawful.  I

1  talked to the ATF.  They even cited opinion letters that I've

2  referenced --

3       THE COURT:  Mr. Larosiere, I'm a little concerned

4  about the comments about having talked to the ATF.  Unless

5  Mr. Hoover wants to go ahead and speak to that under oath, I am

6  a little -- to the extent that he's trying to mitigate by

7  saying that he was told these were lawful, I think arguably

8  that could be problematic under an obstruction consideration.

9  I don't think that's the path we want to tread down.

10      MR. LAROSIERE:  So I do think that the point is made

11 that he believed -- I think his belief is relevant and I --

12 would it be okay if we just moved beyond this particular point?

13      And I guess, Hoover, all you have to say is this was

14 your honest belief.  And I will actually address the things you

15 were talking about when I take argument.

16      DEFENDANT HOOVER:  So, yeah, it was my honest belief.

17 And I feel responsibile for Mr. Ervin, too, because he came to

18 me in good faith talking to a machine gun manufacturer, that if

19 there was some sort of problem, I would have instructed him.

20 And he had already done his due diligence, blah, blah, blah,

21 blah, blah.  I know if I would have been like, "Hey, there's

22 questions here in the law, like I'm not really sure about

23 this," he wouldn't have done it and I wouldn't have taken the

24 contract.  So I apologize for all the problems I caused.

25      I'm not saying, like, the jury did something wrong or

1  anything like that.  I totally accept responsibility for

2  everything and I'm just --

3          MR. LAROSIERE:  Slow.

4          DEFENDANT HOOVER:  I'm just really hoping you'll take

5  into consideration, like, I truly didn't believe I was breaking

6  the law.  Like, I really didn't.

7          And it sucks because I'm probably going to go away

8  for a long time and miss big parts of my little girls' --

9  anyway, Babe, I'm sorry that you're having to go through this.

10         I apologize.

11         THE COURT:  Take your time.  That's okay.  I

12  understand.

13         DEFENDANT HOOVER:  Because you've been through so

14  much and you don't deserve it.

15         I'm not trying to stall, I'm just a little emotional.

16         THE COURT:  It's understandable.

17         DEFENDANT HOOVER:  Not, like, trying to guilt-trip

18  you into a lesser sentence or anything like that, just please

19  take all that stuff into consideration.  Thank you.

20         THE COURT:  All right, sir.

21         DEFENDANT HOOVER:  Thank you for your time, too.

22         MR. LAROSIERE:  I would now like to hear some words

23  from Mr. Hoover's father, Mr. Hoover, Sr.

24         THE COURT:  Sir, I'm going to ask you to --

25         MR. MICHAEL HOOVER:  I'm not good at talking in front

1    of a crowd.

2         THE COURT:  Okay.  Let me ask you before you start

3    just to tell my court reporter your first and last name.

4         MR. MICHAEL HOOVER:  Michael Hoover.  Michael J.

5    Hoover.

6         THE COURT:  And take your time, sir.

7         MR. MICHAEL HOOVER:  Matt's always been there for me.

8    He drove a truck for me for nine years hauling U.S. mail.  And,

9    yeah, our hours got cut, so he had to do something different.

10   He started helping me in the store.  And I also have a store.

11        And he's always tried to do everything right.  Even

12   with my trucking, if I wasn't sure about rules, he'd research

13   it for me and always get back to me on it.

14        If he would have known that this thing was not legal,

15   he wouldn't have done it.

16        He -- I know it's been said it didn't happen, but he

17   did call the ATF and talk to the agent and describe what it was

18   and --

19        MS. TAYLOR:  Your Honor --

20        MR. MICHAEL HOOVER:  I know I --

21        THE COURT:  So --

22        MR. MICHAEL HOOVER:  Sorry.

23        THE COURT:  -- here's the thing.  Mr. Ervin and

24   Mr. Hoover went to trial and the evidence was presented.

25        MR. MICHAEL HOOVER:  Yeah.

1        THE COURT:  And the jury concluded that they did know

2   that this was -- that what they were doing was unlawful.  And I

3   have to sentence them based on that evidence that was presented

4   to the jury.

5        So you go --

6        MR. MICHAEL HOOVER:  I'm just asking for you to be

7   lenient or mercy or whatever.  And thank you for your time.

8        THE COURT:  Thank you, sir.  I know this is

9   difficult.

10       MR. MICHAEL HOOVER:  Okay.

11       MR. LAROSIERE:  Mr. Richard Hughes.

12       MR. HUGHES:  Your Honor, thank you for your time.

13       THE COURT:  Can you just give my court reporter your

14   full name -- your name, sir.

15       MR. HUGHES:  Sure.  Richard Hughes, Palm Beach,

16   Florida.

17       Judge, I've watched you through this.  You've been

18   very thoughtful, justice-seeking, and I admire your attention

19   to detail.

20       I became friends with Erica and Matt.  I do YouTube

21   videos.  And Matt and Erica, they reached out to help me with,

22   you know, thumbnails, titles, camera position, settings.  And

23   they've helped other YouTubers.

24       I'm just here to tell you that he's a good guy.  He

25   reaches out to people.  I've talked to Matt about, you know,

1    life issues.  We kind of have different paradigms.  He -- his

2    whole goal in life was just to do videos on YouTube, make

3    money, and be with his family, so that he could by noon be done

4    with all of his YouTube work and hang out with his wife and

5    kids.

6            He loves being a dad.  He loves his wife.  He would

7    get up in the morning, drive his daughter to school.  And his

8    whole life philosophy was just keeping his expenses low and

9    just being able to pay for everything by basically working half

10   a day doing YouTube and being a dad the rest of the time.

11           As far as YouTube goes and what this case has meant

12   to people like myself, like Matt, that do YouTube videos in the

13   firearms space, it really is a shot across the bow.  People in

14   our community have been paying very careful attention to this

15   case.  It's a very sobering and very chilling fact that we make

16   money by taking sponsorships for products, to advertise

17   products.  Myself not so much.  I have a regular day job that

18   this is just kind of a fun thing for me to do.  My day job, I'm

19   a cloud engineer, and I'm doing okay so I don't need to take

20   sponsorships.

21           The -- what's happened recently in the YouTube space

22   is we're more self-policing.  If I see somebody going in a

23   direction that's not -- that's going to actually end up like

24   Matt, I'm like, "Hey, you better look at what's going on.  You

25   don't want to even go in that direction."

1          So if the prosecution's case is like, "Hey, we need
2    to make an example," they already did.  It's well known.
3          I just really wanted to tell you that I have really
4    high regard for Matt.  Matt doesn't have a formal education.
5    He doesn't have a college degree.  I actually have an
6    associate's from a community college, but I do cloud
7    engineering, pretty much self-taught.
8          Matt's a brilliant guy.  His analytical ability, the
9    way he figures things out, you know, he would call me up, he's
10   like, "Hey, I did a new thumbnail for you.  You got the wrong
11   colors."
12         THE COURT:  I don't know what you mean when you're
13   talking about thumbnails.
14         MR. HUGHES:  So for a YouTube video, what you see is
15   a thumbnail.  And he knew the analytics on what colors worked
16   right, how to do the titling.  And he would, you know, freely
17   share.  I know other YouTubers in the same space and they've
18   never said boo to me about how to improve yourself, how to be
19   better at the YouTube space.
20         I'm sorry, I skipped a page here because I've been
21   taking notes in the court.
22         And I think -- I know Matt.  We've talked about the
23   situation, and I know Matt honestly didn't believe he was doing
24   anything wrong.
25         And we -- a couple of things were mentioned earlier

1    by the prosecution.  There's a joke in the YouTube 2A community

2    about shooting your dog because of Ruby Ridge, and there's

3    other incidents where the ATF has shot people's dogs.  So

4    that's kind of a common cliché.  I don't think that means a

5    whole lot.

6            The other thing about this is as much as YouTube is

7    kind of reality TV in your basement, there's a little bit of

8    the TV effect to it.  So, you know, you can't share your whole

9    personal life.  That's not a good thing.

10           The other thing is you may exaggerate some things to,

11   like, make something interesting, like a product to be more

12   marketable.  I've often said that if ABC, NBC, CBS were held to

13   the same standard in regards to something like Fen-Phen that

14   caused a bunch of deaths, we'd have a bunch of CEOs in jail

15   right now.

16           I'm just shocked personally that engaging in

17   advertising has ended up in somebody behind bars.  I think this

18   all could have been settled with a cease-and-desist letter

19   early on and both of the men involved would have just walked

20   away.

21           And thank you for your time.

22           THE COURT:  Thank you, sir.

23           Just a moment.

24       (Pause in proceedings.)

25           THE COURT:  Go ahead.

1          MR. LAROSIERE:  Your Honor, I'd just like to spend a

2    short moment talking about Matt Hoover, the man I know, and

3    then I will hard transition into the 3553 factors.

4          It might sometimes be looked at as a bad word in this

5    courtroom from earlier proceedings, but I will admit on the

6    record:  I am a YouTuber.

7          I met Matt Hoover --

8          THE COURT:  I wasn't the one that was offended by

9    being a YouTuber, it was Mr. --

10         MR. LAROSIERE:  Crump.

11         THE COURT:  -- Crump's lawyer that seemed -- I said I

12   didn't think it was a negative word.

13         MR. LAROSIERE:  I agree.

14         THE COURT:  But go ahead.

15         MR. LAROSIERE:  I met Matt Hoover because he was

16   responding to videos that I was making that he was concerned

17   were making fun of him.  And for the first time, I'm going to

18   tell y'all:  Matt, I lied.  I was making fun of you.

19         DEFENDANT HOOVER:  I knew you were.

20         MR. LAROSIERE:  But I reached out to Matt and said,

21   "Hey, I don't want to have beef."  Which was true, I didn't

22   want to have arguments, I just wanted to get away with making

23   fun of him.

24         And he was the kindest salt-of-the-earth person I had

25   ever interacted with.

1        This was an individual who knew I was making fun of

2    him in public, and the moment I indicated I wanted a

3    relationship with him, I'll echo what Mr. Hughes said, he fixed

4    my thumbnails.

5        In effect, throughout the trial, Mr. Hoover, apropos

6    of nothing, would generate thumbnails for my videos because he

7    wanted to see me succeed.  He wants to see everyone he

8    interacts with succeed.

9        His entire family has this intensely nurturing

10   instinct about all of them.  The moment Mr. Hoover met my

11   fiancée he wanted to know her favorite color, he wanted to know

12   everything about her.  And he remembers these things.  It's

13   a -- you know, sometimes you meet people and you feel it's fake

14   because you've read, you know, *How to Make Friends and*

15   *Influence People,* but given some of the other stuff that's on

16   the record, I'm aware Mr. Hoover didn't read that.  I'm aware

17   it all comes from his incredibly good and kind heart.

18       So let's talk about these factors.

19       The government said a lot of things, and it probably

20   won't surprise you that I'm going to quibble with them.  We

21   need to be a little careful here when we talk about certain

22   statements and conflate them with the actual convicted conduct.

23   So we need to be careful.

24       There is a lot of First-Amendment-protected conduct

25   in the overall underlying -- I don't want to say the charged

1   conduct, but you know what I'm saying, the entire course of

2   events.  There was a lot of obviously First-Amendment-protected

3   conduct excluding the auto key cards.

4          THE COURT:  Sure.  But what they're being sentenced

5   for is not First-Amendment conduct.

6          MR. LAROSIERE:  I'm concerned that the

7   First-Amendment-protected conduct that the government is

8   pointing to could improperly be used to exacerbate what is a

9   conviction under 5861, but is assuredly a fringe conviction.

10  That's not to say that -- it's not to doubt the finding.

11  That's to say:  we couldn't be further from the heartland.

12         THE COURT:  And what First-Amendment-protected

13  conduct is it that you think is being misused?

14         MR. LAROSIERE:  Anything Mr. Hoover said about his

15  trust for the government or what -- how individuals should

16  interact with government agents is certainly

17  First-Amendment-protected conduct.  The opinion "don't talk to

18  the cops" is often stated and is certainly First-Amendment

19  protected.

20         THE COURT:  All right.  Go on.

21         MR. LAROSIERE:  Insofar as our distance from the

22  heartland, of course -- and I understand the Court was not

23  doubting the conviction or doubting any of the underlying --

24  I'm not relitigating that.  But this Court observed that

25  whether defendants transferred a combination of parts may not

1   have been obvious in this particular case.  It's an edge case

2   at best, and certainly aberrant behavior under 5K2.20.

3          So let's talk about the nature and circumstances.

4   Yes, we have repeatedly said Mr. Hoover was convicted of

5   talking about this product, which in the brief we described as

6   lines on a piece of steel.  That doesn't mean that it wasn't

7   what the jury said it was.  It can both be lines on a

8   homogenous piece of steel and something that sustained a

9   conviction under 5861 because, well, that's where we are.  We

10  may make -- I expect to say very different things on appeal,

11  but that is where we are right now.  It is certainly relevant

12  to the underlying conduct.

13         As far as promoting respect for the rule of law, as

14  Mr. Hughes said, this has made waves.

15         And as far as the just punishment, Mr. Hoover's

16  entire source of income was as a firearms presenter.  Since

17  1992, that is something that cannot be recovered now.  There is

18  no way to federally restore your right to possess firearms

19  since 1992.  So he has a lifelong prohibition from touching or

20  even possessing the things that were the basis of his entire

21  livelihood.  I think that has to be taken into consideration.

22         In terms of adequate deterrence, I think it's very

23  well served.  People -- people are terrified.  Guideline

24  sentence.  This Court has already observed that if we follow

25  the guidelines as calculated, it's quite extreme relative to

1   the conduct, especially with respect to Mr. Hoover, who, as he

2   just indicated, had a -- the most tenuous connection to what

3   was being sent out and calculated behind the scenes.

4        The need to avoid unwarranted sentence disparities.

5   Well, these types of sentences are rare.  We don't see many

6   sentences where there are actual machine guns.  And I think any

7   disparities in this instant case would be warranted between the

8   defendants.  So I don't think we have an issue of unwarranted

9   sentence disparities.

10        As far as restitution, of course, there's no victim.

11   There's no identifiable victim.  And that should -- you know,

12   that factor should be very important in considering the overall

13   nature of the case.

14        The government, again, on its own, cited some

15   parallel litigation and said nothing about the ATF rulemaking,

16   that basically this case was not about ATF rulemaking or the

17   ATF sneaking something under the nose of the public.

18   Respectfully, I disagree.  The law is absolutely in flux with

19   respect to the very concern we have here.  And we'll --

20        THE COURT:  Mr. Larosiere, the definition of "machine

21   gun" has been in the statute for quite some time.  That's the

22   definition of "machine gun."  This isn't about ATF rulemaking.

23        MR. LAROSIERE:  I know, Your Honor.  If I may,

24   because the government brought up a parallel point, the bump

25   stock point, I would like to bring up a parallel point.  And

1   specifically --

2          THE COURT:  This case isn't about bump stocks.  I'll

3   let you make your record, but I'm deciding this case based on

4   the facts of this case and the law applicable to this case.

5   I'm not interested in what's going on with bump stocks and that

6   litigation.  Fortunately for me, I'm not one of the judges that

7   has one of those cases.

8          MR. LAROSIERE:  Right.

9          THE COURT:  I just said that, and tomorrow I'll get

10  one.  But for the moment, I'm trying to decide this case based

11  on what these gentlemen actually did, who each of them is as a

12  person, because I'm required to consider their history and

13  characteristics, the circumstances of their offense, the law

14  applicable to it.

15         MR. LAROSIERE:  Right.

16         THE COURT:  So you can go ahead, but at the end of

17  the day, bump stocks aren't going to carry me anywhere.

18         MR. LAROSIERE:  You'll be elated to know I'm not

19  talking about bump stocks.

20         The point was raised very early on in this litigation

21  that the definitions the government was using and did use and

22  are in the record as to why this item was a machine gun tracked

23  with -- and again, because the question is when does it become

24  a machine gun.  I think that's fair to say.  The jury said it's

25  become a machine gun.  That's fine.

 1              The point is, relevant to 5K2.20, right before

 2    Mr. Hoover was arrested, ATF had put in a rule specifically

 3    relevant to this, which was:  When does a firearm cross that

 4    threshold?  The language was the same as that -- and I had

 5    brought this up earlier on.  The language was the same as that

 6    invoked by the government.  That rule, using that language, was

 7    just voided as unconstitutional.

 8              So the only point I'm making is just to rebut the

 9    government's saying it is absolutely not in flux.  It's

10    absolutely in flux.  The definition of when something does or

11    does not become a regulable firearm is a hundred percent in

12    flux.

13              And the danger here isn't subjective.  As Your Honor

14    was grappling with the government over how much danger these

15    actually pose, the government was speaking as though the danger

16    matters to what the individual had in their mind.  An

17    individual could think an acorn is a thermonuclear weapon, but

18    if it's not a thermonuclear weapon, I don't think they'd be

19    charged under that particular part of -- actually, the same

20    statute we're talking about.

21              THE COURT:  I don't think that argument is --

22    that's --

23              MR. LAROSIERE:  Well, for the purposes of sentencing,

24    we have to take a look at the factual record.  The factual

25    record was no one aside from the ATF agent got it to cause a

1    firearm to fire automatically.  And when he did -- this is in

2    the record, and I understand -- he did not cut along the line.

3    It's relevant in some way.  It's relevant as to why the

4    government didn't go around collecting them because Agent

5    Slosson testified that if this was an AK-47, you would have no

6    doubt that the ATF would go knocking on every single door, just

7    to rebut that point.

8           The nationwide -- an attempted nationwide recovery

9    would have shown that this is serious, but that didn't happen.

10   The evidence we have shows that it was just a couple guys from

11   the Jacksonville Field Office flying around to get a couple of

12   cards.  And even where they claimed that "oh, the obfuscation,"

13   the "send the order form somewhere else," they still brought

14   people here to court who had done that exact thing.

15          Finally, the government, interestingly, as we've gone

16   back and forth in this question of whether or not there was a

17   conversation with someone who claimed to be or was at the ATF

18   or was an IOI, the government brought up the evidence of that

19   when trying to suggest that Mr. Hoover's speech showed some

20   kind of bad intent.  They said that he had released a video

21   indicating that people should cut these up or whatever.

22          Well, that's not what he actually said.  If we review

23   that evidence, what Hoover said in that video was that -- you

24   know, he basically said to the extent -- to the -- to the

25   effect of, "Hey, guys.  Information I previously had suggested

1    this was legal, but now something has changed.  That is not the

2    case."

3            MS. TAYLOR:  Your Honor, can I just -- I have -- I

4    have no idea what Mr. Larosiere is referring to, like which

5    video.  I don't -- this isn't sounding familiar to me.

6            MR. LAROSIERE:  The video -- sorry.

7            THE COURT:  Why don't you confer with Ms. Taylor and

8    see if you can identify it.

9        (Mr. Larosiere and Ms. Taylor confer.)

10           MR. LAROSIERE:  The point is there's certainly

11   support for a preponderance that he at least believed that the

12   conversation happened.  And to use his suggesting to the

13   audience, "Hey, this is no longer legal, get rid of it," I

14   think that looks more like a subsequent remedial measure than

15   anything else.

16           It seems more to me as, "Hey, guys.  I communicated

17   something to you.  I now know it's wrong," and he's trying to

18   fix it.  I think it would be -- we ought not punish him for

19   that, but it's --

20           THE COURT:  Mr. Larosiere, the jury concluded that he

21   did know it was unlawful.  That's what the jury verdict shows.

22           MR. LAROSIERE:  Yes.

23           THE COURT:  Arguing evidence contrary to the jury

24   verdict at sentencing isn't helpful because I'm going to -- I

25   have to impose a sentence based upon the jury's conclusion that

1    he -- knowing the unlawful purpose of the plan, that was, the

2    unlawful nature of machine gun conversion devices, that he

3    willfully joined in that conspiracy.

4              MR. LAROSIERE:  Right.

5              THE COURT:  So continuing to argue to me that there

6    is evidence that he didn't know or that he thought it was legal

7    when he was doing it, that's contrary to the jury's verdict.

8    And I'm not going to sentence him on a version of the facts

9    that is contrary to the jury's verdict.  That's not how this

10   works.

11             MR. LAROSIERE:  Fully understood, Your Honor, and

12   fully respected.  What I'm trying to communicate is the state

13   of flux in this area, how chaotic and wildly inequitable it is.

14   It does not require overturning any jury finding.  I'm simply

15   requesting that it be taken into account and explaining how

16   some statements that the government brought up in furtherance

17   of an upward departure might actually support a downward

18   departure or variance.  And I think that all of the -- all of

19   the 3553 factors counsel towards downward -- a downward

20   departure or a variance because they're -- frankly, the

21   guidelines would be far more than is necessary.

22             It seems to counsel that the permanent effects that

23   the conviction alone will have on Mr. Hoover and his family are

24   more than adequate to serve the purposes of the law.

25             THE COURT:  Mr. Larosiere, I understand your variance

1    request.  I want to make sure I know what specific guideline

2    you're relying upon for a downward departure.

3            MR. LAROSIERE:  I would stand on the memorandum for

4    that.

5            THE COURT:  Just a moment, because --

6            MR. LAROSIERE:  I believe the majority of the

7    departure is the heartland analysis.  The heartland factor

8    alone can justify a downward departure.

9            MS. TAYLOR:  Your Honor, may I have a moment?

10           THE COURT:  Go ahead.

11       (Ms. Taylor and Mr. Larosiere confer.)

12           MR. LAROSIERE:  It would be 5K2.0, Your Honor.

13           THE COURT:  Okay.  Just a moment.  I'm just looking

14   back here.

15           I see a reference to 5H1.6 for family

16   responsibilities.  I see a reference to 5K2.1 [verbatim] based

17   on aberrant behavior.  I think those are the only two.

18           MR. LAROSIERE:  Page five, we have 2.0.

19           THE COURT:  I said that.  I said 5K2.0 and 5H1.6 are

20   the only two I see referenced.

21           MR. LAROSIERE:  Yes, Your Honor.

22           THE COURT:  Is that correct?

23           MR. LAROSIERE:  Yes, Your Honor.

24           THE COURT:  Okay.  Go ahead.

25           MR. LAROSIERE:  Your Honor, we -- we believe that all

 1   of the purposes of the laws have been satisfied, again, by the

 2   time that Mr. Hoover has spent in this county detention

 3   facility, which somebody really ought to do something about,

 4   and the lifelong disabilities that he's going to suffer.  I

 5   think there's no indication that Hoover would ever recommit,

 6   and certainly not in the same way, unlike what happened in the

 7   *Bixley* or *Hixley* case, where --

 8              THE COURT:  *Hixson*, or --

 9              MR. LAROSIERE:  *Hixson*, where it was, you know, quite

10   extreme.  The guy was on probation and was selling machine

11   guns.  That's kind of night-and-day from what we're dealing

12   with now.

13              THE COURT:  Of course, that involved only nine of

14   them and not several thousand.

15              MR. LAROSIERE:  And he was on probation, which is a

16   point of fact.  And also, as Mr. King brought up -- careful to

17   craft this in a way not to -- much more transparently machine

18   guns there, and in some cases, actual -- which I understand

19   this Court believes there is no distinction, but in some cases

20   they are actual whole machine guns, so . . .

21              I believe that is all I have.  Thank you so much for

22   your time, Your Honor.

23              THE COURT:  Thank you, Mr. Larosiere.

24              Ms. Taylor.

25              MS. TAYLOR:  Your Honor, I'm going to endeavor to be

1    as succinct as possible.

2         THE COURT:  That would be appreciated.

3         MS. TAYLOR:  So when listening to Mr. Ervin's

4    allocution -- Kristopher Justinboyer Ervin, just to distinguish

5    him from his father -- it was clear that he views himself as a

6    victim of this prosecution.

7         One of the first things he says was that he thinks

8    "the government wants to hurt me and my family."  He talked

9    about being put under pressure in these proceedings.  And he

10   also talked about being sent here by God to do the right thing

11   and that he does not believe that he committed a crime.

12        He also suggested that there was some sort of

13   evidence tampering when discussing his phone, that the

14   testimony at trial was that it erased itself.

15        And he stated he's thirsty for justice.  And I don't

16   think I have the exact quote here because I couldn't keep up

17   with him, but something to the effect of that he respects the

18   rule of law, but he just doesn't agree with either this case or

19   this prosecution or how the law has been applied in this case.

20   And that he's taking the moral high ground.

21        And also suggested that he wouldn't have had an

22   attorney had his friends and family not contributed money,

23   which, of course, is not correct.  He had a public defender

24   that was appointed to him at the very outset of this case.  And

25   he has a right to an attorney under the Constitution, and so of

1   course he would have been represented.

2          Your Honor, he talked a lot about the First Amendment

3   and that that's what his purpose was.  I know the Court already

4   addressed that in part, but I also just want to bring this back

5   to the point that was made in trial and that I made earlier,

6   that Mr. Ervin, if he genuinely were interested in just

7   spurring conversation about the auto key card, he -- or about

8   lightning links and the NFA and his apparent disagreement with

9   it, he had a million different ways that he could have done

10  that that didn't involve making not-quite-finished auto sears

11  and then selling them in bulk at enormous profits.  Again, he

12  was paying 2 to $3 per card and selling them for about 60 to

13  $150 each.  His profit margins on these things was huge.

14         He also had available on his website gear, T-shirts

15  and beanie caps.  I believe he had at least a T-shirt that had

16  an image of the auto key card on it.  If really his goal was to

17  get people talking about this, why not just make the T-shirt?

18  And then somebody is walking around with your idea on it.  And

19  maybe that actually would spark a conversation, as opposed to

20  selling a device that Mr. Hoover then goes on YouTube and tells

21  people, you know, "Don't go on YouTube showing yourself using

22  this" and "use your anti-gun relative's address to get it sent

23  to so that the government doesn't know what you're doing."

24         So the idea that this was about freedom of speech or

25  a political protest is completely undermined by the actual

1  evidence in this case, which also includes one of Mr. Ervin's

2  text messages where he was talking about, "I just talked to a

3  YouTuber" who's going to advertise his cards, and relates that

4  the YouTuber said, "We're going to make a metric f-u-c-k ton of

5  money."  It was about the money.

6           And of course, you know, there's nothing wrong with

7  wanting to make a living.  There's nothing wrong with that.

8  But when you're making a living by thumbing your nose at the

9  law and essentially -- and Mr. Hoover articulated this in one

10 of the videos that was played at trial.  It's the video where

11 he talked about the Stamp Act and his desire to support Ervin.

12 And what Mr. Hoover says in that video was that Mr. Ervin was

13 the flag carrier or something, the flag bearer, I think, that

14 he was out there purposefully disobeying the NFA so that he

15 could foment mass resistance to the law.  And it appears that

16 the ultimate goal was they believed that they would undermine

17 the NFA to such an extent that the government was forced not to

18 enforce it any longer.  So that's what this case was about.

19          There was also a suggestion that these were bad

20 firearms.  Mr. King said he's only ever fired a gun one time

21 but represented that he believed that he could install a Glock

22 switch based upon watching a ten-minute video.  I mean, I don't

23 know where -- what that's based on.

24          And he also talked about templates being available

25 online for this.  And that's true, they are.  And those are not

1   illegal.  Templates are also available, and 3D and printing

2   instructions, for other kinds of auto sears online.  Not

3   necessarily illegal, but that's not what we were dealing with

4   here.  We're dealing with somebody who was having these

5   manufactured at mass scale and selling them, and selling them

6   with a person who was advocating for his viewers to use them

7   for a particular purpose, and that purpose was to make a

8   machine gun.

9         And there was a suggestion made that -- I think it

10   was suggested that the facts proving that Mr. Hoover talked to

11   the ATF were that he said he believed it was legal.  Those two

12   things don't necessarily have anything to do with each other.

13   And in any event, Mr. Hoover clearly knew that it was not legal

14   when he made those videos.  He made a laundry list of

15   statements reflecting that he knew exactly what the auto key

16   card was and that he believed that at some point in the future

17   there would be prosecutions based upon the auto key card and

18   that ATF would view it as an NFA item.

19         And these things are not in dispute.  They were right

20   in black and white, shown to the jury at the trial.  The Court

21   has heard them.  We all heard them.  We all watched the same

22   videos.

23         And Your Honor, my goal here is just to refocus on

24   what the actual evidence was.

25         And finally, Your Honor, one thing that I wrote down

1    that you said a few minutes ago was that you're not going to

2    sentence the defendants based upon a version of facts that's

3    contrary to the jury's verdict.  Well, the jury's verdict in

4    this case included a finding that each of the auto key cards

5    that was transferred as-is in the conspiracy, that those things

6    were machine gun conversion devices under the law.

7          I personally have not ever seen someone come into

8    court and say that they were less culpable for illegally

9    possessing a firearm because it was a crummy, low-quality,

10   rusty pistol instead of a nice, shiny, new, high-quality

11   pistol.

12         THE COURT:  Then you didn't sit through Judge

13   Corrigan's chickenhawk case --

14         MS. TAYLOR:  I did not.

15         THE COURT:  -- because I think that was precisely the

16   defense.

17         MS. TAYLOR:  Well, in any event, it's a firearm.

18   It's a firearm, it's a firearm, it's a firearm.  That's what

19   the jury's verdict was, and that's what we're asking the Court

20   to sentence the defendants based upon.

21         It's undisputed that 6,600 of these auto key cards,

22   which the jury determined were firearms and machine guns under

23   federal law, were transferred in this case.  And that is what

24   we're asking the Court to sentence these men on, is their

25   personal history and characteristics, which reflect, based on

1  their statements today, that they do not accept responsibility

2  for what they did.  They don't even accept -- the don't accept

3  the jury's verdict.  They don't accept that what they did was

4  wrong.

5          Mr. Hoover certainly -- he appears remorseful, or at

6  least tearful, in the sense that I am confident that he truly

7  does not want to be separated from his family and does not want

8  to go to prison, but that's not the same thing as accepting

9  responsibility.

10          And Your Honor, for all of those reasons, the United

11  States submits that a guideline sentence is the appropriate

12  sentence in this case, and that's what we're asking you to

13  impose.

14          THE COURT:  Thank you.

15          Give me a moment.

16      (Pause in proceedings.)

17          THE COURT:  Ms. Wiles, may I see you.

18      (The judge and the courtroom deputy confer.)

19          THE COURT:  Ms. Wiles and I are just looking at a

20  calendar because I'm -- I want to take some time to consider

21  the arguments that have been made.  And as the lawyers who are

22  here know, once the Court announces a sentence, there's no

23  opportunity for buyer's remorse.  You can't change your mind

24  once you say it out loud.  And so I want to make sure that I

25  have fully considered all of the positions of the parties, and

1   so I'm -- what I'd like to do is take the evening and reconvene

2   tomorrow to announce my sentence.

3           Mr. King, you and I are together in another case

4   tomorrow morning, but we could do this perhaps after that at

5   11:30.  I understand that before that 10 o'clock hearing would

6   be problematic for you.  Is there any reason why we couldn't

7   reconvene at 11:30, with the understanding that my intention

8   would be at 11:30 tomorrow to simply pronounce sentence?  There

9   would be no further argument as I have now -- I think I've

10  heard everything that anybody could possibly want to say at

11  this point.  Would 11:30 work?

12          MR. KING:  Yes, Your Honor.  And I was going to say,

13  the only thing in terms of what we did not discuss is we would

14  prefer a Coleman designation.

15          THE COURT:  Okay.  Mr. Larosiere, is there any reason

16  why we can't reconvene at 11:30 tomorrow?

17          MR. LAROSIERE:  No, Your Honor.

18          THE COURT:  All right.

19          Ms. Taylor?

20          MS. TAYLOR:  That works for Mr. Mesrobian and I, Your

21  Honor.

22          THE COURT:  Okay.  Then I'm going to -- I'm going to

23  just make a -- do a couple things so that the record is clear

24  and then we're going to recess and we'll reconvene at 11:30,

25  with the understanding that at 11:30 it will simply be the

1    imposition of sentence.

2         Mr. King, is there any bar to sentencing at this time

3    with respect to Mr. Hoover -- Ervin?

4         MR. KING:  No, Your Honor.

5         THE COURT:  Mr. Larosiere, is there any bar to

6    sentencing as to Mr. Hoover?

7         MR. LAROSIERE:  No, Your Honor.

8         THE COURT:  Ms. Taylor, any bar to sentencing as the

9    either of these gentlemen?

10        MS. TAYLOR:  No, Your Honor.

11        THE COURT:  All right.  Then with that, the arguments

12   are completed.  And I will take the parties's respective

13   positions under advisement and we will reconvene at 11:30

14   tomorrow morning.

15        And I apologize for those of you that traveled.  I

16   know that that's probably inconvenient, and I'm sorry about

17   that, but it is more important that I have the opportunity to

18   fully consider everybody's arguments than it is that I try to

19   move too quickly.  That is definitely one thing I've learned in

20   this job.  So I apologize to the extent that I'm

21   inconveniencing anybody, but I really do think I need the

22   additional time.

23        Mr. King, Mr. Ervin wants to say something.

24        DEFENDANT ERVIN:  Thank you for your diligence, Your

25   Honor.  I appreciate you.  I just wanted to tell you I

1    appreciate you for taking this seriously.

2              THE COURT:  All right.  We're in recess.

3              COURT SECURITY OFFICER:  All rise.

4         (Proceedings adjourned at 3:05 p.m., to be continued on

5    Thursday, September 7, 2023, at 11:30 a.m.)

6                           -      -      -

1                    CERTIFICATE OF OFFICIAL COURT REPORTER

2

3   UNITED STATES DISTRICT COURT)

4   MIDDLE DISTRICT OF FLORIDA )

5

6          I hereby certify that the foregoing transcript is a true

7   and correct computer-aided transcription of my stenotype notes

8   taken at the time and place indicated herein.

9

10          DATED this 14th day of September, 2023.

11

12                         /s/ Katharine M. Healey
                           Katharine M. Healey, RMR, CRR, FPR-C
13                         Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25